UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re PARMALAT SECURITIES LITIGATION

This document relates to:  04 Civ. 0030 (LAK)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

:
:
:
:
:
:
:

MASTER DOCKET
04 MD 1653 (LAK)

**ELECTRONIC FILING**

---

## MEMORANDUM OF LAW IN SUPPORT OF GRANT THORNTON INTERNATIONAL'S MOTION TO DISMISS THE FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

**STROOCK & STROOCK & LAVAN LLP**

180 Maiden Lane
New York, NY 10038
(212) 806-5400

*Attorneys for Grant Thornton International, Inc.*

*Of Counsel:*
Brian M. Cogan
James L. Bernard
Quinlan D. Murphy

SSL-DOCS2 70203233v2

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................. ii

PRELIMINARY STATEMENT ............................................................................1

STATEMENT OF FACTS ....................................................................................3

PROCEDURAL HISTORY...................................................................................6

ARGUMENT..........................................................................................................7

POINT I
PLAINTIFFS CANNOT STATE A CAUSE OF ACTION AGAINST GTI UNDER
SECTION 10(B) OF THE SECURITIES AND EXCHANGE ACT OF 1934 AND
THEREFORE THE CLAIM SHOULD BE DISMISSED .......................................7

    A.    Plaintiffs Have Not Plead Fraud with Anything Approaching the Particularity
Required by Rule 9(b).........................................................................................7

    B.    GTI and its Member Firms are Not "One-firm" .....................................9

    C.    Neither GT-Italy nor GT-US are GTI's Agent .....................................14

POINT II
PLAINTIFFS CANNOT STATE A CAUSE OF ACTION AGAINST GTI UNDER
SECTION 20(A) OF THE SECURITIES AND EXCHANGE ACT OF 1934 AND
THEREFORE THE CLAIM SHOULD BE DISMISSED .......................................16

    A.    Plaintiffs' Have Failed to Sufficiently Allege that GTI Controlled a Primary
Violator ............................................................................................................17

    B.    Plaintiffs Have Failed to Allege GTI was a Culpable Participant in a Primary
Violation ..........................................................................................................21

POINT III
PLAINTIFFS SHOULD NOT BE PERMITTED TO AMEND THEIR COMPLAINT ........23

CONCLUSION.....................................................................................................24

## TABLE OF AUTHORITIES

## CASES

In re AM International Sec. Litigation,
    606 F.Supp. 600 (S.D.N.Y. 1985) ................................................................10

ATSI Communications, Inc. v. The Shaar Fund, Ltd.,
    No. 02 Civ. 8726 (LAK), 2003 WL 2165013
    (S.D.N.Y. July 14, 2003) ........................................................................21

In re Asia Pulp & Paper,
    293 F.Supp.2d 391 (S.D.N.Y. 2003).............................................13, 18, 19, 20

In re Bayer AG Sec. Litigation,
    No. 03 Civ. 1546 (WHP), 2004 WL 2190357
    (S.D.N.Y. Sept. 30, 2004) ........................................................................22

In re Blech Sec. Litigation,
    928 F.Supp. 1279 (S.D.N.Y. 1996) ..............................................................8

In re Blech Sec. Litigation,
    961 F.Supp. 569 (S.D.N.Y. 1997) ..............................................................17

Boguslavsky v. Kaplan,
    159 F.3d 715 (2d Cir. 1998)................................................................21, 22

Burstyn v. Worldwide Xceed Group, Inc.,
    No. 01 Civ. 1125 (GEL), 2002 WL 31191741
    (S.D.N.Y. Sept. 30, 2002) ........................................................................22

Chambers v. Time Warner, Inc.,
    282 F.3d 147 (2d. Cir. 2002)................................................................3, n.1

In re Champion Enterprises, Inc., Sec. Litigation,
    145 F.Supp.2d 871 (E.D. Mich. 2001)........................................................23

Cosmas v. Hassett,
    886 F.2d 8 (2d Cir. 1989).........................................................................7

Cromer Finance Ltd. v. Berger,
    137 F.Supp.2d 452 (S.D.N.Y. 2001)..............................................10, 17, 21

Cromer Finance Ltd. v. Berger,
    Nos. 00 Civ. 2284 (DLC) & 00 Civ. 2498 (DLC),
    2002 WL 826847 (S.D.N.Y. May 2, 2002) .............................................11, n.5

SSL-DOCS2 70203233v2

In re Deutsche Telekom AG Sec. Litigation,
    No. 00 Civ. 9475, 2002 WL 244597
    (S.D.N.Y. Feb. 20, 2002) ..............................................................................19, 21

DiVittorio v. Equidyne Extractive Indus., Inc.,
    822 F.2d 1242 (2d Cir. 1987) ..............................................................................7

Double Alpha, Inc. v. Mako Partners, L.P.,
    No. 99 Civ. 11541 (DC), 2000 WL 1036034
    (S.D.N.Y. July 27, 2000) ......................................................................................7

In re EMEX Corp. Sec. Litig.,
    No. 01 Civ. 4886 (SWK), 2002 WL 31093612
    (S.D.N.Y. Sept. 18, 2002) ...................................................................................22

Endovasc Ltd., Inc. v. J.P. Turner & Co., LLC,
    No. 02 Civ. 7313 (LAP), 2004 WL 634171
    (S.D.N.Y. March 30, 2004)....................................................................................8

First Capital Asset Management v. Brickellbush, Inc.,
    218 F.Supp.2d 369 (S.D.N.Y. 2002)...................................................................20

First Nationwide Bank v. Gelt Funding Corp.,
    27 F.3d 763 (2d Cir. 1994)..................................................................................20

Fisk v. Superannuities, Inc.,
    927 F.Supp. 718 (S.D.N.Y. 1996) .........................................................................7

Ganino v. Citizens Util. Co.,
    228 F.3d 154 ( .................................................................................................7, 22

In re Global Crossing, Ltd. Sec. Litigation,
    322 F.Supp.2d 319 (S.D.N.Y. 2004)...................................................................22

Gutierrez v. The Cayman Islands Firm of Deloitte & Touche,
    100 S.W.3d 261 (Tex. App. 2002).......................................................................11

Howard v. Klynveld Peat Marwick Goerdeler,
    977 F.Supp. 654 (S.D.N.Y. 1997) ..........................................................10, 12, 19

In re Initial Public Offering Sec. Lit.,
    241 F.Supp.2d 281 (S.D.N.Y. 2003)...................................................................22

Koehler v. Bank of Bermuda (New York) Ltd.,
    No. 96 Civ. 7885 (JFK), 1998 WL 790931
    (S.D.N.Y. Nov. 12, 1998) ...................................................................................24

In re Lernout & Hauspie Sec. Lit.,
    230 F.Supp.2d 152 (D. Mass. 2002) ...................................................................10, 12, 14

Levitch v. Columbia Broad. Sys., Inc.,
    94 F.R.D. 292 (S.D.N.Y. 1982) .......................................................................................24

Levitt v. Bear Stearns & Co.,
    340 F.3d 94 (2d Cir. 2003) ..................................................................................................7

In re Livent, Inc., Noteholders Sec. Litigation,
    151 F.Supp.2d 371 (S.D.N.Y. 2001) ...............................................................................22

Mishkin v. Ageloff,
    No. 97 Civ. 2690 (LAP), 1998 WL 651065
    (S.D.N.Y. Sept. 23, 1998) ..........................................................................................21, 24

In re NTL, Inc. Sec. Lit.,
    No. 02 Civ. 3013 (LAK), 2004 WL 2786024
    (S.D.N.Y. Dec. 6, 2004) ....................................................................................................21

Neubauer v. Eva-Health USA, Inc.,
    158 F.R.D. 281 (S.D.N.Y 1994) ......................................................................................21

