UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————x   MASTER DOCKET
                                                     04 MD 1653 (LAK) ECF Case

In re PARMALAT SECURITIES LITIGATION

                                                     **MOTION TO DISMISS**

This document relates to:

In re PARMALAT SECURITIES LITIGATION      04 Civ. 0030 (LAK)

                                                     ELECTRONICALLY FILED

——————————————————————x


**MEMORANDUM OF DELOITTE & TOUCHE USA LLP
AND DELOITTE & TOUCHE LLP IN SUPPORT OF
THEIR MOTION TO DISMISS THE FIRST AMENDED
CONSOLIDATED CLASS ACTION COMPLAINT**

Alan N. Salpeter
Stephen M. Shapiro
Michele Odorizzi
Daniel L. Ring
MAYER, BROWN, ROWE & MAW LLP
190 South LaSalle Street
Chicago, Illinois 60603
(312) 782-0600

Robert J. Ward (RW 0149)
MAYER, BROWN, ROWE & MAW LLP
1675 Broadway
New York, New York 10019
(212) 506-2500

*Attorneys for Defendants
Deloitte & Touche USA LLP and
Deloitte & Touche LLP*

Dated: January 10, 2005

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ iii

INTRODUCTION ...........................................................................1

BACKGROUND .............................................................................5

Plaintiffs' Offer No Factual Support For Their "One-Firm"
  And Agency Allegations Against DTT ...............................................6

Plaintiffs Offer No Factual Support For Their "Alter Ego"
  Allegations Against Deloitte USA ...................................................8

Plaintiffs' Do Not Allege Any Facts To Show That Deloitte
  USA Controlled DT-Italy's Audit Activities Or That
  Deloitte USA Engaged In Any Wrongdoing ..........................................9

Plaintiffs Do Not Allege That Anyone Was Misled Into
  Believing That  Parmalat's Financial Statements Had Been
  Audited By Deloitte USA .............................................................12

ARGUMENT ...............................................................................13

I.      The Complaint Fails To Meet The Requirements Of
        Rule 9(b) And The PSLRA Because It Impermissibly
        Lumps Together The Statements And Conduct Of A
        Number Of DTT Member Firms ..............................................13

II.     Plaintiffs Have Failed To State A Claim For Primary
        Liability Against Deloitte USA ...........................................15

        A.      Plaintiffs Have Not Alleged Any Basis For Holding
                Deloitte USA Liable For Audit Opinions And Reports
                Signed By DT-Italy ...............................................16

                1.      Plaintiffs Have Not Alleged Any Factual
                        Basis For Treating DT-Italy As The Agent
                        Of Either DTT Or Deloitte USA .........................20

                2.      Plaintiffs Have Failed To Allege Any Basis
                        For Treating Deloite USA As The "Alter Ego"
                        Of DTT ................................................23

        B.      Plaintiffs Have Not Alleged A Claim Based On
                "Scheme" Liability ...............................................27

C.    Plaintiffs Have Failed To Plead Facts Giving Rise
To A Strong Inference That Deloitte USA Acted With
Scienter ................................................................................................ 28

III.   Plaintiffs Have Failed To State A Claim Against Deloitte
USA Under Section 20(a) ................................................................................ 30

A.    Plaintiffs Have Failed To Plead The Element Of
"Control" .............................................................................................. 30

B.    Plaintiffs Have Failed To Plead "Culpable Participation"
By Deloitte USA ................................................................................... 32

CONCLUSION ........................................................................................................... 35

# TABLE OF AUTHORITIES

## *Cases*

ATSI Communications, Inc. v. The Shaar Fund, Ltd.,
  No. 02 Civ. 9726 (LAK), 2004 WL 909173
  (S.D.N.Y. Apr. 28, 2004) ...................................................................................31

*Boguslavsky v. Kaplan*,
  159 F.3d 715 (2d Cir. 1998) ............................................................................30

*Burstyn v. Worldwide Xceed Group, Inc.*,
  No. 01 Civ. 1125 (GEL), 2002 WL 31191741
  (S.D.N.Y. Sept. 30, 2002) ...........................................................................33, 35

*Central Bank of Denver, N.A. v. First Interstate*
  *Bank of Denver, N.A.*, 511 U.S. 164, 114 S.Ct. 1439 (1994); ...........................16, 17, 19, 27, 28

*Cromer Fin. Ltd. v. Berger*, 137 F.Supp.2d 452
  (S.D.N.Y. 2001).................................................................................................22

*Cromer Fin. Ltd. v. Berger*,
  No. 00 Civ. 2284 (DLC), 2002 WL 826847
  (S.D.N.Y. May 2, 2002)....................................................................................22

*Freeman v. Complex Computing Co.*,
  119 F.3d 1044 (2d Cir. 1997) ..........................................................................25

*Gabriel Capital, L.P. v. NatWest Finance, Inc.*,
  122 F.Supp.2d 407 (S.D.N.Y. 2000)............................................................19, 23

*Goldin Assocs., LLC v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
  00 Civ. 8688 (WHP), WL 22218643
  (S.D.N.Y. Sept. 25, 2003) ................................................................................14

*Gutierrez v. Cayman Is. Firm of Deloitte & Touche*,
  100 S.W.3d 261 (Tex. App. 2002)....................................................................21

*In re AM Int'l, Inc. Sec. Litig.*,
  606 F.Supp. 600 (S.D.N.Y.1985)..................................................................18, 22

*In re AOL Time Warner Sec. & ERISA Litig.*,
  No. 02 Civ. 5575 (SWK) 2004 WL 992991
  (S.D.N.Y. May 5, 2004) ...................................................................................33

*In re Asia Pulp & Paper Sec. Litig.*,
  293 F.Supp.2d 391 (S.D.N.Y. 2003)...........................................................4, 26, 32

*In re Bayer AG Sec. Litig,*
  No. 03 Civ. 1546 (WHP), 2004 WL 2190357
  (S.D.N.Y. Sept. 30, 2004) ............................................................................................ 33, 35

*In re Dynegy, Inc. Sec. Litig.*,
  339 F.Supp.2d 804 (S.D. Tex. 2004) ................................................................................ 28

*In re Deutsche Telekom AG Sec. Litig.*,
  No. 00 Civ. 9475 (SHS), 2002 WL 244597
  (S.D.N.Y. Feb. 20, 2002) ........................................................................................ 31, 33, 35

*In re Elan Corp. Sec. Litig.*,
  02 Civ. 865 (RMB)(FM), 2004 WL 1305845
  (S.D.N.Y. May 18, 2004) ........................................................................................... 15, 17

*In re Enron Corp. Sec., ERISA and Deriv. Litig.*,
  235 F.Supp.2d 549 (S.D. Tex. 2002) ................................................................................ 28

*In re Global Crossing, Ltd. Sec. Litig.*,
  322 F.Supp.2d 319 (S.D.N.Y. 2004) ..................................................................... 28, 29, 33

*In re Homestore.com, Inc. Sec. Litig.*,
  252 F.Supp.2d 1018 (C.D. Cal. 2003) .............................................................................. 28

*In re Indep. Energy Holdings PLC Sec. Litig.*,
  154 F. Supp. 2d 741 (S.D.N.Y. 2001) .............................................................................. 34

*In re Initial Public Offering Sec. Litig.*,
  241 F. Supp. 2d 281 (S.D.N.Y. 2003) ........................................................................ 31, 34

*In re Lernout & Hauspie Sec. Litig.*,
  230 F.Supp.2d 152, (D. Mass. 2002) ....................................................................... 15, 21, 25

*In re Livent, Inc. Noteholders Sec. Litig.*,
  151 F. Supp. 2d 371 (S.D.N.Y. 2001) .............................................................................. 33

*In re McKesson HBOC, Inc. Sec. Litig.*,
  126 F.Supp.2d 1248 (N.D. Cal. 2000) ............................................................................... 4

*In re NTL, Inc. Sec. Litig.*,
  No. 02 Civ. 3013 (LAK), 2004 WL 2786024
  (S.D.N.Y, Dec. 6, 2004) ............................................................................... 3, 13, 14, 33

*In re Oxford Health Plans, Inc., Sec. Litig.*,
  51 F.Supp.2d 290 (S.D.N.Y. 1999) .................................................................................. 29

*In re Philip Servs. Corp. Sec. Litig.*,
  No. 98 Civ. 0835 (MBM), 2004 WL 1152501
  (S.D.N.Y. May 24, 2004) ................................................................................33

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
  2004 WL 2955934 (D. Md. Dec. 21, 2004) .................................................1, 3, 21

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001) ............................................................................30

*In re Ski Train Fire in Kaprun, Aus.*,
  230 F. Supp. 2d 403 (S.D.N.Y. 2002) ............................................................26

*In re Sotheby's Holdings, Inc.*,
  No. 00 Civ. 1041 (DLC), 2000 WL 1234601
  (S.D.N.Y. Aug. 31, 2000) ..............................................................................32

*In re Worldcom, Inc. Sec. Litig.*,
  02 Civ. 3288 (DLC), 2003 WL 21488087
  (S.D.N.Y. Jun. 25, 2003) ...............................................................................21

*In re Worldcom, Inc. Sec. Litig.*,
  02 Civ. 3288 (DLC), 2004 WL 1097786
  (S.D.N.Y. May 18, 2004) ...............................................................................32

*In re WorldCom, Inc. Sec. Litig.*,
  294 F.Supp.2d 392 (S.D.N.Y. 2003) ..........................................................33, 34

*Jeffries v. Deloitte Touche Tohmatsu Int'l*,
  893 F. Supp. 455 (E.D. Pa. 1995). ..................................................................4

*Kolbeck v. LIT America, Inc.*,
  823 F.Supp. 557 (S.D.N.Y. 1996) ...................................................................20

*Lippe v. Bairnco Corp.*,
  225 B.R. 846 (S.D.N.Y.1998) .........................................................................14

*Maresca v. Holiday Inns, Inc.*,
  92 Civ. 4550 (RPP), 1993 WL 8166
  (S.D.N.Y. Jan. 14, 1993) ...............................................................................22

*McCall v. Scott*, 239 F.3d 808 (6th Cir. 2001) ...................................................4

*Mishkin v. Ageloff*, No. 97 Civ. 2690 (LAP),
  1998 WL 651065 (S.D.N.Y. Sept. 23, 1998) ...............................................33, 34

*Mitchell v. Washingtonville Cen. Sch. Dist.*,
  190 F.3d 1 (2d Cir. 1999) ..............................................................................13

*Murray v. Miner*,
   74 F.3d 402 (2d Cir. 1996) ......................................................................24

*Nanopierce Techs., Inc. v. Southridge Capital Mgmt LLC*,
   No. 02 Civ. 0767 (LBS), 2002 WL 31819207
   (S.D.N.Y. Oct. 10, 2002)........................................................................31

*Nuevo Mundo Holdings v. PricewaterhouseCoopers LLP*,
   No. 03 Civ. 0613 (GBD), 2004 WL 112948
   (S.D.N.Y. Jan. 22, 2004) ...............................................2, 20, 21, 25, 26

