UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x
                                                      :
                                                      :
                                                      :
                                                      :   MASTER DOCKET
In re PARMALAT SECURITIES LITIGATION   :   04 MD 1653 (LAK)
                                                      :
This document relates to:                      :
                                                      :
                                                      :   04 Civ. 0030 (LAK) ECF Case
PARMALAT SECURITIES LITIGATION       :   ELECTRONICALLY FILED
                                                      :
                                                      :
———————————————————————— x


## MEMORANDUM IN SUPPORT OF THE MOTION
## OF DEFENDANT DELOITTE TOUCHE TOHMATSU
## TO DISMISS THE FIRST AMENDED
## CONSOLIDATED CLASS ACTION COMPLAINT


KRAMER LEVIN NAFTALIS & FRANKEL, LLP
Michael J. Dell (MD-7714)
Robert A. de By (RD-6197)
919 Third Avenue
New York, New York 10022
(212) 715-9100

Attorneys for defendant Deloitte Touche Tohmatsu

# TABLE OF CONTENTS

**PAGE**

Table Of Authorities.................................................................................................................ii-x

Preliminary Statement ................................................................................................................. 1

The Complaint............................................................................................................................. 3

    A.    Parmalat's Fraudulent Scheme................................................................................3

    B.    Parmalat Hid Its Scheme From Its New Auditor DT-Italy ................................................4

    C.    DTT Is Not The Same Entity As DT-Italy And Did Not Audit Parmalat...........................5

    D.    DT-Italy And The Other DTT Member Firms That Audited  Parmalat And
        its Subsidiaries Are Not Controlled By Or Agents Of DTT ................................................6

Argument..................................................................................................................................... 7

I.    COUNTS IV AND V SHOULD BE DISMISSED FOR FAILURE TO STATE
    A CLAIM AGAINST DTT UNDER SECTION 10(b) OR RULE 10b-5 ...................................8

    A.    The Complaint Does Not Allege A Misrepresentation Or Omission
        By DTT.......................................................................................................................8

    B.    The Complaint Fails to Allege Scienter with the Required
        Particularity ...............................................................................................................10

        1.  No Facts Showing A DTT Motive or Opportunity .....................................................11

        2.  No Facts Showing DTT Conscious Misbehavior Or Recklessness ............................13

    C.    The Complaint Does Not Allege Reasonable Reliance Or Loss
        Causation....................................................................................................................14

II.    PLAINTIFFS' "ONE FIRM" AND "AGENCY" ALLEGATIONS
    DO NOT STATE A CLAIM AGAINST DTT ..........................................................................16

    A.    Plaintiffs Have Not Alleged Facts Showing That DTT Is The  Alter Ego Of
        Its Member Firms That Audited Parmalat Entities ............................................................18

        1.  The Complaint Fails To Allege That DTT Owned Shares  In Or
            Exercised Complete Dominion Over Its Member  Firms So That They
            Had No Will Of Their Own..........................................................................................20

        2.  The Complaint Fails To Allege That DTT Used Its Purported Dominion
            Over Its Member Firms To Perpetrate A Fraud Against Plaintiffs..............................22

B.  The Complaint Fails Adequately To Allege That DT-Italy Or Other DTT Member Firms Audited Parmalat Or Its Subsidiaries As Agents Of DTT ........................................................................................................................... 23

1.  Plaintiffs Do Not Allege Facts Showing That DTT Manifested That Any Member Firms Should Act for It In Their Audits of Parmalat Entities ......................................................................................................................... 24

2.  The Complaint Fails To Plead Facts Establishing That DTT's Member Firms Acted For DTT Rather Than For Themselves In Auditing Parmalat Or That DTT Controlled The Audits ........................................................... 27

C.  Plaintiffs Do Not Allege That DTT Deceived Them Into Believing That DTT And Its Member Firms Are "One Firm" Or That The Latter were DTT's Agents In Auditing Parmalat Entities And Plaintiffs Relied On That ............................... 29

III COUNT VI SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM UNDER SECTION 20(A) OF THE SECURITIES EXCHANGE ACT .............................................................................................................................................. 30

IV. THE COMPLAINT SHOULD BE DISMISSED BECAUSE ITS ALLEGATIONS AS TO DTT ARE CONFUSING AND ITS EXCEPTIONAL LENGTH VIOLATES THE REQUIREMENTS OF FED. R. CIV. P.8(A) AND 8(E)(1) ............................................................................................................. 34

KL3:2389365.1

# TABLE OF AUTHORITIES

**PAGE**

## CASES

*7-UP Bottling Co. v. Archer Daniels Midland Co. (In re Citric Acid Litig.)*,
191 F.3d 1090 (9th Cir. 1999), *cert. denied.* 529 U.S. 1037, 120 S. Ct. 1531
(2000) ................................................................................................................ 28, 32

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*, No. 02 Civ. 8726 (LAK), 2004
WL 616123 (S.D.N.Y. Mar. 30, 2004) ........................................................... 10, 33

*Aerotel, Ltd. v. Sprint Corp.*, 100 F. Supp. 2d 189 (S.D.N.Y. 2000) ........................... 21

*American Buying Ins. Servs., Inc. v. S. Kornreich & Sons, Inc.*, 944 F. Supp. 240
(S.D.N.Y. 1996) ...................................................................................................... 10

*American Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130 (2d Cir. 1997) ............................. 22

*American High-Income Trust v. Alliedsignal*, 329 F. Supp. 2d 534 (S.D.N.Y. 2004).................. 12

*American Protein Corp. v. AB Volvo*, 844 F.2d 56 (2d Cir.), *cert. denied*,
488 U.S. 852, 109 S. Ct. 136 (1988)............................................................... 19, 20

*Anderson v. Abbott*, 321 U.S. 349, 64 S. Ct. 531 (1944) .............................................. 16

*In re Asia Pulp & Paper Secs. Litig.*, 293 F. Supp. 2d 391 (S.D.N.Y. 2003) ............. 18, 20, 31, 32

*Atlantic Gypsum Co. v. Lloyds Int'l Corp.*, 753 F. Supp. 505(S.D.N.Y. 1990) ...................... 12 n.5

*Bamberg v. SG Cowen*, 236 F. Supp. 2d 79 (D.Mass. 2002) .......................................... 18, 22 n.22

*Bangor Punta Operations, Inc. v. Bangor & A. R. Co.*,
417 U.S. 703, 94 S. Ct. 2578 (1974).................................................................... 17

*In re Bayer AG Secs. Litig.*, No. 03 Civ.1546 WHP, 2004 WL 2190357
(S.D.N.Y. Sept. 30, 2004) ...................................................................................... 34

*In re Blech Secs. Litig.*, 928 F. Supp. 1279 (S.D.N.Y. 1996)......................................... 13

*In re Blech Secs. Litig.*, 961 F. Supp. 569 (S.D.N.Y. 1997)........................................... 31

*Boguslavsky v. Kaplan*, 159 F.3d 715 (2d Cir. 1998) .................................................... 33

*Boston Telecommunications Group, Inc. v. Deloitte Touche Tohmatsu*,
No C 02-05971 JSW (N.D. Cal. Aug. 7, 2003) ....................................................... 25

KL3:2389365.1

*Bourjaily v. United States*, 483 U.S. 171, 107 S. Ct. 2775 (1987)..........................................23, 24

*Bright v.Primary Source Media*, No. 98-1313 MJJ, 1998 WL 671247
(N.D. Cal. Sept. 29, 1998)...................................................................................22 n.9

*Brotherhood of Locomotive Eng'rs v. Springfield Terminal Ry. Co.*, 210 F.3d 18
(1st Cir. 2000) ....................................................................................................... 18

*Browning-Ferris Indus. of Ill., Inc. v. Ter Maat*, 195 F.3d 953 (7th Cir. 1999),
cert. denied, 529 U.S. 1098, 120 S. Ct. 1832 (2000); .......................................17 n.7

*Burstyn v. Worldwide Xceed Group, Inc.*, No. 01 Civ. 1125(GEL), 2002 WL 31191741
(S.D.N.Y. Sept. 30, 2002) ..................................................................................... 34

*In re CBT Group PLC Secs. Litig.*, No. C-98-21014-RMW, 2000 WL 33339615
(N.D. Cal. Dec. 29, 2000) ...................................................................................... 32

*Cabrera v. Jakabovitz*, 24 F.3d 372 (2d Cir. 1994)........................................................ 23

*Carte Blanche (Sing.) PTE., Ltd. v. Diners Club Int'l, Inc.*, 758 F. Supp. 908
(S.D.N.Y. 1991) ...................................................................................................... 29

*Castillo v. First City Bancorporation of Texas, Inc.*, 43 F.3d 953
(5th Cir. 1994)....................................................................................................19, 30

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
511 U.S. 164, 114 S. Ct. 1439 (1994) ...................................................................... 8

*Chiarella v. United States*, 445 U.S. 222, 100 S. Ct. 1108 (1980)................................... 8

*Chill v. General Elec. Co.*, 101 F.3d 263 (2d Cir. 1996) .........................................10, 14

*Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489 (2d Cir. 1992) ......................................... 15

*Cohen v. Standard Bank Inv. Corp. (Jersey) Ltd.*, No. 97 Civ. 3802 (SAS),
1998 WL 782024 (S.D.N.Y. Nov. 6, 1998) ............................................................ 23

*Converse, Inc. v. Norwood Venture Corp.*, No. 96 CIV. 3745  (HB), 1997
WL 742534 (S.D.N.Y. Dec. 1, 1997)..................................................................30-31

*In re Corning, Inc. Secs. Litig.*, No. 92 Civ. 345(TPG), 2004 WL 2979907
(S.D.N.Y. Dec. 22, 2004)........................................................................................ 34

*Cromer Fin. Ltd. v. Berger*, No. 00 Civ. 2284 (DLC), 2002 WL 826847
(S.D.N.Y. May 2, 2002)........................................................................................... 28

KL3:2389365.1

*Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452 (S.D.N.Y. 2001) ........................................ 28, 32

*Cromer Fin. Ltd. v. Berger*, 245 F. Supp. 2d 552 (S.D.N.Y. 2003) ............................................. 29

*DVI, Inc. v. Superior Court*, 104 Cal. App. 4th 1080, 128 Cal. Rptr. 2d 683
    (Cal. Dist. Ct. App. 2002); ................................................................................................ 22 n.9

*DeJesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65 (2d Cir. 1996), *cert. denied*,
    519 U.S. 1007, 117 S. Ct. 509 (1996) ................................................................................... 7

*In re Deutsche Telekom AG Secs. Litig.*, No. 00 CIV 9475 SHS, 2002 WL 244597
    (S.D.N.Y. Feb. 20, 2002) ............................................................................................... 31, 34

*DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242 (2d Cir. 1987) ............................ 10

*Dubowski v. Ash (In re AM Int'l, Inc. Secs. Litig.)*, 606 F. Supp. 600
    (S.D.N.Y. 1985) ............................................................................................................... 18, 22

*Duncan v. Pencer*, No. 94 Civ. 0321(LAP), 1996 WL 19043
    (S.D.N.Y. Jan. 18, 1996) ..................................................................................................... 12

*EED Holdings v. Palmer Johnson Acquisition Corp.*, No. 04 Civ. 0505
    (RWS), 2004 WL 2348093 (S.D.N.Y. Oct. 20, 2004) .......................................................... 22

*Electronic Switching Indus., Inc. v. Faradyne Elecs. Corp.*, 833 F.2d 418
    (2d Cir. 1987) ....................................................................................................................... 22

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 165 F. Supp. 2d 615
    (S.D.N.Y. 2001) .................................................................................................................... 15

*Epps v. Stewart Info. Servs. Corp*, 327 F.3d 642 (8th Cir. 2003) ............................................... 26

*In re Flag Telecom Holdings, Ltd. Secs. Litig.*, 308 F. Supp. 2d 249 (S.D.N.Y. 2004) ....... 34 n.17

*Fletcher v. Atex, Inc.*, 68 F.3d 1451 (2d Cir. 1995) ................................................................... 21

*Freeman v. Complex Computing Co.*, 119 F.3d 1044 (2d Cir. 1997) .......................................... 22

*Gabriel Capital, L.P. v. NatWest Fin., Inc.*, 122 F. Supp. 2d 407 (S.D.N.Y. 2000) .................... 19

*Ganino v. Citizens Utils. Co.*, 228 F.3d 154 (2d Cir. 2000) .................................................. 30, 33

*Glickman v. Alexander & Alexander Servs., Inc.*, No. 93 Civ. 7594 (LAP), 1996
    WL 88570 (S.D.N.Y. Feb. 29, 1996) ................................................................................... 14

*In re Global Crossing, Ltd. Secs. Litig.*, 322 F. Supp. 2d 319 (S.D.N.Y. 2004) .......................... 34

*Goh v. Baldor Elec. Co.*, No. 3:98-MC-064-T, 1999 WL 20943
(N.D. Tex. Jan. 13, 1999)..................................................................................................26 n.12

*Golf City, Inc. v. Wilson Sporting Goods, Co.*, 555 F.2d 426 (5th Cir. 1977) ........................22 n.9

*Gonzales v. Wing*, 167 F.R.D. 352 (N.D.N.Y. 1996)........................................................................35

*Gonzalez v. Walgreens Co.*, 878 F.2d 560 (1st Cir. 1989).......................................................22 n.9

*Greenwald v. Orb Communications & Mktg., Inc.*, No. 00 Civ.1939 (LTS HBP),
2003 WL 660844 (S.D.N.Y. Feb. 27, 2003).............................................................................16

*Gutierrez v. The Cayman Islands Firm of Deloitte & Touche*,
100 S.W. 3d 261, 270 (Tex. Ct. App. 2002) ..............................................................18, 22 n.9

*Gutierrez v. Cayman Islands Firm of Deloitte & Touche*, 100 S.W.3d 261, 270
(Tex. App. 2002),...................................................................................................................26 n.12

*Hevesi v. Citigroup Inc.*, 366 F.3d 70 (2d Cir. 2004)........................................................................15

*Hilliard v. Roc-Newark Assocs.*, 287 A.D.2d 691, 732 N.Y.S.2d 421
(2d Dep't 2001).............................................................................................................26, 27 n.13

*Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085 (2d Cir. 1995) ..................................................13

*Howard v. Klynveld Peat Marwick Goerdeler*, 977 F. Supp. 654 (S.D.N.Y. 1997),
*aff'd*, 173 F.3d 844  (2d Cir. 1999).........................................................................................21

