**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____ :     **ELECTRONICALLY FILED**
    :
In re PARMALAT SECURITIES LITIGATION    :     MASTER DOCKET
    :     04 MD 1653 (LAK)
This document relates to:  04 CV 0030 (LAK)    :
    :     Hon. Lewis A. Kaplan
    :
_____:

**GRANT THORNTON LLP's MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION TO DISMISS**
**(CORRECTED)**

WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
(212) 294-6700

_Attorneys for Defendant_
_Grant Thornton LLP_

# TABLE OF CONTENTS

Table of Authorities…………………………………………………………………………ii

Preliminary Statement……………………………………………………...………………1

Procedural History………………………………………………………..…………………4

Factual Background…………………………………………………………...………………..4

Argument………………………………………………………………...…………………..7

I.     Plaintiffs have failed to state a claim against GT-US
for liability under Section 10(b) and Rule 10b-5………………………………………8

     A.     The Complaint's factual allegations concerning GT-US
do not come close to meeting the pleading standards
for securities fraud…………………………………………...………………8

     B.     To the extent that Plaintiffs seek to hold GT-US
liable as part of a single, worldwide firm,
that theory fails as a matter of law. ………………………..…………………14

     C.     GT-US is not liable for GT Italy's conduct
under any agency theory………………………………………….…………...21

II.     GT-US cannot be held liable as a "controlling person"
under Section 20(a)……………………………………………….………………..23

III.     The Complaint suffers from numerous other
pleading deficiencies………………………………………………..……………....27

IV.     This Court should dismiss the claims against GT-US with prejudice.. ………………....28

Conclusion……………………………………………………………….………………29

## <u>TABLE OF AUTHORITIES</u>

**Cases:**

*Acito v. IMCERA Group, Inc.*, 47 F.3d 47 (2d Cir. 1995)…………………….………....……...9

In re *AM Int'l Inc. Sec. Litig.*, 606 F. Supp. 600 (S.D.N.Y.1985)……. …………………13, 15-16

In re *Asia Pulp & Paper Sec. Litig.*,
293 F. Supp. 2d 391 (S.D.N.Y. 2003)…………………………………………………...24

*ATSI Communications, Inc. v. The Shaar Fund, Ltd.*, No. 02 Civ. 8726,
2003 WL 21650135 (S.D.N.Y. July 14, 2003)…………………………………………26

*Bamberg v. SG Cowen*, 236 F. Supp. 2d 79 (D. Mass. 2002)……….. …………………15, 17, 18

In re *Bayer AG Sec. Litig.*, No. 03 Civ. 1546, 2004 WL 2190357
(S.D.N.Y. Sept. 30, 2004)………………………………………………… …………………26

In re *Blech Sec. Litig.*, 928 F. Supp. 1279 (S.D.N.Y. 1996)………………… …………………13

*Boguslavsky v. Kaplan*, 159 F.3d 715 (2d Cir. 1998)……………… …………………...23, 25, 26

*Burstyn v. Worldwide Xceed Group, Inc.*, No. 01 Civ. 1125,
2002 WL 31191741 (S.D.N.Y. Sept. 30, 2002)……………………..…………………...26

*Central Bank of Denver, N.A., v. First Interstate Bank of Denver, N.A.*,
511 U.S. 164, 114 S. Ct. 1439 (1994)……………………………. ……………....8, 16, 17

*Chambers v. Time Warner, Inc*., 282 F.3d 147 (2d Cir. 2002)……………… ……………...11, 20

*Citibank, N.A. v. Itochu Internat'l Inc.*, No. 01 Civ. 6007,
2003 WL 1797847 (S.D.N.Y. Apr. 4, 2003)…………………………… ……………...19, 21

*Cromer Fin. Ltd. v. Berger*,
137 F. Supp. 2d 452 (S.D.N.Y. 2001)…………………………. ……………....14, 15, 19

*Cromer Fin. Ltd. v. Berger*, Nos. 00 Civ. 2284 (DLC) and 00 Civ. 2498,
2002 WL 826847 (S.D.N.Y. May 2, 2002)………………………………………...22

In re *Deutsche Telekom AG Sec. Litig.*,
No. 00 Civ. 9475, 2002 WL 244597 (S.D.N.Y. Feb. 20, 2002)…………………24, 26-27

*DiVittorio v. Equidyne Extractive Indus., Inc.*,
822 F.2d 1242 (2d Cir. 1987)……………………………………………………………13

*Doehla v. Wathne Ltd., Inc.*, No. 98 Civ. 6087, 1999 WL 566311
   (S.D.N.Y. Aug. 3, 1999)………………………………………………………13

*Double Alpha, Inc. v. Mako Partners, L.P.*, No. 99 Civ. 11541,
   2000 WL 1036034, (S.D.N.Y. July 27, 2000)…………………………..…………12

In re *EMEX Corp. Sec. Litig.*, No. 01 Civ. 4886, 2002 WL 31093612,
   (S.D.N.Y. Sept. 18, 2002)…………………………………………………….……26

*Fisk v. Superannuities, Inc.*, 927 F. Supp. 718 (S.D.N.Y. 1995)………………….………………..13

*Food & Allied Service Trades Dept., AFL-CIO,  v. Millfield Trading Co.*,
   841 F. Supp. 1386 (S.D.N.Y. 1994)………………………………………………..26

*Ganino v. Citizens Util. Co.*, 228 F.3d 154 (2d Cir. 2000)…………………………………..25, 26

In re *Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319
   (S.D.N.Y. 2004)………………………………………………………………26

*Howard v. Klynveld Peat Marwick Goerdeler*,
   977 F. Supp. 654 (S.D.N.Y. 1997)…………………………………………………..16, 19

In re *Initial Pub. Offering Sec. Lit.*, 241 F. Supp. 2d 281
   (S.D.N.Y. 2003)………………………………………………………………26

*Itel Containers Int'l Corp. v. Atlanttrafik Express Service Ltd.*,
   909 F.2d 698 (2d Cir. 1990)…………………………………………………...21

*Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001)…………………………...…………………8, 9, 10

*Karavos Compania Naviera S.A. v. Atlantica Export Corp.*,
   588 F.2d 1 (2d Cir. 1978)………………………………………..…………………21

*Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996)……………………………………………...19, 21

In re *Lernout & Hauspie Sec. Litig.*,
   230 F. Supp. 2d 152 (D. Mass. 2002)…………………………………………15, 22, 24

*Levitch v. Columbia Broadcasting Sys., Inc.*, 94 F.R.D. 292
   (S.D.N.Y. 1982)………………………………………………………………28

In re *Livent, Inc., Noteholders Sec. Litig.*, 151 F. Supp. 2d 371
   (S.D.N.Y. 2001)………………………………………………………………27

*Luce v. Edelstein*, 802 F.2d 49 (2d Cir. 1986)…………………………….……………..13

*Mills v. Polar Molecular Corp.*, 12 F.3d 1170 (2d Cir. 1993)……………….……...…..9, 12-13

*Mishkin v. Ageloff*, No. 97 Civ. 2690, 1998 WL 651065
    (S.D.N.Y. Sept. 23, 1998)……………………………………………………………27

*Neubauer v. Eva-Health USA, Inc.*, 158 F.R.D. 281
    (S.D.N.Y. 1994)……………………………………………………………………25-26

*Newby v. Enron Corp.*, No. 04-20001, __ F.3d __, 2004 WL 2892044
    (5th Cir. Dec. 15, 2004)…………………………………...………………15, 19

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000)……………………………………………9

*Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP*, No. 03 Civ. 0613,
    2004 WL 112948 (S.D.N.Y. Jan. 22, 2004)………………….....……………….*passim*

*Reingold v. Deloitte, Haskins & Sells*,
    599 F. Supp. 1241 (S.D.N.Y. 1984)……………………………………………16, 19

