UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re PARMALAT SECURITIES LITIGATION

This document relates to:  04 Civ. 0030 (LAK)

MASTER DOCKET

04 MD 1653 (LAK) ECF Case

ELECTRONICALLY FILED

**PLAINTIFFS' MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
THE FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

GRANT & EISENHOFER P.A.
Stuart M. Grant (SG-8157)
John C. Kairis
Diane Zilka (DZ-9452)
James J. Sabella (JS-5454)
Chase Manhattan Centre
1201 North Market Street
Wilmington, DE 19801
Tel: 302.622.7000
Fax: 302.622.7100

Of Counsel:

SPECTOR ROSEMAN & KODROFF, P.C.
Robert M. Roseman
Andrew D. Abramowitz
Rachel E. Kopp
1818 Market Street, 25th Floor
Philadelphia, PA  19103
Tel: 215.496.0300
Fax: 215.496.6611

COHEN, MILSTEIN, HAUSFELD &
    TOLL, P.L.L.C.
Steven J. Toll
Mark S. Willis
Julie Goldsmith Reiser
Joshua S. Devore
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, D.C.  20005-3964
Tel: 202.408.4600
Fax: 202.408.4699

*Co-Lead Counsel for Plaintiffs*

## TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................. vi

PRELIMINARY STATEMENT ........................................................................................ 1

INTRODUCTION .............................................................................................................. 2

STATEMENT OF FACTS ................................................................................................. 8

    A.   Overview of the Fraud ......................................................................................... 8

    B.   The Bank Defendants' Role in Defrauding Investors ........................................ 9

        1.   Citibank's Role in Hiding Debt and Fraudulently Selling Securities ..................... 9

            a.   Buconero – the Black Hole ............................................................... 9

            b.   Citibank's Double-Billing Scheme ................................................ 10

            c.   Citibank's Loans for the Acquisitions of Canadian Companies ..................... 11

            d.   Citigroup's Fraudulent Securities Sales ........................................ 12

        2.   Bank of America's Role in Defrauding Parmalat Investors ................................. 13

            a.   Bank of America Arranges Financing for Parmalat Brazil........................... 13

            b.   Bank of America's Fraudulent Securities Sales........................... 15

        3.   BNL's Role in Recycling Invoices for Factoring Arrangements ..................... 17

        4.   CSFB's Fraudulent Securities Sales .......................................................... 18

    C.   The Auditor Defendants' Participation in the Fraudulent Scheme ................. 19

        1.   Grant Thornton's and Deloitte's Auditing Roles.................................... 19

        2.   The Auditor Defendants' Role in Understating Parmalat Debt.......................... 21

            a.   The Creation of Offshore Shell Companies................................ 22

            b.   The Creation of Bonlat ................................................................. 23

            c.   Bonlat's "Investment" in the Epicurum Fund ............................ 24

         3.   Hiding Debt through Account 999 .......................................................... 25

        4.   Fictitious Sales of Powdered Milk to Cuba ........................................... 25

        5.   Fictitious Bond Repurchases .................................................................. 26

        6.   Illegal Money Transfers to Tanzi Family Companies ........................... 27

        7.   Manipulation of Goodwill ...................................................................... 27

        8.   Fictitious Sales of Trademarks and Other Intellectual Property......................... 28

ARGUMENT ................................................................................................................... 29

I.      THE APPLICABLE PLEADING STANDARDS IN A RULE 10b-5 CASE ............. 29

II.    THE COMPLAINT STATES CLAIMS UNDER RULE 10b-5(a) AND (c) ............... 33

    A.   The Requirements for a Claim Under Rule 10b-5(a) and (c) ......................... 34

        1.   Rule 10b-5(a) and (c) Apply to More Than Just Narrow, Technical Forms of Stock Market Manipulation ............................................ 35

      2.   Rule 10b-5(a) and (c) Do Not Require that the Defendants Make a Misleading Statement ................................................................................ 38

      3.   Central Bank Does Not Absolve Defendants from Their Primary Participation in the Fraudulent Scheme .................................................. 40

  B.  Defendant Citigroup's Primary Violation of Rule 10b-5(a) and (c) .......................... 43

      1.   The Black Hole ...................................................................................... 43

      2.   The Double-Billing and Securitization Scheme..................................... 45

      3.   The Fraudulent Classification of Debt as Equity .................................. 47

  C.  Defendant Bank of America's Primary Violation of Rule 10b-5(a) and (c).............. 48

      1.   Bank of America's Active Participation in the Fraud............................ 49

          a.   The Sham Brazil Investment........................................................ 49

          b.   The Sale of Worthless Debt ........................................................ 50

      2.   Plaintiffs' Claims Against Bank of America Comply with Rule 9(b) ................. 53

  D.  Defendant CSFB's Primary Violation of Rule 10b-5(a) and (c)........................... 54

  E.  Defendant BNL's Primary Violation of Rule 10b-5(a) and (c)............................ 55

  F.  The Auditor Defendants' Primary Violation of Rule 10b-5(a) and (c)................. 57

      1.   The Members of the Grant Thornton and Deloitte Organizations in Italy Engaged in a Fraudulent Scheme.......................................................... 58

          a.   Actual Knowledge of and Participation in the Fraud .................. 58

              i.   DT-Italy................................................................................. 58

              ii.  GT-Italy ............................................................................... 60

          b.   Recklessness................................................................................ 62

              i.   DT-Italy................................................................................. 63

              ii.  GT-Italy................................................................................ 66

          c.   The Magnitude of the Fraud Supports an Inference of Scienter ................... 67

      2.   DTT, Deloitte USA, GTI, GT-US and Copeland Are Liable for the Conduct of Others in Their Worldwide Organizations .................... 69

          a.   The Complaint Alleges that Deloitte and Grant Thornton Each Constitutes a Unitary, Worldwide Firm ..................................... 70

              i.   Deloitte ................................................................................. 71

              ii.  Grant Thornton..................................................................... 72

              iii. These Allegations Are Sufficient for Purposes of Pleading Alter Ego Liability ............................................................... 73

          b.   The Auditor Defendants Are Liable Based on Agency Principles for the Conduct of their Italian Member Firms ................. 78

      3.   Copeland, DTT and Deloitte USA Engaged Directly in the Fraudulent Scheme in Violation of Rule 10b-5(a) and (c)......... 82

III.   THE COMPLAINT STATES CLAIMS UNDER RULE 10b-5(b)................. 84

  A.  The Bank Defendants' Violations of Rule 10b-5(b) ........................................ 86

  B.  The Auditor Defendants' Violations of Rule 10b-5(b) ................................... 88

IV.    THE COMPLAINT STATES CLAIMS UNDER SECTION 20(a) ............................ 89

A.  The Pleading Requirements for a Section 20(a) Claim ................................ 90

B.  Citigroup and Citibank Are Liable as Control Persons.................................. 95

C.  Bank of America Corp. and Bank of America N.A. Are Liable As Control Persons ................................................................................................................ 95

   1.  Plaintiffs Have Pled a Primary Violation by a Controlled Person...................... 95

   2.  Plaintiffs Have Sufficiently Alleged Control ................................ 96

   3.  Plaintiffs Have Alleged Culpable Participation ................................ 97

D.  Defendant BASL Is Liable as a Control Person.................................. 97

E.  BNL Is Liable as a Control Person of Ifitalia ................................ 98

   1.  The Complaint Pleads a Primary Violation by Ifitalia ................................ 98

   2.  BNL Is a Controlling Person of Ifitalia ................................ 99

   3.  The Complaint Pleads Culpable Participation by BNL ................................ 101

F.  DTT, Deloitte USA and Copeland Are Liable as Control Persons.......................... 102

G.  GTI and GT-US Are Liable as Control Persons ................................ 105

V.    PLAINTIFFS HAVE SUFFICIENTLY ALLEGED CAUSATION .......................... 107

A.  Plaintiffs Have Adequately Alleged Transaction Causation.................................. 107

   1.  The Standards for Pleading Transaction Causation ................................ 107

   2.  Plaintiffs Have Alleged Claims Based Upon Defendants' Omissions ................ 109

   3.  Plaintiffs Have Alleged a Fraud on the Market ................................ 110

   4.  Plaintiffs Have Adequately Alleged that Defendants' Fraud Created the Market................................................................................................................ 112

B.  Plaintiffs Have Adequately Pled Loss Causation ................................ 114

   1.  The Standard for Loss Causation................................ 115

   2.  Loss Causation Is Adequately Pled ................................ 117

VI.   CSFB'S AND BNL'S SUBJECT MATTER JURISDICTION ARGUMENTS SHOULD BE REJECTED ................................ 121

A.  Subject Matter Jurisdiction Is Evaluated on the Basis of the Fraud as a Whole ... 123

B.  When the Transactions as a Whole Are Considered, It Is Clear that the Court Has Subject Matter Jurisdiction ................................ 124

   1.  The Conduct Test................................ 124

      a.  The Material Conduct of the Law Firm Defendants in the United States... 125

      b.  The Material Conduct of the Bank Defendants in the United States.......... 127

      c.  The Material Conduct of the Auditor Defendants in the United States ...... 129

   2.  The Effects Test................................ 130

C.  Even If Considered in Isolation, the Activities of CSFB and BNL Satisfy the Effects Test ................................ 131

**D.  The Court Has Jurisdiction Over Claims by Foreign Purchasers of Parmalat Securities**................................................................................................ **132**

**VII.  THE COMPLAINT ALLEGES A LEGALLY SUFFICIENT BASIS TO ASSERT PERSONAL JURISDICTION OVER BASL** ........................................ **134**

**A.  The Minimum Contacts Test Is Satisfied** ................................................ **136**

**B.  The Reasonableness Inquiry Is Satisfied** ................................................ **140**

**VIII. DTT'S RULE 8 MOTION SHOULD BE DENIED** ........................................ **141**

**IX.  LEAVE TO REPLEAD SHOULD BE GRANTED IF NECESSARY** ........................ **143**

**CONCLUSION** ................................................................................................ **148**

## <u>TABLE OF AUTHORITIES</u>

### CASES

*A.I. Trade Finance, Inc. v. Petra Bank*, 989 F.2d 76 (2d Cir.1993) ...........................................136

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
   No. 02 Civ 5575 (SWK), 2004 WL 992991 (S.D.N.Y. May 5, 2004) ..............37, 66, 117

*A. T. Brod & Co. v. Perlow*, 375 F.2d 393 (2d Cir. 1967)............................................................38

*ATSI Communications, Inc. v. The Shaar Fund, Ltd.*, No. 02 Civ. 8726 (LAK),
   2003 WL 21650135 (S.D.N.Y. July 14, 2003) .........................................................91, 94

*ATSI Communications, Inc. v. The Shaar Fund, Ltd.*, No. 02 Civ. 8726 (LAK),
   2004 WL 616123 (S.D.N.Y. Mar. 30, 2004) ...................................................................145

*ATSI Communications, Inc. v. The Shaar Fund, Ltd.*, No. 02 Civ. 8726 (LAK),
   2004 WL 909173 (S.D.N.Y. April 28, 2004) ..................................................................136

*Abell v. Potomac Ins. Co.*, 858 F.2d 1104 (5th Cir. 1988), *vacated*, 492 U.S. 914
   (1989)..................................................................................................................................113

*Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083 (10th Cir. 2003) .................................................104

*Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S. Ct. 1456 (1972) ..................... *passim*

*Aiena v. Olsen*, 69 F. Supp. 2d 521 (S.D.N.Y. 1999) .............................................................7, 116

*Alfadda v. Fenn*, 935 F.2d 475 (2d Cir. 1991).................................................................125, 134

*Alicea v. Lasar Mfg. Co.*, No. 91 Civ 3929 (JFK), 1992 WL 230203
   (S.D.N.Y. Aug. 31 1992) .................................................................................................136

*In re American Bank Note Holographics, Inc.*, 93 F. Supp. 2d 424
   (S.D.N.Y. 2000)..........................................................................................................69, 101

*In re American Bank Note Holographics, Inc.,* 127 F. Supp. 2d 418
   (S.D.N.Y. 2001) .................................................................................................................116

*American Buying Ins. Servs., Inc. v. Kornreich & Sons, Inc.*, 944 F. Supp. 240
   (S.D.N.Y. 1996)..............................................................................................................31, 32

*Anderson v. Elmhurst Chevrolet, Inc.*, No. 03 C 5662, 2004 WL 2038170
   (N.D. Ill. Sept. 2, 2004) ......................................................................................................81

*Arduini/Messina P'ship v. National Med. Fin. Serv. Corp.*, 74 F. Supp. 2d 352
(S.D.N.Y. 1999) ...........................................................................................114

*Armstrong v. McAlpin*, 1978 U.S. Dist. LEXIS 19801 (S.D.N.Y. Feb. 1, 1978) .......................123

*Arthur Young & Co. v. Reves*, 937 F.2d 1310 (8th Cir. 1991) ....................................109

*Asahi Metal Indus. Co. v. Superior Ct.*, 480 U.S. 102, 107 S. Ct. 1026 (1987) ..........................140

*In re Asia Pulp & Paper Co. Sec. Litig.*, 293 F. Supp. 2d 391 (S.D.N.Y. 2003).........................103

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474
(S.D.N.Y. 2004) .................................................................................116, 117

*Azrielli v. Cohen Law Offices*, 21 F.3d 512 (2d Cir. 1994) ..........................................87

*BHC Interim Funding, L.P. v. Finantra Capital, Inc.*, 283 F. Supp. 2d 968
(S.D.N.Y. 2003) ...........................................................................................121

*In re Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1 (D.D.C. 2000) ....................................103

*Basic v. Levinson*, 485 U.S. 224, 108 S. Ct. 978 (1988)..........................................108

*In re Bayer AB Sec. Litig.*, No. 03 Civ. 1546 (WHP), 2004 WL 2190357
(S.D.N.Y. Sept. 30, 2004) ...............................................................................134

*Benjamin v. Kim*, No. 95 Civ. 9597 (LMM), 1999 WL 249706
(S.D.N.Y. April 28, 1999) ................................................................................30

*Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974 (2d Cir. 1975) ...................................123, 130, 134

*Blatt v. Muse Technologies, Inc.*, No. Civ. A. 01-11010, 2002 WL 31107537
(D. Mass. Aug 27, 2002)...................................................................................111

*In re Blech Sec. Litig.*, 928 F. Supp. 1279 (S.D.N.Y. 1996).........................................35

*In re Blech Sec. Litig.*, 961 F. Supp. 569 (S.D.N.Y. 1997).........................................34

*Boguslavsky v. Kaplan*, 159 F.3d 715 (2d Cir. 1998) ..................................................91

*Borden, Inc. v. Spoor Behrins Campbell & Young*, 735 F. Supp. 587
(S.D.N.Y. 1990)...........................................................................................91

*Bourjaily v. United States*, 483 U.S. 171, 107 S. Ct. 2775 (1987) ................................81

*Braswell v. United States*, 487 U.S. 99, 108 S. Ct. 2284 (1988) ..................................53

*Bridas S.A.P.I.C. v. Gov't of Turkm.*, 345 F.3d 347 (5th Cir. 2003) ...........................................70

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 105 S. Ct. 2174 (1985)....................................137

*Burstyn v. Worldwide Xceed Group, Inc.*, No. 01 Civ. 1125 (GEL),
    2002 WL 31191741 (S.D.N.Y. Sept. 30, 2002)..................................................................69

*CL-Alexanders Laing & Cruickshank v. Goldfeld*, 709 F. Supp. 472
    (S.D.N.Y. 1989) .........................................................................................123, 127, 133

*In re CMS Energy Sec. Litig.*, 2005 U.S. Dist. LEXIS 439
    (E.D. Mich. Jan. 7, 2005)....................................................................................116

*Cabrera v. Jakabovitz*, 24 F.3d 372 (2d Cir. 1994) ............................................................79, 81

*Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) ....................................................110

*Caputo v. Pfizer, Inc.*, 267 F.3d 181 (2d Cir. 2001) ....................................................144

*Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645 (7th Cir. 1997) ...............................116

*Castellano v. Young & Rubicam*, 257 F.3d 171 (2d Cir. 2001)....................................................115

*In re Cendant Corp. Sec. Litig.*, 264 F.3d 201 (3d Cir. 2001)....................................................115

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
    511 U.S. 164, 114 S. Ct. 1439 (1994)........................................................................ *passim*

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002)....................................................76

*Chew v. Dietrich*, 143 F.3d 24 (2d Cir. 1998) ....................................................................136

*Chiarella v. United States*, 445 U.S. 222, 100 S. Ct. 1108 (1980) ...............................................140

*Ciralsky v. CIA*, 355 F.3d 661 (D.C. Cir. 2004) ....................................................................142

*In re CitiSource, Inc. Sec. Litig.*, 694 F. Supp. 1069 (S.D.N.Y. 1988)........................................94

*In re Citigroup Inc. Sec. Litig.*, 330 F. Supp. 2d 367 (S.D.N.Y. 2004) .......................................144

*In re Complete Mgmt. Sec. Litig.*, 153 F. Supp. 2d 314 (S.D.N.Y. 2001) ..............................62, 66

*Conley v. Gibson*, 355 U.S. 41, 78 S. Ct. 99 (1957) ....................................................................29

*Cordius Trust v. Kummerfield,* No. 99 Civ. 3200 (DLC), 2004 WL 357076
(S.D.N.Y. Feb. 19, 2004), *recommendation adopted,* 2004 WL 616125
(S.D.N.Y. Mar. 30, 2004) ...............................................................................70

*Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir. 1991) .......................................143

*Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452 (S.D.N.Y. 2001) ..................................... *passim*

*Cromer Fin. Ltd. v. Berger*, No. 00 Civ. 2284 (DLC), 2001 WL 935475
(S.D.N.Y. Aug. 16, 2001) .............................................................................123

*Cromer Fin. Ltd. v. Berger*, No. 00 Civ. 2284 (DLC), 2002 WL 826847
(S.D.N.Y. May 2, 2002).........................................................................72, 80, 81

*Cromer Fin. Ltd. v. Berger*, 245 F. Supp. 2d 552 (S.D.N.Y. 2003) ..................................... *passim*

*Cromer Fin. Ltd. v. Berger,* No. 00 Civ. 2284 (DLC), 2003 WL 21436164
(S.D.N.Y. June 23, 2003).............................................................................124

*Davis v. Ruby Foods, Inc.*, 269 F.3d 818 (7th Cir. 2001) ................................................142

*DeMarco v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 110 (S.D.N.Y. 2004)....................109, 121

*Derensis v. Coopers & Lybrand Chartered Accountants*, 930 F. Supp. 1003
(D.N.J. 1996)...........................................................................................140

*Devaney v. Chester*, 813 F.2d 566 (2d Cir. 1987) ...............................................144, 145

*Dietrich v. Bauer*, 76 F. Supp. 2d 312 (S.D.N.Y. 1999)                              34, 35, 104, 108

*Dietrich v. Bauer*, 126 F. Supp. 2d 759 (S.D.N.Y. 2001).........................................92, 93

*Duncan v. Pencer*, No. 94 Civ. 0321 (LAP), 1996 WL 19043
(S.D.N.Y. Jan. 18, 1996)..............................................................................94

*In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d 804 (S.D. Tex. 2004) ...........................................46

*E-Smart Techs., Inc. v. Corse*, No. 03 Civ. 7060 (RO), 2004 WL 2093531
(S.D.N.Y. Sept. 17, 2004).............................................................................145

*Ellison v. American Image Motor Co.*, 36 F. Supp. 2d 628 (S.D.N.Y. 1999) ........................97, 98

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*,
343 F.3d 189 (2d Cir. 2003)......................................................................... *passim*

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 235 F. Supp. 2d 549
(S.D. Tex. 2002)....................................................................................... *passim*

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 310 F. Supp. 2d 819
(S.D. Tex. 2004)....................................................................................... *passim*

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S. Ct. 1375 (1976)........................................30, 41

*European & Overseas Commodity Traders, S.A. v. Banque Paribas London*,
147 F.3d 118 (2d Cir. 1998).......................................................................135

*In re Executive Telecard, Ltd. Sec. Litig.*, 913 F. Supp. 280 (S.D.N.Y. 1996)..............................90

*Ez-Tixz v. Hit-Tix, Inc.*, 919 F. Supp. 728 (S.D.N.Y. 1996) ...............................................71

*FDIC v. British-American Corp.*, 726 F. Supp. 622 (E.D.N.C. 1989) .....................................74

*FDIC v. FSI Futures, Inc.*, No. 88 Civ. 0906 (PNL), 1990 U.S. Dist. LEXIS 2907
(S.D.N.Y. Mar. 16, 1990) ...........................................................................79

*Federated Dept. Stores, Inc. Sec. Litig.*, No. 00 CV 6362 (RCC), 2004 WL 444559
(S.D.N.Y. Mar. 11, 2004) ...........................................................................145

*Fellman v. Electro Optical Sys. Corp.*, No. 98 Civ. 6403 (LBS), 2000 WL 489713
(S.D.N.Y. Apr. 25, 2000)............................................................................111

*Fezzani v. Bear Stearns & Co.*, No. 99 Civ. 0793 (RCC), 2004 WL 744594
(S.D.N.Y. April 6, 2004).............................................................................94

*Fitzsimmons v. Barton*, 589 F.2d 330 (7th Cir. 1979) ...................................................137

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 380 F. Supp. 2d 249
(S.D.N.Y. 2004)......................................................................................93

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*, No. 02 Civ. 3400 (WCC),
2005 WL 81704 (S.D.N.Y. Jan. 12, 2005) .........................................................145

*Flecker v. Hollywood Entertainment Corp.*, 1997 WL 269488
(D. Or. Feb. 12, 1997)...........................................................................116, 117

*In re Fleming Cos. Inc. Sec. & Deriv. Litig.*, 2004 U.S. Dist. LEXIS 26488
(S.D. Tex. June 10, 2004) .......................................................................117, 118

*Fogarazzo v. Lehman Bros., Inc.*, 341 F. Supp. 2d 274 (S.D.N.Y. 2004) ...............108, 109, 118

*Foman v. Davis*, 371 U.S. 178, 83 S. Ct. 227 (1962) ...................................................144

*Food & Allied Serv. Trades v. Millfeld Trading Co.*, 841 F. Supp. 1386
  (S.D.N.Y. 1994) ......................................................................................................92

*Franklin High Income Trust v. APP Global, Ltd.*, 7 A.D.2d 400,
  776 N.Y.S.2d 473 (N.Y. App. Div. 2004) .......................................................74

*Freeman v. Complex Computing Co.*, 931 F. Supp. 1115 (S.D.N.Y. 1996).................77

*Freeman v. Complex Computing Co.*, 119 F.3d 1044 (2d Cir. 1997).........................76

*Fund of Funds, Ltd. v. Arthur Andersen & Co.*, No. 75 Civ. 540, 1980 WL 1146
  (S.D.N.Y. Dec. 18, 1980) .................................................................129, 134

*GMS Group, Inc. v. Sentinel Trust Co.*, No. 97 Civ. 1342 (WK), 1997 WL 414147
  (S.D.N.Y. July 23, 1997) ...............................................................................137

*Gabriel Capital, L.P. v. NatWest Finance, Inc.*, 122 F. Supp. 2d 407
  (S.D.N.Y. 2000)....................................................................................82, 83

*In re Gaming Lottery Sec. Litig.*, 58 F. Supp. 2d 62 (S.D.N.Y. 1999) .......................129

*Ganino v. Citizens Utilities Co.*, 228 F.3d 154 (2d Cir. 2000) ................................48, 92

*In re Global Crossing, Ltd. Sec. Litig.,* No. 02 Civ. 910 (GEL),
  2004 WL 763890 (S.D.N.Y. Mar. 23, 2004) .........................................105, 107

*In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319 (S.D.N.Y. 2004).................... *passim*

*Goh v. Baldor Elec. Co.*, No. 3:98-MC-064-T, 1999 WL 20943
  (N.D. Tex. Jan. 13, 1999).................................................................................75

*Guaranty Residential Lending, Inc. v. Int'l Mortgage Ctr., Inc.*,
  305 F. Supp. 2d 846 (N.D. Ill. 2004) ...............................................................81

*Handlos v. Litton Indus., Inc.*, 304 F. Supp. 347 (E.D. Wisc. 1967)...........................74

*In re Hayes Lemmerz Int'l, Inc. Equity Sec. Litig.*, 271 F. Supp. 2d 1007
  (E. D. Mich. 2003) ........................................................................90, 104

*Hayes v. Gross*, 982 F.2d 104 (3d Cir. 1992) .........................................................111

*In re Health Mgmt., Inc. Sec. Litig.*, 970 F. Supp. 192 (E.D.N.Y. 1997) ................31, 66

*Helicopteros Nacionales de Colombia S.A. v. Hall*, 466 U.S. 408,

104 S. Ct. 1868 (1984) ................................................................................................137

*Herman & MacLean v. Huddleston*, 459 U.S. 375, 103 S. Ct. 683 (1983) ...................35

*Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28 (2d Cir. 1997)......................100

*Hevesi v. Citigroup, Inc.*, 366 F.3d 70 (2d Cir. 2004) ................................................108

*Hishon v. King & Spalding*, 467 U.S. 69, 104 S. Ct. 2229 (1984) ................................29

*Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55 (2d Cir. 1985)........................135

*In re ICN/Viratek Sec. Litig.*, No. 87 Civ. 4296, 1996 WL 164732
    (S.D.N.Y. April  9, 1996) .......................................................................................78

*IIT v. Vencap, Ltd.*, 519 F.2d 1001 (2d Cir. 1975) .....................................................127

*In re Independent Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741
    (S.D.N.Y. 2001) ....................................................................................................100

*In re Initial Public Offering Sec. Litig*, 241 F. Supp. 2d 281 (S.D.N.Y. 2003).................... *passim*

*In re Initial Public Offerings Sec. Litig.*, 341 F. Supp. 2d 328 (S.D.N.Y. 2004) ........................144

*In re Interpublic Sec. Litig.*, No. 02 Civ. 6527 (DLC), 2003 WL 21250682
    (S.D.N.Y. May 29, 2003).........................................................................................91

*Investment Properties, Int'l, Ltd. v. IOS, Ltd.*, 459 F.2d 705 (2d Cir. 1972)..............122

*Itel Containers Int'l. Corp. v. Atlanttrafik Express Serv. Ltd.*, 909 F.2d 698
    (2d Cir.1990)...........................................................................................................81

*Itoba Ltd. v. LEP Group PLC*, 930 F. Supp. 36 (D. Conn. 1996) ......................124, 139

*Itoba Ltd. v. LEP Group PLC*, 54 F.3d 118 (2d Cir. 1995).........................124, 132, 133

*Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil Co.*, 456 F. Supp. 831
    (D. Del. 1978) .........................................................................................................79

*Kalnit v. Eichler*, 85 F. Supp. 2d 232 (S.D.N.Y. 1999) ...............................................112

*Karavos Compania Naviera S.A. v. Atlantica Export Corp.*, 588 F.2d 1
    (2d Cir. 1978)...........................................................................................................81

*In re Kendall Square Research Corp. Sec. Litig.*, 868 F. Supp. 26 (D. Mass. 1994) ...................44

*In re Kidder Peabody Sec. Litig.*, 10 F. Supp. 2d 398 (S.D.N.Y. 1998) ........................................79

*Kinsey v. Cendant Corp.*, No. 04 Civ. 0582, 2004 WL 2591946 (S.D.N.Y.
    Nov. 16, 2004) ...........................................................................................145

*Kittay v. Kornstein*, 230 F.3d 531 (2d Cir. 2000) ......................................................143

*Koehler v. Bank of Bermuda, Ltd.,* M18-302, Judgment No. 931745,
    1994 WL 48825 (S.D.N.Y. Feb. 16, 1994) ....................................................74

*Krasselt v. Joseph E. Seagram & Sons, Inc.*, No. 01 Civ. 2821,
    2002 WL 1997926 (S.D.N.Y. Aug. 29, 2002) .................................................143

*Kulak v. City of New York*, 88 F.3d 63 (2d Cir. 1996) .................................................101

*Landry v. Price Waterhouse Chartered Accountants*, 715 F. Supp. 98
    (S.D.N.Y. 1989) ...........................................................................................140

*In re Laser Arms Corp. Sec. Litig.*, 794 F. Supp. 475 (S.D.N.Y. 1989),
    *aff'd*, 969 F.2d 15 (2d Cir. 1992) ...................................................................111

*Lentell v. Merrill Lynch & Co., Inc.*, No. 03-7948 (DJ), 2005 WL 107044
    (2d Cir. Jan. 20, 2005) .................................................................... *passim*

*Leonard F. v. Israel Discount Bank of New York*, 199 F.3d 99 (2d Cir. 1999) ............................77

*Leonard v. Garantia Banking Ltd.*, No. 98 Civ. 4848 (LMM),
    1999 WL 944802 (S.D.N.Y. Oct. 19, 1999) .........................................................123, 129

*In re Lernout & Hauspie Sec. Litig.*, 230 F. Supp. 2d 152 (D. Mass. 2002) ................................86

*In re Lernout & Hauspie Sec. Litig.*, 236 F. Supp. 2d 161 (D. Mass. 2003) ..........................37, 39

*In re Leslie Fay Cos. Inc. Sec. Litig.*, 871 F. Supp. 686 (S.D.N.Y. 1995),
    *amended*, 918 F. Supp. 749 (S.D.N.Y. 1996) ..................................................66

*Liberty Ridge LLC v. RealTech Sys. Corp.*, 173 F. Supp. 2d 129 (S.D.N.Y. 2001) ......................31

*Litton Indus., Inc. v. Lehman Bros Kuhn Loeb, Inc.*, 967 F.2d 742 (2d Cir. 1992) ....................108

*In re Livent, Inc. Noteholders Sec. Litig.*, 174 F. Supp. 2d 144 (S.D.N.Y. 2001) ......................86

*Louros v. Kreicas*, No. 03 Civ. 1514 (LAK), 2003 WL 22353979
    (S.D.N.Y. Oct. 15, 2003) .............................................................................116

*Luce v. Edelstein*, 802 F.2d 49 (2d Cir. 1986) .........................................................145

*MAG Portfolio Consult GMBH v. Merlin Biomed Group LLC*, 268 F.3d 58
(2d Cir. 2001) ................................................................................................70

*MBIA Ins. Corp. v. Royal Indem. Co.*, 221 F.R.D. 419 (D. Del. 2004) ..........................31

*MTC Elec. Tech. Co. v. Leung*, 889 F. Supp. 396 (C.D. Cal. 1995) ............................138

*Manhattan Life Ins. Co. v. A.J. Stratton Syndicate*, 731 F. Supp. 587
(S.D.N.Y. 1990) ............................................................................................135

*Manning v. Utilities Mut. Ins. Co., Inc.*, 254 F.3d 387 (2d Cir. 2001) ........................143

*McLaughlin v. Anderson*, 962 F.2d 187 (2d Cir. 1992) ..............................................143

*Meason v. Bank of Miami*, 652 F.2d 542 (5th Cir. 1981) ..........................................123

*Merrill Lynch Inv't Managers v. Optibase, Ltd.*, 337 F.3d 125 (2d Cir. 2003) ..............81

*Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560
(2d Cir. 1996) ..............................................................................................136

*In re MicroStrategy Inc. Sec. Litig.*, 115 F. Supp. 2d 620 (E.D. Va. 2000) .......... *passim*

*Miller v. Cudahy Co.*, 858 F.2d 1449 (10th Cir. 1988) ................................................71

*Moses v. Martin*, No. 04 Civ 1533 (SAS), 2004 WL 2809198
(S.D.N.Y. Dec. 3, 2004) ..................................................................................70

*Mottoros v. Abrams*, 524 F. Supp. 254 (N.D. Ill. 1981) ............................................111

*Music Research, Inc. v. Vanguard Recording Society, Inc.*, 547 F.2d 192
(2d Cir. 1976) ................................................................................................79

*Myzel v. Fields*, 386 F.2d 718 (2d Cir. 1967)                          91, 103, 106

*In re NTL Sec. Litig.*, 347 F. Supp. 2d 15 (S.D.N.Y. 2004) ............................29, 31 48

*Nanopierce Tech. v. Southridge Capital Mgmt. LLC*, No. 02 Civ. 0767,
2003 WL 21507294 (S.D.N.Y. June 30, 2003) ..................................................35

*Nat'l Council on Comp. Ins. v. Hopkins*, No. 92-C082, 1995 U.S. Dist. LEXIS 21030
(E.D. Tenn. Dec. 19, 1995) ..............................................................................79

*Network Enterprises, Inc. v. APBA Offshore Products*, No. 01 Civ 11765 (CSH),

2002 WL 31050846 (S.D.N.Y. Sept. 12, 2002)..............................................................76

*Network Enters. v. APBA Offshore Prods.*, No. 01-11765 (CSH), 2003 WL 124521
   (S.D.N.Y. Jan. 15, 2003)..............................................................................................70

*Neubauer v. Eva-Health USA, Inc.*, 158 F.R.D. 281 (S.D.N.Y. 1994)....................................91, 94

*New Moon Shipping Co., Ltd. v. Man B. & W. Diesel AG*, 121 F.3d 24
   (2d Cir. 1997)..............................................................................................................100

*Newbro v. Freed*, No. 03 Civ. 10308 (PKC), 2004 WL 691392
   (S.D.N.Y. Mar. 31, 2004) ............................................................................................135

*No. 84 Employer-Teamster Joint Council Pension Trust v. America W. Holding Corp.*,
   320 F.3d 920 (9th Cir.), *cert. denied*, 540 U.S. 966, 124 S. Ct. 433 (2003)...................90

*In re Nortel Networks Corp. Sec. Litig.*, No. 01 Civ. 1855 (RMB),
   2003 WL 22077464 (S.D.N.Y. Sept. 8, 2003)..............................................................133

*In re Nortel Networks Corp. Sec. Litig.*, No. 01 Civ. 1855 (RMB) (MHD),
   2004 WL 2149111 (S.D.N.Y. Sept. 23, 2004)................................................................74

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) ................................................... *passim*

*OSRecovery, Inc. v. One Groupe Int'l, Inc.*, No. 02 Civ. 8993 (LAK),
   2005 U.S. Dist. LEXIS 772 (S.D.N.Y. Jan. 21, 2005) ....................................................86

*Oliver Schs., Inc. v. Foley*, 930 F.2d 248 (2d Cir. 1991) .............................................144

*Olsen v. Pratt & Whitney Aircraft, Div. of United Tech. Corp.*, 136 F.3d 273
   (2d Cir. 1998)..............................................................................................................144

*Oost-Lievense v. N. Am. Consortium, P.C.*, 969 F. Supp. 874 (S.D.N.Y. 1997)..........................70

*In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133 (S.D.N.Y. 1999) ............................90

*In re Oxford Health Plans, Inc. Sec. Litig.*, 51 F. Supp. 2d 290 (S.D.N.Y. 1999) ..................62, 66

*PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105 (2d Cir. 1997) ....................................136

*Paraschos v. YBM Magnex, Int'l, Inc.*, No. Civ. A. 98-6444, 2000 WL 32945
   (E.D. Pa. Mar. 29, 2000)................................................................................................60

*Perez-Rubio v. Wyckoff*, 718 F. Supp. 217 (S.D.N.Y. 1989)......................................138

*In re Philip Servs. Corp. Sec. Litig.*, No. 98 Civ. 0835 (MBM), 2004 WL 1152501
    (S.D.N.Y. May 24, 2004).........................................................................66, 94

*Pollack v. Laidlaw Holdings, Inc.*, No. 90 Civ. 5788 (DLC), 1995 WL 261518
    (S.D.N.Y. May 3, 1995)............................................................................78

*Polycast Tech. Corp. v. Uniroyal*, No. 87 Civ. 3297 (JMW), 1988 WL 96586
    (S.D.N.Y. Aug. 31, 1988)..........................................................................94

*Pozniak v. Imperial Chem. Indus. PLC*, No. 03 Civ. 2457, 2004 WL 2186546
    (S.D.N.Y. Sept. 28, 2004)..........................................................................144

*Psimenos v. E.F. Hutton & Co.*, 722 F.2d 1041 (2d Cir. 1983)...................................127, 132, 134

*In re Quintel Entm't Inc. Sec. Litig.*, 72 F. Supp. 2d 283 (S.D.N.Y. 1999)....................................91

*Reingold v. Deloitte Haskins & Sells*, 599 F. Supp. 1241 (S.D.N.Y. 1984)..................................75

*In re Ribozyme Pharm., Inc. Sec. Litig.*, 119 F. Supp. 2d 1156 (D. Colo. 2000) ........................103

*Richardson Greenshields Sec., Inc. v. Lau*, 825 F.2d 647 (2d Cir. 1987) ....................................148

*Ronzani v. Sanofi S.A.*, 899 F.2d 195 (2d Cir. 1990) .....................................................143

*Ross v. A.H. Robins Co.*, 607 F.2d 545 (2d Cir. 1979) ...................................................143

*Ross v. Bank South, N.A.*, 885 F.2d 723 (11th Cir. 1989).................................................112

*Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000)........................................................30, 69

*In re Royal Ahold N.V. Sec. & ERISA Litig.,* No. Civ. 1:03-MD-01539,
    2004 WL 2955934 (D. Md. Dec. 21, 2004).......................................................37, 111, 132

*SEC v. Berger*, 322 F.3d 187 (2d Cir. 2003).....................................................125, 126, 133

*SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 84 S. Ct. 275 (1963)..............................36

*SEC v. Euro Sec. Fund, Coim SA*, No. 98 Civ. 7437, 1999 WL 76801
    (S.D.N.Y. Feb. 17, 1999) ........................................................................136, 140

*SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450 (2d Cir. 1996) ....................................87, 91, 92, 93

*SEC v. Foundation Hai*, 736 F. Supp. 465 (S.D.N.Y. 1990)......................................................138

*SEC v. Franklin Atlas Corp.*, 154 F. Supp. 395 (S.D.N.Y. 1957) ...............................................90

*SEC v. Ogle*, No. 99 C 609, 1999 WL 446857 (N.D. Ill. June 15, 1999)....................................138

*SEC v. Price Waterhouse*, 797 F. Supp. 1217 (S.D.N.Y. 1992).....................................................63

*SEC v. Softpoint Inc.*, No. 95 Civ 2951, 2001 WL 43611
    (S.D.N.Y. Jan.18, 2001)........................................................................................................135

*SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968).....................................................108

*SEC v. U.S. Envt'l, Inc.*, 155 F.3d 107 (2d Cir.1998) ........................................................... *passim*

*SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990) ...................................................135, 137, 139

*SEC v. Zandford*, 535 U.S. 813, 122 S. Ct. 1899 (2002) ..........................................................38, 39

*Saddle Rock Partners Ltd. v. Hiatt*, No. 96 Civ 9474, 2000 WL 1182793
    (S.D.N.Y. Aug. 21, 2000) ..................................................................................................111

*Salahuddin v. Cuomo*, 861 F.2d 40 (2d Cir. 1988)..............................................................142,143

*In re Salomon Analyst AT&T Litig.*, No. 02 Civ. 6801, 2004 WL 2757398
    (S.D.N.Y. Dec. 2, 2004)...................................................................................39, 115, 121

*Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 97 S. Ct. 1292 (1977)......................................36, 37

*In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63 (2d Cir. 2001) ............................................ *passim*

*Schwartz v. Michaels*, No. 91 Civ. 3538, 1992 WL 184527
    (S.D.N.Y. Jul. 23, 1992) ....................................................................................................110

*Schweitzer v. Advanced Telemarketing Corp.*, 104 F.3d 761 (5th Cir. 1997) .............................70

*In re Sears, Roebuck & Co. ERISA Litig.*, No. 02-C-8324, 2004 WL 407007
    (N.D. Ill. Mar. 3, 2004)......................................................................................................115

*Shanahan v. Vallat*, No. 03 Civ. 3496, 2004 WL 2937805
    (S.D.N.Y. Dec. 19, 2004) ...........................................................................................115 138

*Shapiro v. Cantor*, 123 F.3d 717 (2d Cir. 1997).....................................................................84, 85

*Shores v. Sklar*, 647 F.2d 462 (5th Cir. 1981) ..........................................................................113

*In re Shulman Transp. Enters., Inc.*, 744 F.2d 293 (2d Cir. 1984)...............................................81

*State of New Jersey v. Sprint Corp.*, 314 F. Supp. 2d 1119 (D. Kan. 2004)................................103

*Steed Finance LDC v. Nomura Sec. Int'l, Inc.*, No. 00 Civ. 8058,
2001 WL 1111508 (S.D.N.Y. Sept. 20, 2001) .................................................................100

*In re Sterling Foster & Co., Inc., Sec. Litig.*, 222 F. Supp. 2d 289
(E.D.N.Y. 2002) .................................................................................................34, 35

*Stinson v. Van Valley Dev. Corp.*, 719 F. Supp. 362 (E.D. Pa. 1989),
*aff'd*, 897 F.2d 524 (3d Cir. 1990) ..........................................................................112, 113

*Stratagem Dev. Corp. v. Heron Int'l N.V.*, 153 F.R.D. 535 (S.D.N.Y. 1994) ...........................135

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87
(2d Cir. 2001) ................................................................................................. *passim*

*Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6,
92 S. Ct. 165 (1971) ...............................................................................................38

*Suppa v. Montano*, No. 87-0636-CV-W-3, 1989 WL 69883
(W.D. Mo. Feb. 28, 1989) .........................................................................................48

*In re Taxable Municipal Bonds Litig.*, Civ. A. MDL No. 863, 1992 WL 165974
(E.D. La. July 1, 1992) ...........................................................................................113

*Teachers' Ret. Sys. of La. v. A.C.L.N. Ltd.*, No. 01 Civ. 11814 (MP),
2003 WL 21058090 (S.D.N.Y. May 12, 2003) .............................................................. *passim*

*Teachers' Ret. Sys. of La. v. A.C.L.N. Ltd.*, No. 01 Civ. 11814 (LAP),
2004 WL 2997957 (S.D.N.Y. Dec. 27, 2004) .................................................................112

*Terra Res. I v. Burgin*, 664 F. Supp. 82 (S.D.N.Y. 1987) ...............................................91

*Terrydale Liquidating Trust v. Barness*, 611 F. Supp. 1006 (S.D.N.Y. 1984) ...........................90

*In re Three Grand Jury Subpoenas Duces Tecum Dated January 29, 1999*,
191 F.3d 173 (2d Cir. 1999) .................................................................................52, 53

*In re Towers Fin. Corp. Noteholders Litig.*, No. 93 Civ. 0810, 1995 WL 571888
(S.D.N.Y. Sept. 20, 1995) ......................................................................................114

*Tri-Star Farms, Ltd. v. Marconi, PLC*, 225 F. Supp. 2d 567 (W.D. Pa. 2002) ...........................134

*Troyer v. Kareagi*, 476 F. Supp. 1142 (S.D.N.Y. 1979) ..............................................96, 98

*In re USA Talks.com, Inc. Sec. Litig.*, No. 99-CV-0162-L (JA), 2000 WL 1887516
(S.D. Cal. Sept. 14, 2000) ......................................................................................110

*Vento & Co. of N.Y., LLC v. Metromedia Fiber Network, Inc.*, No. 97 Civ. 7751 (JGK),
    1999 WL 147732 (S.D.N.Y. Mar. 18, 1999) ............................................................78, 81

*Vitzethum v. Dominick & Dominick*, No. 94 Civ. 4938, 1996 WL 19062
    (S.D.N.Y. Jan. 18, 1996)............................................................................................122

*In re Vivendi Univ. S.A. Sec. Litig.*, 02 Civ. 5571, 2003 WL 22489764
    (S.D.N.Y. Nov. 3, 2003) ........................................................................................ *passim*

*In re Vivendi Universal S.A.*, No. 02 Civ. 5571 (RJH), 2004 WL 876050
    (S.D.N.Y. April 22, 2004) ............................................................................................94

*In re Vivendi Universal S.A.*, No. 02 Civ. 5571 (RJH), 2004 WL 2375830
    (S.D.N.Y. Oct. 22, 2004) ...........................................................................122, 125, 133

*Vtech Holdings Ltd. v. PriceWaterhouseCoopers LLP*, 348 F. Supp. 2d 255
    (S.D.N.Y. 2004)............................................................................................................29

*Wade v. Industrial Funding Corp.*, No. C92-0343, 1993 WL 650837 (N.D. Cal.
    Aug. 30, 1993) ...........................................................................................................113

*Waltree Ltd. v. ING Furman Selz, LLC*, 97 F. Supp. 2d 464 (S.D.N.Y. 2000) ......................31, 53

*Wiggins v. Weicker*, 104 F.3d 351, No. 94-9216(L), 1996 WL 617569
    (2d Cir. 1996)............................................................................................................144

*Williamson v. Tucker*, 645 F.2d 404 (5th Cir. 1981) ...................................................................123

*In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392 (S.D.N.Y. 2003) ............................. *passim*

*In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288 (DLC), 2003 WL 21488087
    (S.D.N.Y. June 25, 2003)..............................................................................................69

*In re WorldCom, Inc. Sec. Litig.,* No. Master File, 02 Civ. 3288 (DLC),
    2004 WL 1097786 (S.D.N.Y. May 18, 2004) .......................................................100, 101

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S. Ct. 559 (1980)...................137

*Wright v. Ernst & Young, LLP*, 152 F.3d 169 (2d Cir. 1998).........................................................85

*Wynder v. McMahon*, 360 F.3d 73 (2d Cir. 2004).......................................................................142

*Young v. FDIC*, 103 F.3d 1180 (4th Cir. 1997) ............................................................................74

*Zoelsch v. Arthur Andersen & Co.*, 824 F.2d 27 (D.C. Cir. 1987) ..............................................123

# STATUTES AND RULES

15 U.S.C. § 78aa ................................................................................135

15 U.S.C. § 78j(b) ........................................................................... *passim*

15 U.S.C. § 78t(a) ........................................................................... *passim*

15 U.S.C. § 78u-4 ........................................................................... *passim*

18 U.S.C. § 1962(c) ..............................................................................55

12 C.F.R. § 211.10(a)(13) ...................................................................139

17 C.F.R. § 230.405 .............................................................................91

17 C.F.R. § 240.10b-5 ..................................................................... *passim*

17 C.F.R. § 240.12b-2 ...........................................................91, 102, 105

Fed. R. Civ. P. 8 ................................................................................141

Fed. R. Civ. P. 9(b) ........................................................................ *passim*

Fed. R. Civ. P. 15(a) ...........................................................................143

# MISCELLANEOUS

*Restatement (Second) of Agency,* Appendix § 14M, Reporter's Notes (1958).............................78

## PRELIMINARY STATEMENT

Plaintiffs Hermes Focus Asset Management Europe, Ltd., Hermes European Focus Fund I, Hermes European Focus Fund II, Hermes European Focus Fund III, Cattolica Partecipazioni, S.p.A., Capital & Finance Asset Management, Societe Moderne des Terrassements Parisiens, Solotrat, Laura J. Sturaitis, Arch Angelus Sturaitis and Paulo Bianco (collectively, the "Plaintiffs"), on their own behalf and on behalf of all other purchasers of securities of Parmalat Finanziaria S.p.A. and its subsidiaries and affiliates ("Parmalat" or the "Company") (such purchasers, along with Plaintiffs, are referred to collectively herein as the "Class") between and including January 5, 1999 and December 18, 2003 (the "Class Period"), respectfully submit this memorandum in opposition to ten motions to dismiss filed by certain defendants in this action. This memorandum is submitted in opposition to the motions of the following parties:

- Defendants Citigroup, Inc., Citibank, N.A. ("Citibank"), Vialattea LLC ("Vialattea"), Buconero LLC ("Buconero") and Eureka Securitisation PLC ("Eureka") (collectively "Citigroup")

- Defendant Banc of America Securities Limited ("BASL")

- Defendants Bank of America Corporation ("BAC") and Bank of America, N.A. ("BANA") (collectively with BASL, "Bank of America" or "BOA")

- Defendant Banca Nazionale Del Lavoro ("BNL")

- Defendant Credit Suisse First Boston ("CSFB")

- Defendant Deloitte Touche Tohmatsu ("DTT")

- Defendants Deloitte & Touche USA LLP and Deloitte & Touche LLP (collectively "Deloitte USA")

- Defendant James E. Copeland, Jr. ("Copeland")

- Defendant Grant Thornton International ("GTI")

- Defendant Grant Thornton LLP ("GT LLP")

All of these parties are collectively referred to herein as the "Defendants."[1]  For all of the following reasons, each of these motions is without merit and should be denied.

## **INTRODUCTION**

No one disputes that the Parmalat scandal was (as dubbed by the SEC) "one of the largest and most brazen corporate financial frauds in history."  Repeatedly referred to in the financial press as "Europe's Enron," the collapse of Parmalat parallels in many respects the demise of that Houston-based energy company including, significantly, having certain defendants in common.  Defendants here are the banks and auditors that *directly participated* in, among other things, creating the notorious Enron-like Special Purpose Entities ("SPEs") used to mask the Company's huge debt levels, securitizing non-existent receivables, and ensuring the certification of Parmalat's false financial statements.  While conceding the *existence* of the fraud, these Defendants point the collective finger of blame across the Atlantic.  They argue, in essence, that the buck stopped in Italy with Company insiders and Parmalat's local auditors.  Although it pushes the boundaries of credulity to suggest that a scheme of this magnitude could be effectuated without the active participation of Parmalat's bankers and international auditors, Defendants insist they were not involved – they admit to being, at most, mere aiders and abettors.  Predictably, several go so far as to claim they were victims of the fraud.

Try as they might, however, Defendants cannot recast the multitude of facts detailing their direct participation as mere aiding and abetting.  Citigroup, for example, cannot now claim it was a passive player when it created with Parmalat the SPE named Buconero – meaning

---

[1] Although the Complaint names others as defendants, only the Defendants listed on pages 1 and 2 have, at this point, filed motions to dismiss.  Therefore, the general factual discussions contained herein focus on the roles and participation of *these* Defendants.  Defendants Citigroup, BASL, BOA, BNL and CSFB are sometimes collectively referred to herein as the "Bank Defendants."  Defendants DTT, Deloitte USA, Copeland, GTI and GT LLP are

*(cont'd)*

"black hole" – designed for the express purpose of hiding Parmalat's growing indebtedness from investors.  Buconero was an essential component of Defendants' scheme in which loans to Parmalat were disguised as equity investments, thereby giving investors a false picture of the Company's health.  Nor was Citigroup a "victim" when it *created* and *actively managed* a complex securitization scheme in which Parmalat issued duplicate invoices to its distributors and franchisees, improperly recorded "sales" for *both*, and Citigroup then securitized these phantom receivables and sold approximately $348 million worth to unsuspecting investors.  And Citigroup was not merely a fringe participant when it used secret put agreements to disguise as an equity investment what was, in fact, $70 million in loans made to Parmalat to purchase Canadian companies.

Similarly, Bank of America cannot now claim to have been a marginal actor when it used two SPEs to effectuate the partial sale of Parmalat's troubled Brazilian subsidiary through a loan that Bank of America falsely characterized as an equity investment – a loan which Parmalat subsequently had to repurchase at a substantial premium.  Bank of America was the mastermind, architect, and implementer of the entire transaction; it structured the deal, found the investors, and even co-authored a false and misleading press release announcing the deal.  These, and the multitude of other activities described in the Complaint and elsewhere herein, are unmistakably the acts of *primary* participants in the Parmalat fraud.  Citigroup, Bank of America and the other Defendants actively solicited Parmalat's business because they were all richly rewarded for their roles in the various schemes and had a powerful financial motive to perpetrate the fraud that ultimately led to Parmalat's collapse.

The foregoing are merely illustrative.  Each of the Defendants did far more than provide

---

sometimes collectively referred to herein as the "Auditor Defendants."

the typical services of outside professionals that were then used by others to commit the fraud. They were primary, indeed essential, participants in this global scheme and are therefore liable under Rule 10b-5(a) and (c) – just as their counterparts were in *Enron*, *Global Crossing*, and other schemes of this magnitude.  Nonetheless, Defendants argue, quite erroneously, that they did not speak and are therefore immune from the reach of Rule 10b-5(a) and (c).  Although the Complaint does, in fact, clearly allege that certain Defendants made misrepresentations, the U.S. Supreme Court, the Second Circuit, and courts in this District have all concluded that liability under Rule 10b-5(a) and (c) is *not* predicated on speaking.  As the court held in *Global Crossing,* "[i]t is apparent from Rule 10b-5's language and the caselaw interpreting it that a cause of action exists under subsections (a) and (c) for behavior that constitutes *participation in a fraudulent scheme*, even absent a fraudulent statement by the defendant."  *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 335 (S.D.N.Y.  2004) (*citing Affiliated Ute Citizens v. United States*, 406 U.S. 128, 152-53, 92 S. Ct. 1456, 1471-72 (1972)) (emphasis added).

        In keeping with the overall theme of deflecting blame for the Parmalat fraud to Italy, the Auditor Defendants aggressively seek to disassociate themselves from their Italian member firms.  While they do not, and cannot, contest that these member firms were complicit in the Parmalat fraud – the evidence of their direct role is too overwhelming – the Auditor Defendants argue that their *non-Italian* operations cannot be held liable for the acts of their Italian member firms.  However, as the Auditor Defendants went to great lengths to publicly present their operations as parts of unified worldwide firms that subsumed the Italian member firms, they cannot decouple these foreign affiliates from the global train whenever trouble arises. The principles of alter ego, agency, and control person liability capture the Auditor Defendants for the acts of their undeniably culpable Italian member firms.

That is not to say that the Auditor Defendants are solely derivatively liable for the Parmalat fraud.  To the contrary, when Deloitte USA and Copeland (the CEO of DTT and Deloitte USA) were made aware of the fraud they did not simply turn a blind eye, but instead took direct steps to perpetuate it.  Facing the potential loss of Parmalat as a client when a non-complicit audit partner in Brazil voiced concerns about the Company's revenue recognition practices, Deloitte USA and Copeland told the troublemaker to keep quiet.  When he later refused to sign off on the audit of Parmalat's Brazilian subsidiary due to additional concerns, Deloitte USA and Copeland simply removed him from the engagement, clearing the way for an unqualified opinion and a happy client.

Further to their blame-deflection theme, Defendants claim they are not liable for the wrongdoing of those they controlled.  This is not only contrary to the law but ignores the fundamental principle that Section 20(a) liability attaches even if liability under Section 10(b) does not, so long as they controlled the primary violator.  Thus, for example, because the evidence that the Italian member firms committed fraud is overwhelming, and because the Auditor Defendants controlled these entities, they are liable for this fraud under Section 20(a) – even if they themselves committed no violation of Section 10(b).   Defendants also argue that Plaintiffs are not entitled to the fraud-on-the-market presumption of reliance, even though the Complaint alleges Defendants' role in perpetrating a fraud on the market for Parmalat securities, that this was an efficient global market, and that information about the Company was widely available.  For pleading purposes, these allegations are sufficient.  Furthermore, even if the fraud-on-the-market presumption is unavailable, Plaintiffs are entitled to a presumption of reliance under the fraud created the market doctrine because Defendants conspired to bring unmarketable Parmalat securities onto the market with the intent to defraud investors.

Defendants also claim that loss causation is not satisfied because the details of their involvement in the fraud were not disclosed until *after* Parmalat's securities prices had already collapsed. This is both contrary to the law and inherently illogical, as such a rule would effectively enable an otherwise culpable party to escape liability simply because a company's securities became worthless *before* its role became known. Again, the Enron and Parmalat scandals have parallel components. In *Enron*, the court flatly rejected the loss causation principle Defendants proffer here, finding that, although Merrill Lynch's individual role in the transactions at issue was not made public until well after Enron's bankruptcy, its actions nevertheless contributed to the artificial inflation of the company's securities, making it a direct and major cause of investors' financial losses when the scheme collapsed. *See In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 310 F. Supp. 2d 819, 832 (S.D. Tex. 2004) (*"Enron II"*). The adequacy of Plaintiffs' loss causation pleading has not been altered by the Second Circuit's recent opinion in *Lentell v. Merrill Lynch & Co., Inc.*, 2005 WL 107044, at *9 (2d Cir. Jan. 20, 2005). This is because the Complaint alleges how each Defendant and each facet of the scheme contributed to Parmalat's creation of phony assets and income and its understatement of debt, and how Parmalat's implosion into bankruptcy was directly due to the fact that those assets, income and the magnitude of its debt were falsely reported. Thus, the undisclosed risk here – that billions of dollars of Parmalat's assets were an illusion, and that its debt was manageable – was the proximate cause of Plaintiffs' losses.

Seemingly recognizing the degree to which the Parmalat fraud was carried out in the U.S., eight of the ten motions to dismiss do not even contest subject matter jurisdiction. CSFB and BNL alone argue, erroneously, that the tests for subject matter jurisdiction should be applied solely by reference to the conduct of each Defendant in isolation. Recent cases in the Second

Circuit have, however, rejected this approach and logically focused instead on whether there is subject matter jurisdiction over the fraud as a whole, rather than over the activities of a particular defendant.  Here, of course, the Complaint is replete with facts describing the conduct occurring in the U.S. that was essential to the creation and perpetration of the scheme, from Parmalat's law firm in New York acting as the nerve center for various fraudulent transactions, to Citigroup's use of several Delaware-incorporated SPEs to conceal Parmalat's debt and inflate its assets.

DTT and Copeland stand alone in making the spurious argument that the Complaint violates Rule 8 because, they incongruously contend, it contains both too little and too much. The other Defendants have wisely steered clear of this charge.  Indeed, it is difficult to imagine how a global fraud spanning several years and involving the direct and active role of so many banks, accounting firms, and Company insiders could be sufficiently pled without the level of detail contained in the Complaint.

Finally, but quite significantly, many of Defendants' arguments confuse what must be *pled* at this stage with what must be *proven* at trial.  Issues such as alter ego, control, fraud-on-the-market, and loss causation are fact-intensive and not susceptible to resolution on a motion to dismiss.  The Complaint clearly contains sufficient allegations on these subjects which Defendants' motions repeatedly ask the Court to reject in favor of resolving prematurely disputed factual issues in their favor.  In so arguing, Defendants "ask too much on a Rule 12 motion."  *Aiena v. Olsen*, 69 F. Supp. 2d 521, 535 (S.D.N.Y. 1999) (Kaplan, J.).

It is not surprising that Defendants desperately want out of a case in which they are exposed to massive liability for actively participating in perpetrating one of the largest and most pervasive frauds in corporate history.  The trouble is, *their fingerprints are everywhere*.  This is hardly shocking, considering that a scheme of the duration, scope and magnitude that led to the

downfall of corporate giants such as Enron or Parmalat simply cannot succeed without the direct involvement of bankers and auditors.  Pointing a finger solely at Italy, as these Defendants do, ignores this reality.  Accordingly, for the reasons discussed herein, Defendants' motions to dismiss should be denied in their entirety.

<u>**STATEMENT OF FACTS**</u>

**A.   <u>Overview of the Fraud</u>**

Beginning in at least the early 1990s, Defendants and their U.S. operations engaged in a global scheme with Parmalat in which they masterminded, structured and directly participated in a series of complex transactions that were specifically designed to and did materially overstate Parmalat's revenue, income and assets, and materially understate its debt.  Their scheme created for investors a decidedly false picture of a thriving, financially sound enterprise.  This could not have been further from the truth, and when Parmalat's true financial condition was revealed, a series of events quickly unfolded which culminated in the Company being driven into bankruptcy and becoming the target of a massive criminal investigation.  As a result, its securities became worthless, causing Plaintiffs and other Parmalat investors to sustain losses in excess of $10 billion.

The scale and scope of Defendants' fraud is staggering.  ¶¶ 49, 771-73, 775-79.[2]  In 2002 alone, Parmalat booked €1.42 billion of receivables when its *entire gross revenue* for the year was only €950 million. ¶ 977.  As of September 30, 2003, Parmalat's actual consolidated debt was at least €14.3 billion – more than twice the €6.4 billion reported for that period, while total consolidated shareholders' equity was no more than *negative* €1.4 billion rather than the

---

[2]  All "¶" references, unless otherwise noted, refer to the First Amended Consolidated Class Action Complaint for Violation of Federal Securities Laws (the "Complaint").

positive €2.1 billion figure reported.  ¶¶ 47, 49, 771-772.  Ultimately, Parmalat's total reported debt was **understated by nearly $10 billion** and its consolidated total net assets (or shareholder equity) was **overstated by $16.4 billion**.  ¶¶ 4, 952.

The Statement of Facts focuses largely on those Defendants who have moved to dismiss the Complaint.  Therefore, the specific role of each Defendant in the fraud, and its knowledge of the fraud, is detailed below.

### B.     The Bank Defendants' Role in Defrauding Investors

The Bank Defendants each played an essential role in the global fraudulent scheme to manipulate Parmalat's financial condition.  Among other things, they created Enron-like SPEs, concealed Parmalat's debt as equity, securitized phantom receivables and made enormous cash infusions with tremendous returns to themselves – but with no risk of loss to them.

### 1.     Citibank's Role in Hiding Debt and Fraudulently Selling Securities
#### a.     Buconero – the Black Hole

In 1995, Citigroup, Inc. through Citibank, N.A. first proposed to Parmalat the complicated scheme which became a telltale component of the Parmalat fraud.  ¶¶ 257-59.  The scheme involved the creation of an SPE and a joint venture agreement pursuant to which Citibank would "invest" in Parmalat through the SPE which, in turn, would make intercompany loans to other Parmalat entities.  ¶¶ 256-59.  Citibank's "investment," however, was essentially a disguised loan, structured in a manner which gave it a guaranteed rate of return.  ¶¶ 265-60.

In 1999, Citibank modified the scheme slightly when it proposed the creation of a fraudulent SPE called Buconero ("black hole" in English) to participate in the joint venture rather than Citibank.  ¶¶ 24, 173, 255.  Buconero was a vehicle created to hide Parmalat debt by disguising loans to Parmalat as equity investments.  ¶¶ 24, 255-56, 794-95.  In December 1999,

Donna Carville of Citibank helped establish Buconero as a Delaware limited liability company; Carville subsequently managed Buconero.  ¶ 788.

Compounding its deception, Citigroup approved a press release which falsely described Buconero's payment to Parmalat as a contribution from a "partner" – thereby misrepresenting to Parmalat investors the true nature of the arrangement.  ¶ 267.  Citigroup has since publicly acknowledged that it did not properly report the Buconero transactions to investors, admitting that "today we would only do this type of transaction if a client agreed to provide greater disclosure," and acknowledging that money transferred from Buconero to Parmalat should have been treated as debt rather than equity.  ¶ 800.

Citibank's scheme was a mutually beneficial one.  Through Buconero (and Vialattea, another Citibank subsidiary) Citibank not only received a guaranteed rate of return on its loans to Parmalat at no risk to itself, but also earned tens of millions of dollars in fees for structuring transactions with Buconero and Vialattea.  ¶ 264.  This aspect of Defendants' fraudulent scheme alone concealed Parmalat's debt by $137 million.  ¶¶ 269.

### b.    Citibank's Double-Billing Scheme

One of the means by which Parmalat overstated its revenues, income and assets throughout the Class Period was through a double-billing scheme in its milk distribution business.  ¶¶ 20, 273, 812.  It could not have done so without Citigroup's knowledge and direct participation.  ¶¶ 20, 270, 273, 278, 804, 812-13.

This scheme involved Parmalat issuing duplicate invoices for products to both distributors in its food distribution network and to retailers – even though only one was obligated to pay.  Since the distributors and retailers were being double-billed for the same goods, a large portion of these "receivables" recorded on Parmalat's balance sheet were, in fact, bogus.  These

fictitious receivables were then used by Parmalat to obtain credit from various banks.

In 1994, Citibank vice presidents Veronique Traush and Alberto Ferraris proposed that Parmalat sell these phony receivables to Archimede, a wholly-owned subsidiary of Eureka, a Citibank SPE,[3] which in turn securitized them and passed them off to unsuspecting investors. ¶¶ 273-74.  Citibank managed this program on behalf of Archimede and later, Eureka.  It also installed its proprietary Enigma software on Parmalat's computer network, which enabled it to keep track of Parmalat's sales and determine which receivables were eligible for the securitization program.  ¶ 278.  In short, Citibank had detailed knowledge of the double-billing scheme (¶¶ 278-79), yet despite this knowledge, through Archimedes and Eureka, used these phony invoices as collateral for the sale of securities to investors in the U.S. and elsewhere. ¶¶ 277, 802, 804-11.[4]

During the Class Period, Citibank sold approximately $348 million of these phantom receivables (¶¶ 273, 293, 818) and for its efforts received more than $35 million in fees – more than 10% of the total amount sold.  ¶ 818.  In the end, Parmalat's receivables financing grew to exceed its actual gross income.  ¶ 829.

### c.    Citibank's Loans for the Acquisitions of Canadian Companies

Citibank concealed an additional $70 million of Parmalat debt by purporting to "purchase" an interest in three Canadian companies purchased by Parmalat in 1997 and 1998.

---

[3] As explained in a report prepared by Dr. Stefania Chiaruttini, the Milan court-appointed expert who investigated the falsification of Parmalat's financial statements and other aspects of the fraud and drafted various reports outlining her findings (herein referred to as "the Chiaruttini Reports") (¶ 47), Eureka was created to finance the securitization transactions.  ¶ 275.

[4] That Citibank had knowledge of the double-billing scheme is further confirmed by Claudio Pessina, a former Parmalat accountant indicted for his role in the fraud, who testified that, beginning at least as early as 1995, and periodically thereafter throughout the Class Period, Citibank "certified in detail the way [Parmalat's] billing system worked."  ¶¶ 804-11.

Citigroup loaned Parmalat $70 million to finance the purchase of the three Canadian companies[5] but disguised the loan as an equity investment so that it appeared Citibank had "purchased" a 24.9% stake in Parmalat Canada.  ¶¶ 25, 369, 371, 819-20.[6]  Here again, the arrangement was mutually beneficial to Citibank and Parmalat.  According to one Chiaruttini Report, Citigroup said "Parmalat required the participation of Citigroup for credibility and prestige reasons."  ¶ 370.  As shown below, for its part Citigroup ultimately received a tax-free profit of Cdn $47.82 million.  ¶ 382.

Although defendant Ferraris, then a Citigroup vice president, told the media that "[Citibank is] a financial partner" in the Canadian business with Parmalat, and that "[w]e are investing in Canada because Parmalat is investing in Canada"; Citibank (and Citigroup) required Parmalat to enter into secret put agreements, which repaid Citibank for its "investments" at set prices that guaranteed substantial profits even if the Canadian companies were not profitable.  ¶¶ 372, 379-80, 820.

In connection with this "investment," Citibank received Cdn $1.3 million in subscription fees from Parmalat Canada and Cdn $5.6 million in financial advisor fees in addition to its net tax-free gain of Cdn $47.82 million on the exercise of the put option, an abnormally high return.  ¶¶ 382-83, 823.  Meanwhile, Parmalat investors were completely unaware that Parmalat had incurred $70 million in debt.  ¶¶ 371, 385.

### d.      Citigroup's Fraudulent Securities Sales

Citigroup knew that if the market perceived Parmalat as performing poorly it would jeopardize the Company's investment-grade credit rating, cut off the Company's access to the

---

[5] Citibank also acted as a financial advisor to Parmalat on these transactions.  ¶ 369.
[6] Citibank proposed that it "invest" less than 25% because, under Canadian tax law, there was no capital gains tax on share interests of less than 25%.  ¶ 376.

capital markets and, most important to Citigroup, endanger repayment of the financing that

Citigroup provided to Parmalat.  ¶ 785.  Accordingly, Citigroup Global Markets Limited, an

affiliate acting on behalf of Citigroup, underwrote or served as a dealer in at least one offering

for €2 billion in Parmalat debt securities to ensure that Citigroup would recoup its investment in

Parmalat.  ¶¶ 32, 706-07.

### 2. Bank of America's Role in Defrauding Parmalat Investors

Parmalat's access to the capital markets was essential to its acquisition program and to its

fraudulent scheme.  Bank of America not only arranged financing for Parmalat's ailing Brazilian

subsidiary but also underwrote more than $1.3 billion in Parmalat debt securities to accomplish

these needs.  Thus, Bank of America's participation in this aspect of Parmalat's fraudulent

scheme was critical.  ¶¶ 397-405.

### a. Bank of America Arranges Financing for Parmalat Brazil

By late 1999, Parmalat's Brazilian subsidiary, Parmalat Empreendimentos e

Administracao ("Parmalat Administracao"), had been losing money for several years.  ¶ 395.

Concerned that Parmalat had overpaid for the Brazilian subsidiary, investors began to worry that

Parmalat would be forced to take a write-down.  *Id.*  To allay investor concerns, and to alleviate

the drain on Parmalat's earnings and to falsely increase the value of Parmalat Administracao,

Bank of America provided financing for the Company's Brazilian operations.  ¶¶ 26, 395-96.

In this regard, Bank of America arranged the sale of an 18.18% interest in the Brazilian

entity to supposedly outside North American investors for $300 million.  ¶¶ 26, 396, 849.  Bank

of America coordinated the entire transaction, including structuring the deal, finding the

investors, and co-authoring the press release announcing the transaction.  ¶¶ 400, 849.  Under the

terms of the transaction, these investors never actually held a direct stake in the Brazilian unit

but instead Bank of America used two Cayman Islands-based SPEs, Dairy Holdings, Ltd. and Food Holdings, Ltd., to sell four-year private placement notes primarily to U.S. institutional investors. ¶ 397.  The expiration of the notes in December 2003 was supposedly timed to coincide with Parmalat Administracao's planned listing on the Brazilian Stock Exchange, an event that Bank of America and Parmalat knew would never occur.  ¶¶ 397-98.

The press release announcing the sale deliberately misled investors into believing that Parmalat's Brazilian operation was worth more than $1.35 billion and that Parmalat was issuing new equity for the deal, rather than it being a $300 million private debt placement which Parmalat would have to repurchase at a substantial premium just four years later.  ¶¶ 26, 398, 400, 402, 849.  News of this transaction drove up the price of Parmalat's securities by 17% on global markets.  ¶ 403.

Since the two Bank of America SPEs (Dairy Holdings and Food Holdings) had no operations from which to pay off the notes, Parmalat S.p.A. guaranteed them, and the notes were further secured by a put agreement obligating Parmalat Capital Finance to buy back the 18.18% stake in the (inevitable) event that Parmalat Administracao did not become publicly listed. ¶¶ 397-98.  The Chiaruttini Reports noted that at the time the parties entered into the put agreement, Bank of America already knew the Brazilian entity never would be listed on the Brazilian Stock Exchange.  ¶ 398.  The transaction, therefore, was merely a disguised loan that Parmalat guaranteed for its Brazilian subsidiary.

Through its use of secret agreements to reduce its own credit risk from the financing, Bank of America received at least $5.5 million in fees for arranging this transaction.  ¶ 850.  In addition, Parmalat was able to understate its debt by at least $300 million from December 21, 1999 to 2003.  ¶¶ 404-05.

b.   **Bank of America's Fraudulent Securities Sales**

During the Class Period, Bank of America and its subsidiaries, Bank of America

Securities LLC and BASL (collectively, "Bank of America Securities"), also underwrote or sold

more than $1.3 billion in Parmalat debt securities through private placements in the United

States and other countries.  ¶¶ 92, 839-40.  As summed up by Luis Moncada, who was

responsible for the credit portfolio at Bank of America's Italian branch, Bank of America used

the U.S. private placements to "create the cash register" to finance Parmalat entities in "at risk"

or emerging countries.  ¶ 842.  According to defendant Tonna:

> Bank of America was the bank that made us issue almost all of the private
> placements in the U.S.  The bank contacted the institutional investors, prepared a
> prospectus appropriate to the U.S. and examined all the balance sheets.  Being aware
> of all those private placements, of the bonds issued, being able to examine the
> balance sheets of the group and being able to turn to "Centrale Rischi" for
> information, Bank of America was in a perfect position to comprehend the adverse
> deficit balance situation of the group.  Bank of America earned high commissions for
> every transaction I have described.

¶ 843.

In addition to funding Parmalat operations, proceeds from the private placements were

used as cash collateral to guarantee Bank of America's loans to Parmalat.  ¶ 844.  At times, Bank

of America demanded or forced Parmalat to sell securities to raise money to repay Bank of

America loans.  ¶ 845.

To effectuate these private placements, Bank of America employees in the U.S. prepared

prospectuses and other offering materials by examining Parmalat's financial statements and

gathering information from "Centrale Rischi," Italy's national registry for bank debt, as well as

Bloomberg's electronic financial news reporting service.  ¶¶ 843, 853.  At least one of Bank of

America's, U.S.–based managers from its Private Placements Group traveled to Italy to work

with Parmalat senior managers in preparing the offering memoranda and prospectuses.  ¶¶ 60,

15

839.  Additionally, according to Parmalat's Extraordinary Commissioner, Bank of America's U.S.-based in-house counsel often drafted or reviewed documents relating to the bank's transactions with Parmalat.  ¶ 834.  Despite the fact that Bank of America knew from its role in arranging financing for Parmalat Brazil, and other activities on Parmalat's behalf, that Parmalat's financial condition was rapidly deteriorating, Bank of America's sale of more than $1 billion of private placements maintained Parmalat's good credit rating.  ¶¶ 35, 853.

In promoting private placement sales, BASL executives arranged "road shows" and traveled with Parmalat executives in the United States where they marketed Parmalat debt securities to major U.S. institutional investors and actively disseminated Parmalat's financial information to them.  ¶¶ 35, 60, 840.  Bank of America had a powerful financial incentive to complete the private placements, *i.e.*, the repayment of loans it had extended to Parmalat. ¶¶ 842, 845, 847-48.  Former employees have testified that Bank of America always issued private placements in an amount that matched its loans to ensure that the bank bore no risk in the transactions.  ¶¶ 842, 844.  For example, on or about September 29, 1998, BOA created a special purpose entity called USPP Trust II, which it used to raise $80 million through private placements of medium term notes with several major U.S. insurance companies.  ¶ 846.  These proceeds were distributed to a Parmalat subsidiary, Eurofood IFSC Limited which, in turn, deposited the funds into a Bank of America account in London.  *Id.*  Bank of America required Parmalat to deposit the funds as a pre-condition for its $80 million loan to Venezuelan Parmalat subsidiaries.  *Id.*  Neither Bank of America nor Parmalat disclosed to investors that they were repaying an earlier Bank of America loan for Parmalat's Venezuelan subsidiaries.  *Id.*

Bank of America used the same model to fund a $100 million loan to Parmalat Brazil and an $80 million loan to Parmalat Capital Finance.  ¶ 847.  In each instance, Bank of America

publicly announced that it had made a conventional loan in the stated amount to Parmalat, despite its knowledge that these loans were paired with private placements underwritten by Bank of America, through its agent, BASL. *Id.*

Bank of America had a powerful financial motive to engage in the foregoing activities. As noted above, the private placements guaranteed the repayment of Bank of America's loans to Parmalat. In addition, the Parmalat account was one of Bank of America's most lucrative relationships in Europe, bringing in more than $30 million in fees. ¶¶ 843, 848.[7]

### 3.   BNL's Role in Recycling Invoices for Factoring Arrangements

Another facet of the scheme which was used to conceal Parmalat debt was the recycling of old invoices for non-existent receivables in factoring arrangements. ¶¶ 21, 302, 305-07. BNL, operating through its wholly-owned subsidiary, Ifitalia S.p.A. ("Ifitalia"), provided cash to Parmalat in exchange for the assignment of invoices that had been previously paid and were no longer collectible. ¶¶ 21, 299, 302. To keep the scheme a secret, BNL directed Parmalat to change a single digit on the new list of stale invoices so that they differed from the previous ones and therefore would not be identified as duplicates in BNL's software. ¶¶ 21, 303, 307, 869.

As a payoff for advancing cash on illegitimate invoices in the factoring scheme, BNL received lucrative investment banking business from Parmalat. ¶ 308. For example, Parmalat engaged BNL to underwrite two bond offerings totaling in excess of €550 million, which earned BNL huge profits. ¶ 871. In addition, Parmalat renewed BNL's lucrative factoring relationship every six months, thus enabling the continuation of the factoring scheme which understated Parmalat's debt by at least €103 million each year during the Class Period. ¶¶ 298, 309, 870.

---

[7] The importance to Bank of America of the relationship is illustrated, in part, by the testimony of Parmalat's former CFO, Alberto Ferraris, and by the fact that Bank of America's CEO personally traveled to Italy in the Summer of

*(cont'd)*

### 4.    CSFB's Fraudulent Securities Sales

CSFB was also instrumental in participating in a scheme in which Parmalat manufactured €248 million in assets, thus allowing the Company to inflate the information contained in its financial statements.  In or about May 2001, CSFB prepared a prospectus for the issuance of bonds by Parmalat Partecipacoes do Brasile ("Parmalat Brasile") in the amount of €500 million to be underwritten entirely by CSFB.  ¶ 407.  CSFB executed a Subscription Agreement with Parmalat on December 19, 2001 which provided for the bonds to be converted into the equity of Parmalat Brasile in the amount of €500 million, with an expiration date in 2008.  ¶ 409.  CSFB purchased and held the entire €500 million allotment.  *Id.*  On the same date, Parmalat and CSFB executed a Forward Sale Agreement under which CSFB transferred back to Parmalat the right of conversion of the bonds at a price to be decided prior to the expiration date contained in the Subscription Agreement.  ¶ 410.  The right of conversion was priced at €248,312,500.  *Id.*

To pay CSFB under the Forward Sale Agreement, Parmalat Finance Corporation B.V. issued bonds in the amount of €250 million ("Eurobond B.V.").  ¶ 411.  CSFB also underwrote these bonds.  ¶¶ 411, 858.  Payment on the Eurobond B.V. was issued to Parmalat Finance Corporation B.V. and then transferred to Parmalat.  ¶ 412.  CSFB then deposited the full payment into its Chase Manhattan checking account, with instructions from Parmalat to use the funds as payment for the right of conversion under the Forward Sale Agreement.  *Id.*

CSFB structured these transactions to eliminate any underwriting risks.  ¶¶ 417, 862.  For at least 50% of the transaction amount, CSFB transferred the risk to Parmalat through the Forward Sale Agreement.  ¶ 417.  For the remaining 50%, CSFB transferred the risk to the market by selling the bonds without the right to conversion, or it may have transferred the risk by

---

2003 to solidify the relationship and solicit new business.  ¶ 837.

executing Credit Default Swap Agreements.  *Id.*  Additionally, according to the Chiaruttini
Reports, after Parmalat defaulted, CSFB exercised its option pursuant to the Forward Sale
Agreement to receive an additional €245 million.  ¶ 414.

Through this complex intercompany deal, CSFB manufactured €248 million in assets for
Parmalat and concealed a corresponding €248 million in increased debt.  ¶¶ 416, 857-58, 863.
As a result, neither Parmalat's credit rating nor its ability to issue debt in the future was
negatively affected by its default (though it would have been had it been disclosed).  ¶ 859.
Furthermore, CSFB sold most of its equity exposure to Parmalat in early 2003, thereby
eliminating its financial exposure before the Company's collapse while earning millions of
dollars in commissions and fees.  ¶ 418.

### C.   The Auditor Defendants' Participation in the Fraudulent Scheme

The Auditor Defendants were essential players in the Parmalat fraud.  As set forth below,
these defendants created offshore entities to remove debt from Parmalat's financial statements,
hid debt through accounting trickery, and used fictitious sales of products and phony bond
repurchases to falsify Parmalat's financial statements, all of which ultimately caused billions of
dollars in losses to Parmalat investors.

### 1.   Grant Thornton's and Deloitte's Auditing Roles

Grant Thornton S.p.A. ("GT-Italy") audited Parmalat's consolidated financial statements
from 1990 until it was replaced by Deloitte in 1999 due to auditing requirements which forced
the Company to change auditors.  In order to keep the accounting fraud concealed, Parmalat,
Deloitte and GT-Italy agreed that GT-Italy would continue to audit Bonlat and Parmalat's
consolidated subsidiaries, offshore entities, and SPEs that were central to the fraud.  ¶¶ 164, 209.

Beginning in 1999, Deloitte & Touche S.p.A. ("DT-Italy") became the Company's

independent auditor and audited Parmalat's consolidated financial statements for fiscal years 1999 through 2003.  In each of its audits, DT-Italy issued clean opinions.  These financial statements were disseminated to investors in the United States and worldwide, incorporated into regulatory filings, incorporated into offering memoranda used to raise over $7 billion in new debt, and placed in other marketing documents that Parmalat and the Bank Defendants used to convey false and misleading information about the Company's financial condition and business prospects.  ¶¶ 137, 953.

As the Chiaruttini Reports concluded, neither DT-Italy nor GT-Italy even remotely followed appropriate auditing procedures.  ¶¶ 39, 1054-56.  Had they done so, she concluded, they would have been in a position to flag the anomalies and structural weaknesses within the Company.  ¶¶ 39, 42, 1032, 1052.  According to Chiaruttini, "Deloitte did not pay attention … to the observations that its field auditors made in the Early Warning Reports and Summary Audit Pleadings" sent to and reviewed by Deloitte USA's lead partners and other DTT personnel in charge of the Parmalat audit.  ¶¶ 40, 1052.

The problems with the audits were not limited to Italy.  DTT regional auditors for various Parmalat subsidiaries, especially those in South America at Deloitte Touche Tohmatsu Auditores Independentes ("DTT Brazil" or "Deloitte Brazil"), raised numerous "red flags" with DT-Italy auditors and Deloitte USA's partners.  ¶¶ 1000, 1004, 1006, 1009-11, 1013, 1023-25, 1033.  When these non-complicit auditors voiced their concerns to more senior personnel within DTT and Deloitte USA, they were invariably and summarily silenced.  ¶¶ 1013, 1033-34.  DTT's decision to bury red flags was understandable, as raising concerns had previously jeopardized its retention of Parmalat as a client.  In 2000, when a regional auditor in Argentina raised concerns about the integrity of certain financial statements which would have required Deloitte to issue a

qualified opinion, DTT's auditing contract in Argentina was revoked.  ¶¶ 1035-36.  Accordingly, top executives of DTT, reaching as high as defendant James Copeland, the CEO of DTT and Deloitte USA, advised auditors who detected fraud to keep quiet to avoid offending Parmalat so that DTT could retain its multi-million dollar client.  ¶¶ 1033-34.  In the case of Parmalat Brasile's financial statements, this meant that Deloitte Brazil included an "emphasis note" on its audit rather than refusing to certify the entity's financial statements.  ¶ 1011.

Fees were so coveted by the auditors that by 2002 the Auditor Defendants lacked any semblance of independence.  Toward the end of 2002, for example, when GT-Italy and DT-Italy were "verifying" Parmalat's assets in preparation for the year-end audit, they took the unprecedented step of letting Parmalat itself verify the single largest asset on its books:  a $4.9 billion Bonlat account at Bank of America.  ¶ 41.  Bonlat was the offshore entity that was formed by Parmalat, the Law Firm Defendants,[8] Grant Thornton and other defendants for the specific purpose of concealing losses.  ¶¶ 14-17.  It was not until a year later that investors learned the Bonlat account was a pure fiction.  ¶¶ 44, 764.  Even after Parmalat's collapse, affiliates of DTT and GTI continued their role in the theft and disappearance of $14 billion, going so far as to hinder the Company's efforts to obtain copies of audit work papers that might reveal the auditors' fraud.  ¶¶ 37, 91.

## 2.   The Auditor Defendants' Role in Understating Parmalat Debt

Parmalat's spiraling debt was a major concern to the Company prior to and throughout the Class Period.  In order to convince investors that Parmalat was effectively managing its huge

---

[8]  The Law Firm Defendants are BBLP Pavia e Ansaldo, Gian Paolo Zini, and Zini & Associates.

debt load, Parmalat and the Auditor Defendants schemed together to hide billions of dollars of debt.

<strong>a.      The Creation of Offshore Shell Companies</strong>

Prior to the Class Period, two GT-Italy partners, acting as agents for, with the authority of, and for the benefit of, GT-Italy, created three shell companies with the intention of using them to improperly remove debt from Parmalat's consolidated financial statements and artificially inflate its reported assets.  ¶¶ 12, 200, 222, 957-58.

Parmalat issued false invoices to a shell company, as if it had purchased a substantial volume of dairy products, even though the shell company had no commercial activities or legitimate business purpose.  ¶¶ 12, 199, 201.  In return, Parmalat generated a "discounted bill" that showed the subsidiary owing Parmalat for the fictitious invoice.  ¶ 202.  Parmalat then sold its right of payment on the discounted bills to various banks so that it could get an immediate infusion of cash.  *Id.*  The banks, including defendant Citibank, paid Parmalat at a discounted rate for the right to receive payment on the invoice, which accounted for the risk of collection and for bank fees incurred in advancing money on a receivable.  *Id.*  Subsequently, Parmalat "loaned" the shell company money to repay the bank for amounts owed.  ¶¶ 12, 203.  Thus, Parmalat was able to record the transferred funds as an asset (an investment in the subsidiary) rather than as a loan.  ¶ 203.  The banks, in addition to taking a fee for advancing the money in the first place, were also repaid for money they advanced on the false invoices.  ¶¶ 204-08.

Although no actual sales were made in these transactions, the banks infused huge amounts of cash into Parmalat which allowed it to improperly record millions of dollars of additional assets on its consolidated balance sheets.  ¶ 208.  Additionally, because the Company purportedly sold products to its consolidated subsidiaries, Parmalat's revenues and profits were

artificially boosted and its cash reserves improperly increased.  *Id.*

### b.    The Creation of Bonlat

When Italian law required Parmalat to change auditors, and the threat of exposure of the fraudulent scheme loomed with DT-Italy assuming audit responsibilities, the previously used shell companies were eventually phased out in favor of Bonlat, an offshore entity that GT-Italy continued to audit.  ¶¶ 14, 212, 361.  Bonlat, like its predecessor shell companies, was used to hide accounting entries which could not be justified and which, if reported, would have prevented the Company from obtaining financing – or at least from obtaining financing at reasonable costs.  ¶¶ 14, 214, 228.  By the time the shell companies were phased out, they had transferred €1.5 billion ($1.75 billion) in non-existent assets into Bonlat.  ¶ 211.

Bonlat was used extensively in the Parmalat fraud.  Between 1999 and 2002, Bonlat's share of Parmalat's assets rose from 22% to 40%, and by the end of 2002, Bonlat purported to have a $4.9 billion account at Bank of America.  ¶ 232.  GT-Italy, in its role as auditor of Bonlat, drafted a letter dated December 20, 2002, to be sent to Bank of America requesting verification of the bank balance, but never sent the request.  *Id.*  Instead, GT-Italy accepted *from Parmalat* a letter dated March 26, 2003 purportedly from Bank of America certifying the existence of the Bonlat account, with no other support.  *Id.*

DT-Italy was equally complicit in perpetuating fraudulent transactions involving Bonlat.  ¶¶ 959-60.  In the first months of 2000, DT-Italy prepared or received a document entitled, "Reconstruction of the Bonlat Operations."  ¶ 960.  The document specifically informed DT-Italy's auditors about the true purpose of Bonlat as a mere shell for hiding Parmalat debts.  *Id.*  Additionally, each quarter, DT-Italy met with Parmalat to verify Bonlat documents and GT-Italy's working papers.  ¶ 959.  Despite this knowledge, DT-Italy continued to permit Parmalat

and GT-Italy to verify information about Bonlat and failed to independently confirm Parmalat's assets.  ¶ 961.

**c.**     **Bonlat's "Investment" in the Epicurum Fund**

Meanwhile, in 2002, two GT-Italy auditors, Penca and Bianchi, realized that many of the promissory notes held by Bonlat were not collectible, and the interest due on them had not been paid.  ¶¶ 18, 354.  Accordingly, they advised Parmalat executives that Bonlat's fraudulent existence could easily be detected.  ¶ 18.  GT-Italy thus proposed that the fictitious promissory notes be transformed into a $625 million equity investment from Bonlat to Epicurum, nominally an investment fund, but in reality a shell company formed for the sole purpose of perpetrating this fraud.  ¶¶ 18, 354-55, 993.

Although GT-Italy audited Epicurum, it undertook no efforts to confirm either Epicurum's existence or the funds therein.  ¶¶ 19, 359, 993.  Instead, it merely accepted a letter from Epicurum confirming the existence of its funds.[9]  ¶¶ 360-61.  The letter contained no explanation of the nature of the accounts, no contact information, and did not attach any supporting documentation.  ¶ 361.

However, CONSOB, the Italian Commission for listed Companies and the Stock Exchange, did seek an explanation from Parmalat's Board of Statutory Auditors about the details of the Epicurum fund.  ¶¶ 363, 994.  Despite CONSOB's inquiry and its specific instruction that DT-Italy should "pay close attention to the financial situation of the group," DT-Italy did nothing.  ¶ 363.  In fact, DT-Italy noted in its October 31, 2003 review letter that it could not even value a contract between Parmalat and "an overseas mutual investment fund" – Epicurum.

---

[9]  According to the Bondi Complaint, the auditor simply "agreed" that Epicurum was a legitimate investment fund because, when the names of Epicurum's directors were read to Grant Thornton, they "did not sound Italian."  ¶ 360.

¶¶ 724, 994.  By this time, Parmalat purportedly had a €77.7 million equity interest in Epicurum, and 97% of Parmalat's net profit for the first half of 2003 was derived from a single transaction with the fund, clearly making it material to Parmalat's financial statements for purposes of DT-Italy's audit.  ¶ 995.

### 3.      Hiding Debt through Account 999

With the Auditor Defendants' active participation, Parmalat used a vehicle, widely known within Parmalat and among its auditors as "Account 999," to reclassify debts to third-parties as intra-company debts.  In fact, Parmalat improperly reclassified at least $4.49 billion of its debt as of September 30, 2003, by creating "Account 999" to track fake revenues, assets and profits that Parmalat pretended to accumulate.  ¶¶ 22-23.  Simply, debts to third-parties were reclassified as debts to Parmalat entities, and subsequently upon consolidation eliminated from Parmalat's balance sheet.  Almost all of the "funds" in Account 999 were subsequently transferred to Bonlat, so that it would offset debt from the Company's consolidated financial statements and look like intra-company obligations.  ¶¶ 310-12.  Indeed, Account 999 was an $8.4 billion account that represented 62% of Parmalat's total assets.  ¶¶ 313, 979.

Parmalat's auditors certainly knew of the existence and purpose of this trash bin.  DT-Italy learned of Parmalat's scheme to reclassify debt through "Account 999" through several meetings with GT-Italy where adjustments to the account were discussed.  ¶¶ 980-81.  Yet, neither GT-Italy nor DT-Italy told investors that these assets did not exist and that Parmalat's debt could not be reclassified.  ¶¶ 22-23, 982.  Instead, they continued to issue clean opinions on Parmalat's financial statements.

### 4.      Fictitious Sales of Powdered Milk to Cuba

Defendants also concocted transactions involving entirely fictitious sales to sham

companies.  For instance, in order to meet earnings projections at the end of 1999, Bonlat falsely

recorded 300,000 tons of fictitious milk sales to a Cuban importer, allowing Bonlat to overstate

its revenues and assets by $620 million that year.  ¶¶ 15, 244-45, 247, 254.  The "sale" was made

on behalf of a shell company that occupied Foo Kan Tan Grant Thornton ("GT Singapore")

offices, shared GT Singapore's employees and, as a GT Singapore employee has admitted,

served only as a mail drop for Parmalat.  ¶¶ 240, 243, 963.

For its part, DT-Italy recognized that one of the shell company's directors was a Parmalat

employee and therefore asked to review that company's balance sheet.  ¶¶ 253, 964.  Rather than

doing so, however, DT-Italy was satisfied when Parmalat merely replaced the director.  ¶ 253.

Likewise, although DT-Italy initially sought evidence of the milk sales through freight or custom

documents, when Parmalat did not provide the paperwork, DT-Italy certified Parmalat's

financials on an incomplete audit.  ¶¶ 253, 964-65.  This, despite the incredible fact that the

volume of powdered milk involved would represent 60 gallons of milk per year for every person

in Cuba.  ¶ 246.

### 5.   <u>Fictitious Bond Repurchases</u>

The Auditor Defendants were also complicit in reporting that Parmalat had repurchased

its own bond issues when, in fact, it had not.  ¶ 321.  According to PricewaterhouseCoopers, LLP

("PwC"),[10] Parmalat underreported its outstanding debt by approximately $4 billion by simply

inventing purchases of its bonds by other Parmalat entities, specifically Bonlat.  ¶ 327.  GT-

Italy's own documents reflect repurchases of $2.9 billion in bonds by Bonlat that never occurred.

¶¶ 325, 984, 986.  GT-Italy never pointed out this discrepancy between its own records and the

---

[10]  PwC was appointed by Bondi to perform a forensic audit and evaluate the effect of the fraud on Parmalat's
financial statements.  ¶ 47.

Company's statements and filings with CONSOB related to the bonds it repurchased. ¶ 984. Likewise, DT-Italy and Deloitte Malta (the auditor of Parmalat Capital Finance B.V., one of the entities whose bonds Bonlat supposedly repurchased) failed to report that billions of dollars worth of Parmalat Capital Finance's bonds had not actually been repurchased. ¶¶ 985-86.

### 6.   Illegal Money Transfers to Tanzi Family Companies

Hundreds of millions of dollars were diverted from Parmalat to Tanzi family companies throughout the Class Period. ¶ 328. For example, from 1997 to 2003, one company alone – Holding Italiana Turismo S.p.A. ("HIT") – received $500 million from Parmalat. ¶ 330. Parmalat recorded these transfers as loans or credits, which it subsequently transferred to Bonlat. ¶¶ 335-36, 340. Bonlat then purported to pay off the credits that Parmalat booked from its Bank of America account that did not exist. ¶¶ 337, 340. GT-Italy audited Bonlat, but made no mention of these transfers. ¶¶ 339, 988-89.

DT-Italy also ignored red flags related to these illegal transfers. ¶ 339. DT-Italy audited Carital, a Parmalat subsidiary that received millions of dollars in rebates from Tetra-Pak, a Swedish-based drink packaging company. ¶¶ 346, 348-51, 990. Over a seven-year period, approximately $62 million in Tetra-Pak rebates should have gone from Carital to Parmalat, but instead was diverted to Tanzi family entities. ¶¶ 352-53. DT-Italy certified financial statements despite the fact that it could not account for this massive diversion of funds. ¶ 990.

### 7.   Manipulation of Goodwill

Another asset-inflating scheme perpetrated by Defendants involved manipulating the value of Parmalat's goodwill. In contravention of proper accounting practices, Parmalat and the Auditor Defendants amortized goodwill over a 25-year term without analyzing whether the entries were supportable. ¶¶ 386-87, 389. Typically, goodwill is amortized over a 5-year term,

which can be extended up to 20-years under a limited set of circumstances. ¶ 388. Mike Power, an auditor in Deloitte's New Jersey office, raised concerns about Parmalat's overvaluation of goodwill in connection with the review and certification for fiscal year 2002, as did a DT Milan auditor. ¶ 1000. Despite these concerns, DT-Italy undertook no further investigation. *Id.*

By manipulating goodwill, Parmalat inflated its assets by $26.5 million in 2003. ¶ 390. Chiaruttini concluded that much of the goodwill recorded in Parmalat's balance sheet was unsupported by the operations of Parmalat's subsidiaries. ¶¶ 391-93, 1000.

### 8.   Fictitious Sales of Trademarks and Other Intellectual Property

Bonlat, GT-Italy's audit client, was also used as a conduit to book fictitious sales of millions of dollars of trademarks and other intellectual property. ¶¶ 435, 1018. Essentially, Bonlat sold brands and technologies for hugely inflated amounts to two Delaware-based shell entities whose books were not consolidated with those of other Parmalat subsidiaries. ¶ 436. The fictitious credits amounted to as much as $430 million. ¶¶ 439, 442. The revenue from these "sales" was used to offset losses incurred by the Brazilian companies. ¶ 440. GT-Italy had specific knowledge of these phony sales, as did DT-Italy, which audited two Parmalat subsidiaries that also purportedly received transfers of fictitious trademark agreements. ¶¶ 435-36, 438, 1018-20.

The foregoing fraudulent financial schemes involving Parmalat entities could not and would not have occurred, but for the active participation of the Auditor and Bank Defendants. As a result of this widespread illegal misconduct, Parmalat was able to portray itself as a growing global company with increased revenues and diminished debt. It was not until the end of the Class Period when this house of cards collapsed following the disclosure of the fraud that the public realized how far-reaching, brazen and costly it had been.

# ARGUMENT

## I.   THE APPLICABLE PLEADING STANDARDS IN A RULE 10b-5 CASE

As this Court recently reiterated, "[i]n deciding a Rule 12(b)(6) motion, the Court accepts as true all allegations in the complaint and draws all reasonable inferences in the plaintiff's favor."  *In re NTL Sec. Litig.*, 347 F. Supp. 2d 15, 21 (S.D.N.Y. 2004) (Kaplan, J.).  "The issue is not whether the plaintiff ultimately will prevail but whether the plaintiff is entitled to offer evidence to support its claims."  *Vtech Holdings Ltd. v. PriceWaterhouseCoopers LLP*, 348 F. Supp. 2d 255, 261 (S.D.N.Y. 2004) (Kaplan, J.).  "A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."  *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S. Ct. 2229, 2232 (1984); *see also Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 102 (1957).

This pleading standard and the presumptions in favor of Plaintiffs apply equally in suits alleging violations of the federal securities laws.  The Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, altered the pleading requirements for the scienter element *only*.  Under the PSLRA, a plaintiff alleging claims under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  For purposes of a Rule 10b-5 claim, the "requisite state of mind," is scienter: "an intent to deceive, manipulate or defraud."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.17, 96 S. Ct. 1375, 1381 n.17 (1976).  Plaintiffs may establish scienter either (a) by alleging facts to show that Defendants had

both the motive and opportunity to commit fraud,[11] or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.[12]  *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000).

 In assessing a complaint's factual allegations, "a court should not consider each relevant factual allegation solely in isolation – though some allegations by themselves may suffice to raise a strong inference of the requisite state of mind – but rather as a part of the overall factual picture painted by the complaint."  *In re MicroStrategy Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 631 (E.D. Va. 2000); *see also In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 417 (S.D.N.Y. 2003) ("The allegations in the Complaint are entitled to be taken together to determine if the facts 'give rise to a strong inference of fraudulent intent.'") (*quoting Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)).  "If the totality of the circumstances alleged raises a 'strong inference' of the requisite state of mind, it is immaterial whether plaintiffs satisfy their burden by 'pleading motive and opportunity, conscious misbehavior, recklessness, or by impressing upon the Court a novel legal theory.'"  *MicroStrategy*, 115 F. Supp. 2d at 631 (*quoting In re Health Management, Inc. Sec. Litig.*, 970 F. Supp. 192, 201 (E.D.N.Y. 1997)).

 Defendants argue that Rule 9(b) requires a plaintiff to specify with particularity each defendant's participation in a fraud, *see, e.g.*, BOA Br. at 11-12.  This argument overlooks that

---

[11] Motive represents "concrete benefits that could be realized" by engaging in the fraud.  Opportunity entails a showing of "the means and likely prospect of achieving concrete benefits by the means alleged."  *Novak*, 216 F.3d at 307.  Allegations that the defendants "benefited in a concrete and personal way from [the] purported fraud" may provide the requisite "strong inference" of scienter in the Second Circuit.  *Id.* at 311.

[12] Under the securities laws, "recklessness" includes "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care.… It encompasses at a minimum … willful blindness."  *Benjamin v. Kim*, No. 95 Civ. 9597 (LMM), 1999 WL 249706, at *8 (S.D.N.Y. April 28, 1999) (quotations omitted); *see also Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000).  Plaintiffs can plead Defendants' conscious misbehavior or recklessness by alleging that "Defendants [had] knowledge of facts or access to information that contradict[ed] their public statements," or by alleging that "Defendants failed to review or check information [that]
*(cont'd)*

the Rule's particularity requirement is relaxed where one defendant is alleged to control other corporate entities. *See Waltree Ltd. v. ING Furman Selz, LLC*, 97 F. Supp. 2d 464, 469 n.6 (S.D.N.Y. 2000) ("facts surrounding the corporate relationship between the ING entities, as well as the precise roles those entities played in the challenged transactions, is exclusively within those entities' knowledge."); *In re Health Mgmt., Inc. Sec. Litig.*, 970 F. Supp. 192, 208 (E.D.N.Y. 1997); *see also MBIA Ins. Corp. v. Royal Indem. Co.*, 221 F.R.D. 419, 422 (D. Del. 2004).

Moreover, although Rule 10b-5 complaints must comply with the particularity requirement of Fed. R. Civ. P. 9(b), "courts should not demand a level of specificity in fraud pleadings that can only be achieved through discovery." *Liberty Ridge LLC v. RealTech Sys. Corp.*, 173 F. Supp. 2d 129, 137 (S.D.N.Y. 2001). "Even with the heightened pleading standard under Rule 9(b) and the [PSLRA] we do not require the pleading of detailed evidentiary matter in securities litigation." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d at 72.

While this Court and others have stated that allegations of fraud based solely on information and belief do not comply with Rule 9(b), *see, e.g., American Buying Ins. Servs., Inc. v. Kornreich & Sons, Inc.*, 944 F. Supp. 240, 248 (S.D.N.Y. 1996) (Kaplan, J.),[13] "[w]here the information is exclusively within the opposing party's knowledge, pleading requirements are somewhat relaxed." *NTL,* 347 F. Supp. 2d at 28, n.76. This is, of course, precisely the situation here, where the details as to what was said among the various participants to the fraudulent schemes and who knew what is exclusively within their knowledge. In such circumstances, the

---

they had a duty to monitor, or ignored obvious signs of fraud." *Novak*, 216 F.3d at 308; *see also In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001).

[13] The PSLRA specifically authorizes information and belief pleading. *See* 15 U.S.C. § 78u-4(b)(1)(B).

complaint must set forth the basis for the plaintiff's information and belief. *American Buying,* 944 F. Supp. at 249. In this Circuit, it is not necessary "that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based. Rather, plaintiffs need only plead with particularity sufficient facts to support those beliefs." *Novak*, 216 F.3d at 313-14.

The Complaint in this case does precisely that, listing for nearly three pages the various confessions, testimony, complaints, indictments, reports by Bondi, Chiaruttini and PwC, press releases, news articles and other sources which form the bases of Plaintiffs' information and belief. *See* ¶ 1. In virtually identical circumstances, in words that read as if written for this case, Judge Scheindlin in *In re Initial Public Offering Sec. Litig,* 241 F. Supp. 2d 281, 359 (S.D.N.Y. 2003) ("*IPO*"), held that the basis for the information and belief allegations were sufficiently alleged:

> [G]eneric references to news articles, academic literature, and press releases are sufficiently particular to support the formation of plaintiffs' beliefs because the substance of those beliefs – that the defendants were perpetrating a massive fraud … – was the stuff of daily headlines. The alleged fraud had so permeated the news media that there can be no doubt that plaintiffs have a sufficient basis for their information and belief, and that is all that the statute requires. The same can be said for any of the categories of sources proffered by plaintiffs. Because there is no real doubt in these cases that plaintiffs have ample grounds on which to base their allegations, there is no danger that the allegations here are "unwarranted" – even if they ultimately turn out to be untrue.

> To ask plaintiffs to show more than they have would be pointless, and to ask the Court to cross-reference every paragraph of every complaint against particular media reports, articles, letters, and other sources would be a waste of this Court's limited resources.

> Plaintiffs' Complaint clearly comports with "information and belief" pleading

requirements.

## II.     THE COMPLAINT STATES CLAIMS UNDER RULE 10b-5(a) AND (c)

The Complaint alleges that the Bank Defendants and the Auditor Defendants violated Rule 10b-5(a) and (c) because they were primary, indeed essential, participants in a global *scheme* to defraud Parmalat's securities holders.  Scheme liability under Rule 10b-5(a) and (c) is hardly a novel approach, as its successful invocation in other mammoth frauds, such as *Enron* and *Global Crossing*, attests.  Even so, and notwithstanding the broad language of Rule 10b-5(a) and (c), Defendants ask this Court essentially to narrow these provisions to the point of extinction, arguing that they apply *only* where a defendant made a misleading statement or where certain forms of technical stock market manipulation are alleged.  While this case certainly involves direct, material misrepresentations by certain defendants (as discussed *infra*), it is also a massive *scheme* where investors were defrauded by the conduct of each participant – even those who said nothing.  Importantly, the U.S. Supreme Court, the Second Circuit, and courts in this District have all clearly rejected Defendants' interpretation and concluded that liability under Rule 10b-5(a) and (c) is *not* predicated on speaking.  As the court held in *Global Crossing,* "[i]t is apparent from Rule 10b-5's language and the caselaw interpreting it that a cause of action exists under subsections (a) and (c) for behavior that constitutes *participation in a fraudulent scheme*, even absent a fraudulent statement by the defendant."  *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 335 (S.D.N.Y.  2004) (*citing Affiliated Ute Citizens v. United States*, 406 U.S. 128, 152-53, 92 S. Ct. 1456, 1471-72 (1972)) (emphasis added).

Entirely misrepresenting the Supreme Court's seminal decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 114 S. Ct. 1439 (1994), Defendants also assert that the primary violations of Rule 10b-5(a) and (c) with which they are charged constitute only inactionable aiding and abetting.  Essentially, they concede the *existence*

of the fraud but hoist the blame for it on parties in Italy (some even claiming they were victims themselves). There is no merit to these arguments. As shown herein, far from alleging mere aiding and abetting, the Complaint details fraudulent conduct that the Defendants undertook themselves – they cannot claim they were merely assisting someone else. Plaintiffs' claims fall squarely within the rubric of primary "scheme" liability under Rule 10b-5(a) and (c) and are not impacted whatsoever by *Central Bank*.

### A. The Requirements for a Claim Under Rule 10b-5(a) and (c)

Rule 10b-5 makes it unlawful for any person, directly or indirectly "(a) to employ any device, scheme or artifice to defraud," or "(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." "All that is required in order to state a claim for a primary violation under Rule 10b-5(a) or (c) is an allegation that the defendant (1) committed a manipulative or deceptive act (2) in furtherance of the alleged scheme to defraud, (3) scienter, and (4) reliance." *Global Crossing,* 322 F. Supp. 2d at 336 (*citing SEC v. U.S. Envt'l, Inc.*, 155 F.3d 107, 111 (2d Cir. 1998)); *see also IPO,* 241 F. Supp. 2d at 385 (*quoting In re Blech Sec. Litig.*, 961 F. Supp. 569, 582 (S.D.N.Y. 1997)); *In re Sterling Foster,* 222 F. Supp. 2d at 303-04.

Significantly, in pleading a deceptive scheme claim under Rule 10b-5(a) or (c), "the level of specificity required by Rule 9(b) is somewhat relaxed" in comparison to a Rule 10b-5(b) misrepresentation claim. *Dietrich v. Bauer*, 76 F. Supp. 2d 312, 339 (S.D.N.Y. 1999); *see also IPO,* 241 F. Supp. 2d at 335 ("Congress intended that the PSLRA supercede the Federal Rules only as to those elements which the PSLRA explicitly mentions (*i.e.*, scienter and material misstatements and omissions)."). "More generalized allegations of the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants are sufficient for alleging

participation."  *Dietrich*, 76 F. Supp. 2d at 339*; see also Nanopierce Tech. v. Southridge Capital Mgmt. LLC*, No. 02 Civ. 0767, 2003 WL 21507294, at *9 (S.D.N.Y. June 30, 2003); *In re Blech Sec. Litig.*, 928 F. Supp. 1279, 1290-91 (S.D.N.Y. 1996).  Courts have recognized the sound reasons for the difference in treatment:  "unlike misrepresentation claims, where some aspects of the time and place and other details of the defendant's activity are within the knowledge of the plaintiff as a matter of course ... the mechanism of the scheme is likely to be unknown to the plaintiffs."  *In re Sterling Foster & Co., Inc., Sec. Litig.*, 222 F. Supp. 2d 289, 304 (E.D.N.Y. 2002).[14]

### 1.    Rule 10b-5(a) and (c) Apply to More Than Just Narrow, Technical Forms of Stock Market Manipulation

There is nothing in the text of Rule 10b-5 suggesting that subsections (a) and (c) thereof apply only to narrow, technical forms of stock market manipulation.  Defendants argue, however, that because Section 10(b) of the Exchange Act proscribes the use of "any manipulative or deceptive device or contrivance," Rule 10b-5 should be narrowly construed so as to apply only technical market manipulation activities, such as "wash sales" or "matched orders."  BOA Br. at 21-22; Deloitte USA Br. at 28; *see* Copeland Br. at 7; Citigroup Br. at 13. In so arguing, Defendants ask this Court to depart from the Supreme Court's well-established teaching that "securities laws combating fraud should be construed 'not technically and restrictively, but flexibly to effectuate [their] remedial purposes.'"  *Herman & MacLean v.*

---

[14] Defendant Copeland's argument concerning information and belief allegations (Copeland Br. at 8-9) relies on the PSLRA and argues that the Complaint must comply with 15 U.S.C. § 78u-4(b)(1)(B), which requires a complaint to "state with particularity all facts on which" information and belief allegations are based.  Such reliance on the PSLRA overlooks that 15 U.S.C. § 78u-4(b)(1) applies only to claims based on "[m]isleading statements and omissions," *i.e.*, claims under Rule 10b-5(b), whereas the claims against Copeland are based principally on Rule 10b-5(a) and (c).  "The requirement of § 78u-4(b)(1) obviously does not apply to claims brought under Rule 10b-5(a) or (c), as such claims do not rely on allegations of material misstatements or omissions."  *Global Crossing*, 322 F. Supp. 2d at 330 n.7; *see also IPO*, 241 F. Supp. 2d at 385 n.100.  In any event, in this Circuit "all" does not mean all.
*(cont'd)*

*Huddleston*, 459 U.S. 375, 386-87, 103 S. Ct. 683, 689 (1983) (*quoting SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 195, 84 S. Ct. 275, 284 (1963)).

Liability under Rule 10b-5(a) and (c) is not limited to the small category of cases that Defendants suggest.  Rather:

> subsections (a) and (c) encompass much more than illegal trading activity: they encompass the use of "any device, scheme or artifice," or "any act, practice, or course of business" used to perpetrate a fraud on investors, 17 C.F.R. § 240.10b-5(a), (c) … [C]ourts including this country's highest court have held that a cause of action lies for claims that involve allegations of manipulative schemes used in connection with securities markets.

*Global Crossing,* 332 F. Supp. 2d at 336-37; *see also IPO,* 241 F. Supp. 2d at 325 n.45 ("There are undoubtedly many more variations [of stock market manipulation;] the scope and content of a manipulative practice are only limited by new schemes which the fertility of man's invention would contrive") (quotation marks omitted).

Citing *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476, 97 S. Ct. 1292 (1977), Defendants argue that the term "manipulative," as used in Section 10(b), is limited to "wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity."  BOA Br. at 22.[15]  This argument overlooks that Section 10(b) prohibits the use of "any manipulative or deceptive device or contrivance," 15 U.S.C. § 78j(b); it does not prohibit merely "market manipulation."  Rejecting Defendants' argument, the courts have held that "the *Santa Fe* list of manipulative practices is clearly not exhaustive; 10b-5(a) and (c) claims need not contain the magic words 'wash sales, matched orders, or rigged prices' to be valid."  *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.,* No. 02 Civ. 5575 (SWK), 2004

---

*Novak*, 216 F.3d at 312.

[15] The holding of *Santa Fe* was merely that corporate mismanagement claims are not covered by Rule 10b-5.  *Santa Fe*, 430 U.S. at 479, 97 S. Ct. at 1304.

WL 992991, at *14 (S.D.N.Y. May 5, 2004).  Indeed, *Santa Fe* itself makes this clear: "No doubt Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices."  *Santa Fe*, 430 U.S. at 477, 97 S. Ct. at 1303.[16]

The Complaint alleges, with specificity, a comprehensive fraudulent scheme to create false revenues and assets and conceal debt by means of, *inter alia*, sham transactions and fictitious documents and accounts.  *See, e.g.*, ¶¶ 199, 232-38, 239, 256, 270, 295, 298, 309, 311. This falls squarely within the scope of Rule 10b-5(a) and (c).  *See Global Crossing*, 322 F. Supp. 2d at 337 ("manipulative" conduct includes "[s]chemes used to artificially inflate the price of stocks by creating phantom revenue"); *AOL Time Warner*, 2004 WL 992991, at *14 (claim stated under Rule 10b-5(a) and (c) where it was alleged that defendants "engaged in a systematic scheme . . . to inflate AOL's reported advertising revenue . . . based on various sham transactions and accounting improprieties"); *In re Lernout & Hauspie Sec. Litig.*, 236 F. Supp. 2d 161, 173 (D. Mass. 2003) (claim stated under Rule 10b-5(a) and (c) where it was alleged that the defendants participated in a fraudulent scheme to create fictitious revenue through bogus transactions with sham entities).

As both the Second Circuit and Supreme Court have stated:

"[We do not] think it sound to dismiss a complaint merely because the alleged scheme does not involve the type of fraud that is 'usually associated with the sale or purchase of securities.' We believe that §10(b) and Rule 10b-5 prohibit all fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception.  Novel or atypical methods should not provide immunity from the securities laws."

---

[16] *See also In re Royal Ahold N.V. Sec. & ERISA Litig.*, No. Civ. 1:03-MD-01539, 2004 WL 2955934, at * 26 (D. Md. Dec. 21, 2004) ("There is no requirement that claims under Rule 10b-5(a) and (c) allege illegal trading or market manipulation . . . ."); *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 235 F. Supp. 2d 549, 577-81, 589 n.31 (S.D. Tex. 2002) ("*Enron I*") (liability under Rule 10b-5(a) and (c) "is not limited to the making of a material misstatement or omission, nor to a few very technical forms of manipulation").

*Superintendent of Ins. v. Bankers Life & Cas. Co.,* 404 U.S. 6, 11 n.7, 92 S. Ct. 165, 168 n.7 (1971) (*quoting A. T. Brod & Co. v. Perlow*, 375 F.2d 393, 397 (2d Cir. 1967)).  As the *Global Crossing* court reiterated, the broad purpose of Section 10(b) is "to 'prevent practices that impair the function of stock markets in enabling people to buy and sell securities at prices that reflect undistorted (though not necessarily accurate) estimates of the underlying economic value of the securities traded.'" 322 F. Supp. 2d at 337 (*quoting Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857, 861 (7th Cir. 1995)).

### 2.        Rule 10b-5(a) and (c) Do Not Require that the Defendants Make a Misleading Statement

Certain Defendants assert that they cannot be liable under Rule 10b-5(a) and (c) because they did not make any false or misleading statements.  *See, e.g.* CSFB Br. at 8; Citigroup Br. at 9. Liability under Rule 10b-5(a) and (c) likewise does not require a material misstatement or omission by each (or any) defendant.  *See Global Crossing,* 322 F. Supp. 2d at 335 ("a cause of action exists under subsections (a) and (c) for behavior that constitutes participation in a fraudulent scheme, even absent a fraudulent statement by the defendant") (*citing Affiliated Ute,* 406 U.S. at 152-53, 92 S.Ct. at 1471-72); *Enron I,* 235 F. Supp. 2d at 577.  *See also SEC v. Zandford*, 535 U.S. 813, 820, 122 S. Ct. 1899, 1903 (2002) ("[N]either the SEC nor this Court has ever held that there must be a misrepresentation about the value of a particular security in order to run afoul of the Act")).  "[T]he better reading of § 10(b) and Rule 10b-5 is that they impose primary liability on any person who substantially participates in a manipulative or deceptive scheme by directly or indirectly employing a manipulative or deceptive device (like the creation or financing of a sham entity) intended to mislead investors, even if a material misstatement by another person creates the nexus between the scheme and the securities market."  *In re Lernout & Hauspie*, 236 F. Supp. 2d at 173.

Thus, in order for a defendant to be held liable under Rule 10b-5, "a plaintiff must allege that that defendant made a false or misleading statement or omission … *or* that s/he 'participated in [a] fraudulent scheme or other activity proscribed by the securities laws.'" *Global Crossing,* 322 F. Supp. 2d at 330 (emphasis added) (*quoting SEC v. U.S. Envt'l, Inc.*, 155 F.3d 107, 111 (2d Cir. 1998)) (citations omitted); *see also In re Salomon Analyst AT&T Litig.,* No. 02 Civ. 6801, 2004 WL 2757398, at *15 (S.D.N.Y. Dec. 2, 2004) ("Defendants are incorrect that *Central Bank* means that section 10(b) suits cannot be maintained against anyone other than those who personally speak, write or disseminate false or misleading statements").

Indeed, more than 30 years ago the Supreme Court explicitly rejected Defendants' argument that liability under Rule 10b-5(a) and (c) must be predicated on the defendant having made a misleading statement. *See Affiliated Ute,* 406 U.S. at 152-53, 92 S. Ct. at 1471-72 ("the Court of Appeals erred when it held that there was no violation of the Rule unless the record disclosed evidence of reliance on material fact misrepresentations by [the bank employees].  We do not read Rule 10b-5 so restrictively.  *To be sure, the second subparagraph of the rule specifies the making of an untrue statement of a material fact and the omission to state a material fact.  The first and third subparagraphs are not so restricted.*") (citations omitted) (emphasis added).  Incredibly, while *Affiliated Ute* is the controlling case, neither Bank of America nor Citigroup mention it in their briefs.[17]  The Supreme Court's recent opinion in *Zandford*, well after *Central Bank*, confirms that this is still the law.  *See Zandford*, 535 U.S. at

---

[17] Defendants argue that they did not make public statements regarding their schemes.  This defense fails for the reasons set forth herein.  Nonetheless, even if that were the requirement, in essence, *every* claim under Rule 10b-5(a) and (c) involves some type of misrepresentation or omission, even if it does not fall under Rule 10b-5(b).  A scheme will not work unless it is kept secret.  "Common to claims of deceptive statements about the financial condition of an issuing corporation and to claims based on market manipulation through deceptive trading activity is the introduction of inaccurate information in to the marketplace."  *Enron I,* 235 F. Supp. 2d at 580 n.17 (*citing GFL Advantage Fund. Ltd. v. Colkitt,* 272 F.3d 189, 205 (3d Cir. 2001)).  Each of the schemes for which Defendants are

*(cont'd)*

820, 122 S. Ct. at 1903; *see also Enron I*, 235 F. Supp. 2d at 578, 581-84 (discussing *Zandford* and *Central Bank*). [18]

### 3.   Central Bank Does Not Absolve Defendants from Their Primary Participation in the Fraudulent Scheme

While Defendants seek to hide behind the Supreme Court's decision in *Central Bank* by recharacterizing the claims against them as aiding and abetting claims, that case has no applicability here because the conduct alleged goes far beyond the limitations imposed by *Central Bank*. Defendants are alleged to be primary violators of Rule 10b-5(a) and (c), not aiders and abettors.

Numerous courts, including the Supreme Court, have found that *Central Bank* does not eliminate liability under Rule 10b-5(a) or (c). Indeed, *Central Bank* itself makes this clear. As set forth in *Global Crossing*:

> [T]he Supreme Court's ruling in Central Bank does not amount to a categorical prohibition on claims against secondary actors such as accountants. To the contrary, the Court explicitly emphasized that secondary actors such as accountants and lawyers may still be held liable where they commit a primary violation of securities laws:
>
> > Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b-5, assuming all of the requirements for primary liability under Rule 10b-5 are met.... In any complex securities fraud ... there are likely to be multiple violators.

---

primarily liable was so significant that Defendants had a duty to disclose those schemes to the investing public.

[18] Bank of America's reliance on *Chiarella v. United States*, 445 U.S. 222, 100 S. Ct. 1108 (1980) (*see* BOA Br. at 22), is misplaced. Nothing in that case even remotely suggests that the Supreme Court there intended to overrule *Affiliated Ute* or to restrict Rule 10b-5(a) and (c) to cases of stock market manipulation. *Chiarella* dealt only with insider trading and held that a person trading on material nonpublic information is not liable under Rule 10b-5 absent a duty of disclosure. Defendants here are not charged with mere possession and nondisclosure of material nonpublic information but rather with engaging in a fraudulent scheme to inflate Parmalat's financial statements through sham transactions and fictitious documents and accounts. *Chiarella* is simply inapposite.

*Global Crossing,* 322 F. Supp. 2d at 330 (*quoting Central Bank*, 511 U.S. at 191, 114 S. Ct. at 1455); *Enron I*, 235 F. Supp. 2d at 582 (same); *see also U.S. Env't'l*, 155 F.3d at 112.

*Central Bank* precluded private actions seeking to recover damages from third parties whose actions merely provided assistance to parties perpetrating a fraud.[19]  There, the Supreme Court determined that the defendant bank could not be held liable because it was alleged only to have aided and abetted, and the statute did not provide for such liability.  In reaching its ultimate conclusion that Section 10(b) of the 1934 Act does not extend to aiders and abettors, the Court repeated its earlier holdings in *Santa Fe* and *Ernst & Ernst v. Hochfelder* that the statute prohibits the making of a material misstatement (or omission) *or* the commission of a manipulative or deceptive act.  *Id.* at 177, 114 S. Ct. at 1448.[20]  Moreover, the Court expressly acknowledged that the statute's explicit language extends to those who both "directly and indirectly" engage in such proscribed activities.  *Id.* at 176, 114 S. Ct. at 1447-48.  Indeed, this language is key to the Court's holding.

Although Defendants ignore the distinction, *Central Bank* explains that there is a meaningful difference between aiding and abetting on one hand, and an "indirect" violation of Section 10(b) on the other.  "[A]iding and abetting liability extends beyond persons who engage, even indirectly, in a proscribed activity; aiding and abetting liability reaches persons who *do not engage in the proscribed activities at all*, but who give a degree of aid to those who do."  *Id.* at

---

[19] In *Central Bank*, the defendant bank was accused of not timely conducting an independent review of a previous appraisal of property which secured certain bonds at issue.  Prior to the review being conducted, the public building authority defaulted on the bonds that it had issued.  The bank was alleged to be "secondarily liable under § 10(b) for its conduct in aiding and abetting the fraud."  511 U.S. at 168, 114 S. Ct. at 1443.  There were no allegations that the bank itself committed a primary violation of the 1934 Act.

[20] Bank of America appears to agree with this point, although its brief attacks the SEC's exercise of its rulemaking power in adopting Rule 10b-5.  *See* BOA Br. at 21.

176, 114 S. Ct. at 1447 (emphasis added).[21]  Here, the Complaint specifically alleges that the Defendants directly or indirectly participated in a proscribed activity (*i.e.*, "employ[ing] any device, scheme or artifice to defraud" or "engag[ing] in any act, practice, or course of conduct which operates or would operate as a fraud or deceit upon any person"), as opposed to merely providing aid to other violators without engaging in the proscribed conduct.

Defendants' arguments that Parmalat itself directed the fraud, and that their participation was merely secondary, ring hollow.  It is not necessary that the violator "designed and carried out" the fraud, nor that they were the "primary architects" of the scheme.  *See Homestore* Amicus Brief.  Indeed, the Second Circuit has found it "of no relevance" that another individual "masterminded" a scheme at issue.  *U.S. Envt'l*, 155 F.3d at 112.  "The Supreme Court in *Central Bank* never intended to restrict § 10(b) liability to supervisors or directors of securities fraud schemes while excluding from liability subordinates who also violated the securities law." *Id.*; *see also Enron I*, 235 F. Supp. 2d at 592.[22]

Here, the Bank and Auditor Defendants went well beyond merely providing services that were used by others to commit the fraud.  They were primary participants in the fraud that was committed and each engaged, directly or indirectly, in acts or transactions that themselves "acted as a fraud or deceit;" their actions were not merely another's tool by which fraud was committed.

---

[21] Thus, the proper rule in determining whether a party is a violator of Rule 10b-5(a) and (c) is set forth by the SEC in its *Simpson v. Homestore.com, Inc.*, Brief of the Securities and Exchange Commission, *Amicus Curiae,* In Support of Positions That Favor Appellant, No. 04-55665 (9th Cir. Oct. 2004) ("*Homestore* Amicus Brief") at 16:

> Any person who directly or indirectly engages in a manipulative or deceptive act as part of a scheme to defraud can be a primary violator of Section 10(b) and Rule 10b-5(a); any person who provides assistance to other participants in a scheme but does not himself engage in a manipulative or deceptive act can only be an aider and abettor.

A copy of the *Homestore* Amicus Brief is attached as Ex. A to the Declaration of Lydia Ferrarese, dated February 17, 2005, filed contemporaneously herewith ("Ferrarese Decl.").

[22] Although liability does not depend on the defendant being the "mastermind" of the conduct, several of the Defendants would nonetheless satisfy this non-existent standard.

As set forth below, the frauds committed by each of the Defendants rise to the level of a primary violation of the securities laws which are actionable by Plaintiffs here.

### B.   Defendant Citigroup's Primary Violation of Rule 10b-5(a) and (c)

Citigroup's attack on the claims asserted against it is premised on a fundamental mischaracterization of the allegations of the Complaint.  According to Citigroup, the Complaint merely alleges that Citigroup was a party to "legitimate business transactions" that Parmalat later "misrepresented in its financial statements" (Citigroup Br. at 1) or "accounted for inaccurately." *Id*. at 8; s*ee also id.* at 11, 14.  Nothing could be further from the truth.

The Complaint alleges that Citigroup was a direct participant in transactions and fraudulent schemes whose purpose was to create fictitious assets and equity for Parmalat while masking its extraordinary level of debt.  Thus, for example, the Complaint alleges that Citigroup created Vialattea and Buconero "for the sole purpose of entering into" fraudulent transactions "improperly boosting Parmalat's assets."  ¶ 260.  Citigroup not only designed and executed the fraudulent Buconero scheme, but it also engaged as a primary party in double-billing and securitization schemes, and fraudulent transactions with Parmalat Canada.  Citigroup perpetrated each of these schemes knowing, or was extremely reckless in not knowing that they were fraudulent and had no lawful purpose other than to mislead Parmalat investors.

### 1.   The Black Hole

Citigroup took significant illicit actions toward infusing Parmalat with cash while hiding its growing debt.  Citibank created two SPEs, Buconero and Vialattea, to make investments in Geslat, a Parmalat subsidiary.  ¶¶ 255-56, 260.  These "investments" were actually loans which Citibank extended at rates far below what Parmalat could have gotten from other lenders, but were recorded as equity on Parmalat's balance sheet.  ¶¶ 260-65.  In total, the Complaint alleges

that Buconero and Vialattea invested $137 million in Parmalat entities, which understated Parmalat's debt and overstated its equity by that same amount.  ¶ 169.

The Complaint pleads with particularity that, because of its close relationship with Parmalat, Citigroup, when it created Buconero, knew of Buconero's intended use to disguise debt.  ¶¶ 792-95.[23]  In fact, Citigroup loaned money to Parmalat at below market rates because it designed these transactions with safeguards in place to ensure that it could not lose money from Buconero's "joint venture."  ¶¶ 795-96.  Citigroup would not and could not have structured transactions in this manner unless it was aware of the intention to mislead Parmalat investors and buoy Parmalat's distressed finances.  ¶ 798.  As a reward for its role, Citigroup earned $5 to $6 million annually from Geslat, plus an additional $7 million in fees.  *Id.*

Almost identical conduct was deemed sufficient to establish primary liability in *Enron*. In that case, CSFB – also a defendant here – was alleged to have designed, structured, and funded SPEs that were, as here, primarily used to falsify Enron's financial condition and misrepresent profits.  *See Enron I*, 235 F. Supp. 2d at 699.  The court in *Enron I*, in upholding claims under Rule 10b-5 (a) and (c), specifically stated that CSFB's use of such entities to "create sham profits and conceal massive debt for Enron" constituted "a scheme to defraud investors [that] raises a strong inference of scienter."  *Id.*[24]  The claims are even stronger in this case, as Citigroup provided an after-the-fact *mea culpa* when it publicly acknowledged that the

---

[23]  Although Citigroup ignores its relationship to Buconero, the Complaint states a claim against Buconero as a primary perpetrator of the fraud.  Citigroup does not offer a separate defense for Buconero, nor does it contest that it is a control person for Buconero.

[24]  Citigroup flatly misrepresents the holding of *In re Kendall Square Research Corp. Sec. Litig.*, 868 F. Supp. 26, 28 (D. Mass. 1994), claiming that that court found "structuring" a transaction does not result in "liability under Rule 10b-5."  Citigroup Br. at 12.  In fact, *Kendall Square* makes crystal clear that the defendant at issue therein was charged only with making a material misstatement under Rule 10b-5(b) and not with commission of a manipulative act, and the court dismissed the claim under the "narrow issue" as to whether the defendant made a material misstatement.  *Kendall Sq.*, 868 F. Supp. at 28.

Buconero investments were in fact debt rather than equity.  ¶ 800.  Citigroup stated, "today we would only do this type of transaction if a client agreed to provide greater disclosure."  *Id*.  Of course, the statement is also self-serving, a blatant attempt to make Citigroup's malfeasance appear to be a simple "client" problem.  Plainly, however, Citigroup was just as involved as its client – if not more so.

This is precisely the type of egregious conduct the SEC deems to be a primary violation of Rule 10b-5.  In a hypothetical example directly on point, the SEC stated in its *Homestore* Amicus Brief that:

> if an investment bank provides services to arrange financing for a client, knowing the client will use the proceeds to commit securities fraud, then it is at most an aider and abettor.  *If, however, the investment bank engages in the creation of a sham entity as part of the services to arrange the financing, the investment bank may be a primary violator if it acted with scienter.  The investment bank itself engaged in a deceptive act.*

*Id.* at 20 (emphasis added).  As the Complaint makes clear, creating a sham entity is precisely what occurred here and there can be little doubt that it was done with scienter.[25]

### 2.   The Double-Billing and Securitization Scheme

The Complaint also specifically alleges that Citibank structured a securitization program

---

[25]  Citigroup's reliance on *Dynegy* to contest scienter is misplaced.  In that action, there were no allegations that Citigroup itself engaged in any manipulative conduct.  The *Dynegy* court found:

> Plaintiffs' allegations regarding Citigroup's participation in the structuring of Black Thunder and Project Alpha *do not identify Citigroup's actions as manipulative*; plaintiffs' claims are that Dynegy improperly reported Black Thunder and Project Alpha on its financial statements and that Citigroup helped Dynegy do so by structuring, funding, and executing Black Thunder and Project Alpha.

*In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d 804, 916 (S.D.Tex. 2004).  In contrast to *Dynegy*, here Citigroup is alleged to have created the fraudulent shell company named "Black Hole."  That act itself is alleged to be a fraudulent and manipulative act.  Although Citigroup assisted Parmalat in other aspects of the overall fraud, Citigroup's actions itself constituted a fraud.  That Citigroup dismisses the allegations against it here as "routine business activity" is disturbing.  Citigroup Br. at 15.  Its narrow escape of civil liability in *Dynegy*, and its $120 million settlement with the SEC regarding its involvement in the Dynegy and Enron scandals, raise substantial questions as to what Citigroup means by "routine business activity."  Not to mention its recent $2.65 billion settlement of allegations in connection with WorldCom.

to sell Parmalat's false invoices to a wholly-owned subsidiary of a Citibank, an SPE known as Eureka, in order to book non-existent sales and record bogus receivables on Parmalat's balance sheet.  ¶¶ 273-75.  The Complaint alleges that, as early as 1995, Citibank met with Parmalat employees to discuss Parmalat's billing system (¶¶ 804-05) and thereafter structured and actively managed the scheme through its proprietary software called Enigma, which allowed Citibank to assess which receivables were eligible for securitization so as to successfully perpetuate the fraud.  ¶ 278.

Citigroup's contention that it did not know the securitization program was being abused is simply untenable.  *See* Citigroup Br. at 6.  Citigroup undertook extensive due diligence efforts to acquaint itself with Parmalat's invoicing system and in doing so knew or was reckless in not knowing that it was selling duplicate invoices as if they were legitimate bills for separate goods. ¶¶ 806-18.  Likewise, Citigroup had access to the data of Bank of Italy's "Centrale Rischi" which collects information on bank debts and which showed Parmalat's receivables financing exceeding Parmalat's gross income.  ¶¶ 797.  *Cf. Enron I*, 235 F. Supp. 2d at 698-99 (Citigroup's access to information about Enron entities' financial operations and transactions contributed to finding of scienter).

Citigroup knew that this double-billing and subsequent securitization scheme created a false impression regarding Parmalat's cash position, which buoyed the marketability of Parmalat securities, allowed Citigroup to sell roughly $348 million of Parmalat securities, based in substantial part on phony receivables, and earned Citigroup approximately $35 million in fees. ¶¶ 293, 802, 808, 818.  These transactions were themselves a fraudulent scheme, having no purpose other than to distort Parmalat's financial results.  *Cf. Enron I*, 235 F. Supp. 2d at 698-99.

### 3.   The Fraudulent Classification of Debt as Equity

Citibank also structured $120 million in loans to Parmalat to appear as capital contributions for three Canadian entities, while Citibank and Parmalat executed a "put agreement" which required Parmalat to repurchase the so-called equity at a price equal to the investment plus a handsome "spread."  ¶¶ 369-72.  In other words, Citibank's initial $70 million "investment" guaranteed that Citibank would realize approximately Cdn. $50 million in profit without any risk of loss.  ¶¶ 371, 383.  Plaintiffs not only allege precisely how these arrangements permitted Parmalat to falsely record loans as equity, and thus overstate its assets and understate its debt, but also how the secret put agreements protected Citibank's investment and allowed it to reap these enormous risk-free profits.  ¶¶ 377-85.  The only reasonable inference is that Citibank knowingly structured these transactions to mislead Parmalat's investors into believing Citibank had invested in Parmalat, rather than that Parmalat had incurred another substantial debt.  In fact, Citibank publicly described itself as Parmalat's financial partner.  ¶ 374.

This concealment of debt and the Buconero and securitization frauds are the same types of fraudulent activity that Citigroup and other banks were alleged to have committed in connection with the Enron debacle.  Where transactions are deliberately structured so as to permit their true nature to be thoroughly misrepresented or concealed, a strong inference of scienter is raised under Section 10(b).  *See Enron I*, 235 F. Supp. 2d at 697-99.  Indeed, defendant Tanzi has confirmed Citigroup's knowledge of Parmalat's financial crisis and Citigroup's specific intention to falsely depict Parmalat's true condition.  ¶ 822.

Plaintiffs also have alleged that Citibank was motivated to commit fraud by its desire to continue to reap large fees and to keep Parmalat afloat long enough to recoup the monies it had

advanced to Parmalat.  ¶¶ 784-85, 818.  Citigroup denies such motives, arguing that while the Complaint alleges the fees were "abnormal" (¶ 823), they were "nothing unusual."  Citigroup Br. at 16 n.10.  The Court cannot resolve this factual dispute on a motion to dismiss.  *See*, *e.g.*, *NTL*, 347 F. Supp. 2d at 21 (allegations of complaint must be treated as true).

Citigroup also argues that its desire to keep Parmalat afloat to ensure repayment of previous loans is not a motive to commit fraud.  Citigroup Br. at 16-17.  Citigroup cites *Ganino v. Citizens Utilities Co.*, 228 F.3d 154 (2d Cir. 2000), as support for this proposition, but that case simply does not stand for this proposition.  *Ganino* did not in any way address whether the desire to keep a company afloat to ensure repayment of loans constitutes a sufficient allegation of motive.  Contrary to Citigroup's unsupported argument, where a complaint alleges that the defendant instigated the fraudulent scheme in the hope that he might thereby "recover the amounts already loaned to" the corporation, motive is sufficiently alleged.  *Suppa v. Montano*, No. 87-0636-CV-W-3, 1989 WL 69883, at *2 (W.D. Mo. Feb. 28, 1989).

Thus, Plaintiffs have adequately pled that Citigroup violated Rule 10b-5(a) and (c), as it (1) committed manipulative or deceptive acts, (2) in furtherance of the alleged scheme to defraud, (3) it did so with scienter, and (4) Plaintiffs were damaged by reliance on Citigroup's fraud.[26]  *Global Crossing*, 322 F. Supp. 2d at 335.

### C.    Defendant Bank of America's Primary Violation of Rule 10b-5(a) and (c)

Like Citigroup, Bank of America[27] designed and implemented fraudulent schemes that were critical to the false portrayal of Parmalat's finances – schemes that were carried out for the

---

[26] Reliance is discussed *infra* at 108.

[27] BASL incorporates by reference the arguments made by BAC and BANA with respect to Plaintiffs' claim under Rule 10b-5(a) and (c).  BASL Br. at 9.  For the reasons set forth herein, the Complaint sets forth sufficient facts to support a claim against BASL as well.

express purpose of deceiving Parmalat investors.

### 1.   Bank of America's Active Participation in the Fraud

#### a.   The Sham Brazil Investment

Bank of America played a primary role in camouflaging the substantial losses suffered by Parmalat's Brazilian affiliate, Parmalat Administracao, and artificially inflating its value by more than $1 billion. ¶¶ 395-405.  Specifically, Bank of America devised a transaction using two SPEs located in the Cayman Islands – Dairy Holdings Ltd. and Food Holdings Ltd. – to sell private placement notes to institutional investors by leading them to believe that they were investing in an entity that would soon be listed on the Brazilian stock exchange.  ¶ 397.  In fact, at the time, Bank of America knew – and internally acknowledged – that the entity would never go public.  ¶ 398.

Because the two SPEs had no operations – and therefore no means to pay off the private placement notes that Bank of America sold through them – Parmalat guaranteed the notes and further secured them with a put agreement that obligated Parmalat Capital Finance to buy back the 18.18% interest in the Brazilian entity – just like Citigroup's fraudulent transactions with Parmalat Canada.  *Id.*  The transaction duped the investing public into believing that an arm's-length purchaser would pay – and did pay – $300 million for an 18.18% interest in Parmalat's Brazilian operations, when its true value was substantially lower.  ¶ 399.

Not only did Bank of America orchestrate the phony sale, but its agent, Luca Sala, on its behalf, co-wrote a press release with Parmalat, dated December 18, 1999, that announced the transaction and deliberately misrepresented the terms so as not to reveal Parmalat's obligation to repurchase the 18.18% interest at a significant premium.  ¶ 400.  These statements, which violate Rule 10b-5(b) as well, are described more fully below.  *See infra* at 86.

Moreover, Plaintiffs' allegations more than adequately plead scienter, as Bank of America personnel – who managed the "sale" and helped draft the public announcement of the deal – plainly had knowledge that the transaction and their characterization of it was false and misleading. *See* ¶ 849. Most tellingly, Bank of America emblazoned its secret agreements alleviating its risk on the deal with "**Do Not Show to Noteholders.**" A clearer indication of its intent to mislead the market is hard to imagine. ¶ 850.

Simply put, this financing arrangement would not have been designed the way it was without Bank of America's specific intent to deceive investors. Courts have held even legitimate transactions in certain circumstances can "raise an inference that [a bank defendant] knew how precarious the financial condition of [the company] was …." *Enron I*, 235 F. Supp. 2d at 698. That this transaction was so blatantly structured to mislead investors raises an even stronger inference of scienter.

**b.      The Sale of Worthless Debt**

As Parmalat's financial condition deteriorated, Bank of America continued to devise ways in which Parmalat could maintain good credit ratings so that its debt issuances could occur at lower costs. ¶ 838. Indeed, during the Class Period, BAC, BANA and its subsidiaries, Banc of America Securities LLC and BASL, served as underwriters or placement agents for more than $1 billion of what were in reality worthless debt securities both in the U.S. and abroad. ¶¶ 839-40. Although Bank of America knew that Parmalat was in dire financial straits, Bank of America continued to market private placements to U.S. investors as if Parmalat was a good credit risk. ¶ 853.

Testimony by Defendants Tonna and Gianfranco Bocchi confirms that Bank of America knew that Parmalat was in danger of defaulting on various debt covenants but that, despite such

knowledge, it repeatedly and directly caused and permitted information to be disseminated that materially misrepresented not only Parmalat's true financial condition, but also the nature of the deals in which Bank of America and Parmalat were engaging.  ¶¶ 853-54.

For example, on or about September 28, 1998, Bank of America, through an SPE called USPP Trust II, raised $80 million through a private placement of notes that were sold to U.S. insurance companies and guaranteed by Parmalat.  The funds from the placement were distributed to a Parmalat subsidiary called Eurofood IFSC Limited, which used the proceeds to make an $81.6 million deposit in a Bank of America account in London as a condition of Bank of America's $80 million loan to Parmalat subsidiaries in Venezuela.  ¶ 846.  Bank of America never disclosed to the investors that the private placement was related to Parmalat's Venezuela operations.  *Id*.  Moreover, Bank of America applied this model to at least two other loans to Parmalat subsidiaries – Parmalat Brazil and Parmalat Capital Finance – continuing its deceptive and manipulate conduct throughout the Class Period.  ¶ 847.

In *Enron*, Bank of America avoided Rule 10b-5 liability because its only specifically alleged involvement in the Enron fraud was an investment of $45 million in one of Enron's SPEs.  *Enron I*, 235 F. Supp. 2d at 704.  However, the type of conduct Bank of America engaged in here is much more akin to the conduct of JP Morgan, Citigroup or CSFB that was found to be actionable in *Enron I*, where the banks engaged in multiple fraudulent transactions and sham loans.  *Id.* at 697-99.  For the reasons set forth above with respect to Citigroup, Bank of America's actions to deceive investors here constitute participation in a fraudulent scheme, just as the actions of Bank of America's indicted personnel go far beyond those of secondary actors.

Bank of America's various relationships with Parmalat were conducted through Bank of America executives which BAC controlled, including:  Sala, who was responsible for the

Parmalat account on behalf of Bank of America's corporate Finance and Relationship Management team; Antonio Luzi, who worked directly under Sala's supervision and was a member of the Corporate Finance and Relationship Management team; and Luis Moncada, who was responsible for the credit portfolio of Bank of America's Italian branch.  ¶ 835.  All were indicted for their actions in connection with the Parmalat fraud.  ¶ 836.  A Milan court has ordered Sala and Moncada to stand trial for fraudulent accounting and financial reporting and market-rigging.  ¶¶ 183, 836.

As defendant Tonna testified on January 20, 2004, Bank of America made itself "willing and able" to engage in the deceptive schemes with Parmalat because "fat commissions were at stake as well as yearly budget targets and career opportunities for Bank of America's managers." ¶ 854.  The relationship between Bank of America and Parmalat was so close that Sala ultimately left Bank of America in 2003 to become a well-compensated consultant to Parmalat. ¶ 836.  According to Sala, Parmalat was one of Bank of America's most lucrative European accounts.  ¶ 837.  Indeed, the relationship was so valuable to Bank of America that its CEO, Kenneth Lewis, and the head of its European operations, Shahzan Shabaz, traveled to Italy to personally solicit additional business from Parmalat in the summer of 2003.  *Id.*

These facts create an extremely strong inference that Bank of America knew or was reckless in not knowing that its conduct was manipulative and deceptive and in furtherance of a fraudulent scheme.  Not surprisingly, Bank of America *never once mentions Moncada, Luzi or Sala in its brief*, despite their active role in the fraud they perpetrated as Bank of America's agents.  Bank of America is liable for its employees' actions just as if the Company had committed those actions itself, as "[a]rtificial entities such as corporations may act only through their agents."  *In re Three Grand Jury Subpoenas Duces Tecum Dated January 29, 1999,* 191

F.3d 173, 178 (2d Cir. 1999) (*quoting Braswell v. United States*, 487 U.S. 99, 110, 108 S. Ct.

2284, 2291 (1988)); *see also Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d

87, 101 (2d Cir. 2001) ("A corporation can only act through its employees and agents.").  As

discussed *infra* at 78, agency liability applies to Rule 10b-5 claims.

### 2.      Plaintiffs' Claims Against Bank of America Comply with Rule 9(b)

Bank of America also contends that Plaintiffs' allegations do not satisfy Rule 9(b)

because they fail to adequately describe which specific Bank of America Defendants are

responsible for the conduct.  BOA Br. at 11-12.  Citing case law that merely recites the general

Rule 9(b) standard with no factual applicability, Bank of America conveniently ignores not only

the allegations regarding the relationship between its affiliates, but also recognized legal

principles.

Most tellingly, Bank of America fails to address or even refer to the *9 pages* of the

Complaint detailing very specifically what Bank of America did.  *See* ¶¶ 834-55; *see also* ¶¶

394-405 (additional specific allegations of Bank of America scheme involving Parmalat's

Brazilian operations).  These allegations make it clear that Bank of America and its composite

entities actively participated in the same scheme regardless of the individual actor for each

transaction.  Therefore, the true responsibilities and precise roles each defendant played in the

conduct alleged throughout the Complaint need not be particularized.  *See Waltree Ltd. v. ING*

*Furman Selz LLC*, 97 F. Supp. 2d 464, 466-67 (S.D.N.Y. 2000).

Plaintiffs have pled with particularity that Bank of America, especially through its

employees, Sala, Luzi and Moncada, has (1) committed manipulative or deceptive acts (2) in

furtherance of the alleged scheme to defraud, (3) with scienter that (4) the market relied upon in

valuing Parmalat's securities. *Global Crossing,* 322 F. Supp. 2d at 335.  As such, Bank of

America is a primary violator of Rule 10b-5(a) and (c).

### D.   Defendant CSFB's Primary Violation of Rule 10b-5(a) and (c)

Plaintiffs' allegations firmly establish that, like Bank of America, CSFB had inside knowledge of Parmalat's distressed financial condition, and deliberately or extremely recklessly participated in fraudulent schemes for its own enrichment. CSFB served as an underwriter – indeed, a manager – for several Parmalat bond offerings, including offerings in March 1998, March 1999, December 2001, and February 2002. ¶¶ 447, 452, 603, 611. Through the course of its due diligence and its obligations as managing underwriter, CSFB had access to and reviewed non-public financial information revealing the true state of affairs at Parmalat. ¶ 860. *Cf. Enron I*, 235 F. Supp. 2d at 698 (access to information about an entity's financial operations and transactions contributes to a finding of scienter on the part of an investment bank that structured and took part in illicit dealings).

CSFB's insider status also enabled it to structure certain transactions – including the issuance of bonds through Parmalat Brasile and a related Forward Sale Agreement – in a way that eliminated risk to itself while ensuring that excessive debt would not be reflected on Parmalat's consolidated financial statements. Specifically, CSFB purchased all €500 million of the initial Parmalat Brasile offering, but transferred €248 million of the risk back to Parmalat through a Forward Sale Agreement, and then transferred the remaining risk to the market through the sale of the bonds without conversion rights. ¶ 862. As a result of this scheme, €248 million in debt was omitted from Parmalat's balance sheet, €248 million in assets were manufactured, and CSFB gained lucrative underwriting business. ¶¶ 861, 863. *See also* ¶¶ 406-18. Further, CSFB sold most of its equity exposure to Parmalat in early 2003 so that its financial exposure was eliminated long before the Company's demise. ¶ 418.

Such a deceptive transaction could not have come about by accident.  In *Enron*, the court was faced with a strikingly similar situation.  Financial institutions such as CSFB, Citigroup, and CIBC made sham loans to Enron through secret swap agreements that guaranteed that Enron would cover any losses and thus shielded the banks from any risk.  *See Enron I*, 235 F. Supp. 2d at 698-701.  The court found such allegations inferred scienter and stated claims under Rule 10b-5(a) and (c) against each of these investment banks.  *Id.*

CSFB's futile argument that it must have had "some part in planning or directing" the fraud in order to be liable under Rule 10b-5(a) and (c), CSFB Br. at 8-9, misstates the law.  *See U.S. Env't'l*, 155 F.3d at 112 (defendant "is a primary violator despite the fact that someone else directed the market manipulation scheme");[28] *Homestore* Amicus Brief at 11.  Like Citigroup and Bank of America, CSFB engaged in sham transactions with Parmalat for the sole purpose of deceiving investors about Parmalat's financial condition.  As noted above, primary participation in such schemes confers liability under Rule 10b-5(a) and (c).  Again, all of the criteria for liability have been established.  *See Global Crossing*, 322 F. Supp. 2d at 335.

### E.   Defendant BNL's Primary Violation of Rule 10b-5(a) and (c)

Unlike CSFB, BNL acknowledges that one need not have "orchestrated" the scheme, but rather that personally executing trades that harmed investors is sufficient for liability to attach.  BNL Br. at 12 (*citing U.S. Env't'l*, 155 F.3d at 107).  That is essentially what BNL did here when, acting through Ifitalia, it engaged in fraudulent factoring transactions that were designed to, and in fact did, artificially burnish Parmalat's finances.

---

[28]   Additionally, CSFB's argument that liability under the Racketeer Influenced and Corrupt Organizations Act is limited to individuals involved in the "operation or management" of a corrupt enterprise (CSFB Br. at 10) (*quoting Reves v. Ernst & Young,* 507 U.S. 170, 184, 113 S.Ct. 1163, 1172 (1993)), is irrelevant, given the substantial differences between the language of Rule 10b-5 and the language of 18 U.S.C. § 1962(c).

The Complaint specifically alleges that BNL willingly participated in recycling old invoices in factoring arrangements for Parmalat.  ¶¶ 295-309.  Parmalat employed a rather crude system for altering the invoices to make them acceptable to BNL's processing software. Specifically, when payment on a set of invoices came due, Contal, a Parmalat subsidiary, provided BNL with a new list of stale invoices to perpetuate the scheme.  ¶ 303.  However, the new list was exactly the same as the prior list with the exception that – at BNL's instruction – Parmalat changed a single digit on each invoice's number.  This prevented BNL's processing system from flagging duplicates.  *Id.*

Another indication of BNL's scienter is the fact that the invoices were always paid by Contal and not by the assigned debtors.  ¶ 305.  As a sophisticated financial institution with an extensive factoring business, BNL, through Ifitalia, should have detected this irregularity. Likewise, the phony invoices were always issued to the same entities for the same amounts.  *Id.*

As if these inferences were not enough, the testimony of Ifitalia's actual knowledge is crystal clear.  Claudio Pessina, a Parmalat internal accountant specifically stated that "Ifitalia knew that the invoices were old and only served to justify the financing."  ¶ 306.  Pessina further stated that "to evade the safeguards in his [computer software] system, [Ifitalia employee] Lastrico asked me to change at least one numeral on each invoice on the list."  *Id.*  Indeed, Plaintiffs provide extensive testimony by Pessina concerning his dealings with BNL and Ifitalia establishing those entities' purposeful participation in the bogus factoring arrangements.  ¶ 307. Finally, the fact that BNL had extremely close ties to Parmalat, including at least two directors in common – Paolo Sciumé and Enrico Barachini (¶ 302) further demonstrates that BNL engaged in the scheme with the specific intent of deceiving investors for its own enrichment.

As a result of this scheme, Parmalat's receivables and assets were overstated, and its debt

understated by at least €103 million during each year of the Class Period.  ¶ 309.[29]  At the same time, BNL reaped enormous returns on its factoring business, and was further rewarded for its participation with underwriting responsibilities for two Parmalat offerings during the Class Period.  ¶ 308.  These facts amply demonstrate that BNL, through its factoring arm Ifitalia, took deceptive and manipulative acts in furtherance of a fraudulent scheme, and that it did so with scienter.  Again, the pleading standards for Rule 10b-5(a) and (c) are more than satisfied.  *See Global Crossing*, 322 F. Supp. 2d at 335.[30]

### F.    The Auditor Defendants' Primary Violation of Rule 10b-5(a) and (c)

Desperate to maintain the fiction that they have little connection to their affiliates – notwithstanding their public pronouncements to the contrary – the Auditor Defendants respond to the Complaint in five separate briefs, written by four different law firms, comprising 137 pages, all making basically the same arguments.  The thrust of the Auditor Defendants' briefs is not that their Italian member firms did not engage in fraud, but rather that their international and U.S. firms cannot be held responsible.  *See, e.g.*, GT-US Br. at 14-22; GTI Br. at 9-16; DTT Br. at 16-30; Deloitte USA Br. at 20-27.  Indeed, not one of the five briefs submitted by the Auditor Defendants denies that the Complaint sufficiently alleges that GT-Italy and DT-Italy engaged in fraudulent and deceptive conduct.

The evidence of participation in a fraudulent and deceptive scheme by GT-Italy and DT-Italy is overwhelming.  However, the evidence does not stop there.  As set forth in the Complaint

---

[29] This illustrates why there is no merit to BNL's argument that its fraudulent factoring scheme was not "in connection with" or did not "touch" the purchase or sale of securities.  BNL Br. at 14-15 n.12.  This fraudulent scheme directly impacted the Parmalat financial statements (¶ 309) which were used to market Parmalat securities purchased by the Class.  The Complaint clearly alleges that BNL's fraud "touched" the sale of Parmalat securities.

[30] BNL relies on *Homestore.com* for its position that its actions as a commercial counterpart are insufficient under *Central Bank*.  BNL Br. at 12-13.  However, as noted *supra* at 42, that court's narrow view of Rule 10b-5 has been

*(cont'd)*

and below, the Auditor Defendants, through principles of alter ego, agency, and control person liability, are liable for the actions of their undeniably culpable member firms.

> ### 1. The Members of the Grant Thornton and Deloitte Organizations in Italy Engaged in a Fraudulent Scheme
>
> #### a. Actual Knowledge of and Participation in the Fraud

Far from making conclusory allegations that the auditors were aware of the fraud, the Complaint, relying on testimony, documents, prior investigations and other sources, provides detailed allegations as to how the auditors learned of, and indeed were direct participants in, the fraud. It is difficult to imagine that, prior to discovery, any Rule 10b-5 pleading could provide more particularized allegations of auditors' involvement in fraud and scienter than the Complaint does here.

Allegations that the auditors had actual knowledge of the fraud and participated in structuring the fraudulent transactions clearly are sufficient to plead scienter. *See, e.g.*, *Global Crossing,* 322 F. Supp. 2d at 346-47 (scienter adequately alleged where the complaint contained "allegations that [the auditor] was well aware that the Companies' books were misleading, and that it played an active role in creating the schemes used to inflate the Companies' revenue"); *Enron I*, 235 F. Supp. 2d at 706 ("Andersen's comprehensive accounting, auditing, and consulting services to Enron necessarily made it intimately privy to the smallest details of Enron's alleged fraudulent activity"); *In re MicroStrategy Inc. Sec. Litig.,* 115 F. Supp. 2d 620, 653 (E.D. Va. 2000) ("the greater [the auditor's] access to and involvement with [the corporation's] operations, the more support an inference of scienter takes on").

> #### i. DT-Italy

---

soundly rejected by *Enron I* and the SEC.

DT-Italy's knowledge of and participation in the schemes is indisputable.  As the Complaint alleges, "Parmalat's former executives have testified … that Deloitte had frequent meetings with Grant Thornton and Parmalat executives where aspects of the fraud were discussed, and Deloitte even obtained documents outlining the fraudulent transactions."  ¶ 953. Parmalat officials specifically explained the fraudulent nature of Parmalat's Account 999 to DT-Italy auditors.  ¶ 980 ("Bocchi testified that he 'explained [Account 999] in detail to Deloitte & Touche auditors, who saw it.'"); *see also* ¶¶ 23, 315, 979.  Moreover, DT-Italy learned about Citibank's double-billing scheme involving the Eureka securitizations.  ¶ 973.  The Complaint further alleges that, based on discussions with Parmalat officials and review of GT-Italy's workpapers, DT-Italy knew that Bonlat was a fraud:

> [A]s Chiaruttini stated in one of her reports, Deloitte actually "examined the working papers from Grant Thornton regarding the auditing of Bonlat, and … Deloitte & Touche discovered immediately how this Company was being used by the Group." Chiaruttini found a document titled "Reconstruction of the Bonlat Operations" that Deloitte prepared or received in the first months of 2000 which informed Deloitte about the fraudulent transactions involving Bonlat.

¶ 960.

DT-Italy knew about the fraudulent diversions of Parmalat funds to Tanzi and Tanzi family entities.  DT-Italy was the auditor for the Parmalat entities which made the fraudulent transfers, and also audited Carital, a related entity, which received millions of dollars in rebates from product discounts that were diverted to Tanzi family entities.  ¶ 990.

Additionally, the Complaint details numerous instances where members of the Deloitte audit team expressed dissatisfaction with the information they were receiving, or conveyed other concerns about transactions being examined, but their superiors ignored their concerns or quashed further inquiries.  For example, the Complaint alleges that Mike Power, an auditor in Deloitte USA's New Jersey office, raised concerns in 2002 about Parmalat's overvaluation of

goodwill, and that Bigogno of DT-Italy office raised the same issue in 2003.  ¶ 1000.  DT-Italy,
however, conducted no further investigation in response to these concerns.  *Id*.  Similarly, the
Complaint alleges that when Deloitte's office in Argentina raised questions and concerns that
Parmalat did not want to hear, DT-Italy did nothing except cave in to Parmalat's wishes.
¶¶ 1035-39.  The Complaint alleges that DT-Italy also ignored concerns voiced by Deloitte
auditors in Brazil, such as concerns raised by Michael Morrell about how to treat the proceeds of
bonds issued in 2002 by a Parmalat company.  ¶ 1004.  And, as discussed below, when Olivetti,
the partner in charge of the audits in Brazil, raised concerns, top DTT and Deloitte USA
executives, including Copeland, told him to keep quiet about it.  ¶ 1033.  Ultimately, DTT,
Deloitte USA and Copeland removed Olivetti from any further role in auditing Parmalat's
Brazilian operations.  ¶ 1013.

Quite clearly, the Complaint is replete with facts from which a strong inference of
scienter may be inferred.  *See Paraschos v. YBM Magnex, Int'l, Inc.*, No. Civ. A 98-6444, 2000
WL 32945, at *10 (E.D. Pa. Mar. 29, 2000) ("the aggregate of allegations against the outside
auditors … raises strong inferences of scienter").

### ii.    **GT-Italy**

Two auditors from GT-Italy were arrested by Italian authorities for their roles in the fraud
at Parmalat.  ¶ 167.  If the Complaint said nothing else about GT-Italy, that would be sufficient
to establish a strong inference of conscious misbehavior.  But there is far more in the Complaint
demonstrating GT-Italy's actual knowledge of and participation in the fraud.

GT-Italy was one of the principal architects of the fraudulent scheme.  As alleged in the
Complaint, "to camouflage the Company's mounting losses and somehow hide or remove the
growing debt on its consolidated financial statements … key Parmalat insiders … along with two

partners from Parmalat's auditor Grant Thornton – created three offshore shell companies to act as repositories for these illicit transactions." ¶ 12; *see also* ¶ 957 (GT-Italy "actually helped create the various offshore companies, including Curcastle, Zilpa and Dancent, which were used to implement this scheme").  Later, those shell companies were phased out in favor of one central offshore entity, Bonlat.  As the Complaint alleges in detail, GT-Italy's role in Bonlat's creation was critical.  The Complaint cites specific testimony by Parmalat officials that "'Bonlat … had its origins in colloquies with the auditors of Grant Thornton' who 'asked us to give them authority to audit Bonlat … so they could continue to certify the balance sheets notwithstanding their knowledge of the falsifications in them.'" ¶ 14; *see* ¶¶ 15, 957.  As alleged in the Complaint:

> Tonna specifically admitted meeting with Penca and Bianchi of Grant Thornton to discuss falsifying the Company's financial statements and determine how to "solve the problem posed by the Antilles companies Curcastle and Zilpa which, up to that point, had performed the same functions that Bonlat would later perform – that is, they were used to unload the group's losses."  Tonna said that Penca and Bianchi deemed the situation "indefensible" and explained that, if a new auditing firm discovered the improper transactions with the shell entities, the new firm "would … certainly refuse[ ] certification" of the Company's financial statements.

*Id.* ¶ 958.

The Complaint further cites testimony establishing that by 2002, GT-Italy had pointed out that should anyone review Bonlat's books, it would be apparent that (1) the promissory notes held by Bonlat were created through phony transactions, and (2) no interest had been paid on any of the notes held by Bonlat.  GT-Italy thereupon suggested that the fictitious promissory notes be transformed into an equity investment, which led to the creation of a new sham entity, Epicurum. ¶¶ 18, 364.  As alleged in the Complaint, "Epicurum was reported to have been funded by $529 million from Bonlat, though, as Grant Thornton knew, Bonlat had no such assets to contribute. Thus, Grant Thornton had to have known that Epicurum was a fraud." ¶ 993.

The Complaint also alleges that two GT-Italy auditors, Bianchi and Penca, knew that Bonlat's supposed $4.9 billion account at Bank of America was pure fiction (¶ 237); that GT-Italy discussed the fraudulent nature of Parmalat's Account 999 in meetings with Parmalat insiders and therefore knew it could not accrue interest (¶ 315); that GT-Italy knew that the Bonlat promissory notes were not collectible (¶ 354); that GT-Italy knew Camfield was a phony company, as it shared GT-Singapore's office space and employees (¶¶ 243, 963); and that in reviewing the receivables, GT-Italy learned about the Eureka/Citibank double-billing scheme. ¶ 972.  As alleged in the Complaint, Tonna testified that "Arnaldo Airoldi, a Grant Thornton auditor, was aware of the improper diversions of funds to Tanzi and Tanzi family tourism companies" (¶ 988); and Bocchi testified that GT-Italy had specific knowledge of fictitious sales of trademarks because it audited financial statements that recorded these transactions.  ¶ 1019.

GT-Italy also knew about the fraudulent diversions of Parmalat funds to Tanzi and Tanzi family entities because GT-Italy was the auditor for many of the tourism companies that received the diverted Parmalat funds.  The transfers were booked as credits through fictitious transactions executed by Bonlat, and Bonlat was audited by GT-Italy.  ¶¶ 988-99.  As the Complaint alleges, Tonna told Italian prosecutors:  "Grant Thornton knew the [Parmalat] Group's reality from the beginning ….  I can state that the auditors knew all – or at least a lot."  ¶ 953.

### b.    Recklessness

The Complaint also establishes scienter on the part of the auditors in Italy by pleading actionable recklessness.  Facts demonstrating a virtual abrogation of the duty to investigate, *i.e.*, where the audit "amounted to no audit at all," are sufficient to allege recklessness on the part of auditors.  *See In re Complete Mgmt. Sec. Litig.*, 153 F. Supp. 2d 314, 333 (S.D.N.Y. 2001); *In re Oxford Health Plans, Inc. Sec. Litig.*, 51 F. Supp. 2d 290, 295 (S.D.N.Y. 1999).  In *Novak*, 216

F.3d at 308, the Second Circuit stated that allegations that the defendants "failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud" are sufficient to allege recklessness. *See also SEC v. Price Waterhouse*, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992) (recklessness is the "egregious refusal to see the obvious, or to investigate the doubtful") (internal citations omitted). This is precisely what the Complaint alleges.

### i.   <u>DT-Italy</u>

The Complaint clearly alleges actionable recklessness by DT-Italy. For example, DT-Italy noted in its workpapers that it could not value a significant contract between Parmalat and Epicurum, yet it failed to investigate further or request any documentation confirming the huge value of this asset. ¶¶ 363, 994. Additionally, DT-Italy knew that CONSOB had requested Parmalat's Board of Statutory Auditors to provide an explanation of Epicurum, and that this request went unanswered. ¶ 363. In light of the materiality of the contract with Epicurum (which accounted for 97% of Parmalat's net profit in the first half of 2003), DT-Italy's failure to probe Parmalat's most significant transaction was astonishingly reckless. *Id.*

Additionally, the Complaint details requests by DT-Italy auditors for documents evidencing the alleged milk sales to Cuba, including requests for freight and customs documents. ¶¶ 253, 964. The Complaint describes a series of e-mails among Deloitte partners pertaining to DT-Italy's request for information on the sales, including a request by one Deloitte auditor to partners in Singapore and the Virgin Islands about the roles of Camfield and Dancent in the milk sales transactions. ¶ 964. Although DT-Italy apparently never received this critical information relating to these highly material transactions (if it did, then it obviously became aware of the fraud), it nevertheless recklessly signed off on the audit without this information.

DT-Italy was also reckless in failing to question an alleged $7 billion loan to Bonlat from

Parmalat's Capital Finance affiliate.  From 2001 to 2002, Capital Finance's reported profit jumped more than eightfold to $28.4 million, due almost entirely to the interest and fees earned on this purported $7 billion "loan."  The $28.4 million profit, which represented roughly 10% of Parmalat's entire profit for 2002 and the $7 billion loan, which equaled almost 70% of Parmalat's reported consolidated assets of $10.78 billion in 2002, clearly should have drawn the scrutiny of Deloitte auditors, whether in the United States, Malta, Italy or elsewhere, who audited the Company's consolidated accounts.  As the auditor for both Parmalat and Capital Finance, DT-Italy was required, under any auditing standards, to understand and confirm that Capital Finance had sufficient liquidity to lend the $7 billion, and that this amount was actually provided to Bonlat.  Instead, DT-Italy conducted "no audit at all" and did nothing to confirm that these material amounts were:  (a) available to be loaned by Capital Finance; (b) actually paid to Bonlat; and (c) that Bonlat was sufficiently creditworthy such that Capital Finance could reasonably expect to be repaid.  *See* ¶¶ 1026-32.

The Complaint further alleges recklessness by DT-Italy in connection with a significant October 25, 2000 swap agreement between Bonlat and Sumitomo Bank Financial Services Inc. for ¥90 billion (roughly $900 million).  The swap was set to expire on December 30, 2005, but it was terminated after only two months.  Nevertheless, Bonlat recognized an immediate profit of $147.8 million.  DT-Italy recklessly failed to investigate this phony transaction notwithstanding that:  DT-Italy received a copy of the swap agreement; the swap involved an advance $147.8 million payment for a five-year swap which was terminated after only two months; there were different Sumitomo signatures on the opening and closing contracts executed two months apart; and the Sumitomo subsidiary that entered into the transaction was a Cayman Islands company. ¶ 1042.  These factors clearly should have caught DT-Italy's attention.

Also, Deloitte knew or was egregiously reckless in failing to know about the improper overvaluation of Parmalat's Brazilian affiliate.  ¶ 1002.  Deloitte's own consulting arm had prepared a valuation of Parmalat Administracao seventeen months prior to the December 1999 announcement of the purported equity investment made by North American investors.  *Id.*  DT-Italy was the auditor of Parmalat, and Deloitte's Brazilian affiliate at that time was the auditor of Parmalat Administracao and other Brazilian affiliates of Parmalat.  Deloitte thus knew that Parmalat based its $1.35 billion valuation of Parmalat Administracao on the valuation that Deloitte's Brazilian arm had made 17 months earlier.  *Id.*  Deloitte also knew about the devaluation of Brazil's currency, the worldwide market depression, and that Parmalat Administracao had been incurring substantial losses, additional facts that showed that Deloitte's valuation was obsolete.  *Id.*  DT-Italy was obligated to question Parmalat's valuation of Parmalat Administracao and the Company's representations of that value but recklessly failed to do so.  *Id.*

Finally, the Complaint identifies a veritable sea of red flags of which DT-Italy was aware but failed to investigate in connection with the Parmalat audits, including:  issues relating to the amortization of trademarks and goodwill, use of Parmalat–related entities' contributions to cover the losses of Parmalat subsidiaries, problems relating to reconciliations between Parmalat-related entities' credits and debits, problems in the consolidation process, ongoing and significant losses incurred by various Parmalat subsidiaries, difficulty obtaining information from Parmalat management, especially financial executives, unexplained entries and, most significantly, "the 'Bonlat' problem."  ¶ 1023.  In fact, DT-Italy itself identified these red flags as items to consider when it began its audit.  *Id.*  "Allegations that multiple red-flags were ignored in performing the audits can reasonably support an inference of intent."  *Teachers' Ret. Sys. of La. v. A.C.L.N. Ltd.*,

No. 01 Civ. 11814 (MP), 2003 WL 21058090, at *11 (S.D.N.Y. May 12, 2003).[31]

Notwithstanding the fact that these red flags were well known to DT-Italy, it rendered

unqualified opinions on Parmalat's financial statements. ¶ 1024-25.  DT-Italy's failure to

resolve or even investigate these issues constitutes, at a minimum, recklessness.

### ii.   GT-Italy

Likewise, GT-Italy was reckless in its auditing of Parmalat entities.  As discussed above,

Bonlat supposedly had a Bank of America account containing $4.9 billion.  The Complaint

alleges that, instead of following the proper auditing procedures and confirming the existence of

the Bank of America account directly with the bank, GT-Italy accepted from Parmalat a letter

purportedly from Bank of America confirming the account.  ¶ 232.  The letter, however, was a

forgery.  ¶ 233.  Given the enormous importance of an account of this size to the accuracy of

Bonlat's financial statements, any auditor not acting recklessly would have understood that it

was necessary to follow generally accepted auditing standards and communicate directly with

the bank.  GT-Italy's failure to do so shows that its audit was "no audit at all."

Similarly, in 2002 GT-Italy accepted oral assurances from Zini, Tonna and Tanzi that

Bonlat's purported $625 million investment in Epicurum was made on an arms-length basis.

---

[31] *See also In re Philip Servs. Corp.  Sec. Litig.*, No. 98 Civ. 0835(MBM), 2004 WL 1152501, at *10 (S.D.N.Y. May 24, 2004) ("Because the red flags would be clearly evident to any auditor performing its duties, one could reasonably conclude that [the auditor] must have noticed the red flags, but deliberately chose to disregard them"); *In re AOL Time Warner,* 2004 WL 992991, at *34-35 (S.D.N.Y. May 5, 2004) (allegations of red flags coupled with allegations of violations of generally accepted accounting and auditing standards "are sufficient to support a strong inference of scienter"); *Complete Mgmt.*, 153 F. Supp. 2d at 334 (allegations of deficient audits as result of which auditor did not detect problems or dealt with them inappropriately constituted "combination of red flags" supporting denial of auditor's motion to dismiss); *Oxford Health Plans,* 51 F. Supp. 2d at 295; *In re Health Mgmt., Inc. Sec. Litig.*, 970 F. Supp. 192, 203 (E.D.N.Y. 1997) (allegations that auditor "credulously" accepted management's statements, failed to follow up on analyst's letter which alerted auditor to artificially inflated receivables, and failed to exercise "heightened scrutiny" in response to SEC inquiry, were "red flags" "suggest[ing] that [the auditor] turned a blind eye to [the company's] fraudulent activities, thus creating a 'strong inference' of … recklessness"); *In re Leslie Fay Cos. Inc. Sec. Litig.*, 871 F. Supp. 686, 699 (S.D.N.Y. 1995), *amended on other grounds*, 918 F. Supp. 749 (S.D.N.Y. 1996).

¶ 359.  GT-Italy never attempted to speak directly with anyone at Epicurum (if it had, it would have discovered, if it did not already know, that Epicurum did not exist).  ¶ 359.  In fact, its confirmation of Epicurum's viability and that it was a legitimate investment arose out of its conclusion that Epicurum's directors had names that, according to GT-Italy, "did not sound Italian."  ¶ 360.

GT-Italy knew or recklessly disregarded facts showing that Parmalat's subsidiaries had falsely reported significant purchases of bonds issued by Parmalat and its subsidiaries.  Marco Ghiringhelli of PwC concluded in his report to prosecutors that GT-Italy's own documents reflect repurchases of bonds by Bonlat that had not occurred.  ¶ 325.  Indeed, the purportedly repurchased bonds were "in the abstracts" of Bonlat's $5 billion Bank of America account which did not exist.  ¶ 325.  Since GT-Italy was the auditor for Bonlat, and there was a clear contradiction between Bonlat's records and Parmalat's statements and filings with CONSOB regarding the bonds the Company allegedly repurchased, GT-Italy either knew of this scheme or was extremely reckless in not knowing of it.

GT-Italy either knew about or recklessly failed to discover the fraud in the highly material transactions with Buconero.  As alleged in the Complaint, GT-Italy was the auditor for Geslat, a Parmalat subsidiary that engaged in the joint venture with Buconero designed to artificially boost Parmalat's assets.  ¶ 967.  GT-Italy either performed an audit on Geslat and discovered or recklessly disregarded the fraud, or it failed to conduct any audit at all.  Indeed, the suspicious name "Buconero" ("black hole") itself should have aroused suspicions and put the auditors on notice to scrutinize transactions with this entity.

### c.      The Magnitude of the Fraud Supports an Inference of Scienter

As the SEC has stated, the Parmalat fraud involved "one of the largest and most brazen

corporate financial frauds in history." ¶ 4.  As a result of the fraud, Parmalat's consolidated net assets were overstated by approximately $16.4 billion, and its debt was understated by nearly $10 billion.  *Id.*; *see also* ¶ 952.  As noted above, in just one aspect of the fraud, a bank account of a Parmalat affiliate that supposedly contained $4.9 billion did not even exist.  ¶ 17.  The sheer magnitude of the inaccuracies and fictitious items in Parmalat's financial statements supports an inference of scienter.

In addition to the large number of fraudulent transactions involved, and the enormous amounts by which the Parmalat financial statements were misstated, another indication of the magnitude of the fraud is the sheer number of offices of the Auditor Defendants that were involved in the audits.  This is not a case involving only one or two rogue auditors in one isolated location.  In addition to the audit work performed in Italy, auditors from two of the Big Four accounting firms in four other countries – Argentina (¶¶ 1035-39), Brazil (¶¶ 1002-13, 1034), Malta (¶¶ 1027, 1031), and the United States (¶¶ 63, 86, 1000, 1010, 1013, 1033-34) – were involved in auditing Parmalat's financials.  Particularly in light of the uniformly high standards that Deloitte and Grant Thornton claim they impose on all of their auditors around the world (¶¶ 144, 146, 147, 163), it is not even remotely conceivable that so many auditors in so many places all missed the fraud.[32]  The only reasonable inference is that they either knew about the fraud or deliberately closed their eyes to it.

"Although the size of the fraud alone does not create an inference of scienter, the enormous amounts at stake coupled with the detailed allegations regarding the nature and extent of [the audit client's] fraudulent accounting and [the auditor's] failure to conduct a thorough and

---

[32] Indeed, the Complaint details how some of the Auditor Defendants' member firms did detect evidence of fraud, only to have their concerns suppressed.

objective audit create a strong inference that [the auditor] was reckless." *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288 (DLC), 2003 WL 21488087, at *7 (S.D.N.Y. June 25, 2003).  *See also Global Crossing,* 322 F. Supp. 2d at 347 ("the scope of the fraud alleged may appropriately be considered in determining whether scienter has been adequately pled.").[33]  If there were ever a case where the gigantic magnitude of the fraud leads inescapably to the conclusion that the auditors were aware of it or at a minimum were reckless in not conducting an audit sufficient to detect the fraud, this is it.

### 2.    DTT, Deloitte USA, GTI, GT-US and Copeland Are Liable for the Conduct of Others in Their Worldwide Organizations

Undoubtedly because the evidence that Parmalat's auditors were actively involved in perpetrating the fraud is so overwhelming, the primary focus of the Auditor Defendants' briefs is not the undeniable fact that their Italian member firms engaged in a massive fraud, but rather that their international and U.S. affiliates cannot be held responsible for the actions of those entities (despite their own repeated representations that they are unified worldwide firms).  *See, e.g.*, Deloitte USA Br. at 16; DTT Br. at 16; GTI Br. at 14.  As shown below, however, DTT, Deloitte USA and Copeland are liable for all of the violations of Rule 10b-5(a), (b) and (c) committed by DT-Italy, and GTI and GT-US are liable for all of the violations of Rule 10b-5(a), (b) and (c) committed by GT-Italy.  The well-pled averments of the Complaint spell out several bases upon which U.S. and international firms may be held liable for the conduct of their Italian member

---

[33] *See also Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (magnitude of the write-offs "renders less credible" defendants' argument that they acted without scienter); *Burstyn v. Worldwide Xceed Group, Inc.*, No. 01 Civ. 1125(GEL), 2002 WL 31191741, at *5-6 (S.D.N.Y. Sept. 30, 2002) (size of accounting adjustments raised questions as to defendants' credibility, supporting strong inference of scienter); *In re American Bank*, 93 F. Supp. 2d at 447 ("the admitted falsity of the statements, the extraordinary degree to which they were false, the length of time (covering several years) that the statements were false, and [the defendants'] access [to the company's] actual sales and revenue information … combine to raise a strong inference that [the defendants] engaged in conduct that was either conscious or reckless").

firms which they now claim are separate entities.[34]  At this juncture, prior to any discovery, such allegations are sufficient to overcome Defendants' motions to dismiss.

<strong>a.      The Complaint Alleges that Deloitte and Grant Thornton<br>Each Constitutes a Unitary, Worldwide Firm</strong>

"[S]uperficially distinct entities may be exposed to liability upon a finding they represent a single, integrated enterprise."  *Schweitzer v. Advanced Telemarketing Corp*., 104 F.3d 761, 763 (5th Cir. 1997).  Defendants acknowledge that alter ego liability survived *Central Bank*.  *See, e.g*., Deloitte USA Br. at 19.

"Determining that veil-piercing is appropriate is a fact specific inquiry."  *MAG Portfolio Consult GMBH v. Merlin Biomed Group LLC*, 268 F.3d 58, 63 (2d Cir. 2001); *see also Moses v. Martin*, No. 04 Civ. 1533 (SAS), 2004 WL 2809198, at *3 (S.D.N.Y. Dec. 3, 2004) (denying motion to dismiss); *Cordius Trust v. Kummerfield,* No. 99 Civ. 3200 (DLC), 2004 WL 357076, at *8 (S.D.N.Y. Feb. 19, 2004) ("fact specific inquiry"), *recommendation adopted*, 2004 WL 616125 (S.D.N.Y. Mar. 30, 2004) (denying motion to dismiss); *Network Enters. v. APBA Offshore Prods*., No. 01-11765 (CSH), 2003 WL 124521, at *3 (S.D.N.Y. Jan. 15, 2003) (alter ego determinations are generally "decided on detailed evidentiary records"; denying motion to dismiss); *Oost-Lievense v. N. Am. Consortium, P.C.*, 969 F. Supp. 874, 880 (S.D.N.Y. 1997) (because "[r]esolution of the alter ego issue is heavily fact-specific," "any claim of veil piercing based on an alter ego theory must be left for the jury"; denying motion to dismiss); *Ez-Tixz v. Hit-Tix, Inc*., 919 F. Supp. 728, 733 (S.D.N.Y. 1996) (denying motion for summary judgment).[35]

---

[34]  These Defendants are also liable as control persons pursuant to Section 20(a), as discussed *infra*.

[35] Courts in other circuits agree.  For example, in *Enron I*, 235 F. Supp. 2d at 564 n.5, the court, dealing with a motion by Citigroup to dismiss claims based on conduct of its subsidiaries, stated:  "These objections cannot be dealt with in the context of a motion to dismiss."  The court further stated that Citigroup could make a later motion submitting "evidence challenging plaintiff's one-entity approach, but for purposes of the motion to dismiss this Court will assume that plaintiff's characterization is proper."  *See also Bridas S.A.P.I.C. v. Gov't of Turkm.*, 345

*(cont'd)*

As discussed below, Plaintiffs have adequately alleged facts establishing alter ego liability.

### i.    Deloitte

As alleged in the Complaint, Deloitte is an integrated worldwide firm.  Deloitte touts itself on its website as a "global network," and boasts that it requires all of its auditors around the world to adhere to uniform standards of quality and ethics.  Auditors from various countries attend joint practice group meetings, attend "world partners' meetings," submit joint bids for work, cross-check the quality of each-other's work, and use each other's services.  The Deloitte member firms are so dominated by DTT that they acquiesce to DTT with respect to the auditing procedures and standards they use.  ¶¶ 138-49.

Moreover, the Complaint alleges that Deloitte requires all of its member firms to use the Deloitte name and logo (¶ 140), and in fact the audit opinions for Parmalat did just that.  Thus, the audit opinions submitted by Deloitte USA as Exhibit B to the Declaration of Michele Odorizzi, dated Jan. 10, 2005 ("Odorizzi Decl.") each include at the top in bold letters "**Deloitte & Touche**" with the Deloitte logo, and each include at the bottom in bold letters "**Deloitte Touche Tohmatsu**."

Importantly, Deloitte USA had access to the Parmalat workpapers of other firms in the Deloitte network and was directly involved in the audits of Parmalat financial statements.  ¶¶ 1131-32.  DTT controlled the global network; Deloitte USA was its "alter ego," and DTT and Deloitte USA shared the same CEO and CFO.  ¶ 151.  *Indeed, the decision to remove a partner of the Deloitte firm in Brazil from the Parmalat audits was made by the CEO of DTT and Deloitte USA, defendant Copeland.*  ¶ 1013.

---

F.3d 347, 359 (5th Cir. 2003) ("Alter ego determinations are highly fact-based, and require considering the totality of the circumstances"); *Miller v. Cudahy Co.*, 858 F.2d 1449, 1460 (10th Cir. 1988) ("the alter ego issue is largely a factual one").

DTT asserts in its brief that it is not an auditing firm.  DTT Br. at 1.  Of course, arguments supporting a motion to dismiss cannot be based on factual assertions outside of the Complaint.  In addition, this assertion in DTT's brief runs directly contrary to what that firm represents to the world in its effort to obtain audit work.  Thus, as Judge Cote observed in *Cromer Fin. Ltd. v. Berger*, No. 00 Civ. 2284 (DLC), 2002 WL 826847, at *2 (S.D.N.Y. May 2, 2002) (emphasis added):

> Deloitte[36] holds itself out as a leading unified international professional services firm that delivers accounting, assurance, advisory, tax, and consulting services "'seamlessly' around the globe."  In marketing materials distributed to the investment fund community and the investing public, Deloitte represents itself as an auditor, stating that "Deloitte Touche Tohmatsu's audit services are at the core of the professional services" that it offers investment management companies, and that Deloitte conducts those audits through its "internationally experienced professionals" who are "deployed … across borders to support [its] clients' needs."

In *Cromer*, unlike the case at bar, at least DTT was forthright enough with the court to "admit[] that it represents itself to the world as an auditor."  *Id.* at *4.[37]

### ii.    Grant Thornton

The Complaint alleges that Grant Thornton markets itself as a global firm and that GTI establishes audit procedures for all of its worldwide partners to follow, and conducts reviews every three years to ensure compliance with its procedures, policies and practices.  The Grant Thornton member firms are so dominated by GTI that GTI dictates the auditing procedures and standards they use.  ¶¶ 162-63.  The Complaint specifically alleges that GT-USA had access to the Parmalat workpapers of other firms in the Grant Thornton network and direct involvement in

---

[36] The Opinion defined "Deloitte" to mean DTT.  *Id.* at *3.

[37] It is no answer for DTT to argue that, in response to *Cromer*, it may have changed some of the language in its website to eliminate some inconvenient phraseology.  Where, as here, the issue is simply whether enough has been pled to overcome a motion to dismiss, any post-*Cromer* wordsmithing does not undermine the factual predicate for the allegations in the Complaint.

their audits of Parmalat financial statements.  ¶¶ 1151-53.[38]  The Complaint also alleges that GTI had the power to expel partners or firms not adhering to its procedures and that, in fact, it eventually expelled GT-Italy from the Grant Thornton family because of its Parmalat audit work.  ¶ 168.

### iii.    These Allegations Are Sufficient for Purposes of Pleading Alter Ego Liability

Plaintiffs' allegations sufficiently establish alter ego liability against the Auditor Defendants for purposes of a motion to dismiss.  Directly on point is *Teachers' Ret. Sys. of Louisiana v. A.C.L.N. Ltd.*, No. 01 Civ. 11814 (MP), 2003 WL 21058090 (S.D.N.Y. May 12, 2003), where the international umbrella organization of the BDO Seidman accounting firms moved to dismiss a Rule 10b-5 case arising out of an audit conducted by BDO member firms.  Like the Complaint here, the pleading in that case alleged that the BDO website described it as "one large global firm" with "uniform and stringent quality controls imposed on each of its member firms," (*id.* at *2), and that BDO "held itself out as a highly skilled international accounting firm that benefits its clients by the interaction between its local offices throughout its global network."  *Id.* at *5.  Denying BDO International B.V.'s motion to dismiss, Judge Pollack held that allegations such as these made out a *prima facie* showing that BDO International B.V. and its network of firms constitute one single entity.  *Id.* at *8; *see also id.* at *7.  Judge Pollack sharply criticized BDO's argument, parroted by Grant Thornton and Deloitte in this case, that it was not bound by the assertions in its marketing materials and website, stating:

> As noted by Judge Haight when confronted by a similar "now you see me now you don't" argument:  either defendants are engaged in a global fraud by producing

---

[38] Resorting to the constant refrain that allegations damaging to its arguments are "conclusory," GTI asserts that these allegations are mere conclusions not entitled to any presumption of truthfulness.  GTI Br. at 5.

promotional materials that are a "pack of lies," or defendants are … part of a "single closely intertwined network."  defendants "cannot have it both ways."  *Koehler v. Bank of Bermuda, Ltd.,* M18-302, Judgment No. 931745, 1994 WL 48825, at *5 (S.D.N.Y. Feb. 16, 1994).

*Id.* at *1 n.4.[39]

Allegations similar to those in the Complaint also were found sufficient to defeat the motion to dismiss in *Franklin High Income Trust v. APP Global, Ltd*., 7 A.D. 2d 400, 776 N.Y.S.2d 473 (N.Y. App. Div. 2004), where the plaintiffs sued the Arthur Andersen worldwide entity (AWSC) and the Arthur Andersen firm in the United States (Arthur Andersen LLP) in connection with audits by the Arthur Andersen firms in Indonesia and Singapore.  The New York Appellate Division affirmed the denial of the motions to dismiss by AWSC and Arthur Andersen LLP, stating dismissal should not be granted "merely because the accounting defendants dispute Plaintiffs' allegations respecting the assertedly close and controlling relationship between them and the Arthur Andersen entity that was purportedly immediately responsible for the complained-of audits and financial statements."  *Id.* at 400-01, 776 N.Y.S. 2d at 473.

The Auditor Defendants, by contrast, rely on cases that were procedurally beyond the motion to dismiss stage; thus, those courts had the benefit of an evidentiary record and were not required to accept as true the allegations of the complaints.[40]  More importantly, Defendants'

---

[39] Judge Pollack's admonition also supplies a complete answer to DTT's so-called "public policy" argument that courts should not impose vicarious liability on international auditing firms for acts of their foreign affiliates.  DTT Br. at 17.  Public policy cuts exactly the opposite way.  These firms market themselves as unified firms which impose uniform auditing practices on all of their auditors around the world, but when something goes wrong they try to hide behind the alleged separateness of the foreign entities.  They should not be allowed to "have it both ways."  *See FDIC v. British-American Corp.*, 726 F. Supp. 622, 629-30 (E.D.N.C. 1989) (it is "against sound policy" to allow a defendant to try to "hide behind the fiction of a subsidiary"); *Handlos v. Litton Indus., Inc*., 304 F. Supp. 347, 350 (E.D. Wisc. 1967).

[40] *See, e.g., Young v. FDIC*, 103 F.3d 1180, 1192 (4th Cir. 1997) (court converted motion to dismiss into motion for summary judgment); *In re Nortel Networks Corp. Sec. Litig*., No. 01 Civ. 1855 (RMB) (MHD), 2004 WL 2149111

*(cont'd)*

cases involve facts not nearly as strong as those present here.  Unlike Plaintiffs' Complaint, which sets forth with specificity facts detailing the interrelationship of the Deloitte and Grant Thornton Defendants' respective member firms, the plaintiffs in the cases relied upon by Defendants failed to demonstrate that the U.S. and foreign auditing firms were part of a single entity.  None of those cases insulates worldwide accounting entities from liability based on conduct of their member firms.  Ultimately, at this stage of the litigation, the Court must look at the allegations of the Complaint and may dismiss only if it can be said that Plaintiffs can prove no set of facts entitling them to relief.  The Complaint, however, is replete with facts detailing the interrelationship of the Deloitte and Grant Thornton Defendants' respective member firms.  Conclusions reached by other courts with respect to complaints with substantially lesser factual allegations are simply irrelevant.

Likewise, as in *Teachers' Ret. Sys.*, the Auditor Defendants rely on self-serving language in their websites or press releases to the effect that their foreign firms are separate and independent entities.  *See, e.g.*, GTI Br. at 6 (a GTI press release stated that no member firm is "responsible for the services or activities of any other"); *see also* DTT Br. at 13, 24; GTI Br. at 2, 4-5, 14 (GTI website "belies Plaintiffs' one-firm argument").  Asking the Court to adopt a rule directly contrary to what the law requires, they argue in essence that any statement in a press release or on a website is entitled to a presumption of truthfulness, but that the contrary allegations of the Complaint are not entitled to such a presumption.  Moreover, they argue that no discovery should be allowed to test the truthfulness of the websites' or press releases' assertions.  A defendant cannot cause the dismissal of a complaint simply by issuing a press

---

(S.D.N.Y. Sept. 23, 2004) (on application to enforce subpoena, court relied on affidavits and material from discovery); *Goh v. Baldor Elec. Co.*, No. 3:98-MC-064-T, 1999 WL 20943 (N.D. Tex. Jan. 13, 1999) (on application to enforce subpoena, court relied on affidavit evidence); *Reingold v. Deloitte Haskins & Sells*, 599 F. Supp. 1241,

*(cont'd)*

release stating that the complaint's allegations are untrue.

Defendants also argue that every aspect of an alter ego claim in a fraud case is subject to the requirements of Fed. R. Civ. P. 9(b).  *See, e.g.*, DTT Br. at 18-19; Deloitte USA Br. at 23-24. Judge Haight rejected that argument in *Network Enterprises, Inc. v. APBA Offshore Products*, No. 01 Civ. 11765 (CSH), 2002 WL 31050846, at *5 (S.D.N.Y. Sept. 12, 2002), where he stated that the defendant "seems to suggest that the domination and control elements of an alter ego claim are also subject to heightened pleading, but there exists no foundation in Rule 9(b) or precedent in the case law for such a conclusion."

The cases that Defendants cite would establish a next-to-impossible pleading burden in a case asserting alter ego liability if they actually stood for the proposition that Defendants claim. *See, e.g.*, DTT Br. at 18-19, Deloitte USA Br. at 23-24.  Significantly, those cases deal not with what must be pled to establish alter ego liability, but rather with what must be proven at trial. For example, Deloitte USA relies heavily on *Freeman v. Complex Computing Co.*, 119 F.3d 1044 (2d Cir. 1997) (Deloitte USA Br. at 24-25), but as this Court's opinion in that case made clear, its ruling was not on a motion to dismiss and the decision was based on the proof, which included affidavits and exhibits.  *See Freeman v. Complex Computing Co.*, 931 F. Supp. 1115 (S.D.N.Y. 1996) (Kaplan, J.).

Finally, the Court should ignore the Articles of DTT (submitted by Deloitte USA as Exhibit D to the Odorizzi Decl.) and any argument based thereon as to the alleged separateness of the Deloitte firms.[41]  *See, e.g.*, Deloitte USA Br. at 9, 24.  It is black letter law that on a

---

1254 n.9 (S.D.N.Y. 1984) (court relied on affidavits and "partnership agreements produced during discovery").

[41] Deloitte USA cannot and does not claim that the Complaint somehow incorporates this document or relies on it, such that it is rendered "integral to the complaint" and therefore can be referred to on a Rule 12(b)(6) motion. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

motion to dismiss a defendant may not contradict a plaintiff's factual averments with its own factual assertions. *See, e.g.*, *Leonard F. v. Israel Discount Bank of New York*, 199 F.3d 99, 107 (2d Cir. 1999). Ironically though, even if the Court were inclined to consider DTT's Articles, they actually bolster Plaintiffs' position. Indeed, the Articles patently demonstrate the power that DTT has over its member firms. They state, for example that one purpose of DTT is "to *assure* that Member Firms' practices conform to professional standards of the highest quality." *See* Odorizzi Decl., Exh. D ¶ 1.2(b). Demonstrating the extent to which the member firms have themselves surrendered control of themselves to DTT or have become joined with it, the Articles further state that each member firm is required to:

> (i)  support and *adhere* to the purposes and policies of the Verein;
>
> (ii)  align national plans, strategies, businesses, and operations with the global plans, strategies, businesses, and operations, as appropriate and in consultation with Verein management;
>
> *          *          *
>
> (iv)  *be bound* by the requirements contained in resolutions and protocols adopted by the board of Directors or the Governance committee … including, without limitation, those regarding professional standards and methodologies … and systems for quality control and risk management….

*Id.* ¶ 6.2 (emphasis added). The Articles even require the member firms to "respect the exclusive privileges of the other Member Firms within their jurisdiction." *Id.* ¶ 6.3(a).

To the extent that the Court would find it useful to consider documentation relating to Deloitte's internal structure and the relationships between DTT and its member firms, Plaintiffs would welcome the opportunity to take narrowly tailored discovery as to, *inter alia*: Deloitte's bylaws; inter-firm agreements; agreements dealing with fee sharing, profit sharing, cost sharing, ownership of trademarks, partner compensation and allocation of taxes; minutes of worldwide partners meetings, meetings relating to the election of new partners, and meetings relating to the

selection of the officers of DTT.  Deloitte USA cannot be allowed on this motion to selectively

rely on one document while keeping secret the bulk of its documents showing the truth as to

relationships among its firms and partners around the world.[42]

**b.    The Auditor Defendants Are Liable Based on Agency
Principles for the Conduct of their Italian Member Firms**

The Auditor Defendants also contend that they cannot be held liable for the misconduct

of their members under principles of agency law.  *See, e.g.*, GTI Br. at 14; DTT Br. at 23.  This

proposition is wishful thinking in light of the facts alleged.  Most courts in this Circuit agree that

"an agency theory of liability remains viable after *Central Bank*."  *Vento & Co. of N.Y., LLC v.

Metromedia Fiber Network, Inc.*, No. 97 Civ. 7751 (JGK), 1999 WL 147732, at *12 (S.D.N.Y.

Mar. 18, 1999); *accord In re Kidder Peabody Sec. Litig.*, 10 F. Supp. 2d 398, 407 (S.D.N.Y.

1998); *In re ICN/Viratek Sec. Litig.*, No. 87 Civ. 4296, 1996 WL 164732, at *6 (S.D.N.Y. April

9, 1996); *Pollack v. Laidlaw Holdings, Inc.*, No. 90 Civ. 5788 (DLC), 1995 WL 261518, at *17

(S.D.N.Y. May 3, 1995).  Defendants concede this point.  *See, e.g.*, Deloitte USA Br. at 18.[43]

Courts have recognized that issues such as the scope of an agency relationship as well as

whether an agency relationship exists in the first instance involve significant questions of fact

and are thus inappropriate for resolution on a motion to dismiss.  As the Second Circuit stated in

---

[42] Deloitte's desire to conceal the true facts as to the relationships among the member firms and DTT is illustrated by
DTT's January 21, 2005 responses to document requests served by the plaintiff in the action styled *Bondi v. Grant
Thornton Int'l*, No. 04 MD 1653, 04 Civ. 09771 (LAK) (S.D.N.Y.), pending in this Court.  There, DTT flatly refused
to produce the Deloitte partnership agreements, bylaws, organizational charts, agreements between member firms
and DTT, documents showing payments made by member firms to DTT or Deloitte USA, documents relating to the
election of officers and directors of DTT, or documents showing how officers of DTT participate in the affairs of
member firms.

[43] While Defendants urge that Plaintiffs' agency theory is just a "re-casting" of the one-firm theory, and that the two
positions are essentially "the same" (GTI Br. at 15), in fact they are entirely separate and distinct.  *See Restatement
(Second) of Agency*, Appendix § 14M, Reporter's Notes, at 68 (1958) ("It is useful to distinguish situations in which
liability is imposed … because of the existence of an agency relation … from cases in which the corporate veil … is
pierced").

78

*Music Research, Inc. v. Vanguard Recording Society, Inc.*, 547 F.2d 192, 195 (2d Cir. 1976), the issue of whether there is an agency relationship is "properly left to the jury." *See also Cabrera v. Jakabovitz*, 24 F.3d 372, 386 (2d Cir. 1994) (generally "the question of agency should be submitted to the jury"); *Nat'l Council on Comp. Ins. v. Hopkins*, No. 92-C082, 1995 U.S. Dist. LEXIS 21030, at *80 (E.D. Tenn. Dec. 19, 1995) (whether an agency relationship exists is "ordinarily an issue of fact for the jury"*); FDIC v. FSI Futures, Inc.*, No. 88-Civ. 0906 (PNL), 1990 U.S. Dist. LEXIS 2907, at *17 (S.D.N.Y. Mar. 16, 1990) (denying motion to dismiss and noting that the "existence of an agency relationship, as well as the scope of the agent's authority is a question of fact to be decided by the jury") (internal citations omitted); *Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil Co.*, 456 F. Supp. 831, 840 (D. Del. 1978).

The Complaint specifically alleges that DT-Italy and Deloitte firms in other countries provided audit services to Parmalat entities as "agents" of DTT and Deloitte USA, and "provided those services on the authority of, at the direction of, and for the benefit of" DTT and Deloitte USA. ¶ 135.  Additionally, the Complaint specifically alleges that GT-US was "an agent of Grant Thornton International, and acted on authority of, at the direction of, and for the benefit of Grant Thornton International" (¶ 158), and that GT-Italy performed its audit work relating to Parmalat as agent of GTI and GT-US, acting "on their authority, at their direction and for their benefit."  ¶ 159.

Based on facts similar to this case, the court in *Cromer*, 2002 WL 826847, held that the plaintiff adequately plead facts to establish agency liability.  In that case, the plaintiff sought to hold DTT and Deloitte USA liable for audit work performed by the Deloitte firm in Bermuda. The complaint in *Cromer* alleged that the engagement partner in the local Deloitte firm conducted the audits "in his capacity as an agent exercising actual authority to act on behalf of

Deloitte." *Id.* at *3.  Judge Cote found that the inference of agency was supported by various facts, including that Deloitte's marketing materials stressed that Deloitte could deliver services "'seamlessly' around the globe," that Deloitte had the power "to promulgate relevant professional standards for its member firms, and the power and authority to exercise oversight over these entities," that "Deloitte entities perform quality-control cross-checks of one another's work product," and that "Deloitte requires member firms to use its name and logo when pitching services to potential clients, and also to include the Deloitte name and logo when delivering the contracted-for services to clients."  *Id.* at *2.  In upholding the agency allegations in the complaint, the court stated:

> [P]laintiffs' allegations of agency rest sufficiently on Deloitte's organization of its own business operations and the way it chose to use its member firms generally, and [Deloitte Bermuda and the audit partner] specifically, to perform the audit work that [DTT] advertised that it was equipped to do around the world.  It is fair to infer, in the context of pleading standards, that the representations made to third parties bore a relationship to the way Deloitte actually conducted its business.

*Id.* at * 5 (emphasis added).  Based on these facts, which are remarkably similar to those alleged in this case, the court held that "[t]he plaintiffs have adequately alleged that [the partner in Bermuda] had actual authority to act as Deloitte's agent when performing audit work."  *Id.* at *4.[44]

Defendants' repeated arguments that Plaintiffs' agency allegations are not sufficiently particularized are misplaced.  "Agency must be pled with particularity only where a plaintiff

---

[44] GT-US attempts to distinguish *Cromer* on the ground that in *Cromer*, the audit reports of the local Deloitte entity "bore the name and logo of the umbrella organization."  GT-US Br. at 22 n.4.  Such a ruling is, of course, devastating to DTT's position here, as the Parmalat audit opinions of DT-Italy each also bore the logo of the Deloitte organization and the name, in bold type, "**Deloitte Touche Tohmatsu**."  *See* Odorizzi Decl., Exh. B.  In any event, as the above discussion of *Cromer* reveals, the presence or absence of such name and logo is not the *sine qua non* of an agency claim, and GT-US cannot expect to have its motion to dismiss granted simply because its logo is not on the audit opinions of GT-Italy.  Moreover, GTI's name does appear on all of the GT-Italy audit reports, and each recites that GT-Italy is "[t]he Italian member firm of Grant Thornton International."  GT-US Br. Exh. A.

relies upon the same circumstances to establish both the fraud and the agency relationship of a

defendant." *Anderson v. Elmhurst Chevrolet, Inc.*, No. 03 C 5662, 2004 WL 2038170, at *3

(N.D. Ill. Sept. 2, 2004); *accord Guar. Residential Lending, Inc. v. Int'l Mortgage Ctr., Inc.*, 305

F. Supp. 2d 846, 860-61 (N.D. Ill. 2004).  Here, "the purported agency relationship … is alleged

generally and independently from the allegations of the fraudulent activity itself" and, therefore,

"it need not be pleaded with the particularity required by Rule 9(b)."  *Anderson*, 2004 WL

2038170, at *3.  Plaintiffs' allegations regarding agency are sufficiently particularized to

overcome a motion to dismiss.  *See Cromer*, 2002 WL 826847, at *5 (where comparable

allegations were held sufficient).

      In arguing that myriad details must be pled when liability is premised on an agency

relationship, Defendants ignore that the issue on a motion to dismiss is simply the sufficiency of

the allegations, not whether those allegations would constitute sufficient proof on a motion for

summary judgment or at trial.  The cases on which Defendants rely are primarily summary

judgment or trial cases, not pleading cases, *i.e.*, they deal not with what must be pled but with the

evidence that can or should be presented after discovery.[45]  Indeed, since the facts as to the

agency relationship between Defendants and their affiliates "is information solely within the

control of those parties," *Vento*, 1999 WL 147732, at *13, if Defendants' assertions as to what

must be pled were correct, the pleading burden on a plaintiff who has not had any discovery

---

[45] Thus, *In re Shulman Transp. Enters., Inc.*, 744 F.2d 293 (2d Cir. 1984) (DTT Br. at 23, GTI Br. at 15), was a summary judgment case that did not address in any way what must be pled to state a claim based on agency.  *Itel Containers International Corp. v. Atlanttrafik Express Service Ltd.*, 909 F.2d 698 (2d Cir. 1990) (GT-US Br. at 21), and *Karavos Compania Naviera S.A. v. Atlantica Export Corp.*, 588 F.2d 1 (2d Cir. 1978) (GT-US Br. at 21), both involved rulings after trial.  *Cabrera v. Jakabovitz*, 24 F.3d 372 (2d Cir. 1994) (DTT Br. at 23), was a decision after a jury verdict.  *Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125 (2d Cir. 2003) (DTT Br. at 23), involved a motion to compel arbitration based on an evidentiary record.  DTT's citation to *Bourjaily v. United States*, 483 U.S. 171, 189, 107 S. Ct. 2775, 2786 (1987) (DTT Br. at 23), is particularly misleading, as the case involved the application of the hearsay rule at trial, and the excerpt quoted by DTT is from the dissenting opinion.

would be impossibly high, and defendants effectively would be insulated from ever facing a claim premised on agency.  Of course, this is what Defendants desire, but the Court should not endorse such an unfair position.

Equally unavailing is Defendants' reliance on *Gabriel Capital, L.P. v. NatWest Finance, Inc.,* 122 F. Supp. 2d 407 (S.D.N.Y. 2000), for the proposition that the principal can only be liable if the person to whom the false statement is made knows that the agent is acting for the principal (Deloitte USA Br. at 18-19).  Here, unlike *Gabriel Capital*, the affiliation between DTT and its member firms or GTI and its member firms is well-known to the investing public by virtue of their websites and other public marketing material.  *See Cromer Finance Ltd. v. Berger*, 245 F. Supp. 2d 552, 563 (S.D.N.Y. 2003) (distinguishing *Gabriel Capital* on the basis that in *Cromer* there were no allegations that the relationship between the principal and agent was obscured to the plaintiff's detriment, as was the case in *Gabriel Capital*).

Thus, through alter ego liability and agency principles, GTI and GT-US are liable for the actions of Grant Thornton's Italian firm.  Likewise, DTT and DT-US are liable for the actions of Deloitte's Italian firm.  Moreover, as discussed below, DTT, DT-US and Copeland are liable for their own primary participation in fraudulent schemes related to Parmalat.[46]

### 3.    Copeland, DTT and Deloitte USA Engaged Directly in the Fraudulent Scheme in Violation of Rule 10b-5(a) and (c)

Defendants Copeland, DTT, and Deloitte USA are not merely liable by virtue of agency theory.  They were active participants in the fraudulent schemes.  In 2002, Wanderley Olivetti, the partner in charge of Deloitte's Parmalat audits in Brazil, complained to the auditors at DT-

---

[46]  As further discussed below, whether or not they are liable under Section 10(b), the Auditor Defendants are liable as control persons of the Italian auditors under Section 20(a) of the Exchange Act.

Italy about a lack of documentation received in response to requests made in the audit of Parmalat's Brazilian operations as well as a lack of cooperation from Parmalat Participacoes. Olivetti also stated that he would be unable to issue a clean opinion because he did not believe that certain receivables of $460 million would be paid. Rather than conducting any audit procedures, and without any basis, DT-Italy simply represented to the office in Brazil that the receivable would be paid. In addition, Deloitte's Italian auditors wrote to Copeland, the CEO of DTT and Deloitte USA, expressing concern that Parmalat might drop Deloitte as its auditor because of Olivetti's inquiries and asking Copeland to intervene to settle the situation. Top DTT and Deloitte USA executives, including Copeland, confronted the auditors who had detected the fraud and told them to keep quiet about it. Deloitte's office in Brazil did not qualify its opinion. ¶¶ 1005-11, 1033.

In 2003, Olivetti complained that Parmalat Participacoes was going to transfer $187 million of inter-company debt to Bonlat by means of fraudulent accounting entries made after the fact. When Olivetti again threatened to refuse to sign off on the Parmalat Participacoes financial statements, DTT and its CEO, Copeland, removed Olivetti from any further role in auditing Parmalat's Brazilian operations. ¶ 1013. These episodes are strongly reminiscent of the situation in *Global Crossing*, 322 F. Supp. 2d at 346-47, where, in denying the auditors' motion to dismiss claims brought under Rule 10b-5(a) and (c), the court stressed that when an employee of the audit firm questioned the accounting, "the auditor's concerns had been 'quashed.'"

The Deloitte defendants attempt to brush off these allegations by asserting that they are "conclusory." *See, e.g.*, DTT Br. at 11; Copeland Br. at 12.[47] However, the Complaint alleges

---

[47] The Court has undoubtedly observed that asserting that allegations are "conclusory" is a constant refrain of defendants in securities class actions generally, and of the Auditor Defendants here, regardless of how specific the

*(cont'd)*

specifically that Copeland "confronted the auditors who had detected the fraud, and told them to keep quiet." ¶ 1033.[48] Remarkably, Defendants claim that even this specific allegation is "conclusory." Nor is there anything "conclusory" about the Complaint's allegation that when Olivetti threatened to refuse to sign off on the financial statements, DTT, through Copeland, "'removed' Olivetti from any further role in auditing Parmalat's Brazilian operations." ¶ 1013. DTT, Deloitte USA and Copeland cannot sweep aside these particularized allegations by simply labeling as "conclusory" every allegation they find inconvenient.

Thus, for all of the foregoing reasons, the Auditor Defendants are liable for the violations of Rule 10b-5(a) and (c) that were committed by themselves and their Italian member firms.

## III.   THE COMPLAINT STATES CLAIMS UNDER RULE 10b-5(b)

In addition to pleading claims against Defendants based on Rule 10b-5(a) and (c), Plaintiffs have also asserted claims under Rule 10b-5(b) against Defendants Citigroup, BAC, BASL, DTT, Deloitte USA, GT-US and GTI. Rule 10b-5(b) forbids making any false or misleading statements or omissions in connection with the purchase or sale of securities. To state a cause of action for misrepresentations and omissions under Rule 10b-5(b):

> the complaint must allege that in connection with the purchase or sale of securities, defendant, acting with scienter, either made a false material representation or omitted to disclose material information, so that plaintiff acting in reliance either on defendant's false representation or its failure to disclose material information suffered injury and damages.

*In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 69 (2d Cir. 2001).

The Bank Defendants contend that the Second Circuit's rulings in *Shapiro v. Cantor,* 123

---

allegations are. *See, e.g.*, GT-US Br. at 19 n.3, 21; GTI Br. at 5, 16, 20.

[48] Copeland argues that the wording used in the memorandum requesting his intervention "shows Mr. Copeland was unlikely to have been personally involved." Copeland Br. at 6. The Complaint alleges otherwise (¶ 1033), and on a

*(cont'd)*

F.3d 717 (2d Cir. 1997), and *Wright v. Ernst & Young, LLP,* 152 F.3d 169 (2d Cir. 1998),

mandate dismissal of Plaintiffs' claims under Rule 10b-5(b) because the Complaint does not

allege that these Defendants actually made a material misstatement.   *See, e.g.*, Citigroup Br. at 9,

15; CSFB Br. at 8, 11; BOA Br. at 5, 15; BNL Br. at 11, 16.

   This argument is not only based upon a misapprehension of Second Circuit law, but is

belied by the Complaint's allegations.  In *Shapiro*, the court stated that there is "no requirement

that the alleged violator directly communicate misrepresentations to [investors] for primary

liability to attach." *Shapiro,* 123 F.3d at 720.[49]  The recent cases in this District hold that there is

no requirement that the alleged misstatements be either personally made by or expressly

attributed to Defendants for liability to attach.  *Global Crossing*, 322 F. Supp. 2d at 33 ("[a]

strict requirement of public attribution would allow those primarily responsible for making false

statements to avoid liability by remaining anonymous, and thus 'would place a premium on

concealment and subterfuge rather than on compliance with the federal securities laws.'")

(*quoting Enron I,* 235 F. Supp. 2d at 587).  *See also In re Vivendi Univ. S.A. Sec. Litig.*, 02 Civ.

5571 (HB), 2003 WL 22489764, at *25 (S.D.N.Y. Nov. 3, 2003) (sustaining claim against CFO

for public statements made by company but not specifically attributed to him); *In re Lernout &

Hauspie Sec. Litig.*, 230 F. Supp. 2d 152, 166-67 (D. Mass. 2002) (sustaining claims against

auditor where auditor's role was widely disseminated to the public and it was "appropriate to

infer that ... investors reasonably attributed the statements" to the auditor); *In re Livent, Inc.

Noteholders Sec. Litig.*, 174 F. Supp. 2d 144, 152 (S.D.N.Y. 2001) (holding broker potentially

liable for "structuring and keeping secret the misrepresented [relationship]" between the

---

Rule 12(b)(6) motion, Copeland cannot ask the Court to make a factual finding as to the "likelihood" that Copeland
was involved.  The Complaint's factual averments are presumed to be true.

underwriter and the company).

As discussed below, the facts alleged in the Complaint are more than sufficient to support Plaintiffs' Rule 10b-5(b) claims against the Bank Defendants and the Auditor Defendants.

### A.   <u>The Bank Defendants' Violations of Rule 10b-5(b)</u>

Where, as here, Plaintiffs allege that Defendants "'prepared, directed or controlled, helped create or materially assisted in preparing the false statements their conduct goes beyond the realm of aiding and abetting' liability precluded by *Central Bank* and are sufficient to establish §10(b) liability." *See, e.g.*, *Global Crossing*, 322 F. Supp. 2d at 334.  Plaintiffs have done so here.[50]

For example, Plaintiffs allege that, in November 2003, Citigroup approved a Parmalat press release that mischaracterized Buconero (which Citigroup owned and controlled) as a "partner" with Parmalat.[51]  Citigroup knew that the portrayal of Buconero as an equity partner was materially false and misleading at the time it was made because it knew that, in reality, Citibank (and Citigroup itself) had loaned millions of dollars to Parmalat.  ¶ 796.  That Citigroup did not itself release the November 2003 press release is by no means fatal to Plaintiffs' claims.

---

[49] For this reason, Bank of America's attempt to dismiss Plaintiffs' Rule 10b-5(b) claim against it on the grounds that Plaintiffs did not participate in the private placements in which Bank of America was involved must also fail.

[50] Plaintiffs recognize that this Court recently endorsed the notion that a defendant cannot be held liable under Rule 10b-5(b) for "substantial participation" in misleading statements made by others.  *OSRecovery, Inc., v. One Groupe Int'l, Inc.*, No. 02 Civ. 8993 (LAK), 2005 U.S. Dist. LEXIS 772, at *29 (S.D.N.Y. Jan. 21, 2005).  However, even if this or other cases suggest that Defendants cannot be held liable under Rule 10b-5(b) if they do not make a statement themselves, they are nonetheless still liable for such statements under the principles of Rule 10b-5(a) & (c).  *See U.S. Envt'l*, 155 F.3d at 111.

[51] Citigroup's assertion that Plaintiffs do not explain what was wrong with this release (Citigroup Br. at 10) is flatly contradicted by the Complaint.  Plaintiffs allege that this release described Citigroup's role as a "partner" when in fact it was a lender, and Buconero was merely a vehicle designed to conceal Citigroup's loans and understate Parmalat's reported debt.  ¶¶ 267-69.

*See Scholastic,* 252 F. 3d at 76; *Global Crossing,* 322 F. Supp. 2d at 333.[52]

Such allegations are more than sufficient to support a claim under Rule 10b-5(b).  *Global Crossing*, 322 F. Supp. 2d at 334.  ("Allegations that [a defendant] 'prepared, directed or controlled,' 'helped create' or 'materially assisted in' preparing false statements issued by [another] place its involvement well beyond the realm of aiding and abetting' liability precluded by *Central Bank*.").  *See also SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1471 (2d Cir. 1996) ("Primary liability may be imposed 'not only on persons who made fraudulent representations but also on those who had knowledge of the fraud and assisted in its preparation.'") (*quoting Azrielli v. Cohen Law Offices*, 21 F.3d 512, 517 (2d Cir. 1994)).

Plaintiffs have also alleged actionable misstatements by Bank of America.[53]  For example, the Complaint alleges that Bank of America agent Luca Sala co-authored Parmalat's December 18, 1999 press release, dictating language that grossly misrepresented the $300 million investment in Parmalat Administracao.  ¶¶ 400, 849.  As explained above, this press release concealed the material fact that the so-called "investment" was in fact a private debt placement.  As Sala and Bank of America knew, since they personally structured the transaction, the cash infusion described in the press release was wholly offset by an increase in debt, as well as $3.75 million in transaction fees.  ¶¶ 401-02.  Significantly, the misrepresentations in the December 18 press release were also included in Parmalat's Directors' Report on Operations for

---

[52] This misrepresentation was consistent with Citigroup's history of misportraying its relationship with Parmalat prior to the Class Period.  For example, in November 1998, Alberto Ferraris, then a Citibank Vice President, falsely characterized what were in fact high interest loans to Parmalat as equity investments, stating that "we are investing in Canada because Parmalat is investing in Canada."  ¶ 374.  This statement was false and misleading because, at the time it was made, Citibank failed to disclose that its "investments" in Parmalat Canada were risk free due to secret put agreements that required Parmalat to buy back Citibank's ownership interest at a profit to Citibank.  ¶¶ 375-83.

[53] BASL incorporates by reference the arguments made by Bank of America and BANA with respect to Plaintiffs' claims under Section 10(b).  For the reasons set forth herein, the Complaint sets forth sufficient facts to sustain a claim against BASL.

the Third Quarter 2003.  ¶¶ 394-405, 742.  Because Sala, acting as agent for Bank of America, prepared the statement, Bank of America is liable for that misstatement under Rule 10b-5(b).  *See Scholastic*, 252 F.3d at 76; *Vivendi,* 2003 WL 22489764, at *25.

Additionally, Bank of America substantially assisted in the preparation of several private placement memoranda in connection with various debt offerings during the Class Period.  *See, e.g.,* ¶¶ 548-54, 581-82, 587, 657-58.  Because these offering memoranda contained Parmalat's financial data which, as described above, Bank of America knew to be false and misleading, Bank of America is liable under Section 10(b) for disseminating, or participating in the dissemination of, such materially misleading information.

As amply demonstrated by the foregoing, the Complaint identifies express statements by Bank of America which were false and misleading at the time they were made, and which deliberately deceived the investing public.

Finally, with respect to Bank of America's scienter, the Complaint specifically describes how each such statement was made knowingly or extremely recklessly, with the intention to deceive.  As described *supra* at 48, a strong inference of Bank of America's scienter is irrefutable.

### B.  The Auditor Defendants' Violations of Rule 10b-5(b)

There is no dispute that GT-Italy and DT-Italy each made statements when they issued unqualified opinions following their audits of Parmalat's financial statements.  For example, GT-Italy issued clean audit reports stating that it had "conducted [its] audit in accordance with generally accepted auditing standards" and concluded that Parmalat's "financial statements give a true and fair view of the state of affairs of Parmalat S.p.A. … in accordance with generally accepted accounting principles."  GT-US Br. Exh. A.  Similarly, DT-Italy issued unqualified

opinions stating that it "conducted [its] audit in accordance with the Auditing Standards recommended by Consob" and concluded that "the consolidated financial statements present fairly the financial position of the Company."  Odorizzi Decl., Exh. B.  There is also no dispute that the Complaint alleges that these statements were false and misleading.  *See*, *e.g.*, ¶¶ 464-71, 514-17, 570-73, 620, 625, 684, 690.  The Auditor Defendants do not appear to contest that the Complaint contains such allegations of material misstatements and omissions by DT-Italy and GT-Italy.

The allegations discussed above are more than sufficient to satisfy the scienter pleading requirement with respect to GT-Italy and DT-Italy, again a point which none of the Auditor Defendants appears to contest.  Additionally, as discussed above, under theories of alter ego, agency or controlling persons, the Complaint pleads facts showing that DTT, Deloitte USA and Copeland are liable for the conduct of DT-Italy, and that GTI and GT-US are liable for the conduct of GT-Italy.  Therefore, the Complaint pleads a claim that DTT, Deloitte USA, GTI and GT-US are liable under Rule 10b-5(b).

## IV.   THE COMPLAINT STATES CLAIMS UNDER SECTION 20(a)

Entirely apart from whether or not the Defendants who have moved to dismiss the Complaint are liable under Section 10(b), the Complaint also pleads claims against them under Section 20(a).  15 U.S.C. § 78t(a).  Thus, the Complaint pleads that certain controlled persons, such as Buconero, Bonlat, Camfield, GT-Italy and DT-Italy, committed fraud, and that the Defendants who controlled them are liable under Section 20(a) – even if they themselves are not liable under §10(b).

As discussed below, Defendants generally do not contest that the Complaint alleges fraud on the part of the controlled persons, but rather argue that the Complaint does not adequately

plead Defendants' control or culpable participation.  Since it is Rule 8, rather than Rule 9(b), that applies here, the Complaint's allegations are more than sufficient.  Finally, and as Defendants understandably ignore, the question of control is highly fact-intensive and therefore not appropriate for adjudication on a Rule 12(b)(6) motion.

### A.  The Pleading Requirements for a Section 20(a) Claim

The question of control person liability "is necessarily fact intensive and cannot be resolved on these motions" to dismiss.  *In re Executive Telecard, Ltd. Sec. Litig.*, 913 F. Supp. 280, 286 (S.D.N.Y. 1996); *see also No. 84 Employer-Teamster Joint Council Pension Trust v. America W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir.), *cert. denied,* 540 U.S. 966, 124 S. Ct. 433 (2003) ("intensely factual question"; reversing order granting motion to dismiss); *Hayes Lemmerz,* 271 F. Supp. 2d at 1022-23 ("whether one is a control person is a factual question"; denying motion to dismiss); *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 143 (S.D.N.Y. 1999) ("fact intensive" question for a jury); *Terrydale Liquidating Trust v. Barness*, 611 F. Supp. 1006, 1023 (S.D.N.Y. 1984) (determination of whether there is control "must be made at trial"); *SEC v. Franklin Atlas Corp.*, 154 F. Supp. 395, 400 (S.D.N.Y. 1957) ("The question of control is a factual question").  Thus, the issue of control person liability "is not ordinarily subject to resolution on a motion to dismiss" and "dismissal is appropriate only when a plaintiff does not plead any facts from which it can reasonably be inferred the defendant was a control person."  *MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d at 661.

The courts agree that a complaint asserting a Section 20(a) claim must allege a primary securities law violation by the controlled person and control by the defendant over such person.[54]

---

[54] The SEC defines "control" as "possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."

*(cont'd)*

There is a split among the courts, however, as to whether the plaintiff must allege at the pleading stage culpable participation by the controlling person.

This Court has held on more than one occasion that it "is persuaded that an Exchange Act claim against a putative control person need not allege culpable participation." *ATSI Comm., Inc. v. The Shaar Fund, Ltd.*, No. 02 Civ. 8726 (LAK), 2003 WL 21650135, at *1 (S.D.N.Y. July 14, 2003) (Kaplan, J.); *see also Neubauer v. Eva-Health USA, Inc.*, 158 F.R.D. 281, 284 (S.D.N.Y. 1994) (Kaplan, J.); BOA Br. at 25 n. 9 (conceding that "[t]his Court has previously held that a Plaintiff need not allege culpable participation"). Numerous other judges in this District have reached the same result. *See, e.g.*, *In re Interpublic Sec. Litig.*, No. 02 Civ. 6527 (DLC), 2003 WL 21250682, at *15 (S.D.N.Y. May 29, 2003); *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 415 (S.D.N.Y. 2003); *IPO,* 241 F. Supp. 2d at 396; *In re Quintel Entm't Inc. Sec. Litig.*, 72 F. Supp. 2d 283, 297-98 (S.D.N.Y. 1999); *Food & Allied Serv. Trades v. Millfeld Trading Co.*, 841 F. Supp. 1386, 1390 (S.D.N.Y. 1994); *Borden, Inc. v. Spoor Behrins Campbell & Young*, 735 F. Supp. 587, 588-89 (S.D.N.Y. 1990); *Terra Res. I v. Burgin*, 664 F. Supp. 82, 88 (S.D.N.Y. 1987).

Defendants wrongly assert that several recent Second Circuit cases (decided prior to this Court's ruling in *ATSI* and prior to the decisions in *Interpublic*, *WorldCom* and *IPO*) establish that culpable participation must be pled.[55] While those cases indicate that culpable participation is an element of a Section 20(a) claim which must be *proven* at trial, none decided how a Section

---

17 C.F.R. § 240.12b-2; *see also* 17 C.F.R. § 230.405; *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1473 (2d Cir. 1996) (adopting this standard for Section 20(a) claims). Section 20(a) requires "only some indirect means of discipline or influence short of actual direction to hold a 'controlling person' liable." *Myzel v. Fields*, 386 F.2d 718, 738 (2d Cir. 1967). In this Circuit, "control requires only the ability to direct the actions of the controlled person, and not the active exercise thereof." *Dietrich v. Bauer*, 126 F. Supp. 2d 759, 764 (S.D.N.Y. 2001) (internal quotations omitted).

[55] *Suez,* 250 F.3d at 101; *Ganino*, 228 F.3d 154; *Boguslavsky v. Kaplan*, 159 F.3d 715 (2d Cir. 1998); *First Jersey*
(cont'd)

20(a) claim must be *pled.*  Indeed, Judge Baer noted in *Vivendi*, 2003 WL 22489764, at *23, that "*First Jersey* was concerned with the sufficiency of evidence as to control at the conclusion of trial and its holding is inapposite … on a motion to dismiss."  None of the Second Circuit cases relied on by Defendants addressed, or even acknowledged, the split among the District Courts in this Circuit concerning whether culpable participation must be pled.

Indeed, in *First Jersey* and *Suez*, both cited by Defendants, the Second Circuit *upheld* Section 20(a) claims based on allegations of control coupled with an underlying violation, without any allegations of culpable participation.  *See Suez,* 250 F.3d at 101 (allegation that "DeRoziere was an officer of the Bank and that he had primary responsibility for the dealings of that Bank and the other corporate defendants with SAM Group … [w]hile somewhat broad, [were] sufficient to plead controlling-person liability for the Bank derived from DeRoziere, the purported primary violator"); *First Jersey*, 101 F.3d at 1473 (finding evidence of primary violation and control, and then turning to issue of whether defendant had satisfied his affirmative defense, without discussing whether plaintiff had established culpable participation).

Courts in this Circuit have recently concluded that the reason the Second Circuit did not discuss culpable participation in *Suez* was because "when a plaintiff pleads control and a primary violation, the plaintiff has pled 'culpable participation.'"  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 380 F. Supp. 2d 249, 272 (S.D.N.Y. 2004).  As Judge Conner held:

> While nothing is clear in this area of § 20(a), it appears that when a plaintiff pleads control over a primary violator the plaintiff has alleged "culpable participation" because a strong inference generally arises that the controlling party should have known that the primary violator was engaged in fraudulent conduct.

2004 WL 371820, at *21; *see also Dietrich*, 126 F. Supp. 2d at 765-66 (where a control person knew or should have known that primary violator over whom the person had control was

---

*Sec.,* 101 F.3d 1450.

engaged in fraudulent conduct, but did not take steps to prevent the primary violation, "there is culpability in the sense required by" the Second Circuit).

In *WorldCom,* 294 F. Supp. 2d at 415, Judge Cote held that "a plaintiff must plead only the existence of a primary violation by a controlled person and the direct or indirect control of the primary violator by the defendant in order to state a claim" under Section 20(a).  The court stated:

> The concept of culpable participation describes that degree of control which is sufficient to render a person liable under Section 20(a).  At the pleading stage, the extent to which the control must be alleged will be governed by Rule 8's pleading standard.  At trial, the degree of control will require the plaintiff to present *prima facie* evidence of sufficient control to support liability.  Although previous opinions of this Court have imposed a greater burden on plaintiffs at the pleading stage, this Court now finds that plaintiffs need not meet the PSLRA's heightened pleading standard in alleging a violation of Section 20(a), or separately allege culpable participation.

*Id.*

Likewise, in her recent decision in *IPO,* 241 F. Supp. 2d at 393-96, Judge Scheindlin analyzed Section 20(a) at length and concluded that culpable participation does not need to be pled, and most certainly does not need to be pled with particularity.  The court noted that there is no basis for equating "culpable participation" with scienter, as culpable conduct "can be blameworthy though it was done unintentionally or unknowingly," and "the scienter-free definition of 'culpable' is particularly appropriate."  *Id.* at 394 n.182.  Judge Scheindlin further observed that the plaintiffs "need not affirmatively plead negligence" and that:

> In both *First Jersey* and *Suez Equity*, allegations of control coupled with an underlying violation sufficed to plead a Section 20(a) claim.  Neither case – both post-PSLRA – even hinted that scienter must be pled in a Section 20(a) claim … and *Suez Equity* explicitly recognized that plaintiff's allegations, while adequate to state a claim under Section 20(a), were "somewhat broad," *i.e.*, not particular.  Thus, although the meaning of "culpable participation" is unclear, there is strong reason to believe that it is not the same as scienter.

*Id.* at 395.[56]

Thus, contrary to Defendants' assertions, Section 20(a) claims must be pled "only in accordance with Rule 8(a).  Neither the PSLRA (because scienter is not an essential element), nor Rule 9(b) (because fraud is not an essential element), apply to a Section 20(a) claim."  *Id.* at 396; *accord Vivendi*, 2004 WL 876050, at *1; *Fezzani v. Bear Stearns & Co.*, No. 99 Civ. 0793 (RCC), 2004 WL 744594, at *23 (S.D.N.Y. Apr. 6, 2004) ("[t]he Rule 9(b) heightened pleading standard does not apply to averments of control person liability."); *WorldCom*, 294 F. Supp. 2d at 414-15; *Duncan v. Pencer*, No. 94 Civ. 0321 (LAP), 1996 WL 19043, at *18 (S.D.N.Y. Jan. 18, 1996).

Therefore, a "short, plain statement that gives the defendant fair notice of the claim that the defendant was a control person and the ground on which it rests its assertion ... is all that is required."  *WorldCom*, 294 F. Supp. 2d at 415-16; *accord In re Philip Servs. Corp. Sec. Litig.*, No. 98 Civ. 0835 (MBM), 2004 WL 1152501, at *19 (S.D.N.Y. May 24, 2004).  "[N]aked allegations of control ... will typically suffice to put a defendant on notice of the claims against her."  *IPO*, 241 F. Supp. 2d at 352; *accord Vivendi*, 2003 WL 22489764, at *2 (distinguishing what must be *pled* from what must ultimately be *proven* at trial); *see also Teachers' Ret. Sys.*, 2003 WL 2105809, at *12 ("At the motion to dismiss stage, a plaintiff need only plead facts supporting a reasonable inference of control").  As this Court stated in *Neubauer*, 158 F.R.D. at 284-85 (Kaplan, J.), "the allegation of control is not an averment of fraud and therefore need not be made with particularity."

---

[56] Numerous other courts in this Circuit, including this Court, have agreed that scienter is not a requirement for a Section 20(a) claim.  *See ATSI Comm., Inc. v. The Shaar Fund, Ltd.*, No. 02 Civ. 8726, 2003 WL 21650135, at *1 (S.D.N.Y. July 14, 2003) (Kaplan, J.); *Vivendi*, 2004 WL 876050, at *2; *Duncan*, 1996 WL 19043, at *17; *Polycast Tech. Corp. v. Uniroyal*, No. 87 Civ. 3297 (JMW), 1988 WL 96586, at *8 (S.D.N.Y. Aug. 31, 1988); *In re CitiSource, Inc. Sec. Litig.*, 694 F. Supp. 1069, 1076 (S.D.N.Y. 1988).

Similarly, assuming *arguendo* that there were a requirement to plead culpable participation, at most all a plaintiff need plead are facts showing "that the controlling person knew or should have known that the primary violator, over whom that person had control, was engaging in fraudulent conduct." *Global Crossing*, 322 F. Supp. 2d at 349 (internal quotation marks omitted); *see also Cromer,* 245 F. Supp. 2d at 563 (culpable participation is shown where the controlling person knew or should have known that the controlled person was engaged in fraudulent conduct, but took no steps to prevent the violation).

### B.  Citigroup and Citibank Are Liable as Control Persons

Neither Citigroup nor Citibank challenges the sufficiency of the control person allegations against them.  Thus, Plaintiffs' allegations that Citigroup, controls Citibank, N.A., Buconero, Vialattea, and Eureka, and that Citibank, N.A. controls Buconero, Vialattea, and Eureka are not in dispute.  ¶¶ 171-75, 1187-89, 1193-95.  The only inquiry, therefore, is whether a primary violation has been sufficiently pled against the controlled parties.  As detailed *supra* at 43, the Complaint plainly establishes Rule 10b-5(a) and (c) liability against Citibank, Eureka, Vialattea, and Buconero for their knowing and active participation in the fraud.

### C.  Bank of America Corp. and Bank of America N.A. Are Liable As Control Persons

#### 1.  Plaintiffs Have Pled a Primary Violation by a Controlled Person

The Complaint clearly alleges that Bank of America Corp. controlled, for purposes of Section 20(a), Bank of America, N.A.; Banc of America Securities, LLC; Banc of America Securities, Ltd.; Bank of America International, Ltd.; Luca Sala; Antonio Luzi; and Luis Moncada. ¶ 178.  Likewise, Plaintiffs allege that BANA controlled BASL; Banc of America Securities LLC; Bank of America International, Ltd.; Sala; Luzi; and Moncada. ¶ 180.

As detailed *supra* at 48, the well-pled allegations in the Complaint amply set forth a primary violation of Section 10(b) with respect to these controlled parties.

### 2.      Plaintiffs Have Sufficiently Alleged Control

Defendants' suggestion that Plaintiffs have not properly alleged that BAC or BANA had control over the controlled entities and individuals is simply not sustainable.  The Complaint thoroughly delineates the relationships between the various entities and individuals under the Bank of America umbrella and defines their respective roles in the fraudulent schemes.  For instance, Plaintiffs allege that BAC, by virtue of its ownership and contractual rights, had the power to influence and control the decision-making of BANA; BASL; Bank of America International, Ltd.; Banc of America Securities LLC; Sala; Luzi; and Moncada.  ¶ 1199.  Indeed, the Complaint alleges that BAC had direct involvement in the day-to-day operations of those entities.  ¶ 1200.

Likewise, by virtue of ownership interest and contractual rights, BANA had the power to influence and control the decision-making of BASL; Bank of America International, Ltd.; Banc of America Securities LLC; Sala; Luzi; and Moncada, and had direct involvement in the day-to-day operations of those entities.  ¶¶ 1205-06.  Moreover, the Complaint alleges that Sala, Luzi, and Moncada were employed by BASL, and thus, as a matter of ownership interest, superior position, and contract, Plaintiffs are entitled to a presumption that BAC and BANA were in a position to control individuals in Sala, Luzi, and Moncada's positions.  ¶ 1212.  Such allegations are sufficient to allege control consistent with Rule 8.  *Ellison v. American Image Motor Co.,* 36 F. Supp. 2d 628, 622 (S.D.N.Y. 1999); *Troyer v. Kareagi*, 476 F. Supp. 1142, 1150 (S.D.N.Y. 1979).

Therefore, contrary to Bank of America's assertion, the Complaint does not merely infer

control from parent/subsidiary relationships.  BOA Br. 26-27.  The Complaint clearly alleges

facts giving rise to a reasonable inference of control and, indeed, pleads actual control on the part

of BAC and BANA.

### 3.      Plaintiffs Have Alleged Culpable Participation

Finally, Bank of America contends that Plaintiffs have failed to demonstrate "culpable

participation" on its part or the part of any of the individual Bank of America Defendants.  BOA

Br. at 28-30.  As discussed above, Plaintiffs need not plead culpable participation to establish

Section 20(a) liability.  *See supra* at 91.  In any event, Plaintiffs have amply alleged a culpable

state of mind by each of the Bank of America entities and the individual Bank of America

employees (Sala, Luzi and Moncada) who were intimately involved in the schemes to defraud.

### D.      Defendant BASL Is Liable as a Control Person

BASL also argues that, for the same reasons asserted by BAC and BANA, the Complaint

fails to state a claim against BASL for control person liability under Section 20(a).  BASL Br. at

10.  This contention is just as groundless as when advanced by Bank of America.

First, Plaintiffs have clearly demonstrated a primary violation by a controlled person.

The Complaint alleges that BASL, on its own and as successor to Bank of America International,

Ltd., acted as a controlling person of its agents and employees, including but not limited to Sala,

Luzi and Moncada, and further, that Sala, Luzi and Moncada were employed by BASL directly

and as Bank of America International, Ltd.'s successor.  ¶¶ 1211-12.  As detailed *supra* at 48,

these controlled persons orchestrated and participated in the fraudulent schemes detailed above,

and committed primary violations of securities laws, including Rule 10b-5(a) and (c).

Second, the Complaint sufficiently alleges that BASL controlled Sala, Luzi and

Moncada.  As described above, Plaintiffs allege that these individuals were employed by BASL,

a relationship which gives rise to a presumption of control.  ¶ 1212; *see Ellison,* 36 F. Supp. at 644; *Troyer,* 476 F. Supp. at 1150.  Moreover, the Complaint describes these individuals' misconduct and participation in the fraudulent schemes on behalf of BASL and Bank of America. Indeed, the Complaint not only details Sala's direct involvement in the bogus "outside" investment in Parmalat's Brazilian operations (¶¶ 400, 849), but it also describes how Bank of America's various dealings with Parmalat were conducted through Bank of America executives including:  Sala, who was responsible for the Parmalat account and Bank of America's corporate Finance and Relationship Management team; Luzi, who worked directly under Sala's supervision and was a member of the Corporate Finance and Relationship Management team; and Moncada, who was responsible for the credit portfolio of Bank of America's Italian branch. ¶ 835.  Thus, the conduct of these individuals, as executives and employees of BASL, and acting on behalf of BASL, plainly establishes that they were controlled by BASL.

Third, BASL's argument that the Complaint fails to plead culpable participation is baseless.  As detailed *supra* at 48, BASL, through its agents, employees and affiliates, clearly acted with the requisite state of mind in controlling the fraudulent conduct of its employees.

### E.    BNL Is Liable as a Control Person of Ifitalia

#### 1.    The Complaint Pleads a Primary Violation by Ifitalia

As previously discussed, the Complaint establishes that Ifitalia, as the instrument of BNL, knew full well the illicit nature of its factoring arrangement with Parmalat, as confirmed by the testimony of Parmalat insiders, including Tonna and Pessina.  ¶¶ 301, 306-07.  Indeed, Ifitalia, at the behest of BNL, advised Parmalat of the best way to avoid having the bank's processing software detect the scheme.  ¶¶ 302-03, 306-07.  These well-pled allegations clearly show manipulative and deceptive conduct in furtherance of a fraudulent scheme, and state a

claim under Rule 10b-5(a) and (c).  As such, BNL's contention (BNL Br. at 22) that Plaintiffs

have not alleged a primary violation by Ifitalia is simply untenable.

### 2.        BNL Is a Controlling Person of Ifitalia

BNL's control over Ifitalia is equally well-pled.  As an initial matter, the Complaint

alleges that Ifitalia is a 99.6% owned subsidiary of BNL.  ¶ 295.  It further alleges that Ifitalia

functions as the factoring arm of BNL, one of the largest banks in the world.  ¶¶ 21, 295.  As

such, if BNL were to engage in a factoring arrangement, it is logical that it would do so through

Ifitalia.  Indeed, the Complaint is replete with allegations that BNL acted through Ifitalia, and

likewise, that Ifitalia acted under the dominion of BNL.  ¶¶ 21, 185, 295, 297, 299, 306, 308.

Moreover, the close relationship between Parmalat and BNL (in terms of cross-

directorship and debt underwriting), as well as the 99.6% ownership interest of BNL in Ifitalia,

gives rise to the inescapable inference that Ifitalia's participation in the factoring scheme with

Parmalat was at BNL's direction.  Significantly, not only do Plaintiffs allege cross-directorship

between BNL and Parmalat, but they also allege cross-directorship between BNL and Ifitalia.

Specifically, Paolo Sciume was the President of Ifitalia, a member of the Board of Directors of

BNL, as well as a member of the Board of Directors of Parmalat.  ¶ 868.  These relationships,

pled with appropriate specificity and detail, clearly satisfy the standard for control.

Perhaps the strongest indication of BNL's control over Ifitalia lies in the fact that,

according to Pessina, Tonna negotiated the stale invoice and factoring scheme *with BNL*.  ¶ 908.

 This demonstrates that while Ifitalia carried out the scheme with Parmalat, it did so at the

direction of its 99.6% parent, which dealt with Parmalat directly in devising and orchestrating

the scheme.  The reasons for Tonna's dealing with BNL, instead of Ifitalia, is obvious:  the true

control rested with BNL, and Tonna wanted to be sure that BNL – not Ifitalia – would provide

the financing necessary to conduct the scheme.  ¶ 908.  Accordingly, it is apparent that BNL

maintained and exerted control over Ifitalia, and used that subsidiary to effect the fraud that it

had devised with Parmalat.  *See Steed Finance LDC v. Nomura Sec. Int'l, Inc.*, No. 00 Civ. 8058,

2001 WL 1111508, at *10 (S.D.N.Y. Sept. 20, 2001) (control found where plaintiff alleged

parent/subsidiary relationship,  overlap of the companies' boards of directors and actual control

over subsidiary's provision of false and misleading information); *In re Independent Energy*

*Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 770 (S.D.N.Y. 2001) (control found where

plaintiff alleged parent/subsidiary relationship and existence of some common management); *In*

*re American Bank*, 93 F. Supp. 2d at 443-44 (control found where plaintiff alleged

parent/subsidiary relationship and, *inter alia*, that companies shared one officer).

BNL argues that Plaintiffs' "conclusory allegations" regarding its control over Ifitalia are

not sufficient to support a Section 20(a) claim (BNL Br. at 24, *citing Suez*, 250 F.3d at 102), and

that the mere fact of its "parent/subsidiary relationship (99% ownership)" with Ifitalia is

insufficient to support a control person claim.  *Id*. at 24-25 (*citing WorldCom*, 2004 WL

1097786, at *3).  This argument misses the mark.  The question is not whether, taken separately,

Plaintiffs' allegations support the existence of control.  If the Court addresses this issue at all at

this stage of the litigation – and the law makes clear that control is appropriately determined by

the trier of fact – the only question presented is whether Plaintiffs' allegations as a whole have

provided BNL with fair notice of the basis for the control person claim.  *WorldCom*, 2004 WL

1097786, at *3.[57]

---

[57]  BNL contends that claims that Ifitalia had "knowledge of 'stale' invoices" must be rejected because they are based upon "testimony given by Claudio Pessina, an indicted Parmalat executive who was allegedly involved in the destruction of evidence."  BNL Br. at 23.  However, issues of credibility, like issues regarding control, are factual matters which may not be resolved on a motion to dismiss.  *See New Moon Shipping Co., Ltd. v. Man B. & W. Diesel AG,* 121 F.3d 24, 30 (2d Cir. 1997); *Hetchkop v. Woodlawn at Grassmere, Inc.,* 116 F.3d 28, 33 (2d Cir. 1997);

*(cont'd)*

BNL bases its argument on two cases with glaring factual dissimilarities from the case at bar.  First, in *Suez*, the Second Circuit affirmed the dismissal of control claims as to certain of the bank defendants' subsidiaries and related entities because the plaintiffs had merely alleged, without more, that these entities "controlled" several of the corporate defendants.  *Suez,* 250 F.3d at 102.[58]  Similarly, in *WorldCom*, the plaintiffs asserted that certain holding company defendants "controlled" the fraudulent actions of their respective underwriting subsidiaries in the bond offerings.  *WorldCom*, 2004 WL 1097786, at *1.  The court held that the only fact pled to support control was the existence of a parent/subsidiary relationship between them.  *Id.*  As described above, the Complaint in the instant case provides far more detailed facts demonstrating that BNL, aside from merely owning 99.6% of Ifitalia, actually controlled that subsidiary for purposes of Section 20(a).

### 3.  The Complaint Pleads Culpable Participation by BNL

BNL's contention that Plaintiffs fail to establish "culpable participation" on BNL's part is wholly unsustainable in light of the facts alleged.  Though there is no requirement that culpable participation be pled, *supra* at 91, the Complaint nonetheless sufficiently alleges BNL's culpable participation in the scheme.  As detailed *supra* at 55, it is clear that BNL knew or should have known about the fraudulent scheme (indeed it participated in that scheme).[59]  Under *Global Crossing* and *Cromer*, that is sufficient to allege culpable participation

---

*Kulak v. City of New York,* 88 F.3d 63, 70 (2d Cir. 1996).

[58] The Court of Appeals, however, reinstated the control claim against a bank officer whom the complaint identified as "an officer of the Bank [with] primary responsibility for the dealings of that Bank and the other corporate Defendants with SAM Group."  *Id.* at 101.  Although this allegation was seen as "somewhat broad," it was held "sufficient to plead controlling-person liability" with respect to that individual.  *Id.*

[59] Indeed, the knowledge of Ifitalia and BNL is evidenced by documents obtained from prosecutors in Milan, which "list each of the factoring transactions, with identification of the concessionaire, the amount of the credit, and the factoring company . . . noted [as] "Ifitalia (BNL)."  ¶ 305.

## F.  DTT, Deloitte USA and Copeland Are Liable as Control Persons

As discussed above, it is undisputed that the Complaint contains sufficient allegations to set forth a primary violation of Rule 10b-5 by DT-Italy.  *See*, *e.g.* DTT Br. at 30.

With respect to control, the Complaint plainly alleges that DTT controls the member firms in the Deloitte global network, including DT-Italy, and that Deloitte USA controls DTT. ¶¶ 135, 136, 151, 1123, 1130.  It specifically alleges that DTT had the power, which it exercised, to dictate the auditing standards and procedures used by Deloitte auditors around the world.  *See, e.g.*, ¶ 146 (Deloitte "promulgates and enforces professional standards which its member firms must obey, and has the power and authority to exercise oversight over these firms"); *see also* ¶¶ 144, 147.  As noted above, the ability to dictate the "policies" of another is the exact concept that the SEC has used to define "control."  17 C.F.R. § 240.12b-2.

In addition, as alleged in the Complaint, DTT's CEO has stated that "any member firm or partner who fails to live up to our ethical principles will be subject to expulsion or termination." ¶ 147.  "[I]ndirect means of discipline or influence" are sufficient for control person liability. *Myzel v. Fields*, 386 F.2d 718, 738 (2d Cir. 1967).  The Complaint further alleges that Copeland, the CEO of DTT and Deloitte USA, "had direct involvement in the day-to-day operations" of DTT and Deloitte USA (¶ 1138) and that "[b]y virtue of his executive positions … Copeland had the power to influence and did influence and control, directly or indirectly, the decision making of" DTT and Deloitte USA.  ¶ 1137.

An eloquent example of the power of Copeland, DTT and Deloitte USA to control activities by Deloitte offices in other countries is provided by the episode in which Olivetti in Deloitte's office in Brazil raised concerns about Parmalat's finances that DT-Italy did not want to hear.  The auditors in Italy complained to Copeland in the U.S. to intervene for fear that

Parmalat might take its business elsewhere.  Consequently, "[t]op executives of Deloitte, including its officers in the United States, such as CEO Copeland, confronted the auditors who had detected the fraud, and told them to keep quiet so that Deloitte could retain its multi-million dollar client."  ¶ 1033.  When Olivetti continued to rock the boat, "the global Deloitte organization, headed in the United States by Jim Copeland, 'removed' Olivetti from any further role in auditing Parmalat's Brazilian operations."  ¶ 1013; *see also* ¶¶ 1010-11.  These circumstances show that the auditors of DT-Italy believed that Copeland, DTT and Deloitte USA had the power to control activities by Deloitte offices in other countries, and that in fact they had such power.[60]

Misrepresenting the allegations of the Complaint, Copeland suggests that the control person allegation against him is based simply on the fact that he is a director.  *See* Copeland Br. at 10 ("'Director status alone does not establish control person liability'" and "'mere bystanders, even if aware of the fraud, cannot be held liable for inaction'").  The relevance of such law is difficult to decipher, since the Complaint alleges that Copeland was not merely a director, but the CEO of both DTT and Deloitte USA,[61] and that he "had direct involvement in the day-to-day operations of [DTT and Deloitte USA], and specifically with respect to audit and other services provided by [DTT and Deloitte USA] to Parmalat entities, and even caused the removal of audit

---

[60] These allegations entirely distinguish *In re Asia Pulp & Paper Co. Sec. Litig.,* 293 F. Supp. 2d 391 (S.D.N.Y. 2003), upon which Defendants rely, because in that case, unlike the situation at bar, the complaint lacked any allegations that the Arthur Andersen international firm "was able to control or in any way influence the particular audits conducted or opinions offered by its individual member firms."  *Id.* at 396.

[61] The CEO of an entity is generally considered a controlling person and is "hard pressed to argue otherwise."  *In re Hayes Lemmerz Int'l, Inc. Equity Sec. Litig.*, 271 F. Supp. 2d 1007, 1021-22 (E. D. Mich. 2003); *see also Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1108 (10th Cir. 2003); *State of New Jersey v. Sprint Corp.*, 314 F. Supp. 2d 1119, 1143-44 (D. Kan. 2004); *In re Vivendi Universal, S.A. Sec. Litig.*, No. 02 Civ. 5571, 2003 WL 22489764, at *9  (S.D.N.Y. Nov. 3, 2003); *IPO*, 241 F. Supp. 2d at 352 n.26; *In re Ribozyme Pharm., Inc. Sec. Litig.*, 119 F. Supp. 2d 1156, 1167 (D. Colo. 2000); *In re Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1, 24 n.28 (D.D.C. 2000) ("a position as CEO may be enough to establish control person status by itself"); *Dietrich*, 76 F. Supp. 2d at 335 (president is a

*(cont'd)*

partners who raised concerns in reports about the appropriateness of Parmalat's accounting."
¶ 1138.

On facts less compelling than those at bar, Judge Pollack denied a motion to dismiss Section 20(a) claims in *Teachers' Ret. Sys.,* 2003 WL 2105809, at *3.  That case involved the BDO Seidman accounting firm network, in which the international organization imposed "strict quality control" on the member firms and "stringent conditions with which each member firm has to comply to be part of the BDO network."  Judge Pollack held that these allegations were sufficient to plead controlling person liability under Section 20.

As noted above, it is not necessary for a plaintiff to plead culpable participation by the control person.  Assuming, *arguendo*, that it were necessary, the Complaint sufficiently does so.  Culpable participation is adequately alleged where facts show that "the controlling person knew or should have known that the primary violator, over whom that person had control, was engaging in fraudulent conduct."  *In re Global Crossing, Ltd. Sec. Litig.,* No. 02 Civ. 910 (GEL), 2004 WL 763890, at *24 (S.D.N.Y. Mar. 23, 2004); *see also Cromer,* 245 F. Supp. 2d at 563 (culpable participation is shown where the controlling person knew or should have known that the controlled person was engaged in fraudulent conduct, but took no steps to prevent the violation).  The Complaint alleges that the Deloitte control persons had access to the Parmalat workpapers of DT-Italy and direct involvement in their audits of Parmalat financial statements.  *See* ¶¶ 1124-25, 1131-32, 1137.  It further alleges that when concerns were raised by Deloitte auditors, DTT, Deloitte USA and Copeland took steps to quash the concerns.  ¶¶ 1005-13, 1033.  These allegations are sufficient to establish that the control persons knew or should have known about the fraud but did nothing to prevent it.

---

"position[] from which control 'can be directly inferred without more'").

G.      **GTI and GT-US Are Liable as Control Persons**

As discussed above, it is undisputed that the Complaint contains sufficient allegations to set forth a primary violation of Rule 10b-5 by GT-Italy.  The Complaint sufficiently alleges that GTI is a controlling person of GT-Italy and that GT-US is a controlling person of GTI.  ¶¶ 157-58, 1143, 1151.[62]  The Complaint also properly pleads that GTI and GT-US were controlling persons of Bonlat and Camfield.  ¶¶ 157, 158, 1143, 1145, 1152.

The specific facts alleged in the Complaint belie Defendants' assertions, *e.g.*, GT-US Br. at 19 n.3, that the allegations of control are "conclusory."  Defendants' assertion that the Complaint does not allege a single fact to support its claim of control or explain "through what mechanism that control was supposedly exercised," GT-US Br. at 6; GTI Br. at 1, is demonstrably false: the Complaint alleges explicitly that GTI dictated the auditing standards and procedures used by the Grant Thornton member firms.  *See, e.g.*, ¶ 163 (GTI "establishes procedures, policies and practices for its members.  Additionally, [GTI] performs a review of its members at least every three years to ensure their compliance with such procedures, policies and practices") ¶ 1143; ("By virtue of the unified international structure of the auditing firm and contractual relationships among member firms … [GTI] had the power to influence and control, and did influence and control, directly or indirectly, the decision making of its member firms and their respective partners").  As discussed above, this power to dictate the "policies" of the member firms constitutes "control."  17 C.F.R. § 240.12b-2.

The power of GTI to control the conduct of the member firms is demonstrated by the fact that GTI could force partners or offices around the world to adhere to its procedures or face

_____

[62] Without citing any authority, GT-US claims that a Section 20(a) claim cannot be based on control "twice removed," *i.e.*, that there can be no claim against GT-US based on the allegation that GT-US controlled GTI and

*(cont'd)*

105

expulsion from the Grant Thornton group.  ¶ 163.  Indeed, it eventually did expel GT-Italy from the Grant Thornton family because of its Parmalat audit work.  ¶ 168.  Such power to "discipline or influence" the member firms is sufficient for control person liability.  *Myzel v. Fields*, 386 F.2d at 738; *see Teachers' Ret. Sys.,* 2003 WL 21058090, at *3 (allegations that international BDO firm imposed "strict quality control" on the member firms and "stringent conditions with which each member firm has to comply to be part of the BDO network" sufficient to plead controlling person liability under Section 20(a)).

Unable to dispute that the Complaint alleges that Bonlat and Camfield committed fraud, GTI resorts to its familiar refrain that the allegations as to its control of Bonlat and Camfield are "conclusions" or "without factual support."  GTI Br. at 20.  In reality, GTI is merely challenging the accuracy of the allegations, which, of course, it may not do on a motion to dismiss. Moreover, the allegations of control are based on specific factual averments, such as that GTI, directly or indirectly through other Grant Thornton entities, "created and oversaw" Bonlat and Camfield and "had the authority to and did control Bonlat and Camfield," and that Camfield "was located in, and shared the staff of, [GTI]'s Singapore member firm's offices."  ¶ 1145.  As it is indisputable that the Complaint alleges fraud by Bonlat and Camfield, the Complaint unquestionably states a claim under Section 20(a) against their controlling persons, GTI and GT-U.S.

Assuming, *arguendo*, even if it were necessary to plead culpable participation, the Complaint sufficiently pleads it.  The Complaint alleges that GT-US and GTI had access to the Parmalat workpapers of GT-Italy and direct involvement in their audits of Parmalat financial statements.  *See* ¶¶ 1144, 1151-53.  These allegations are sufficient to establish that GT-US and

---

GTI controlled GT-Italy.  GT-US Br. at 23.  The SEC has rejected GT-US's argument.  *See* 17 C.F.R. § 240.12b-2
*(cont'd)*

GTI knew, or at least should have known, about the fraud but did nothing to prevent it.  *See Global Crossing,* 2004 WL 763890, at \*24; *Cromer,* 245 F. Supp. 2d at 563.

## V.   <u>PLAINTIFFS HAVE SUFFICIENTLY ALLEGED CAUSATION</u>

Certain Defendants argue that the Complaint fails to demonstrate that their conduct caused Plaintiffs' losses.  *See, e.g.,* BOA Br. at 18; DTT Br. at 14; BNL Br. at 20; Citigroup Br. at 19.  A securities fraud plaintiff must plead facts sufficient to demonstrate both "transaction causation" and "loss causation."  *Lentell v. Merrill Lynch & Co., Inc.*, 2005 WL 107044, at \*9 (2d Cir. Jan. 20, 2005); *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 96-97 (2d Cir. 2003); *Suez,* 250 F.3d at 95.  *See* 15 U.S.C. § 78u-4(b)(4).  Defendants' contentions that neither transaction causation nor loss causation are sufficiently pled are entirely meritless.

### A.   <u>Plaintiffs Have Adequately Alleged Transaction Causation</u>

#### 1.   <u>The Standards for Pleading Transaction Causation</u>

The Second Circuit has defined transaction causation as "akin to reliance," requiring "only an allegation that 'but for the claimed misrepresentations or omission, the plaintiff would not have entered into the detrimental securities transaction.'"  *Lentell,* 2005 WL 107044, at \*9 (*quoting Emergent Capital*, 343 F.3d at 197).  Transaction causation does not, as Defendants contend, require reliance on a specific misstatement.  Rather, reliance is presumed where, as here, "'a plaintiff's claim is based on a defendant's failure to disclose material information.'"  *Dietrich*, 76 F. Supp. 2d at 340 (*quoting Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb, Inc.*, 967

---

(defining "control" as including the "indirect" power to direct the policies of another).

F.2d 742, 748 (2d Cir. 1992)).[63]  *See also Affiliated Ute Citizens v. United States*, 406 U.S. 128,

153-154, 92 S. Ct. 1456, 1472 (1972); *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d

Cir. 1968).

A plaintiff is also entitled to a rebuttable presumption of transaction causation in a "fraud

on the market" case.  *Lentell*, 2005 WL 107044, at *9; *Fogarazzo v. Lehman Bros., Inc.*, 341 F.

Supp. 2d 274, 286 (S.D.N.Y. 2004).  The Supreme Court explained this theory as follows:

> The fraud on the market theory is based on the hypothesis that, in an open and
> developed securities market, the price of a company's stock is determined by the
> available material information regarding the company and its business….
> Misleading statements will therefore defraud purchasers of stock even if the
> purchasers do not directly rely on the misstatements….  The causal connection
> between the defendants' fraud and the plaintiffs' purchase of stock in such a case is
> no less significant than in a case of direct reliance on misrepresentations.

*Basic v. Levinson*, 485 U.S. 224, 241-42, 108 S. Ct. 978, 989 (1988) (quotations omitted); *see*

*also Hevesi v. Citigroup, Inc.*, 366 F.3d 70, 77 (2d Cir. 2004) (*quoting Basic*); *DeMarco v.*

*Robertson Stephens, Inc.*, 318 F. Supp. 2d 110, 119-120 (S.D.N.Y. 2004).[64]

---

[63] The Second Circuit provided the rationale for providing a plaintiff with this rebuttable presumption in omission cases:

> Because, in such situations, the plaintiff is unaware of the omitted information, the record generally
> fails to provide a basis from which a finder of fact may evaluate how the plaintiff would have reacted
> if he or she had been aware of the withheld information.

*Litton*, 967 F.2d at 748.

[64] Bank of America erroneously argues that Plaintiffs cannot demonstrate transaction causation with respect to it because Bank of America had no dealings with Plaintiffs and did not make any disclosures upon which Plaintiffs relied.  *See* BOA Br. at 18.  However, under the fraud on the market theory, a plaintiff need not allege any direct reliance on a defendant's misrepresentations or omissions.  *See Fogarazzo*, 341 F. Supp. 2d at 286 (plaintiff entitled to fraud on the market theory "even where a plaintiff was unaware of the fraudulent conduct at the time of the purchase or sale").  Likewise, the Court should reject the arguments raised by DTT (Br. at 15), BNL (Br. at 20-21) and Citigroup (Br. at 20) that there is no transaction causation as to them because they did not "inject" any information into the marketplace. As stated above, Plaintiffs have in fact alleged that each of these Defendants engaged in schemes designed to falsify Parmalat's financial statements through the creation of fictitious assets or concealment of debt, and that they withheld from the market material information about their dealings with Parmalat and Parmalat's financial condition.

### 2.   Plaintiffs Have Alleged Claims Based Upon Defendants' Omissions

Plaintiffs have alleged that each Defendant (including Bank of America, BNL, Citigroup, and DTT) participated in the fraud through various improper transactions, and concealed and failed to disclose material information about those transactions and Parmalat's deteriorating financial condition.  For example, Plaintiffs allege that Bank of America substantially assisted in the preparation of a press release and several private placement memoranda for Parmalat debt offerings, (¶¶ 400, 548-54, 581-82, 587, 657-58, 849), which omitted certain material facts known to the bank, including that the bank's $300 million investment was, in fact, a private debt placement designed solely to artificially inflate the value of Parmalat's Brazilian affiliate. ¶¶ 395-405.  Similarly, Plaintiffs have alleged that both Citigroup and DTT omitted material information regarding various aspects of the fraud (such as the false invoicing and double-billing schemes) and other improper transactions and improper accounting for those transactions.[65] Plaintiffs are therefore entitled to a presumption of reliance and a finding of transaction causation.  *See, e.g., Suez*, 250 F.3d at 95-98 (transaction causation found against bank and related entities for withholding negative material information about company principal's financial history); *Arthur Young & Co. v. Reves*, 937 F.2d 1310, 1327-32 (8th Cir. 1991) (transaction causation found against auditor for omitting to disclose material information about

---

[65] For Citigroup omissions, *see, e.g.*, ¶¶ 12, 202-08, 751 (false invoice scheme); ¶¶ 20, 31-33, 270-81, 292-93, 751, 801-18 (double billing scheme); ¶¶ 24-25, 31-33, 48, 82, 197, 573, 751, 819-28 (fraudulent accounting); ¶¶ 31-33, 371, 374-79 (structuring loans and investments); ¶¶ 31-33, 468-69, 516, 690, 707 (false bond offering materials); ¶¶ 78, 83 (bank accounts used to transfer bribes); ¶¶ 80, 171, 173, 255-69, 518, 751, 791-800 (improper Buconero transactions); ¶¶ 81, 171, 175 (improper Eureka transactions); ¶ 174 (improper Vialattea transactions); ¶ 172 (Parmalat ADR program); ¶ 444 (Account "999"); ¶ 625 (false press releases).  For DTT's omissions, *see, e.g.*, ¶¶ 13, 37, 40, 362, 541, 568-70, 594, 620-25, 646, 690, 724, 1052 (fraudulent audit reports); ¶¶ 38, 389, 393, 444, 573, 776, 971-91, 1001-50, 1052-57 (improper accounting practices); ¶¶ 1022-23 (ignored red flags); ¶¶ 155, 197-98, 209, 514-16, 573, 684-85, 690 (false financial statements); ¶¶ 310, 444, 573, 751, 997-98 (reclassified debt as equity); ¶¶ 311, 315-20, 444 (account "999"); ¶¶ 363 (failed due diligence); ¶¶ 386-88, 999-1000 (improper amortization of goodwill); ¶ 444 (false invoices); ¶¶ 444, 751, 956-61, 966-70, 992-96 (improper special purpose entity transactions).

client's financial problems); *Schwartz v. Michaels*, No. 91 Civ. 3538, 1992 WL 184527, at *10-12 (S.D.N.Y. Jul. 23, 1992) (transaction causation found against accountant and auditor for omitting to disclose business relationship with advisors recommending investment).

### 3.      Plaintiffs Have Alleged a Fraud on the Market

Plaintiffs are also entitled to a presumption of reliance for purposes of transaction causation under the fraud on the market theory.  In determining whether a plaintiff has adequately pled the existence of an efficient or open and developed market, courts have been guided by the following definitions:

> An open market is one in which anyone, or at least a large number of persons, can buy or sell.  A developed market is one which has a relatively high level of activity and frequency, and for which trading information (e.g., price and volume) is widely available. It is principally a secondary market in outstanding securities. It usually, but not necessarily, has continuity and liquidity (the ability to absorb a reasonable amount of trading with relatively small price changes).

*Fellman v. Electro Optical Sys. Corp.,* No. 98 Civ. 6403 (LBS)*,* 2000 WL 489713, at *11 (S.D.N.Y. Apr. 25, 2000) (stock actively traded on the over-the-counter bulletin board was traded in an open and developed market); *See also Cammer v. Bloom*, 711 F. Supp. 1264, 1276 n.17 (D.N.J. 1989) (defining "open market," "developed market" and "efficient market" for purposes of fraud on the market theory).

As an initial matter, whether the market for a given stock is open and efficient is a question of fact and should not be considered beyond what Plaintiffs have pled.  *In re Laser Arms Corp. Sec. Litig.*, 794 F. Supp. 475, 490 (S.D.N.Y. 1989), *aff'd*, 969 F.2d 15 (2d Cir. 1992); *see also Hayes v. Gross,* 982 F.2d 104, 107 (3d Cir. 1992) ("the question on a motion to dismiss is not whether plaintiff has proved an efficient market, but whether he has pleaded one"). *In re USA Talks.com, Inc. Sec. Litig.*, No. 99-CV-0162-L(JA), 2000 WL 1887516, at *6 (S.D. Cal. Sept. 14, 2000) ("A showing of whether the *Cammer* elements are met requires a factual

exploration which is premature at the motion to dismiss stage.").

Here, Plaintiffs allege that the Defendants perpetrated a fraud on the market through participation in various fraudulent schemes.[66]  Plaintiffs allege that Parmalat securities were actively traded on efficient global markets, ¶¶ 8, 57-59, 1059, 1063-65; that information about Parmalat securities was widely available, ¶¶ 4, 443-752; that securities analysts at major brokerage firms actively followed and reported on Parmalat, ¶¶ 450, 678, 1064; and that Parmalat was subject to regulatory enforcement by CONSOB,[67] the Italian securities regulator, and made regular filings pursuant to its regulations. ¶¶ 1, 62, 363, 464, 486, 511, 567, 594, 618, 638, 646, 671, 701, 709, 726.  In short, Plaintiffs have alleged that there is single, worldwide efficient market for Parmalat securities, which trade in tandem around the world with similar and corresponding price movements on various securities exchanges and markets.[68]  These allegations adequately allege an efficient market for Parmalat securities.[69]  *See Saddle Rock*

---

[66] *See In re Royal Ahold N.V. Sec. & ERISA Litig.,* No. Civ. 03-MD-1539, 2004 WL 2955934, at *30 (D. Md. Dec 21, 2004) (fraud on the market asserted with respect to individual defendants involved in misrepresenting income and revenue figures); *Blatt v. Muse Technologies, Inc.,* No. Civ. A. 01-11010-DPW, 2002 WL 31107537, at *12 (D. Mass. Aug 27, 2002) (material overstatements of revenue and net income contribute to finding of fraud on the market); *Mottoros v. Abrams,* 524 F. Supp. 254, 258-59 (N.D. Ill. 1981) (where defendants' fraudulent activities caused artificial inflation of market value, plaintiff may prevail upon "fraud upon the market" theory).

[67] CONSOB's responsibilities in Italy are similar to those of the SEC in the United States.  ¶¶ 1(g), 62 (CONSOB is the Italian counterpart to the SEC).  *See* <http://www.consob.it/mainen/index.html?mode=gfx> (viewed February 1, 2005) CONSOB is the public authority responsible for regulating the Italian securities market"); http://www.consob.it/mainen/consob/what/what.html?symblink=/mainen/ consob/what/index.html (viewed February 1, 2005) (CONSOB's "activity is aimed at the protection of the investing public.  In this connection, CONSOB is the competent authority for ensuring: transparency and correct behavior by securities market participants; disclosure of complete and accurate information to the investing public by listed companies; accuracy of the facts represented in the prospectuses related to offerings of transferable securities to the investing public; and compliance with regulations by auditors entered in the Special Register.  [CONSOB also] conducts investigations with respect to potential infringements of insider dealing and market manipulation law").

[68] There is no requirement to allege "what market, if any, most of these securities were sold and traded" (DTT Br. at 15), but even if there were, Plaintiffs have done so.  *See* ¶¶ 8, 1064(a) (listing markets).

[69] Of course, that there were "many different types of [Parmalat] securities, including new issues…, issues denominated in numerous currencies … and private placements" (DTT Br. at 15) does not defeat a finding of an efficient market; otherwise, a company could immunize itself from fraud on the market claims simply by issuing more than one type of security, or listing a security on exchanges in more than one country.  Not surprisingly, DTT

*(cont'd)*

*Partners Ltd. v. Hiatt,* No. 96 Civ. 9474, 2000 WL 1182793, at *3 (S.D.N.Y. Aug. 21, 2000)

(fraud on the market alleged where plaintiff "alleged that Defendants made public, material

misrepresentations; that Maybelline's shares were publicly traded in an efficient market; and that

the shares were traded during the time between the making of the misrepresentations and the

revelation of the truth"); *Kalnit v. Eichler*, 85 F. Supp. 2d 232, 240-41 (S.D.N.Y. 1999) (fraud on

the market alleged where plaintiff "alleges that he and the purported class members relied upon

the 'integrity of the market' when they sold their MediaOne shares, and that defendants'

allegedly fraudulent actions compromised the integrity of that market"); *Teachers' Ret. Sys. of

La. v. A.C.L.N. Ltd.,* 2004 WL 2997957, at *6 (S.D.N.Y. Dec. 27, 2004) (finding that plaintiff

had "adduced evidence" at class certification that the market for ACLN securities was efficient,

as "ACLN traded on either the NASDAQ or the NYSE and reported significant trading volume

[and] [t]here were numerous news stories about ACLN in leading financial publications, and

institutional investors were interested in and owned ACLN stock").

### 4.    Plaintiffs Have Adequately Alleged that Defendants' Fraud Created the Market

Even if this Court were to find that Plaintiffs are not entitled to rely upon the fraud on the

market doctrine, Plaintiffs are still entitled to a presumption of reliance under the fraud created

the market doctrine.  This doctrine, adopted by various courts, provides an alternative to direct

reliance by permitting a plaintiff to show that a fraud allowed securities that otherwise would

have been unmarketable to enter and exist in the market.  *See, e.g.*, *Ross v. Bank South, N.A.*, 885

F.2d 723, 729 (11th Cir. 1989) (en banc); *Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1122-23

(5th Cir. 1988), *vacated on other grounds sub nom. Fryer v. Abell,* 492 U.S. 914 (1989); *Stinson*

---

has failed to cite a single case supporting this novel and flawed argument.

*v. Van Valley Dev. Corp.*, 719 F. Supp. 362, 366 (E.D. Pa. 1989), *aff'd*, 897 F.2d 524 (3d Cir. 1990); *Shores v. Sklar*, 647 F.2d 462, 470-71 (5th Cir. 1981) (en banc).

Under the fraud created the market doctrine, investors are not presumed to rely on the integrity of the market price, but on the integrity of the market itself, *i.e.*, that securities offered on a public market are genuine. *Ross*, 885 F.2d at 729; *Shores*, 647 F.2d at 470-71. The causal connection between the fraud and the injury is established by alleging that the securities could not have been marketed at any price absent fraud. *Ross*, 885 F.2d at 731; *Shores*, 647 F.2d at 469-71. Courts have recognized this presumption where, as here, the securities were newly issued.[70]

*Shores* was the first case to articulate the fraud created the market doctrine. The defendants in *Shores* engaged in an elaborate scheme to create a bond issue so lacking in basic requirements that it would never have been approved absent the massive fraud. *Shores*, 647 F.2d at 464 n.2. The Fifth Circuit stated that the plaintiff would be entitled to a presumption of reliance if he could establish that "the Defendants knowingly conspired to bring securities onto the market which were not entitled to be marketed, intending to defraud purchasers." *Id.* at 469. This is precisely what Plaintiffs allege here.

As set forth in the Complaint, the Parmalat securities at issue could not have been offered absent Defendants' fraudulent conduct. *See, e.g.,* ¶¶ 780-83, 952-55. During the Class Period, Parmalat was in dire financial trouble, yet the unlawful efforts of BNL, Bank of America,

---

[70] *See Wade v. Industrial Funding Corp.*, No. C92-0343, 1993 WL 650837, at *6 (N.D. Cal. Aug. 30, 1993) (finding allegations that plaintiffs relied on defendant's misrepresentation of "its stability and fiscal well-being to the extent that its entire public image was distorted" sufficient to state a claim based on the fraud created the market presumption); *In re Taxable Municipal Bonds Litig.*, Civ. A. MDL No. 863, 1992 WL 165974, at *7-8 (E.D. La. July 1, 1992) (finding allegations sufficient to invoke the doctrine where plaintiffs alleged that the bonds were "patently worthless" and that "no investor would have purchased the bonds had the market known the truth at the time of the initial issuance").

Citigroup and CSFB permitted the Company to continue issuing new securities in the form of bonds, intentionally deceiving investors into believing that Parmalat was worthy of their investments at the price offered.  *See, e.g.,* ¶¶ 784-818, 829-71.  In addition, without the active conduct of Deloitte and Grant Thornton in preparing and approving the Company's audited financial statements, there would have been no market for Parmalat securities, as Parmalat's true financial condition would have given it an impossibly low credit rating.  *See, e.g.,* ¶¶ 956-1021, 1023-25, 1041-50, 1052-57.  Plaintiffs and the Class, having purchased Parmalat securities, have suffered (and continue to suffer) damages as a result, and are entitled to a presumption of reliance under the fraud created the market theory.[71]

### B.    Plaintiffs Have Adequately Pled Loss Causation

Ignoring the well-pled allegations in the Complaint, the Bank Defendants and DTT argue that Plaintiffs have not pled loss causation because the Complaint does not allege that their actions caused Plaintiffs' investment losses.  *See* BNL Br. at 20-21; BOA Br. at 18-19; Citigroup Br. at 20-21; DTT Br. at 15.  However, under Second Circuit law, loss causation exists where the alleged loss is "foreseeable and … caused by the materialization of the concealed risk."  *Lentell*, 2005 WL 107044, at *10.  This test is plainly satisfied here.

---

[71] Citigroup argues in a footnote that this doctrine is not recognized in the Second Circuit.  Citigroup Br. at 21 n.12.  While the authorities relied upon by Citigroup acknowledge that the Second Circuit has not yet embraced the fraud created the market doctrine, neither case expressly rejects the legal viability of the doctrine.  *See Arduini/Messina P'ship v. National Med. Fin. Serv. Corp.*, 74 F. Supp. 2d 352, 363 (S.D.N.Y. 1999); *In re Towers Fin. Corp. Noteholders Litig.*, No. 93 Civ. 0810, 1995 WL 571888 (S.D.N.Y. Sept. 20, 1995).  In *Arduini/Messina P'ship*, the court did not reach the issue of whether the Plaintiffs could rely on this doctrine in the Second Circuit because applying the doctrine to the particular facts would not have helped the Plaintiffs allege the essential loss causation element missing from their claim.  *Id.*  Similarly, in *In re Towers Fin. Corp. Noteholders Litig.*, the court noted that while "[c]ourts in the Second Circuit have implicitly rejected the fraud created the market theory," 1995 WL 571888, at *22, "the fraud created the market theory has been applied to cases involving new securities in undeveloped markets."  *Id.* at *22-23.  *See also IPO*, 241 F. Supp. 2d at 377 n.143 ("It is unclear whether the fraud created the market theory is good law in this circuit.")

### 1.    The Standard for Loss Causation

As the Second Circuit recently held in *Lentell*, 2005 WL 107044, at *9, "[l]oss causation 'is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff'" (*quoting Emergent Capital*, 343 F.3d at 197).  Loss causation "examines how directly … [the fraudulent conduct] caused the loss, and whether the resulting loss was a foreseeable outcome of the fraudulent [conduct]."  *Suez*, 250 F.3d at 96; s*ee also Castellano v. Young & Rubicam*, 257 F.3d 171, 186-90 (2d Cir. 2001); *In re Salomon Analyst AT&T Litig.,* No. 02 Civ. 6801, 2004 WL 2757398, at *12-13 (S.D.N.Y. Dec. 2, 2004).  Though focused solely on misrepresentations and omissions rather than a scheme to defraud such as this, the *Lentell* court defined loss causation as follows:

> A misstatement or omission is the "proximate cause" of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by the disappointed investor.

*Lentell*, 2005 WL 107044, at *9.  Further, loss causation involves "a foreseeability finding [that] turns on fairness, policy and … a rough sense of justice," *Shanahan v. Vallat*, No. 03 Civ. 3496, 2004 WL 2937805, at *5 (S.D.N.Y. Dec. 19, 2004) (quotations omitted), and it is satisfied with allegations that the defendant's misconduct "played some part in" causing the plaintiff's loss. *Lentell*, 2005 WL 107044, at *13.

As an initial matter, because issues of loss causation are factual matters often requiring expert testimony,[72] they are generally "not proper to resolve on a motion to dismiss."  *In re Sears, Roebuck & Co. ERISA Litig*., No. 02-C-8324, 2004 WL 407007, at *7 (N.D. Ill. Mar. 3, 2004); *see also Lentell*, 2005 WL 107044, at *11 ("Loss causation is a fact-based inquiry");

---

[72] *See, e.g., In re Cendant Corp. Sec. Litig.*, 264 F.3d 201, 249-50 (3d Cir. 2001); *In re American Bank Note Holographics*, 127 F. Supp. 2d 418, 426-27 (S.D.N.Y. 2001); *Flecker v. Hollywood Entertainment Corp.*, 1997 WL 269488, at *5 (D. Or. Feb. 12, 1997).

*Louros v. Kreicas*, No. 03 Civ. 1514, 2003 WL 22353979, at *2 (S.D.N.Y. Oct. 15, 2003)

(Kaplan, J.) (granting leave to amend because "[f]or present purposes … it is sufficient to

conclude that it cannot be said with certainty that plaintiff has failed adequately to allege loss

causation" in proposed amended complaint); *Aiena v. Olsen*, 69 F. Supp. 2d 521, 535 (S.D.N.Y.

1999) (Kaplan, J.) (rejecting defendants' argument that plaintiffs had not alleged that disclosure

of concealed facts caused their loss, because "Defendants ask too much on a Rule 12 motion").

Indeed, as the Second Circuit has specifically stated, whether or not the "chain of causation" is

established "is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to

dismiss." *Emergent Capital*, 343 F.3d at 197.  *See also In re Atlas Air Worldwide Holdings, Inc.*

*Sec. Litig.*, 324 F. Supp. 2d 474, 498 (S.D.N.Y. 2004); *AOL Time Warner,* 2004 WL 992991, at

*27.[73]

Finally, courts have cautioned that the requirement of pleading loss causation "ought not

to place unrealistic burdens on the plaintiff at the initial pleading stage."  *Caremark, Inc. v.*

*Coram Healthcare Corp.*, 113 F.3d 645, 649 (7th Cir. 1997).  The burden of pleading loss

causation in a Rule 10b-5 case is considered a "light one."  *Enron II*, 310 F. Supp. 2d at 836.

Indeed, "[t]he PSLRA does not affect causation pleadings" and therefore "the allegations must

only meet the traditional 'fair notice' standards."  *In re Fleming Cos. Inc. Sec. & Deriv. Litig.*,

2004 U.S. Dist. LEXIS 26488, at *130-31 (S.D. Tex. June 10, 2004); *see also In re CMS Energy*

*Sec. Litig.,* 2005 U.S. Dist LEXIS 439, at *50 (E.D. Mich. Jan. 7, 2005) ("unlike for pleading

scienter, there are no heightened pleading requirements for loss causation.").

---

[73] Indeed, Citigroup explicitly asks the Court to resolve a factual issue as to causation when it argues that "the relevant price decline resulted from some factor other than a revelation of the defendant's conduct."  Citigroup Br. at 19.  *Emergent Capital* expressly forbids such a determination on a motion to dismiss.  343 F.3d at 197.

2.    **Loss Causation Is Adequately Pled**

Plaintiffs have alleged that the Bank and Auditor Defendants were active participants in the various enumerated schemes which, *inter alia*, inflated Parmalat's revenues and earnings and misstated its financial condition, leading directly to the artificial inflation of the price of Parmalat securities and, in turn, the collapse of those prices when the Company's true condition was revealed. *See, e.g.,* ¶¶ 195-98 (Bank and Auditor Defendants engaged in a variety of improper practices that artificially inflated the price of Parmalat securities); ¶¶ 295-309, 865-71 (BNL engaged in improper "factoring" schemes that inflated Parmalat's revenues and perpetuated its fraudulent schemes); ¶¶ 444-45, 780-83 (investors in Parmalat securities lost billions as a result of Bank and Auditor Defendants' misrepresentations); ¶¶ 468, 516, 573, 625, 690, 751, 953-55 (Bank and Auditor Defendants' repeated omissions of material information about Parmalat caused significant financial harm to investors).[74]

Defendants could reasonably have foreseen that the improper transactions and accounting fraud in which they participated would result in the artificial inflation of Parmalat's reported financial condition and stock price and ultimate decline in the stock price when it was revealed that Parmalat's income and assets were fictitious. *See In re Atlas Air,* 324 F. Supp. 2d at 498 (allegations that company's financial statements were false (and were restated) and that disclosure of need to restate and inability to complete audit resulted in delisting of stock and bankruptcy filing were "sufficient to plead loss causation because plaintiffs have adequately alleged that their loss was a foreseeable consequence of the false financial statements issued by the company").

---

[74] These detailed allegations describing the fraud and its effect on Parmalat's financial condition, credit rating and stock price are not "bare" (DTT Br. at 16), "boilerplate" (Citigroup Br. at 20), nor "conclusory" (BOA Br. at 20).

*(cont'd)*

Courts in this Circuit have often found that loss causation was adequately pled where, as here, defendants were alleged to have concealed adverse information about a company which, when revealed, resulted in the financial collapse of the company.  For example, in *Fogarazzo*, various banks were:

> alleged to have lied about the financial health and future prospects of RSL – namely, the investment quality of RSL securities.  Moreover, RSL ultimately failed because of the very facts that the Banks misrepresented:  that RSL was in financial trouble and that the entire "internet telephony sector" was collapsing.

341 F. Supp. 2d at 289.  The court held that "there is no doubt that plaintiffs here have adequately alleged that the Banks' misrepresentations caused their loss."  *Id*.  Likewise, in *Emergent Capital*, 343 F.3d at 198, the court found that loss causation was satisfied because the plaintiffs "specifically asserted a causal connection between the concealed information … and the ultimate failure of the venture."[75]

In contrast, in *Lentell*, 2005 WL 107044, at *13, loss causation was not pled because the "plaintiffs nowhere explain[ed] how or to what extent those misrepresentations and omissions concealed the risk of a significant devaluation of [the subject] securities."  In *Lentell*, the misrepresentations and omissions related to the analysts' reasons for recommending the securities, not to anything intrinsic to the securities themselves.  When the stocks declined for economic reasons, the court held that loss causation was not pled because the misrepresentations or omissions as to the analysts' motivations did not relate to the reasons why the securities declined.  Significantly, the *Lentell* court noted that the "case is therefore sharply distinguishable

Moreover, there is no particularity required for loss causation pleadings. *See, e.g., Fleming Cos*., 2004 U.S. Dist. LEXIS 26488, at *130-31.

[75]  *See also Suez*, 250 F.3d at 98 ("Since defendants reasonably could have foreseen that [the executive's] concealed lack of skill would cause the company's eventual liquidity problems, defendants' misrepresentations may be the causal precursor to the Group's final failure"); *Salomon*, 2004 WL 2757398, at *14 (loss causation existed where

*(cont'd)*

from cases in which some or all of the risk that materialized was clearly concealed by a defendant's misstatements or omissions." *Id*. Conversely, Plaintiffs here have alleged how each Defendant and each facet of the scheme contributed to Parmalat's creation of phony assets and income, and how Parmalat's bankruptcy was directly due to the fact that those assets and income were fictitious. Thus, the risk (that Parmalat's growing assets, revenues and billion dollar liquid accounts were a mirage) was concealed, and Plaintiffs have explained how Defendants' conduct propped up the Company and ultimately caused Plaintiffs' losses. Accordingly, the Court should reject Defendants' arguments that Plaintiffs have not pled loss causation.

Defendants contend that their actions did not cause Plaintiffs' losses because their involvement in Parmalat's schemes was not made public until after the price decline "on which Plaintiffs' claims are based." *See* BNL Br. at 20-21; Citigroup Br. at 20-21; DTT Br. at 15. This argument was explicitly rejected in the leading case on this issue, *Enron II*. In *Enron II*, the plaintiffs alleged that sham transactions involving a large number of banks and other entities had inflated the price of Enron securities. Merrill Lynch, one of the banks involved in the fraud, moved to dismiss claiming that the plaintiffs had not demonstrated loss causation as to it because its role in the fraud was not revealed until after Enron's stock had collapsed. In a well-reasoned opinion, the court flatly rejected this argument, noting that although Merrill Lynch's role was not made public until after Enron's bankruptcy, its substantial participation in the scheme contributed to the artificial inflation of the securities and to the plaintiffs' loss:

> Viewing the pleading in a light most favorable to Lead Plaintiff, the Court finds that … the plaintiffs have adequately pleaded that their loss was directly and foreseeably caused by defendants' alleged fraudulent practices at Enron, including Merrill Lynch's Nigerian barge transaction and bogus power trades involving Enron North America, the nonexistence of the reported influx of cash, and the all too real,

plaintiff "alleg[ed] artificial inflation of a stock and link[ed] that inflation to the ultimate decline in the value of plaintiffs' holdings").

increasing, but hidden, debt as defendants' deceptive scheme allowed them to create the illusion of a growing and profitable company while grabbing high fees based on fraudulent business deals with no legitimate purpose other than to "cook the books" and appropriate money from deceived investors.  Non-exposure of Enron's deceptive business practices and the concealment of its actual financial condition directly and foreseeably induced the plaintiffs to purchase the securities at a highly inflated price until the Ponzi scheme bubble inevitably broke.  Once the fraud began to be disclosed, the swift drop in the market price of Enron securities reflected the real financial condition of this empty house of cards and revealed the disparity between the plaintiffs' purchase price and the actual value of the securities when they were bought.  *While information about Merrill Lynch's individual role in the Nigerian barge transaction and the sham power swaps may not have been made public until long after the Enron bankruptcy, that fact does not relieve Merrill Lynch of responsibility for Enron's collapse; Merrill Lynch's alleged substantial participation in the deceptive business practices contributed to the artificial inflation of the price of the securities and thereby was a direct and major cause of plaintiffs' financial loss, according to the amended complaint.*

*Enron II*, 310 F. Supp. 2d at 832 (emphasis added).  As in *Enron II*, Plaintiffs here have alleged an overarching scheme to defraud.  When that scheme collapsed, Plaintiffs suffered tremendous losses.

Indeed, Plaintiffs' allegations against BNL, Citigroup and DTT are similar to those that supported a finding of loss causation in *Enron*.  *Compare* ¶¶ 3-42 (describing efforts by BNL, Citigroup and DTT to understate Parmalat's debt and overstate Parmalat's revenue, create bogus bank accounts and off-shore companies, forge financial records, manipulate balance sheets, invoices and income statements and engage in improper accounting practices to conceal it all as the foundation for Parmalat's demise and the cause of Plaintiff's economic losses), and ¶¶ 194-98, 255-69, 270-94, 295-309, 784-833, 865-71, 951-1057 (describing BNL, Citigroup and DTT's efforts to perpetuate Parmalat's massive accounting fraud which artificially inflated the price of Parmalat's securities, all of which caused significant financial harm to Plaintiffs), *with Enron II*, 310 F. Supp. 2d at 829-32 (alleging that Merrill Lynch purchased Nigerian barges from Enron to create sham earnings in return for secret, oral side agreement that Enron would repurchase them

within six months so that Merrill Lynch would incur lucrative profit and no risk; alleging bogus power trades; alleging non-existence of cash influx).

These allegations, taken together, are more than sufficient to establish the existence of loss causation as to BNL, Citigroup and DTT (and the other Defendants as well). *See Enron II*, 310 F. Supp. 2d at 832; *Salomon Analyst AT&T*, 2004 WL 2757398, at *14 (loss causation found despite after-the-fact disclosure of defendants' improper actions); *DeMarco,* 318 F. Supp. 2d at 123 (loss causation found where defendants' misrepresentations contributed to stock price inflation); *BHC Interim Funding, L.P. v. Finantra Capital, Inc.*, 283 F. Supp. 2d 968, 982 (S.D.N.Y. 2003) (loss causation found where defendants' misstatements inflated the price of stock and caused plaintiff to enter into losing transaction).

That each specific participant's precise role in the fraudulent scheme was not revealed at the time the stock price actually declined does not relieve the participants of their liability for the scheme they perpetrated. *Id.* As Plaintiffs have alleged that the ultimate and inevitable – *i.e.,* foreseeable – collapse of the scheme is what caused their losses, loss causation has been adequately alleged.

## VI.    CSFB'S AND BNL'S SUBJECT MATTER JURISDICTION ARGUMENTS SHOULD BE REJECTED

Two Defendants – CSFB and BNL – challenge the Court's subject matter jurisdiction over claims asserted against them. They both argue that the conduct alleged against them occurred outside the United States. BNL Br. at 7; CSFB Br. at 17. These assertions fail on both the law and the well-pled facts. Indeed, the Complaint alleges that much of the core infrastructure of this worldwide fraudulent scheme was built in the United States by lawyers, banks, accounting firms and other persons or entities located in the United States. The scheme's

sole purpose was to falsely present Parmalat's financial statements in order to sell its securities to investors in the United States and around the world.  Given the strong connection between this case and the United States, there is no merit to CSFB's or BNL's argument.

Where, as here, a defendant's challenge to subject matter jurisdiction "depend[s] upon facts intertwined with the merits," the motion to dismiss is "assessed by the standards that govern summary judgment motions, with the "burden" on the defendant "to show that there is no genuine issue as to any material fact."  *Semi-Tech Litig., LLC v. Bankers Trust Co.*, 272 F. Supp. 2d 319, 329 (S.D.N.Y. 2003) (Kaplan, J.); *see also Bell v. Hood*, 327 U.S. 678, 682, 66 S. Ct. 773, 776 (1946).  Moreover, "the factual basis for a court's subject matter jurisdiction may remain an issue through trial and, if and when doubts are resolved against jurisdiction, warrant dismissal at that time."  *Europe & Overseas Commodities Traders, S.A. v. Banque Paribus London*, 147 F.3d 118, 121 (2d Cir. 1998).  Therefore, where the question of subject matter jurisdiction is a close one, a court should be "mindful of not depriving plaintiffs of their day in court with a premature order dismissing the case."  *In re Vivendi Universal, S.A. Sec. Litig.*, No. 02 Civ. 5571, 2004 WL 2375830, at * 7 (S.D.N.Y. Oct. 22, 2004); *see also Leonard v. Garantia Banking, Ltd.*, No. 98 Civ. 4848, 1999 WL 944802, at *3 (S.D.N.Y. Oct. 19, 1999), *aff'd mem.*, 213 F.3d 626 (2d Cir. 2000) ("where there has been no hearing and no discovery … a plaintiff need only make a prima facie showing of jurisdiction"; denying motion to dismiss).[76]

---

[76] In the event the Court is not convinced that it has subject matter jurisdiction, Plaintiffs should be given the opportunity to conduct jurisdictional discovery concerning conduct by BSL and CSFB in the U.S. related to Parmalat, as well as the effects in the U.S. of their conduct abroad.  The Second Circuit has recognized that in order to establish subject matter jurisdiction in a Rule 10b-5 case, "discovery may well be needed."  *Investment Properties, Int'l, Ltd. v. IOS, Ltd.*, 459 F.2d 705, 708 n.4 (2d Cir. 1972) (granting mandamus directing the district court "to allow such limited discovery as will permit the trial court to determine whether it has jurisdiction").  The courts in this District frequently have allowed jurisdictional discovery when the court's subject matter jurisdiction in a Rule 10b-5 case is challenged.  *See, e.g.*, *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 483, 493 (S.D.N.Y. 2001); *Vitzethum v. Dominick & Dominick*, No. 94 Civ. 4938, 1996 WL 19062 at *3 (S.D.N.Y. Jan. 18, 1996);

*(cont'd)*

### A.  Subject Matter Jurisdiction Is Evaluated on the Basis of the Fraud as a Whole

The argument of CSFB and BNL is premised on the erroneous assumption that the tests for subject matter jurisdiction should be applied solely by reference to the conduct of each entity in isolation, and that the Court should ignore the activities of all of the other Defendants.  CSFB Br. at 17; BNL Br. at 8.  While, in *dicta*, Judge Bork in the D.C. Circuit did lend support to that position 18 years ago,[77] the recent cases in this Circuit reject it and hold that the question is whether there is subject matter jurisdiction over the fraud as a whole, not over the activities of a particular defendant.  For example, in *CL-Alexanders Laing & Cruickshank v. Goldfeld*, 709 F. Supp. 472 (S.D.N.Y. 1989), the defendant accounting firm argued that "subject-matter jurisdiction must be assessed against each defendant by reference only to that defendant's activities."  *Id.* at 478.  Judge Mukasey's opinion sustaining jurisdiction flatly stated:  "I disagree…. [T]he activities of the other Defendants may be considered in determining whether subject matter jurisdiction is proper."  *Id.*

Similarly, one defendant in *Cromer* argued "that the issue of subject matter jurisdiction is defendant specific and that its conduct cannot be aggregated with the conduct of any other defendant in assessing jurisdiction."  *Cromer Fin. Ltd. v. Berger,* No. 00 Civ. 2284 (DLC), 2003

---

*Armstrong v. McAlpin*, 1978 U.S. Dist. LEXIS 19801, at *31-32 (S.D.N.Y. Feb. 1, 1978) (denying motion to dismiss without prejudice, stating that "discovery is appropriate to gather necessary jurisdictional facts"); *see also Meason v. Bank of Miami*, 652 F.2d 542 (5th Cir. 1981) (reversing dismissal to permit jurisdictional discovery); *Williamson v. Tucker*, 645 F.2d 404, 414 (5th Cir. 1981) ("the district court must give the plaintiff an opportunity for discovery and for a hearing that is appropriate to the nature of the motion to dismiss.  Thus, some courts have refused to grant such a motion before a plaintiff has had a chance to discover the facts necessary to establish jurisdiction").

[77] *See Zoelsch v. Arthur Andersen & Co*., 824 F.2d 27, 36 (D.C. Cir. 1987) (BNL Br. at 8).  In *Cromer Fin. Ltd. v. Berger*, No. 00 Civ. 2284, 2003 WL 21436164, at *5 n.2, Judge Cote described the statement in *Zoelsch* on which BNL relies as plainly "*dicta*," since in *Zoelsch* the Plaintiffs "sued one defendant, an American accounting firm.  The case, therefore, did not address the aggregation of contacts with the United States for separate Defendants…."  And as noted below, the other case on which BNL relies, *Bersch v. Drexel Firestone, Inc*., 519 F.2d 974, 991-92 (2d Cir. 1975) (BNL Br. at 8), has not been interpreted by judges in this District as imposing a rule that subject matter jurisdiction as to one defendant may not be impacted by other aspects of the fraud.

WL 21436164, at *4 (S.D.N.Y. June 23, 2003).  Judge Cote rejected this argument, stating:

> DTB, however, is wrong about the standard for subject matter jurisdiction.  The issue is whether the court has jurisdiction over the transaction, not whether it separately has jurisdiction over the particular acts committed by each defendant in connection with the transaction.

*Id.*[78]  Likewise, this Court should consider the activities of all of the Defendants in determining whether there exists subject matter jurisdiction over any aspect of the fraud.

### B. When the Transactions as a Whole Are Considered, It Is Clear that the Court Has Subject Matter Jurisdiction

As CSFB and BNL recognize (CSFB Br. at 18; BNL Br. at 9), in evaluating whether subject matter jurisdiction exists over a securities case with significant foreign connections, the Second Circuit has developed two tests:  the "conduct" test and the "effects" test.  *Alfadda v. Fenn*, 935 F.2d 475, 478 (2d Cir. 1991).  As shown below, subject matter jurisdiction in this case is justified under either test.[79]

### 1. The Conduct Test

Under the conduct test, a federal court has subject matter jurisdiction if "'conduct material to the completion of the fraud occurred in the United States.'"  *Alfadda*, 935 F.2d at 478 (*quoting Psimenos v. E.F. Hutton & Co.*, 722 F.2d 1041, 1046 (2d Cir. 1983)).

The Complaint alleges that domestic conduct of the Law Firm Defendants, the Bank Defendants and the Auditor Defendants was an integral component in the worldwide fraudulent

---

[78] In so holding, Judge Cote specifically declined to follow the *dicta* in *Zoelsch* on which BNL relies, stating that "its *dicta* regarding the aggregation of activities by non-party participants has no relevance to the issues here."  *Cromer,* 2003 WL 21436164, at *5 n.2.  And like BNL, the defendants in *Cromer* also cited *Bersch, see Cromer Fin. Ltd. v. Berger*, No. 00 Civ. 2284 (DLC), 2001 WL 935475, at *2 (S.D.N.Y. Aug. 16, 2001), but Judge Cote nevertheless rejected the non-aggregation rule that CSFB and BNL urge at bar.

[79] "There is no requirement that these two tests be applied separately and distinctly from each other.  Indeed, an admixture or combination of the two often gives a better picture of whether there is sufficient United States involvement to justify the exercise of jurisdiction by an American court."  *Itoba Ltd. v. LEP Group PLC*, 54 F.3d

*(cont'd)*

scheme which caused Plaintiff's losses and those of other Class Members.  As described below, among other things, the following conduct emanated from the United States:  (i) the Law Firm Defendants, from their New York offices, were vital not only in creating numerous shell companies which were used in the sham transactions but also in creating the false transaction documents essential to the fraud; (ii) the Law Firm Defendants, from their New York offices, funneled illicitly gained money through various bank and trust accounts maintained at New York banks; (iii) Parmalat formed United States entities and subsidiaries to illicitly transfer money and to raise additional capital through numerous debt offerings; (iv) several of the Individual Defendants, including Tanzi and G. Tanzi, opened bank accounts in New York into which Parmalat funds were improperly diverted; and (v) United States based auditors and banks had direct roles in the fraudulent scheme.  ¶¶ 31-36, 37-42, 63.

### a.      The Material Conduct of the Law Firm Defendants in the United States

As the Court recognized at the conference herein on May 21, 2004, "[t]he assertion that is made here is that the Zini law firm uptown was a nerve center of this alleged fraud."  *See* Transcript of May 21, 2004 Hearing, submitted as Exhibit E to Affirmation of Michael J. Dell, dated January 10, 2005, at 30.  This was the site chosen by Tanzi as a base from which to orchestrate the legal and financial aspects of the fraud.[80]  Tonna, Parmalat's CFO for many years, told criminal investigators in Italy that Zini was "at the center of Parmalat's financial

---

118, 122 (2d Cir. 1995); *accord Vivendi*, 2004 WL 2375830, at *6 (S.D.N.Y. Oct. 22, 2004); *Cromer,* 137 F. Supp. 2d at 479; *see also SEC v. Berger*, 322 F.3d 187, 193, 195 (2d Cir. 2003).

[80] Defendant Zini had been Parmalat's lawyer in Milan.  The Complaint alleges that Tanzi asked him to relocate to New York because that would put him closer to the banks involved with Parmalat and would further the fraud by giving greater credibility to Parmalat's fraudulent money-raising schemes.  ¶ 66.  This is highly reminiscent of the situation in *Vivendi,* 2004 WL 2375830, at *7 n.6 where in upholding subject matter jurisdiction over foreign purchasers' claims based on the conduct test, Judge Holwell noted that the U.S. actors "were not in the United States fortuitously."  They "purposely moved" to the United States "allegedly to better implement a fraudulent scheme."  *Id.*

scheme" and was one of its "masterminds."  ¶ 65.  In the words of several former Zini employees, the New York offices of the Law Firm Defendants served as a "legal factory to produce documents and manage offshore transactions for Parmalat."  ¶ 67.  The fact that the fraud was masterminded by the lawyers in New York is a decisive factor in the jurisdictional analysis.  For example, in *SEC v. Berger*, 322 F.3d 187 (2d Cir. 2003), the Second Circuit stressed in upholding jurisdiction that "the fraudulent scheme was masterminded" in the United States.  This is exactly what happened here.

Zini and the other attorneys at the Law Firm Defendants were not mere advisors.  As the Complaint alleges, they were directly involved in orchestrating the fraud.  From their New York offices, they directly participated in the creation and operation of Epicurum, the fictitious entity that was fraudulently reported to hold over €500 million invested by Parmalat through Bonlat. ¶ 70.  Similarly, as alleged in the Complaint, from their base in New York, the Law Firm Defendants were responsible for the creation of many of the other entities through which the fraudulent transactions were conducted and without which the fraud could not have occurred, such as Web Holdings, Inc.; Boston Holdings Inc.; Findairy Corporation; Newlat S.r.l.; Nyte Investments Group Inc.; and many others.  *See* ¶¶ 72-77.

Additionally, Zini and other attorneys in the New York offices of the Law Firm Defendants drafted, negotiated and reviewed the legal documents that were necessary to effectuate the fraudulent financial transactions.  Bocchi, an assistant to Tonna involved in preparing offering materials, explained to Italian prosecutors that each time a financial transaction took place, she had to get approval of the documents from the Zini law firm.  ¶ 68. This U.S. conduct is material to the completion of the fraud.  *See Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 481 (S.D.N.Y. 2001) (subject matter jurisdiction upheld where the offshore

defendants "were in regular, often daily, telephone/fax or correspondence contact with [a key

U.S. defendant] seeking approval for NAV calculations, redemption requests, or other matters, or

to negotiate additional fees"); *see also CL-Alexanders Laing*, 709 F. Supp. at 478 (subject matter

jurisdiction upheld where the foreign company's U.S. law firm "engaged in allegedly fraudulent

activities from the United States").

The Second Circuit highlighted the jurisdictional significance of using a U.S. law firm as

a foreign fraudster's base of operations in *IIT v. Vencap, Ltd.*, 519 F.2d 1001 (2d Cir. 1975),

where it noted that the foreign company involved in the fraud "used the Havens, Wandless office

at 99 Park Avenue in New York as its base…. [L]iterally hundreds of transactions and pieces of

mail for Vencap …. were initiated, directed and consummated from and received at 99 Park

Avenue." *Id.* at 1018.

### b.     The Material Conduct of the Bank Defendants in the United States

The Bank Defendants' key role in the global, fraudulent scheme involved substantial

conduct in the United States.  Beginning in 1995, and continuing throughout the Class Period,

Citigroup ran the "Eureka" securitization program for Parmalat through which Citigroup helped

Parmalat obtain hundreds of millions of dollars in financing based on what Citigroup knew were

phony, duplicate supermarket invoices.  Parmalat's U.S. subsidiary, Farmland Dairies, LLC, was

an integral participant in the securitization fraud.  ¶ 81.

The transactions involving Buconero, Web Holdings, Findairy, and the other sham

entities in the U.S., involved U.S.-based transactions, as did the Eureka securitization program.

¶¶ 71-75, 81.  Unquestionably, the transactions involving U.S. entities and bank accounts were

"material to the completion of the fraud" and "significant acts without which [the foreign and

U.S. purchasers'] losses could not have occurred." *Psimenos v. E.F. Hutton & Co.*, 722 F.2d

1041, 1046, 1048 (2d Cir. 1983).

As described in detail above, in late 1999, defendant Citigroup formed the "black hole," Buconero, a Delaware limited liability company, to enable Citigroup to funnel money to Parmalat by disguising what were essentially loans as investments in Parmalat subsidiaries. Vialattea, a Delaware limited liability company and Citigroup subsidiary, Buconero's direct parent, had its principal place of business in New York. *Id.* ¶ 80.

The money trail also goes through New York. The Citibank accounts of the Law Firm Defendants in the U.S. were used to transfer huge sums of money to key Parmalat insiders, to pay bribes to other Parmalat employees, to transfer funds between Parmalat accounts and companies, and to pay the Law Firm Defendants (and Zini) for their role in the fraudulent scheme. Citigroup, Bank of America and other financial institutions provided extensive banking services to Parmalat that furthered and concealed the fraudulent and manipulative accounting practices of Parmalat, by channeling hundreds of millions of dollars through United States bank accounts, and siphoning off hundreds of millions of dollars from Parmalat through various U.S. bank accounts. ¶¶ 64, 78, 82-84. Use of American accounts in this manner is a factor supporting jurisdiction under the conduct test. *See, e.g.*, *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, No. 75 Civ. 540, 1980 WL 1146 (S.D.N.Y. Dec. 18, 1980); *see also Leonard v. Garantia Banking Ltd.*, 1999 WL 944802, at *3-5.

These U.S. entities have great jurisdictional significance because the inclusion in Parmalat's financial statements of the fraudulent transactions with these entities, which artificially inflated the Company's revenues and earnings, directly caused Plaintiffs' losses. A similar circumstance was presented by *Fund of Funds*, which involved false financial statements of a foreign mutual fund sold to foreigners. In denying a motion to dismiss for lack of subject

matter jurisdiction, the court stressed that information in the financial statements was based on allegedly fraudulent transactions involving entities in the U.S.  1980 WL 1146, at *6; *see also In re Gaming Lottery Sec. Litig.*, 58 F. Supp. 2d 62, 74 (S.D.N.Y. 1999) (upholding jurisdiction where the misrepresentations and omissions regarding the foreign company's acquisition and operation of a U.S. subsidiary inflated the price of the foreign company's stock).

Finally, the Complaint alleges that Bank of America's United States offices were directly involved in marketing and selling Parmalat's debt securities to U.S. investors.  Bank of America executives and Parmalat executives traveled together in the United States to market Parmalat debt securities to U.S. investors.  Luca Sala, Bank of America's former client relationship manager for the Parmalat account and later a "senior advisor" to Parmalat, also attended road shows in the United States.  In addition, in or about October 2002 and July 2003, representatives of Parmalat, including Tonna, met with prospective investors in the United States to discuss ongoing offerings and answer questions about Parmalat's financial performance and offerings, where they misrepresented the true financial condition of Parmalat.  For the October 2002 road shows, Tonna met with potential investors in Massachusetts, Connecticut, New York, Indiana, and Illinois.  ¶ 60.

c.   **The Material Conduct of the Auditor Defendants in the United States**

Likewise, auditors in the United States also played a key role in the success of the fraud. DTT and GTI in the United States controlled the auditors in Italy  (¶¶ 135, 136, 151, 157, 158, 1123, 1130, 1143, 1151) and dictated the policies and procedures used by DT-Italy and GT-Italy in the Parmalat audits.  ¶¶ 144, 146, 147, 163.  In addition, defendant Copeland, from his office in New York, exerted his control over member firms abroad and prevented disclosure of the fraud.  For example, Copeland silenced the auditors who raised concerns about the Parmalat

129

financial statements and eventually caused one audit partner to be removed from the audit of Parmalat entities.  ¶¶ 1005-13, 1033.

As such, the foregoing conduct of the Law Firm Defendants, Bank Defendants and the Auditor Defendants satisfies the conduct test.

### 2.    The Effects Test

The effects test is satisfied where the fraud causes "losses from sales of securities to Americans resident in the United States whether or not acts (or culpable failures to act) of material importance occurred in this country."  *Bersch*, 519 F.2d at 993.  The Complaint contains detailed allegations as to the effects of the Parmalat fraud on U.S. investors.

Parmalat actively marketed and sold securities in the United States by means of its false and misleading financial statements.  Parmalat's ordinary shares were traded in the United States in the over-the-counter market throughout the Class Period.  Parmalat's records of shareholders entitled to vote at annual meetings held during the Class Period reflect that a multitude of United States institutional investors bought Parmalat ordinary shares including, among others listed in the Complaint:  Bankers Trust Company New York, Connecticut General Life Insurance Company, the Commonwealth of Pennsylvania Public School Employees Retirement Fund, Dreyfus Founders Worldwide Growth Fund, Prudential Insurance Company of America, the California Public Employees' Retirement System, and TIAA-CREF International Equity Fund. ¶ 59.

Additionally, Parmalat sold nearly $1.5 billion in notes and bonds to United States investors through offering materials which contained the false financial statements of Parmalat, with defendant Bank of America having placed over $1 billion in Parmalat debt in the United States.  ¶ 61.  More than 50% of the Company's outstanding bonds were sold to American

investors, including such large and well known U.S. financial institutions as: American International Group, Inc.; Allstate Life Insurance Corporation; Bear Stearns & Co., Inc.; Metropolitan Life Insurance Company and New York Life Insurance Company, among others. ¶ 59.  All of these institutional bond purchasers have a significant presence in this District.

Finally, throughout the Class Period, Parmalat regularly filed false and misleading reports with CONSOB (the Italian equivalent of the SEC), including quarterly, six-month and annual reports, which were relied upon by investors in the United States in making investment decisions concerning Parmalat securities.  Parmalat posted copies of all of these filings in English on its website to ensure that United States investors would be able to review those documents.  Further, Ferraris, one of Parmalat's former chief financial officers, organized meetings, including one in New York, with the financial community to review the reported results.  ¶ 62.  The foregoing satisfy the effects test.

### C.    Even If Considered in Isolation, the Activities of CSFB and BNL Satisfy the Effects Test

The Complaint alleges that there was but a single worldwide market for Parmalat securities.  The price of Parmalat securities was based on trades reported from various exchanges throughout the world.  That worldwide market was defrauded by Defendants' conduct, causing extensive effects on U.S. purchasers of Parmalat securities.  ¶ 57.  It is irrelevant if the securities sold in the transactions in which CSFB and BNL participated were not sold to U.S. investors. The conduct of BNL and CSFB in participating in the fraudulent transactions that misstated Parmalat's financial statements contributed to the worldwide inflation in the price of Parmalat securities and thereby impacted investors in the United States.

The Complaint also alleges that, by reason of the fraudulent factoring scheme in which BNL participated, "Parmalat overstated its receivables and assets, and understated its debt by at

least €103 million each year during the Class Period."  ¶ 309.  Similarly, the Complaint alleges

that CSFB participated in a fraudulent scheme which resulted in Parmalat recording on its

consolidated balance sheet approximately €250 million that should have been recorded as

additional debt.  ¶ 859; *see also* ¶¶ 406-18.  These Parmalat financial statements, fraudulently

inflated as a result of CSFB's and BNL's wrongful conduct, were then used by Parmalat and

other underwriters to defraud investors in the United States, as described above.  The effects test

is thus satisfied as to BNL and CSFB.[81]

### D.   The Court Has Jurisdiction Over Claims by Foreign Purchasers of Parmalat Securities

Presumably cognizant of the weakness of their argument that there is no jurisdiction over

any of the claims against them, BNL and CSFB offer a fall back position that, "[a]t a minimum,"

the Court should dismiss claims by "foreign purchasers of foreign securities."  CSFB Br. at 20;

*see also* BNL Br. at 10 n.9.  But this argument too must fail.  Because, as shown above, Plaintiffs

have satisfied the conduct test with respect to the activities of all Defendants, this Court has

jurisdiction over the claims by foreign purchasers of Parmalat securities on foreign exchanges.

*See Royal Ahold,* 2004 WL 2955934 (subject matter jurisdiction exists for claims of foreign

purchasers on foreign exchanges when plaintiffs satisfy conduct test).

Congress did not intend "the United States to be used as a base for manufacturing

fraudulent security devices for export, even when these are peddled only to foreigners."  *Itoba*

*Ltd. v. LEP Group PLC*, 54 F.3d 118, 122 (2d Cir. 1995) (*quoting Psimenos*, 722 F.2d at 1045).

---

[81] BNL asserts that "Plaintiffs do not allege, and cannot, that the factoring transactions (which are wholly foreign) caused a substantial impact on United States exchanges and citizens that was direct and foreseeable."  BNL Br. at 10.  Given the Complaint's allegation that Parmalat's financial statements, which were used to sell securities to investors in the United States, were inflated by at least €103 million due to BNL's fraud, this bold assertion by BNL is hard to fathom.  Indeed, since Parmalat's false and misleading reports were posted "in English on Parmalat's website to ensure that United States investors would be able to review those documents" (¶ 62) it was clearly

*(cont'd)*

Thus, where "conduct material to the completion of the fraud occurred in the United States," as is the case here, there is jurisdiction over claims by foreign purchasers of foreign securities. *Alfadda v. Fenn*, 935 F.2d 475, 478 (2d Cir. 1991) (upholding jurisdiction over claims by foreign purchasers of foreign securities) (quotation omitted); *In re Nortel Networks Corp. Sec. Litig.*, No. 01 Civ. 1855 (RMB), 2003 WL 22077464 (S.D.N.Y. Sept. 8, 2003) (same); *Fund of Funds*, 1980 WL 1146 (same).

Where the conduct test is satisfied, jurisdiction over the claims of foreign purchasers who purchase securities on a foreign exchange exists notwithstanding that the financial statements or other documents they relied on were prepared and delivered to them outside of the United States. *See Berger*, 322 F.3d at 195 ("[W]e do not lack subject matter jurisdiction in this case simply because the financial statements that were disseminated to the Fund's investors were prepared in Bermuda.")  The fact that the false statements did not emanate from the United States is not determinative of jurisdictional questions. *Itoba,* 54 F.3d at 124.  Otherwise, as noted in *Vivendi,* 2004 WL 2375830, at *6, the federal securities laws could be "circumvented simply by preparing fraudulent statements outside the United States."  Indeed, in *CL-Alexanders Laing*, 709 F. Supp. at 477, the court rejected the defendants' argument that there was no subject matter jurisdiction because "no fraudulent statements were communicated by them from the United States."

*Alfadda*, 935 F.2d 475, also applies here.  In that case, the plaintiffs, all residents and nationals of foreign countries, purchased stock in an offering by several foreign corporations and two U.S. citizens.  The prospectus pursuant to which the plaintiffs purchased stock represented that no more than 600,000 voting shares would be sold, but in fact twice that amount of shares

---

foreseeable that the fraud would affect investors in the United States.

was sold, thus diluting the plaintiffs' interests. The alleged misrepresentations were made outside the U.S., as were the plaintiffs' purchases. Nonetheless, the Court of Appeals held that there was subject matter jurisdiction because the parties who purchased the excess stock negotiated those purchases in the U.S., which constituted "conduct material to the completion of the fraud." *Id.* at 478-79.

These cases demonstrate that subject matter jurisdiction exists over foreign purchasers of securities if transactions that occur in the United States render statements made outside the United States false or misleading, provided the transactions are material to the fraud. Here, the fraudulent financial transactions involving Buconero, Web Holdings, Findairy and the other sham entities in the U.S. were *U.S.* transactions, as was the Eureka securitization program. Unquestionably, the transactions involving U.S. entities and accounts were "material to the completion of the fraud" and "significant acts without which [the foreign purchasers'] losses could not have occurred." *Psimenos*, 722 F.2d at 1048. As such, there is jurisdiction over the foreign purchasers' claims.[82]

## VII. THE COMPLAINT ALLEGES A LEGALLY SUFFICIENT BASIS TO ASSERT PERSONAL JURISDICTION OVER BASL

BASL seeks dismissal on the grounds that the Complaint fails to establish personal jurisdiction over it. BASL Br. at 2. This challenge is legally and factually unsustainable.

Plaintiffs have alleged that BASL, and individuals acting on its behalf, participated in a fraudulent scheme that included the underwriting of $1 billion in private placement debt that was

---

[82] The cases that Defendants cite, *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974 (2d Cir. 1975); *Tri-Star Farms, Ltd. v. Marconi, plc*, 225 F. Supp. 2d 567 (W.D. Pa. 2002); *European & Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118 (2d Cir. 1998); and *In re Bayer AB Sec. Litig.*, No. 03 Civ. 1546 (WHP), 2004 WL 2190357 (S.D.N.Y. Sept. 30, 2004), each involved the plaintiff's failure to establish jurisdiction based on either the

*(cont'd)*

sold and caused injury to investors in the United States and elsewhere.  ¶ 840.  Plaintiffs also allege that BASL participated in a worldwide scheme to inflate Parmalat's reported financial condition to create and maintain a market in the United States and elsewhere for Parmalat's securities.  Where a defendant's activities have an "unmistakably foreseeable effect within the United States" and "could reasonably be expected to be visited upon the United States [investors]," exercise of personal jurisdiction over foreign defendants for securities fraud claims is appropriate.  *SEC v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990); *SEC v. Softpoint Inc.*, No. 95 Civ. 2951, 2001 WL 43611, at *5 (S.D.N.Y. Jan. 18, 2001).  BASL's activities satisfy this criteria.  At a minimum, Plaintiffs' factual allegations, made without benefit of discovery, suffice to defeat BASL's motion at this time.[83]

Section 27 of the Exchange Act, 15 U.S.C. § 78aa, empowers United States courts to exercise personal jurisdiction in Rule 10b-5 cases to the full extent permitted by due process.  *See Unifund SAL*, 910 F. 2d at 1033; *ATSI Comm., Inc. v. The Shaar Fund, Ltd.,* No. 02 Civ. 8726 (LAK), 2004 WL 909173, at *2 (S.D.N.Y. April 28, 2004) (Kaplan, J.); *Cromer*, 137 F.

---

"conduct" or "effects" tests.  For the reasons set forth above, Plaintiffs have satisfied both of these tests to establish the jurisdiction of this Court.

[83] Where, as here, a defendant brings a motion to dismiss for lack of personal jurisdiction before discovery has begun, the plaintiff may defeat the motion simply by alleging a *prima facie* case.  *See PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997); *A.I. Trade Finance, Inc. v. Petra Bank*, 989 F.2d 76, 79 (2d Cir. 1993).  To do so, Plaintiffs may rely entirely on mere allegations of fact in the Complaint, and they will prevail even if BASL subsequently makes contrary allegations which controvert their *prima facie* case.  *See A.I. Trade*, 989 F.2d at 79; *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 57 (2d Cir. 1985).

If the Court determines that Plaintiffs have not yet established the basis for asserting personal jurisdiction over BASL, Plaintiffs request leave to conduct discovery of BASL limited to issues of jurisdiction, such as its contacts with the U.S. and the effects in the U.S. of the transactions involving Parmalat in which it engaged.  At this juncture of the case, Plaintiffs need satisfy only a "light burden" to be entitled to discovery as to personal jurisdiction.  *Alicea v. Lasar Mfg. Co.*, No. 91 Civ. 3929 (JFK), 1992 WL 230203, at *2 (S.D.N.Y. Aug. 31 1992).  "Plaintiffs are entitled to discovery regarding the issue of personal jurisdiction if they have made a sufficient start, and shown their position not to be frivolous."  *Newbro v. Freed*, No. 03 Civ. 10308 (PKC), 2004 WL 691392, at *3 (S.D.N.Y. Mar. 31, 2004); *see also Stratagem Dev. Corp. v. Heron Int'l N.V.*, 153 F.R.D. 535, 547 (S.D.N.Y. 1994) (discovery allowed where plaintiff failed to make a *prima facie* showing of jurisdiction but its position was not frivolous); *Manhattan Life Ins. Co. v. A.J. Stratton Syndicate*, 731 F. Supp. 587, 593 (S.D.N.Y. 1990) (same).

Supp. 2d at 473.  To determine whether the exercise of personal jurisdiction is proper, the Court

must conduct a two-part due process analysis:  a "minimum contacts" inquiry and a

"reasonableness" inquiry.  *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567

(2d Cir. 1996); *Cromer*, 137 F. Supp. 2d at 473.  The "minimum contacts" analysis examines a

defendant's contacts with the United States.  *Chew v. Dietrich*, 143 F.3d 24, 28 n. 4 (2d Cir.

1998); *Cromer*, 137 F. Supp. 2d at 473; *GMS Group, Inc. v. Sentinel Trust Co.*, No. 97 Civ. 1342

(WK), 1997 WL 414147, at *2 (S.D.N.Y. July 23, 1997).  If the court finds sufficient contacts

with the United States, it then assesses the "reasonableness" – from the forum's perspective – of

exercising jurisdiction.  *See Fitzsimmons v. Barton*, 589 F.2d 330, 333 (7th Cir. 1979) (reversing

dismissal because the trial court's fairness analysis did not focus on interests of United States in

hearing action, as reflected in the securities laws); *see also SEC v. Euro Sec. Fund, Coim SA*, No.

98 Civ. 7437, 1999 WL 76801, at * 3 (S.D.N.Y. Feb. 17, 1999).  As both tests are easily satisfied

here, the Court should deny BASL's motion to dismiss.

### A.      The Minimum Contacts Test Is Satisfied

Minimum contacts with the United States can be established under either of two theories:

general or specific jurisdiction.  General jurisdiction exists where a defendant's contacts with the

forum are so "continuous and systematic" that it can be sued for any claim, irrespective of the

relationship of the claim to the forum-related conduct.  *Helicopteros Nacionales de Colombia*

*S.A. v. Hall*, 466 U.S. 408, 415-16, 104 S. Ct. 1868, 1872-73 (1984).  "Specific jurisdiction

exists when 'a State exercises personal jurisdiction over a defendant in a suit arising out of or

related to the defendant's contacts with the forum.'"  *Metropolitan Life Ins.*, 84 F.3d at 567-68

(*citing Helicopteros Nacionales*, 466 U.S. at 414-16 & nn.8-9, 104 S. Ct. at 1872-73 & nn.8-9).

To assert specific jurisdiction, the Court must find that "the defendant has 'purposefully

directed' his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 105 S. Ct. 2174, 2182 (1985). Moreover, courts examine whether it was foreseeable to the defendant that its actions would cause injury in the forum State. *Id*. at 474, 105 S. Ct. at 2183 (foreseeability analysis requires that "'the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there'") (*quoting World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S. Ct. 559, 567 (1980)). One circumstance making such anticipation reasonable is where a defendant has acted in such a way as to have "caused consequences" in the forum state. *See Unifund SAL*, 910 F.2d at 1033 (finding personal jurisdiction where defendants' actions abroad had a clearly foreseeable and direct impact on the United States securities market).

BASL makes much of its lack of physical connection to the United States. Lack of offices, or other tangible signs of a presence in the United States, is not dispositive on the issue of whether this Court may exercise specific jurisdiction over BASL. The Complaint alleges significant conduct in furtherance of the fraud in the United States by persons employed or controlled by BASL. Thus, BASL's client relationship manager for the Parmalat account, Luca Sala, who has been indicted (¶ 836), participated in "road shows" conducted in the United States. *Id.* ¶ 60. Sala also managed the purported "outside" investment by North American investors (including United States institutional investors) of $300 million in Parmalat's Brazilian operations. ¶¶ 394-405. BASL controlled and directed Sala's activities, and Sala acted on BASL's behalf. ¶¶ 181, 1210-12.

Moreover, personal jurisdiction in a Rule 10b-5 case may be asserted over a defendant with *no* physical contact with the forum if he or she "caus[ed] an effect in the state by an act

done elsewhere." *Perez-Rubio v. Wyckoff*, 718 F. Supp. 217, 228 (S.D.N.Y. 1989); *see, e.g.*, *Shanahan v. Vallat*, No. 03 Civ. 3496, 2004 WL 2937805 at *8 (S.D.N.Y. Dec. 19, 2004) ("These contacts are sufficient to establish specific personal jurisdiction: [foreign] defendants acted with intent to influence a resident of the United States, and this litigation arises out of Defendants' acts."); *SEC v. Ogle*, No. 99 C 609, 1999 WL 446857, at *2 (N.D. Ill. June 15, 1999) (finding personal jurisdiction where complaint alleged defendants' "knowing participation in planning and executing a scheme designed to defraud American investors and securities markets" and finding "irrelevant" contention that defendants had no direct contact with the United States).

Thus, even if BASL did not have any physical contacts with the United States, this Court would still have authority to exercise personal jurisdiction based on its non-United States activities that affected United States investors. *Teachers' Ret. Sys.,* 2003 WL 21058090, at *8-9 (foreign parent of international accounting firm subject to personal jurisdiction where plaintiff alleged it was "engaged in a course of conduct with the knowledge that it would affect American investors in the United States."); *SEC v. Foundation Hai*, 736 F. Supp. 465, 469 (S.D.N.Y. 1990) (overseas trading activities of foreign defendants in United States-listed securities sufficiently directed toward United States for purposes of liability under § 10(b)); *see also MTC Elec. Tech. Co. v. Leung*, 889 F. Supp. 396, 400 (C.D. Cal. 1995) ("within the rubric of 'purposeful availment,' jurisdiction may be exercised over a defendant whose only contact with the forum is the 'purposeful direction' of a foreign act which has an effect in the forum") (*quoting Calder v. Jones*, 465 U.S. 783, 104 S. Ct. 1482 (1984)).

Plaintiffs have also alleged that BASL participated with its affiliates and individuals within the Bank of America family in a worldwide scheme to maintain an active market in the

United States and elsewhere for Parmalat's securities.  *See* ¶¶ 1163-67 (Defendants engaged in scheme "to maintain artificially high market prices" for Parmalat securities that was designed to and did result in Plaintiffs' "acquir[ing] Parmalat securities at artificially inflated prices").[84] Moreover, Plaintiffs have alleged that BASL participated with other Bank of America entities, even if not as a named underwriter, in selling over $1 billion in private placement debt into the United States.  *See* ¶¶ 839-47.[85]

    Thus, BASL knew or should have known that its and its employees' actions in furtherance of Parmalat's fraudulent scheme would have a direct effect in the United States, and a direct impact on Parmalat's investors in the United States.  *See Unifund SAL*, 910 F.2d at 1031 (asserting personal jurisdiction based on trading through foreign brokers of options of United States-based company); *Derensis v. Coopers & Lybrand Chartered Accountants*, 930 F. Supp. 1003, 1014 (D.N.J. 1996) (personal jurisdiction existed over Canadian defendants who had no direct contacts with forum but allegedly approved and disseminated financial statements they knew would influence the price of securities traded on NASDAQ); *Itoba*, 930 F. Supp. at 41 (D. Conn. 1996) (personal jurisdiction is appropriate where director of foreign corporation knew or should have known a form he approved would be filed with the SEC and relied upon on by potential investors); *Landry v. Price Waterhouse Chartered Accountants*, 715 F. Supp. 98, 102 (S.D.N.Y. 1989) (personal jurisdiction existed over a foreign defendant charged with control person liability based on his "behind the scenes" role in the subject transaction which he must

---

[84] It almost goes without saying that New York City, the location of this Court, is one of the financial centers of the world and that the United States' securities markets are an extremely large part of the worldwide market for capital.

[85] BASL has cited Federal Reserve Regulation K, 12 C.F.R. § 211.10(a)(13), perhaps to suggest it could not play any role in Bank of America's investment banking and underwriting business that impacted the United States.  The Court cannot make a finding on a Rule 12(b)(6) motion that BASL played no role in Parmalat's United States transactions. This is a factual issue as to which there has been no discovery.  Moreover, as a securities firm, BASL had to know that any actions it took in furthering Parmalat's fraudulent scheme and inflating Parmalat's financial statements

*(cont'd)*

have known would have an impact on stock trading within the United States).

### B.     The Reasonableness Inquiry Is Satisfied

It is "reasonable" to compel BASL to litigate Plaintiffs' claim in this forum.  Courts

employ a five-factor test in assessing whether the assertion of personal jurisdiction is reasonable:

(1) the burden on the foreign entity to litigate here; (2) the interests of the United States as the

forum for adjudicating the case; (3) the plaintiffs' interest in obtaining convenient and effective

relief; (4) the most efficient interstate resolution of the controversy; and (5) the availability of

relief in another forum.  *See Asahi Metal Indus. Co. v. Superior Ct.,* 480 U.S. 102, 113-14, 107

S. Ct. 1026, 1033 (1987).  Contrary to BASL's contention, these factors weigh decidedly in

favor of asserting personal jurisdiction over BASL in this action.

First, it is indisputable that this Court and the United States have an interest in enforcing

the securities laws against obvious violators like Defendants herein, who were active and willful

participants in this global fraud.  *See Euro Sec. Fund*, 1999 WL 76801, at * 4 ("The United

States has a substantial interest in the integrity of its securities markets").  In addition, Plaintiffs

have a strong interest in obtaining convenient and effective relief, for themselves and the Class,

as Parmalat's investors have suffered billions of dollars in losses.  *Id*.  The courts in this District,

and the remedies provided Plaintiffs in the Exchange Act, support assertion of jurisdiction here.

*See Cromer*, 137 F. Supp. 2d at 479 (federal courts in Southern District of New York have an

"expertise in [securities] litigation").  Moreover, trying this case in this District, a financial nerve

center served by three major airports and the home of many of these Defendants or their

subsidiaries or affiliates, will facilitate its efficient resolution.  Indeed, BASL's corporate parents

have offices in this District and it is reasonable to believe that BASL's officers and employees

---

would impact United States investors in Parmalat securities.

frequently travel to the United States.  Travel for purposes of trial of this matter would not

impose a burden on BASL.  As to the final two factors, BASL's suggested alternative forum in

England would upset the interstate system's interest in an efficient resolution of this matter.

While only BASL has contested personal jurisdiction in the United States, it seems obvious that

several Defendants would contest jurisdiction in England.  Accordingly, this Court provides a

convenient forum for Defendants to resolve the claims of Parmalat investors worldwide.[86]

## VIII.   DTT'S RULE 8 MOTION SHOULD BE DENIED

Highlighting the procedural Catch-22 in which Defendants seek to place Plaintiffs in the

post-PSLRA era, DTT also moves to dismiss pursuant to Fed. R. Civ. P. 8, arguing that the

Complaint is both too long and insufficiently concise.  DTT Br. at 34-35.  This puts the

exclamation point on Defendants' approach to pleading requirements:  No matter how much

detail a plaintiff pleads, it is never enough; but when the plaintiff pleads with substantial

particularity, defendants will argue the complaint violates Rule 8.

Rule 8 motions are highly disfavored.  "Many lawyers strongly believe that … the more

comprehensive pleading assists the judge in understanding the case….  This judgment by the bar

has been accepted to the extent that complaints signed by a lawyer are never dismissed simply

because they are not short, concise, and plain."  *Davis v. Ruby Foods, Inc.,* 269 F.3d 818, 820

---

[86] Relevant here also is the fact that, at an earlier juncture in the case, BASL's parent corporation, BANA, represented by the same counsel that represents BASL, filed papers with the Judicial Panel on Multidistrict Litigation urging that all of the Parmalat cases be consolidated and transferred to this Court to "promote the just and efficient conduct' of these actions."  *See* Bank of America's Memorandum of Law in Support of Motion for Transfer for Coordinated and Consolidated Pretrial Proceedings Under 28 U.S.C. § 1407, dated Nov. 4, 2004, at 6 (submitted herewith as Ex. B to Ferrarese Decl.).  Such motion also noted that GTI and DTT had previously filed papers making a similar request.  *Id.*  The DTT brief to which BANA referred stated that "a litigation of this scope will benefit from centralization in a major metropolitan center like New York City because it is 'well served by major airlines, provides ample hotel and office accommodations, and offers a well developed support system for legal services.'"  *See* Memorandum in Support of Deloitte Touche Tohmatsu's Motion for Transfer and Consolidation Pursuant to 28 U.S.C. § 1407, at 16-17 (submitted herewith as Ex. C to Ferrarese Decl.).  It further stated that "many of the non-

*(cont'd)*

(7th Cir. 2001).  Dismissal under Rule 8 "is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988).  This is hardly such a case.

The fact that the Complaint is lengthy does not demonstrate a Rule 8 violation, since "Rule 8 does not require a 'short and plain complaint,' but rather a 'short and plain statement of the claim.'" *Ciralsky v. CIA*, 355 F.3d 661, 670 (D.C. Cir. 2004).  The purpose of Rule 8 is to ensure that defendants are informed of the nature of the claims against them.  The Complaint contains clear allegations as to DTT's actions in furthering the fraud by squelching questions being raised by the Deloitte auditors in Brazil.  ¶¶ 1005-13, 1033.  It contains clear allegations as to how DTT exercises control over its auditors around the world and how DT-Italy acted as an agent of DTT.  ¶¶ 135, 144, 146, 147, 159.  Indeed, the length of the Complaint is due in no small part to the extensive, far-reaching and complex nature and scope of the fraudulent activities and conduct alleged.  Here, as in *Krasselt v. Joseph E. Seagram & Sons, Inc.,* No. 01 Civ. 2821, 2002 WL 1997926, at *2 (S.D.N.Y. Aug. 29, 2002), "[d]efendants cannot really argue that they do not have notice of the claims against them…."

The fact that DTT has filed a 35-page brief asserting numerous arguments why it contends that the claims asserted against it should be dismissed demonstrates that "plaintiff's long submission does not overwhelm the defendant's ability to understand or to mount a defense." *Wynder v. McMahon*, 360 F.3d 73, 80 (2d Cir. 2004).  As stated in *Kittay v. Kornstein*, 230 F.3d 531, 541 (2d Cir. 2000), "[i]f the court understood the allegations sufficiently to determine that they could state a claim for relief, the complaint has satisfied Rule

---

foreign witnesses and documents will be available in New York."  *Id.* at 16.

8."

In any event, DTT's Rule 8 motion conflicts with its request for dismissal with prejudice, as "it will generally be an abuse of discretion to deny leave to amend" when a court dismisses a nonfrivolous complaint on ground that it violates Rule 8.  *Salahuddin*, 861 F.2d at 42.

## IX.    <u>LEAVE TO REPLEAD SHOULD BE GRANTED IF NECESSARY</u>

If any of their claims is found deficient, Plaintiffs respectfully request leave to replead.[87] It is familiar law that leave to replead should be "freely given."  Fed. R. Civ. P. 15(a); *see Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 230 (1962); *Manning v. Utilities Mut. Ins. Co., Inc*., 254 F.3d 387, 402 (2d Cir. 2001) (reversing dismissal of claim and granting plaintiff opportunity to replead on remand).  Indeed, recognizing that Federal Rules favor resolving cases on their merits, courts in this Circuit have long been reluctant "to preclude the prosecution of a possibly meritorious claim because of defects in the pleadings."  *Ross v. A.H. Robins Co.*, 607 F.2d 545, 547 (2d Cir. 1979) (reversing dismissal with prejudice of Plaintiffs' securities fraud complaint).  Accordingly, "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead."  *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) (*citing Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990)); *Devaney v. Chester,* 813 F.2d 566, 569 (2d Cir. 1987).

Plaintiffs have not previously sought leave to amend.  This is an important factor weighing in favor of granting such leave, as this would be their first opportunity to address any potential defects in the pleading that are identified.  "[T]he court should normally give the

---

[87] Seeking leave to replead by means of a request in a brief in opposition to a motion to dismiss is appropriate.  *See McLaughlin v. Anderson*, 962 F.2d 187, 195 (2d Cir. 1992) ("lack of a formal motion is not [a] sufficient ground for a district court's dismissal without leave to amend, so long as the plaintiff has made its willingness to amend clear"); *Oliver Schs., Inc. v. Foley*, 930 F.2d 248, 252-53 (2d Cir. 1991) (noting that leave to amend should be granted even

*(cont'd)*

Plaintiff at least one opportunity to amend the complaint."  *Oliver Schs.*, 930 F.2d at 253; *see Wiggins v. Weicker*, 104 F.3d 351 (Table), No. 94-9216, 1996 WL 617569, at *1 (2d Cir. 1996)); *Devaney*, 813 F.2d at 569 (reversing dismissal where plaintiff had no opportunity to address deficiencies identified in complaint); *ATSI Comm., Inc. v. The Shaar Fund Ltd.*, No. 02 Civ. 8726 (LAK), 2004 WL 616123, at *4 (S.D.N.Y. Mar. 30, 2004) (Kaplan, J.) (granting leave to replead after dismissal of amended complaint for deficiencies under PSLRA and Fed. R. Civ. P. 9(b)).[88]

The essence of much of Defendants' motions to dismiss is their contention that the allegations of the Complaint lack sufficient particularity and are "conclusory."  Leave to replead is particularly appropriate where a dismissal is pursuant to Rule 9(b).  *Olsen v. Pratt & Whitney Aircraft, Div. of United Tech. Corp.*, 136 F.3d 273, 275 (2d Cir. 1998); *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986).  Indeed, failure to grant leave to replead in such cases is often deemed an abuse of discretion subject to reversal.  *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 191 (2d Cir. 2001); *Luce*, 802 F.2d at 56-57.  The rationale for courts' willingness to grant leave to replead when a dismissal is pursuant to Rule 9(b) is that the plaintiff may able to correct any deficiency by amplifying the allegations.  *See, e.g., E-Smart Techs., Inc. v. Corse*, No. 03 Civ. 7060 (RO), 2004 WL 2093531, at *4 (S.D.N.Y. Sept. 17, 2004) (granting leave to amend where "it may well be" that amendment will satisfy pleading standards); *Federated Dept. Stores, Inc.*

---

without an explicit motion where the adverse party had knowledge of desire to amend).

[88] Courts in this District have not hesitated after granting motions to dismiss to permit the filing of amended pleadings in securities fraud cases.  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, No. 02 Civ. 3400 (WCC), 2005 WL 81704, at *35 (S.D.N.Y. Jan. 12, 2005) (granting leave to file fourth amended complaint); *Kinsey v. Cendant Corp.*, No. 04 Civ. 0582, 2004 WL 2591946, at *19 (S.D.N.Y. Nov. 16, 2004) (granting leave to file second amended complaint); *Pozniak v. Imperial Chem. Indus. PLC*, No. 03 Civ. 2457, 2004 WL 2186546, at *8 (S.D.N.Y. Sept. 28, 2004) (second amended complaint); *In re Citigroup Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 382 (S.D.N.Y. 2004) (same); *In re Initial Public Offerings Sec. Litig.*, 341 F. Supp. 2d 328, 351 (S.D.N.Y. 2004) (same); *In re Vivendi Universal, S.A. Sec. Litig.*, 2003 WL 22489764, at *26 (S.D.N.Y. Nov. 3, 2003).

*Sec. Litig.*, No. 00 CV 6362 (RCC), 2004 WL 444559, at *8 (S.D.N.Y. Mar. 11, 2004) (leave to replead granted because it was "possible" plaintiffs could remedy the pleading deficiency).

Indeed, while Plaintiffs believe that their Complaint more than satisfies Rule 9(b), leave to amend would not be futile because Plaintiffs are now in a position to provide even greater particularization of their allegations than the Complaint already provides.  As set forth in the accompanying Ferrarese Decl., documents that Plaintiffs' counsel have now obtained or had translated provide significant additional factual support for the allegations in the Complaint.  For example, Plaintiffs have now obtained additional documentation which supports the allegation that BASL acted at the direction of and as agent for BANA.  Plaintiffs have obtained a December 14, 2001 letter to a Parmalat entity signed by "Banc of America Securities Limited acting as agent for Bank of America, N.A." and also stating that it is from "Bank of America, N.A. acting through its agent, Banc of America Securities Limited."  Plaintiffs have obtained a July 16, 2003 letter agreement between Cur Holdings Limited and "Banc of America Securities Limited acting as agent for Bank of America, N.A."  And Plaintiffs have obtained a November 8, 2002 letter similarly signed by "Banc of America Securities Limited acting as agent for Bank of America, N.A., London Branch."  Ferrarese Decl. ¶¶ 6-8.

Plaintiffs also recently received and translated into English a report by the Banca d'Italia on its investigation, conducted over the period between March and May of 2003, into the Milan office of BANA, where Sala, Luzi and Moncada were based.  The report notes that the investigation was complicated by the fact that a number of BANA's Milan branch operations are accounted for on the books and records of BASL and that BASL acting as a broker/dealer exercises significant organizational control over the Milan branch.  ¶ 9.

Plaintiffs also have obtained additional documents supporting the allegation that DT-Italy

operated as an agent of DTT.  These include a letter from DT-Italy to Desam S.r.l. dated July 16, 2002 specifically stating that it is being sent by DT-Italy "[o]n behalf of Deloitte Touche Tohmatsu."  ¶ 10.  Plaintiffs have also obtained the DTT Professional Practice Manual ("PPM") which contains several hundred pages of procedures and policies to which Deloitte member firms must adhere.  It states that "Member Firms should sign reports and correspondence for International Engagements referred to them by other Member Firms in either the name Deloitte Touche Tohmatsu or the name Deloitte & Touche."  ¶ 11.  In addition, Plaintiffs have obtained the form License Agreement between DTT and its member firms, which allows the member firms to use the name Deloitte Touche Tohmatsu or Deloitte "alone or in combination with each other."  ¶ 16.

Plaintiffs have also obtained additional documents supporting the allegation that DTT and the member firms are in reality a single unified entity. For example, the PPM states that DTT is merely "a composite of the Member Firms."  ¶ 12.  The PPM states that "it is important that we function as one firm at the international level," and that "when several firms are engaged to serve an international client, it is clearly desirable that they project the image of a cohesive international organization."  *Id.*  The new documents demonstrate significant revenue sharing among DTT and the member firms, such as a provision in the Supplement to the Articles of DTT providing that withdrawing member firms with seats on the Board must pay 5 or 10 percent of their revenues to DTT.  ¶ 17.  The PMM indicates that there may be cross-ownership of member firms, as it states that there is an "expectation that each Member Firm will be exclusively owned by its own Partners and professionals *unless a firm wishes to place equity holdings elsewhere in the Deloitte Touche Tohmatsu organization.*"  ¶ 13.  (emphasis added).  The PPM also states that on multinational clients there is "one worldwide lead client service partner (an individual who

can be consulted regarding all service matters in all service locations)." ¶ 14.  Plaintiffs have also obtained emails showing that when DT-Italy wanted to verify the location of a Bank of America branch in New York, it simply instructed Deloitte USA to check and Deloitte USA did so.  ¶ 19.

Finally, Plaintiffs recently obtained documents further supporting the allegation that Deloitte USA controls the member firms, such as the Supplement to the Articles of DTT, which states that Deloitte USA has seven seats on the Board of DTT.  No other country has more than two.  ¶ 17.  Newly obtained documents also further support the allegation that DTT controls the member firms.  For example, the Supplement to the Articles of DTT provides that each member firm must comply with the insurance program adopted by DTT.  ¶ 18.  The member firms are required to obtain their insurance from a DTT captive insurance company.  *Id.*  Additionally, the PPM states that member firms cannot engage in significant mergers with other firms without approval by DTT.  ¶ 15.

Defendants cannot be heard to assert that there has been any undue delay by Plaintiffs in seeking leave to amend based on these documents.  Plaintiffs have obtained hundreds of thousands of pages of documents from the proceedings in Italy,[89] many of which are in Italian and need translation.  ¶ 5.  The process of reviewing all of these documents and identifying those most relevant is a time-consuming one.

---

[89] Certain documents – those from the proceeding in Milan – were made available only recently, on or about February 3, 2005.  Ferrarese Decl. ¶ 5.

Furthermore, even if by some stretch Defendants could argue that there has been undue delay, "mere delay … absent a showing of bad faith or undue prejudice, does not provide a basis for the district court to deny the right to amend." *Richardson Greenshields Sec., Inc. v. Lau*, 825 F.2d 647, 653 (2d Cir. 1987). No prejudice has been or could be shown here.

## <u>CONCLUSION</u>

For all of the foregoing reasons, Defendants' motions should be denied in their entirety. In the alternative, should the Court find any infirmity in the allegations of the Complaint, Plaintiffs respectfully request leave to amend and/or limited discovery to investigate any jurisdictional deficiencies.

Dated: February 18, 2005

Respectfully submitted,

COHEN, MILSTEIN, HAUSFELD &
  TOLL,  P.L.L.C.

By: /s/  Catherine A. Torell
Catherine A. Torell (CT-0905)

150 East 52nd Strett
30th Floor
New York, New York  10022
Tel: 212.838.7797

Steven J. Toll
Mark S. Willis
Julie Goldsmith Reiser
Joshua S. Devore
1100 New York Avenue, N.W.,
Suite 500, West Tower
Washington, D.C.  20005-3964
Tel: 202.408.4600
Fax: 202.408.4699

Of Counsel:

SPECTOR ROSEMAN & KODROFF, P.C.
Robert M. Roseman
Andrew D. Abramowitz
Rachel E. Kopp
1818 Market Street, 25th Floor
Philadelphia, PA  19103
Tel: 215.496.0300
Fax: 215.496.6611

GRANT & EISENHOFER, P.A.
Stuart M. Grant (SG-8157)
John C. Kairis
Diane Zilka (DZ-9452)
James J. Sabella (JS-5454)
Chase Manhattan Centre
1201 North Market Street
Wilmington, DE 19801
Tel: 302.622.7000
Fax: 302.622.7100

*Co-Lead Counsel for Plaintiffs*