**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

|   |   |
|---|---|
| : | **ELECTRONICALLY FILED** |
| : |   |
| In re PARMALAT SECURITIES LITIGATION    : | MASTER DOCKET |
| : | 04 MD 1653 (LAK) |
| This document relates to:  04 Civ. 0030 (LAK)    : |   |
| : | Hon. Lewis A. Kaplan |
| : |   |
| _____ : |   |


**GRANT THORNTON LLP'S REPLY**
**IN FURTHER SUPPORT OF ITS MOTION TO DISMISS**


WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
(212) 294-6700

*Attorneys for Defendant*
*Grant Thornton LLP*

## <u>TABLE OF CONTENTS</u>

*Table of Authorities*..............................................................................................................ii

*Grant Thornton LLP's Reply in Further Support of its Motion to Dismiss* ...................................1

I.     Even if "scheme liability" were a viable theory in this Circuit,
       Plaintiffs have not alleged any facts that would implicate GT-US
       in any fraudulent scheme. ...................................................................................................2

II.    Plaintiffs have not alleged any basis for holding GT-US liable under
       any subsection of Rule 10b-5 as the alter ego or principal of GT-Italy.............................4

       A.     Plaintiffs' bare allegations do not support a "one-firm" theory of
              liability based on principles of alter ego or "piercing the veil." ...........................5

       B.     GT-US cannot be held liable for GT-Italy's conduct under agency law. ...............7

III.   GT-US cannot be held liable as a "control person" under Section 20(a). ..........................9

IV.    Conclusion. .........................................................................................................................10

## <u>TABLE OF AUTHORITIES</u>

**Cases:**

In re *AM Int'l, Inc. Sec. Litig.*, 606 F. Supp. 600 (S.D.N.Y. 1985) ................................................6

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
   511 U.S. 164 (1994)..................................................................................................................2

*Cordius Trust v. Kummerfeld Assoc.*,
   No. 99 Civ. 3200 (DLC) (RLE), 2004 WL 357076 (S.D.N.Y. Feb. 19, 2004) .........................6

*Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452 (S.D.N.Y. 2001) ........................................ 6, 8-9

*Cromer Finance Ltd. v. Berger*,
   Nos. 00 Civ. 2284 & 00 Civ. 2498 (DLC), 2002 WL 826847 (S.D.N.Y. May 2, 2002)........ 8-9

In re *Executive Telecard, Ltd. Sec. Litig.*, 913 F. Supp. 280 (S.D.N.Y. 1996).............................10

*First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994)...................................7

In re *Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319 (S.D.N.Y. 2004) .........................3, 4

*Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil, Inc.*,
   456 F. Supp. 831 (D.C. Del. 1978). ..........................................................................................8

*Leeds v. Meltz*, 85 F.3d 51 (2d Cir. 1996)......................................................................................7

*MAG Portfolio Cons. GMBH v. Merlin Biomed Group LLC*,
   268 F.3d 58 (2d Cir. 2001)........................................................................................................5

*Moses v. Martin*,
   No. 04 Civ. 1533 (SAS), 2004 WL 2809198 (S.D.N.Y. Dec 3, 2004)......................................5

*Music Research, Inc. v. Vanguard Recording Society, Inc.*,
   547 F.2d 192 (2d Cir. 1976).......................................................................................................8

*No. 84 Employer- Teamster Joint Council Pension Trust Fund
   v. America W. Holding Corp.*, 320 F.3d 920 (9th Cir. 2003) ..................................................10

*Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP*,
   No. 03 Civ. 0613 (GBD), 2004 WL 112948 (S.D.N.Y. Jan. 22, 2004)...................................5, 6

In re *Oxford Health Plans, Inc., Sec. Litig.*, 187 F.R.D. 133 (S.D.N.Y. 1999) ............................10

*SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450  (2d Cir. 1996) ........................................ 9-10

