UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————x   MASTER DOCKET
                                     04 MD 1653 (LAK) ECF Case

In re PARMALAT SECURITIES LITIGATION


This document relates to:

In re PARMALAT SECURITIES LITIGATION          04 Civ. 0030 (LAK)

                                     ELECTRONICALLY FILED


——————————————————————x


**REPLY MEMORANDUM OF DELOITTE & TOUCHE USA LLP
AND DELOITTE & TOUCHE LLP IN SUPPORT OF
THEIR MOTION TO DISMISS THE FIRST AMENDED
CONSOLIDATED CLASS ACTION COMPLAINT**

Alan N. Salpeter
Stephen M. Shapiro
Michele Odorizzi
Daniel L. Ring
MAYER, BROWN, ROWE & MAW LLP
190 South LaSalle Street
Chicago, Illinois 60603
(312) 782-0600

Robert J. Ward (RW 0149)
MAYER, BROWN, ROWE & MAW LLP
1675 Broadway
New York, New York 10019
(212) 506-2500

*Attorneys for Defendants
Deloitte & Touche USA LLP and
Deloitte & Touche LLP*

Dated: March 4, 2005

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................ii

INTRODUCTION .............................................................................................................1

ARGUMENT ....................................................................................................................2

I.    Plaintiffs Have Failed To State A Claim For Primary
      Liability Against Deloitte USA..............................................................................2

      A.    Plaintiffs Cannot Invoke "Scheme" Liability Against
            Deloitte USA ..............................................................................................2

            1.    Plaintiffs Have Not Alleged Any Actionable
                  Conduct By Deloitte USA ...........................................................2

            2.    Plaintiffs Have Not Alleged Facts Giving Rise
                  To A Strong Inference That Deloitte USA Acted
                  With Scienter..................................................................................5

      B.    Plaintiffs Have Failed To Allege Any Basis For Holding
            Deloitte USA Vicariously Liable for DT-Italy's Alleged
            Misstatements ............................................................................................7

            1.    Plaintiffs Have Not Alleged An "Alter Ego"
                  Claim Against Deloitte USA.......................................................8

            2.    Plaintiffs Have Not Alleged A Claim Based
                  On Agency ...................................................................................12

II.   Plaintiffs Have Not Stated A Control Person Claim Against
      Deloitte USA........................................................................................................13

CONCLUSION...............................................................................................................15

# TABLE OF AUTHORITIES

## *Cases*

*Bamberg v. S G Cowen*, 236 F.Supp.2d 79 (D. Mass. 2002) ......................................................11

*Central Bank of Denver, N.A. v. First Interstate*
  *Bank of Denver, N.A.*, 511 U.S. 164, 114 S.Ct. 1439 (1994) ..........................................2, 3, 5, 8

*Chambers v. Time Warner, Inc.,* 282 F.3d 147
  (2d Cir. 2002) ......................................................................................................................14

*Cromer Fin. Ltd. v. Berger*, 137 F.Supp.2d 452
  (S.D.N.Y. 2001) ...............................................................................................................11, 12

*Cromer Fin. Ltd. v. Berger*,
  No. 00 Civ. 2284 (DLC), 2002 WL 826847
  (S.D.N.Y. May 2, 2002) ........................................................................................................12

*De Jesus v. Sears, Roebuck & Co.*,
  87 F.3d 65 (2d Cir. 1996) .......................................................................................................7

*DePace v. Flaherty*, 183 F.Supp.2d 633
  (S.D.N.Y. 2002) ......................................................................................................................7

*Fezzani v. Bear, Stearns & Co.*, No. 99 Civ. 0793 (RCC),
  2004 WL 744594 (S.D.N.Y. Apr. 6, 2004) ...........................................................................13

*Franklin High Income Trust* v. *APP Global*, *Ltd.*,
  776 N.Y.S.2d 473 (N.Y. App. Div. 2004) .............................................................................11

*Gabriel Capital, L.P. v. NatWest Finance, Inc.*,
  122 F.Supp.2d 407 (S.D.N.Y. 2000) ....................................................................................12

*In re AM Int'l, Inc. Sec. Litig.*,
  606 F. Supp. 600 (S.D.N.Y. 1985)........................................................................................11

*In re Asia Pulp & Paper Sec. Litig.*,
  293 F.Supp.2d 391 (S.D.N.Y. 2003) ...............................................................................11, 14

*In re Blech Sec. Litig.*, 961 F.Supp. 569 (S.D.N.Y. 1997) .......................................................13

*In re CBT Group PLC Sec. Litig.*, No. C-98-21014-RMW,
  2000 WL 33339615 (N.D. Cal. Dec. 29, 2000)....................................................................11

*In re Currency Conversion Fee Antitrust Litig.*,
  265 F. Supp. 2d 385 (S.D.N.Y. 2003)....................................................................................9

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*, No. 02 Civ. 4400
  (WCC), 2005 WL 81704 (S.D.N.Y. Jan. 12, 2005) ........................................................... 13, 15

*In re Global Crossing, Ltd. Sec. Litig.*,
  322 F.Supp.2d 319 (S.D.N.Y. 2004) ......................................................................................... 3

*In re Health Mgmt Sys., Inc. Sec. Litig.*, No. 97 Civ. 1865 (HB),
  1998 WL 283286 (S.D.N.Y. June 1, 1998) ................................................................................ 6