Newby v. Newby,
    No. 04-20001, 2004 WL 2892044 (5th Cir. Dec. 15, 2004)...............................................13

Nuevo Mundo Holdings v. PricewaterhouseCoopers LLP,
    03 Civ. 0613 (GBD), 2004 WL 112948 (S.D.N.Y. Jan. 22, 2004)...........................*passim*

Primavera Familienstiftung v. Askin,
    No. 95 Civ. 8905 (RWS), 1996 WL 494904
    (S.D.N.Y. Aug. 30, 1996) ..................................................................................................19

Reingold v. Deloitte Haskins & Sells,
    599 F.Supp. 1241 (S.D.N.Y. 1984) ................................................................11, 12-13

In re Rezulin Products Liability Litigation,
    133 F.Supp.2d 272 (S.D.N.Y. 2001)..................................................................................8

Rich v. Maidstone Finance, Inc.,
    No. 98 Civ. 2569 (DAB), 2002 WL 31867724
    (S.D.N.Y. Dec. 20, 2002)................................................................................7, 8, 19, 22

In re Royal Ahold N.V. Sec. & ERISA Lit.,
    No. Civ. 03-MD-01539, 2004 WL 2955934

(D. Md. Dec. 21, 2004) .................................................................................................11

Ruffolo v. Oppenheimer & Co.,
    987 F.2d 129 (2d Cir. 1993)............................................................................ 23-24

SEC v. First Jersey Sec., Inc.,
    101 F.3d 1450 (2d Cir. 1996)..................................................................16, 17, 22

In re Shulman Transport Enterprise, Inc.,
    744 F.2d 293 (2d Cir. 1984)..........................................................................21

Steed Financial LDC v. Nomura Sec. Int'l, Inc.,
    No. 00 Civ. 8058 (NRB), 2001 WL 1111508
    (S.D.N.Y Sept. 20, 2001).............................................................................15

Suez Equity Investment, L.P. v. Toronto-Dominion Bank,
    250 F.3d 87 (2d Cir. 2001).............................................................................22

Wallace v. Buttar,
    239 F.Supp.2d 388 (S.D.N.Y. 2003)................................................................17

In re WorldCom, Inc. Sec. Lit.,
    No. 02 C 3288 (DLC), 2003 WL 21488087
    (S.D.N.Y. June 25, 2003)................................................................10, 12, 16

In re Worldcom, Inc. Sec. Lit.,
    294 F.Supp.2d 392 (S.D.N.Y. 2003)................................................................22

## STATUTES

Fed. R. Civ. P. 9(b) ....................................................................................................7

17 C.F.R. § 240.12b-2 ................................................................................................17

## PRELIMINARY STATEMENT

Having engaged in one of the world's largest financial frauds, Parmalat is unable to pay its debts, and its shareholders and bondholders are now in search of deep pockets. But unlike the familiar claims investors commonly bring against secondary actors, Plaintiffs here have gone one step further in seeking recovery from a tertiary entity that did not act, Grant Thornton International ("GTI"): For, GTI "is a non-practicing, non-trading international umbrella organization [that] does not deliver services in its own name" (Ex. A), and neither GTI nor Grant Thornton LLP ("GT-US") served as an auditor for Parmalat or any of its subsidiaries or affiliates. Indeed, GTI is not, and has never been, an auditor, and is not licensed anywhere in the world to perform audit work -- a reality that is fatal to any claims against GTI. To circumvent this reality, Plaintiffs simply pile up conclusory allegations of GTI's control over, and unspecified involvement with, Grant Thornton S.p.A. ("GT-Italy"), now known as Italaudit, the Italian licensed accounting firm that performed audit work for Parmalat. These conclusory allegations are not sufficient to sustain liability against GTI as a matter of law, and all causes of action against GTI should therefore be dismissed.

Faced with this dispositive deficiency in their claims against GTI -- and GT-US as well -- Plaintiffs resort to a definitional sleight of hand in which they clump GTI, GT-US, and GT-Italy together under the rubric "Grant Thornton" to advance a unitary or one-firm theory of liability that they hope will enable them to hold GTI liable, not for GTI's own actions, but for those of GT-Italy or any other accounting firm licensed to use the Grant Thornton brand name.

Other than general declarations that GTI performed work for Parmalat (Compl. ¶ 156), Plaintiffs do not describe a single service GTI provided to Parmalat. Nor do Plaintiffs describe how GTI was able to direct or influence the conduct of its member firms and their employees, except by way of unsupported, conclusory allegations that GTI was directly involved in its

member firms' audits (id. at ¶ 1146) and had unlimited access to allegedly fraudulent documents. (Id. at ¶ 1144).  In like manner, Plaintiffs intone that GTI controlled Parmalat affiliates Bonlat and Camfield (id. at ¶¶ 157, 1143), but again provide no details to back up that declaration.  At most, Plaintiffs simply say that GTI either "directly or through its member firms" helped to create Bonlat (id. at ¶ 1145) and that "Camfield . . . was located in, and shared the staff of, Grant Thornton International's Singapore member firm's offices."  (Id. at ¶¶ 15, 243, 963, 1145).  No factual examples or even explanations are given of how these allegations add up to control over Bonlat or Camfield.

No fewer than seven decisions in this District, and several more from others, have rejected similarly deficient claims against other "non-practicing, non-trading international umbrella organizations" like GTI.  This Court should do the same here.  GTI is not an accounting firm, it is not licensed to and does not perform accounting work, and the Complaint contains no sufficiently detailed allegations to the contrary.  Nor does the Complaint contain anything remotely approaching the level of detail required to state a claim that GTI controlled GT-Italy, thus subjecting GTI to potential liability for GT-Italy's actions.  To the contrary, the Complaint cites a January 8, 2004 GTI press release (id. at ¶ 168), which prominently states that:

> Each member and correspondent firm in Grant Thornton International is a separate independent national firm. These firms are not members of one international partnership or otherwise legal partners with each other, nor is any one firm responsible for the services or activities of any other.  Each firm governs itself and handles its administrative matters on a local basis.  Although many of the firms now carry the Grant Thornton name, either exclusively or in their national practice names, there is no common ownership among the firms or by Grant Thornton International.

(Ex. A (emphasis added)).  The plain meaning of this press release directly contradicts Plaintiffs'

conclusory one-firm theory.[1]  In short, Plaintiffs have no viable claims against GTI, and Counts IV, V and IX should therefore be dismissed in their entirety.

## STATEMENT OF FACTS

On December 19, 2003, the Parmalat scandal erupted when Parmalat acknowledged that it did not have 3.95 billion euros (approximately $4.9 billion) it had falsely claimed were in a Bank of America account.  (Compl. ¶ 44).  Parmalat Finanziaria S.p.A., Parmalat S.p.A. and other affiliated entities ("Parmalat"), had expanded at a breakneck pace during the 1990s, acquiring units in nations across the globe after going public in Italy.  (Id. at ¶ 96).  This buying spree boosted Parmalat's debt and was not profitable, with the result that Parmalat's senior executives engaged in a scheme to manipulate its financial statements to hide the debt and mounting losses at some of these newly acquired units.  (Id. at ¶¶ 6-9).  Soon after the fraud was discovered, Parmalat, and its related European entities, entered bankruptcy seeking protection from creditors for an estimated debt of at least  $10 billion – several times what Parmalat had claimed prior to entering bankruptcy.  (Id. at ¶¶ 4, 49).