*Pharmachemie, B.V. v. Pharmacia, S.p.A.*,
   934 F. Supp. 484 (D. Mass. 1996) ..........................................................6

*Reingold v. Deloitte Haskins & Sells*,
   599 F.Supp. 1241 (S.D.N.Y. 1984)........................................................22

*Rich v. Maidstone Fin., Inc.*,
   No. 98 Civ. 2569(DAB), 2002 WL 31867724
   (S.D.N.Y. Dec. 20, 2002) ........................................................ 16, 31, 33

*Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000) ......................................29

*SEC v. First Jersey Sec., Inc.*,
   101 F.3d 1450 (2d Cir. 1996) ...........................................................4, 31

*Shanahan v. Vallat*, No.
   03 Civ. 3496 (MBM), 2004 U.S. Dist. LEXIS 25523
   (S.D.N.Y. Dec. 19, 2004) ...................................................................33,34

*Skidmore Energy, Inc. v. KPMG*,
   No. 03 cv 2138-B, 2004 WL 3019097
   (N.D. Tex. Dec. 28, 2004) ...............................................................21, 25

*Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*,
   No. 00 Civ. 8058 (NRB), 2001 WL 1111508
   (S.D.N.Y. Sept. 20, 2001) ......................................................................35

*Suez Equity Investors, L.P. v. Toronto Dominion Bank*,
   250 F.3d 87 (2d Cir. 2001) .....................................................................19

*United States v. Bestfoods*, 524 U.S. 51, 118 S.Ct. 1876 (1998)..........26, 27

*Wendy Hong Wu v. Dunkin' Donuts, Inc.*,
   105 F.Supp.2d 83 (E.D.N.Y. 2000) ........................................................22

*Wright v. Ernst & Young LLP,*
   152 F.3d 169 (2d Cir. 1998) ................................................................. 2, 16, 17, 18, 19, 27, 28

*Ziemba v. Cascade Int'l, Inc.,*
   256 F.3d 1194 (11th Cir. 2001) ................................................................. 18


## Statutes And Regulations

17 C.F.R. § 210.2-01(f)(2) ................................................................. 7

Del. Code Ann. tit. 6, § 15-201(a) ................................................................. 24


## Miscellaneous

2004 SEC No-Act LEXIS 610 (May 7, 2004) ................................................................. 7

Black's Law Dictionary 385 (7th ed. 1999) ................................................................. 33

Federal Rule of Civil Procedure, Rule 44.1 ................................................................. 25

Francesco A. Di Pietro, *Direct Investment in Italy Through
   a Corporation: A Guide for Selecting from the Available
   Options*, 10 INT'L LEGAL PERSP. 193 (1998) ................................................................. 6

*Restatement (Second) of Agency* § 1 *cmt. B* (1958) ................................................................. 20

S. Rep. No. 104-98 at 9 (1995) ................................................................. 13

Webster's Third New Int'l Dictionary (1993) ................................................................. 34

This memorandum is filed by defendants Deloitte & Touche USA LLP and Deloitte & Touche LLP (collectively, "Deloitte USA") in support of their motion to dismiss the claims made against them in the First Amended Consolidated Class Action Complaint for failure to state a claim and failure to plead fraud with the particularity required by Rule 9(b) and the heightened pleading requirements of the Private Securities Litigation Reform Act (the "PSLRA").

## INTRODUCTION

At the end of 2003, Parmalat Finanzaria S.p.A. and its wholly-owned subsidiary Parmalat S.p.A. (referred to collectively herein as "Parmalat") collapsed amid charges of widespread fraud by company insiders.  Shortly thereafter, three purported class action securities fraud complaints were filed in this Court by investors in Parmalat securities. All three complaints named as defendants Deloitte & Touche S.p.A. ("DT-Italy"), the Italian accounting firm that issued audit opinions with respect to Parmalat's consolidated financial statements for the years 1999 through 2002, and Deloitte Touche Tohmatsu ("DTT"), the Swiss verein in which DT-Italy is a member. Remarkably, in the Consolidated Complaint plaintiffs have dropped DT-Italy as a defendant.  In a transparent attempt to find a deeper pocket, plaintiffs have substituted instead the two Deloitte USA limited liability partnerships — even though Deloitte USA is an entirely separate legal entity, which never acted as Parmalat's auditor, never made any representations to the market about Parmalat's financial statements, and is not alleged to have had any knowledge of the Parmalat fraud or to have done anything that enabled the fraud to continue.

There is a long and growing line of cases in which courts have dismissed at the pleading stage similar attempts to hold one member of an international accounting association liable for alleged wrongdoing by another member.  As the court recently observed in *In re Royal Ahold N.V. Sec. & ERISA Litig.*, "[i]t is well recognized that 'member firms in an international accounting association are not part of a single firm and are neither agents nor partners of other

member firms simply by virtue of using the same brand name.'" No. 03-MD-1539, 2004 WL 2955934 at *36 n.41 (D. Md. Dec. 21, 2004), quoting *Nuevo Mundo Holdings v. PricewaterhouseCoopers LLP*, No. 03 Civ. 0613 (GBD), 2004 WL 112948 at *3 (S.D.N.Y. Jan. 22, 2004); *see also* the cases cited *infra* at 20-21.  Plaintiffs have not alleged any facts that would lead to a different result here.

Although it is not entirely clear, plaintiffs apparently seek to hold Deloitte USA primarily liable under Section 10(b) for allegedly false and misleading audit opinions issued by DT-Italy based on a two-step theory: (i) that DT-Italy supposedly acted as the agent of DTT in auditing Parmalat's financial statements and (ii) that Deloitte USA allegedly dominated and controlled and was the "alter ego" of DTT.  Complt. ¶¶ 135, 151.  Plaintiffs also assert a control person theory against Deloitte USA, claiming that Deloitte USA controlled DTT which, in turn, supposedly controlled DT-Italy.

All of these claims should be dismissed with prejudice.  To state a claim for primary liability under Section 10(b) against Deloitte USA, plaintiffs would have to plead facts showing that (i) Deloitte USA knowingly or recklessly made false and misleading statements to investors that (ii) were attributed to Deloitte USA.  *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998).  To state a claim for control person liability, plaintiffs would have to plead facts giving rise to a reasonable inference that Deloitte USA had the power to control DT-Italy's conduct of the Parmalat audit, as well as facts giving rise to a strong inference that Deloitte USA was a culpable participant in DT-Italy's alleged misstatements. The Consolidated Complaint does not come close to meeting any of these requirements.

First, plaintiffs have not alleged any facts suggesting that Deloitte USA "made" the allegedly misleading representations that appear in audit opinions and reports signed by DT-Italy.  That "the two firms shared [the Deloitte] brand name and the corporate [DTT] website

2

described a 'global' firm" does not make Deloitte USA responsible for statements made by DT-Italy. *See In re Royal Ahold N.V. Sec. & ERISA Litig.*, 2004 WL 2955934 at *36 n.41 (rejecting the claim that Deloitte USA and Deloitte Netherlands "operated as a single auditing firm in auditing Ahold's annual financial statements" and that each should therefore be held responsible for audit opinions and other statements made by the other firm).

Furthermore, plaintiffs do not allege — nor could they allege — that they personally believed that the audit opinions at issue here were statements made by Deloitte USA, let alone that the market would have attributed those statements to Deloitte USA. Lead plaintiff Hermes Focus Asset Management Europe, Ltd. ("HFAME"), which is audited by the DTT member in the United Kingdom, expressly acknowledged during the lead plaintiff selection process that DTT member firms in different countries are separate firms that audit financial statements under local auditing and accounting standards. In addition, the very documents that plaintiffs cite for the proposition that "Deloitte" is a single worldwide accounting firm explain that each DTT member firm — including Deloitte USA and DT-Italy — is a "separate and independent legal entity" and therefore that neither DTT "nor any of its member firms has any liability for each other's acts or omissions." *See* Ex. F hereto. Under these circumstances, neither plaintiffs in particular nor the market in general could have attributed to Deloitte USA an audit opinion that was originally rendered in Italian, that was signed "Deloitte & Touche S.p.A" on the letterhead of the Italian firm, and that rendered an opinion with respect to the financial statements' compliance with "principles which regulate the preparation of consolidated financial statements in Italy." *See* Exs. A and B hereto. [1]

---

[1]     Plaintiffs' claims against Deloitte USA are based on audit opinions and half-year reports issued by DT-Italy, which plaintiffs quote in part throughout their complaint. *See, e.g.,* Complt. ¶¶ 514, 541, 570, and 646. The Court can consider the full text of those opinions and reports, as well as the full text of other documents plaintiffs cite, in ruling on the motion to dismiss. *See, e.g., In re NTL Inc. Sec. Litig.*, No. 02 Civ. 3013 (LAK), 2004 WL 2786024 at *2 (S.D.N.Y. Dec. 6, 2004) (the court "may consider also the full text of documents partially quoted in
(cont'd)

Second, with respect to plaintiffs' claim under Section 20(a), it is well settled that bare allegations of "control" are insufficient to state a claim. In addition, plaintiffs must allege facts giving rise to a reasonable inference that Deloitte USA "possessed the power to direct or cause the direction of the management and policies of [DT-Italy], whether through the ownership of voting securities, by contract, or otherwise." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472-73 (2d Cir. 1996). Here, plaintiffs do not allege — nor could they allege — that Deloitte USA has any ownership interest in DT-Italy or any contractual right to control how DT-Italy conducts its audits in accordance with Italian accounting and auditing principles. That both firms are members in the same association of accounting firms gives Deloitte USA no right to exercise control over how DT-Italy conducts its business. *See, e.g., In re Asia Pulp & Paper Sec. Litig.*, 293 F.Supp.2d 391, 396 (S.D.N.Y. 2003) (dismissing Section 20(a) claim against Andersen Worldwide Societe Cooperative because the complaint was "bereft" of any allegations showing that the umbrella organization "was able to control or in any way influence the particular audits conducted or opinions offered by its individual member firms"). Indeed, the Articles of the Verein governing DTT specifically require each member firm to "respect the exclusive privileges of the other Member Firms within their jurisdictions." *See* Ex. D hereto, Art. 6.3(a).[2]

In addition to their failure to plead the element of "control," plaintiffs have also failed to plead any "culpable participation" on the part of Deloitte USA in DT-Italy's alleged wrongdoing.

---

(… cont'd)

the complaint where the documents are 'integral' to it and relied upon by plaintiffs"). References in this memorandum to "Ex. __ hereto" are to the exhibits attached to the Declaration of Michele Odorizzi.