*Holdings v. PricewaterhouseCoopers LLP*, No. 03 Civ. 0613 GBD, 2004 WL 112948
(S.D.N.Y. Jan. 22, 2004)...............................................................................................................18

*Howard v. Klynveld Peat Marwick Goerdeler*, 977 F. Supp. 654, 660-62
(S.D.N.Y. 1997), *aff'd*, 173 F.3d 844 (2d Cir. 1999).............................................................21

*Huard v. Shreveport Pirates, Inc.*, 147 F.3d 406 (5th Cir. 1998) ...........................................17 n.7

*ICD Holdings S.A.*, 976 F. Supp. 234 (S.D.N.Y. 1997)..................................................................12

*Itel Containers Int'l Corp. v. Atlanttrafik Exp. Serv. Ltd.*, 909 F.2d 698
(2d Cir. 1990)...................................................................................................................................26

*In re JWP Inc. Sec. Litig.*, 928 F. Supp. 1239 (S.D.N.Y. 1996)........................................................9

*Jeffries v. Deloitte Touche Tohmatsu Int'l*, 893 F. Supp. 455 (E.D. Pa. 1995).............5, 22 n.9, 28

*Johnson v. Hunger*, 266 F. Supp. 590 (S.D.N.Y. 1967)..................................................................34

*Matter of Kaiser*, 791 F.2d 73 (7th Cir.), *cert. denied*, 479 U.S. 1011,
107 S. Ct. 655 (1986) ..................................................................17 n.7

*Kalnit v. Eichler*, 85 F. Supp. 2d 232 (S.D.N.Y. 1999) ................................................................32

*Klesch & Co. v. Liberty Media Corp.*, 217 F.R.D. 517 (D. Colo. 2003) ................................22 n.9

*Kolbeck v. LIT America, Inc.*, 923 F. Supp. 557 (S.D.N.Y. 1996), *aff'd*, No. 96-9422,
1998 WL 406036 (2d Cir. June 8, 1998) .............................................................19

*Kramer v. Time Warner Inc.*, 937 F.2d 767 (2d Cir. 1991) ...........................................................3

*Kyung Sup Ahn v. Rooney, Pace Inc.*, 624 F. Supp. 368 (S.D.N.Y. 1985); ..................................23

*L'Europeenne de Banque v. La Republica de Venezuela*, 700 F. Supp. 114
(S.D.N.Y. 1988) ...........................................................................7

*L.L. Capital Partners, L.P. v. Rockefeller Ctr. Props., Inc.*, 921 F. Supp. 1174
(S.D.N.Y. 1996) ......................................................................8, 11

*Landy v. Mitchell Petroleum Tech. Corp.*, 734 F. Supp. 608 (S.D.N.Y. 1990) ......................10, 19

*In re Laser Arms Corp. Secs. Litig.*, 794 F. Supp. 475 (S.D.N.Y. 1989),
*aff'd*, 969 F.2d 15 (2d Cir. 1992)......................................................................14

*Lee v. Kim*, No. 93 CIV. 8280 (KTD), 1994 WL 586435 (S.D.N.Y. Oct. 25, 1994)....................23

*In re Lernout & Hauspie Secs. Litig.*, 230 F. Supp. 2d 152 (D. Mass. 2002) .............13, 18, 25, 30

*Levin v. McPhee*, 917 F. Supp. 230 (S.D.N.Y. 1996), *aff'd*, 119 F.3d 189
(2d Cir. 1997)..........................................................................3

*In re Livent Inc. Secs. Litig.*, 78 F. Supp. 2d 194 (S.D.N.Y. 1999)........................................13 n.6

*Logal v. Inland Steel Indus., Inc.*, 209 Ill. App. 3d 304, 568 N.E.2d 152
(Ill. App. 1 Dist. 1991)..........................................................................22

*Lonesome v. Lebedeff*, 141 F.R.D. 397 (E.D.N.Y. 1992)..............................................................35

*In re Loral Space & Communications Ltd. Secs. Litig.*, No. 01 Civ. 4388(JGK),
2004 WL 376442 (S.D.N.Y. Feb. 27, 2004) ..........................................................34

*Maung Ng We v. Merrill Lynch & Co.*, 2000 WL 1159835..............................................23, 26, 27

KL3:2389365.1

*Martin v. EVP Second Corp.*, No. 90 Civ. 7074 (LLS), 1991 WL 131176
(S.D.N.Y. July 9, 1991)..................................................................................... 24, 33

*In re Merrill Lynch & Co.*, 273 F. Supp. 2d 351 (S.D.N.Y. 2003) ...................................... 9, 15, 16

*Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125 (2d Cir. 2003)............................. 23

*Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1 (2d Cir. 1999)...................................... 29

*Mobil Oil Corp. v. Bransford*, 648 So. 2d 119 (Fla. 1995) ..................................................... 29 n.14

*In re Motel 6 Secs. Litig.*, 161 F. Supp. 2d 227 (S.D.N.Y. 2001) ................................................. 31

*Motorola Credit Corp. v. Uzan*, 388 F.3d 39 (2d Cir. 2004) ........................................................ 20

*Murray v. Miner*, 74 F.3d 402 (2d Cir. 1996) ............................................................................... 18

*Neubauer v. Eva-Health USA, Inc.*, 158 F.R.D. 281 (S.D.N.Y. 1994) ............................... 9, 31, 33

*Newby v. Enron Corp.*, No. 04-20001, 2004 WL 2892044 (5th Cir. Dec. 15, 2004) ................... 25

*In re Nortel Networks Corp. Secs. Litig.*, No. 01 Civ. 1855RMBMHD,
2004 WL 2149111 (S.D.N.Y. Sept. 23, 2004)........................................................ 26 n.12, 34

*Old Republic Nat'l Title Ins. Co. v. Moskowitz*, 297 A.D.2d 724, 747 N.Y.S.2d 556
(2nd Dep't 2002)............................................................................................................ 19

*Pahmer v. Greenberg*, 926 F. Supp. 287 (E.D.N.Y. 1996), *aff'd*, 123 F.3d 717
(2d Cir. 1997)................................................................................................................ 35

*Papas v. Smart Health U.S.A.*, 861 So. 2d 84 (Fla. Dist. Ct. App. 4th Dist. 2004) ...................... 29

*Paul v. Genesee & Wyoming Indus., Inc.*, 93 F. Supp. 2d 310 (W.D.N.Y. 2000) ........................ 19

*PCI Parfums et Cosmetiques Int'l v. Perfumania, Inc.*, No. 93 Civ. 9009,
1998 WL 646635 (S.D.N.Y. Sept. 21, 1998)........................................................... 21

*Perpetual Real Estate Servs., Inc. v. Michaelson Props., Inc.*, 974 F.2d 545
(4th Cir. 1992);............................................................................................................ 17 n.7

*Pits, Ltd. v. American Express Bank Int'l*, 911 F. Supp. 710 (S.D.N.Y. 1996)...................... 19, 20

*Primavera Familienstiftung v. Askin*, No. 95 CIV. 8905 (RWS),1996
WL 580917 (S.D.N.Y. Oct. 9, 1996) ......................................................................... 31 n.15

KL3:2389365.1

*In re Regal Communications Corp. Secs. Litig.*, Master File No. 94-179,
   1996 WL 411654 (E.D. Pa. July 17, 1996) ............................................................................ 32

*Reingold v. Deloitte Haskins & Sells*, 599 F. Supp. 1241 (S.D.N.Y. 1984) ............... 14, 18, 22, 26

*Reiss v. GAN S.A.*, 78 F. Supp. 2d 147 (S.D.N.Y. 1999), *vacated on other grounds*,
   235 F.3d 738, 743 (2d Cir. 2000) ........................................................................................... 21

*Rich v. Maidstone Fin., Inc.*, No. 98 Civ. 2569(DAB), 2002 WL 31867724
   (S.D.N.Y. Dec. 20, 2002) .......................................................................................... 34 & n.17

*Robbins v. Kroger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) .................................................. 15

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) .................................................................. 8, 11

*Ross v. Bolton*, No. 83 CIV. 8244 (WK), 1989 WL 80428
   (S.D.N.Y. Apr. 4, 1989), *aff'd*, 904 F.2d 819 (2nd Cir. 1990) ............................................. 31

*Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000) ........................................................................... 3

*In re Royal Ahold N.V. Secs. & ERISA Litig.*, No. Civ.1:03-MD-01539,
   2004 WL 2955934 (D. Md. Dec. 21, 2004) ....................................................... 11, 13 n.6, 21

*S.E.C. v. First Jersey Secs., Inc.*, 101 F.3d 1450 (2d Cir. 1996),
   *cert. denied*, 522 U.S. 812, 118 S. Ct. 57 (1997) ................................................................. 33

*SEC v. Price Waterhouse*, 797 F. Supp. 1217 (S.D.N.Y. 1992) .................................................. 14

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*,
   75 F.3d 801 (2d Cir. 1996) ............................................................................................... 12 n.5

*Schoenwandt v. Jamfro Corp.*, 261 A.D.2d 117, 689 N.Y.S.2d 461
   (1st Dep't 1999) ........................................................................................................................ 20

*Shapiro v. Cantor*, 123 F.3d 717 (2d Cir. 1997) ........................................................................... 9

*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ............................. 11, 12 n.5

*In re Shulman Transp. Enters., Inc.*, 744 F.2d 293 (2d Cir.), *cert. denied*,
   513 U.S. 876, 115 S. Ct. 205 (1984) ...................................................................................... 23

*In re Ski Train Fire in Kaprun, Austria*, 230 F. Supp. 2d 403
   (S.D.N.Y. 2002) ........................................................................................................................ 21

*Sloane Overseas Fund, Ltd. v. Sapiens Int'l Corp.*, 941 F. Supp. 1369
   (S.D.N.Y. 1996) ........................................................................................................................ 31

- ix -

*Skidmore Energy, Inc. v. KPMG LLP*, No. Civ.A.3:03CV2138-B, 2004
    WL 3019097 (N.D. Tex. Dec. 28, 2004) .......................................................... 13, 18, 26 n.12

*In re Sotheby's Holdings, Inc.*, No. 00 Civ. 1041(DLC), 2000 WL 1234601
    (S.D.N.Y. Aug. 31, 2000) ...................................................................................... 31

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank,*
    250 F.3d 87 (2d Cir. 2001)........................................................................ 24 n.10, 33

*Tarsis v. Reise Org.*, 211 F.3d 30 (2d Cir. 2000) ............................................................. 7

*In re Time Warner Inc. Secs. Litig.*, 9 F.3d 259 (2d Cir. 1993), *cert. denied,*
    511 U.S. 1017, 114 S. Ct. 1397 (1994)................................................................. 8

*Total Communications Servs. Inc. v. Seiscor Techs., Inc.*, 1990 U.S. Dist.
    LEXIS 13337 (N.D. Ill. Oct. 5 1990).............................................................. 22 n.9

*U.S. v. Bestfoods*, 524 U.S. 51, 118 S. Ct. 1876 (1998) ................................................ 16

*United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.*,
    960 F.2d 1080 (1st Cir. 1992) ............................................................................. 16

*VTech Holdings Ltd. v. Pricewaterhouse Coopers LLP*, No. 03 Civ. 1413 (LAK),
    2003 WL 21756623 (S.D.N.Y. July 30, 2003) .......................................... 14, 18, 34

*Valinote v. Ballis*, 295 F.3d 666 (7th Cir. 2002) ........................................................... 17

*Von Grabe v. Sprint PCS*, 312 F. Supp. 2d 1285 (S.D. Cal. 2003)........................ 22 n.9

*Wiedemann v. Cunard Line Ltd.*, 63 Ill. App. 3d 1023, 380 N.E.2d 932
    (Ill. App. 1 Dist. 1978)...................................................................................... 22 n.9

*Wood v. William Carter Co.*, 273 A.D.2d 7, 708 N.Y.S.2d 107 (1st Dep't 2000) ............... 29 n.14

*In re WorldCom, Inc. Secs. Litig.*, No. 02 Civ. 3288 (DLC), 2003 WL 21488087
    (S.D.N.Y. June 25, 2003)............................................................... 13, 24 n.10, 25, 29

*Wright v. Ernst & Young LLP*, 152 F.3d 169 (2d Cir. 1998) ......................................... 9

*Young v. FDIC*, 103 F.3d 1180 (4th Cir. 1997), cert denied, 522 U.S. 928 (1997) ............... 22 n.9

*Zucker v. Sasaki*, 963 F. Supp. 301 (S.D.N.Y. 1997)................................................... 12

**STATUTES**

KL3:2389365.1

15 U.S.C. § 78u-4(b) ...................................................................................................... 8, 10, 33

Fed. R. Civ. P. 8 ............................................................................................................ 1, 2, 3, 34

Fed. R. Civ. P. 9 ............................................................................................ 1, 7, 10, 12, 13, 14, 19

Fed. R. Civ. P. 12 ....................................................................................................... 1, 7, 10, 19

Private Securities Litigation Reform Act ....................................................................... 1, 9, 10

Securities Exchange Act, Section 10 ............................................................................... 1, 8, 9

Securities Exchange Act, Section 20 ............................................................................... 1, 2, 33

### Others

Larry D. Soderquist et al., *Corporate Law & Practice*, § 1:3.1 (2d ed. 1999) .............................. 17

Byron F. Egan, *Choice of Entity Alternatives*, 39 Tex. J. Bus. L., (2004) .............................. 17 n.7

Stephen B. Presser, *Piercing the Corporate Veil* § 1.01, at 4, § 1.06 (1997) ........................... 17 n.7

Frank H. Easterbrook & Daniel R. Fischel, *Limited Liability & the Corporation*,
52 U. Chi. L. Rev. 89, 92 & 97 (1985) ............................................................................ 17 n. 7

Henry G. Manne, *Our Two Corporation Systems: Law and Economics*,
53 Va. L. Rev. 259 (1967) ............................................................................................... 18 n.7

William M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations*,
§ 41 (perm ed. rev. vol. 1990) ...................................................................................... 19

KL3:2389365.1

Defendant Deloitte Touche Tohmatsu ("DTT") respectfully submits this memorandum in support of its motion to dismiss the First Amended Consolidated Class Action Complaint ("Complaint") as against DTT for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 8(a)(2), 8(e)(1), 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act ("PSLRA").

## Preliminary Statement

Plaintiffs sue for alleged damages sustained as a result of their purchase of securities of Parmalat Finanziaria S.p.A. ("Parmalat") and its subsidiaries between January 5, 1999 and December 18, 2003. Plaintiffs allege that the price of Parmalat securities was inflated due to a multi-billion dollar fraud.