*Rich v. Maidstone Fin., Inc.,* No. 98 Civ. 2569, 2002 WL 31867724
    (S.D.N.Y. Dec. 20, 2002)…………………………………………..……………....26

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004)……………………………………………9

*Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000)……………………………………………11

*Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129 (2d Cir. 1993)…………………….……………..28

*San Leandro Emer. Med. Group Profit Sharing Plan v. Philip Morris Cos.*,
    75 F.3d 801 (2d Cir. 1996)……………………………………………..……………8

*SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450 (2d Cir. 1996)……...……………….23-24, 25, 26

*Shapiro v. Cantor*, 123 F.3d 717 (2d Cir. 1997)……………………...……………….8-9, 16-17

*Shields v. Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994)……………………………………………………9

*Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, No. 00 Civ. 8058,
    2001 WL 1111508 (S.D.N.Y. Sept. 20, 2001)………………………………………...27

*Suez Equity Investors, L.P., v. Toronto-Dominion Bank*,
    250 F.3d 87 (2d Cir. 2001)…………………………………………………………24

In re *Worldcom, Inc.*, No. 02 Civ. 3288, 2003 WL 21488087
    (S.D.N.Y. June 25, 2003)……………………………………………………15, 18

In re *Worldcom, Inc. Sec. Lit.*, 294 F. Supp. 2d 392 (S.D.N.Y. 2003)……………………………..26

*Wright v. Ernst & Young LLP*, 152 F.3d 169 (2d Cir. 1998)…………...…………………8, 13, 17

**Statutes and Rules:**

15 U.S.C. § 78j(b)……………………………………………………...…………………*passim*

15 U.S.C. § 78(t)(a)…………………………………………………………………………*passim*

15 U.S.C. § 78u-4(b)(1) (1994 & Supp. V 1999)……………………………………………………9

15 U.S.C. § 78u-4(b)(2)………………………………………………….……………..9, 25, 26

17 C.F.R. § 240.10b-5…………………………………………………...……………..*passim*

Federal Rule of Civil Procedure 9(b)………………………………………………...1, 9, 11, 12

**Other Authorities:**

*Internat'l Fin. Reporting & Discl. Issues* IV.F.2 (May 1, 2001)
      (available at *www.sec.gov/divisions/corpfin/internatl/issues0501.htm*)…………………..6

Peter F. McLaughlin, *Legal and Cultural Issues When Negotiating M&A Transactions
      In Europe: An Italian Example*, 10 INT'L L. PRACTICUM 21, 22 (Spring 1997)…..………6

3 JAMES WM. MOORE ET AL, MOORE'S FEDERAL PRACTICE § 15.15 [3] (3d ed.2001)…………..28

RESTATEMENT (SECOND) OF AGENCY (1958)………………………………………………………21

5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL
      § 1357 (3d ed. 2004)…………………………………...……………………………………11

Defendant Grant Thornton LLP ("GT-US") respectfully submits this Memorandum of Law in support of its Motion to Dismiss the First Amended Consolidated Class Action Complaint. In its Motion, GT-US seeks dismissal under Federal Rules 12(b)(6) and 9(b) of all claims against it (Counts IV, V, and X) for failure to state a claim upon which relief can be granted and for failure to meet the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act.

## PRELIMINARY STATEMENT

Supported by nothing more than bare legal conclusions, Plaintiffs in this case are attempting to shift their investment losses in a scandal-ridden Italian conglomerate onto U.S. auditing firms that had no involvement whatever in the alleged fraud that occurred there. With Parmalat in bankruptcy and many of its executives under indictment, Plaintiffs are now seeking civil damages from the banks, lawyers, and auditors that, in Plaintiffs' view, participated in and facilitated the alleged fraud. In their continuing search for deep pockets, however, Plaintiffs have not contented themselves with naming the banks, lawyers, and auditors that actually worked with Parmalat. The Complaint also asserts claims against GT-US, a U.S. auditing firm that never served as Parmalat's auditor and never issued any opinions or made any statements to anyone about Parmalat's financial condition.

Despite the Complaint's extraordinary length and level of detail, the claims against GT-US fail to meet even the most minimal standards of pleading, much less the heightened standards that apply in fraud cases under the federal securities laws. Nowhere in the Complaint's 1,259 paragraphs do Plaintiffs allege that GT-US or any of its employees made any statement at all with regard to Parmalat, participated in or directed any fraudulent or deceptive act, or had the level of scienter required for an action under the securities laws. **Indeed, the Complaint does**

**not attribute a single act, statement, or omission concerning Parmalat to GT-US.** Under the law of this Circuit, Plaintiffs thus have utterly failed to allege a claim against GT-US for direct liability under Section 10(b) and Rule 10b-5.

Given the complete absence of factual allegations against GT-US itself, Plaintiffs' entire Complaint must rest on the theory that GT-US—together with Grant Thornton International ("GTI"), the international accounting organization of which GT-US is a member, and the many other member firms of GTI—is part of a single, unified global firm and thus bears joint liability for the conduct of any of the other member firms anywhere in the world. Plaintiffs allege that GTI and its members "market[] [themselves] as a global organization" and operate using unspecified "procedures, policies, and practices" established and monitored by GTI. Compl. ¶¶ 162, 163.  Then, based only on those insubstantial allegations, Plaintiffs attribute all the alleged conduct by Grant Thornton S.p.A. ("GT-Italy")—which was the only affiliate of GTI that ever served as Parmalat's auditor—to a composite "Grant Thornton" entity that they have invented out of thin air for purposes of this Complaint. As discussed below, this facile tactic does not relieve Plaintiffs of the obligation to plead specific facts to support liability for each defendant from which they seek damages.

Courts have consistently rejected attempts by plaintiffs to treat global accounting organizations and their member firms as jointly liable under a "one-firm" theory, even for claims under state tort law. Under the federal securities laws, the answer is even clearer:  a defendant cannot be held liable in a private lawsuit under Section 10(b) for the deceptive acts or statements of another.  Accordingly, Plaintiffs' "one-firm" theory fails as a matter of law, and Plaintiffs cannot rely on that theory as a justification for baldly ignoring the legal and practical separation between GTI and its member firms in different countries.

Although the Complaint also seeks to impose "controlling person" liability on GT-US under Section 20(a) of the Exchange Act, it does not base this claim on the allegation that GT-US was a controlling person of GT-Italy, which served as Parmalat's auditor and allegedly committed the fraud.  Rather, the Complaint seeks to hold GT-US vicariously liable as a controlling person of GTI, which also had no direct involvement in the alleged fraud. *See* Compl. ¶ 1151 (alleging a claim under Section 20(a) on the ground that GT-US "acted as a controlling person of Grant Thornton International").[1] Plaintiffs' novel and attenuated theory—that GT-US is vicariously liable for the actions of another third party, which itself is at worst only vicariously liable for the actions of the alleged wrongdoer—finds no support in the law of this or any other Circuit.  Even the allegations of "control" on which the Section 20(a) claim is based are mere legal conclusions, falling far short of the specificity required under the securities laws.

The Complaint includes three different claims against GT-US:  Counts IV and V, which both seek to hold GT-US (along with other auditor defendants) liable for primary violations of Section 10(b), and Count X, which seeks to hold GT-US liable under Section 20(a) as the "controlling person" of GTI.[2] For the reasons discussed below, all these claims fail as a matter of law and must be dismissed with prejudice.

---

[1] Although Plaintiffs do allege earlier in the Complaint that GT-US "was a controlling person of Grant Thornton S.p.A.," their claim for relief under Section 20(a) is based only on the allegation that GT-US was a controlling person of GTI.  *See* Compl. ¶ 1154 (Count X) ("By virtue of its position as a controlling person of Grant Thornton International, [GT-US] is liable pursuant to Section 20(a).").