*Spanierman Gallery, PSP v. Love*,
   No. 03 Civ. 3188 (VM), 2003 WL 22480055 (S.D.N.Y. Oct. 31, 2003) ..................................5

*Teachers' Retirement System v. ACLN, Ltd.*,
   No. 01 Civ. 11814 (MP), 2003 WL 21058090 (S.D.N.Y. May 12, 2003) ............................6-7

In re *Worldcom, Inc. Sec. Lit.*, 294 F. Supp. 2d  392 (S.D.N.Y. 2003) .........................................10

In re *Worldcom, Inc. Sec. Litig.*,
   No. 02 Civ. 3288 (DLC), 2003 WL 21488087 (S.D.N.Y. June 25, 2003)...........................4, 6

*Wright v. Ernst & Young LLP*, 152 F.3d 169 (2d Cir. 1998).........................................................2

**Statutes and Rules:**

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ......................... *passim*

Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a).........................1, 9, 10

Rule 10b-5, 17 C.F.R. §240.10b-5 ..................................................................................... *passim*

17 C.F.R. § 240.12b-2.............................................................................................................9

Rule 11 of the Federal Rules of Civil Procedure ..............................................................10

Rule 12(b)(6) of the Federal Rule of Civil Procedure ...................................................7

In their brief opposing the motions to dismiss, Plaintiffs make virtually no attempt to defend their claims against GT-US.  Like their Complaint, Plaintiffs' brief does not point to a single act, statement, or omission by GT-US that relates in any way to the alleged fraud. Indeed, Plaintiffs ***do not even mention GT-US once*** in the ten pages they devote to "The Auditor Defendants' Participation in the Fraudulent Scheme."  *See* Pl. Mem. 19-28.  The reason for this is simple:  GT-US never served as Parmalat's auditor, never issued any opinion concerning Parmalat's financial statements, and did not take any action in furtherance of an alleged "fraudulent scheme" halfway across the world.  In view of these facts—which Plaintiffs still have not disputed—Plaintiffs cannot state a claim against GT-US under any part of Rule 10b-5.

Plaintiffs' various efforts to hold GT-US vicariously liable for the conduct of GT-Italy are equally baseless and fail as a matter of law.  As discussed below:

· No court has ever "pierced the corporate veil" to hold one entity liable as the "alter ego" of another simply on the ground that both were members of the same umbrella organization and allegedly had a right of access to one another's records.

· Plaintiffs have not alleged a single fact to support their wholly unbelievable theory that when GT-Italy audited the Italian financial statements of its Italian client pursuant to Italian law, it did so as the "agent" of and at the direction of its U.S. counterpart.

· A claim of control person liability can only exist where the defendant had control—direct or indirect—***over the primary violator***.  Plaintiffs have not even attempted to base their Section 20(a) claim on any argument that GT-US controlled GT-Italy.

As they search for deep pockets, Plaintiffs apparently believe that by offering lengthy descriptions of the alleged fraud by Parmalat and its Italian auditors, they can focus this Court's attention away from the allegations (or lack thereof) against the U.S. and international firms that they have drawn into this dispute.  In the end, however—despite the extraordinary access they have had to Parmalat's internal documents (Compl. ¶ 1)—they are unable to give this Court any legal or factual basis for keeping GT-US in this case and subjecting it to expensive, intrusive, and ultimately pointless discovery.  Accordingly, all claims against GT-US must be dismissed.

**I.**   **Even if "scheme liability" were a viable theory in this Circuit, Plaintiffs have not alleged any facts that would implicate GT-US in any fraudulent scheme.**

In its opening brief, GT-US explained in no uncertain terms the factual deficiencies in Plaintiffs' claims against GT-US.  The point bears repeating:  "Nowhere in the Complaint's 1,259 paragraphs do Plaintiffs allege that GT-US or any of its employees made any statement at all with regard to Parmalat, participated in or directed any fraudulent or deceptive act, or had the level of scienter required for an action under the securities laws."  GT-US Mem. 1.  GT-US also took issue with the Plaintiffs' disingenuous practice of lumping GTI and GT-US with GT-Italy as part of a collective "Grant Thornton," without distinguishing between those respective firms in their factual allegations.  *Id.* at 11-14.  Plaintiffs' 148-page brief does not challenge GT-US's characterization of the Complaint and offers no defense of this "group pleading" technique.