*In re Lernout & Hauspie Sec. Litig.*,
  230 F.Supp.2d 152 (D. Mass. 2002) ................................................................................... 11, 14

*In re Motel 6 Sec. Litig.*, 161 F.Supp.2d 227 (S.D.N.Y. 2001) ................................................... 13

*In re Regeneron Pharms. Sec. Litig.*, No. 03 Civ. 3111 (RWS),
  2005 WL 225288 (S.D.N.Y. Feb. 1, 2005) .............................................................................. 15

*In re Royal Ahold N.V. Sec. & ERISA, Litig.*,
  2004 WL 2955934 (D. Md. Dec. 21, 2004) ............................................................................. 11

*In re Salomon Analyst AT&T Litig.*, 350 F.Supp.2d 455
  (S.D.N.Y. 2004) ....................................................................................................................... 3, 5

*In re Worldcom, Inc. Sec. Litig.*,
  No. 02 CIV. 3288 (DLC), 2003 WL 21488087
  (S.D.N.Y. June 25, 2003) ......................................................................................................... 11

*Kaplan v. Aspen Knolls Corp.*, 290 F.Supp.2d 335
  (E.D.N.Y. 2003) .......................................................................................................................... 7

*Nuevo Mundo Holdings v. PricewaterhouseCoopers LLP*,
  No. 03 Civ. 0613 (GBD), 2004 WL 112948
  (S.D.N.Y. Jan. 22, 2004) .......................................................................................................... 11

*OSRecovery, Inc. v. One Groupe Int'l*, No. 82 Civ. 8993 (LAK),
  2005 WL 121741 (S.D.N.Y. Jan. 22, 2005) .............................................................................. 5

*Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67
  (2d Cir. 1998) ........................................................................................................................... 14

*Pits, Ltd. v. Am. Express Bank Int'l,* 911 F.Supp. 710
  (S.D.N.Y. 1996) ........................................................................................................................... 8

*SEC v. U.S. Environmental, Inc.*, 155 F.3d 107
  (2d Cir. 1998) ............................................................................................................................. 3

*Shanahan v. Vallat*, No. 03 Civ. 3496 (MBM),
  2004 WL 2937805 (S.D.N.Y. Dec. 19, 2004) .......................................................................... 15

*Skidmore Energy, Inc. v. KPMG,*
  No. 03 cv 2138-B, 2004 WL 3019097
  (N.D. Tex. Dec. 28, 2004) ....................................................................................................11

*Teachers' Ret. Sys. of Louisiana v. A.C.L.N., Ltd.,*
  No. 01 Civ. 11814(MP), 2003 WL 21058090
  (S.D.N.Y. May 12, 2004) .....................................................................................................11

*United States v. Bestfoods,* 524 U.S. 51, 118 S. Ct. 1876 (1998)..........................................4, 14

*Miscellaneous*

Miller GAAP Guide, Chs. 20 and 23 (Jan. 2002) .........................................................................6

## INTRODUCTION

A consistent theme throughout plaintiffs' brief is that Deloitte USA and the other defendants are attempting to "deflect[] blame for the Parmalat fraud to Italy." Pl. Br. at 4. But plaintiffs' own brief — which devotes more than twenty pages to their allegations against GT-Italy (which has not responded to the complaint) and DT-Italy (which plaintiffs did not even bother to sue) — demonstrates that if there was any blame on the part of Parmalat's auditors, it in fact lies in Italy. Plaintiffs argue that Deloitte USA can be held liable for DT-Italy's alleged misconduct under veil-piercing, agency and "control person" theories. But plaintiffs do not cite a single case where a court has accepted any of those theories to sustain a Section 10(b) or 20(a) claim against one member of an international accounting association based on an audit opinion signed by another member. Plaintiffs offer no reason why the result should be different here.

Plaintiffs also argue that Deloitte USA's "fingerprints" were all over the Parmalat audits and that it can therefore be held primarily liable under Section 10(b) for its own conduct. But that claim misreads plaintiffs' own complaint: there is in fact no allegation that Deloitte USA did anything other than audit the financial statements of Parmalat subsidiaries in the U.S. Plaintiffs do not claim that there was any wrongdoing at those subsidiaries, that their financial statements were misstated, or that Deloitte USA made any errors in its audit work. On the contrary, plaintiffs allege that a Deloitte USA auditor did his job by raising an issue concerning Parmalat USA's writedown of goodwill with DT-Italy, in its capacity as the auditor of the parent company's audited financial statements. Plaintiffs do not dispute the argument made in Deloitte USA's opening brief (at 18) that, as the auditor of a subsidiary, Deloitte USA had no obligation to follow up to ensure that the item was properly accounted for under Italian accounting principles in the parent company's financial statements.