Not surprisingly, this Complaint is replete with allegations of Parmalat's and Parmalat's management's central involvement in the alleged financial fraud at Parmalat.  For example, the Complaint alleges that "Parmalat and its top management concocted a series of transactions whose aim was to show the investing public that the Company had profits and assets that, in fact, did not exist."  (Id. at  ¶ 10).  The Complaint also states that "at least six Parmalat insiders have confessed to their direct participation in the fraud."  (Id. at ¶ 46).  Any number of other

---

[1] In ruling on a motion to dismiss, this Court may consider documents referenced and relied upon in the Complaint. Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d. Cir. 2002).

paragraphs contain similar, and more detailed, allegations of Parmalat's fraudulent conduct. (See, e.g., id. at ¶¶ 58, 368, 406, 443).

Yet, in this action, Parmalat and its subsidiaries are not named as defendants. They are in Extraordinary Administration proceedings in Italy pursuant to special legislation adopted by the Italian government in response to the Parmalat crash (id. at ¶¶ 98, 100), and the Bankruptcy Court in this district has entered an injunction prohibiting suit against them. Plaintiffs do seek to recover, however, from, among others, Parmalat's legal advisors, outside accountants, and investment and commercial banks. Plaintiffs allege that "Grant Thornton," even though no such entity exists except as the fictional, self-serving creation of the plaintiffs, audited Parmalat's consolidated financial statements from 1990 through 1998 and continued to provide auditing services for at least 17 other Parmalat subsidiaries from 1999 until early 2004. (Id. at ¶ 164). In performing these services, this mythical "Grant Thornton" is alleged to have actively participated in the preparation, review and issuance of Parmalat's false financial statements and fictitious financial documents. (Id. at ¶ 166).

But something is missing from the 1259-paragraph Complaint: There are no factual allegations establishing that GTI had any involvement whatsoever in the alleged securities violations. Instead, Plaintiffs attempt to attribute what could only be the alleged actions of GT-Italy to GTI and others by clumping together GTI, GT-US, and the former GT-Italy under the collective term "Grant Thornton." (Id. at ¶ 160).

Not a single substantive allegation is made that deals with work GTI performed for Parmalat. The reason for this lack of content is apparent. GTI does not perform accounting work of any kind. As the January 8, 2004 GTI press release, which Plaintiffs cite in their Complaint (id. at ¶ 168), prominently states, GTI is a "non-practicing, non-trading international

-4-

umbrella organization and does not deliver services in its own name." (Annexed hereto as Ex. A). In fact, GTI is an Illinois not-for-profit corporation and is not licensed anywhere in the world to perform audit work.

Also absent from this Complaint are any allegations which establish that GTI had control over the alleged acts of its member firms and the employees of these member firms, on the one hand, or any Parmalat affiliates, on the other. Plaintiffs do no more than repeatedly declare, in an empty refrain, that "Grant Thornton International was a controlling person of Grant Thornton LLP, Grant Thornton S.p.A. [GT-Italy], [Italian] audit partners Lorenzo Penca and Maurizio Bianchi, and Bonlat and Camfield." (See, e.g., Compl. ¶¶ 57-59). To support this supposed control by GTI over its member firms and their employees, Plaintiffs simply rely upon GTI's multi-national membership to argue that there is a unitary global entity they name "Grant Thornton," noting that GTI establishes policies and procedures for its member firms and reviews its members at least every three years. (Id. ¶¶ 157-168). From these rudimentary observations and without any factual support, Plaintiffs leapfrog to the conclusions that GTI had access to its member firms' work papers and other documents and thus had the power to prevent the issuance of various allegedly misleading documents (id. at ¶ 1144) and that GTI also had direct involvement in its member firms' audits and other work for Parmalat. (Id. at ¶ 1146). Similarly, Plaintiffs allege that GTI "created and oversaw" Bonlat either directly or through its member firms and therefore controlled Bonlat (id. at ¶ 1145), and that GTI controlled Camfield because Camfield and GT Singapore were allegedly located in the same office and shared staff. (Id. at ¶¶ 15, 243, 963, 1145). Again, one searches in vain for the factual content in these generalities.

It is not just that the allegations against GTI are unsupported and insufficient: The documentary evidence referred to and incorporated by reference in the Complaint contradicts

those very same allegations. For example, the January 8, 2004 GTI press release states that while "many of the firms now carry the Grant Thornton name," each firm "is a separate independent national firm," and no one firm is "responsible for the services or activities of any other." (Ex. A). Accordingly, and as we amplify below, this Court should follow the decisions of the numerous other courts that have dismissed similarly deficient claims against organizations like GTI.[2]

## PROCEDURAL HISTORY

Beginning in January 2004, three purported class actions were filed in the Southern District of New York against Parmalat's legal advisors, outside accountants, investment and commercial banks, as well as members of Parmalat's senior management and affiliates. An amended complaint was then filed on March 2, 2004. By order dated May 11, 2004, this Court consolidated the related actions, and by order dated May 25, 2004, designated Hermes Focus Asset Management Europe Limited and Cattolica Partecipanzioni S.p.A., Solotrat, Societe Moderne des Terrassements Parisiens, and Capital & Finance Asset Management as co-lead plaintiffs. After a sixty-day extension of time, Plaintiffs filed the First Amended Consolidated Class Action Complaint for Violation of the Federal Securities Laws (the "Complaint") on October 18, 2004, on behalf of a putative class of all persons who purchased securities of Parmalat Finanziaria S.p.A. and its subsidiaries and affiliates between and including January 5, 1999 and December 18, 2003.[3] (Compl. ¶ 1).

---

[2] In addition to the reasons set forth herein, this Court should dismiss Plaintiffs' claims against GTI for the reasons set forth in the Memoranda in Support of the Motions to Dismiss filed by our co-defendants. GTI adopts each of those motions.

[3] Notably, Parmalat, in the suit originally filed by Mr. Enrico Bondi in Illinois (04 Civ. 9771 (LAK)), also purports to seek relief on behalf of Parmalat's shareholders and creditors.

## ARGUMENT

## POINT I

**PLAINTIFFS CANNOT STATE A CAUSE OF ACTION AGAINST GTI
UNDER SECTION 10(B) OF THE SECURITIES AND EXCHANGE ACT OF 1934 AND
THEREFORE THE CLAIM SHOULD BE DISMISSED**

A.     **Plaintiffs Have Not Plead Fraud with Anything Approaching the Particularity
Required by Rule 9(b)**

Securities fraud claims must be pled with the particularity required by Fed. R. Civ. P.

9(b).  Although the Private Securities Litigation Reform Act ("PSLRA") also imposes

heightened pleading requirements, the Second Circuit has held that the PSLRA's pleading

requirements are essentially a codification of the Second Circuit's interpretation of what is

required by Rule 9(b).  Levitt v. Bear Stearns & Co., 340 F.3d 94, 104 (2d Cir. 2003).  The

particularity mandated in Rule 9(b) is especially rigorous.  Ganino v. Citizens Util. Co., 228 F.3d

154, 168 (2d Cir. 2000); Rich v. Maidstone Fin., Inc., No. 98 Civ. 2569 (DAB), 2002 WL

31867724, at *10 (S.D.N.Y. Dec. 20, 2002).  Under Rule 9(b), "a complaint must adequately

specify the statements it claims were false or misleading, give particulars as to the respect in

which plaintiff contends the statements were fraudulent, state when and where statements were

made, and identify those responsible for the statements."  Cosmas v. Hassett, 886 F.2d 8, 11 (2d

Cir. 1989).

Additionally, "[w]hen fraud is alleged against multiple defendants, a plaintiff must . . .

[set] forth separately the acts complained of by each defendant."  Double Alpha, Inc. v. Mako

Partners, L.P., No. 99 Civ. 11541 (DC), 2000 WL 1036034, at *3 (S.D.N.Y. July 27, 2000)

(dismissing Section 10(b) claims where complaint failed to separate the multiple defendants and

"alleg[e] specific acts of wrongdoing by each one of them"); Fisk v. Superannuities, Inc., 927 F.