[2]      "[A] Swiss Verein is an entity without an exact legal counterpart in the United States, but which is somewhat akin to an incorporated membership association. It is legally distinct from its members." *Jeffries v. Deloitte Touche Tohmatsu Int'l*, 893 F.Supp.455, 457 n.1 (E.D. Pa. 1995). In ruling on the motion to dismiss, the Court can take into account the Articles of the Verein, which are the equivalent of a corporate charter. *See McCall v. Scott*, 239 F.3d 808, 814 (6th Cir. 2001) (taking judicial notice of the Company's articles of incorporation in an appeal on a motion to dismiss); *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F.Supp.2d 1248, 1278 (N.D. Cal. 2000) (same).

Plaintiffs have done their best to obscure the very minor role that Deloitte USA played with respect to the worldwide audit of Parmalat and its numerous subsidiaries by defining "Deloitte" to include DTT and Deloitte USA and then alleging, without any factual basis, that "Deloitte" performed all of the audit work and signed the audit opinions at issue here.  But that pleading device cannot obscure the fact that all of the audit work plaintiffs challenge was done by DT-Italy — and *not* by Deloitte USA.  As a result, there is no basis for inferring that Deloitte USA had any knowledge whatsoever of any errors or misstatements in the Parmalat financial statements, let alone that it was a culpable "participant" in the alleged wrongdoing.

## BACKGROUND

Parmalat is an Italian dairy and food conglomerate with subsidiaries all over the world. Plaintiffs allege that beginning in 1999 "Deloitte" — a term plaintiffs use to lump together DTT, Deloitte USA and all of the DTT member firms that played any role in auditing Parmalat — "was engaged by Parmalat to provide independent auditing and/or consulting services to Parmalat, including the preparation, examination and/or review of Parmalat's consolidated financial statements for fiscal years 1999 through 2003."  Complt. ¶¶ 134, 135, 137.  Parmalat's own SEC filings, however, identify its "independent auditors" as "Deloitte & Touche spa, registered office in Milan at Palazzo Carducci, via Olona 2."  Ex. E hereto at 10.  In addition, plaintiffs admit that it was DT-Italy that signed the audit report issued with respect to Parmalat's financial statements and the Parmalat group's consolidated financial statements for fiscal 1999 and that DT-Italy partners Adolfo Mamoli and Giuseppe Rovelli "had the final responsibility to certify the audits."  Complt. ¶¶ 514, 1024.

In fact, *all* of the audit opinions and reports that were disseminated to investors were signed by DT-Italy. *See* Exs. A-C hereto.  Each opinion and report at issue here appeared on DT-Italy letterhead, was written in Italian, and was signed on behalf of "Deloitte & Touche S.p.A."

(an Italian "Societá per Azione," Complt. ¶ 135(A)), either by "Adolfo Mamoli, Socio [Partner]" or by "Giuseppe Rovelli, Socio." *Id.*[3]   An English translation accompanied each of these audit letters and reports, explaining that "[t]his report has been translated into the English language solely for the convenience of international readers." Exs. B and C hereto. The English translation of each audit opinion stated DT-Italy's opinion that Parmalat's financial statements for the year "comply with principles which regulate the preparation of consolidated financial statements in Italy." Ex. B.  And the English translation of each review report explained that DT Italy's review "was carried out in accordance with the criteria for reviews recommended by CONSOB [the Italian equivalent of the SEC, Complt. ¶ 1(g)] under Resolution n. 10867 of July 31, 1997." Ex. C. Significantly, there is no mention of either U.S. accounting principles or Deloitte USA anywhere in the DT-Italy audit opinions or half-year reviews.[4]

### Plaintiffs Offer No Factual Support For Their' "One-Firm" And Agency Allegations Against DTT

Deloitte USA never made any statements to investors about Parmalat.  In paragraphs 138-154 of the complaint, plaintiffs lay out their theory as to why Deloitte USA should nevertheless be deemed responsible for audit opinions and reports that were issued and signed by DT-Italy, which is an entirely separate firm.  Plaintiffs begin by alleging that "Deloitte holds itself out as a leading unified international professional services firm which delivers accounting, assurance, advisory, tax, and consulting services 'seamlessly around the globe.'"  Complt. ¶ 138. They say

---

[3]       An S.p.A. is a limited liability business association.  *See* Francesco A. Di Pietro, *Direct Investment in Italy Through a Corporation: A Guide for Selecting from the Available Options*, 10 INT'L LEGAL PERSP. 193, 194 (1998).  As such, it is a separate and distinct legal entity.  *See, e.g.*, *Pharmachemie, B.V. v. Pharmacia, S.p.A.*, 934 F.Supp. 484, 486 (D. Mass. 1996).

[4]       A "Deloitte & Touche" logo appears at the top of the DT-Italy stationery and a smaller DTT logo is at the bottom.  But there is no reference to Deloitte & Touche LLP, which is the Deloitte USA auditing firm.  Moreover, the remainder of the letterhead makes it clear that it was the Italian firm that was providing the opinion or report.  Thus, the letterhead identifies the sender as "Deloitte & Touche, S.p.A." and includes the address and telephone number of the Milan office.  At the bottom right-hand corner there is a list of the Italian cities where DT-Italy does business, along with the address of its "sede legale" (its registered office) and information about DT Italy's capitalization and its registration as an Italian business association.  *See* Exs. A-C hereto.

that "Deloitte markets itself as a single global enterprise," but then quote DTT marketing materials that describe DTT as "an organization of member firms" and that tout the services provided by the "member firms."   *Id.*   Plaintiffs also note that DTT's website states that, effective October 1, 2003, "our organization will be recognized in the marketplace by the single brand name 'Deloitte'"; plaintiffs allege that member firms are required to use the "Deloitte" brand name and logo when soliciting potential clients and delivering contracted-for services. Complt. ¶¶ 139-40.  But plaintiffs neglect to mention that this very website carefully explains that each DTT member is a separate legal entity:

> As a Swiss Verein (Association), *neither Deloitte Touche Tohmatsu nor any of its member firms has any liability for each other's acts or omissions.  Each of the member firms is a separate and independent legal entity* operating under the names "Deloitte," "Deloitte & Touche," "Deloitte Touche Tohmatsu," or related names.  Services are provided by the member firms or their subsidiaries or affiliates and not by the Deloitte Touche Tohmatsu Verein.

*See* Ex. F hereto (emphasis added).[5]

In support of their allegation that DTT controlled DT-Italy, which supposedly acted as DTT's agent in auditing Parmalat, plaintiffs point to the fact that representatives of DTT member firms participate in practice groups and regularly attend practice meetings.  Complt. ¶ 144.  They allege that DTT has established a "policy and practice" to "cross-check the quality of each other's work product" across member firms in order to ensure the quality of service provided under the "Deloitte" tradename and that it "promulgates professional standards which its member

---

[5]        In addition to citing marketing materials, plaintiffs point to a request for a no-action letter that Deloitte USA filed with the SEC in May 2004 — after the events at issue here — in which Deloitte USA used the defined term "Deloitte" to refer to DTT, Deloitte USA and all other DTT member firms.  Complt. ¶ 143; *see* 2004 SEC No-Act LEXIS 610 (May 7, 2004) (Ex. G hereto), which contains the full text of Deloitte USA's request to the SEC and the SEC's response.  This request, however, related to the SEC's new independence rules for auditors, which define the term "accounting firm" for this particular purpose very broadly to encompass not only the firm that conducts the audit but also "all of the organization's departments, divisions, parents, subsidiaries, and associated entities, including those located outside of the United States."  17 C.F.R. § 210.2-01(f)(2).

firms must obey." Complt. ¶¶ 144-45.[6]  They also allege that member firms use each other's services "to perform or assist in performing" audits of multinational companies like Parmalat and that they "join together in submitting bids for potential audit services and other work." Complt. ¶¶ 148-49.  Finally, plaintiffs point to the fact that DTT publicly reports annual revenues earned by its member firms on a combined basis, noting that in an October 1, 2003 press release DTT announced combined revenues for fiscal year 2003. Complt. ¶ 150. Once again, however, plaintiffs omit the fact that the press release ends with an explanation that it is the member firms (rather than DTT) that provide services, that each member firm is "a separate and independent legal entity," and that the member firms therefore do not have "any liability for each other's acts or omissions." Ex. H hereto.[7]

### Plaintiffs Offer No Factual Support For Their "Alter Ego" Allegations Against Deloitte USA

Having asserted the existence of an agency relationship between DTT and DT-Italy, plaintiffs try to forge the final connection between DT-Italy and Deloitte USA by claiming that DTT "was, at all relevant times, dominated and controlled by its U.S. member firm and alter ego, Deloitte & Touche LLP." Complt. ¶ 151.  The only fact plaintiffs cite in support of this claim, however, is that, for the last ten years, the positions of CEO and CFO at DTT have been held by Deloitte USA partners.  From 1999 through May 2003, James Copeland was the CEO of both DTT and Deloitte USA, while Jeffrey Rohr and then Bill Fowler acted as CFO of both DTT and

---

[6]    In ¶ 147, plaintiffs allege that in May 2004, DTT's CEO announced the creation of a global ethics and compliance program and global code of conduct.  Plaintiffs do not explain how the creation of such programs *after* the events at issue here has any relevance to their claims against Deloitte USA.

[7]    The last paragraph of the October 1, 2003 press release reads as follows:

    Deloitte Touche Tohmatsu is a Swiss Verein (association), and, as such, neither Deloitte Touche Tohmatsu nor any of its member firms has any liability for each other's acts or omissions.  Each of the member firms is a separate and independent legal entity operating under the names "Deloitte," "Deloitte & Touche," "Deloitte Touche Tohmatsu," or related names.  The services described herein are provided by the member firms and not by the Deloitte Touche Tohmatsu Verein.

Deloitte USA.   Complt. ¶¶ 151-52.   In May 2003, Bill Parrett was elected CEO of DTT; he continues to serve as Deloitte & Touche LLP's senior partner.   Complt. ¶ 151.[8]

Significantly, plaintiffs do not allege that Deloitte USA has a majority of directors on DTT's Board of Directors or has any contractual right to control the activities of the Verein — let alone to control the activities of another member of the Verein.   The Court can take judicial notice of the fact that the Articles of the Verein specifically require both DTT and the DTT member firms to respect the independence and exclusive rights of each member firm within its own jurisdiction.   *See* Ex. D hereto, Articles 6.1, 6.3.   Plaintiffs also do not allege that Deloitte USA conducts itself in a manner that ignores the separate identity of the Verein, that it commingles DTT's funds with its own, or that DTT is undercapitalized — in short, plaintiffs fail to allege any indicia of an "alter ego" under American law.