DTT, a Swiss Verein which provides services only to its member firms, is not an audit firm, never audited nor had any dealings with Parmalat or any of its subsidiaries and never had any dealings with plaintiffs concerning Parmalat. Nevertheless, plaintiffs assert three claims for relief against DTT, Counts IV and V for violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder, and Count VI for violation of Section 20(a) of the Exchange Act. Plaintiffs attempt to provide a basis for their claims against DTT by lumping it together with its U.S. member firm, Deloitte & Touche LLP ("Deloitte USA") and Deloitte USA's affiliate, Deloitte & Touche USA LLP ("DT-US"), as "Deloitte," and making conclusory allegations that the DTT member firms that did audit Parmalat and its subsidiaries are agents of "Deloitte" (Compl. ¶ 135) and "Deloitte" is a "unified international professional services firm." (Compl. ¶ 138). However, plaintiffs do not allege facts that support those conclusions.

DTT shows in Point I below that Counts IV and V should be dismissed for failure to state a claim and to plead fraud with particularity. Plaintiffs fail adequately to allege any of the elements of a Section 10(b) claim. They do not allege facts establishing that (i) DTT made any misrepresentations or omissions in connection with the purchase or sale of Parmalat securities, (ii) DTT

acted with scienter, (iii) plaintiffs relied on any misrepresentation or omission by DTT in purchasing or selling Parmalat securities, or (iv) plaintiffs' damages were caused by their reliance on a misrepresentation by DTT.

Point II shows that plaintiffs cannot get around their failure to state a Section 10(b) claim against DTT, based on its own conduct, by alleging that the firms that are members of DTT and audited Parmalat or its subsidiaries did so as "Deloitte's" agents or that they and DTT are "one firm" because plaintiffs do not allege facts to support those conclusions. Courts have repeatedly dismissed complaints predicated on the same theory that international associations and member audit firms should be treated as "one firm," or that the latter are agents of the former. Indeed, it is a principle of law deeply ingrained in our economic and legal systems that an entity, such as DTT, is not liable for the conduct of separate legal entities, such as its member firms, in their audits of Parmalat or its subsidiaries, unless plaintiffs can establish (i) that DTT exercised such complete dominion and control in respect to those audits that the auditors had no separate will of their own and DTT used that domination to commit a fraud against plaintiffs, or (ii) the member firms performed such audits as the actual agents of DTT, or (iii) DTT deceived plaintiffs into believing that DTT and the member firms are one firm and plaintiffs relied on that belief in purchasing Parmalat securities. However, plaintiff's "one firm" and agency allegations here are purely conclusory, and plaintiffs do not allege that they were deceived by DTT as to its relationship with its member firms.

DTT shows in Point III that Count V should be dismissed for failure to state a claim that DTT was a controlling person of a primary violator under Section 20(a) of the Exchange Act. Plaintiffs rely on a conclusory restatement of the legal standard for control person liability, and have failed to plead facts which support a reasonable inference that DTT (a) had the power to direct (i) the management and policies of the member firms that conducted the Parmalat audits and (ii) those audits themselves and the audit reports that were issued, or (b) was a culpable participant.

Finally, DTT shows in Point IV that the 1259 paragraph Complaint should be dismissed as to DTT for failure to comply with Fed. R. Civ. P. 8(a)(2) and (e)(1) by providing a short and plain statement of plaintiffs' claims and simple, concise and direct allegations.

## The Complaint

Solely for purposes of this motion to dismiss, DTT assumes the truth of the non-conclusory allegations of the Complaint, except where they are contradicted by documents referred to or relied on in the Complaint.[1]

### A.    Parmalat's Fraudulent Scheme

In December 2003, Parmalat, an Italian dairy conglomerate, collapsed as a result of a massive fraud conducted by its insiders. (Compl. ¶ 4).  On December 19, 2003, Parmalat announced that a Bank of America account of Parmalat's Bonlat subsidiary, which Parmalat had represented held $4.9 billion, did not exist.  (Compl. ¶ 764).  These events led to revelations that the company had understated its debt and overstated its assets by billions of dollars.  (Compl. ¶¶ 4-27).  On December 24, 2003, Parmalat filed for bankruptcy in Parma, Italy.  On December 29 the court there declared Parmalat insolvent.  (Compl. ¶¶ 769-70).

Parmalat's fraudulent scheme began as early as 1995.  Its centerpiece was the creation of offshore entities to generate fictitious revenues and inflate the assets recorded on Parmalat's consolidated balance sheet.  (Compl. ¶¶ 199-231).  Plaintiffs allege that Parmalat's top management, its outside lawyers and its accountant, Grant Thornton S.p.A. ("GT-Italy"), were the chief architects of the scheme.  (Compl. ¶¶ 28-29, 193, 209, 239-442).

---

[1] The Court may consider "documents that the plaintiffs either possessed or knew about and upon which they relied in bringing suit." *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000)."[T]he Court considers the entire work as properly before it." *Levin v. McPhee*, 917 F. Supp. 230, 234 n.2 (S.D.N.Y. 1996) (Kaplan, J.), *aff'd*, 119 F.3d 189 (2d Cir. 1997). "[I]t may also consider matters of which judicial notice may be taken under Fed. R. Evid. 201." *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991).

KL3:2389365.1

**B.    Parmalat Hid Its Scheme From Its New Auditor DT-Italy**

Until the audit of Parmalat's 1999 financial statements, Parmalat's auditor was GT-Italy. However, Italian accounting rules required Parmalat to retain a new auditor. According to plaintiffs, Parmalat's top management, lawyers and existing auditors "realized that their ability to conceal their ongoing fraud was jeopardized" by the switch and devised another scheme to hide the fraud from the new auditor. (Compl. ¶ 209). Their plan was as follows: "Knowing the existing scheme would not be acquiesced to by a new auditor, they agreed that Grant Thornton [Italy] would audit Parmalat's various consolidated subsidiaries, off-shore entities and SPEs central to the fraud, while *Deloitte* would audit and certify Parmalat's consolidated financial statements. In auditing Parmalat's books, Deloitte would rely on the audits and certifications of Grant Thornton [Italy] relating to the various Parmalat subsidiaries involved in the fraud." (Compl. ¶ 13 (emphasis in original)). Because it was necessary to keep Parmalat's new auditor, Deloitte & Touche S.p.A ("DT-Italy"), in the dark, Parmalat and its co-conspirators realized "the switch from Grant Thornton [Italy] to Deloitte [Italy] was no mere perfunctory act . . . . [r]ather . . . it was essential to the continuation of the fraud." (Compl. ¶ 467).

To ensure that DT-Italy would not find out about the fraudulent scheme, Parmalat made even more intricate its web of subsidiaries used to hide losses. Plaintiffs allege that GT-Italy told Parmalat's CFO "that the situation was indefensible, and that the new auditing firm, upon discovering the problem, would have certainly refused certification." (Compl. ¶¶ 221, 958). "Thus they suggested shifting these anomalous situations to a new company to be audited by [GT-Italy]." (Compl. ¶ 221, brackets in original). The plan worked, because after DT-Italy "replaced Grant Thornton [Italy] as the Company's auditor, Parmalat retained Grant Thornton [Italy] to provide auditing services, including the preparation, examination and/or review of the financial statements for Bonlat and at least 17 other Parmalat subsidiaries." (Compl. ¶¶ 164, 514). DT-Italy relied "upon the audits and certifications of Grant Thornton relating to the various Parmalat subsidiaries involved in the fraud." (Compl. ¶ 209). Plaintiffs allege that when uncollectible promissory notes held by Bonlat, on which the interest due had

-4-

not been paid, "called into question the legitimacy of the promissory notes *should anyone review Bonlat's books*," GT-Italy proposed that the fictitious promissory notes be transformed into an equity investment. (Compl. ¶ 354, emphasis added).

**C.    DTT Is Not The Same Entity As DT-Italy And Did Not Audit Parmalat**

The Complaint's 318-page fact section mentions DTT only in asserting jurisdiction (Compl. ¶¶ 94-95), cursorily introducing the defendants (Compl. ¶¶ 131, 134), vague conclusory allegations that DTT controlled its member firms and they acted as its agents (Compl. ¶¶ 135-54), and allegations that DTT "removed" an auditor working for DT Brazil (Compl. ¶ 1013, 1033). DT-Italy is not named as a defendant.

DTT is a Swiss Verein, "an entity without an exact legal counterpart in the United States, but which is somewhat akin to an incorporated membership association. It is legally distinct from its members." *Jeffries v. Deloitte Touche Tohmatsu* Int'l, 893 F. Supp. 455, 457 n. 1 (E.D. Pa. 1995). Plaintiffs recognize that DTT is not an audit firm but a "professional services organization with member firms around the world." (Compl. ¶ 131). DTT's website, referred to by plaintiffs (Compl. ¶139), expressly states that: "[a]s a Swiss Verein (association), neither Deloitte Touche Tohmatsu nor any of its member firms has any liability for each other's acts or omissions. Each of the member firms is a separate and independent legal entity . . . [s]ervices are provided by the member firms or their subsidiaries or affiliates and not by the Deloitte Touche Tohmatsu Verein." (January 10, 2005 Affirmation of Michael J. Dell ("Dell Aff"), Ex. C). The DTT website also makes clear that audit services are provided by DTT's member firms and not by, on behalf of or at the direction of DTT. (Compl. ¶ 138 ("our *member firms* . . . deliver services in four professional areas: audit, tax, consulting, and financial advisory services . . . . Our *member firms* serve over one-half of the world's largest companies") (emphasis added).

Nevertheless, plaintiffs lump DTT together with its U.S. member firm, Deloitte USA and Deloitte USA's affiliate, DT-US, as "Deloitte." (Compl. ¶¶ 134 *et seq.*). Plaintiffs further confuse

- 5 -

matters by using the collective term "Deloitte" to refer at some times to DTT, Deloitte USA and DT-US together, at other times to those entities separately (*see*, *e.g.*, Compl. ¶ 148) and at still other times to DT-Italy and/or other DTT member firms. (*See*, *e.g.*, Compl. ¶ 1024). The Complaint even uses "Deloitte" in the same paragraph to refer to different entities, both defendants and non-defendants. (*See*, *e.g.*, Compl. ¶¶ 136 and 155).

Plaintiffs recognize that DT-Italy and other DTT member firms, not DTT, audited Parmalat and its subsidiaries. (Compl. ¶¶ 135, 148).[2] All audit reports on Parmalat's annual financial statements and auditors' review reports on its interim financial statements referenced in the Complaint were issued by DT-Italy on its letterhead and signed by a DT-Italy partner on its behalf. (Dell Aff. Ex. D referenced in Compl. ¶¶ 514, 570, 594, 620, 646, 684, 724). The Complaint does not allege that DTT or the collective "Deloitte" made any misrepresentations or omissions other than those supposedly committed by DT-Italy in those reports.

The Complaint lacks any factual allegation that DTT acted with scienter, that plaintiffs reasonably relied on any statement or omission by DTT, or that DTT caused plaintiffs' losses. Plaintiffs try to paper over these deficiencies with merely conclusory statements about the collective "Deloitte" that plainly refer only to DT-Italy. Because DTT does not provide audit or accounting services, these assertions cannot and do not refer to DTT.

### D.    DT-Italy And The Other DTT Member Firms That Audited Parmalat And its Subsidiaries Are Not Controlled By Or Agents Of DTT

Plaintiffs make the conclusory allegation that DTT's "member firms, to the extent they provided audit services to Parmalat entities, did so as agents of Deloitte, and provided those services on the authority of, at the direction of, and for the benefit of Deloitte. Deloitte controlled the acts of its member firms and audit partners." (Compl. ¶ 135). However, plaintiffs fail to make any factual

---

[2] Plaintiffs' intial complaint alleged that it was not DTT but "Deloitte & Touche S.p.A. and the individual Deloitte & Touche employees who participated in the scheme alleged." (Dell Aff. Ex.B at ¶ 270).

KL3:2389365.1

allegation showing that DTT's member firms that audited Parmalat entities were controlled by or acted as the agents of *DTT* in connection with those audits.

The lead plaintiffs here have admitted and insisted several times that DTT and its member firms are distinct legal entities and operate as such. Lead Counsel for Plaintiffs, Stuart M. Grant, so informed the Court during the May 21, 2004 hearing in support of his client's motion for appointment as lead plaintiff. Mr. Grant explained that his client's retention of DTT member firm Deloitte & Touche LLP as auditor does not present a conflict of interest because it is "a separate company" operating as a distinct legal entity from DT-Italy. Accordingly, Mr. Grant dismissed arguments that "Deloitte" is one firm as "a tremendous amount of mud . . . a lot of dirt . . . [m]ost of it consists of relationships . . . and then there is just all this kind of inference, and it is very poor inference at that . . . [for] example, the accusation with regard to Deloitte." (Dell Aff. Ex. E at pp. 6-7). Similarly, Lead Plaintiff HFAME, in its Chief Executive's April 1, 2004 sworn declaration filed with this Court, and in its joint reply with Co-Lead Plaintiff Sparinvest in support of their joint motion to be appointed Lead Plaintiffs, averred that DTT and its member firms are legally distinct entities that operate separately, so that HFAME does not have a conflict of interest in suing DTT and accusing its member firms, including DT-Italy, of fraud, merely because a DTT member firm audits HFAME. (Dell. Aff. Ex. F at ¶ 12(a); Ex. G at p. 13).

### Argument

Although a court must construe a complaint in plaintiffs' favor in ruling on a motion to dismiss, "bald assertions and conclusions of law" do not suffice to state a claim. *Tarsis v. Reise Org.*, 211 F.3d 30, 35 (2d Cir. 2000). "A complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." *DeJesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65, 70 (2d Cir. 1996), *cert. denied*, 519 U.S. 1007, 117 S. Ct. 509 (1996). "[D]eductions or opinions couched as factual allegations are not given a presumption of truthfulness." *L'Europeenne de Banque v. La Republica de Venezuela*, 700 F. Supp. 114, 122 (S.D.N.Y. 1988). Rule 9(b) requires

- 7 -

that averments of fraud be made with particularity and "manifestly" applies to plaintiffs' Rule 10b-5

claims. *L.L. Capital Partners, L.P. v. Rockefeller Ctr. Props., Inc.*, 921 F. Supp. 1174, 1183 (S.D.N.Y.