[2] The Complaint purports to assert two separate 10(b) claims against GT-US and the other audit firms: Count V, which alleges that the firms "made false and misleading statements of material fact" (¶ 1112), and Count IV, which alleges that the firms "employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business that operated as a fraud and deceit" (¶ 1100).  Upon closer examination, however, the "devices, schemes, and artifices" claim also rests on the issuance of "audit reports and opinions" on which investors allegedly relied.  *Id.* ¶ 1102.  Thus it appears that both claims are actually based upon alleged misstatements and omissions.  In any case, the Complaint does not allege facts sufficient to establish either a misstatement of fact or any other fraudulent scheme by GT-US.

## PROCEDURAL HISTORY

In early 2004, three class action complaints were filed in the Southern District of New York against Parmalat management and affiliates, as well as against a group of former legal advisors, outside accountants, and investment and commercial banks that Plaintiffs contended should be held jointly liable for the alleged fraud at Parmalat. In May 2004, this Court consolidated the related actions and designated Hermes Focus Asset Management Europe Limited and Cattolica Partecipanzioni S.p.A., Solotrat, Societe Moderne des Terrassements Parisiens, and Capital & Finance Asset Management as co-lead plaintiffs ("Plaintiffs"). On October 18, 2004, after requesting and receiving a sixty-day extension of time, Plaintiffs filed the First Amended Consolidated Class Action Complaint (the "Complaint"), which is at issue in this Motion. The Complaint was filed on behalf of a putative class of all persons who purchased securities of Parmalat Finanziaria S.p.A. and its subsidiaries and affiliates between and including January 5, 1999 and December 18, 2003. Compl. ¶ 1. Significantly, the interests of these shareholders are also purportedly represented in a related lawsuit brought in Illinois by Enrico Bondi, the Extraordinary Commissioner of Parmalat's Italian bankruptcy estate, who seeks recovery for the benefit of Parmalat's creditors. That lawsuit is also now before this Court.

## FACTUAL BACKGROUND

This case arises out of the collapse of Parmalat, an Italian dairy conglomerate that is now at the center of a European accounting scandal. Parmalat, which grew rapidly during the 1990s through a series of international acquisitions, disclosed in late 2003 that it had falsely claimed as assets on its financial statements 3.95 billion euros in cash (approximately $4.9 billion). Following this and other disclosures, Parmalat collapsed and was declared insolvent by an Italian court. To date, 21 Parmalat board members, executives, and internal auditors have been indicted

4

for their parts in the alleged fraud. Those criminal proceedings have continued in Milan, Italy under a political and public spotlight.

Throughout the relevant period, Parmalat retained one or more auditing firms licensed under Italian law to audit its financial statements. Beginning in 1985, before Parmalat's rapid expansion began, Parmalat's outside auditing firm was the Italian firm Hodgson Landau Brands SAS.  In 1996, Hodgson Landau became a member of GTI and changed its name to Grant Thornton S.p.A. ("GT-Italy"). GT-Italy audited Parmalat's financial statements through the year ending December 31, 1998.  Another Italian firm, Defendant Deloitte & Touche S.p.A. ("D&T Italy"), succeeded GT-Italy as Parmalat's auditor for the year ending December 31, 1999, and served in that capacity through Parmalat's collapse in December 2003. GT-Italy was terminated as a member firm of GTI in early 2004.  It took the name "Italaudit S.p.A" and is a defendant in this action.

Neither GTI nor GT-US ever served as auditor for Parmalat, nor were they empowered to do so. GTI is a non-practicing, non-trading, not-for-profit membership corporation organized under the laws of the State of Illinois. It exists to provide support to its 110 member firms; it does not provide any accounting or auditing services to clients and is not licensed anywhere in the world to do so. GT-US—an Illinois limited liability partnership—is the U.S. member firm of GTI.  GT-US does not provide audit services in Italy, nor is it licensed to provide such services. At all times, GT-Italy was the only GTI member firm with the requisite license and authorization from agencies of the Italian government to perform audit work for an Italian corporation. There is no allegation in this case that either GTI or GT-US issued any statement or audit opinion concerning Parmalat or its affiliates. There is also no allegation that GT-US and GTI shared in the revenues GT-Italy derived from its work for Parmalat.

Even assuming that the GT member firms share certain policies and procedures and market themselves "as a global organization," as Plaintiffs allege (Compl. ¶ 162), the firms are independent entities and do not control one another's conduct. Indeed, although the Complaint in this case includes the legal conclusion that GT-Italy was "controlled by" GTI and GT-US and "was their agent acting on their authority, at their direction, and for their benefit" (Compl. ¶ 159), it does not allege a single fact to support that conclusion and does not explain how, why, or through what mechanism that control was supposedly exercised. Nor is it obvious how such control could exist, given that accounting and auditing practices in any one country are dictated in large measure by local securities regulations and tax laws. *E.g., Internat'l Fin. Reporting & Discl. Issues* IV.F.2 (May 1, 2001) (available at *www.sec.gov/divisions/corpfin/internatl/ issues0501.htm*); Peter F. McLaughlin, *Legal and Cultural Issues When Negotiating M&A Transactions In Europe: An Italian Example*, 10 INT'L L. PRACTICUM 21, 22 (Spring 1997).

The independence of the GTI member firms is fully disclosed and described in the very press release that Plaintiffs quote in their Complaint. A January 8, 2004 press release by GTI— quoted selectively by Plaintiffs in Paragraph 168 of their Complaint—includes the following statement:

> Each member and correspondent firm in Grant Thornton International is a separate independent national firm. These firms are not members of one international partnership or otherwise legal partners with each other, nor is any one firm responsible for the services or activities of any other. Each firm governs itself and handles its administrative matters on a local basis. Although many of the firms now carry the Grant Thornton name, either exclusively or in their national practice names, there is no common ownership among the firms or by Grant Thornton International.

Ex. B hereto. This disclosure refutes any suggestion by Plaintiffs that GTI and its member firms held themselves out as a single, unified firm.

6

Plaintiffs' Complaint blatantly ignores the legal and practical separation between and among GTI, GT-US, and GT-Italy and instead attributes what are most clearly the alleged actions of GT-Italy to the others by lumping them all together under the contrived, collective rubric "Grant Thornton." *E.g.*, Compl. ¶ 160 ("Grant Thornton International, Grant Thornton LLP, and Grant Thornton S.p.A. are referred to herein as "Grant Thornton.'"). In reality, there is no such collective entity as "Grant Thornton," except as fictionally created by Plaintiffs in this Complaint to disguise the lack of a claim against either GT-US or GTI.

When Plaintiffs' pleading artifice is stripped away, it is clear that Plaintiffs have no basis for holding GT-US responsible for the conduct of its Italian counterpart. While the Complaint is replete with allegations against "Grant Thornton," none of its 1,259 paragraphs attributes any wrongful conduct to GTI or GT-US. And although Plaintiffs conclude that GT-Italy was "controlled" by GTI and GT-US, it offers no factual allegations sufficient to support that conclusion. As discussed below, the Complaint thus falls far short of stating a claim against either GTI or its U.S. member firm.

## ARGUMENT

Plaintiffs' attempt to draw GT-US into a corporate collapse halfway across the world fails to meet the most basic levels of pleading, much less the heightened pleading standards that apply in a securities fraud case. The Complaint does not include a single factual allegation that would implicate GT-US in any wrongdoing. Moreover, even if they had alleged facts to support it, Plaintiffs' theory that GT-US and GT-Italy were actually part of a single, unified firm with global liability fails as a matter of law. Courts have consistently rejected the argument that members of an international accounting association are "one firm" upon which joint liability may

be imposed, and no U.S. court has ever held an accounting firm liable for the misconduct of another based simply on the fact that both were members of the same international organization.