Instead of responding to GT-US's arguments—and indeed there is no satisfactory response they could give—Plaintiffs take issue with the proposition that a defendant "must actually make a false or misleading statement in order to be held liable under Section 10(b)." *Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998) (citation omitted).  They argue that a "participant in a fraudulent scheme" may be held liable under Rule 10b-5(a) and (c)— despite the fact that in a case about false statements, "participation" is indistinguishable from "aiding and abetting," which they concede is not a basis for private liability. Pl. Mem. 41 (citing *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994)).

With respect to GT-US, however, Plaintiffs' attempts to distinguish scheme liability from aiding-and-abetting liability is entirely academic.  Even under the test Plaintiffs have proposed, their Complaint gives no basis for the claim that GT-US is liable as a "participant" in any "fraudulent scheme."  Plaintiffs contend that where a defendant "prepared, directed or controlled, helped create or materially assisted in preparing the false statements" made by others, the

defendant may be held primarily liable based on its "substantial participation" in the overall scheme. Pl. Mem. 86 & n.50 (quoting In re *Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 334 (S.D.N.Y. 2004) (Lynch, J.)). But Plaintiffs' allegations do not implicate GT-US in a fraudulent "scheme"—and they certainly do not show that GT-US "prepared, directed or controlled, helped create or materially assisted" in any false statements regarding Parmalat. To the contrary, in describing the work performed by auditors outside Italy, Plaintiffs state in their brief that "auditors from two of the Big Four accounting firms in four other countries"— including the United States—"were involved in auditing Parmalat's financials." Pl. Mem. 68. No entity bearing the "Grant Thornton" name is among the "Big Four." [1]

Indeed, despite Plaintiffs' insistence that ***all*** the Defendants were "primary, indeed essential, participants in a global scheme to defraud Parmalat's securities holders" (*id.* at 33), GT-US ***is not mentioned once*** in their discussion of "The Auditor Defendants' Participation in the Fraudulent Scheme" (*id.* at 19-28). [2] Even in their argument for "scheme liability," Plaintiffs focus entirely on the conduct and scienter of GT-Italy, without making any effort to argue that GT-US and GTI themselves participated in any wrongdoing or had the requisite scienter. *Id.* at 58-67; *see also id.* at iii (II.F.1 entitled "The Members of the Grant Thornton and Deloitte Organizations in Italy Engaged in a Fraudulent Scheme," with subheadings "DT-Italy" and "GT-

---

[1]   Unlike Dr. Bondi, Plaintiffs do not make the baseless claim that GT-US audited Parmalat's U.S. affiliates. *Compare* Compl. ¶ 86 (alleging only that the "U.S. offices" "provided non-audit services" relating to "certain Parmalat U.S. acquisitions," though not alleging any impropriety in those alleged "services") *with* Bondi Compl. ¶¶ 64, 99, 117. Although Plaintiffs do aver generally GT-US had "direct involvement in and communications regarding its member firms'—including [GT-Italy's]—audits of, and consulting for, Parmalat and its subsidiaries" (Compl. ¶ 1153), that vague and conclusory statement falls far short of the heightened pleading standards and does not purport to connect GT-US with any fraud.

[2]   Although Plaintiffs contend that "affiliates of DTT and GTI continued their role" after Parmalat's collapse, even "hinder[ing] the Company's efforts to obtain copies of audit work papers that might reveal the auditors' fraud" (Pl. Mem. 21), they do not allege that GT-US was one of those "affiliates."