## ARGUMENT

**I.    Plaintiffs Have Failed To State A Claim For Primary Liability Against Deloitte USA.**

Plaintiffs have largely abandoned their attempt to obscure the identity of Parmalat's real auditor by using the collective term "Deloitte."   Plaintiffs now concede (at 19-20) that "[b]eginning in 1999, Deloitte & Touche S.p.A. ("DT-Italy") became the Company's independent auditor and audited Parmalat's consolidated financial statements for fiscal years 1999 through 2003." *See also* Deloitte USA Exs. E, N-P (Parmalat annual reports identifying "Deloitte & Touche spa" as the Company's independent auditor).  Plaintiffs do not deny that the audit opinions DT-Italy issued with respect to Parmalat's financial statements during those years were publicly attributed to DT-Italy and that there were *never* any audit opinions or other statements about Parmalat that were publicly attributed to Deloitte USA.  Under the Second Circuit's "bright line" test, the fact that Deloitte USA was not a "speaker" is fatal to any claim for primary liability under Section 10(b).

Plaintiffs offer two theories in an attempt to avoid that conclusion.  First, they argue that Deloitte USA was itself a participant in a fraudulent "scheme" in violation of Rule 10b-5(a) and (c).  Second, plaintiffs contend that Deloitte USA is vicariously liable for DT-Italy's alleged misstatements because (i) DT-Italy allegedly acted as the agent of DTT and (ii) DTT is supposedly the "alter ego" of Deloitte USA.  Both of these theories should be rejected.

### A.    Plaintiffs Cannot Invoke "Scheme" Liability Against Deloitte USA.

#### 1.    Plaintiffs Have Not Alleged Any Actionable Conduct By Deloitte USA.

In *Central Bank*, the Supreme Court held that in light of the plain language of Section 10(b) a defendant cannot be liable under Section 10(b) unless he himself "employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies." 511 U.S. at 191, 114 S.Ct. at 1455. Courts that have endorsed "scheme" liability have done so by stretching the concept of "manipulation" to include phony

transactions that are used to falsify a company's financial statements, which in turn artificially inflates its stock price. Those courts have held that one who knowingly participates in creating the phony transactions employs a "manipulative device" and therefore is primarily liable under Section 10(b). *See, e.g.*, *In re Global Crossing Sec. Litig.*, 322 F.Supp.2d 319, 336-37 (S.D.N.Y. 2004).

As Judge Lynch emphasized, however, "scheme" liability is not a "short cut to circumvent *Central Bank's* limitations on liability for a secondary actor's involvement in making misleading statements." *Id.* at 337 n.17 (internal quotations omitted). Thus, it is not enough to allege that an accounting firm discovered the phony transaction or assisted someone else in misreporting it. Instead, plaintiffs must allege that the firm was the architect of the phony transaction itself. *Id.* Plaintiffs had pleaded such a claim against Arthur Andersen because they alleged that it had "masterminded the misleading accounting for IRUs and the subsequent sham swap transactions" that Global Crossing used to generate "phantom revenue." *Id.* at 336-37. As Judge Lynch later explained, the "highly unusual circumstances" alleged in *Global Crossing* gave rise to a claim for "scheme" liability because Andersen allegedly "conceived and engineered, rather than merely abetted or turned a blind eye to, a fraudulent scheme." *In re Salomon Analyst AT&T Litig.*, 350 F.Supp.2d 455, 474 (S.D.N.Y. 2004).

For the reasons advanced by the bank defendants, the Court should reject the entire concept of "scheme" liability. But even if the Court were to accept the general concept, it would not supply a basis for a claim against Deloitte USA because plaintiffs do not allege — even in a conclusory fashion — that Deloitte USA "conceived and engineered" any of the fraudulent transactions or schemes Parmalat allegedly used to inflate its revenues and conceal its debts.[1]

---

[1]    Plaintiffs argue (at 42) that the defendant need not be the "mastermind" of the scheme, citing *SEC v. U.S. Environmental, Inc.*, 155 F.3d 107 (2d Cir. 1998). There, however, the issue was whether the individual who had placed the "very buy and sell orders that manipulated USE's stock upward" was primarily liable for market

(cont'd)

The sum total of plaintiffs' "scheme" theory against Deloitte USA is that a DT-Brazil auditor (Wanderley Olivetti) "raised concerns" about intercompany transactions, but "top DTT and Deloitte USA executives, including Copeland," told him "to keep quiet about it" and ultimately "DTT, Deloitte USA and Copeland" removed Olivetti from the Parmalat engagement. Pl. Br. at 60. The first problem with this story is that critical aspects of it are not alleged in the complaint. The complaint alleges only that Olivetti communicated his concerns to DT-Italy's lead audit partner (Alfredo Mamoli); it does *not* allege that he ever talked to Copeland or anyone else in the DTT or Deloitte USA organizations. *See* Complt. ¶¶ 1005-09. Moreover, there is no allegation that Copeland — or anyone else at DTT or Deloitte USA — told Olivetti to "keep quiet."[2] Complt. ¶ 1011.

While the complaint goes on to allege that, a year after the first incident, "the global Deloitte organization [that is, DTT], headed in the United States by Jim Copeland, 'removed' Olivetti from any further role in auditing Parmalat's Brazilian operations," Complt. ¶ 1013, it is devoid of a single factual allegation supporting that conclusory assertion. More importantly, there is no allegation that *Deloitte USA* — or Jim Copeland for that matter — had anything to do with the alleged "removal." Thus, the Olivetti incident does not show that Copeland knew there was a scheme afoot or that he did anything, even unwittingly, to assist it. Moreover, whatever Copeland may have done while wearing his DTT "hat," *see United States v. Bestfoods*, 524 U.S.