Supp. 718, 727 (S.D.N.Y. 1996) (Kaplan, J.) (stating that if there are multiple defendants, each

must "be informed 'of the nature of his alleged participation in the fraud'") (quoting DiVittorio
v. Equidyne Extractive Indus., Inc., 822 F.2d 1242, 1247 (2d Cir. 1987)).  A complaint may not
simply "clump defendants together in vague allegations" to meet the pleading requirements of
Rule 9(b).  Rich, 2002 WL 31867724, at *8 (finding that "'using the term 'Defendants' to clump
all of the Defendants together with 'vague allegations' of fraud is insufficient to meet the
particularity requirements of Rule 9(b) and the PSLRA' . . . [and] [a]ccordingly, the Court shall
not consider those allegations where the word 'Defendants' is used") (citing In re Blech Sec.
Litig., 928 F. Supp. 1279, 1294 (S.D.N.Y. 1996) (granting motion to dismiss for failure to plead
fraud with particularity on the basis that "even if [plaintiffs'] language is somewhat more exact
than 'defendants,' Plaintiffs do not distinguish the allegedly illegal acts of the [subset of
defendants] from one another")); see also In re Rezulin Products Liab. Litig., 133 F. Supp. 2d
272, 283-84 (S.D.N.Y. 2001) (Kaplan, J.) (finding that allegations "ascribe[d] to salespeople
through the use of the catch-all attribution . . . 'defendants' . . . do not meet the Rule 9(b)
requirements"); Endovasc Ltd., Inc. v. J.P. Turner & Co., LLC, No. 02 Civ. 7313 (LAP), 2004
WL 634171, at *6 (S.D.N.Y. March 30, 2004) (the clumping of defendants together in vague
allegations "is the very type of inadequate pleading that Rule 9(b) and the PSLRA sought to
prevent").

    In this case, the Complaint should be dismissed because Plaintiffs fail to allege that GTI
engaged in any fraudulent acts.  Instead, in an attempt to overcome this critical deficiency in
their pleading, Plaintiffs employ the term "Grant Thornton" to collectively embrace all Grant
Thornton entities.  (Compl. ¶ 160).  No entity by that name exists, and in this 1259-paragraph
Complaint Plaintiffs make no allegations that GTI performed accounting work for Parmalat
outside of one conclusory statement simply stating that GTI did such work (id. at ¶ 156) and the

-8-

rote allegations against all the "Auditor Defendants" in the 10(b) and 10b-5 Counts.  (Id. at ¶¶ 1102, 1111-115, 1119).

For example, the Complaint alleges that "Grant Thornton" falsely certified Parmalat's financial statements from fiscal years 1990 through 1998.  (Id. at ¶ 164).  However, Parmalat's 1998 consolidated financial statements, quoted and specifically identified in the Complaint as having been audited by "Grant Thornton" (id. at ¶ 464), were actually audited by GT-Italy and GT-Italy alone signed the certificates.  A 1998 Audit Report – available on Parmalat's website – shows that the certification was issued on GT-Italy letterhead and signed by two GT-Italy partners.  (Annexed hereto as Ex. B).

A complaint so lacking in specificity violates the most basic pleading requirements for allegations of fraud.  Because Plaintiffs do not separately allege any specific acts of wrongdoing by GTI, the Complaint fails to meet the requirements of Rule 9(b) and accordingly fails to sufficiently state a claim for fraud against GTI.

**B.**     **GTI and its Member Firms are Not "One-firm"**

Unable to point to any acts by GTI establishing a violation of Section 10(b), Plaintiffs attempt to hold GTI liable for the alleged wrongdoing of others under a one-firm, single-entity theory in which Plaintiffs claim that a non-trading and non-practicing umbrella organization has responsibility for the audits that its member firms that use the umbrella organization's brand name perform.[4]

Case after case has addressed this issue, and case after case has rejected the very same legal theory upon which Plaintiffs seek to recover.  These courts have consistently held that an

---

[4] We note for the Court's convenience that Parmalat also relies upon this "one-firm" theory, and GTI's Memorandum of Law in Support of its Motion to Dismiss that complaint, dated October 28, 2004, contains a similar discussion of the deficiencies in Parmalat's allegations at pages 7-10.

international accounting umbrella organization and its member firms using the same brand name are not a single firm for purposes of imposing vicarious liability. See, e.g., In re WorldCom, Inc. Sec. Litig., No. 02 C 3288 (DLC), 2003 WL 21488087, at *10 (S.D.N.Y. June 25, 2003) (dismissing Section 10(b) claim against Anderson Worldwide SC ("AWSC") because the allegations that AWSC was an "'umbrella organization for its member firms worldwide'" were "insufficient to plead that [Arthur Andersen LLP] acted as an agent of AWSC … or to impute [Arthur Andersen LLP]'s knowledge or recklessness to AWSC"); In re Lernout & Hauspie Sec. Litig., 230 F. Supp. 2d 152, 170 (D. Mass. 2002) (declining to hold KPMG International and its member firms liable "for one another's acts, simply because they shared an associational name and/or collaborated on certain aspects of the relevant transaction"); Nuevo Mundo Holdings v. PricewaterhouseCoopers LLP, 03 Civ. 0613 (GBD), 2004 WL 112948, at *3 (S.D.N.Y. Jan. 22, 2004) (holding that "[m]ember firms in an international accounting association are not part of a single firm and are neither agents nor partners of other member firms simply by virtue of using the same brand name"); Cromer Fin. Ltd. v. Berger, 137 F. Supp. 2d 452, 485 n.23 (S.D.N.Y. 2001) (dismissing certain claims against Ernst & Young International because "there was no reference to EYI in the documents in which the false statements were contained," despite allegations that "Ernst & Young operated as a global, financially interdependent enterprise and that EYI provided executive management and strategic direction for its members"); In re AM Int'l Sec. Litig., 606 F. Supp. 600, 607 (S.D.N.Y. 1985) (dismissing aiding and abetting allegations against "various foreign affiliates of Price Waterhouse [that were not involved in the relevant decisions] on the theory that all Price Waterhouse firms world-wide are in fact one entity and acted as agents for one another"); see also Howard v. Klynveld Peat Marwick Goerdeler, 977 F. Supp. 654, 662 (S.D.N.Y. 1997) (dismissing allegations of personal

-10-

jurisdiction based on "public relations materials suggest[ing that KPMG] is a global firm or an international network of member firms" because they do not support a legal finding of partnership); Reingold v. Deloitte Haskins & Sells, 599 F. Supp. 1241, 1249, 1254 n.10 (S.D.N.Y. 1984) (holding that existence of DH&S International, "an organization composed of a large number of affiliated accounting firms," did not prove that DH&S was "a single worldwide entity" even though some brochures described DH&S (US) as "a single cohesive worldwide organization"); In re Royal Ahold N.V. Sec. & ERISA Litig., No. Civ. 03-MD-01539, 2004 WL 2955934, *36 n.41 (D. Md. Dec. 21, 2004) (stating that "[i]t is well recognized that "[m]ember firms in an international accounting association are not part of a single firm and are neither agents nor partners of other member firms simply by virtue of using the same brand name") (internal citations omitted)), Gutierrez v. The Cayman Islands Firm of Deloitte & Touche, 100 S.W.3d 261, 270-71 (Tex. App. 2002) (declining to find jurisdiction over DTT when "[a]side from maintaining a website and lending its name to multiple accounting firms, DTT had no relationship to the transactions in [the] case").[5]

In support of its theory of liability, Plaintiffs have pled anew the following stock allegations that commonly accompany the one-firm theory which, as noted, the courts have been uniform in rejecting.  Plaintiffs allege that GTI "has member firms in approximately 100 countries," including its U.S. member firm GT-US and its former Italian member firm GT-Italy (Compl. ¶¶ 157-59).  The Complaint states that "Grant Thornton provides accountancy, audit and business advice around the world . . .." (Id. at ¶ 161).  Plaintiffs next allege that "Grant

---

[5] But see Cromer Fin. Ltd. v. Berger, Nos. 00 Civ. 2284 (DLC), 00 Civ. 2498 (DLC), 2002 WL 826847 (S.D.N.Y. May 2, 2002) (permitting plaintiffs to proceed on the theory that Deloitte Touche Bermuda had acted as the agent of Deloitte Touche Tohmatsu, and that the scienter of the member firm could be imputed to the international umbrella firm, where the complaint there, unlike the complaint here, included specific allegations of a conveyance of actual authority and where plaintiffs also alleged that the name and logo of the umbrella organization appeared on the audits prepared by Deloitte Touche Bermuda).