### Plaintiffs Do Not Allege Any Facts To Show That Deloitte USA Controlled DT-Italy's Audit Activities Or That Deloitte USA Engaged In Any Wrongdoing

Apart from generalized allegations about the marketing of the "Deloitte" brand-name and cooperation among DTT members, plaintiffs offer no factual basis for their assertion that DT-Italy was acting as an agent of DTT (and Deloitte USA as well) when it signed the audit opinions and review reports at issue here.   For example, plaintiff does not allege that either DTT or Deloitte USA ever entered into an engagement letter with Parmalat in which either agreed to undertake the audit of its consolidated financial statements.   Nor do they even try to explain how an American auditing firm could possibly purport to provide an opinion as to whether financial

---

[8]      Plaintiffs quote references in the press releases announcing the elections of Parrett and Rohr in an attempt to show that Deloitte USA also portrayed itself and DTT as a single, worldwide firm.   Complt. ¶¶ 151-52.   But, once again, they leave out the explanations that appear at the end of these press releases.   *See* Ex. I hereto (February 18, 2003 press release quoted in part in Complt. ¶ 151) ("Deloitte & Touche is the national practice of [DTT].   [DTT] is a Swiss Verein, and *each of its national practices is a separate and independent legal entity*") (emphasis added); Ex. J hereto (June 21, 2004 press release quoted in part in Complt. ¶ 152) (using the same language quoted in footnote 7, above).

statements comport with accounting principles that are generally accepted in Italy.

Plaintiffs also do not allege any facts to suggest that either DTT or Deloitte USA ever exercised any control over DT-Italy's conduct of the Parmalat audit. The closest plaintiffs come to alleging any involvement by DTT is their claim that in April 2002 a DT-Italy partner (Adolfo Mamoli) sent an "internal note" to DTT's CEO (who was also the CEO of Deloitte USA), James Copeland, asking Copeland to intervene to resolve a situation that had arisen involving DTT's "Brazilian affiliate," which was auditing a Brazilian affiliate of Parmalat. Complt. ¶ 1010. Plaintiffs allege that Mamoli expressed concern that Parmalat might take away a "multimillion-dollar worldwide engagement" as a result of inquiries being made by a DT-Brazil partner named Olivetti. Although plaintiffs quote from the memo, they do not allege that it contained any information that should have alerted Copeland to the fact that there was a fraud afoot at Parmalat. Moreover, plaintiffs do not allege that Copeland did anything in response to Mamoli's memo. Instead, they simply allege that DT-Brazil subsequently altered its position, stating that it would include an "emphasis note" in its audit report for the Brazilian Parmalat affiliate, rather than qualifying its opinion. Complt. ¶ 1011.

Plaintiffs allege that in 2003, Olivetti threatened once again to refuse to sign off on the Brazilian subsidiary's financial statements. They claim that "the global Deloitte organization, headed in the United States by Jim Copeland, 'removed' Olivetti from any further role in auditing Parmalat's Brazlian operations." Complt. ¶ 1013. But this carefully crafted sentence does not purport to allege that Copeland himself took any action. Indeed, it does not even allege that Copeland knew about this particular episode — let alone that he had information that should have alerted him to misstatements in Parmalat's consolidated financial statements or that he took

10

any action to "silence" Olivetti.[9]

Plaintiffs' allegations do not support their assertion that DTT or Copeland was directing and controlling the conduct of the Parmalat audit.  On the contrary, the allegations show that DT-Italy was in charge of the audit; the fact that DT-Italy sought assistance from DTT when a controversy arose with another DTT member does not give rise to an inference that DTT — much less Deloitte USA — controlled the Parmalat audit. Furthermore, the facts plaintiffs allege do not give rise to an inference that Copeland did anything wrong or that he had any reason to believe that there were any material misstatements in Parmalat's consolidated financial statements.

When it comes to Deloitte USA, plaintiffs' allegations are even sketchier.  Plaintiffs allege that "Deloitte" provided auditing services for "various Parmalat entities in the United States, including Parmalat USA Corporation" and that its "U.S. offices provided non-audit services, including providing 'comfort letters' in connection with certain Parmalat U.S. acquisitions." Complt. ¶ 86. Significantly, plaintiffs do not claim that Parmalat USA Corporation or any other U.S. entity that Deloitte USA supposedly provided services to was involved in the fraud, that any financial statements that Deloitte USA audited were materially misstated, that Deloitte USA made any mistakes in any of the work it did for "various Parmalat entities" in the United States, or that it uncovered any portion of the alleged fraud in the course of performing this work.  In short, plaintiffs allege no misconduct whatsoever on the part of Deloitte USA.

The only specific allegation in the entire complaint about Deloitte USA's conduct is in ¶ 1000, where plaintiffs allege that an auditor in "Deloitte's" New Jersey office, Mike Power, "raised concerns about Parmalat's overvaluation of goodwill in connection with the review and

---

[9]     In ¶ 1034, plaintiffs allege that "[a]s explained above, Copeland successfully silenced Deloitte auditors who raised questions regarding their audits of Parmalat's Brazilian affiliates."  In the "above" passages plaintiffs are referring to, however, plaintiffs do not allege any facts to support the claim that Copeland "silenced" anyone.

certification for fiscal year 2002" with "Bigogno," whom plaintiffs identify as being from "Deloitte Milan."  Plaintiffs allege that Bigogno in turn raised this issue with Parmalat's CFO and the DT-Italy partners who signed the audit opinions in 2003, but that "Deloitte" failed to conduct any further investigation.  Plaintiffs do not allege that Power did anything wrong; on the contrary, plaintiffs' own allegations demonstrate that he did his job properly by raising his "concerns" with the auditors who were responsible for opining on the material accuracy of the parent's consolidated financial statements under Italian accounting principles.[10]

Plaintiffs do not even attempt to explain how this sequence of alleged events can be squared with their assertion that Deloitte USA directed and controlled the Parmalat audit:  after all, if Deloitte USA had been in control and was raising concerns about the audit with its "agents" (the DT-Italy partners), it would have been able to compel DT-Italy to address those concerns.  Plaintiffs' allegation that *DT-Italy* failed to address those concerns before Mamoli or Rovelli signed off on the DT-Italy audit opinion confirms that DT-Italy was acting independently and *not* subject to the control of Deloitte USA.

### Plaintiffs Do Not Allege That Anyone Was Misled Into Believing That Parmalat's Financial Statements Had Been Audited By Deloitte USA

Although plaintiffs appear to be relying at least in part on a "holding out" theory, they do not allege that they or investors in general were misled into believing that Deloitte USA was speaking through the audit opinions signed by DT-Italy.  In fact, the lead plaintiffs here, who are sophisticated investors, clearly understood that DTT members are separate entities.  During the litigation over who should be appointed lead plaintiff, one faction pointed out that the Hermes

---

[10]    In ¶ 390, plaintiffs allege that Parmalat failed to record in its consolidated financial statements $26.5 million in "accumulated amortization against goodwill already booked" by Parmalat USA.  Footnote 2 of Parmalat USA's financial statements, which were audited by Deloitte USA, fully discloses that Parmalat USA had written down goodwill by $26.5 million as a result of the implementation of a new U.S. GAAP accounting rule.  *See* Ex. K hereto at 7.  Thus, according to plaintiffs themselves, the financial statements that Deloitte USA audited were correct; plaintiffs' only complaint is that the consolidated financial statements — which were audited by DT-Italy — supposedly did not properly reflect the writedown taken by Parmalat USA.

plaintiffs were audited by the DTT member firm in the United Kingdom and argued that their relationship presented a potential conflict.  Hermes' counsel (who has since been selected as lead counsel for the class) dismissed the claimed conflict on the ground that "[w]e use the UK Deloitte, *which is a separate company*, as our auditor.  There is an Italian entity that is invariably going to be defended here.  That's not our auditor.  They are not even licensed to audit in the UK."  May 21, 2004 Tr. (Ex. L hereto) at 7 (emphasis added).   Under these circumstances, plaintiffs can hardly argue now that they did not appreciate that DT-Italy was a "separate company" that was licensed to audit financial statements in Italy and that Deloitte USA was *not* licensed to do so.[11]

**ARGUMENT**

I.      **The Complaint Fails To Meet The Requirements Of Rule 9(b) And The PSLRA Because It Impermissibly Lumps Together The Statements And Conduct Of A Number Of DTT Member Firms.**

When it enacted the PSLRA, Congress recognized that "professionals are prime targets of abusive securities lawsuits.  The deeper the pocket, the greater the likelihood that a marginal party will be named as a defendant."  S. Rep. No. 104-98 at 9 (1995).  The heightened pleading requirements of the PSLRA were designed to enable the Court to root out strike suits against professionals (among others) at the outset of the litigation, by requiring plaintiffs to provide a clear factual basis for the claims asserted against *each* of the defendants.  As this Court recently explained in *In re NTL Inc. Sec. Litig.*, complaints in a Section 10(b) case must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  2004 WL 2786024 at *2.  In addition, "bald allegations of scienter will not suffice.  Plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the

---

[11]      Indeed, plaintiffs should be judicially estopped from making such an argument.  *See Mitchell v. Washingtonville Cen. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir. 1999).

required state of mind.'"  *Id.*  Finally, "[w]here, as here, there are multiple defendants, the complaint must also disclose the specific nature of each defendant's participation in the alleged fraud."  *Goldin Assocs., LLC v. Donaldson, Lufkin & Jenrette Sec. Corp.*, No. 00 Civ. 8688 (WHP), 2003 WL 22218643 at *3 (S.D.N.Y. Sept. 24, 2003).  *See also Lippe v. Bairnco Corp.*, 225 B.R. 846, 860 (S.D.N.Y. 1998) (even under Rule 8, "plaintiffs cannot simply 'lump' all the defendants together and allege that the purported acts of every defendant can be imputed to every other defendant").

Plaintiffs have not come close to meeting these standards with respect to Deloitte USA.  Rather than specifically explaining what Deloitte USA supposedly said or did, plaintiffs have tried to obscure Deloitte USA's involvement (or lack thereof) by improperly "lumping together" all of the DTT member firms and DTT under the term "Deloitte."  Indeed, plaintiffs even try to hide the true identity of the "speaker" of the alleged misstatements by attributing the audit opinions and review reports issued by DT-Italy to "Deloitte."  *See*, *e.g.*, Complt. ¶¶ 570, 573, 646.  This tactic is fundamentally inconsistent with Rule 9(b) and the PSLRA and is enough, in and of itself, to require dismissal of the claims asserted against Deloitte USA.

This is not a case where the group pleading doctrine can be invoked "to 'circumvent the general pleading rule that fraudulent statements must be linked directly to the party accused of fraudulent intent.'"  *In re NTL Inc. Sec. Litig.*, 2004 WL 2786024 at *3 n.26.  The group pleading doctrine allows plaintiffs to rely on a presumption that SEC filings, press releases and similar documents are the collective work of "insiders" who are directly involved in the day-to-day business operations of the company.  *Id.*  Here, however, plaintiffs do not allege any facts to suggest that Deloitte USA was involved in the day-to-day business of Parmalat, DT-Italy, or of any other DTT member firms.  Accordingly, plaintiffs should not be excused from pleading facts showing what *each* DTT member (and DTT itself) allegedly said or did.