1996) (Kaplan, J.). "Similarly, the PSLRA, which applies . . . to claims brought under the Exchange

Act, requires that any securities fraud complaint . . . must 'specify each statement alleged to have been

misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the

statement or omission is made on information and belief, the complaint shall state with particularity all

facts on which that belief is formed'." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (quoting

15 U.S.C. § 78u-4(b)(1)). Plaintiffs must also state "facts giving rise to a strong inference that

defendants acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

## I.    COUNTS IV AND V SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM AGAINST DTT UNDER SECTION 10(b) OR RULE 10b-5

To state a claim for securities fraud under Section 10(b) and Rule 10b-5, a plaintiff must

allege facts showing: "(1) a misrepresentation of or failure to disclose a material fact, (2) made in

connection with the purchase or sale of any security, (3) with scienter, (4) reliance by the plaintiff upon

the misrepresentation or omission, (5) and a loss caused thereby." *In re Time Warner Inc. Secs. Litig.*,

9 F.3d 259, 264 (2d Cir. 1993), *cert. denied*, 511 U.S. 1017, 114 S. Ct. 1397 (1994). If the allegation

of fraud is based upon nondisclosure, the defendant cannot be liable unless it had a duty to speak.

*Chiarella v. United States*, 445 U.S. 222, 234-35, 100 S. Ct. 1108, 1118 (1980). Moreover, only

primary violators, not those who aided and abetted, may be liable. *Central Bank of Denver, N.A. v.

First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177, 114 S. Ct. 1439, 1448 (1994). The

Complaint fails to allege any of the elements of a Section 10(b) claim against DTT.

### A.    The Complaint Does Not Allege A Misrepresentation Or Omission By DTT

Plaintiffs do not allege a single misrepresentation or omission by DTT. Their

conclusory allegations that DTT "made untrue statements of material fact and/or omitted to state

material facts necessary to make statements not misleading" (Compl. ¶ 1111), or "made false and

misleading statements of material fact" (Compl. ¶ 1112), are insufficient because "there is no

- 8 -

indication as to what [DTT's] alleged false representations were or when, by whom . . . or to whom

specifically they were made." *Neubauer v. Eva-Health USA, Inc.*, 158 F.R.D. 281, 283 (S.D.N.Y.

1994) (Kaplan, J.).[3]

Plaintiffs recognize that it was not DTT but DT-Italy and several other audit firms that

audited Parmalat and its subsidiaries. (Compl. ¶¶ 139, 514, 620, 646, 684, 1024). The allegedly

fraudulent statements and omissions on which plaintiffs base their claims against DTT were made in

"audit reports and opinions issued *by the member firms* world-wide concerning the financial statements

and reports of Parmalat" (Compl. ¶ 1102, emphasis added), not by DTT.  However, "[i]f *Central Bank*

is to have any real meaning, a defendant must actually make a false or misleading statement in order to

be held liable under Section 10(b).  Anything short of such conduct is merely aiding and abetting, and

no matter how substantial that aid may be, it is not enough to trigger liability under Section 10(b)."

*Shapiro v. Cantor*, 123 F.3d 717, 720 (2d Cir. 1997); *see also In re JWP Inc. Sec. Litig.*, 928 F. Supp.

1239, 1255-56 (S.D.N.Y. 1996).  "[A] secondary actor cannot incur primary liability . . . for a

statement not attributed to that actor *at the time of its dissemination* . . . as '[r]eliance only on

representations made by others cannot itself form the basis of liability'." *Wright v. Ernst & Young*

*LLP*, 152 F.3d 169, 175 (2d Cir. 1998) (emphasis added).

Plaintiffs try to escape their failure to allege any misrepresentation by DTT by (a)

"lumping" DTT and other entities together and renaming them collectively as "Deloitte" (Compl.

¶ 134) and then using that same name "Deloitte" also to refer to Parmalat's auditor, DT-Italy (*see, e.g.*,

Compl. ¶¶ 164, 467, 514, 620, 646, 684, 939, 1024); (b) asserting that "Deloitte" is one firm; and (c)

---

[3] Plaintiffs cannot avoid pleading a misrepresentation by DTT by purporting to assert Rule 10b-5(a) & (c) claims.  *In re Merrill Lynch & Co.*, 273 F. Supp. 2d 351, 375 (S.D.N.Y. 2003) (plaintiffs' contrary contention "is simply not true in this case where [plaintiffs'] claims are based *only* on alleged misrepresentations and omissions . . . . plaintiffs must comply with the pleading requirements of the [PSLRA]") (emphasis in original).

alleging that DT Italy was DTT's agent in auditing Parmalat.  None of these devices can rescue plaintiffs' claims against DTT. [4]

The "lumping" is impermissible because "[w]here multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud." *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987); *Landy v. Mitchell Petroleum Tech. Corp.*, 734 F. Supp. 608, 620 (S.D.N.Y. 1990).

The one firm and agency allegations fail for reasons established in Point II below. Moreover, since the Complaint's information and belief allegations that "Deloitte" fraudulently made statements and omissions refer to DT-Italy, not to DTT, the documents listed in the Complaint as the supposed bases for those allegations (Compl. ¶¶ 1, 315, 438, 968, 1051-56), do not provide a basis for such a belief as to DTT.  Accordingly, the Complaint does not meet the requirement of Fed. R. Civ. P. 9(b) and the PSLRA that plaintiffs set forth the facts on which they base their fraud allegations on information and belief against DTT.  *See ATSI Communications, Inc. v. Shaar Fund, Ltd.*, No. 02 Civ. 8726 (LAK), 2004 WL 616123, at *1 & n.1 (S.D.N.Y. Mar. 30, 2004) (dismissing for failure to plead factual basis for belief); *American Buying Ins. Servs., Inc. v. S. Kornreich & Sons, Inc.*, 944 F. Supp. 240, 248-49 (S.D.N.Y. 1996) (Kaplan, J.); 15 U.S.C. § 78u-4(b)(1)(B).

**B.    The Complaint Fails to Allege Scienter with the Required Particularity**

The PSLRA imposes a heightened pleading requirement that "the complaint shall, with respect to each act or omission alleged to violate [the Exchange Act], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2); *see also Chill v. General Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996).  "[A] 'pleading technique [that] couple[s] a factual statement with a conclusory allegation of fraudulent intent' is insufficient to 'support the inference that the defendants acted recklessly or with fraudulent intent.'"

---

[4] Plaintiffs also impermissibly lump DTT, Deloitte USA and DT-US together with Grant Thornton International, GT-US, and GT-Italy as the "Auditor Defendants." (Compl. ¶¶ 170, 1099).  This is particularly inappropriate because, unlike DTT or any of its member firms, GT-Italy is alleged to be one of the "chief architects" of the fraud. (Compl. ¶ 209).

*Rombach v. Chang*, 355 F.3d 164, 176 (2d Cir. 2004) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25

F.3d 1124, 1128 (2d Cir. 1994)).  A plaintiff may plead scienter "either (a) by alleging facts to show

that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that

constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Id.*  The

Complaint fails to do either with respect to DTT.

### 1.    No Facts Showing A DTT Motive or Opportunity

To allege motive and opportunity, plaintiffs must plead facts demonstrating that DTT

had "the means and likely prospect of achieving concrete benefits by the means alleged."  *Shields*, 25

F.3d at 1130.  However, plaintiffs' only allegation of any DTT opportunity is that in April 2002 its

CEO, James Copeland, was asked "to intervene to settle" a dispute between DT-Brazil and DT-Italy

concerning the audit of Parmalat's Brazilian operation.  (Compl. ¶¶ 1003-10).  The dispute was settled

in May 2002 when DT-Brazil included the "emphasis note" it wanted to include in its auditors opinion.

(Compl. ¶ 1011).

Nevertheless, plaintiffs make the conclusory assertion that "[t]op executives of Deloitte"

"confronted the auditors who had detected the fraud, and told them to keep quiet so that Deloitte could

retain its multi-million dollar client" (Compl. ¶ 1033), Mr. "Copeland successfully silenced Deloitte

auditors who raised questions regarding their audits of Parmalat's Brazilian affiliates" (Compl. ¶ 1034),

and DTT "removed" Mr. Olivetti from Parmalat audit work when he "again refused to sign off" on the

financials of its Brazilian operations.  (Compl. ¶ 1013).  However, "all of those allegations are made on

information and belief . . . and none is supported by even a scrap of evidentiary detail . . . [i]n

consequence, the conclusory allegations rest on nothing."  *L.L. Capital Partners, L.P.*, 921 F. Supp. at

1183; *see also In re Royal Ahold N.V. Secs. & ERISA Litig.*, No. Civ.1:03-MD-01539, 2004 WL

2955934, at *38 n.45 (D. Md. Dec. 21, 2004) ("plaintiffs' allegations pertaining to . . . Copeland lack

sufficient evidentiary support, and therefore they will be stricken and dismissed along with the rest of

the § 10(b) and 10b-5 claims against the Deloitte defendants").  Moreover, none of them establishes

that any misrepresentation or omission was made as a consequence of DTT's conduct, much less that DTT had anything to do with DT Italy's audit reports on which the Complaint against DTT is premised.

Plaintiffs purport to allege motive by asserting that "Deloitte and its member firms received tens of millions of dollars in fees." (Compl. ¶ 137). However, the vague reference to "Deloitte and its member firms" is insufficient since plaintiffs have lumped DTT and other entities into their definition of Deloitte. There is no allegation that DTT itself received fees. Moreover, allegations that "Deloitte" received fees fail to establish motive. The Complaint does not allege that "Deloitte" received anything other than the usual fees for the work performed. However, "[m]any federal courts have held that the fact that professional service firms . . . receive fees for their services is insufficient to supply the motive essential to the motive-and-opportunity theory under Rule 9(b)." *ICD Holdings S.A.*, 976 F. Supp. 234, 245 n.50 (S.D.N.Y. 1997)(collecting cases); *American High-Income Trust v. Alliedsignal*, 329 F. Supp. 2d 534, 545 (S.D.N.Y. 2004) (allegations that defendant "desired to earn professional fees or to maintain its relationship to [client] do not support a strong inference of scienter"). Accordingly, "Deloitte's" alleged "receipt of compensation and the maintenance of a profitable professional business relationship for auditing services does not constitute a sufficient motive for purposes of pleading scienter." *Zucker v. Sasaki*, 963 F. Supp. 301, 308 (S.D.N.Y. 1997); *see also Duncan v. Pencer*, No. 94 Civ. 0321(LAP), 1996 WL 19043, at *9-10 (S.D.N.Y. Jan. 18, 1996).[5]

---

[5] Moreover, where "'[p]laintiff's view of the facts defies economic reason, [it] does not yield a reasonable inference of fraudulent intent'." *Shields*, 25 F.3d at 1130 (quoting *Atlantic Gypsum Co. v. Lloyds Int'l Corp.*, 753 F. Supp. 505, 514 (S.D.N.Y. 1990)). Here, it defies economic reason for plaintiffs to suggest that DTT or its member firms would risk their reputation by engaging in Parmalat's fraudulent scheme in return for what are alleged to be the professional fees that DTT's member firms earn in their regular course of business. Indeed, "[i]t is hard to see what benefits [would] accrue [to DTT or its member firms] from a short respite from an inevitable day of reckoning" inherent in Parmalat's scheme. *Shields*, 25 F.3d at 1130. "Plaintiffs do not . . . enjoy a 'license to base claims of fraud on speculation and conclusory allegations'." *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 813 (2d Cir. 1996) (citation omitted).

KL3:2389365.1

### 2.      No Facts Showing DTT Conscious Misbehavior Or Recklessness

Plaintiffs allege that "Deloitte" knew about and ignored Parmalat's fraudulent schemes when issuing audit reports (Compl. ¶¶ 956-1021), and acted recklessly by ignoring "red flags," violating "basic audit principles" (Compl. ¶¶ 1022), and relying on GT-Italy for the audit of Parmalat's subsidiaries. (Compl. ¶¶ 13, 209, 221, 514, 958 and 1057). However, allegations against the collective "Deloitte" and "Auditor Defendants" cannot state a claim against DTT, much less provide the required strong inference that DTT acted with scienter. *See, e.g., In re Blech Secs. Litig.*, 928 F. Supp. 1279, 1294 (S.D.N.Y. 1996) ("Rule 9(b) is not satisfied by a complaint in which defendants are clumped together in vague allegations"). Moreover, these allegations cannot refer to DTT because plaintiffs elsewhere more specifically allege that the auditors were DTT member firms, not DTT. (*See, e.g.*, Compl. ¶ 514 ("The reports were signed by Adolfo Mamoli for [DT-Italy]"), ¶ 1007 ("Deloitte Milan is the auditor of the Parent company of the Parmalat Group")). The websites referred to in the Complaint all state that DTT is not an audit firm and that it is the legally distinct and independent member firms that provide audit services. (Dell Aff. Ex. C); *see also In re Lernout & Hauspie Secs. Litig.*, 230 F. Supp. 2d 152, 170 (D. Mass. 2002) ("very source upon which Plaintiffs rely--the home page of the KPMG website--belies their claim [as it] states at the bottom that each of KPMG's member firms is a 'separate and independent legal entity' and describes itself as such"); *Skidmore Energy, Inc. v. KPMG LLP*, No. Civ.A.3:03CV2138-B, 2004 WL 3019097, at *4 (N.D. Tex. Dec. 28, 2004) (same). "The court need not credit [plaintiffs'] general conclusory allegations that 'are belied by more specific allegations of the complaint'." *In re WorldCom, Inc. Secs. Litig.*, No. 02 Civ. 3288 (DLC), 2003 WL 21488087, at *5 (S.D.N.Y. June 25, 2003) (quoting *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995)).[6]

---

[6] Even if these allegations had referred to DTT, the Complaint concedes that both GT-Italy and Parmalat went to considerable lengths to conceal their fraud from "Deloitte." (Compl. ¶¶ 13, 209, 221, 354, 467, 958). "It is impossible to draw a 'strong inference' that the Deloitte defendants knew about or recklessly disregarded the [] fraud . . . where the complaint contain[s] allegations demonstrate that the auditor's client 'went to considerable lengths to conceal the truth' from the auditors." *In re Royal Ahold N.V. Secs. & ERISA Litig.*, 2004 WL 2955934, at *40 (quoting *In re Livent Inc. Secs. Litig.*, 78 F. Supp. 2d 194, 217-18 (S.D.N.Y. 1999)).