## POINT I

## PLAINTIFFS HAVE FAILED TO STATE A CLAIM AGAINST GT-US FOR LIABILITY UNDER SECTION 10(B) AND RULE 10B-5.

### A.   The Complaint's factual allegations concerning GT-US do not come close to meeting the pleading standards for securities fraud.

As discussed above, the Complaint is premised wholly on a discredited theory of vicarious liability and does not include a single factual allegation that would connect GT-US directly with Parmalat in any way.  Given the utter absence of facts concerning conduct by GT-US or any of its partners or employees, Plaintiffs' claims against GT-US fail to meet even the most minimal standards of pleading, much less the heightened standards that apply in securities fraud cases.

For a plaintiff to state a cause of action under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), or Rule 10b-5, 17 C.F.R. § 240.10b-5, the complaint must allege that in connection with the purchase or sale of securities, "'the defendant made a false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused plaintiff injury.'"  *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (quoting *San Leandro Emer. Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808 (2d Cir. 1996)). In the wake of *Central Bank of Denver, N.A., v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 114 S. Ct. 1439 (1994), the Second Circuit has made clear that a defendant  "must actually make a false or misleading statement in order to be held liable under Section 10(b)." *Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998) (quoting *Shapiro v. Cantor*, 123 F.3d 717,

720 (2d Cir. 1997)).  "Anything short of such conduct is merely aiding and abetting," which is "not enough to trigger liability under Section 10(b)." *Id.* (citations omitted).

To survive a motion to dismiss, the plaintiffs' allegations of wrongdoing must be specific:  the complaint must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1) (1994 & Supp. V 1999) (codifying Private Securities Litigation Reform Act ("PSLRA") § 101(b)). The Federal Rules of Civil Procedure also require specificity in pleading fraud.  Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b).  The Second Circuit "has read Rule 9(b) to require that a complaint '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).

Similarly, the plaintiff's allegations of scienter must be specific in order to meet the heightened pleading standards set out in the PSLRA.  The PSLRA requires that plaintiffs "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); see also *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000) (reaffirming that Second Circuit case law remained the standard after the PSLRA).  A plaintiff can establish this intent "'either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)); *Kalnit*, 264 F.3d at 138 (same).

Despite its extraordinary length and level of detail concerning Parmalat, the Complaint does not allege any wrongdoing whatsoever on the part of GT-US itself.  Neither GT-US nor any employee or partner of GT-US is named anywhere in the lengthy discussion that details the alleged accounting and auditing failures at Parmalat. There is no allegation that GT-US made any statement about any aspect of Parmalat's financial condition or that GT-US actually participated in any deceptive or fraudulent device. Indeed, Plaintiffs could not make such an allegation, as GT-US was never retained by Parmalat or any of its affiliates as auditor of its financial statements, never served in that capacity, and, it bears repeating, never issued any statement or audit opinion of any sort with regard to Parmalat.

Moreover, far from "stat[ing] with particularity facts giving rise to a strong inference" that GT-US had the required scienter, Plaintiffs have failed to plead **a single fact** concerning GT-US's state of mind with regard to the situation at Parmalat. At most, Plaintiffs state in conclusory fashion that GT-US "had unlimited access to copies of its member firms' workpapers" and "was aware of the creation … of entities used to perpetrate the fraud." Compl. ¶¶ 1151-52. These allegations falls far short of the heightened pleading requirements established by the PSLRA, as they give the Court no basis for inferring either that GT-US engaged in conscious misbehavior or that it had both "motive and opportunity" to engage in fraud.  Indeed, the Second Circuit has rejected allegations of scienter that were far more detailed than these.  See, *e.g.*, *Kalnit*, 264 F.3d at 139-44 (plaintiff had not alleged scienter even though complaint included detailed allegations that defendants were motivated to commit fraud so that they could protect their own compensation and benefits, avoid personal liability for a contract breach, and increase the odds of a particular corporate transaction).

10

Indeed, rather than meeting the Rule 9(b) requirement of identifying who made each alleged misstatement, Plaintiffs do quite the opposite:  they ignore the legal and practical separation between GTI, GT-US, and GT-Italy and lump all of them together under the collective rubric "Grant Thornton."  *E.g.*, Compl. ¶ 160 ("Grant Thornton International, Grant Thornton LLP, and Grant Thornton S.p.A. are referred to herein as "Grant Thornton.'"). In reality, there is no such collective entity as "Grant Thornton," except as created by Plaintiffs to conceal the fact that neither GT-US nor GTI was involved in any of the activities described in the Complaint.

The inadequacy of this pleading artifice is best illustrated by an examination of the audit opinions that are quoted at length in the Complaint—the very statements that form the basis of Plaintiffs' claims against the auditors under Section 10(b). This Court may examine the full text of these audit opinions in resolving this motion to dismiss, as the Complaint refers to these opinions and quotes them at length, and they are part of Parmalat's public filings. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (on motion to dismiss, court may consider any document on which the complaint relies heavily, even if the document has not been attached to the complaint); *cf. Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (on motion to dismiss, court may consider "any statements or documents incorporated in [the complaint] by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC"); 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357, at 376 (3d ed. 2004).

For example, the Complaint misleadingly alleges that "Grant Thornton audited Parmalat's consolidated financial statements during the period 1990 through and including 1998" and issued audit opinions in each year.  Compl. ¶ 164.  In fact, the 1990-1994 audit work was

performed by the Italian auditing firm Hodgson Landau Brands SAS—a predecessor firm to GT-Italy that had no connection whatever to GTI, let alone to GT-US.

Moreover, for the period from 1995-1998, the financial statements of Parmalat were audited by GT-Italy alone. Athough the Complaint alleges that "Grant Thornton certified Parmalat's and the Parmalat Group's fiscal year 1998 financial statements" (Compl. ¶ 464), the audit opinion quoted in the Complaint and attributed to "Grant Thornton" was obviously issued by GT-Italy alone. The opinion appears on GT-Italy letterhead and was signed by two GT-Italy partners. *See* Ex. A hereto. The letterhead indicates that GT-Italy's headquarters are in Milan, with other offices in the Italian cities of Bari, Bologna, Brescia Firenze, Genova, Napoli, Padova, Roma, and Torino. *Id.*  Both the letterhead and the text refer to CONSOB (the Italian securities market regulator, roughly equivalent to the SEC), and the letterhead provides GT-Italy's CONSOB registration numbers. *Id.* ("We conducted our audit in accordance with the auditing standards recommended by CONSOB"). Neither the 1998 audit report nor any other Parmalat audit report refers to GT-US in any way, and there would be no reason for anyone reading the audit opinions to believe that the statements of GT-Italy were, in fact, the statements of GT-US.