Italy").  Thus Plaintiffs have utterly failed to set forth a legal or factual basis for "scheme" liability, much less to satisfy the heightened pleading standards under the federal securities laws.

After discussing their scienter allegations involving GT-Italy, Plaintiffs argue that "[t]he sheer magnitude of the inaccuracies and fictitious items in Parmalat's financial statements supports an inference of scienter."  Pl. Mem. 68.  This argument appears in a section devoted to the "Members of the Grant Thornton and Deloitte Organizations *in Italy*" (*id*. at 58-69 (emphasis added))—so presumably Plaintiffs do not intend to suggest that the Court may "infer" from the magnitude of the alleged fraud that the ***non-Italian audit firms*** also had scienter. If that is their suggestion, however, it has no basis in law.  Although the Court in *Global Crossing* did give some weight to the "scope of the fraud" when evaluating allegations of scienter, it considered that factor in combination with "over thirty paragraphs of the Complaint" devoted to "allegations that Andersen was well aware that the Companies' books were misleading."  322 F. Supp. 2d at 346-47.  Given their lack of participation in the audit of Parmalat's financial statements, the size of the alleged fraud cannot logically support an inference of scienter on the part of GT-US and GTI.  *See* In re *Worldcom, Inc.*, No. 02 Civ. 3288 (DLC), 2003 WL 21488087, at *7 (S.D.N.Y. June 25, 2003) ("size of the fraud alone does not create an inference of scienter").

## II.    Plaintiffs have not alleged any basis for holding GT-US liable under any subsection of Rule 10b-5 as the alter ego or principal of GT-Italy.

Plaintiffs apparently agree that if they cannot hold GT-US vicariously liable for the actions of GT-Italy, they have no hope of stating a claim against it.  *See* Pl. Mem. 69, 88-89 (claims against GT-US under Rule 10b-5 depend on theories of vicarious liability).  Notably, Plaintiffs do not contend that GT-US may be held liable for a primary violation under ***other*** theories of vicarious liability, such as joint venture, partnership, or apparent agency.  Their brief advances only two theories—an alter ego or "one-firm" argument, and the argument that GT-US

4

is liable through principles of agency law.  But as explained in GT-US's opening brief, Plaintiffs

have not provided a factual or legal basis for either of these theories.  GT-US Mem. 14-22.

### A.   Plaintiffs' bare allegations do not support a "one-firm" theory of liability based on principles of alter ego or "piercing the veil."

Incredibly, Plaintiffs contend that this Court should hold GT-US liable as the "alter ego"

of GT-Italy even in the absence of any allegation that GT-US dominated or owned GT-Italy or

even directed its conduct—much less any showing that GT-Italy was a "mere instrumentality" of

GT-US as the "real actor."  *Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP*, No. 03

Civ. 0613 (GBD), 2004 WL 112948, at *6 (S.D.N.Y. Jan. 22, 2004).  Plaintiffs' claim that GT-

US should be liable as an "alter ego" is based on two general allegations:  (i) GT-US is part of a

"global" organization "dominated by GTI," and (ii) GT-US allegedly "had access to the Parmalat

workpapers of other firms in the Grant Thornton network and direct involvement in their audits

of Parmalat financial statements."  Pl. Mem. 72-73.  Even assuming that these conclusory and

vague allegations were true—and they are not—they do not come close to providing this Court

with a justification for ignoring the real corporate separation between the respective entities.

To show alter ego liability, the plaintiff must allege that the party behind the "veil" had

"complete domination" over the other entity and used that domination to commit a  wrongful or

fraudulent act toward the plaintiff.  *Spanierman Gallery, PSP v. Love*, No. 03 Civ. 3188 (VM),

2003 WL 22480055, at *2 (S.D.N.Y. Oct. 31, 2003); *see also MAG Portfolio Cons. GMBH v.

Merlin Biomed Group LLC*, 268 F.3d 58, 63 (2d Cir. 2001) (indicia of domination include

disregard of corporate formalities, inadequate capitalization, intermingling of funds).  The cases