(… cont'd)

manipulation, even though "someone else directed the market manipulation scheme." *Id.* at 112. Not surprisingly, the Court held that the person who committed the actual manipulative act with scienter was a primary, rather than a secondary, actor.

[2]     The only *fact* alleged in the complaint to connect Copeland to the Parmalat audit is that Mamoli sent an internal note to Copeland in April 2002 asking Copeland "to intervene to settle the situation." Complt. ¶ 1010. That note, however, did not contain any substantive explanation of the "major contrast" Mamoli reported between "our Firm" and Parmalat. See Ex. B to Copeland' Motion to Dismiss. In fact, Mamoli stated that he did not want to "bother [Copeland] with the details" in recognition of the fact that he was "clearly busy with other matters." *Id.* Mamoli went on to say that he would "strongly appreciate your input *or the input of somebody delegated by you* to arbitrate the matter." *Id.* (Emphasis added). Plaintiffs do not allege that Copeland took any action in response to Mamoli's note. In any event, that note was clearly an appeal to Copeland in his capacity as CEO of DTT — not as CEO of Deloitte USA — to use his good offices to help work out a problem that involved two member firms.

at 69, 118 S.Ct. at 1888, there is no hint in the complaint that *Deloitte USA* was involved.

Beyond this, even if plaintiffs' characterization of their own complaint were accurate, it would not provide a basis for holding Deloitte USA liable under Section 10(b).  There is nothing in plaintiffs' enhanced version of the story that even remotely suggests that Deloitte USA participated in structuring or implementing phony transactions. At most, plaintiffs' story would support an attenuated theory of aiding and abetting DT-Italy's alleged misstatements — conduct that would clearly not be actionable under *Central Bank* and its progeny.  *See OSRecovery, Inc. v. One Groupe Int'l*, No. 82 Civ. 8993 (LAK), 2005 WL 121741 at *7 (S.D.N.Y. Jan. 22, 2005).

### 2.    Plaintiffs Have Not Alleged Facts Giving Rise To A Strong Inference That Deloitte USA Acted With Scienter.

Plaintiffs' Section 10(b) claim against Deloitte USA also fails because they have not met their burden of pleading particularized facts giving rise to a strong inference of "substantial knowing participation [in] or orchestration" of the alleged scheme by Deloitte USA. *In re Salomon Analyst AT&T Litig.*, 350 F.Supp.2d at 473.  Nowhere in the complaint are any facts alleged that give rise to a strong inference that Deloitte USA was aware of any improprieties in Parmalat's financial statements — let alone that it was a "knowing participant" in any scheme.

The Olivetti incident does not give rise to a strong inference that Deloitte USA was aware of any part of the alleged scheme.  As noted above, plaintiffs do not allege any facts to suggest that Olivetti communicated whatever concerns he may have had about intercompany receivables to Deloitte USA.  And, even if he had done so, plaintiffs allege that DT-Italy assured Olivetti that the Parmalat subsidiaries in question did have the ability to make those payments. Complt. ¶ 1007.  Nowhere do plaintiffs allege that Deloitte USA had any information that would have caused it to question such a representation if, in fact, Deloitte USA ever saw that representation.

Plaintiffs also point to the fact that a Deloitte USA auditor (Mike Power) raised "issues" with DT-Italy about whether the parent company should write down goodwill on its consolidated

financial statements to reflect the $26.5 million writedown disclosed in Parmalat USA's financial statements (which Deloitte USA had audited). Complt. ¶ 1000. But there was nothing suspicious about that writedown: as the financial statements explain, it was the result of a change in U.S. accounting principles — *not* of the discovery of any improper inflation of the company's assets.[3] Deloitte USA Ex. K at 7. Furthermore, even assuming that Power knew that the parent company had not taken an equivalent writedown (which plaintiffs do not allege), that would not raise a red flag because the parent company's financial statements were based on Italian, rather than U.S., GAAP — something that Power is not alleged to have had any knowledge of.

Plaintiffs also cite their allegation that "Deloitte's lead partners in the U.S." received copies of "observations" that "field auditors made in . . . Early Warning Reports and Summary Audit Pleadings." Complt. ¶ 40. Plaintiffs quote an Italian investigator as stating that "Deloitte" failed to pay attention to those observations. *Id.* This allegation is woefully insufficient to show that *Deloitte USA* saw any "red flags," because it fails to allege *who* actually received the reports, whether that person was a partner of Deloitte USA (since plaintiffs used the term "Deloitte" to include both DTT and Deloitte USA), or *what* the documents actually said.

Unable to show that Deloitte USA actually received any information that would have alerted it to the fraud, plaintiffs fall back on their entirely conclusory allegations that Deloitte USA directly or indirectly controlled DT-Italy and therefore had "access" to all of its workpapers and was "directly involved in the audits of Parmalat financial statements." Pl. Br. at 71 (citing Complt. ¶¶ 1131-32). These allegations are doubly deficient. First, courts have "routinely" rejected boilerplate allegations of "access" as insufficient to give rise to a strong inference of scienter against alleged "control" persons. *See, e.g., In re Health Mgmt Sys., Inc. Sec. Litig.*, No.

---

[3]    Under the prior standard, FAS 121, there was no impairment so long as the *undiscounted* future cash flow was equal to the carrying amount of the asset. Miller GAAP Guide, Ch. 20 (Jan. 2002). The new standard, FAS 142, requires *discounting* to present value. Miller GAAP Guide, Ch. 23 (Jan. 2002). *See* Deloitte USA Exs. Q-R.