Thornton" markets itself as a global organization and cite to a news release to that effect.  (Id. at ¶ 162).  Then Plaintiffs allege that GTI "establishes procedures, policies and practices for its members . . . [and] performs a review of its members at least every three years to ensure their compliance . . .."  (Id. at ¶ 163).  Lastly, Plaintiffs cite to an announcement that GTI expelled GT-Italy from "the international network."  (Id. at ¶ 168).

Courts have routinely rejected nearly identical allegations in other complaints, holding they are insufficient to support a claim that an international accounting organization and its members are vicariously liable for one another.  For example, Judge Daniels in Nuevo Mundo Holdings rejected the one-firm argument, concluding that different firms in an international accounting association cannot be treated "as a single entity . . . simply because they shared an associational name and/or collaborated on certain aspects of a transaction."  2004 WL 112948, at *3. (citing Lernout & Hauspie, 230 F. Supp. 2d at 170).  The allegation that "Grant Thornton" provides accounting, audit, and other advice around the world is equally unavailing.  In WorldCom, Inc., Judge Cote rejected plaintiffs' argument that "[t]hrough Andersen and Andersen UK," AWSC was "involved" in WorldCom audits through its role as an "umbrella organization for its member firms worldwide."  2003 WL 21488087, at *2, *10.

Plaintiffs' allegations that "Grant Thornton" markets itself as a global organization likewise fail to establish that the acts of firms bearing the Grant Thornton brand name should be attributed to GTI.  For example, in Howard, Judge Kram ruled that "[w]hile Klynveld's public relations materials suggest that Klynveld is a global firm or an international network of member firms, this fact neither justifies a legal finding of partnership nor supports [plaintiff's] assertion that [a member firm's] acts in the United States should be attributed to Klynveld."  977 F. Supp. at 662; see also, e.g., Reingold, 599 F. Supp. at 1254 n.10 (finding allegations that defendant

-12-

firm's brochures and pamphlets described the firm as a "single cohesive worldwide organization" could not "contradict the plain meaning of [defendants'] international agreements" stating that defendants were independent legal entities).

Plaintiffs' argument that GTI establishes certain standards for member firms also does not support the claim that GTI and its member firms constitute "one-firm." In <u>Nuevo Mundo Holdings</u>, Judge Daniels concluded that it was irrelevant that umbrella associations for firms using the Arthur Anderson and PricewaterhouseCoopers trade names provided training, held peer review meetings, and prescribed standards to ensure compliance with accepted professional standards and ethical requirements. <u>Id</u>. at *3, <u>see</u> <u>also</u>, <u>e.g.</u>, <u>In re Asia Pulp & Paper</u>, 293 F. Supp. 2d 391 (S.D.N.Y. 2003) (rejecting one-firm theory when plaintiffs alleged, <u>inter</u> <u>alia</u>, that the accounting umbrella organization "set 'professional standards and principles' under which the individual offices operated").

Responding to the one-firm argument in an opinion issued just last month, the Fifth Circuit described as "conclusional testimony" affidavits offered to show that Arthur Anderson's umbrella organization was liable for the acts of its member firms because it was in charge of setting and enforcing professional standards, training, and coordinating client services on a worldwide basis for all its member firms. <u>Newby v. Newby</u>, --- F.3d ---, No. 04-20001, 2004 WL 2892044, at *3 (5th Cir. Dec. 15, 2004). The Fifth Circuit concluded that "[t]he remainder of the Objectors' arguments are premised on pithy statements of worldwide corporate unity found in marketing materials. We decline, as did the district court, to afford those corporate cliches considerable weight." <u>Id</u>.

Moreover, Plaintiffs' allegations against GTI are also directly contradicted by documents referenced and relied upon in the Complaint. For example, the January 8, 2004 GTI press

-13-

release cited in the Complaint (Compl. ¶ 168) plainly states that GTI is legally distinct from its member firms, explaining that each firm "is a separate independent national firm," and no one firm is "responsible for the services or activities of any other." (Ex. A). Indeed, one of the very lines Plaintiffs quote in the Complaint from the press release describes GTI member firms as "independent." (Compl. ¶ 168).

Other courts, in dismissing claims just like the claims brought by Plaintiffs, have relied upon similar statements in documents incorporated in complaints. See Lernout & Hauspie, 230 F. Supp. 2d at 170-71. There, plaintiffs cited the KPMG International website for its description of KPMG International and its member firms "'as a unitary global entity.'" Id. at 171. However, the website also explained that each of KPMG International's member firms was a "'separate and independent legal entity.'" Id. at 170. Judge Saris rejected plaintiffs' one-firm argument and granted KPMG International's motion to dismiss on the basis that: "[T]he very source upon which Plaintiffs rely – the home page of the KPMG website – belies their claim."[6] Id.

In short, Plaintiffs have failed to sufficiently demonstrate that under the one-firm theory GTI is legally responsible for the acts of the former GT-Italy or any other member firms bearing the Grant Thornton brand name. Accordingly, this Court should join the no less than ten other Judges who have dismissed similarly deficient claims.

## C.    Neither GT-Italy nor GT-US are GTI's Agent

Relying on these same one-firm allegations, Plaintiffs also make the conclusory allegation that GTI is liable for GT-Italy's actions because GT-Italy and GT-US were agents of

---

[6] Similarly, GTI's website, www.gti.org, which contains language nearly identical to GTI's January 8, 2004 press release -- that each firm "is a separate independent national firm" and no one firm is "responsible for the services or activities of any other" -- belies Plaintiffs one-firm argument.

-14-

GTI, acting on GTI's authority, and for the benefit of GTI. (Compl. ¶¶ 158-59). But Plaintiffs cannot avoid the dispositive flaws in its one-firm theory by re-casting those same allegations under an "agency" theory. The underlying point remains the same: Courts, faced with similar insufficient allegations of control, refuse to hold entities like GTI liable for the work of separate and distinct legal entities that share a common brand name.

Even more directly, to prove an actual agency relationship, plaintiffs must demonstrate: (1) that the claimed principal manifested consent for the claimed agent to act for the principal and that the purported agent consented to act for the claimed principal; (2) that the alleged agent acted for the benefit of the asserted principal; and (3) that the supposed principal exercised control over the claimed agent with respect to the transaction at issue. See In re Shulman Transp. Enter., Inc., 744 F.2d 293, 295 (2d Cir. 1984); Nuevo Mundo, 2004 WL 112948, at *4. "The importance of control by the principal is paramount." Nuevo Mundo, 2004 WL 112948, at *5.

Plaintiffs have done no more than pile one conclusory allegation on top another in an attempt to support a finding that GTI has the authority or ability to control its member firms. They have utterly failed to offer any facts demonstrating that GTI or any of its member firms agreed for a member firm to act for or on behalf of GTI. And, perhaps more directly to the point, Plaintiffs do not allege any acts that could support a finding that GT-Italy acted for the benefit of GTI in performing services for Parmalat, nor do Plaintiffs identify any services performed for Parmalat by GT-US specifically, much less services that GT-US performed on behalf of GTI.