In *In re Lernout & Hauspie Sec. Litig.*, 230 F.Supp.2d 152, 169-70 (D. Mass. 2002), the court rejected the argument that the group pleading doctrine excused plaintiffs from particularizing the role played by one member of an international accounting association (KPMG UK) in an allegedly fraudulent audit opinion issued by another member (KPMG Belgium). In that case, as here, the plaintiffs had not alleged any facts showing that representatives of KPMG UK played "an active daily role" in managing KPMG Belgium or in handling the audit in question. Under those circumstances, the court concluded that KPMG UK could not be deemed the equivalent of a "clearly cognizable corporate insider" to whom the statements in question would "automatically be attributed" for pleading purposes under the group pleading doctrine. *Id.* at 170. On the contrary, the court observed that "[t]he necessity for this Court to 'evaluate the allegations concerning each of the individual defendants' . . . is especially compelling where defendants are not officers of a single corporation, but independent corporate entities linked only by their membership in a trade association and collaboration on certain client projects." *Id.* *See also In re Elan Corp. Sec. Litig.*, No. 02 Civ. 865 (RMB)(FM), 2004 WL 1305845 at *26 (S.D.N.Y. May 18, 2004) (Magistrate's Report & Rec.) (plaintiffs could not avoid pleading KPMG-US's specific involvement in an audit conducted by KPMG-Ireland because the complaint did not allege facts showing that KPMG-US had the "requisite level of involvement" necessary to invoke the group pleading doctrine).

## II.  Plaintiffs Have Failed To State A Claim For Primary Liability Against Deloitte USA.

In Counts IV and V of the complaint plaintiffs seek to hold Deloitte USA primarily liable under Section 10(b) on two grounds. First, they allege that Deloitte USA should be held responsible for alleged misstatements in the audit opinions and reports issued by DT-Italy that were disseminated to investors. Complt. ¶ 1102. Second, plaintiffs also seek to hold Deloitte USA liable for alleged participation in Parmalat's "scheme" to deceive the investing public.

Complt. ¶ 1101.  For the reasons set forth below, plaintiffs have failed to state a claim against Deloitte USA under either theory.

> **A.  Plaintiffs Have Not Alleged Any Basis For Holding Deloitte USA Liable For Audit Opinions And Reports Signed By DT-Italy.**

After the Supreme Court's decision in *Central Bank*, it is clear that Section 10(b) "reaches only primary violators, *i.e.*, those who commit a manipulative or deceptive act in connection with the purchase or sale of securities."  *Rich v. Maidstone Fin., Inc.*, No. 98 Civ. 2569(DAB), 2002 WL 31867724 at *7 (S.D.N.Y. Dec. 19, 2002), citing *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 114 S. Ct. 1439 (1994).  As the Second Circuit explained in *Wright v. Ernst & Young LLP*, an allegation that the defendant somehow assisted, enabled or allowed *someone else* to make a deceptive statement on which investors relied is not enough to state a claim of primary liability: "if *Central Bank* is to have any real meaning, a defendant must actually make a false or misleading statement in order to be held liable under Section 10(b).  Anything short of such conduct is merely aiding and abetting, and no matter how substantial that aid may be, it is not enough to trigger liability under Section 10(b)." 152 F.3d 169, 175 (2d Cir. 1998) (internal quotation marks omitted).

In *Wright*, the Second Circuit held that Ernst & Young LLP ("E&Y") could not be held liable under Section 10(b) for its client's release of materially misleading, unaudited financial results.  Plaintiffs alleged that E&Y had "signed off" on the financial results knowing or in reckless disregard of the fact that they were materially misstated.  Even though the results were described as "unaudited," plaintiffs claimed that the market understood that they would not have been released absent E&Y's approval.  Plaintiffs argued that, under these circumstances, E&Y had "substantially participated" in the making of the allegedly false statement and therefore should be held primarily liable for violating Section 10(b).  The Second Circuit rejected this argument, adopting a "bright line" test under which only a person who actually makes a

16

statement to investors may be held primarily liable for a misstatement.  152 F.3d at 175.

The Second Circuit noted that a secondary actor like E&Y could be held liable for "speaking" indirectly to the market — that is, for making a false or misleading statement that it knew or should have known would be communicated to investors by someone else. But the Court concluded that it would "circumvent the reliance requirements" of the 1934 Act, as interpreted by the Supreme Court in *Central Bank*, to hold E&Y liable for statements made by another that were not attributed to E&Y. 152 F.3d at 175.  In *Central Bank*, the Supreme Court had held that plaintiffs "must show reliance on the defendant's misstatement or omission to recover under 10b-5."  511 U.S. at 180, 114 S.Ct. at 1449.  In *Wright*, the Second Circuit concluded that investors must understand that they are relying on statements made by the defendant in question; thus, in order to impose primary liability on a defendant for a statement made by someone else, the "misrepresentation must be attributed to that specific actor at the time of public dissemination, that is, in advance of the investment decision." 152 F.3d at 175.

The alleged misstatements in DT-Italy's audit opinions and review reports were neither made by Deloitte USA nor attributed to Deloitte USA.  Accordingly, under the "bright line" rule adopted in *Wright*, plaintiffs cannot state a Section 10(b) claim against Deloitte USA.  *See In re Elan Corp. Sec. Litig.*, 2004 WL 1305845 at *25-26 (under *Wright,* KPMG-US could not be held liable for misstatements in financial statements audited by KPMG-Ireland because the audit report was never attributed to KPMG-US). Indeed, plaintiffs' allegations about the conduct of representatives of Deloitte USA and DTT are classic examples of attempts to plead prohibited claims for aiding and abetting.  Plaintiffs' assertion that Jim Copeland "successfully silenced" DT-Brazil auditors who raised questions about Parmalat's Brazilian subsidiaries, even if supported by factual allegations, would amount at most to a claim that Copeland aided and abetted misstatements by DT-Italy and Parmalat.

Similarly, a Section 10(b) claim against Deloitte USA cannot be based on a claim that, as the auditor of a subsidiary company, Deloitte USA failed to ensure that a write-down of goodwill was properly reflected in the parent company's consolidated financial statements. In *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1211 (11th Cir. 2001), the Eleventh Circuit upheld the dismissal of just such a claim, holding that Coopers & Lybrand could not be held liable for alleged misstatements in a parent company's financial statements audited by another firm based on the claim that Coopers knew, as a result of audit work it had done for a subsidiary, that the parent company's financial statements were materially misstated. Following *Wright*, the Eleventh Circuit held that Coopers could not be held liable because plaintiffs had not alleged any affirmative misrepresentations that were attributed to Coopers and because plaintiffs had not cited any accounting principle that would have imposed on Coopers, as subsidiary's auditor, a duty to ensure the accuracy of the parent company's consolidated financial statements. So too, in this case, DT-Italy's audit opinions and reports were never attributed to Deloitte USA; as an auditor of a U.S. subsidiary of Parmalat, Deloitte USA had no obligation (or ability) to ensure the accuracy of the Italian parent company's consolidated financial statements under Italian accounting principles.[12]

Plaintiffs try to get around *Wright* by claiming that DT-Italy acted as the agent for DTT and that DTT is the "alter ego" of Deloitte USA. In *Gabriel Capital, L.P. v. NatWest Finance, Inc.*, 122 F.Supp.2d 407, 431-32 (S.D.N.Y. 2000), the court held that "agency" liability survived *Central Bank*. *Accord*, *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001). However, in order to reconcile agency principles with the Second Circuit's decision in *Wright*, the court held that a principal can be liable under § 10(b) for the

---

[12]     *See also In re AM Int'l, Inc. Sec. Litig.*, 606 F.Supp. 600, 607 (S.D.N.Y. 1985) (affiliated accounting firms who "acted as a source of information" about foreign subsidiaries could not be sued for failing to ensure that the information they provided was properly reflected in the parent's financial statements).

misrepresentations of its agent *only* if the person to whom the misrepresentations were made "knows" that the agent is acting under the "actual or apparent authority of the principal." 122 F.Supp.2d at 431 (emphasis added).  The court noted that "[b]y explaining her authority to the listener, the agent essentially attributes the misrepresentations to the principal."  *Id*.

*Gabriel Capital* also concluded that alter ego liability survived *Central Bank*.  The court recognized that "[b]ecause a parent corporation is being held legally accountable for the acts of its subsidiary, there is a danger that veil-piercing liability could run afoul of *Central Bank*."  122 F.Supp.2d at 432.  But it held that adherence to traditional veil-piercing principles would avoid any conflict with *Central Bank* because the rationale for piercing the veil is that "the parent corporation was, in reality, the party responsible for the allegedly fraudulent conduct."  *Id*.  Thus, "[a]ny lingering concern about veil-piercing liability after *Central Bank* is alleviated by the fact that plaintiffs must meet a high standard before such liability can attach."  *Id*.

As demonstrated below, plaintiffs have not alleged any basis for concluding that DT-Italy acted as the agent of DTT or Deloitte USA, let alone that the claimed agency relationship was ever disclosed, leading investors to attribute DT-Italy's audit opinions to Deloitte USA. Moreover, plaintiffs have failed to plead any facts to show that they can meet the "high standard" necessary to treat DTT and Deloitte USA as if they were a single entity.

###     1.     Plaintiffs Have Not Alleged Any Factual Basis For Treating DT-Italy As The Agent Of Either DTT Or Deloitte USA.

In order to establish a principal/agent relationship, plaintiffs must plead and prove:  "(1) the manifestation by the principal that the agent shall act for him; (2) the agent's acceptance of the undertaking; and (3) an understanding between the parties that the principal is to be in control of the undertaking."  *Nuevo Mundo Holdings*, 2004 WL 112948 at *4 (citing *Restatement (Second) of Agency* § 1 cmt. B (1958)).  "The importance of control by the principal is paramount."  *Id*. at *5.  Thus, absent a factual basis for believing that DTT and Deloitte USA

directed and controlled DT-Italy's conduct of the Parmalat audit, there is no basis for any inference of an agency relationship.

In this case, plaintiffs allege that DTT and Deloitte USA perpetrated a fraud by using their purported control over DT-Italy and other DTT members.  Because plaintiffs' allegations with respect to the purported agency relationship are so closely intertwined with their fraud claims, the heightened pleading requirements of Rule 9(b) should apply.  *Kolbeck v. LIT America, Inc.*, 923 F.Supp. 557, 569 (S.D.N.Y. 1996).  But even under notice pleading requirements, plaintiffs would not be able to state a claim simply by asserting that DT-Italy acted as the agent of DTT or Deloitte USA; plaintiffs must allege a factual basis from which the Court can reasonably infer an agency relationship.  *Nuevo Mundo Holdings*, 2004 WL 112948 at *4 (if "one firm" and agency claims against accounting firms were to "withstand defendants' motion to dismiss, their complaint must clearly and specifically articulate allegations of fact which can support the existence of at least one of these relationships").

Here, plaintiffs do not allege any facts suggesting that a principal-agent relationship was formed for the purpose of conducting the Parmalat audit.  For example, plaintiffs do not identify any documents suggesting that DTT or Deloitte USA was appointed to audit the Parmalat family of companies.  In fact, as noted above, Parmalat itself stated in its SEC filings that DT-Italy was its independent auditor.  Instead, plaintiffs' claim seems to be that DTT is structured and markets itself in such a way that DTT members *always* act as agents on behalf of DTT (and Deloitte USA as well) when they perform auditing work.