In addition, the allegation that "Deloitte" violated "basic audit principles" (Compl. ¶¶ 1022) is insufficient, because "'[r]ecklessness' in a securities fraud action against an accountant . . . requires more than a misapplication of accounting principles." *SEC v. Price Waterhouse*, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992). The allegations that Deloitte ignored supposed "red flags" (Compl. ¶¶ 1023-25) are equally insufficient. *Chill*, 101 F.3d at 269-70 ([a]llegations that defendant "was reckless in disregarding 'red flags' [and] a violation of GAAP, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim"). Indeed, plaintiffs' allegation that "Deloitte" relied on GT-Italy for audits of the Parmalat subsidiaries through which the fraud was carried out (Compl. ¶ 1057) negates plaintiffs' attempt to label "Deloitte" reckless. *See Chill*, 101 F.3d at 270 ("Given the significant burden on the plaintiff in stating a fraud claim based on recklessness, the success, even the extraordinary success, of a subsidiary will not suffice in itself to state a claim that the [defendant] was reckless in failing to further investigate"); *Glickman v. Alexander & Alexander Servs., Inc.*, No. 93 Civ. 7594 (LAP), 1996 WL 88570, at * 15 (S.D.N.Y. Feb. 29, 1996) ("[i]ntentional misconduct or recklessness cannot be presumed from . . . reliance on . . . subsidiary's internal controls").

## C.     The Complaint Does Not Allege Reasonable Reliance Or Loss Causation

Plaintiffs seek a presumption of reliance based on the fraud on the market doctrine. (Compl. ¶1063). However, "[t]he Second Circuit has limited the application of the fraud on the market theory to developed markets, which represent the 'efficient market' model." *In re Laser Arms Corp. Secs. Litig.*, 794 F. Supp. 475, 490 (S.D.N.Y. 1989), *aff'd*, 969 F.2d 15 (2d Cir. 1992). "[A]pplication of the 'fraud on the market' theory to inefficient markets would essentially eliminate causation as an element from some 10b-5 actions." *Reingold v. Deloitte Haskins & Sells*, 599 F. Supp. 1241, 1264 (S.D.N.Y. 1984). Here, the Complaint fails to allege facts entitling plaintiffs to a fraud on the market

---

Moreover, the Complaint alleges "only constructive knowledge on the basis of" the collective Deloitte's "acess to [the company's] books . . . [i]t does not assert any specific facts that would give rise to an inference that" DTT "actually knew of [the company's] allegedly fraudulent actvities . . . . Allegations that a defendant should have known of fraud are insufficient . . . access to all [] papers [and] allegation that [defendant] knew of 'red flags' . . . [are] not enough to satisfy the requirement of actual knowledge . . . This does not satisfy Rule 9(b)." *VTech Holdings Ltd. v. Pricewaterhouse Coopers LLP*, No. 03 Civ.1413(LAK), 2004 WL 2904303, at *9 (S.D.N.Y. Dec. 14, 2004).

- 14 -

presumption. Plaintiffs' allegations cover many different types of securities, including new issues (Compl. ¶¶ 406-763), issues denominated in numerous currencies (*see, e.g.,* Compl. ¶¶ 476, 487, 530 (€/AUS$/¥/US$) and private placements. (Compl. ¶¶ 402, 779). However, plaintiffs do not allege on what market, if any, most of these securities were sold or traded. Moreover, since plaintiffs have not pled that DTT made any misrepresentation or had any duty to speak, they have not pled that DTT committed a fraud on the market. Accordingly, "reliance must be [pled] separately as to each class member." *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 78 (2d Cir. 2004). But plaintiffs fail to do so with respect to DTT.

       Plaintiffs also attempt to plead loss causation by lumping DTT with its member firms and referring to the fraud on the market theory. (Compl. ¶ 445). For the reasons set forth above, that is insufficient. Moreover, the fraud on the market doctrine cannot be used to plead loss causation. *See, e.g., Robbins v. Kroger Props., Inc.*, 116 F.3d 1441, 1448 (11th Cir. 1997); *In re Merrill Lynch Secs. Litig.*, 273 F. Supp. 2d 351, 365 (S.D.N.Y. 2003) ("[t]o permit plaintiffs to allege artificial inflation through the fraud on the market theory to satisfy loss causation would improperly conflate both the 'but for' transaction causation and the loss causation elements into one.").

       Plaintiffs' loss causation allegations are also insufficient because they do not contend that any misrepresentation by DTT was the proximate cause of *the decline in value* of Parmalat securities, *Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489, 1496-97 (2d Cir. 1992), or that "information allegedly concealed" by DTT or a DTT misrepresentation, "was disclosed to the market or that a decline in [Parmalat's] share price resulted." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 165 F. Supp. 2d 615, 626 (S.D.N.Y. 2001). On the contrary, the Complaint asserts that the information plaintiffs allege *should* have been disclosed was revealed *after* Parmalat went bankrupt (Compl. ¶ 764), as a result of the investigations that *followed*. Plaintiffs do allege that "[b]ut for the fraud, none of the securities that were brought to market could have been sold at any price and those securities that were traded in the market would not have been purchased at artificially inflated prices."

(Compl. ¶ 1106). However, that is insufficient, because "courts in this district have rejected bare allegations that the misconduct alleged induced a disparity between the transaction price and 'true investment quality.'" *In re Merrill Lynch*, 273 F. Supp. 2d at 367; *see also Greenwald v. Orb Communications & Mktg., Inc.*, No. 00 Civ.1939 (LTS HBP), 2003 WL 660844, at *2 (S.D.N.Y. Feb. 27, 2003).

## II.   PLAINTIFFS' "ONE FIRM" AND "AGENCY" ALLEGATIONS DO NOT STATE A CLAIM AGAINST DTT

As noted above, plaintiffs try to get around their failure to state a Section 10(b) or Rule 10b-5 claim against DTT, based on its own conduct, by trying to attribute to it the conduct of DT-Italy and other member firms that audited Parmalat or its subsidiaries. Plaintiffs make conclusory allegations that DTT and its member firms are a "unified international services firm which delivers accounting . . . services" as "a single global organization" with leadership "centralized in a global Chief Executive Officer and a global Board of Directors" (Compl. ¶ 138) and therefore "[DTT] . . . acted as auditor[] for Parmalat." (Compl. ¶¶ 1102, 1113). Plaintiffs also allege in conclusory form that DT-Italy and other member firms rendered their "audit services to Parmalat entities . . . as agents of Deloitte." (Compl. ¶ 136). These allegations do not state a claim against DTT.

It has long been established that "[l]imited liability is the rule not the exception; and on that assumption large undertakings are rested, vast enterprises are launched, and huge sums of capital attracted." *Anderson v. Abbott*, 321 U.S. 349, 362, 64 S. Ct. 531, 537-38 (1944).

> "It is a general principle of corporate law deeply ingrained in our economic and legal systems that [one] corporation . . . is not liable for the acts of [another] . . . [n]either does the mere fact that there exists a . . . relationship between two corporations . . . [n]or will a duplication of some or all of the directors or executive officers be fatal."

*U.S. v. Bestfoods*, 524 U.S. 51, 61-62, 118 S.Ct. 1876, 1884 (1998). A "free-wheeling approach to veil piercing would hamstring established businesses in their legitimate efforts to expand into new fields; undermine the predictability of corporate risk-taking; and provide a huge disincentive for the investment of venture capital." *United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St.*

- 16 -

*Corp.*, 960 F.2d 1080, 1093 (1st Cir. 1992); *Valinote v. Ballis*, 295 F.3d 666, 668 -669 (7th Cir. 2002)

("the venerable principle of limited liability . . . may be vital to a business's ability to raise capital");

Larry D. Soderquist et al., *Corporate Law & Practice*, § 1:3.1 (2d ed. 1999) ("'the limited liability

corporation is the greatest single discovery of modern times' . . . society receives from it . . . an

increased amount of capital invested for the provision of goods and services").[7]

       Here, too, there are significant public policy reasons to reject plaintiffs' effort to impose

upon DTT vicarious liability for the conduct of DT-Italy and the other member firms that audited

Parmalat or its subsidiaries. Accounting and audit firms are organized by country, often because of

local legal requirements, and because their partners cannot assume liability for audits done in foreign

countries under audit regimes and regulations with which they may be unfamiliar and that may be

outside the scope of their expertise. If the corporate form and the legal foundations and protections of

the accounting and audit industry were ignored, and the long-established protection of limited liability

of different firms were cast aside, it would endanger their ability to continue to cooperate in auditing

multi-national clients. This in turn would cause great harm to the orderly functioning of national and

international capital markets that rely on audit firms' continued ability to perform audits of multi-

national corporations. That would be contrary to the public interest. *See Bangor Punta Operations,*

*Inc. v. Bangor & A. R. Co.*, 417 U.S. 703, 728-29, 94 S. Ct. 2578, 2592 (1974) ("[a]s this Court has

---

[7] *See, also Browning-Ferris Indus. of Ill., Inc. v. Ter Maat*, 195 F.3d 953, 959 (7th Cir. 1999), *cert. denied*, 529 U.S. 1098, 120 S. Ct. 1832 (2000) ("principle of limited liability . . . serves the important social purpose of encouraging investment by individuals who are risk averse and therefore will not invest . . . in an enterprise if by doing so they expose their entire wealth to the hazards of litigation"); *Huard v. Shreveport Pirates, Inc.*, 147 F.3d 406, 409 (5th Cir. 1998) ("limited liability . . . encourages business and industry, including investment in high-risk ventures"); *Perpetual Real Estate Servs., Inc. v. Michaelson Props., Inc.*, 974 F.2d 545, 548 (4th Cir. 1992) ("concept of limited liability supports a vital economic policy"); *Matter of Kaiser*, 791 F.2d 73, 75 (7th Cir.), *cert. denied*, 479 U.S. 1011, 107 S. Ct. 655 (1986) ("[t]he principle of limited liability . . . is important to our capitalist system [and] enables people to invest in business . . . [without it] equity investments would be discouraged"); Byron F. Egan, *Choice of Entity Alternatives*, 39 Tex. J. Bus. L., 379, 418-19 (2004) ("[l]imited liability is one of the most important advantages of doing business as a corporation"); Stephen B. Presser, *Piercing the Corporate Veil* § 1.01, at 4, § 1.06, at 71-72 (1997) ("the doctrine of limited liability was originally formulated . . . to implement . . . economic . . . goals . . . approaches to piercing the corporate veil which fail to recognize these important public policy considerations . . . are deficient"); Frank H. Easterbrook & Daniel R. Fischel, *Limited Liability & the Corporation*, 52 U. Chi. L. Rev. 89, 92 & 97 (1985) (without limited liability "it would be impossible to conduct an organized liquid market . . . [l]imited liability makes markets possible . . . [ignoring it] will shrink the pool of funds available for investment in projects . . . [t]he increased availability of funds for projects with positive net values is the real

KL3:2389365.1

frequently recognized, equity should pierce the corporate veil only when necessary to serve some paramount public interest"); *Brotherhood of Locomotive Eng'rs v. Springfield Terminal Ry. Co.*, 210 F.3d 18, 38 (1st Cir. 2000) ("[t]he true test must be whether the corporation was created for a legitimate business purpose or primarily for evasion of a federal policy or statute"). Indeed, Courts have repeatedly dismissed complaints alleging that international associations and their audit firm members should be treated as "one firm." *See, e.g., Skidmore Energy, Inc.*, 2004 WL 3019097, at *4; *Holdings v. PricewaterhouseCoopers LLP*, No. 03 Civ. 0613 GBD, 2004 WL 112948, at *6 (S.D.N.Y. Jan. 22, 2004); *In re Asia Pulp & Paper Secs. Litig.*, 293 F. Supp. 2d 391, 396 (S.D.N.Y. 2003); *Bamberg v. SG Cowen*, 236 F. Supp. 2d 79, 89 (D.Mass. 2002); *In re Lernout & Hauspie Secs. Litig.*, 230 F. Supp. 2d at 171; *Gutierrez v. The Cayman Islands Firm of Deloitte & Touche*, 100 S.W. 3d 261, 270 (Tex. Ct. App. 2002); *Dubowski v. Ash (In re AM Int'l, Inc. Secs. Litig.)*, 606 F. Supp. 600, 607 (S.D.N.Y. 1985); *Reingold v. Deloitte Haskins & Sells*, 599 F. Supp. 1241, 1254 n.10 (S.D.N.Y. 1984).

Courts have recognized three exceptions to the bedrock principle of limited liability: alter ego liability, actual agency, and apparent agency. However, plaintiffs have not pled any facts establishing (1) that DTT ignored corporate formalities so as to become the alter ego of its member firms in their audits of Parmalat entities, (2) that DTT's member firms that audited Parmalat entities did so as agents of DTT, or (3) that DTT deceived plaintiffs into believing that DTT and its member firms that audited Parmalat entities are the same firm or that the latter were DTT's agents in that audit and that plaintiffs relied on that in purchasing Parmalat securities.

### A.    Plaintiffs Have Not Alleged Facts Showing That DTT Is The Alter Ego Of Its Member Firms That Audited Parmalat Entities

As limited liability is the rule, the Second Circuit has directed that veil piercing is appropriate only under "extraordinary circumstances." *Murray v. Miner*, 74 F.3d 402, 404 (2d Cir. 1996). Moreover, because plaintiffs' securities law claims sound in fraud, the Complaint's alter ego

---

benefit of limited liability"); Henry G. Manne, *Our Two Corporation Systems: Law and Economics*, 53 Va. L. Rev. 259 (1967) (the modern publicly held corporation with many small shareholders could not exist without limited liability).

allegations must meet the heightened pleading requirement of Fed. R. Civ. P. 9(b). *Gabriel Capital, L.P. v. NatWest Fin., Inc.*, 122 F. Supp. 2d 407, 433 (S.D.N.Y. 2000); *Pits, Ltd. v. American Express Bank Int'l*, 911 F. Supp. 710, 715 (S.D.N.Y. 1996). "Conclusory assertions that one defendant controlled another, or that some defendants are guilty because of their association with others, do not inform each defendant of its role in the fraud and do not satisfy Rule 9(b)." *Kolbeck v. LIT America, Inc.*, 923 F. Supp. 557, 569 (S.D.N.Y. 1996), *aff'd*, No. 96-9422, 1998 WL 406036 (2d Cir. June 8, 1998) ("[t]he requirement of precision applies equally when the goal is to hold defendants vicariously liable for the fraud of another"); *Landy*, 734 F. Supp. at 620 ("guilt by association is not a sufficient pleading of fraud under Rule 9(b)").[8]

Accordingly, plaintiffs had to plead with specificity facts that establish: (1) that DTT exercised such complete dominion and control over its member firms that audited Parmalat entities that they "at [that] time" "in respect to the transaction attacked" had no separate will of their own, and (2) that DTT used this domination to "commit fraud or wrong" against plaintiffs. *American Protein Corp. v. AB Volvo*, 844 F.2d 56, 60 (2d Cir.), *cert. denied*, 488 U.S. 852, 109 S. Ct. 136 (1988). Moreover, "[a]t a minimum the defendant must own shares in the alleged alter ego corporation." William M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations*, § 41, at 603 (perm ed. rev. vol. 1990); *see also Old Republic Nat'l Title Ins. Co. v. Moskowitz*, 297 A.D.2d 724, 726, 747 N.Y.S.2d 556, 558-59 (2nd Dep't 2002) ("[t]here is no basis to pierce the corporate veil as against [defendant] since [defendant] was neither an owner, director, nor a shareholder in [the allegedly controlled corporation]"); *Castillo v. First City Bancorporation of Texas, Inc.*, 43 F.3d 953, 963 (5th Cir. 1994) ("summary judgment [is warranted] for an obvious reason . . . [t]here is no *ownership* relation between or among [law firm, lawyer] and [allegedly controlled corporation]; [corporation] thus has no 'corporate veil' between it and its lawyers and law firm . . . [accordingly controlling person] claim is not just meritless, but silly") (emphasis in original); *Paul v. Genesee & Wyoming Indus., Inc.*, 93 F.