Plaintiffs' pleading strategy—attributing all of GT Italy's alleged conduct to a fictitious, global "Grant Thornton" entity and then implicating GT-US as part of "Grant Thornton"—is insufficient as a matter of law. It is well established that a plaintiff alleging fraud against multiple defendants must "set[ ] forth separately the acts complained of by each defendant." *Double Alpha, Inc. v. Mako Partners, L.P.*, No. 99 Civ. 11541 (DC), 2000 WL 1036034, at *3 (S.D.N.Y. July 27, 2000) (dismissing Section 10(b) claims because complaint failed to "alleg[e] specific acts of wrongdoing by each one" of the multiple defendants); *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993) ("Rule 9(b) is not satisfied where the complaint

vaguely attributes the alleged fraudulent statements to 'defendants'.") (citing *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986)); In re *Blech Sec. Litig.*, 928 F. Supp. 1279, 1294 (S.D.N.Y. 1996) (complaint failed to plead fraud with particularity because it did not distinguish the allegedly illegal acts of one group of defendants from those of another group); *see also Doehla v. Wathne Ltd., Inc.*, No. 98 Civ. 6087, 1999 WL 566311, *17-18 (S.D.N.Y. Aug. 3, 1999) (plaintiff failed to sufficiently plead the circumstances of fraud where all the defendants were lumped together in a group); *Fisk v. Superannuities, Inc.*, 927 F. Supp. 718, 727 (S.D.N.Y. 1995) (Kaplan, J.) (when complaint names multiple defendants, each one must "be informed 'of the nature of his alleged participation in the fraud'") (quoting *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987)). This principle applies to allegations of scienter, as well as to the basic acts that constitute the fraud; "plaintiffs must plead acts from which an intent to deceive, manipulate, or defraud may reasonably be inferred **with respect to each defendant**." In re *AM Int'l Inc. Sec. Litig.*, 606 F. Supp. 600, 605 (S.D.N.Y. 1985) (emphasis added); *see id.* at 607 (dismissing securities fraud claims against "foreign" member firm based on audit by U.S. firm where "[t]here are no facts alleged in the complaint which remotely suggest that the foreign firms ever participated in the decision as to how this information should be reported, and certainly none which would support an inference that they had knowledge of any such distortions"). The fact that Plaintiffs have lumped GT-US together with other defendants for purposes of the Complaint itself warrants dismissal of all claims against GT-US.

Furthermore, under the law of this Circuit, GT-US cannot be held liable for any statement it did not make unless that statement was "attributed to that specific actor at the time of public dissemination." *Wright*, 152 F.3d at 175. The audit opinions that are the subject of this

Complaint were issued by GT-Italy and do not refer to GT-US in any way.  For this reason as well, GT-US cannot be held liable under Section 10(b). *See Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 485 (S.D.N.Y. 2001) (Cote, J.) (dismissing claims against an international accounting organization in part because the allegedly false audit opinions were issued by a member firm and did not refer to the international organization).

From the face of the Complaint and the documents to which it refers, this Court must conclude that GT-US did not serve as Parmalat's auditor and did not issue the statements that Plaintiffs attribute to the fictional "Grant Thornton." The Complaint does not include a single factual allegation that would implicate GT-US in any wrongdoing, does not identify a single misstatement made by GT-US or anyone authorized to speak on its behalf, and does not include any facts from which the Court could infer that GT-US had the requisite scienter.  Accordingly, the claims against GT-US must be dismissed.

**B.     To the extent that Plaintiffs seek to hold GT-US liable as part of a single, worldwide firm, that theory fails as a matter of law.**

Although Plaintiffs do not plead it expressly, their pleading technique suggests that they believe GTI and its member firms should all be treated as a single, unified firm, without reference to their corporate structures.  *See, e.g.,* Compl. ¶ 160 ("Defendants Grant Thornton International, Grant Thornton LLP and Grant Thornton S.p.A. are referred to herein as 'Grant Thornton.'"). If that is their theory, it fails as a matter of law.

Courts have consistently rejected the argument that all members of international accounting associations are a single firm on which joint and several liability may be imposed. *E.g.*, *Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP*, No. 03 Civ. 0613 (GBD), 2004 WL 112948, at *3 (S.D.N.Y. Jan. 22, 2004) (allegation of affiliate relationship among members of an international accounting organization did not support liability under any theory, including

agency, partnership, and piercing the corporate veil); *see also, e.g.*, *Newby v. Enron Corp.*, No. 04-20001, __ F.3d __, 2004 WL 2892044, at *10  (5th Cir., Dec. 15, 2004) (in approving a securities fraud settlement, concluding that plaintiffs' prospects for holding Andersen Worldwide liable for the conduct of Andersen U.S. were "dubious," in light of "substantial caselaw" rejecting the one-firm theory); *Bamberg v. SG Cowen*, 236 F. Supp. 2d 79, 89-90 (D. Mass. 2002) (in securities fraud case, refusing to hold KPMG Singapore liable for alleged misstatements by other member firms); In re *Lernout & Hauspie Sec. Litig.*, 230 F. Supp. 2d 152, 170 (D. Mass. 2002) (dismissing claims that member firms of an international accounting organization share liability for one another's conduct "simply because they shared an associational name and/or collaborated on certain aspects of the relevant transaction").

Indeed, five different judges in this very Court have all rejected the theory that accounting organizations and their member firms share liability for one another's conduct as part of a single, unified firm, even where the complaint included more detailed allegations of coordination than those offered here.  *See Nuevo Mundo Holdings*, 2004 WL 112948, at *3 (Daniels, J.) (in granting motion to dismiss a RICO case, holding that "[m]ember firms in an international accounting association are not part of a single firm and are neither agents nor partners of other member firms simply by virtue of using the same brand name"); In re *Worldcom, Inc.*, No. 02 Civ. 3288, 2003 WL 21488087 (S.D.N.Y. June 25, 2003) (Cote, J.) (rejecting theory that Andersen Worldwide and its British member firm should be held liable for securities fraud allegedly committed by the U.S. firm); *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 488 (S.D.N.Y. 2001) (Cote, J.) (on motion to dismiss, holding allegations that Ernst & Young member firms share clients, revenues, operational policies, and marketing efforts "insufficient" to establish liability based on a "unified" global firm theory); In re *AM Int'l Inc.*

*Sec. Litig.*, 606 F. Supp. 600, 607 (S.D.N.Y. 1985) (Sprizzo, J.) (on motion to dismiss, rejecting argument that all Price Waterhouse affiliates were "in fact one entity, and acted as agents of one another"); *see also Howard v. Klynveld Peat Marwick Goerdeler*, 977 F. Supp. 654 (S.D.N.Y. 1997) (Kram, J.) (for purposes of personal jurisdiction, refusing to attribute the conduct of one member firm to a global organization); *Reingold v. Deloitte, Haskins & Sells*, 599 F. Supp. 1241, 1249 (S.D.N.Y. 1984) (Goettel, J.) (in evaluating personal jurisdiction, holding that the existence of DH&S International, "an organization composed of a large number of affiliated accounting firms," did not establish that DH&S was "a single worldwide entity").

Even before *Central Bank*, when a defendant in the Second Circuit could be held liable for aiding and abetting the misstatements of another, an accounting firm could not be held liable for another firm's misconduct based merely on their shared membership in a global accounting organization.  In the case of *AM International, Inc.*, for example, this Court rejected the plaintiffs' argument that "all the Price Waterhouse firms world-wide are in fact one entity, and acted as agents of one another." 606 F. Supp. at 607. Accordingly, this Court refused to impose even aiding and abetting liability on the foreign affiliates of Price Waterhouse, because there were "no facts alleged in the complaint which remotely suggest that the foreign firms ever participated in the decision as to how this information should be reported, and certainly none which would support an inference that they had knowledge of any such distortions and the requisite intent to assist the alleged fraud which aiding and abetting requires." *Id.*

Since the U.S. Supreme Court eliminated private aiding and abetting liability in *Central Bank*, the "one-firm" theory has become even more untenable.  Following *Central Bank*, the Second Circuit has held that "a defendant must actually make a false or misleading statement in order to be held liable under Section 10(b)." *Shapiro v. Cantor*, 123 F.3d 717, 720 (2d Cir. 1997)

16

(holding that "substantial assistance" is no longer sufficient for Section 10(b) liability). Under this new standard, "accountants [are] secondary actors who may no longer be held primarily liable under [Section] 10(b) for mere knowledge and assistance in the fraud." *Wright v. Ernst & Young LLP*, 152 F.3d 169, 176 (2d Cir. 1998). Thus, absent specific allegations to support an agency relationship—in other words, factual allegations to support an inference that one firm authorized another to act as its agent and that the agent "acts subject to the principal's direction and control"—one firm cannot be held liable under Section 10(b) for the misstatements of another. *Nuevo Mundo Holdings*, 2004 WL 112948, at *4.