Plaintiffs cite to show the "fact-specific" nature of an alter ego claim aptly demonstrate the

"domination" required before a court will pierce the corporate veil.  Pl. Mem. 70; *see, e.g.,

Moses v. Martin*, No. 04 Civ. 1533 (SAS), 2004 WL 2809198, at *1 -*3 (S.D.N.Y. Dec 3, 2004)

(denying motion to dismiss based on allegation that defendant owned and operated corporation and used its receivables for personal use rather than distributing to plaintiff); *Cordius Trust v. Kummerfeld Assoc.*, No. 99 Civ. 3200 (DLC) (RLE), 2004 WL 357076, at *6-*7 (S.D.N.Y. Feb. 19, 2004) (denying motion to dismiss in light of allegations that corporate formalities were not observed, corporation was inadequately capitalized, and defendant commingled personal funds with corporation's and used it to avoid liability for fraudulent investment scheme).

In stark contrast to these authorities, Plaintiffs here argue simply that all members of an international accounting organization should bear one another's liability because the organization shares certain standards and markets itself as a unified enterprise. But courts have consistently rejected this theory of "one-firm" liability for international accounting firms and their members, even based on allegations far more substantial than those made here. GT-US Mem. 14-21 (citing cases). These cases are ***not*** all "procedurally beyond the motion to dismiss stage," as Plaintiffs suggest. *See* Pl. Mem. 74. Indeed, GT-US cited four different cases from this very District in which a plaintiff's claims against either an umbrella organization or a sister member firm have been dismissed based on allegations of coordination at least as detailed as those here.[3]

Although Plaintiffs place great emphasis on *Teachers' Retirement System v. ACLN, Ltd.*, No. 01 Civ. 11814 (MP), 2003 WL 21058090 (S.D.N.Y. May 12, 2003), that case does not even concern alter ego liability and included allegations very different from those made in this case. In *Teachers' Retirement*, the court denied a motion to dismiss claims against BDO International—an umbrella organization, not a co-member firm like GT-US—after concluding that the audit opinions had been issued by and under the name of the umbrella organization itself.

---

[3] *See* GT-US Mem. 15-16 (citing *Nuevo Mundo Holdings*, 2004 WL 112948; In re *Worldcom, Inc.*, No. 02 Civ. 3288 (DLC), 2003 WL 21488087 (S.D.N.Y. June 25, 2003); *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452 (S.D.N.Y. 2001); In re *AM Int'l, Inc. Sec. Litig.*, 606 F. Supp. 600 (S.D.N.Y. 1985)).

The court reached this conclusion after reciting pages of detailed factual allegations showing that the umbrella entity had specific influence over the member firms' audits and that the audit opinions at issue had been "signed" by the umbrella firm.  *Id*. at *5; *see id*. at *2 (umbrella organization "represents to the public that its member firms are its representatives"); *id*. at *2, *5 (financial statements, audit reports, and other documents identified auditor as "BDO International"); *id*. at *5 (if client retained "only a local office," that office would sign the audit report—but in the audit at issue and in many others, opinions were signed by "BDO International" instead).  Plaintiffs did not and cannot make any such allegations in this case.  And in any event, *Teacher's Retirement* provides no support for Plaintiffs' extraordinary argument that one member firm may be held liable for the conduct of another member firm based simply on their shared membership in a single umbrella organization and their alleged access to one another's work papers.