97 Civ. 1865 (HB), 1998 WL 283286 at *6 (S.D.N.Y. June 1, 1998) ("Courts have routinely rejected the attempt to plead scienter based on allegations that because of defendants' board membership . . . they had access to information concerning the company's adverse financial outlook"). Second, for the reasons outlined below, plaintiffs have not provided any factual basis for their conclusory assertion that Deloitte USA had the power to control either DT-Italy in general or the Parmalat audit in particular.

Finally, plaintiffs contend (at 68) that Deloitte USA must have been aware of the fraud because of its sheer magnitude and the number of DTT member firms that were involved in auditing Parmalat subsidiaries. But this argument ignores the fact that Deloitte USA itself audited only one piece of the far-flung Parmalat empire which, according to plaintiffs themselves, was *not* where the fraud was carried out.  Under these circumstances, there is no basis for inferring that Deloitte USA was aware of any aspect of the claimed fraud.

### B.    Plaintiffs Have Failed To Allege Any Basis For Holding Deloitte USA Vicariously Liable For DT-Italy's Alleged Misstatements.

Plaintiffs' primary defense of their vicarious liability theory is that it is a "question of fact" whether, as plaintiffs allege, DTT was the "alter ego" of Deloitte USA and DT-Italy acted as the agent of DTT in auditing Parmalat.  Plaintiffs contend that they should not have to plead more than they do because the relevant facts are within the sole knowledge of the defendants. But even under Rule 8, a plaintiff cannot state a claim simply by invoking the magic words "alter ego" and "agent."  "A plaintiff must offer more than conclusory allegations to defeat a motion to dismiss." *DePace v. Flaherty*, 183 F.Supp.2d 633, 638 (S.D.N.Y. 2002). Thus, to create a question of fact that bars dismissal, plaintiffs must allege specific facts and circumstances to support the conclusion that the elements of an alter ego or agency claim can be satisfied.[4]

---

[4]      *See, e.g.*, *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir. 1996) ("To overcome the presumption of separateness afforded to related corporations, Plaintiffs must come forward with the showing of actual

(cont'd)

That is particularly true in a case like this, where plaintiffs are seeking the right to pursue billion-dollar securities fraud claims against Deloitte USA. As the Supreme Court has explained, "litigation under Rule 10b-5 presents a danger of vexatiousness different in degree and kind than that which accompanies litigation in general." *Central Bank*, 511 U.S. at 189, 114 S.Ct. at 1454. In recognition of this fact, Congress has imposed heightened pleading requirements on plaintiffs to screen out claims that were filed without a substantial factual basis, in the hope that a real claim might emerge from discovery.  In light of this strong congressional policy, the Court should follow the lead of the majority of courts in this district, which have held that where, as here, the securities fraud allegations are closely "intertwined" with plaintiff's vicarious liability theory, Rule 9(b)'s heightened pleading obligations apply.[5]

Regardless of whether the Court applies Rule 8 or Rule 9(b), however, plaintiffs have failed to offer any factual basis for either pillar of their theory — for treating DTT as the "alter ego" of Deloitte USA or for treating DT-Italy as the agent of DTT and Deloitte USA.

### 1.    Plaintiffs Have Not Alleged An "Alter Ego" Claim Against Deloitte USA

In their "alter ego" discussion, plaintiffs ignore the standards traditionally employed to decide whether one entity can be held responsible for the conduct of another under an "alter ego" or veil-piercing theory. As demonstrated in Deloitte USA's opening brief (at 24-25), veil piercing requires pleading and proof of both disregard of corporate formalities (commingling of assets, complete domination of one entity by the other) and fraud or other abuse of the corporate form that injured the plaintiff.  This stringent standard reflects the strong public policy of

---

(… cont'd)

domination required to pierce the corporate veil") (internal quotations omitted) (upholding dismissal of complaint where the pleadings were "devoid of any specific facts or circumstances" showing the alleged domination and control).  *See also Kaplan v. Aspen Knolls Corp.*, 290 F.Supp.2d 335, 340 (E.D.N.Y. 2003) ("[E]ven under the liberal pleading standards of [Rule 8], a plaintiff must plead facts sufficient to show that these elements [of a veil piercing claim] are satisfied").

[5]      In addition to the cases cited in Deloitte USA's opening brief (at 20, 23), *see Pits, Ltd. v. Am. Express Bank Int'l,* 911 F.Supp. 710, 715 (S.D.N.Y. 1996).

respecting the separate legal identities of corporations, except in those rare instances where the defendant has forfeited its right to limited liability by misusing corporate forms to injure others.

There are no such circumstances alleged here. Plaintiffs claim that DTT is the alter ego of Deloitte USA, but they do not allege that Deloitte USA has even a majority of directors on the DTT Board, that it commingles assets with DTT, or that DTT is otherwise operated in such a way that it is indistinguishable from Deloitte USA. Nor have plaintiffs even attempted to rebut the case law we cited (at 26), which demonstrates that the mere fact that DTT and Deloitte USA shared a CEO and CFO cannot transform two separate firms into mere "alter egos."