Not only do the documents referred to in the Complaint contradict Plaintiffs' core "unified, one firm theory," those same documents also completely undermine any claim that there was an "agency" relationship between GTI and GT-Italy Again, the January 8, 2004 GTI

press release states that GTI and the member firms "are not members of one international partnership or otherwise legal partners with each other, <u>nor is any one firm responsible for the services or activities of any other</u>." (Ex. A (emphasis added)). In short, Plaintiffs' have not alleged facts to support an agency theory. <u>See Nuevo Mundo</u>, 2004 WL 112948, at *3, *6 (finding that "[m]ember firms in an international accounting association are . . . neither agents nor partners of other member[s] . . . by virtue of using the same brand name," and "conclusory allegations" of agency are "insufficient to withstand [a] motion to dismiss"); <u>WorldCom, Inc.</u>, 2003 WL 21488087, at *10 (finding bare one-firm allegations insufficient to plead agency relationship between Anderson umbrella organization and Anderson member firm). Accordingly, Plaintiffs fail to state a claim against GTI under an agency theory.

**POINT II**

**PLAINTIFFS CANNOT STATE A CAUSE OF ACTION AGAINST GTI
UNDER SECTION 20(A) OF THE SECURITIES AND EXCHANGE ACT OF 1934 AND
THEREFORE THE CLAIM SHOULD BE DISMISSED**

In order to bring a claim for control person liability under Section 20(a), a plaintiff must allege a primary violation of the securities laws by the controlled person, control of the primary violator by the targeted defendant, and culpable participation by the defendant in the primary violation committed by the controlled person. <u>SEC v. First Jersey Sec., Inc.</u>, 101 F.3d 1450, 1472 (2d Cir. 1996) (internal citations omitted). Here, Plaintiffs have merely mouthed the conclusory language that: (1) GTI exercised control over the GTI member firms and their employees, on the one hand, and Parmalat affiliates or the transactions in question, on the other; and (2) GTI culpably participated in a violation of the securities laws by a controlled entity. This Section 20(a) claim should therefore be dismissed.

-16-

**A.      Plaintiffs' Have Failed to Sufficiently Allege that GTI Controlled a Primary Violator**

To satisfy the element of control, a complaint must plead facts supporting a reasonable inference that the defendant possessed "the power to direct or cause the direction of the management and policies of a person whether through ownership of voting securities, by contract, or otherwise." First Jersey, 101 F.3d at 1472-73 (quoting 17 C.F.R. § 240.12b-2).  The test for control is a functional one, Wallace v. Buttar, 239 F. Supp. 2d 388, 396 (S.D.N.Y. 2003), reversed and remanded on other grounds, 378 F.3d. 182 (2d. Cir. 2004), and thus "[a]ctual control over the wrongdoer *and the transactions in question* is necessary for control person liability." Cromer Fin. Ltd., 137 F. Supp. 2d at 484 (emphasis added); In re Blech Sec. Litig., 961 F. Supp. 569, 586-87 (S.D.N.Y. 1997).

**1.      GTI Did Not Have the Power to Control GTI Member Firms or Their Employees**

Plaintiffs rely on the same one-firm allegations discussed above to support Plaintiffs' claim that GTI controlled its member firms and employees.  In addition, Plaintiffs allege that GTI had, and exercised, the power to control its member firms and their employees because GTI "had direct involvement in and communications regarding its member firms' . . . audits of, and consulting for, Parmalat and its subsidiaries." (Compl. ¶ 1146).  Plaintiffs also allege that GTI "was provided with or had unlimited access to copies of its member firms' work papers for audits of Parmalat and its subsidiaries." (Id. at ¶ 1144).  Additionally, Plaintiffs allege GTI had access to statements Plaintiffs allege to be misleading that were used in furtherance of the alleged fraud.  (Id.)  Based on these unsupported declarations, Plaintiffs conclude GTI could have corrected or prevented the issuance of such statements.  (Id.)

Plaintiffs, however, do not allege a single instance of GTI's involvement in GT-Italy's audits and consulting for Parmalat.  Plaintiffs also fail to cite any document or other source

-17-

supporting their claim that GTI had access to its member firms' work papers, let alone the ability to correct or prevent the issuance of reports for which those work papers provided the evidential support. Aside from an equally general rephrasing of the one-firm allegations, no other allegations are made in support of Plaintiffs' assertion that GTI controlled its member firms and their employees in the transactions at issue.

Courts have consistently rejected such sparse allegations as the basis for control person liability claims. For example, in Asia Pulp & Paper, plaintiffs relied on control allegations virtually identical to those asserted against GTI. 293 F. Supp. 2d at 393-96. There, plaintiffs alleged that Anderson Worldwide SC ("AWSC"), the "umbrella entity" for all Anderson firms, directed the management and policies of the primary violator, Anderson Singapore. Id. at 393. Plaintiffs also alleged that "AWSC markets this 'one-firm' concept in its news releases, web site and recruiting brochures." Id. at 394. According to the complaint, this worldwide structure was achieved through partner overlap, sharing of costs and profits, global setting of professional standards, and maintenance of a global infrastructure and administration. Id. at 393.

Judge Sprizzo characterized plaintiffs' allegations as, "at most . . . generally [claiming] that AWSC set 'professional standards and principles' under which the individual offices operated," and otherwise being "bereft of any allegations that AWSC . . . was able to control or in any way influence the particular audits conducted or opinions offered by its individual member firms." Id. at 396. Granting AWSC's motion to dismiss, Judge Sprizzo concluded "that such conclusory allegations are insufficient to state a claim of control person liability as defined by the Second Circuit" and noted that "the 'one-firm,' unified-company theory, . . . has been rejected by courts in other contexts." Id.

Similarly, In re Deutsche Telekom AG Sec. Litig., No. 00 Civ. 9475 (SHS), 2002 WL
244597 at *6 (S.D.N.Y. Feb. 20, 2002), in support of their Section 20(a) claim, plaintiffs alleged,
among other things, that defendant was "'provided with or had unlimited access to copies of the
complained of statements prior to and/or shortly after these statements were issued and had the
ability to prevent the issuance of the statements or cause the statements to be corrected."
Recognizing the conclusory nature of the allegations, Judge Stein dismissed the Section 20(a)
claim on the basis that "[p]laintiffs fail[ed] to allege any facts that support the alleged control
person status of [the defendant]." Id.; see also, e.g., Primavera Familienstiftung v. Askin, No. 95
Civ. 8905 (RWS), 1996 WL 494904, at *11 (S.D.N.Y. Aug. 30, 1996) (dismissing 20(a) claim
and stating that "[s]imply alleging 'control status' in a conclusory fashion . . . is not all that is
required to state a claim under Section 20(a) of the 1934 Act"); Rich v. Maidstone Fin., Inc., No.
98 Civ. 2569 (DAB), 2001 WL 286757 (S.D.N.Y. March 23, 2001) (same).

As in Asia Pulp & Paper, Deutsche Telekom AG, and the numerous other authorities
discussed above in which plaintiffs' sparse allegations of control person liability were deemed
inadequate, Plaintiffs' purported basis for Section 20(a) liability against GTI is equally deficient
and does not support Plaintiffs' claim -- as Plaintiffs must in order to defeat a motion to dismiss -
- that GTI had actual control over its member firms and the various fraudulent transactions
alleged. See, e.g., Howard, 977 F. Supp. at 662; Nuevo Mundo, 2004 WL 112948, at *3.