This is a theory that has been thoroughly discredited in case after case.  For example, in *In re Lernout & Hauspie Sec. Litig.*, 230 F.Supp.2d at 172-73, the court held that plaintiffs had failed to plead a claim against KPMG's umbrella organization (also a Swiss verein) under an agency theory.  The court held that allegations that different KPMG entities cooperated on

20

different aspects of the audit in question was insufficient to support the assertion of an agency relationship because there was no "support for the notion that such collaborations occurred at the behest of, on behalf of, under the direction of, or subject to the control of KPMG International." *Id.* at 173. The court also rejected the claim that KPMG International's "global" marketing created an apparent or implied agency, noting that the KPMG website (like the DTT website) contained an "express declaration that each member . . . is a 'separate and independent legal entity.'" *Id.* at 173 n.17. *See also In re Worldcom, Inc. Sec. Litig.*, 02 Civ. 3288 (DLC), 2003 WL 21488087 at *10 (S.D.N.Y. Jun. 25, 2003) ("bare allegations are insufficient" to state a claim against Andersen Worldwide based on alleged principal-agent relationship with a member firm); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 2004 WL 2955934 at *36 n.41 (it is "well recognized" that members of an international accounting association are not "one entity" and are not agents or partners of each other); *Nuevo Mundo Holdings*, 2004 WL 112948 at *3 (same); *Skidmore Energy, Inc. v. KPMG,* No. 03 CV 2138-B, 2004 WL 3019097 at *4 (N.D. Tex. Dec. 28, 2004) (plaintiffs' allegations that KPMG was acting as a "worldwide organization" were insufficient to state a RICO claim against KPMG-US for the acts of the KPMG member in Morocco); *Gutierrez v. Cayman Islands Firm of Deloitte & Touche*, 100 S.W.3d 261 (Tex. App. 2002) (no agency relationship between DTT member firms); *In re AM Int'l, Inc. Sec. Litig.*, 606 F.Supp.600, 607 (S.D.N.Y. 1985) (dismissing claim that all Price Waterhouse affiliates worldwide were "in fact one entity, and acted as agents of one another"); *Reingold v. Deloitte Haskins & Sells*, 599 F.Supp.1241, 1252-54 (S.D.N.Y. 1984) (dismissing same claim against Deloitte Haskins & Sells). [13]

---

[13]     *Cromer Fin. Ltd. v. Berger*, No. 00 Civ. 2284 (DLC), 2002 WL 826847 (S.D.N.Y. May 2, 2002) ("*Cromer II*"), is the only case we are aware of in which a court has denied a motion to dismiss a Section 10(b) claim against an international umbrella association that was sued on an agency theory. While we believe that *Cromer II* was wrongly decided, the facts alleged there are clearly distinguishable from the allegations here. In *Cromer II*, plaintiffs alleged that the audit firm, Deloitte-Bermuda, had only seven members and that the Deloitte-Bermuda

(cont'd)

As these cases hold, the fact that DTT markets DTT member firms globally and sets standards that members must meet in order to continue using the "Deloitte" and "DTT" trademarks owned by DTT does not transform DTT member firms into "agents" of DTT — let alone agents of Deloitte USA.  The same principle has long been applied to licensors.  Under the Lanham Act, licensors have "an affirmative duty . . . to supervise trademark licensees to ensure that the trademark is not used to deceive the public concerning the quality of goods or services furnished under the trademark."  *Maresca v. Holiday Inns, Inc.*, No. 92 Civ. 4550 (RPP), 1993 WL 8166 at *5  (S.D.N.Y. Jan. 5, 1993).  But it is well-settled that requiring licensees or franchisees to comply with quality standards does not create a principal-agent relationship.  *Id.* at *5.  Instead, it is only where the licensor or franchisor "controls the day-to-day operations of the franchisee" that an agency relationship may arise. *Hong Wu v. Dunkin' Donuts, Inc.*, 105 F.Supp.2d 83, 87 (E.D.N.Y. 2000).  In this case, plaintiffs do not allege any facts to suggest that DTT controlled the "day-to-day operations" of DT-Italy or of any other DTT member firm, for that matter.  Accordingly, plaintiffs have failed to provide any factual basis for their claim that DT-Italy acted as the agent for DTT and Deloitte USA in connection with the audit of Parmalat's financial statements.

Apart from their failure to allege the existence of an agency relationship, plaintiffs have also failed to allege any facts to suggest that the market was ever informed or understood that DT-Italy was acting as the agent for DTT or Deloitte USA.  The audit opinions themselves, as

---

(… cont'd)

partner in charge of the audit was a leader of DTT's global investment management and hedge fund practice who acted as DTT's agent in auditing the Fund in question. *Id.* at *2-3. The court also relied on the fact that nothing in the audit reports themselves or the Fund Offering Memorandum made it clear that a separate Deloitte-Bermuda entity was the auditor.  *Id.* at *5. Here, by contrast, plaintiffs' agency allegations are not supported by any facts, and it was crystal clear to investors that DT-Italy was the auditor.  Significantly, Judge Cote did not disturb her prior conclusion in *Cromer I* that plaintiffs had failed to state either Section 10(b) or state law claims against Deloitte USA under either an agency or "partnership by estoppel" theory. *Cromer Fin. Ltd. v. Berger*, 137 F.Supp.2d 452, 496 (S.D.N.Y. 2001) (noting that neither the audit reports nor the offering memorandum mentioned Deloitte USA).

well as Parmalat's SEC filings, made it clear that it was "Deloitte & Touche S.p.A." that served as Parmalat's outside auditor.   Moreover, the very marketing materials that plaintiffs cite as evidence that DTT held itself out as "one firm" make it clear that DTT does not provide audit services, that member firms like DT-Italy are separate and independent entities, and that neither DTT "nor any of its member firms has any liability for each other's acts or omissions."   *See* Ex. F hereto.   Under these circumstances, plaintiffs cannot claim that the market attributed DT-Italy's audit opinions and review reports to DTT or Deloitte USA.   Thus, plaintiffs fail both prongs of the test set forth in *Gabriel Capital*:   they do not allege any basis for treating DT-Italy as the agent of either DTT or Deloitte USA, nor do they allege that investors in general (or the named plaintiffs in particular) attributed DT-Italy's statements to either DTT or Deloitte USA.

### 2.   Plaintiffs Have Failed To Allege Any Basis For Treating Deloitte USA  As The "Alter Ego" Of DTT.

Even if plaintiffs had alleged sufficient facts to show that DT-Italy was the agent of DTT (which they have not), their Section 10(b) claim against Deloitte USA fails unless they can properly plead the final step of their theory — that DTT is a mere "alter ego" of Deloitte USA. Where, as in this case, "plaintiffs' securities fraud and veil-piercing claims are inextricably intertwined," plaintiffs' alter ego allegations must meet the heightened pleading requirements of Rule 9(b).   *Gabriel Capital*, 122 F.Supp.3d at 434 & n.14.   Even under Rule 8, however, it would not be enough for plaintiffs to make a conclusory assertion that one entity is the alter ego of another.   *ATSI Communications, Inc. v. The Shaar Fund, Ltd.,* 2004 WL 909173 at *3.

It is well settled that "[t]he law allows a corporation to organize so as to isolate liabilities among separate entities." *Murray v. Miner*, 74 F.3d 402, 404 (2d Cir. 1996).   "Under the doctrine of limited liability, a corporate entity is liable for the acts of a separate, related entity only under extraordinary circumstances."   *Id.*   The entities at issue here are not corporations.   But the same fundamental principle applies.   Indeed, it should apply with even greater force to professional

service organizations like accounting firms, which (unlike affiliated corporations) do not have common ownership, but rather are individually owned and controlled by their partners.

DTT and its member firms are "organize[d] so as to isolate liabilities among separate entities." The Deloitte USA partnerships are Delaware limited liability partnerships. Complt. ¶¶ 132-33. As such, they are by statute "separate legal entit[ies] . . . distinct from [their] partners" — and from other DTT members as well. Del. Code Ann. tit. 6, § 15-201(a). DT-Italy is an Italian limited liability business association, which is also a separate and independent legal entity. *See* n.3, *supra*. The Articles of the DTT Verein are specifically designed to give DTT members the same limited liability that shareholders would enjoy if DTT had been organized as a corporation. Thus, Article 7.4 specifically provides that "the liabilities and obligations of the Verein may be enforced against its assets only, and no Member Firm shall have any personal liability for any liabilities or obligations of the Verein." *See* Ex. D hereto. Absent extraordinary circumstances, this "isolat[ion of] liabilities" should not be disturbed. Indeed, the consequences of holding an American accounting firm liable for the activities of another firm practicing thousands of miles away in another language and pursuant to different rules would be devastating: the American accounting firm would be subjected to potentially unlimited liability for conduct that it knew nothing about and could not possibly control.

Plaintiffs have not come close to pleading the extraordinary circumstances necessary to treat DTT as the "alter ego" of Deloitte USA. As the Second Circuit explained in *Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1052 (2d Cir. 1997), in order to establish an "alter ego" claim, plaintiffs must show that the owner has exercised such complete domination and control over the entity in question that it "has become a mere instrumentality" of the owner, that "such control has been used to commit a fraud or other wrong," and that the "fraud or wrong results in

an unjust loss or injury to plaintiff" (internal quotation marks omitted).[14]   In determining whether the first element of "complete control" exists, the courts consider a long list of factors, none of which is "decisive," including

> (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities.

*Id.* at 1053.

In the cases cited above (at 20-21), courts have consistently rejected "one firm" and alter ego claims based on the kinds of allegations made here.   For example, in *Nuevo Mundo Holdings*, 2004 WL 112948 at *6-7, the court dismissed an "alter ego" claim based on the alleged "close contact" among Andersen Worldwide members and the overall supervision and training allegedly provided by Andersen Worldwide.   In *In re Lernout & Hauspie Sec. Litig.*, 230 F.Supp.2d at 170, the court held that plaintiffs had failed to properly plead a claim based on a "single firm" theory, noting that "[s]everal courts have declined to treat different firms as a single entity, holding them jointly and severally liable for on another's acts,  simply because they shared an associational name and/or collaborated on certain aspects of the relevant transaction." *See also Skidmore Energy, Inc. v. KPMG,* 2004 WL 3019097 at *5 (rejecting "alter ego" theory as applied to KPMG-US); *In re Asia Pulp & Paper Sec. Litig.*, 293 F.Supp.2d at 396 (rejecting "the 'one-firm' unified company theory" as a basis for imposing control person liability under Section 20(a)).