---

[8] Since plaintiffs have not pled Swiss law, DTT applies U.S. law here, without conceding that it governs.

Supp. 2d 310, 315 (W.D.N.Y. 2000) (same where defendants "have no connection outside of the fact

that both were subsidiaries"); *Schoenwandt v. Jamfro Corp.*, 261 A.D.2d 117, 117, 689 N.Y.S.2d 461,

462 (1st Dep't 1999) (same where defendants are "merely franchisor-franchisee, and there is no

showing of the existence of a parent-subsidiary relationship").   The Complaint fails to plead these

elements.

### 1.    The Complaint Fails To Allege That DTT Owned Shares In Or Exercised Complete Dominion Over Its Member Firms So That They Had No Will Of Their Own

Plaintiffs do not even allege that DTT has any ownership interest in its member firms

that audited Parmalat entities.  Plaintiffs' sole allegation of DTT involvement with its member firms

concerning Parmalat's audits arises from a request to Mr. Copeland to arbitrate a dispute between

auditors at two member firms.  (*See* Point I.B.1 above).  Those allegations are insufficient to show DTT

control and domination of DT-Italy's audits of Parmalat, or other member firms' audits of Parmalat

entities.  The allegations that Mr. Copeland and others held positions simultaneously at DTT and

Deloitte USA also fail to provide any evidence of DTT domination of DT-Italy and other firms

involved in audits of Parmalat entities or that DTT used that domination to perpetrate a fraud on

plaintiffs.  (Compl. ¶¶ 136, 151-52, 1010).  The "'commonplace circumstance' of modern business [of

common officers and directors] is insufficient where fraud is alleged to provide a court with a basis for

piercing the corporate veil." *Pits, Ltd.*, 911 F. Supp. at 715 (quoting *American Protein Corp.*, 844 F.2d

at 60); *see also Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 62 (2d Cir. 2004).

Nor do the Complaint's allegations concerning DTT "practice groups," "meetings"

attended by member firm personnel and a DTT "oversight policy" (Compl. ¶ 144), show control of

member firms, much less of Parmalat audits. *See In re Asia Pulp & Paper Secs. Litig.*, 293 F. Supp. 2d

at 396 (allegation that membership organization "set 'professional standards and principles' under

which the individual [audit firms] operated . . . insufficient to state a claim of control person liability

[noting that plaintiffs' reliance] on the 'one-firm,' unified-company theory . . . has been rejected by

KL3:2389365.1

courts in other contexts"); *Nuevo Mundo Holdings,* 2004 WL 112948, at *7 (allegations that "PWC International and Andersen Worldwide Societe Cooperative" oversaw the activities of affiliates and "the supervisory groups and all affiliates were in close contact, with periodic meetings following mandated training" were insufficient and conclusory).

Similarly, the allegations that DTT, in its role of membership organization, markets the services provided by its member firms and in doing so speaks of "a global network of audit professionals" (Compl ¶ 141), and plaintiffs' conclusion that "Deloitte holds itself out as a leading unified international professional services firm" (Compl. ¶ 138), are no basis to ignore DTT's separate corporate existence. *See, e.g., In re Royal Ahold N.V. Secs. & ERISA Litig.*, 2004 WL 2955934, at *36 n.41 ("Deloitte U.S. and Deloitte Netherlands are legally distinct, autonomous firms . . . [p]laintiffs' emphasis on the facts that the two firms shared a brand name and the corporate website described a 'global' firm are similarly unavailing"). Courts in this District and elsewhere have held that the use of words that separate entities have in common as part of their names, such as "Deloitte" or "Deloitte & Touche" in the case of DTT and its member firms (*see* Compl. ¶ 135) or a logo (Compl. ¶ 140), is not a basis to ignore that they are distinct legal entities. *See, e.g., Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1462 (2d Cir. 1995); *In re Ski Train Fire in Kaprun, Austria*, 230 F. Supp. 2d 403, 411 (S.D.N.Y. 2002) (rejecting plaintiffs' argument that "Siemens Austria" was a mere department of "Siemens Germany" because the two companies hold themselves out to the world as a single entity and use the same name "Siemens" and corporate logo); *Aerotel, Ltd. v. Sprint Corp.*, 100 F. Supp 2d 189, 193 (S.D.N.Y. 2000) (common trade name insufficient); *PCI Parfums et Cosmetiques Int'l v. Perfumania, Inc.*, No. 93 Civ. 9009, 1998 WL 646635, at *3 (S.D.N.Y. Sept. 21, 1998). This is so even if a corporate website refers to offices of the separate legal entities as "our company." *Id.* at *1; *Reiss v. GAN S.A.*, 78 F. Supp. 2d 147, 159 (S.D.N.Y. 1999), *vacated on other grounds*, 235 F.3d 738, 743 (2d Cir. 2000) (website that defendant was "'present in 20 countries'" insufficient to ignore separate corporate identities); *Howard v. Klynveld Peat Marwick Goerdeler*, 977 F. Supp. 654, 660-62 (S.D.N.Y. 1997), *aff'd*, 173 F.3d 844

- 21 -

KL3:2389365.1

(2d Cir. 1999); *Dubowski*, 606 F. Supp. at 607; *Reingold*, 599 F. Supp. at 1254 n.10 (foreign

accounting firm's promotional materials touting it as part of a "single cohesive worldwide

organization" insufficient to ignore separate corporate existence).[9]

### 2.    The Complaint Fails To Allege That DTT Used Its Purported Dominion Over Its Member Firms To Perpetrate A Fraud Against Plaintiffs

"While complete domination of the corporation is the key to piercing the corporate veil,

. . . such domination, standing alone, is not enough; some showing of a wrongful or unjust act toward

plaintiff is required." *Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1053 (2d Cir. 1997); *see

also Electronic Switching Indus., Inc. v. Faradyne Elecs. Corp.*, 833 F.2d 418, 424 (2d Cir. 1987)

(dismissing because "plaintiff failed to allege . . . control and domination was used to commit wrong,

fraud, or the breach of a legal duty, or a dishonest and unjust act"); *see also American Fuel Corp. v.

Utah Energy Dev. Co.*, 122 F.3d 130, 134 & n.2 (2d Cir. 1997).  Accordingly, "[t]o avoid dismissal, a

party seeking application of the doctrine must come forward with factual allegations as to both

elements of the veil-piercing claim." *EED Holdings v. Palmer Johnson Acquisition Corp.*, No. 04 Civ.

0505 (RWS), 2004 WL 2348093, at *6 (S.D.N.Y. Oct. 20, 2004).  However, the Complaint does not

contain a single factual allegation that DTT used its member firms to commit fraud.

---

[9] There abound numerous cases outside this District which have reached the same result. *See, e.g., Young v. FDIC*, 103 F.3d 1180, 1192-93 (4th Cir. 1997), *cert denied*, 522 U.S. 928 (1997) (no partnership existed between audit firm and affiliated organization despite marketing material that described "Price Waterhouse as one of the 'world's largest and most respected professional organizations' with 'offices throughout the world'"); *Klesch & Co. v. Liberty Media Corp.*, 217 F.R.D. 517, 520 (D. Colo. 2003) (no control by Rothschild (Denver) over other Rothschild entities despite website "which touts Rothschild's 'world presence' as evidenced by 'over 40 offices in more than 30 countries and . . . more than 2,000 people around the world'"); *Von Grabe v. Sprint PCS*, 312 F. Supp. 2d 1285, 1299-1301 (S.D. Cal. 2003); *Bamberg*, 236 F. Supp. 2d at 89; *Gutierrez*, 100 S.W. 3d at 270; *DVI, Inc. v. Superior Court*, 104 Cal. App. 4th 1080, 1096, 128 Cal. Rptr. 2d 683, 694 (Cal. Dist. Ct. App. 2002); *Bright v. Primary Source Media*, No. 98-1313 MJJ, 1998 WL 671247, at *5-7 (N.D. Cal. Sept. 29, 1998); *Jeffries*, 893 F. Supp. at 459; *Logal v. Inland Steel Indus., Inc.*, 209 Ill. App. 3d 304, 311, 568 N.E.2d 152, 157 (Ill. App. 1 Dist. 1991); *Total Communications Servs. Inc. v. Seiscor Techs., Inc.*, 1990 U.S. Dist. LEXIS 13337, at *15-16 (N.D. Ill. Oct. 5 1990) *Gonzalez v. Walgreens Co.*, 878 F.2d 560, 562 (1st Cir. 1989); *Wiedemann v. Cunard Line Ltd.*, 63 Ill. App. 3d 1023, 1031, 380 N.E.2d 932, 939 (Ill. App. 1 Dist. 1978); *Golf City, Inc. v. Wilson Sporting Goods, Co.*, 555 F.2d 426, 437 (5th Cir. 1977).

**B.     The Complaint Fails Adequately To Allege That DT-Italy Or Other DTT Member Firms Audited Parmalat Or Its Subsidiaries As Agents Of DTT**

Plaintiffs offer only the barest conclusory allegation that "affiliates and member firms, to the extent that they provided audit services to Parmalat entities, did so as agents of Deloitte." (Compl. ¶ 135). *See Cohen v. Standard Bank Inv. Corp. (Jersey) Ltd.*, No. 97 Civ. 3802 (SAS), 1998 WL 782024, at *5-6 (S.D.N.Y. Nov. 6, 1998) (dismissing fraud claim where the complaint failed to plead sufficient facts to establish an agency relationship). Moreover, as noted above, lumping DTT into a collective "Deloitte" does not plead a claim against DTT.

"A [member firm] does not become the agent of [a defendant] simply because [it] is called an agent." *In re Shulman Transp. Enters., Inc.*, 744 F.2d 293, 295 (2d Cir.), *cert. denied*, 513 U.S. 876, 115 S. Ct. 205 (1984). Agency requires a showing of (1) "the manifestation by the principal that the agent shall act for him," (2) "the agent's acceptance of the undertaking," and (3) the parties' understanding "that the principal is to be in control of the undertaking." *Cabrera v. Jakabovitz*, 24 F.3d 372, 386 (2d Cir. 1994) (quoting Restatement (Second) of Agency § 1 comment b (1958)). "An essential characteristic of an agency relationship is that the agent acts subject to the principal's direction and control . . . [a]bsent the critical element of control by [defendant] over [a purported agent, it] cannot be said to have acted as [defendant's] agent." *In re Shulman Transp. Enters., Inc.*, 744 F.2d at 295; *see also Lee v. Kim*, No. 93 CIV. 8280 (KTD), 1994 WL 586435, at *3 (S.D.N.Y. Oct. 25, 1994). "[T]he element of subservience is essential." *Kyung Sup Ahn v. Rooney, Pace Inc.*, 624 F. Supp. 368, 370 (S.D.N.Y. 1985); *see also Maung Ng We*, 2000 WL 1159835, at *7. Moreover, a purported "agent's statement cannot . . . prove the existence of the agency relationship . . . [because] the agent's authority must be traced back to some act or statement by the alleged principal." *Bourjaily v. United States*, 483 U.S. 171, 189, 107 S. Ct. 2775, 2786 (1987). "Anything short of requiring a *full* showing of some accepted theory under agency . . . law imperils a vast number of parent corporations . . . [t]his Court . . . does not adopt such an approach." *Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 130 (2d Cir. 2003) (emphasis in original). This applies with even more force to DTT, as

- 23 -

it is not alleged to be a parent corporation and is not alleged to own an interest in DT-Italy.  (Compl. ¶ 131).

Plaintiffs do not meet these pleading requirements because they fail to make any allegation of facts establishing (1) a manifestation by DTT that DT-Italy or any other DTT member firm was to act on DTT's behalf in connection with Parmalat audits, (2) that the DTT member firms that audited Parmalat entities accepted or had an understanding that DTT was to be in control of those audits, or (3) that DTT controlled its member firms in their audits of Parmalat entities.[10]

### 1.    Plaintiffs Do Not Allege Facts Showing That DTT Manifested That Any Member Firms Should Act for It In Their Audits of Parmalat Entities

Plaintiffs do not allege any conveyance of authority by DTT to any member firms to act for it in their audits of Parmalat entities (or otherwise).  To the contrary, DTT expressly states in its website, referred to by plaintiffs, that:  "Each of the member firms is a separate and independent legal entity . . . [s]ervices are provided by the member firms or their subsidiaries or affiliates and not by the Deloitte Touche Tohmatsu Verein."  (Dell Aff Ex. C).  Similarly, the press release cited in the Complaint (at ¶ 150), reports that revenues are "from [DTT's] member firms" and that services are provided by them "and not by the Deloitte Touche Tohmatsu Verein."  (Dell Aff. Ex. H).[11]

---

[10] Plaintiffs allege that certain officers of DTT simultaneously served as officers of Deloitte USA and sat on committees at both entities.  That is irrelevant for several reasons to the question whether any fraudulent misrepresentations or scienter of the firms that audited Parmalat entities can be attributed to DTT.  (Compl. ¶¶ 136, 151-54).  First, the Complaint does not contain any allegation that Deloitte USA made any fraudulent misrepresentation in connection with the Parmalat audit, or that the officers mentioned as serving both DTT and Deloitte USA made any such fraudulent misrepresentation.  The conclusory allegation on information and belief that "[t]he leadership of Deloitte is centralized in a global Chief Executive Officer and a global Board of Directors" (Compl. ¶ 138), is irrelevant to whether plaintiffs have adequately pled agency, because DT-Italy not "Deloitte" audited Parmalat.  Second, the Complaint does not include "specific allegations of a conveyance of actual authority" by DTT to Deloitte USA so as to make Deloitte USA an agent of DTT.  *See In re WorldCom, Inc. Secs. Litig.*, 2003 WL 21488087, at *10.  The mere allegations of overlapping officers (Compl. ¶¶ 151-54) is insufficient to show Deloitte USA is an agent of DTT.  *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 102 (2d Cir. 2001); *Martin v. EVP Second Corp.*, No. 90 Civ. 7074 (LLS), 1991 WL 131176, at *3-4 (S.D.N.Y. July 9, 1991).