In *Bamberg v. SG Cowen*, for example, the court rejected the "one-firm" argument and refused to accept the plaintiffs' pleading tactic of lumping together the activities of various KPMG member firms, despite specific allegations that the firms had worked together on the audits in question. 236 F. Supp. 2d at 89 (noting that it was "difficult to parse" the claim against KPMG Singapore "because, in conclusory fashion, it conflates the activities and statements of KPMG Singapore and KPMG Belgium, and more generally the activities of all the KPMG entities"). The court held that the plaintiffs' one-firm theory—that the defendants shared liability because "all KPMG entities are one worldwide firm or all agents of one another" (*id*.)—failed to establish liability under any theory. In light of *Central Bank*, the Court held that KPMG Singapore could not be held liable for the misstatements of another member firm absent allegations sufficient to support a "reasonable inference" that it had actually "exercised control" over the other firm's audit report. *Id.* Even specific allegations that KPMG Singapore had actually performed work related to the relevant audits were not sufficient to establish its liability. *Id.* at 90.

Similarly, in the *Worldcom* matter, which concerned alleged misconduct by the U.S. audit firm Arthur Andersen LLP, this Court refused to ignore the separate existence of the member firms of Andersen Worldwide and dismissed claims against both the membership organization and the U.K. member firm, despite allegations of actual coordination between the member firms with respect to the audits at issue—allegations that are not present here.  In *Worldcom*, the plaintiffs alleged that Andersen U.K. audited certain Worldcom affiliates and that a Worldcom executive discussed his concerns about certain U.S. accounting practices with a representative of Andersen U.K.  Nevertheless, even that direct connection with Worldcom was insufficient to draw the U.K. firm into the alleged misconduct of the U.S. firm. 2003 WL 21488087, at *8-*9. The Court concluded that the claims against Andersen U.K. failed for several reasons, including because the complaint failed to identify any false statement by Andersen U.K., any work performed by Andersen U.K. that resulted in a false statement, or any work that Andersen U.K. should have performed that would have uncovered the fraud.  *Id.* In addition to these other deficiencies, the Court held that the complaint must be dismissed because it contained "insufficient allegations to give rise to an inference—much less a **strong** inference—that Andersen U.K. acted with fraudulent intent." *Id.* at *9. The Court also refused to impose liability on Andersen Worldwide, holding that the allegation that it served as a worldwide "umbrella organization" was insufficient to invoke any agency or partnership theory. *Id.* at *10.

In the instant case, Plaintiffs do not allege—nor could they—that GT-US had anything approaching the level of involvement in the relevant audits that the affiliate firms had in *Bamberg* and In re *Worldcom*.  Thus the inadequacy of the Complaint in this case is even more obvious here than it was in those cases.

18

Indeed, Plaintiffs offer only the most minimal factual allegations to support their one-firm theory.[3]  They allege that "Grant Thornton markets itself as a global organization." Compl. ¶ 162.  They also quote a 2003 marketing release—issued well after GT-Italy had been replaced as Parmalat's auditor and had issued its last audit opinion on Parmalat's financial statements—which states:  "Grant Thornton is the leading global accounting, tax and business advisory firm dedicated to servicing the needs of middle-market companies. . . . Grant Thornton serves public and private middle-market clients through 50 offices in the United States, and in 585 offices in 110 countries through Grant Thornton International." *Id.*  But these sorts of marketing statements fall far short of establishing that any one entity had actual control over the conduct of another. *Newby*, ___ F.3d at ___, 2004 WL 2892044, at *3 (noting that the arguments in favor of finding liability on the part of Andersen Worldwide were "premised on pithy statements of worldwide corporate unity found in marketing materials" and declining "to afford those corporate clichés considerable weight"); *see also Howard,* 977 F. Supp. at 662 ("While Klynveld's public relations materials suggest that Klynveld is a global firm or an international network of member firms, this fact neither justifies a legal finding of partnership nor supports Howard's assertion that Peat Marwick's acts in the United States should be attributed to Klynveld"); *Reingold*, 599 F. Supp. at 1254 n.10 ("brochures and pamphlets describing DH&S (U.S.) in terms such as 'a single cohesive worldwide organization'  . . . cannot alone contradict the plain meaning of the . . . international agreements"); *Cromer,* 137 F. Supp. 2d at 487 ("the allegation of a general advertising scheme is not sufficient").  And in any case, another release—quoted selectively in

---

[3] Although the Complaint does include the legal conclusion that GT-Italy "was controlled by" GTI and GT-US (Compl. ¶ 159), that conclusion is not supported by factual allegations and may be disregarded. "[B]ald contentions, unsupported characterizations, and legal conclusions are not well-pleaded allegations, and will not suffice to defeat a motion to dismiss." *Citibank, N.A. v. Itochu Internat'l Inc.,* No. 01 Civ. 6007 (GBD), 2003 WL 1797847, * 1 (S.D.N.Y. Apr. 4, 2003)  (citing *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996)).

the Complaint at Paragraph 168—clearly states that each member firm of GTI is a "separate independent national firm.  These firms are not members of one international partnership or otherwise legal partners with each other, nor is any one firm responsible for the services or activities of any other."  Ex. B hereto; *see Chambers*, 282 F.3d at 152 (on motion to dismiss, court may consider full text of materials upon which complaint relies); *see supra* at p.11.

The only other factual allegation offered to support Plaintiffs' one-firm theory is that GTI "establishes procedures, policies and practices for its members" and "performs a review of its members at least every three years to ensure their compliance with such procedures, policies and practices." Compl. ¶ 163. The Complaint does not identify any of these procedures, policies or practices, however, nor does it suggest that they had anything to do with the alleged fraud by GT-Italy.  And even assuming that GT-US and GT-Italy were both required to follow the same procedures and to subject themselves to review by GT-International every three years, that cannot possibly provide a basis for holding one member firm liable for the other member firm's conduct, particularly given the absence of any suggestion that the unspecified common procedures were implicated in the alleged fraud.  *E.g., Nuevo Mundo Holdings*, 2004 WL 112948, at * 3 (dismissing claim against one affiliate based on conduct of another where plaintiff alleged there was "overall training and supervision of all affiliates and peer review meetings held to assure compliance with the accepted professional standards and ethical requirements of what each affiliate is doing").

In short, Plaintiffs cannot hold GT-US liable for the conduct of GT-Italy on the theory that both were part of a single, unified firm.  Plaintiffs cannot ignore the legal separation between these entities merely by alleging that Grant Thornton member firms operated under some of the same professional standards and practices and marketed themselves as members of a global

organization. American courts have consistently rejected this "one firm" theory, and this Court should do so here.

### C.       GT-US is not liable for GT Italy's conduct under any agency theory.

For similar reasons, the Complaint fails to state a claim against GT-US under any principle of agency law.  The Complaint concludes that GT-Italy "was controlled by" GTI and GT-US and "was their agent acting on their authority, at their direction, and for their benefit." Compl. ¶ 159.  Because they offer no factual allegations to support this conclusion, however, it does not suffice to defeat a motion to dismiss.  *Citibank, N.A. v. Itochu Internat'l Inc.*, No. 01 Civ. 6007 (GBD), 2003 WL 1797847, * 1 (S.D.N.Y. Apr. 4, 2003) ("[B]ald contentions, unsupported characterizations, and legal conclusions are not well-pleaded allegations, and will not suffice to defeat a motion to dismiss.") (citing *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996)).