### B.    GT-US cannot be held liable for GT-Italy's conduct under agency law.

Plaintiffs argue that GT-US should be held liable for GT-Italy's conduct because, according to Plaintiffs, "GT-Italy performed its audit work relating to Parmalat as agent of GTI and GT-US, acting 'on their authority, at their direction and for their benefit.'"  Pl. Mem. 79 (quoting Compl. ¶ 159).  This quoted language, however, is the ***only*** statement in the Complaint that Plaintiffs can point to in support of their agency theory, and it does not reasonably or logically follow from any of the facts alleged in the Complaint.  *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996) ("bald assertions and conclusions of law" will not suffice to defeat a motion to dismiss); *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771 (2d Cir. 1994) (on Rule 12(b)(6) motion, "conclusions of law or unwarranted deductions of fact are not admitted").  GT-US explained in its opening brief that Plaintiffs had not sufficiently alleged any of the

elements of agency with respect to GT-US (GT-US Mem. 21-22), and Plaintiffs do not offer any serious response to that argument.

Although Plaintiffs contend that questions of agency are ordinarily left to the jury, none of the cases they cite actually supports the proposition that a plaintiff may survive a motion to dismiss merely by stating in his complaint that one party acted as another's agent.  *See* Pl. Mem. 78-79.  The case of *Music Research, Inc. v. Vanguard Recording Society, Inc.*, 547 F.2d 192 (2d Cir. 1976), for example, has nothing to do with the adequacy of a complaint.  Instead, the court held that the district court, having heard evidence at trial relating to the agency relationship, properly left the issue of agency for the jury.  *Id.* at 195.  And in another of the cases cited by Plaintiffs, the court held that despite the plaintiffs' many detailed factual allegations, they had not sufficiently demonstrated an agency relationship because "the overall picture presented by the facts described . . . [was] not one of complete domination or control." *Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil, Inc.*, 456 F. Supp. 831, 845 (D.C. Del. 1978).

Moreover, *Cromer Finance Ltd. v. Berger,* which forms the centerpiece of Plaintiffs' agency argument, does not support a finding of liability against any of the auditor defendants in this case, least of all GT-US.  In *Cromer*, the court permitted a plaintiff to proceed with claims against an umbrella organization based on audits performed by its Bermuda member firm because of specific allegations showing that one of the audit partners for the Bermuda audit had actual authority to act on behalf of the umbrella organization and had signed the audit opinions in that capacity.  *Cromer Finance Ltd. v. Berger*, Nos. 00 Civ. 2284 & 00 Civ. 2498 (DLC), 2002 WL 826847 (S.D.N.Y. May 2, 2002), *cited in* Pl. Mem. 79-80.  *See generally* GT-US Reply in Further Support of its Motion to Dismiss the Bondi Complaint, at 8-10 (discussing *Cromer* cases in detail).  Moreover, that same court ***rejected*** the claim that one member firm is liable for the

conduct of another. In an earlier opinion, the *Cromer* court dismissed claims against DT-US, concluding that the plaintiffs could not proceed on an agency theory based on allegations that DT-US was part of an "international Deloitte & Touche enterprise" that sought to become a "true global firm" and to provide "seamless, consistent services wherever [its] clients operate." *Cromer Finance v. Berger*, 137 F. Supp. 2d 452, 489, 496 (S.D.N.Y. 2001).  Thus the *Cromer* cases—on which Plaintiffs rely so heavily—soundly defeat their claims against GT-US.

### III.    GT-US cannot be held liable as a "control person" under Section 20(a).

Plaintiffs' brief makes little effort to address the central point in GT-US's motion to dismiss the Section 20(a) claim—namely, that a defendant cannot be held liable as a "controlling person" of a party ***other than*** the primary violator.  Plaintiffs seek to hold GT-US vicariously liable as a controlling person—not of GT-Italy—but of GTI, the umbrella organization.[4]  *See* GT-US Mem. 23; Pl. Mem. 105.  As discussed above, Plaintiffs' claims against GTI are also based entirely on principles of vicarious or control person liability.  Plaintiffs cite no authority for the proposition that a defendant may be held vicariously liable as a "controlling person" of another party that itself is only vicariously liable.