Plaintiffs' only response is to complain that Deloitte USA is seeking to impose a "next-to-impossible pleading burden" on them by requiring them to plead facts concerning the inner workings of DTT and Deloitte USA. Pl. Br. at 76. But plaintiffs cannot obtain the right to discovery simply by suing two related firms and then asserting that one so dominated and controlled the other that they were mere alter egos.[6] Under either Rule 8 or 9(b), plaintiffs must first provide a reasonable factual basis for believing that such domination and control exists. There are no such allegations here.[7]

In any event, plaintiffs' veil piercing claim also fails because they have not alleged any facts to show that the second prong of the test — that Deloitte USA used DTT to perpetrate a fraud or other injustice on Parmalat investors — is satisfied. Plaintiffs argue (at 4) that the defendants "went to great lengths to publicly present their operations as part of unified

---

[6]     *See, e.g.*, *In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385, 426 (S.D.N.Y. 2003) ("even under the liberal notice pleading standard . . . . the unadorned invocation of dominion and control is simply not enough").

[7]     In pleading for an opportunity to amend their complaint, plaintiffs offer as "significant additional factual support" for their alter ego allegations the fact that Deloitte USA appoints 7 of the 31 members on the DTT Board, which is more than any other individual DTT member firm. Pl. Br. at 145, 147. The mere fact that Deloitte USA is the largest DTT member firm and therefore has the largest representation on the Board, however, does not come close to creating an inference that Deloitte USA so dominates and controls DTT that its separate identity has essentially disappeared. Indeed, if an "alter ego" claim could be premised on having the "most" directors on the board, courts would never respect the separate corporate identities of wholly-owned subsidiaries.

worldwide firms that subsumed the Italian member firms" and therefore "cannot decouple these foreign affiliates from the global train whenever trouble arises."[8] But this argument ignores the fact that plaintiffs themselves do not allege that the market was misled into believing that either DTT or Deloitte USA was standing behind the audit opinions provided by DT-Italy.

Nor could plaintiffs make such a claim. As we pointed out in our opening brief (at 12-13), the named plaintiffs were sophisticated investors who understood that their own DTT member auditor was a separate entity. And, since plaintiffs rely on a fraud on the market theory, we have to assume that the "efficient" market absorbed all available information about DTT, including the disclaimers that appeared in DTT's promotional statements, which explained that "neither Deloitte Touche Tohmatsu nor any of its member firms has any liability for each other's acts or omissions. Each of the member firms is a separate and independent legal entity." Deloitte USA Ex. F.[9] Thus, when the market was told, by Parmalat, that "Deloitte & Touche, spa" was its auditor and then audit opinions were issued in Italian, signed by DT-Italy, with an Italian address, listing (among other things) DT-Italy's capitalization in Euros, the market could not possibly have been deceived into believing that the real auditor was DTT or Deloitte USA. *See* Deloitte USA Exs. A-C, E and N-P.

As demonstrated in our opening brief, there are now approximately a dozen cases in which courts have refused to allow a lawsuit to proceed against either an international accounting association or one of its members based on precisely the kinds of "alter ego" and "one firm"

---

[8]  Plaintiffs' veil-piercing claim is muddled because, at times, they seem to be arguing that the separate identities of *all* DTT member firms should be disregarded, even though their complaint alleged a narrower theory under which only DTT and Deloitte USA would be conflated. To the extent that plaintiffs are trying to show that Deloitte USA and DT-Italy should be treated as "alter egos," that claim would also fail because there is no allegation of any overlapping ownership, management or facilities and because, for the reasons outlined below, no one could have reasonably believed that DT-Italy and Deloitte USA were the same entity.

[9]  Plaintiffs argue (at 75) that they are entitled to test the "truthfulness of the websites' or press releases' assertions." But plaintiffs' theory is that DTT and Deloitte USA held themselves out to the world as a single firm. Thus, under their own theory, the proper focus is on what DTT said and *not* on how DTT actually operated.

allegations plaintiffs make here.  Plaintiffs try to brush off this wealth of authority by claiming that most of the cases defendants cited were decided at a later point in the proceedings, after the plaintiffs had been permitted discovery.  Pl. Br. at 81.  But that simply is not true.  In fact, we can count *eleven* cases in which such claims were dismissed at the pleading stage for failure to plead sufficient facts to support a vicarious liability theory.[10]

By contrast, plaintiffs cite only two cases that they characterize as upholding vicarious liability allegations against an international accounting association based on allegations they say are similar to those here.  One state court case, *Franklin High Income Trust* v. *APP Global, Ltd.*, 776 N.Y.S.2d 473 (N.Y. App. Div. 2004), provides no guidance because it does not explain either the facts alleged in the complaint or the basis for the ruling sustaining it.  The other case, *Teachers' Ret. Sys. of Louisiana v. A.C.L.N., Ltd.*, No. 01 Civ. 11814(MP), 2003 WL 21058090 (S.D.N.Y. May 12, 2004), is completely distinguishable. There, BDO International sought dismissal on the ground that one of its members, rather than BDO International itself, was the auditor of the allegedly fraudulent financial statements.  The court denied that motion because, among other things, plaintiffs alleged that the company had repeatedly told investors that "BDO International" was its auditor and BDO International itself had actually *signed* the audit opinions at issue.  *Id*. at *2, *5. Thus, BDO International was kept in the case because it had allegedly spoken directly to investors — not because plaintiffs succeeded in alleging a vicarious liability claim. Here, by contrast, it was crystal clear that it was DT-Italy — *not* DTT and certainly not Deloitte USA — that was the auditor and had signed the opinions.