## 2.     GTI Did Not Have the Power to Control Bonlat or Camfield

Plaintiffs also allege that GTI acted as a controlling person of Bonlat and Camfield.
Plaintiffs claim that GTI, directly or through either GT-US, GT-Italy, or "audit partners"
including Penca and Bianchi, "created and oversaw . . . Bonlat." (Compl. ¶¶ 1145, 157, 1143).
Otherwise, however, while Plaintiffs make numerous allegations about their generic "Grant
Thornton's" involvement in the creation and auditing of Bonlat, as well as the involvement of

-19-

Parmalat, Zini and the "Law Firm Defendants," and Parmalat insiders (see, e.g., id. at ¶ 101, 224, 225), they do not make a single allegation supporting their claim that GTI controlled Bonlat. Nevertheless, Plaintiffs conclude that GTI "had the authority to and did control Bonlat," (id. at ¶ 1145), despite having failed to allege facts showing GTI's specific involvement with Bonlat and having instead relied on "clump" pleadings and sparse one-firm allegations.

Plaintiffs allege that Camfield was located in the offices of and shared staff with GT Singapore, and that therefore GTI "had the authority to and did control . . . Camfield." (Id. at ¶¶ 1145, 15, 243, 963). Plaintiffs also baldly state, without support, that "Grant Thornton" "participated" in Parmalat's establishment of Camfield. (Id. at ¶ 240). At the same time Plaintiffs allege that Parmalat, Tanzi, Tonna, "the Individual Defendants," GT-Italy, and GT-US controlled Camfield. (Id. at ¶¶ 240, 102, 158, 159). And while Plaintiffs offer factual allegations describing the involvement in and operation of Camfield by Parmalat, Tonna, Del Soldato, Zini and others (id. at ¶¶ 29, 344, 520, 907, 914), Plaintiffs do not offer a single factual allegation to support their claim that GTI controlled Camfield.

As recognized by the Second Circuit, "courts do not accept conclusory allegations on the legal effect of the events plaintiff has set out if these allegations do not reasonably follow from his description of what happened." First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 772 (2d Cir. 1994) (internal citations omitted); see also First Capital Asset Mgmt. v. Brickellbush, Inc., 218 F. Supp. 2d 369, 387 (S.D.N.Y. 2002) (Kaplan, J.) (citing First Nationwide Bank, 27 F.3d at 771). Accordingly, this Court should dismiss the control person liability claim against GTI because Plaintiffs' conclusory allegations are not supported by any factual allegations and are thus insufficient to state a claim of control person liability. See Asia Pulp & Paper, 293 F. Supp. 2d at 396.

-20-

**B.**     **Plaintiffs Have Failed to Allege GTI was a Culpable Participant in a Primary Violation**

Plaintiffs' allegations of culpable participation are equally deficient.  In order to state a claim under Section 20(a), Plaintiffs must also allege particularized facts giving rise to an inference that the controlling person culpably participated in the fraud perpetrated by the controlled person.  See, e.g., Mishkin v. Ageloff, No. 97 Civ. 2690 (LAP), 1998 WL 651065, at *25 (S.D.N.Y. Sept. 23, 1998) (Preska, J.); Deutsche Telekom AG, 2002 WL 244597, at * 7; Steed Fin. LDC v. Nomura Sec. Int'l, Inc., No. 00 Civ. 8058 (NRB), 2001 WL 1111508, at *10 (S.D.N.Y. Sept. 20, 2001).  Because the culpable participation element requires plaintiffs to prove the controlling person's state of mind, the PSLRA's heightened pleading requirements apply.  Deutsche Telekom AG, 2002 WL 244597, at * 7; Mishkin, 1998 WL 651065, at *25. Accordingly, in order to withstand a motion to dismiss a Section 20(a) claim a complaint must allege particularized facts "giving rise to a strong inference that [the controlling person] in some meaningful sense culpably participated in the [controlled person's] primary violation."  Cromer, 137 F. Supp. 2d at 484 (internal quotations omitted); Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998).  Moreover, Section 20(a) requires "an individualized determination of . . . a defendant's particular culpability."  Boguslavsky, 159 F.3d at 720.

To be sure, we acknowledge that Your Honor has ruled that a Plaintiff need not plead culpable participation, see Neubauer v. Eva-Health USA, Inc., 158 F.R.D. 281, 284 (S.D.N.Y. 1994); ATSI Communications, Inc. v. The Shaar Fund, Ltd., No. 02 Civ. 8726 (LAK), 2003 WL 21650135, at *1 (S.D.N.Y. July 14, 2003), but Your Honor also recently acknowledged that courts are "deeply divided" on this issue, In re NTL, Inc. Sec. Lit., No. 02 Civ. 3013 (LAK), 2004 WL 2786024, at *13 & n.127 (S.D.N.Y. Dec. 6, 2004).

-21-

And since Your Honor's decision in 1994, the Second Circuit has issued a series of decisions, see First Jersey, 101 F.3d at 1472; Ganino, 228 F.3d at 170; Suez Equity Inv., L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 101 (2d Cir. 2001); Boguslavsky, 159 F.3d at 720, which have led a number of Judges in this District to conclude that plaintiffs must adequately plead culpable participation, see, e.g., In re Bayer AG Sec. Litig., No. 03 Civ. 1546 (WHP), 2004 WL 2190357, at *16 (S.D.N.Y. Sept. 30, 2004); In re Global Crossing, Ltd. Sec. Litig., 322 F. Supp.2d 319, 349 (S.D.N.Y. 2004) (Lynch, J.); Rich, 2002 WL 31867724, at *12; Burstyn v. Worldwide Xceed Group, Inc., No. 01 Civ. 1125 (GEL), 2002 WL 31191741, at *7 (S.D.N.Y. Sept. 30, 2002); In re EMEX Corp. Sec. Litig., No. 01 Civ. 4886 (SWK), 2002 WL 31093612, at *10 (S.D.N.Y. Sept. 18, 2002); In re Livent, Inc., Noteholders Sec. Litig., 151 F. Supp. 2d 371, 413-17 (S.D.N.Y. 2001) (Marrero, J.).  But see In re Worldcom, Inc. Sec. Lit., 294 F. Supp.2d 392 (S.D.N.Y. 2003); In re Initial Pub. Offering Sec. Lit., 241 F. Supp.2d 281 (S.D.N.Y. 2003). For the reasons set forth in those opinions, we respectfully request Your Honor to reconsider his earlier view and require Plaintiffs to plead culpable participation at the pleading stage.

Applying the other more recent holdings in this District here, it is evident that Plaintiffs have failed to allege culpable participation by GTI.  Plaintiffs plead no facts supporting an inference that GTI was a participant, let alone a culpable participant, in any violation.  Plaintiffs do not attribute to GTI a single statement, act, or omission involving the alleged fraud at Parmalat.  Furthermore, as set forth above, allegations that clump defendants together do not meet the PSLRA's heightened pleading requirements.  Because Plaintiffs have not, and indeed cannot, allege any facts to establish independent culpable participation by GTI, Plaintiffs Section 20(a) claim should be dismissed.

-22-

## POINT III

## PLAINTIFFS SHOULD NOT BE PERMITTED TO AMEND THEIR COMPLAINT

If the Court dismisses the Complaint, GTI respectfully submits that the Court should deny Plaintiffs leave to amend.  The strict PSLRA pleading requirements trump the general pleading rule in the Federal Rules of Civil Procedure which provides that leave to amend shall be freely granted.  See, e.g., In re Champion Enters., Inc., Sec. Litig., 145 F. Supp. 2d 871, 873 (E.D. Mich. 2001).  "The pleading requirement is more than simply a line the plaintiffs must cross to get to discovery; it is the heart of the Reform Act . . . [i]t evinces Congress's acknowledgement of the burden an allegation of securities fraud places on the innocent defendant even without discovery."  Id.  If every complaint could be amended "the [PSLRA] pleading requirements would merely be a technical formality which could be cured by amendment."  Id. at 874.