---

[14]     Plaintiffs do not allege Swiss law, as Rule 44.1 would require if they intended to pursue their veil-piercing claim under the law governing the Verein.  Therefore, we assume that plaintiffs are taking the position that American veil-piercing or alter ego law would apply in this action.  For purposes of this motion, we will assume that the law of the forum should be applied.  Because plaintiffs have not come close to pleading a viable alter ego claim under any conceivable law, the Court need not undertake a choice of law analysis.

When all of the allegations about global marketing and DTT's attempts to create global standards are stripped away, all that is left of plaintiffs' "alter ego" claim is the fact that DTT and Deloitte USA had two overlapping senior officers. The mere existence of overlapping officers is not enough, however, to give rise to an inference that DTT is the "alter ego" of Deloitte USA. Indeed, even in the context of a wholly-owned subsidiary, the courts have held that the existence of overlapping officers and directors is "not determinative." *In re Ski Train Fire in Kaprun, Aus.*, 230 F.Supp.2d 403, 412 (S.D.N.Y. 2002).

As the Supreme Court observed in *United States v. Bestfoods*, 524 U.S. 51, 69, 118 S. Ct. 1876, 1888 (1998), it is a "well established principle [of corporate law] that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership" (internal quotation marks omitted; brackets in original). Courts "generally presume that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary." *Id.* (internal quotation marks omitted). As a result, the "time-honored common law rule" is that the mere fact that there are dual officers and directors making policy decisions and supervising the subsidiary's activities is not enough, standing alone, to provide a basis for imposing liability on the parent for the wrongs committed by the subsidiary. *Id.* at 70, 118 S. Ct. at 1888-89. The same principle applies with even greater force here, where (unlike a parent corporation) Deloitte USA is not alleged to have controlled a majority of the DTT Board of Directors. Under these circumstances, there is no reason to question the ordinary presumption that when Jim Copeland acted as CEO of DTT, he was wearing his "DTT hat," rather than his "Deloitte USA hat" — and there is therefore no basis for treating DTT as if it were the alter ego of Deloitte USA.

Apart from their failure to advance any facts to support the claim that DTT was a "mere instrumentality" of Deloitte USA, plaintiffs have also failed to allege any basis for believing that

the entities at issue here were established to perpetrate a fraud or other wrong, to the detriment of the plaintiffs.  This requirement dovetails with the standard set forth in *Central Bank* and *Wright*, under which plaintiffs must be able to show that the misstatements in question were attributed to Deloitte USA.   For, in order to show that the form of the Verein was used to perpetrate a fraud on investors in Parmalat securities, plaintiffs would have to allege that investors were misled into believing that Deloitte USA had provided the audit opinions in question when, in fact, the opinions were provided by DT-Italy.

As described above, plaintiffs do not allege that either they or the market believed that the audit opinions issued by DT-Italy constituted statements by Deloitte USA.  The Hermes plaintiffs clearly understood that DTT members are separate firms and that they provide audit services in different countries under the accounting standards applied in those countries.  In addition, the very documents plaintiffs rely upon make it clear that DTT and its member firms are all separate legal entities and therefore not legally responsible for each other's conduct. Plaintiffs allege that the market for Parmalat securities was an efficient market. Complt. ¶ 1064. Taking that allegation as true for purposes of the motion to dismiss, the Court must presume that the market was aware not only of the "global" service claims made in DTT's press releases and on its website, but also of the unequivocal statements that appear in those same documents explaining that DTT and its member firms are separate legal entities.

**B.    Plaintiffs Have Not Stated A Claim Based On "Scheme" Liability.**

Plaintiffs also try to get around *Central Bank* and *Wright* by claiming that Deloitte USA can be held primarily liable under Rule 10b-5(a) and (c) as an alleged "participant" in a claimed "scheme" to defraud Parmalat investors. Some courts have adopted "scheme" liability to hold secondary actors liable for "creating" transactions designed to enable a company to misstate its financial results or condition — even though the secondary actors in question never made any

27

statements to the market.  *See*, *e.g.*, *In re Enron Corp. Sec., ERISA and Deriv. Litig.*, 235 F.Supp.2d 549, 577-81 (S.D. Tex. 2002); *but see In re Homestore.com, Inc. Sec. Litig.*, 252 F.Supp.2d 1018, 1038-42 (C.D. Cal. 2003), and *In re Dynegy*, *Inc. Sec. Litig.*, 339 F.Supp.2d 804, 916 (S.D. Tex. 2004) (rejecting the approach adopted in *Enron* on the ground that this type of "scheme liability" creates a new form of aiding and abetting liability, in contravention of *Central Bank*).  In *In re Global Crossing Sec. Litig.*, Judge Lynch concluded that a secondary actor can be held liable for orchestrating a fraudulent scheme, even if the actor did not speak directly to the market.  322 F.Supp.2d at 336.  He concluded that plaintiffs had stated a "scheme" claim against Arthur Andersen by alleging that Andersen had "masterminded the misleading accounting" treatment of certain transactions. *Id.*

The theory adopted in *Global Crossing* cannot be reconciled with the Second Circuit's post-*Central Bank* case law.  Indeed, it would eviscerate the "bright line" distinction recognized in *Wright* to impose primary liability under a "scheme" theory on a secondary actor who never made any representations to investors, on the ground that the actor allegedly enabled the issuer to make misrepresentations.  But this Court need not decide this issue in order to dismiss plaintiffs' "scheme" claim against Deloitte USA.  Even under the standard adopted in *Global Crossing*, that claim fails because plaintiffs do not allege that Deloitte USA "orchestrated" anything. Indeed, the sum total of Deloitte USA's alleged "participation" in the audit of Parmalat's consolidated financial statements consists of allegedly raising "concerns" about how the parent company was accounting for goodwill in its 2002 financial statements — activity that is insufficient, under *any* theory, to provide a basis for imposing primary liability on Deloitte USA under Section 10(b).

### C.  Plaintiffs Have Failed To Plead Facts Giving Rise To A Strong Inference That Deloitte USA Acted With Scienter.

A separate and independent reason for dismissing plaintiffs' Section 10(b) claim against Deloitte USA is that plaintiffs have failed to meet their burden under the PSLRA of pleading

specific facts giving rise to a strong inference that Deloitte USA acted with the necessary intent to deceive investors.  Because plaintiffs have not pleaded facts sufficient to show that DT-Italy acted as Deloitte USA's agent, they cannot base their scienter allegations on the knowledge or conduct of DT-Italy or its partners — or of DTT or any other DTT member firm for that matter. Instead, plaintiffs must be able to point to specific information that was communicated to Deloitte USA or conduct by Deloitte USA that gives rise to a strong inference that Deloitte USA knew that Parmalat's consolidated financial statements were materially misstated or recklessly disregarded facts that must have made the misstatements obvious.  *Rothman v. Gregor*, 220 F.3d 81, 88, 98 (2d Cir. 2000) (scienter was not properly plead where no facts were alleged from which the court could "reasonably infer that [the accounting firm] knew" the critical facts necessary to alert it to the fraud).[15]  Plaintiffs have not come close to meeting that burden.

As described above, the only allegations in the entire 368-page complaint about Deloitte USA's knowledge appear in ¶ 1000 of the complaint, where plaintiffs allege that a Deloitte USA auditor in New Jersey (Mike Power) raised "concerns" with DT-Italy auditors about Parmalat's alleged overvaluation of goodwill.  Plaintiffs do not allege any facts to suggest that it must have been obvious to Power — who is not alleged to have been qualified to opine on Italian accounting principles — that goodwill was overvalued on Parmalat's consolidated financial statements under those principles.  Nor do they cite any accounting principle under generally accepted auditing standards in either the U.S. or Italy that would have required Power to do more than raise whatever concerns he may have had with the Italian auditors responsible for conducting the audit of the parent company's financial statements under Italian accounting

---

[15]    Plaintiffs do not allege that Deloitte USA had any motive or opportunity to engage in fraud.  They allege that "Deloitte" was paid "tens of millions" for the Parmalat engagement.  Complt. ¶ 155.  But plaintiffs do not allege how much Deloitte USA was paid for the work it did.  In any event, the mere fact that an accounting firm is paid for its work is not a sufficient motive to give rise to a strong inference that it acted with scienter.  *See, e.g.*, *In re Oxford Health Plans, Inc., Sec. Litig.*, 51 F.Supp.2d 290, 294 (S.D.N.Y. 1999).

principles. Indeed, far from suggesting that Power was complicit in any fraud, the facts alleged in the complaint suggest that he was doing precisely what he should have done, by communicating his "concerns" to the auditors of Parmalat's consolidated financial statements and allowing them to decide whether or how those concerns should be addressed.[16]

### III.   Plaintiffs Have Failed To State A Claim Against Deloitte USA Under Section 20(a).

In order to state a claim for control person liability under Section 20(a), plaintiffs must plead: (1) a primary violation by the allegedly controlled person; (2) control by the defendant of the primary violator; and (3) "that the controlling person was in some meaningful sense a culpable participant in the primary violation." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (internal quotation marks omitted); *accord, In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 77-78 (2d Cir. 2001), *SEC v. First Jersey Sec., Inc.*, 101 F.3d at 1472. Even if we assume, for purposes of argument, that plaintiffs have properly pleaded a primary violation by DT-Italy, they have not met their obligation of pleading control by Deloitte USA or of pleading facts showing "culpable participation."

### A.   Plaintiffs Have Failed To Plead The Element Of "Control."

"Control" for purposes of Section 20(a) means "the power to direct or cause the direction of the management and policies of [the controlled person], whether through the ownership of voting securities, by contract, or otherwise." *SEC v. First Jersey Sec.*, 101 F.3d at 1472-73. Conclusory allegations of control are insufficient to state a claim under Section 20(a). *ATSI Communications, Inc. v. The Shaar Fund, Ltd.,* No. 02 Civ. 9726 (LAK), 2004 WL 909173 at *3 (S.D.N.Y. Apr. 28, 2004). Plaintiffs must be able to "allege facts from which it can be inferred

---

[16]    As noted above, plaintiffs also allege that DT-Italy contacted Jim Copeland to mediate a dispute between DT-Italy and DT-Brazil concerning the audit of Parmalat's Brazilian subsidiary. The allegations of the complaint, however, make it clear that Mr. Copeland was consulted in his role as CEO of DTT — and not when he was wearing his Deloitte USA "hat." In any event, for the reasons outlined in Mr. Copeland's motion to dismiss and the motion to dismiss filed by DTT, plaintiffs' allegations regarding Mr. Copeland's conduct are also insufficient to give rise to a strong inference that he acted recklessly or with knowledge of the Parmalat fraud.

that the defendant had actual power or influence over the controlled person." *Rich v. Maidstone Fin.*, 2002 WL 31867724 at *11; *Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*, No. 02 Civ. 0767 (LBS), 2002 WL 31819207 at *9 (S.D.N.Y. Oct. 10, 2002); *In re Deutsche Telekom AG Sec. Litig.*, No. 00 Civ. 9475 (SHS), 2002 WL 244597 at *7 (S.D.N.Y. Feb. 20, 2002) ("Conclusory allegations" of control "are insufficient for the assertion of liability pursuant to sections 15 and 20(a)") ("In order to survive a Rule 12(b)(6) motion, a plaintiff must plead facts which support a reasonable inference that they had the potential power to influence and direct the activities of the primary violator") (internal quotation marks omitted).