[11] Many documents cited by plaintiff are simply irrelevant, because they are statements by a purported agent, not by the alleged principal DTT, and thus cannot establish an actual agency for DTT.  *Bourjaily*, 483 U.S. at 189, 107 S. Ct. at 2786.  For example, plaintiffs cite a request for a no-action letter by Deloitte USA (Compl. ¶ 143), and DT-Italy materials used to solicit clients and audit reports containing a "Deloitte name and logo."  (Compl. ¶ 140).

Plaintiffs allege that "Deloitte requires member firms, including [DT-Italy], to use the Deloitte brand name and logo" (Comp. ¶ 140), personnel of "Deloitte member firms regularly attend meetings of [DTT]" (Compl. ¶ 144), DTT "has established a policy and practice among its member firms to cross-check the quality of each others work product" (Compl. ¶ 144), "Deloitte counsels its member firms to look for the possibility of fraud when those firms conduct audits" (Compl. ¶ 145), and "Deloitte also promulgates and enforces professional standards." (Compl. ¶ 146). However, this merely reflects the functioning of a membership association in which members have agreed to abide by certain mutually agreed upon standards and procedures for their own benefit.

In *Boston Telecommunications Group, Inc. v. Deloitte Touche Tohmatsu*, No C 02-05971 JSW (N.D. Cal. Aug. 7, 2003), the court held that allegations similar to plaintiffs' here, "that DTT markets itself as 'One Firm,' reports its 'global' revenues . . . [and] requires . . . member entities [to market themselves as] an international firm . . . and to use [Deloitte] logos," "have not alleged sufficient facts to establish that DTT exercises the requisite degree of control over Deloitte USA to demonstrate an agency relationship." *Id.* at 7 (Dell Aff. Ex. I). Similarly, *In re WorldCom, Inc. Secs. Litig.*, 2003 WL 21488087, at *10, held that allegations that a defendant was a "Swiss Societe Cooperative and an 'umbrella organization for its member firms worldwide'," that had performed audits, "are insufficient to plead that [a member firm] acted as an agent . . . when it conducted the [] audits, or to impute [the member firm's] knowledge or recklessness to [the membership organization]." *See also Newby v. Enron Corp.*, No. 04-20001, 2004 WL 2892044, at *3, *10 & n.22 (5th Cir. Dec. 15, 2004) (rejecting notion that Swiss umbrella organization for audit firms is liable for allegedly defective audit and other services provided by a member firm to Enron, as plaintiffs' "arguments are based on pithy statements of worldwide corporate unity found in marketing materials . . . . [w]e decline . . . to afford these corporate clichés considerable weight"). And in *In re Lernout & Hauspie Secs. Litig.*, 230 F. Supp. 2d at 171, the court dismissed the complaint as to a Swiss Verein, because it was legally distinct from its member firms and they could not be characterized as its agents. *Id.* at 171-73; *see also*

- 25 -

*Reingold v. Deloitte Haskins & Sells*, 599 F. Supp. 1241, 1249 (S.D.N.Y. 1984) ("[t]here is no single worldwide [audit] firm . . . the only worldwide [] entity . . . is an organization composed of a large number of affiliated accounting firms"). "It is one thing to 'consult' with, or obtain 'recommendations' or approval from [an entity] . . . . [i]t is quite another for [that entity's] approval to be *required* before [another entity] can act." *Maung Ng We v. Merrill Lynch & Co.*, Inc., 2000 WL 1159835, at *7 (dismissing agency claim) (emphasis added); *Hilliard v. Roc-Newark Assocs.*, 287 A.D.2d 691, 693, 732 N.Y.S.2d 421, 423-24 (2d Dep't 2001) ("[n]o agency, joint venture, or partnership relationship was created" as result of use of "service mark 'Holiday Inn' . . . programs for advertising, training, and inspection, and [compliance with] standards contained in Holiday Inn's manual [or] pay[ment of] a monthly royalty fee based on [] gross revenues"); *Epps v. Stewart Info. Servs. Corp*, 327 F.3d 642, 646 (8th Cir. 2003) (press release by holding company reporting revenue from subsidiary insufficient to ignore corporate separation).[12]

Plaintiffs' allegation that "Deloitte markets itself as a single global organization" (Compl. ¶¶ 138, 140, 141) also is not evidence of the existence of an agency because "[w]hether such an agency is formed depends on the actual interaction between the putative principal and agent, not on any perception a third party may have of the relationship." *Itel Containers Int'l Corp. v. Atlanttrafik Exp. Serv. Ltd.*, 909 F.2d 698, 702 (2d Cir. 1990); *see also Nuevo Mundo Holdings*, 2004 WL 112948, at *6 ("Plaintiffs' conclusory allegations that [member firms] were 'agents' of [PricewaterhouseCoopers International], because they represented themselves as part of defendants . . . insufficient to withstand . . . motion to dismiss"). Moreover, the Complaint itself shows that any perception that member firms are DTT's agents would be unwarranted, because "Deloitte" as used in

---

[12] *See also Gutierrez v. Cayman Islands Firm of Deloitte & Touche*, 100 S.W.3d 261, 270 (Tex. App. 2002), ("[a]side from maintaining a website and lending its name to multiple accounting firms, DTT had no relationship to the transactions . . . [i]t performed none of the work, had no interaction with [the audit firm's client], and did not provide any services to [its member firms] in connection with the [] audit."); *Skidmore Energy, Inc.*, 2004 WL 3019097, at *4; *In re Nortel Networks Corp. Secs. Litig.*, No. 01 Civ. 1855RMBMHD, 2004 WL 2149111, at *1 (S.D.N.Y. Sept. 23, 2004) (DTT and its member firms are not one entity); *Goh v. Baldor Elec. Co.*, No. 3:98-MC-064-T, 1999 WL 20943, at *3 (N.D. Tex. Jan. 13, 1999) ("[o]ther than shared membership in the common association [membership organization and audit firms] are separate entities").

marketing materials and websites is a brand name under which the "*member firms* (including their affiliates) deliver services." (Compl. ¶¶ 138-39) (emphasis added). As noted, the websites emphasize the independence of the different entities. (Compl. ¶ 139). Further, DT-Italy did not act in the name of DTT. The audit reports mentioned in the Complaint (Compl. ¶¶ 514, 570, 594, 620, 646, 684, 724), list DT-Italy's name and address and explicitly state that they are signed on its behalf. (Dell Aff. Ex. D).[13]

### 2. The Complaint Fails To Plead Facts Establishing That DTT's Member Firms Acted For DTT Rather Than For Themselves In Auditing Parmalat Or That DTT Controlled The Audits

The Complaint's agency allegations are also deficient because they do not contain any facts indicating that DT-Italy or other DTT member firms, in auditing Parmalat entities, considered themselves to be acting as agents and for the benefit of DTT as principal, much less that they or DTT understood that DTT was in control of the undertaking. However, "an important feature of an agency relationship is that the actions taken by the purported agent are taken on behalf of and for the benefit of the principal -- not the agent." *Maung Ng We*, 2000 WL 1159835, at *9.

"Not only are facts suggesting that [DT-Italy] and its employees were conducting the business of [DTT] -- as opposed to its own -- missing from the amended complaint, the pleaded facts are actually inconsistent with such a conclusion. The facts suggest that the only business being conducted was [DT-Italy's]. Plaintiffs allege that [Parmalat] dealt with the [Milan] office of [DT-Italy], specifically with [DT-Italy] employee[s] [Mamoli and Rovelli] . . . . [p]laintiffs further aver that after the [Parmalat] 'scandal' broke, the [Italian] investigation led to [DT-Italy]." *Id.* at *10; (Compl. ¶¶ 514, 570, 594, 620, 646, 684, 724, 964, 1007, 1024-25). The Complaint concedes that DT-Italy, not DTT, was Parmalat's auditor (Compl. ¶¶ 514, 620, 646, 684 and Dell Aff. Ex. D), and that Parmalat paid fees for the audits to DT-Italy, not DTT. (Compl. ¶¶ 137, 155). The website referenced in the Complaint also makes clear that DTT does not perform audits. (Compl. ¶ 138-39; Dell Aff. Ex. C).

---

[13] That DTT receives membership fees from it members, such as DT-Italy, is irrelevant. *See Hilliard v. Roc-Newark Assocs.*, 287 A.D.2d 691, 693, 732 N.Y.S.2d 421, 423-24 (2d Dep't 2001) ("[n]o agency . . . relationship was created" as result of use of "pay[ment of] a monthly royalty fee based on [] gross revenues")

Because DT-Italy and the other firms that are members of DTT and audited Parmalat entities had "discretion to act," DTT "cannot justifiably be said to have the essential right of control." *Maung Ng We, supra.* Moreover, plaintiffs do not allege facts showing that DTT controlled Parmalat's audits. As many courts have held, a Swiss Verein, such as DTT, is legally distinct from and does not control its member firms. *See, e.g., Jeffries*, 893 F. Supp. at 457 n. 1; *7-UP Bottling Co. v. Archer Daniels Midland Co. (In re Citric Acid Litig.)*, 191 F.3d 1090, 1106-08 (9th Cir. 1999), *cert denied.* 529 U.S. 1037, 120 S. Ct. 1531 (2000).

Plaintiffs cannot rely on *Cromer Fin. Ltd. v. Berger*, No. 00 Civ. 2284 (DLC), 2002 WL 826847 (S.D.N.Y. May 2, 2002) ("*Cromer II*"), to try to show that Deloitte Italy and the other DTT member firms that audited Parmalat entities are agents of DTT. The *Cromer* court had earlier addressed the situation in which plaintiffs find themselves here, namely, where there is no evidence that a DTT member firm that prepared audit reports was an agent of DTT. In *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452 (S.D.N.Y. 2001) ("*Cromer I*"), the court dismissed the claims against DTT for failure to state a claim. The *Cromer* plaintiffs had argued that audit reports concerning the Manhattan Fund prepared by a DTT member firm, Deloitte & Touche Bermuda ("DTB"), could be imputed to DTT because DTT's name and logo were on the audit reports. *Cromer I* held that plaintiffs failed to state a claim because that was insufficient to allege scienter against DTT. *Id.* at 494. Similarly, plaintiffs here have not made *any* factual, non-conclusory allegation that DT Italy acted for DTT in rendering the Parmalat audit reports mentioned in the Complaint. The mere fact that DTT's name and logo appear on some of the documents does not do that.

DTT was brought back into the case in *Cromer II*, only after the court found that plaintiffs had presented evidence that "the partner at DTB in charge of the [Manhattan] Fund's audits" was "invited to join [a DTT committee] precisely because of his experience with and expertise in engagements like the Fund" audit, that his relationship with DTT "encompassed knowledge he acquired in his work as an auditor" for the Fund and that auditing work was "within the scope of [his]

participation in [the DTT committee]." *Cromer Fin. Ltd. v. Berger*, 245 F. Supp. 2d 552, 555, 561-62 (S.D.N.Y. 2003) ("*Cromer III*"). The court later denied DTT's motion for summary judgment after concluding that plaintiffs had presented enough evidence for a jury to find that, *in the unique circumstances of that case*, the DTB audit partner's responsibilities on the DTT committee overlapped with his work as an auditor and consequently that "knowledge he acquired about off-shore investment funds during that agency, was 'on account of' and could be imputed to DTT. *Id.* at 562. In contrast, plaintiffs here have not presented *any* evidence that anyone involved with the auditing of Parmalat held a position with DTT. Indeed, in *In re WorldCom*, the court addressed a similar situation where plaintiffs made no "specific allegations of a conveyance of actual authority," and held that in such a situation reliance on that court's earlier *Cromer* decision "is misplaced." 2003 WL 21488087, at *10.

### C. Plaintiffs Do Not Allege That DTT Deceived Them Into Believing That DTT And Its Member Firms Are "One Firm" Or That The Latter were DTT's Agents In Auditing Parmalat Entities And Plaintiffs Relied On That

Plaintiffs do not, and cannot, allege that DTT deceived them into believing that DT-Italy was the same firm as DTT. Plaintiffs took the opposite position in successfully obtaining appointment as Lead Counsel and should be judicially estopped from taking a different position now. *See* page 7, above; *see, e.g., Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir. 1999). Nor have plaintiffs based their claims against DTT on the theory that DTT led them to believe that its member firms had apparent authority to act as its agents. *See, e.g., Carte Blanche (Sing.) PTE., Ltd. v. Diners Club Int'l, Inc.*, 758 F. Supp. 908, 920 (S.D.N.Y. 1991) ("party can invoke the doctrine of apparent authority only when the words or conduct of the *principal*, communicated to the third party, have caused the third party to believe that an agent has authority") (emphasis in original).[14]

---

[14] *See also Mobil Oil Corp. v. Bransford*, 648 So. 2d 119, 121 (Fla. 1995) (no apparent agency because "plaintiff below alleged no genuine factual representation by Mobil, but merely assumed that such a representation is implicit in the prominent use of Mobil symbols and products throughout the station and in the provision of support activities"); *Papas v. Smart Health U.S.A.*, 861 So. 2d 84, 85 (Fla. Dist. Ct. App. 4th Dist. 2004) ("permissive use of [defendant's] name . . . did not create an agency"); *Wood v. William Carter Co.*, 273 A.D.2d 7, 708 N.Y.S. 2d 107, 107-08 (1st Dep't 2000) (dismissing claims because "[e]ssential to the creation of apparent authority are words or conduct of the principal, communicated to [plaintiffs], that give rise to the appearance and belief that the agent possesses authority") (quotation & citation omitted).