In order to establish a principal/agent relationship, Plaintiffs must demonstrate the following elements:  "(1) the manifestation by the principal that the agent shall act for him; (2) the agent's acceptance of the undertaking; and (3) an understanding between the parties that the principal is to be in control of the undertaking."  *Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP*, No. 03 Civ. 0613 (GBD), 2004 WL 112948, at *4 (S.D.N.Y. Jan. 22, 2004) (citing RESTATEMENT (SECOND) OF AGENCY § 1 (1958)); *see also id.* at *5 ( "The importance of control by the principal is paramount.").  "Actual agency is created by 'written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account."  *Id.* at *5 (quoting *Itel Containers Int'l Corp. v. Atlanttrafik Express Service Ltd.*, 909 F.2d 698, 702 (2d Cir. 1990)).  The authority of an agent "can only be established by tracing it to its source in some word or act of the alleged principal." *Id.* at *6 (citing *Karavos Compania Naviera S.A. v. Atlantica Export Corp.*, 588 F.2d 1, 10 (2d Cir. 1978)).

Given these elements, Plaintiffs have failed to allege any facts that could support a finding that GT-US is liable as principal for the conduct of GT-Italy as agent.[4] The Complaint does not point to any "manifestation" of GT-US's supposed intent that GT-Italy act on its behalf. The Complaint also fails to allege any facts that would establish an agreement between GT-US and GT-Italy under which GT-Italy would act on behalf of and under the control of GT-US. Indeed, there are no factual allegations from which this Court could conclude that GT-US was in control of GT-Italy's conduct in any respect.  To the contrary, the audit opinions on Parmalat's financial statements plainly demonstrate that the Italian accountants working for GT-Italy conducted the audit of Parmalat—a client of GT-Italy—in Italy pursuant to Italian requirements. *See* Ex. A hereto.  There is simply no reason to conclude—and no fact pleaded that would support a conclusion—that when GT-Italy was issuing its opinion following its audit of Parmalat, it was acting on behalf of GT-US and at its direction.  *See Nuevo Mundo Holdings*, 2004 WL 112948, at *5 (no basis for agency relationship when Plaintiffs merely made a "bald assertion" of such relationship between Pricewaterhouse and its Peruvian affiliates); *Lernout & Hauspie*, 230 F. Supp. 2d at 173 (granting motion to dismiss when complaint did not allege any facts—"aside from advertising slogans"—that support the inference of an agency relationship between an international accounting organization and a member firm). Accordingly, Plaintiffs have failed to state a claim against GT-US based on the law of agency.[5]

---

[4] In this respect, the instant case is easily distinguished from *Cromer Fin. Ltd. v. Berger*, Nos. 00 Civ. 2284 (DLC) and 00 Civ. 2498 (DLC), 2002 WL 826847 (S.D.N.Y. May 2, 2002), where the court permitted plaintiffs to proceed on the theory that an international accounting organization was the agent of a member firm.  In that case, the plaintiffs had alleged that the audit opinions also bore the name and logo of the umbrella organization and had included specific factual allegations supporting the conclusion that actual agency authority had been conveyed from one firm to another.

[5] Plaintiffs have not alleged that GT-US is liable under an **apparent** agency theory, nor have they alleged any facts to support such a theory.

**POINT II**

**GT-US CANNOT BE HELD LIABLE AS A "CONTROLLING PERSON"
UNDER SECTION 20(A).**

Although Plaintiffs also attempt to assert a claim against GT-US for "control person"

liability under Section 20(a), 15 U.S.C. § 78(t)(a), their attenuated theory makes no sense, has no

factual support in this Complaint, and fails as a matter of law.  The Complaint seeks to hold GT-

US vicariously liable as a controlling person—not of GT-Italy—but of GTI, which itself also had

no direct involvement in the alleged fraud. *See* Compl. ¶ 1154 ("By virtue of its position as a

controlling person of Grant Thornton International, Grant Thornton LLP is liable pursuant to

Section 20(a)."); *id*. at ¶ 1151 (alleging a claim under Section 20(a) on the ground that GT-US

"acted as a controlling person of Grant Thornton International"). This "twice removed" theory of

vicarious liability under Section 20(a) has no support in the law of this or any other circuit.

Indeed, the Second Circuit has explained that in order for Section 20(a) liability to lie, the

plaintiff must show "a **primary** violation by the controlled person."  *Boguslavsky v. Kaplan*, 159

F.3d 715, 720 (2d Cir. 1998) (emphasis added). For all the reasons set out in the Motion to

Dismiss filed today by GTI, the Complaint fails to allege that GTI committed a primary violation

of Section 10(b). On that basis alone, the derivative claim against GT-US as "control person" of

GTI fails as a matter of law.

In any event, the Complaint does not contain a single factual allegation that could support

the conclusion that GT-US was a "controlling person" of either GTI or GT-Italy.  *Boguslavsky*,

159 F.3d at 720 (plaintiff must show "control of the primary violator by the defendant").  For

purposes of Section 20(a), a defendant controls another party if it has the ability to "direct or

cause the direction of the management and policies of [the controlled person], whether through

the ownership of voting securities, by contract, or otherwise." *SEC v. First Jersey Sec., Inc*., 101

F.3d 1450, 1472-73 (2d Cir. 1996). The plaintiff must plead facts to support the inference that the defendant possessed and exercised such control; conclusory allegations of control are not sufficient. *See Suez Equity Investors, L.P., v. Toronto-Dominion Bank*, 250 F.3d 87, 102 (2d Cir. 2001) (conclusory allegations of control not sufficient); In re *Deutsche Telekom AG Sec. Litig.*, No. 00 Civ. 9475, 2002 WL 244597, at * 7 (S.D.N.Y. Feb. 20, 2002) (same).

Other than their conclusory allegations that GT-US "controlled" GTI—which may be disregarded for purposes of this Motion—Plaintiffs offer only one vague factual statement to support imposing control person liability on GT-US: they allege that GT-US must have had such control "[b]y virtue of the unified international structure of the auditing firm, the size of [GT-US] within that structure, and the contractual relationships among member firms." Compl. ¶ 1151. That supposition does not come close to supporting an inference that GT-US actually controlled GTI in any respect. Plaintiffs also do not explain what control GT-US supposedly had over GTI (or GT-Italy) in the context of the Parmalat audit specifically and whether—and how—that control was supposedly exercised. Based on these deficiencies, Plaintiffs' claims against GT-US under Section 20(a) fail as a matter of law. *See* In re *Asia Pulp & Paper Sec. Litig.*, 293 F. Supp. 2d 391, 395 (S.D.N.Y. 2003) (no 20(a) liability when complaint included only conclusory allegations of control person liability and did not allege that Andersen Worldwide in fact "was able to control or in any way influence the particular audits conducted or opinions offered by its individual member firms"); *Lernout & Hauspie*, 230 F. Supp. 2d at 175-76 (no 20(a) liability when plaintiffs made "no specific allegations" to bolster their claim that other member firms had power to control the firm that was actually performing the audit and that they "did, in fact, exercise such power").

24

In fact, Plaintiffs' allegation that GT-US was in control of GTI is flatly contradicted earlier in the Complaint, when Plaintiffs allege the converse: **that GTI was in control of GT-US.** Compl. ¶ 158 (GT-US "was controlled by and was an agent of Grant Thornton International, and acted on authority of, at the direction of, and for the benefit of Grant Thornton International."); *see also id.* at ¶ 157 ("Grant Thornton International was a controlling person of [GT-US]"); *id*. at ¶ 1143 ("Grant Thornton International acted as a controlling person of [GT-US]").  Obviously, GT-US cannot exercise control over an organization if it is actually under the control of the same organization.