Indeed, Plaintiffs' only defense of this theory of liability "twice-removed" is a footnote reference to 17 C.F.R. § 240.12b-2, in which the SEC explains that "control" may be "indirect" as well as "direct."  Pl. Mem. 105-07 n.62.  But even allegations of "indirect" control ***must relate to the primary violator.***  *See SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1472  (2d Cir. 1996) ("In order to establish a prima facie case of controlling-person liability, a plaintiff must show a primary violation ***by the controlled person*** and control of the primary violator by the

---

[4]    Plaintiffs also argue that GT-US was a controlling person of Bonlat and Camfield.  Pl. Mem. 105. This is not part of their claim for Section 20(a) liability in Count IV.  Moreover, the facts Plaintiffs have alleged do not support the legal conclusion that GT-US was a "controlling person" of these entities; at most, Plaintiffs allege that GT-US "was aware of the creation" of Bonlat and Camfield.   Compl. ¶ 1152.

targeted defendant.") (emphasis added).  Plaintiffs do not base their claim against GT-US on an allegation that it had control over GT-Italy, nor could they within the constraints of Rule 11.

In any event, a claim for control person liability must do more than merely aver that the defendant was a "control person," as Plaintiffs have done here.  GT-US Mem. 24 (citing cases).  Even Plaintiffs concede that a complaint under Section 20(a) must allege both "'the claim that the defendant was a control person *and the ground on which it rests its assertion.*'"  Pl. Mem. 94 (quoting In re *Worldcom, Inc. Sec. Lit.*, 294 F. Supp. 2d  392, 415-16 (S.D.N.Y. 2003)).  Indeed, the cases Plaintiffs cite for the proposition that control cannot be resolved on a motion to dismiss all involved specific allegations showing "traditional indicia of control."  *No. 84 Employer-Teamster Joint Council Pension Trust Fund  v. America W. Holding Corp.*, 320 F.3d 920, 945-46 (9th Cir. 2003) ("control persons" were corporation's two largest shareholders and allegedly chose directors favorable to their interests), *cited in* Pl. Mem. 90.[5]  Plaintiffs neither allege nor argue that any such factors were present here, and they do not point to any fact or "ground" on which to rest the conclusion that GT-US had control over GTI or any other entity. Thus Plaintiffs' claim against GT-US fails to meet even the ordinary standards of pleading that apply in this Circuit.[6]

## IV.    Conclusion

For all these reasons, and for the reasons stated in the opening submission by GT-US, all claims against GT-US should be dismissed with prejudice.

---

[5]    *See also* In re *Oxford Health Plans, Inc., Sec. Litig.*, 187 F.R.D. 133, 143 (S.D.N.Y. 1999) ("control persons" were either high-level officers who participated directly in corporation's dissemination of false statements or board members with equity interests);  In re *Executive Telecard, Ltd. Sec. Litig.*, 913 F. Supp. 280, 286 (S.D.N.Y. 1996) ("control person" allegedly owned and controlled companies owning significant stock in primary violator and caused those companies to sell stock at inflated price).

[6]    Plaintiffs have also failed to allege any "culpable participation" by GT-US in the conduct by GT-Italy, as required under the PSLRA.  GT-US Mem. 25-27.  But even aside from that requirement, the claim against GT-US must also be dismissed because of the other deficiencies described above.

Dated:  February 28, 2005

Respectfully submitted,

GRANT THORNTON LLP

_____/S/_____

By:   Linda T. Coberly (LC-8078)
      *One of its Attorneys*

      Bruce R. Braun
        (BB-2505, admitted *pro hac vice*)
      Linda T. Coberly
        (LC-8078, admitted *pro hac vice*)
      WINSTON & STRAWN LLP
      35 West Wacker Drive
      Chicago, Illinois 60601
      (312) 558-5600

      Louise R. Radin (LR-9368)
      WINSTON & STRAWN LLP
      200 Park Avenue
      New York, New York 10166
      (212) 294-6700

*Of Counsel:*

Margaret Maxwell Zagel
Ronald P. Gould
GRANT THORNTON LLP
175 West Jackson, 20th Floor
Chicago, Illinois 60604