---

[10]      All but two of these cases were cited in our opening brief.  The following cases granted motions to dismiss Section 10(b) or 20(a) claims: *Lernout*, *Royal Ahold*, *Asia Pulp & Paper*, *Cromer I*, *Worldcom*, *AM Int'l*, *Elan Corp*., *Bamberg v. S G Cowen*, 236 F.Supp.2d 79, 89-90 (D. Mass. 2002), and *In re CBT Group PLC Sec. Litig.*, No. C-98-21014-RMW, 2000 WL 33339615 at *1, 4-5 (N.D. Cal. Dec. 29, 2000)  The other two cases (*Nuevo Mundo* and *Skidmore*) granted motions to dismiss RICO and state law claims.

## 2.    Plaintiffs Have Not Alleged A Claim Based On Agency.

Plaintiffs also continue to argue that they have properly alleged the second step in their attenuated vicarious liability theory — that DT-Italy acted as the agent of DTT and Deloitte USA.  Predictably, plaintiffs rely on *Cromer II*, which is the only case we are aware of that has ever accepted an agency theory in this context.  As DTT explains, the facts in *Cromer II* are entirely distinguishable from those alleged here.  Insofar as Deloitte USA is concerned, however, the key decision is *Cromer I*, in which Judge Cote dismissed a Section 10(b) claim against Deloitte USA predicated on an agency theory.  In an opinion that was not altered or disturbed in any subsequent ruling, the court held that plaintiffs had failed to state an agency claim against Deloitte USA because they alleged "no manifestation from DTUS to DTB indicating bestowal of authority to DTB nor to any express or implied communication by DTUS to a third party from which it would be reasonable to infer that DTB had DTUS' authority to perform its audits." *Cromer Fin. Ltd. v. Berger*, 137 F.Supp.2d 452, 496 (S.D.N.Y. 2001). So too, in this case, plaintiffs point to nothing to suggest that Deloitte USA bestowed any authority on DT-Italy to conduct the Parmalat audit on its behalf or that Deloitte USA ever did anything to suggest to investors that DT-Italy was acting as Deloitte USA's agent.

Yet another reason why plaintiffs' agency claim fails is that plaintiffs do not allege that investors understood DT-Italy to be signing its audit opinions as the agent of either DTT or Deloitte USA. Plaintiffs do not dispute the conclusion in *Gabriel Capital* that primary liability cannot be predicated on an agency theory unless investors understand that the purported agent is speaking on behalf of the alleged principal.  Pl. Br. at 82.  Instead, they argue that the well-known "affiliation between DTT and its member firms" is sufficient to supply the necessary link. But, for the reasons outlined above, that affiliation was publicly described in a way that precludes any inference that DTT members act as agents of DTT when signing audit opinions. And the audit opinions themselves in this particular case make it clear that the auditor was DT-

12

Italy and nowhere suggest that DT-Italy was acting as the agent of DTT — let alone as the agent of another DTT member firm.

## II.    Plaintiffs Have Not Stated A Control Person Claim Against Deloitte USA.

Plaintiffs argue that they are not required to plead any facts showing "culpable participation" in order to state a control person claim and that they can plead the element of control simply by *asserting* that the defendant controlled an alleged primary violator.  Thus, according to plaintiffs, virtually any entity that has the misfortune of being related in some way to an alleged primary violator could be dragged into a securities fraud case, regardless of the lack of any real basis for doing so, and forced to expend vast sums defending itself.  Fortunately, that has never been the law in this Circuit.

As this Court has repeatedly held, conclusory allegations of control are insufficient to state a claim under Section 20(a).  *See* Deloitte USA Opening Br. at 30-31.  Instead, "plaintiff must allege that the defendant had actual control over the primary violator" — that is, "'the power to direct or cause the direction of the management and policies of'" the alleged wrongdoer. *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, No. 02 Civ. 4400 (WCC), 2005 WL 81704 at *24 (S.D.N.Y. Jan. 12, 2005) (quoting the SEC's definition of "control").  "Control in this context is not the mere ability to persuade, but almost always means the practical ability to *direct* the actions of [the primary violator]." *Id*. (internal quotations omitted). *Accord*, *In re Motel 6 Sec. Litig*., 161 F.Supp.2d 227, 238 (S.D.N.Y. 2001) ("Control is not the same as influence; a 'control person' must have some enforceable power over the primary violator"); *Fezzani v. Bear, Stearns & Co.*, No. 99 Civ. 0793 (RCC), 2004 WL 744594 at *23 (S.D.N.Y. Apr. 6, 2004) (same); *In re Blech Sec. Litig*., 961 F.Supp. 569, 587 (S.D.N.Y. 1997) (same). Applying this test in *Flag Telecom*, Judge Conner held that plaintiffs had not properly alleged that Verizon controlled Flag even though Verizon was its largest shareholder, owned 30% of its stock, appointed three of the nine directors on the board, and was able to influence Flag to enter into

13

transactions that benefited Verizon at Flag's expense.  2005 WL 81704 at *23-25.