In addition, Plaintiffs have already been granted leave to file an amended complaint, which they did in October 2004 after having requested and received a sixty-day extension to file.  Prior to and during that extension Plaintiffs self-evidently had the opportunity to analyze numerous documents and reports that "directly relate to the fraud alleged in this action."  Plaintiffs' Motion for an Extension of Time ¶ 2; see also Compl. ¶¶ 1-2.  Nevertheless, Plaintiffs were still unable to adequately allege securities violations by GTI, instead relying on clump pleadings and sparse one-firm allegations in an effort that demonstrates the absence of a viable case.

In sum, GTI does not perform accounting work of any kind and is not legally responsible for the audit work of its member firms.  The defects in the Complaint, therefore, are not curable, and further amendment would be futile.  See Ruffolo v. Oppenheimer & Co., 987 F.2d 129, 131-32 (2d Cir. 1993) (affirming denial of leave to replead and noting that "where it appears that

-23-

granting leave to amend is unlikely to be productive . . . it is not an abuse of discretion to deny leave to amend"). Having already filed two complaints, Plaintiffs are not entitled to a third try. See Levitch v. Columbia Broad. Sys., Inc., 94 F.R.D. 292, 295 (S.D.N.Y. 1982) (denying leave to amend when plaintiffs had amended the complaint once already and stating that the "liberal rules of pleading in the federal system are not without limits"); Koehler v. Bank of Bermuda (New York) Ltd., No. 96 Civ. 7885 (JFK), 1998 WL 790931, at *2 (S.D.N.Y. Nov. 12, 1998) (denying leave to amend when plaintiff "had two opportunities to plead the elements of a securities fraud claim but . . . failed to do so").

## CONCLUSION

For the reasons set forth above, GTI respectfully submits that this action should be dismissed as to GTI with prejudice.

DATED:   New York, New York
         January 10, 2004

STROOCK & STROOCK & LAVAN LLP

By:   /s/ BRIAN M. COGAN
         Brian M. Cogan (BC-1876)
         James L. Bernard (JB-4273)
      180 Maiden Lane
      New York, New York 10038-4982
      (212) 806-5400

*Attorneys for Grant Thornton International*

*Of Counsel:*
Quinlan D. Murphy

-24-

**EXHIBIT A**

**Home** | **About us** | **Services** | **Press room** | **Publications** | **Market surveys** | **Case studies** | **Member firms**
Home > Press room > Press releases 2003-2004 >

## Grant Thornton 🐦



**Contact us**
For further information, please contact:

**E:** gti@fourplc.com
**T:** 44 (0) 870 4203256

**Other resources:**

www.gti.org

# Grant Thornton International **acts decisively to protect reputation**

**Grant Thornton International expels Grant Thornton SpA from international network**

*08 Jan. 2004 2:30 PM CST*
Today (8 January 2004) Grant Thornton International announced that it has terminated its relationship with its member firm Grant Thornton SpA in Italy with immediate effect.

The decision has been taken by Grant Thornton International during the course of its ongoing internal investigation into Grant Thornton SpA and the Parmalat matter.

Said David McDonnell, chief executive of Grant Thornton International: "Our first responsibility is to our clients around the world. They need to be assured of our commitment to maintain the reputation and integrity of Grant Thornton International. As a result of our ongoing investigation it is clear that Grant Thornton SpA will not be able to operate in the forseeable future in an effective way to protect the reputation of the Grant Thornton International name and the reputation of the other independent firms in the Grant Thornton International network.

"Grant Thornton SpA has been unable to provide sufficient assurances or access to the appropriate information and people in an acceptable timeframe. We have lost confidence in Grant Thornton SpA and are therefore acting clearly and decisively to protect our clients and the reputation of all of the other independent firms in the international network."

At this stage, Grant Thornton International is not in a position to disclose further details. Grant Thornton International will continue to cooperate with the authorities.

The expulsion of Grant Thornton SpA from the Grant Thornton International network of independent member firms is effective immediately. It means:

- Grant Thornton SpA can no longer operate as part of the international network and cannot hold itself out as having any ongoing connection with Grant Thornton International or other independent Grant Thornton International member firms around the world
- Grant Thornton SpA must, with immediate effect, cease to use the Grant Thornton name.
- No further work will be performed by independent Grant Thornton International member firms on behalf of Grant Thornton SpA
- Grant Thornton International is taking immediate action to provide alternative support for international clients of its other member firms doing business in Italy.

**Background on Grant Thornton International**
Grant Thornton International is a very strong international membership organisation, with each member firm independently owned and operated. Services are delivered nationally by the member and correspondent firms of Grant Thornton International, a network of independent firms throughout the world. Grant Thornton International is a non-practising, non-trading international umbrella organisation and does not deliver services in its own name.

GTI.org - Jan 2004 Press Release

Each member and correspondent firm in Grant Thornton International is a separate independent national firm. These firms are not members of one international partnership or otherwise legal partners with each other, nor is any one firm responsible for the services or activities of any other. Each firm governs itself and handles its administrative matters on a local basis. Although many of the firms now carry the Grant Thornton name, either exclusively or in their national practice names, there is no common ownership among the firms or by Grant Thornton International.

© 2004 Grant Thornton International - All rights reserved

Legal | Privacy | Sitemap

**EXHIBIT B**

**Certification report**

Revisione e
Organizzazione Contabile
The Italian Member Firm of
Grant Thornton International

# Grant Thornton SpA

Audit report under article 4 of
Presidential Decree 136, 31st March 1975

To the shareholders of
PARMALAT FINANZIARIA S.p.A.
Via O. Grassi, 24/26
43044 - COLLECCHIO (PR)

1.      We have audited the consolidated financial  statements of PARMALAT
FINANZIARIA S.p.A. for the year ended 31st December 1998. We have also verified that
the information contained in the directors' report is in agreement with the contents of the
consolidated financial statements.

2.      We conducted our audit in accordance with the auditing standards recommended by
CONSOB (National Commission for Listed Companies and the Stock Exchange) which
included such tests we considered necessary for the purposes of our engagement. With
respect to the opinion expressed on the previous year's consolidated financial statements, as
required by law, reference is made to our audit report thereon dated 12th June 1998.
The financial statements of a number of subsidiaries which represent respectively 30% of
aggregate total assets and 22% of aggregate sales, were examined by other auditors who
furnished us with their reports. Our opinion, expressed in this report, with respect to the
values relating to these companies included in the consolidation, are also based on the work
performed by other auditors.

3.      In our opinion, the consolidated financial statements referred to above have been
clearly drawn up and give a true and fair view of the state of affairs and of the results of
operations of the company and its subsidiaries, in conformity with generally accepted
accounting principles concerning consolidated financial statements. Consequently we issue
our auditors' certificate on the consolidated financial statements of PARMALAT
FINANZIARIA S.p.A. Group as at 31st December 1998.

Milan, 13th May 1998

Grant Thornton S.p.A.

Maurizio Bianchi                           Lorenzo Penca

(Partners)

Sede legale
Largo Augusto, 7
I-20122 Milano
Telefono (0)2-762971
Telefax (0)2-76297260

Uffici in Bari, Bologna, Brescia
Firenze, Genova, Napoli,
Padova, Roma, Torino

Internet: http://www.grantthornton.it

Iscritta nel 1° albo speciale CONSOB con delibera n. 697 del 26/4/1980
Capitale sociale L 688.400.000 i.v. - c.c.i.a.a. 0989025 Isci Trib. Milano n° 181857
vol. 5239 fasc. 7 registro società - codice fiscale e partita IVA 04112350154