In this case, plaintiffs do not allege — nor could they allege — that Deloitte USA had any ownership interest in DT-Italy or that it had any contractual right to control how DT-Italy conducted its audit of Parmalat's financial statements.  On the contrary, the Articles of the Verein specifically require Deloitte USA to "respect the exclusive privileges of the other Member Firms within their jurisdictions."  Ex. D, Article 6.3(a).  Thus, there is no factual basis for any claim that Deloitte USA had the right to control DT-Italy directly.

In apparent recognition of the weakness of any claim of direct control, plaintiffs allege that Deloitte USA controlled DT-Italy indirectly, through its alleged control over DTT.  Once again, however, plaintiffs offer no factual basis for their conclusory assertion that Deloitte USA controlled DTT which, in turn, controlled DT-Italy.  Plaintiffs do not allege, for example, that Deloitte USA had a majority of directors on the DTT Board or otherwise had the contractual right  to control DTT.[17]  Instead, plaintiffs apparently rely on the overlap of CEO's and CFO's between DTT and Deloitte USA.  For all of the reasons set forth above, that overlap is not enough to give rise to a reasonable inference that Deloitte USA controlled DTT.

---

[17]     Indeed, even a controlling ownership interest is not enough, without more, to plead a control person claim. *See In re Worldcom, Inc. Sec. Litig.*, No. 02 Civ. 3288 (DLC), 2004 WL 1097786 at *3 (S.D.N.Y May 18, 2004) (allegations of a parent-subsidiary relationship were not enough to meet the plaintiffs' burden of pleading control).

Moreover, in order to state a control person claim against Deloitte USA, plaintiffs would also have to show that DTT had the ability to control DT-Italy's day-to-day operations and specifically its conduct of the Parmalat audit. *See In re Sotheby's Holdings, Inc.,* No. 00 Civ. 1041 (DLC), 2000 WL 1234601 at *8 (S.D.N.Y. Aug. 31, 2000) ("Actual control over the wrongdoer and the transaction in question is necessary for control person liability"). Plaintiffs apparently take the position that DTT "controls" DT-Italy because DTT allegedly "promulgates professional standards which its member firms must obey." Complt. ¶¶ 144-45.  As the court held in *In re Asia Pulp & Paper Sec. Litig.*, however, allegations that an umbrella organization like DTT "set 'professional standards and principles' under which the individual offices operated" are insufficient to state a claim for control person liability.  293 F.Supp.2d at 396.[18] As in *Asia Pulp & Paper*, this Court should dismiss plaintiffs' control person claim because the complaint is "bereft of any allegations that [DTT], pursuant to an agreement or otherwise, was able to control or in any way influence the particular audits conducted or opinions offered by its individual member firms."  *Id.*  Indeed, any such control or influence would be directly contrary to the Articles of the Verein, which expressly provide that DTT shall "respect: (a) the independence and integrity of the Member Firms; (b) the exclusive privileges of each Member Firm within its jurisdiction; and (c) the obligation of the Member Firms to comply with the laws, regulations, professional rules of conduct, codes of ethics, and usages applicable to Professional Services in their respective jurisdictions."  Ex. D, Article 6.1.

### B.     Plaintiffs Have Failed To Plead "Culpable Participation" By Deloitte USA.

As this Court noted in a recent decision, there is an ongoing debate in this District about whether the element of culpable participation must be pleaded in a Section 20(a) case.  *See In re*

---

[18]     In any event, DTT could not control the auditing standards that apply to its member firms, because each member is subject to a host of local laws that control its provision of professional services.  *See* Ex. D hereto, Article 6.1.

*NTL Inc. Sec. Litig.*, 2004 WL 2786024 at *13.   The Second Circuit has repeatedly held that culpable participation is an element of a Section 20(a) claim.   *See supra* at 30.   In light of these authorities, the "debate is properly understood not as whether 'culpable participation' is a requirement of a Section 20(a) claim, but what the phrase 'culpable participation' means."   *In re Philip Servs. Corp. Sec. Litig.*, No. 98 Civ. 0835 (MBM), 2004 WL 1152501 at *20 n.13 (S.D.N.Y. May 19, 2004).

The vast majority of courts in this District have concluded that some showing of scienter is required to state a claim under Section 20(a).[19]   Only Judges Scheindlin and Cote have concluded that, while culpable participation is an element of a Section 20(a) claim, plaintiffs are not required to allege any kind of scienter on the part of the alleged control person in order to state a claim under Section 20(a).   *See, e.g., In re Initial Public Offering Sec. Litig.*, 241 F.Supp.2d 281 (S.D.N.Y. 2003); *In re WorldCom, Inc. Sec. Litig.*, 294 F.Supp.2d 392 (S.D.N.Y. 2003).   In *WorldCom*, Judge Cote held that there is no "requirement that the plaintiff plead or prove a culpable state of mind to allege or establish culpable participation." 294 F.Supp.2d at 415. Judge Scheindlin reached the same result in the *IPO Litigation*, stating that "[w]hy 'culpable participation' was equated with scienter is a mystery that no court in this circuit has ever explained. 'Culpable' means: 'Guilty; blameworthy' *Black's Law Dictionary* 385 (7th ed. 1999). Certainly conduct can be blameworthy though it was done unintentionally or unknowingly."   241 F.Supp.2d at 394 n.182.

---

[19]     *See, e.g., Shanahan v. Vallat*, No. 03 Civ. 3496 (MBM), 2004 U.S. Dist. LEXIS 25523 at *16 (S.D.N.Y. Dec. 14, 2004) (attached hereto as Ex. M); *In re Bayer AG Sec. Litig*, No. 03 Civ. 1546 (WHP), 2004 WL 2190357 at *16 (S.D.N.Y. Sept. 30, 2004); *In re AOL Time Warner Sec. & ERISA Litig.*, No. 02 Civ. 5575 (SWK) 2004 WL 992991 at *28, 30 (S.D.N.Y. May 5, 2004); *In re Global Crossing, Ltd. Sec. Litig.*, 322 F.Supp.2d 319, 349 n.24 (S.D.N.Y. 2004); *Rich v. Maidstone Fin.*, No. 98 Civ. 2569, 2002 WL 31867724 at *12 (S.D.N.Y. Dec. 20, 2002); *Burstyn v. Worldwide Xceed Group, Inc.*, No. 01 Civ. 1125 (GEL), 2002 WL 31191741 at *7-8 (S.D.N.Y. Sept. 30, 2002); *In re Deutsche Telekom AG Sec. Litig.*, 2002 WL 244597 at *7; *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F.Supp.2d 371, 413-18 (S.D.N.Y. 2001); *Mishkin v. Ageloff*, No. 97 Civ. 2690 (LAP), 1998 WL 651065 at *23-24 (S.D.N.Y. Sept. 23, 1998).

The approach taken in the *IPO* and *Worldcom* cases should be rejected. Starting with the proposition (which has now been established in this Circuit) that "culpable participation" is an element of a Section 20(a) claim, it necessarily follows that it must have some relationship to the defendant's state of mind.   For if culpable participation can be pleaded simply by pleading control, as the *IPO* and *World Com* courts concluded, then it is entirely superfluous.   Moreover, "participation" alone is not enough; the defendants' participation must be in some sense "culpable" — that is, guilty or blameworthy.   *See* Webster's THIRD NEW INT'L DICTIONARY 552 (1993) ("culpable" means "meriting condemnation or censure"). Thus, in a case like this, it is not enough to allege that Deloitte USA "participated" in some fashion in the Parmalat audit.   To make that "participation" "culpable," plaintiffs must point to facts showing that Deloitte USA should have been aware that Parmalat's consolidated financial statements were materially misstated and should have taken some action to ensure that DT-Italy did not issue an unqualified audit opinion with respect to those financial statements. Otherwise, there is simply nothing that could be deemed "blameworthy" about Deloitte USA's conduct.

Because "culpable participation" requires scienter to be pleaded, it is subject to the PSLRA's "strong inference" standard.   *Shanahan v. Vallat*, 2004 U.S. Dist. LEXIS 25523 at 17.[20]   Formulations of the required level of intent vary. *See In re Deutsche Telekom*, 2002 WL 244597 at *7 (collecting cases).   Some cases require plaintiffs to plead facts giving rise to a strong inference "that the controlling person either knew or should have known that the controlled person was committing  fraud."   *Shanahan v. Valat*, 2004 U.S. Dist. LEXIS 25523 at *17.  Others require plaintiffs to plead "particularized facts of the controlling person's conscious misbehavior as a culpable participant in the fraud." *Mishkin v. Ageloff*, No. 97 Civ. 2690 (LAP),

---

[20]       See also *In re Bayer AG Sec. Litig.*, 2004 WL 2190357 at *16; *Rich v. Maidstone Fin.*, 2002 WL 31867724 at *12; *Burstyn v. Worldwide Xceed Group, Inc.*, No. 01 Civ. 1125 (GEL), 2002 WL 31191741 at *8 (S.D.N.Y. Sept. 30, 2002); *In re Deutsche Telekom AG Sec. Litig.*, 2002 WL 244597 at *7; *In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F.Supp.2d 741, 771 (S.D.N.Y. 2001).

1998 WL 651065 at *25 (S.D.N.Y. Sept. 23, 1998).  Still others require plaintiffs to plead the same level of scienter that is required for primary liability — "either conscious misbehavior or recklessness." *Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, No. 00 Civ. 8058 (NRB), 2001 WL 1111508 at *10 (S.D.N.Y. Sept. 19, 2001).

Plaintiffs' Section 20(a) claim should be dismissed no matter which formula is used here. For all of the reasons set forth in Part II-C above, plaintiffs have failed to allege any facts that give rise to an inference (let alone a strong inference) that Deloitte USA either knew or should have known that Parmalat's consolidated financial statements were misstated in any way. Accordingly, there is no basis for any claim that Deloitte USA was a "culpable participant" in DT-Italy's alleged misconduct.

## CONCLUSION

For the foregoing reasons, all of plaintiffs' claims against Deloitte USA should be dismissed with prejudice.

Respectfully submitted,

Dated: January 10, 2005

/s/ Michele Odorizzi
One of the attorneys for Defendants
Deloitte & Touche USA LLP and
Deloitte & Touche LLP

Alan N. Salpeter (admitted *pro hac vice*)
Stephen M. Shapiro (admitted *pro hac vice*)
Michele Odorizzi (admitted *pro hac vice*)
MAYER, BROWN, ROWE & MAW LLP
190 South LaSalle Street
Chicago, Illinois 60603
(312) 782-0600

Robert J. Ward (RW 0149)
MAYER, BROWN, ROWE & MAW LLP
1675 Broadway
New York, New York 10019
(212) 506-2500