On the contrary, the DTT website referenced in the Complaint makes clear that DTT and its member firms are separate entities (Compl. ¶¶ 138-39; Dell Aff. Ex. C), as did the KPMG website in *Lernout*. *See In re Lernout & Hauspie Secs. Litig.*, 230 F. Supp. 2d at 170 (dismissing complaint as to KPMG International because "[p]laintiffs rest their claim [on] the allegation that 'KPMG Int'l markets itself and all of its member firms as a single entity' . . . . [while] [i]n fact . . . the very source upon which Plaintiffs rely--the home page of the KPMG website--belies their claim [as it] states at the bottom that each of KPMG's member firms is a 'separate and independent legal entity' and describes itself as such"). Moreover, the Complaint does not contain any non-conclusory allegations that plaintiffs relied in purchasing Parmalat securities on the appearance that member firms were acting for DTT in their audits of Parmalat entities.

III.    **COUNT VI SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM UNDER SECTION 20(A) OF THE SECURITIES EXCHANGE ACT**

Count VI alleges that DTT "acted as a controlling person of its member firms and employees, including but not limited to [Deloitte USA], [DT-US], [DT-Italy], Adolfo Mamoli and Guiseppe Rovelli" (Compl. ¶ 1122), and as such is liable because they committed primary securities law violations in connection with the Parmalat "scheme." (Compl. ¶¶ 131-54, 1120-26). "To make out a prima facie case under § 20(a) of the Exchange Act, a plaintiff must show [1] a primary violation . . . by the controlled person . . . and [2] control of the primary violator by the targeted defendant . . ., and . . . [3] that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 170-71 (2d Cir. 2000). The Complaint fails to plead facts showing that DTT controlled its member firms and their employees or their audits of Parmalat entities and that it was a culpable participant in its member firms' alleged wrongdoing.

*First*, "[i]n order to defeat [DTT's] motion at the pleading stage, [plaintiffs] must plead facts which support a reasonable inference" that DTT had "the power to direct or cause the direction of management and policies of" DT-Italy. *Converse, Inc. v. Norwood Venture Corp.*, No. 96 CIV. 3745

- 30 -

(HB), 1997 WL 742534, at *3 (S.D.N.Y. Dec. 1, 1997).[15]  Conclusory allegations do not suffice. *Neubauer*, 158 F.R.D. at 284-85.  Moreover, while well-pleaded agency allegations can sometimes be enough to establish control, "if plaintiff[s] seek[] to attribute control status to a third party [such as DTT] . . . then *further allegations must be made to show that in fact such control can be inferred*." *In re Motel 6 Secs. Litig.*, 161 F. Supp. 2d 227, 239 (S.D.N.Y. 2001) (emphasis in original); *Sloane Overseas Fund, Ltd. v. Sapiens Int'l Corp.*, 941 F. Supp. 1369, 1378 (S.D.N.Y. 1996).  "Actual control over the wrongdoer *and the transactions in question* is necessary for control person liability." *In re Sotheby's Holdings, Inc.*, No. 00 Civ. 1041(DLC), 2000 WL 1234601, at *8 (S.D.N.Y. Aug. 31, 2000) (emphasis added); *In re Blech Secs. Litig.*, 961 F. Supp. 569, 587 (S.D.N.Y. 1997) ("defendant must possess actual control over the transactions in question").

   "However, the Amended Complaint is bereft of any allegations that [the Swiss membership organization], pursuant to an agreement or otherwise, was able to control or in any way influence the particular audits conducted or opinions offered by its individual member firms." *In re Asia Pulp & Paper Secs. Litig.*, 293 F. Supp. 2d at 396 ("[t]hat being so, the Court finds that such conclusory allegations are insufficient to state a claim of control person liability as defined by the Second Circuit"); *Ross v. Bolton*, No. 83 CIV. 8244 (WK), 1989 WL 80428, *3 (S.D.N.Y. Apr. 4, 1989), *aff'd*, 904 F.2d 819 (2nd Cir. 1990) ("Congressional objective . . . mean[s] that, in order to incur controlling person liability, a defendant must possess actual control over the transactions in question").  As DTT has shown in Point II above, the Complaint does not allege facts establishing that DTT had the power to direct and did direct DT-Italy's or any other member firm's audits of Parmalat or its subsidiaries.  Plaintiffs' control allegations are wholly conclusory and simply restate the legal standard for control peron liability.  (Comp. ¶¶ 1120-26).  *See In re Deutsche Telekom AG Secs. Litig.*, No. 00

---

[15] The Complaint mentions eight other DTT member firms, but does not purport to allege that their independent actions violated the securities laws.  While "[i]t is true that a plaintiff need not make a claim against the 'controlled person' in order to maintain a 'derivative' Section 20(a) claim . . ., a plaintiff is required to sufficiently allege primary violations of the securities laws by the controlled person as an element of a section 20(a) claim." *Primavera Familienstiftung v. Askin*, No. 95 CIV. 8905 (RWS),1996 WL 580917, at *2 (S.D.N.Y. Oct. 9, 1996).

CIV 9475 SHS, 2002 WL 244597, at *7 (S.D.N.Y. Feb. 20, 2002). Moreover, plaintiffs impermissibly

seek to impose both control person liability and primary liability on DTT for the same primary

violation. *See Kalnit v. Eichler*, 85 F. Supp. 2d 232, 246 (S.D.N.Y. 1999) (because plaintiff sought to

assert Section 10(b) claim against defendants, "under plaintiff's own theory, the [defendants] could not

be control persons and section 20(a) does not apply"); *In re Regal Communications Corp. Secs. Litig.*,

Master File No. 94-179, 1996 WL 411654, at *4 (E.D. Pa. July 17, 1996).

        In *In re CBT Group PLC Secs. Litig.*, No. C-98-21014-RMW, 2000 WL 33339615, at

*1, 4-5 (N.D. Cal. Dec. 29, 2000), the court dismissed a similar Section 20(a) claim against "an

umbrella organization that coordinates the various international Ernst & Young operations." *CBT* ruled

that it was not enough to allege that the defendant was an "association of professional accountants and

advisors that holds itself out to the public as a single unified 'global professional services organization'

with 675 offices worldwide," that it was "responsible for coordinating cross-border work among its

members engaged in multinational engagements and developing uniform practice standards [because

of] the worldwide scope of [audit clients'] operations" and that "the auditing work for [clients] was

performed on a global coordinated basis." *Id.* at *1, 5. The court found that it "cannot reasonably infer

from the allegations that [the umbrella organization] exercised the power to direct or cause the

direction of [its members'] day-to-day operation or management . . . [and] plaintiffs do not allege [that

the membership organization had an] ownership interest, if any, in [audit firm members]." *Id.* at *5;

*see also In re Asia Pulp & Paper Secs. Litig.*, 293 F. Supp. 2d at 393, 396 (allegations that Arthur

Andersen firms operated as "a single entity," engaged in "global setting of professional standards," had

"a global infrastructure and administration" and "market[ed] this 'one-firm' concept in . . . news

releases, web site and recruiting brochures" insufficient to allege control by global membership

organization of "the particular audits conducted or opinions offered by its individual member firms");

*Cromer I*, 137 F. Supp. 2d at 485-86 (dismissing § 20(a) claim against EYI); *Archer Daniels Midland*

*Co. (In re Citric Acid Litig.)*, 191 F.3d at 1106 (finding Coopers & Lybrand International did not

- 32 -

control its member firms and U.S. member firm did not control Swiss member firm); *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, No. 02 Civ. 8726 (LAK), unpublished order, at p. 3-4 (rejecting conclusory allegations of control based on the "flawed assumption that an advisory firm and its directors necessarily control the clients of the firm") (Dell. Aff. Ex. I). Plaintiffs' control person allegations against DTT should be dismissed for the same reasons.[16]

        *Second*, plaintiffs' control person claim must be dismissed for the additional reason that it fails to plead facts establishing a strong inference that DTT was a culpable participant by acting with scienter. While this Court previously held that plaintiffs need not allege culpable participation by the controlling person, *see Neubauer*, 158 F.R.D. at 284, it recently observed that it "is an interesting question on which courts, both within and outside this circuit, are deeply divided." *In re NTL, Inc. Secs. Litig.*, No. 02 Civ.3013 LAK, 2004 WL 2786024, at *13 (S.D.N.Y. Dec. 6, 2004). The Court did not reach the issue in *NTL* because plaintiffs there had adequately pled a primary violation by the defendants alleged to be controlling persons, but the Court ruled that "[d]efendants may raise the point anew if plaintiffs fail to establish a primary violation by any of the individual defendants at trial." *Id.* Indeed, the Second Circuit has held that "§ 20(a) liability requires an individualized determination of a defendant's control of the primary violator *as well as* a defendant's particular culpability." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (emphasis added); *see Ganino*, 228 F.3d at 170 ("To make out a prima facie case under § 20(a) . . . 'plaintiff must . . . show that the controlling person was in some meaningful sense a culpable participant'"); *S.E.C. v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996), *cert. denied*, 522 U.S. 812, 118 S. Ct. 57 (1997) (plaintiff must "show that the controlling person was 'in some meaningful sense [a] culpable participant'"); § 78u-4(b)(2) ("plaintiff may recover money damages only on proof that the defendant acted with a particular state of

---

[16] Plaintiffs' allegations that "Deloitte" knew of the Parmalat "scheme" do not support their Section 20(a) claim. (Compl. ¶¶ 951-1021). Those allegations do not refer separately to DTT. Moreover, mere knowledge that a primary violator committed securities fraud is insufficient. The allegations that certain officers served both DTT and Deloitte USA (Compl. ¶ 136, 151-54), are similarly insufficient. *Suez Equity Investors, L.P.*, 250 F.3d at 102 (allegations "that certain employees worked for multiple defendants . . . insufficient under § 20 as a matter of law").

mind"). *See, also, In re Corning, Inc. Secs. Litig.*, No. 92 Civ. 345(TPG), 2004 WL 2979907, *24

(S.D.N.Y. Dec. 22, 2004); *In re Bayer AG Secs. Litig.*, No. 03 Civ.1546 WHP, 2004 WL 2190357, at

*16 (S.D.N.Y. Sept. 30, 2004); *In re Global Crossing, Ltd. Secs. Litig.*, 322 F. Supp. 2d 319, 349 &

n.24 (S.D.N.Y. 2004); *In re Loral Space & Communications Ltd. Secs. Litig.*, No. 01 Civ. 4388(JGK),

2004 WL 376442, at *19 (S.D.N.Y. Feb. 27, 2004); *Rich v. Maidstone Fin., Inc.*, No. 98 Civ.

2569(DAB), 2002 WL 31867724, *12 (S.D.N.Y. Dec. 20, 2002); *Burstyn v. Worldwide Xceed Group,

Inc.*, No. 01 Civ. 1125(GEL), 2002 WL 31191741, at *7 (S.D.N.Y. Sept. 30, 2002); *In re Deutsche

Telekom AG Secs. Litig.*, No. 00 CIV 9475 SHS, 2002 WL 244597, at *6 (S.D.N.Y. Feb. 20, 2002).[17]

## IV.    THE COMPLAINT SHOULD BE DISMISSED BECAUSE ITS ALLEGATIONS AS TO DTT ARE CONFUSING AND ITS EXCEPTIONAL LENGTH VIOLATES THE REQUIREMENTS OF FED. R. CIV. P. 8(A) AND 8(E)(1)

The Complaint is 1259 paragraphs and 368 pages. This exceptional length, and the

confusion due to plaintiffs' varied uses of the word "Deloitte" (discussed above), violate the

requirement that a complaint "shall contain . . . a short and plain statement of the claim." Fed. R. Civ.

P. 8(a)(2); *see Johnson v. Hunger*, 266 F. Supp. 590, 591 (S.D.N.Y. 1967) (dismissing complaint that

"represents a confusing and foggy mixture of evidentiary statements, arguments and conclusory

matter"). In addition, Fed. R. Civ. P. 8(e)(1) requires that "[e]ach averment of a pleading shall be

simple, concise, and direct." "Certainly there is nothing short and very little plain about this

complaint." *VTech Holdings Ltd. v. PriceWaterhouseCoopers, LLP*, No. 03 Civ. 1413 (LAK), 2003

WL 21756623, at *1 (S.D.N.Y. July 30, 2003) (dismissing complaint of "113 pages and 179 numbered

paragraphs in length" which "[d]espite its enormous length and an overabundance of detail, it often is

quite conclusory"). "The fact that plaintiffs assert [securities fraud] claims does not justify [a] verbose

---

[17] Even courts that have, until now, held that culpable participation need not be pled separately, have recognized its growing importance and acknowledged that "[n]evertheless, allegations of control will not always be sufficient to allege willful blindness . . . so we do not think . . . 'culpable participation' is meaningless." *In re Flag Telecom Holdings, Ltd. Secs. Litig.*, 308 F. Supp. 2d 249, 273 (S.D.N.Y. 2004) (quoting *Rich*, 2002 WL 31867724, at *12 (mere allegation that defendant owned 50-75% of the company's shares not sufficient)).

complaint." *See Pahmer v. Greenberg*, 926 F. Supp. 287, 294 n.2 (E.D.N.Y. 1996), *aff'd*, 123 F.3d 717 (2d Cir. 1997).

The Complaint here is an egregious violation of Rule 8 requirements. "[F]orcing defendants to answer such a pleading would fly in the face of the very purposes for which Rule 8 exists." *Lonesome v. Lebedeff*, 141 F.R.D. 397, 398 (E.D.N.Y. 1992). As this Court put it in *VTech Holdings Ltd.*, 2003 WL 21756623, at *2, "[h]ad plaintiffs filed a well organized complaint of reasonable length, the Court would sort through its allegations one at a time and address each . . . . in this context, however, [that] would be enormously wasteful of resources upon which other litigants have an equal call." *See also Gonzales v. Wing*, 167 F.R.D. 352, 355 (N.D.N.Y. 1996) (287 page complaint was "far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiffs'] claims").

### Conclusion

For the foregoing reasons, DTT respectfully requests the Court to enter an Order dismissing the First Amended Consolidated Class Action Complaint as to DTT with prejudice, and granting such other and further relief as the Court deems proper.

Dated: New York, New York
      January 10, 2005

                  KRAMER LEVIN NAFTALIS & FRANKEL, LLP

                  By:_____
                      Michael J. Dell (MD-7714)
                      Robert A. de By (RD-6197)
                919 Third Avenue
                New York, New York 10022
                (212) 715-9100

                Attorneys for defendant Deloitte Touche Tohmatsu

KL3:2389365.1