In addition, Plaintiffs have not alleged any facts to satisfy the final requirement for a claim under Section 20(a):  "'that the controlling person was in some meaningful sense a culpable participant in the primary violation.'" *Boguslavsky*, 159 F.3d at 720 (quoting *SEC v. First Jersey Securities, Inc.*, 101 F.3d at 1472).  As the Second Circuit has made clear, culpable participation is an element of a prima facie case under Section 20(a).  *Id*.; *Ganino v. Citizens Util. Co.*, 228 F.3d 154, 170 (2d Cir. 2000). Because Plaintiffs' recovery for their Section 20(a) claim depends upon their ability to prove that GT-US acted with culpability—or, in other words, with "a particular state of mind"—the PSLRA requires that the Complaint "state with particularity facts giving rise to a strong inference" that GT-US was in some meaningful way a culpable participant in the alleged fraud. 15 U.S.C. § 78u-4(b)(2).

Ten years ago, in *Neubauer v. Eva-Health USA, Inc.*, 158 F.R.D. 281 (S.D.N.Y. 1994) (Kaplan, J.), this Court discussed a disagreement among judges in this District concerning whether a plaintiff must plead specific facts supporting an inference of "culpable participation" in order to avoid a motion to dismiss a claim under Section 20(a).  This Court concluded that there was no such pleading requirement, based upon authority holding that "'[k]nowledge and

culpability are not elements of a prima facie case; instead, their absence constitutes an affirmative defense.'" *Id*. at 284 (quoting *Food & Allied Service Trades Dept., AFL-CIO, v. Millfield Trading Co.*, 841 F. Supp. 1386, 1390 (S.D.N.Y. 1994)); *see also ATSI Communications, Inc. v. The Shaar Fund, Ltd.*, No. 02 Civ. 8726, 2003 WL 21650135, at *1 (S.D.N.Y. July 14, 2003) (Kaplan, J.) (relying on *Neubauer*).

Since this Court's decision in *Neubauer*, however, the legal landscape has changed and now requires a different result. Most important, the Second Circuit has held expressly that culpable participation is, indeed, an element of a prima facie case under Section 20(a).  See, *e.g., Ganino*, 228 F.3d at 170; *Boguslavsky*, 159 F.3d at 720; *SEC v. First Jersey Sec., Inc*., 101 F.3d at 1472. Under the standard codified in the PSLRA—which now governs pleading standards for securities fraud claims—a plaintiff is required to plead specific facts for any claim that depends upon a particular statement of mind. 15 U.S.C. § 78u-4(b)(2). Although two subsequent opinions have discussed the PSLRA's heightened pleading requirement and have held nevertheless that a plaintiff is not required to plead culpable participation—on the theory that scienter is not required for Section 20(a) [6]—the majority of opinions in this District have held that culpable participation must indeed be pleaded specifically under the PSLRA. See, *e.g.,* In re *Bayer AG Sec. Litig.*, No. 03 Civ. 1546, 2004 WL 2190357, at *16 (S.D.N.Y. Sept. 30, 2004) (Pauley, J.); In re *Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 349 (S.D.N.Y. 2004) (Lynch, J.); *Rich v. Maidstone Fin., Inc.,* No. 98 Civ. 2569, 2002 WL 31867724, at *12 (S.D.N.Y. Dec. 20, 2002) (Batts, J.); *Burstyn v. Worldwide Xceed Group, Inc.*, No. 01 Civ. 1125, 2002 WL 31191741, at *7 (S.D.N.Y. Sept. 30, 2002) (Lynch, J.); In re *EMEX Corp. Sec. Litig.*, No. 01 Civ. 4886, 2002 WL 31093612, at *10 (S.D.N.Y. Sept. 18, 2002) (Kram, J.); *Deutsche Telekom*

---

[6] *See* In re *Worldcom, Inc. Sec. Lit.*, 294 F. Supp. 2d 392 (S.D.N.Y. 2003) (Cote, J.); In re *Initial Pub. Offering Sec. Lit.*, 241 F. Supp. 2d 281 (S.D.N.Y. 2003) (Scheindlin, J.).

*AG*, 2002 WL 244597, at * 7 (Stein, J.); In re *Livent, Inc., Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 413-17 (S.D.N.Y. 2001) (Marrero, J.); *Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, No. 00 Civ. 8058, 2001 WL 1111508, at *10 (S.D.N.Y. Sept. 20, 2001) (Buchwald, J.); *Mishkin v. Ageloff*, No. 97 Civ. 2690, 1998 WL 651065, at *25 (S.D.N.Y. Sept. 23, 1998) (Preska, J.). For the reasons set out in those opinions, the better view is that a claim under Section 20(a) cannot survive a motion to dismiss without specific allegations of the defendant's culpable participation in the alleged fraud.

Plaintiffs have not included any factual allegations that could possibly support a strong inference that GT-US had any culpability in the alleged fraud at Parmalat. Indeed, the Complaint does not attribute a single statement, act, or omission regarding Parmalat to GT-US or any of its employees. At most, Plaintiffs offer only the vague and unsupported suggestion that GT-US "had unlimited access to" GT-Italy's workpapers and "was aware of" the creation of entities that were allegedly used to perpetrate the fraud.  Compl. ¶¶ 1151-52.  These allegations cannot support the inference that GT-US knew about the alleged fraud—much less that GT-US was a "culpable participant" in the fraudulent conduct, as Section 20(a) requires. For all these reasons, the Section 20(a) claim against GT-US must be dismissed.

### POINT III

### THE COMPLAINT SUFFERS FROM
### NUMEROUS OTHER PLEADING DEFICIENCIES.

In addition to the arguments set forth above, the Complaint in this case also fails to state a claim against GT-US for the reasons set forth in the Motions to Dismiss and supporting Memoranda filed by defendants GTI, Deloitte & Touche USA LLP and Deloitte & Touche LLP, and Bank of America Corporation and Bank of America, N.A. To avoid burdening this Court with additional briefing, GT-US joins and adopts each of those Motions to Dismiss.

**POINT IV**

**THIS COURT SHOULD DISMISS THE CLAIMS AGAINST GT-US WITH PREJUDICE.**

No amendment could cure the Complaint's deficiencies. GT-US simply was not involved in the Parmalat matters at issue here, and there are no facts that could support the legal conclusion that GT-US should be held responsible for the conduct of an entirely separate accounting firm over which it had no control. Moreover, Plaintiffs have already been given the opportunity to amend the Complaint once—after requesting and receiving an extension of sixty days in which to review a very large volume of documents related to the alleged fraud—and they were still unable to attribute a single act, omission, or statement with respect to Parmalat to GT-US or any of its partners or employees. Accordingly, the Court should dismiss all claims against GT-US with prejudice. *See Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131-32 (2d Cir. 1993) ("where it appears that granting leave to amend is unlikely to be productive . . . it is not an abuse of discretion to deny leave to amend"); *Levitch v. Columbia Broadcasting Sys., Inc.*, 94 F.R.D. 292, 295 (S.D.N.Y. 1982) (denying leave to file a second amended complaint and explaining that "liberal rules of pleading in the federal system are not without limits"); 3 JAMES WM. MOORE ET AL, MOORE'S FEDERAL PRACTICE § 15.15[3] (3d ed. 2001).

## **CONCLUSION**

Plaintiffs' Complaint does not include a single allegation of wrongdoing on the part of GT-US, and it fails to provide any basis for holding GT-US liable for the conduct of an Italian audit firm over which it had no control. For all the foregoing reasons, Defendant Grant Thornton LLP respectfully urges this Court to dismiss all claims against it with prejudice.

Dated: January 10, 2004

<div style="margin-left: 4em;">

Respectfully submitted,

GRANT THORNTON LLP


S/_____

By:   Linda T. Coberly

Bruce R. Braun
Linda T. Coberly
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600

Louise R. Radin (LR-9368)
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
(212) 294-6700

</div>

*Of Counsel:*

Margaret Maxwell Zagel
Ronald P. Gould
GRANT THORNTON LLP
175 West Jackson, 20th Floor
Chicago, Illinois 60604

29