When the same standards are applied here, it becomes apparent that plaintiffs have failed to plead any factual basis for their conclusion that Deloitte USA indirectly controlled the alleged primary violator — DT-Italy — through its alleged control of DTT.  Plaintiffs' allegation that DTT promulgated worldwide standards is not enough to show that DTT controlled DT-Italy. DTT does not *own* its members or have any "enforceable power" to direct their conduct of particular audits.  Indeed, the Articles of the Verein specifically require DTT to respect the "independence and integrity of the Member Firms," their "exclusive privileges" within their own jurisdictions, as well as their obligation to comply with the "laws, regulations, professional rules of conduct, code of ethics, and usages" in their respective jurisdictions. Deloitte USA Ex. D, Art. 6.1.[11] Under these circumstances, the promulgation of standards by an umbrella association does not give rise to an inference that the association controls its members.  *See*, *e.g.*, *Lernout*, 230 F.Supp.2d at 171-73; *Asia Pulp & Paper*, 293 F.Supp.2d at 396.

Moreover, plaintiffs have not alleged any basis for concluding that Deloitte USA controlled DTT — let alone that it controlled DT-Italy.  Plaintiffs do not claim that Deloitte USA had a majority of directors on the DTT Board. That it shared a CEO with DTT did not give Deloitte USA the ability to direct DTT's actions: when Copeland was wearing his "hat" as DTT's CEO, he was required to act subject to the control of DTT's Board — *not* subject to the control of Deloitte USA's partners. *Bestfoods*, 524 U.S. at 69, 118 S.Ct. at 1888.  Furthermore, the Articles of the Verein make it clear that no member has the right to control the actions of any

---

[11]     Plaintiffs object to Deloitte USA's citation to the Articles of the Verein.  However, those articles are publicly available from the Commercial Register of Canton Zurich (http://www.hrazh.ch/english.htm).  Thus, like a corporate charter, they are the proper subject of judicial notice under Rule 201 of the Federal Rules of Evidence. *See Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998) ("It is well established that a district court may rely on matters of public record in deciding a motion to dismiss under Rule 12(b)(6)").  That is particularly true where, as here, the document in question is one that is integral to plaintiffs' allegations.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *see, e.g.*, Complt. ¶ 1130 (alleging control based on the "contractual relationships among member firms"), ¶¶ 138, 140, 144 (describing the DTT organization).

other member; on the contrary, each member is required to respect the others' exclusive rights in their own jurisdictions.[12]

Plaintiffs also do not allege any facts that would support a claim that Deloitte USA controlled, directly or indirectly, the way DT-Italy conducted the Parmalat audit.  Plaintiffs use the Olivetti incident as evidence of "control."  But, as demonstrated above, plaintiffs have not alleged any facts to show that Deloitte USA had any involvement in that alleged incident.  Moreover, the version of the story plaintiffs tell in their brief does not show that anyone was controlling DT-Italy; if anything, it suggests that *DT-Italy* was in control.

A second and independent reason for dismissing plaintiffs' control person claim is that they do not plead any facts showing culpable participation by Deloitte USA.  Plaintiffs argue that culpable participation is not an element of a Section 20(a) claim or can be pleaded simply by pleading control. In so arguing, they ignore the large body of case law cited in Deloitte USA's opening brief (at 33 & n.19) holding that plaintiffs must, at the very least, plead facts giving rise to a strong inference "that the controlling person either knew or should have known that the controlled person was committing fraud."  *Shanahan v. Vallat*, 2004 WL 2937805 at *5.[13]  For the reasons outlined above, plaintiffs have not met that burden with respect to Deloitte USA.

### CONCLUSION

For the foregoing reasons and the reasons set forth in our opening brief,  plaintiffs' claims against Deloitte USA should be dismissed with prejudice.

---

[12]     At page 147 of their brief, plaintiffs argue they should be allowed to amend because they have discovered that when DT-Italy "wanted to verify the location of a Bank of America branch, it simply instructed Deloitte USA to check and Deloitte USA did so."  But if DT-Italy was "instruct[ing]" Deloitte USA to do menial tasks for it, that hardly supports the conclusion that Deloitte USA was controlling DT-Italy.

[13]     Two new opinions, decided since we filed our opening brief, have adopted this view.  *See In re Regeneron Pharms. Sec. Litig.*, 03 Civ. 3111 (RWS), 2005 WL 225288 at *11 n.4 (S.D.N.Y. Feb. 1, 2005) (holding that culpable participation must be pleaded and that "[t]he culpable participation element is subject to the PSLRA's heightened pleading requirements, and requires particularized allegations that defendants acted with scienter"); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 2005 WL 81704 at *34.

Respectfully submitted,

Dated: March 4, 2005

/s/ Michele Odorizzi
One of the attorneys for Defendants
Deloitte & Touche USA LLP and
Deloitte & Touche LLP


Alan N. Salpeter (admitted *pro hac vice*)
Stephen M. Shapiro (admitted *pro hac vice*)
Michele Odorizzi (admitted *pro hac vice*)
MAYER, BROWN, ROWE & MAW LLP
190 South LaSalle Street
Chicago, Illinois 60603
(312) 782-0600

Robert J. Ward (RW 0149)
MAYER, BROWN, ROWE & MAW LLP
1675 Broadway
New York, New York 10019
(212) 506-2500