UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re PARMALAT SECURITIES LITIGATION

MASTER DOCKET

This document relates to:   04 Civ. 0030

04 MD 1653 (LAK)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## OPINION

Appearances:

Steven J. Toll
Mark S. Willis
Julie Goldsmith Reiser
Joshua S. Devore
COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.

Stuart M. Grant
John C. Kairis
Diane Zilka
James J. Sabella
GRANT & EISENHOFER, P.A.

*Attorneys for Plaintiffs*

Brian M. Cogan
James L. Bernard
Quinlan D. Murphy
STROOCK & STROOCK & LAVAN LLP
*Attorneys for Defendant Grant Thornton International*

Bruce R. Braun
Linda T. Coberly
Louise R. Radin
WINSTON & STRAWN LLP
*Attorneys for Defendant Grant Thornton LLP*

Michael J. Dell
Robert A. de By
Jonathan A. Popolow
KRAMER LEVIN NAFTALIS & FRANKEL, LLP
*Attorneys for Defendant Deloitte Touche Tohmatsu and James E. Copeland*

Alan N. Salpeter
Stephen M. Shapiro
Michele Odorizzi
Daniel L. Ring
Robert J. Ward
MAYER, BROWN, ROWE & MAW LLP
*Attorneys for Defendants Deloitte & Touche USA LLP and Deloitte & Touche LLP*

LEWIS A. KAPLAN, *District Judge.*

Parmalat Finanziaria, S.p.A. and Parmalat S.p.A. and its affiliates (collectively, "Parmalat") collapsed upon the discovery of a massive fraud that reportedly involved the understatement of Parmalat's debt by nearly $10 billion and the overstatement of its net assets by $16.4 billion.[1] Plaintiffs, purchasers of Parmalat securities between January 5, 1999 and December 18, 2003 (the "Class Period"), seek damages against Parmalat's accountants, banks and others, most of whom now move to dismiss the complaint pursuant to Rules 12(b), 9(b) and 8(a) and (e) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA").[2] This opinion addresses the motions to dismiss of some of the accountants and addresses the question whether the complaint states a claim against the multinational accounting firms with which Parmalat's Italian auditors were connected.

## I. Background

Plaintiffs purportedly represent a class of individuals who purchased ordinary Parmalat shares and bonds during the Class Period". They sue Deloitte Touch Tohmatsu, Deloitte & Touche LLP, Deloitte & Touche USA LLP, and James Copeland (collectively, the "Deloitte defendants"), and Grant Thornton International, Grant Thornton LLP and Grant Thornton S.p.A. (collectively, the "Grant Thornton defendants"), among others, under Sections 10(b) and 20(a) of

---

[1]

First Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws ("Cpt.") ¶ 4.

[2]

15 U.S.C. § 78u-4.

the Securities Exchange Act of 1934[3] (the "Exchange Act") and Rule 10b-5 thereunder.[4]  The complaint alleges the following facts, which the Court accepts as true for the purposes of this motion.[5]

In the early 1990s, Parmalat, an Italian dairy conglomerate known for its long shelf-life milk, pursued an aggressive growth strategy financed largely by debt.  Its expansion into South America, however, turned out to be ill-advised, and it began to lose hundreds of millions of dollars a year from its operations there.[6]  To cover these losses, service its massive debt, and hide the personal diversion of funds by Parmalat chief executive officer Calisto Tanzi and his family,[7] the

---

[3]

15 U.S.C. §§ 78j(b), t(a).

[4]

17 C.F.R. § 240.10b-5 (2005).

[5]

The complaint is premised almost entirely on information and belief.  Cpt. ¶ 1.  Plaintiffs base their beliefs on (1) confessions of former Parmalat board members and senior executives, (2) review of internal Parmalat documents and filings with regulators in Italy, (3) the First Amended Complaint against Parmalat filed by the Securities and Exchange Commission, (4) complaints filed by Dr. Enrico Bondi, the Extraordinary Commissioner of Parmalat, (5) the Indictment filed in the Milan Criminal Court on May 26, 2004, (6) the Writ of Attachment issued by the Court of Parma on June 21, 2004, (7) the reports prepared by Pricewaterhouse Coopers, LLP in connection with its engagement to review Parmalat's accounts, (8) the reports of Dr. Stefania Chiaruttini, consultant to Milan prosecutors, which were prepared on the basis of transcripts of interrogations of Parmalat insiders and documents seized from the offices of its Italian auditors, (9) the Report by Dr. Enrico Bondi dated June 19, 2004, entitled "On the Causes of the Insolvency of Parmalat Finanziaria, S.p.A., and it Holdings," filed with the prosecutors in the Milan Criminal Court, June 21, 2004, (10) review and analysis of securities analysts' reports, press releases and news articles about Parmalat, and (11) other publicly available information.

[6]

*Id.* ¶ 200 ("By 1995, Parmalat was losing about $320 million a year in its South American operations alone.").

[7]

*Id.* ¶¶ 226, 328-40.  According to former Parmalat chief financial officer Fausto Tonna, hundreds of millions of dollars were transferred to Tanzi family companies between 1997 and 2003. *Id.* ¶ 328.

company needed constant infusions of cash. But cash could be obtained only so long as Parmalat appeared to be a sound investment. To this end, insiders at Parmalat and Grant Thornton S.p.A.[8] ("GT-Italy") concocted a scheme involving misleading transactions and off-shore entities that created the appearance of financial health.[9] One such transaction, for example, involved a fictitious sale of 300,000 tons of powdered milk to Cuba for $620 million.[10] Loans obtained on the basis of this transaction were used to service debt and obtain more loans.[11] In short, Parmalat and its confederates were operating something akin to a Ponzi scheme.

Italian law obliged Parmalat to switch auditors in 1999. Concerned that new auditors

---

[8]  The complaint uses the name "Grant Thornton" without distinction as to whether it is referring to GT-Italy, Grant Thornton LLP, or Grant Thornton International.

[9]  Cpt. ¶¶ 8-10.

[10]  *Id.* ¶¶ 244-245. A Chilean subsidiary of Parmalat actually had a contract with the Cuban importer for $700,000 worth of powdered milk a month, or about 7,000-8,000 tons of milk annually. *Id.* ¶ 246.

[11]  One of the more significant parts of this scheme used a multi-step process to create the appearance of revenue while removing debt from Parmalat's books. First, Parmalat would issue a phony invoice to an offshore shell company, thus creating an account receivable for a nonexistent debt. *Id.* ¶¶ 200-01. After 1999, Bonlat was the primary offshore company used for this purpose. At the same time it issued the invoice, Parmalat would create a discounted bill, which represented the subsidiary's payment obligation to Parmalat. *Id.* ¶¶ 202, 215-16. It then would sell the discounted bill to a bank, giving the bank the right to be paid on the invoice. The shell companies did not have any assets or revenue, however, and so Parmalat would loan the company money to pay the bank. Next, Parmalat would record the transfer as an investment in a subsidiary rather than as a loan. *Id.* ¶¶ 202-03, 219. Finally, at the end of the accounting period, Parmalat assigned the credit and the liability on the invoice of the consolidated subsidiary to an unconsolidated subsidiary. *Id.* ¶¶ 204-06. Parmalat then could record the transaction as an asset, because it now had a credit owed to it by an unconsolidated subsidiary. Plaintiffs contend that this scheme allowed Parmalat to obtain approximately €1 billion in loans from banks while recording them as assets, which gave rise to Parmalat's overvaluation. *Id.* ¶¶ 208, 214-15, 217, 219.

would discover and disclose the fraud, Parmalat and GT-Italy moved the allegedly fictitious financing transactions to Bonlat, a new company incorporated in the Caribbean, that would continue to be audited by Grant Thornton.[12] Parmalat then hired Deloitte & Touche, S.p.A. ("Deloitte Italy") as its auditor. Deloitte offices in a dozen countries audited Parmalat and its subsidiaries and affiliates as part of this worldwide engagement.[13] Despite the company's fear that new auditors would not continue to perpetuate the fraud, Deloitte[14] discovered or recklessly ignored the fraud, yet certified the company's financial statements as substantially accurate.[15]

By late 2003, the scheme became unsustainable, and Parmalat had a liquidity crisis. The collapse was rapid. In early December, Parmalat could not pay certain maturing bonds.[16] By December 11, the company's stock had lost half its value.[17] Trading was suspended for days by Italian regulators.[18] Parmalat's bonds rapidly lost value as well.[19] On December 19, the company

---

[12]
    *Id.* ¶ 220-21 (quoting Tonna's account of the enterprise to Italian authorities on December 23, 2003), ¶ 228 (summarizing the interrogation of Tonna's assistant, Gianfranco Bocchi, on January 5, 2004).

[13]
    *Id.* ¶135.

[14]
    As with Grant Thornton, the plaintiffs often use the term "Deloitte" without further specification.

[15]
    *E.g.*, Cpt. ¶¶ 953, 973.

[16]
    *Id.* ¶¶ 754-57.

[17]
    *Id.* ¶ 759.

[18]
    *Id.* ¶¶ 755, 760.

[19]
    *Id.* ¶ 761.

announced that a Bank of America account allegedly held by Bonlat that supposedly contained $4.9 billion did not exist.

Parmalat filed for bankruptcy in Italy on December 24, and it was declared insolvent three days later.[20] Italian authorities thereafter indicted a number of Parmalat executives and insiders as well as the company's auditor, Deloitte Italy, and individual partners of GT-Italy. Authorities also arrested many individuals connected with the fraud and seized their assets.[21]

## II. Pleading Standards

In deciding a Rule 12(b)(6) motion, the Court accepts as true the well-pleaded allegations in the complaint and draws all reasonable inferences in the plaintiffs' favor.[22] Dismissal is inappropriate "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."[23] Although such motions are addressed to the pleading, a district court may consider also the full text of documents partially quoted or

---

[20] *Id.* ¶¶ 769-70. Parmalat's United States subsidiaries filed for bankruptcy in the Southern District of New York. *See Grant Thornton Int'l v. Parmalat Finanziaria, S.p.A.*, 326 B.R. 46 (S.D.N.Y. 2005).

[21] Cpt. ¶¶ 115-27, 135, 169.

[22] *Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001), *cert. denied*, 535 U.S. 10541 (2002) (citing *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir.1994)).

[23] *Cohen v. Koenig,* 25 F.3d 1168 (2d Cir. 1994) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)).

incorporated in the complaint where the documents are "integral" to it and relied upon by plaintiffs.[24] Accordingly, the exhibits submitted in connection with defendants' moving papers are taken into account.[25]

A.    *Section 10(b) and Rule 10b-5*

Exchange Act Rule 10b-5 makes it unlawful:

"(a) To employ any device, scheme, or artifice to defraud,

"(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

To state a claim under Rule 10b-5(b), "a plaintiff must plead that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with *scienter*, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff."[26] Plaintiffs asserting a claim under Rule 10b-5(a) or (c) – that is, on the basis of manipulative or deceptive conduct – must allege that the defendant committed a manipulative or deceptive act with

---

[24]
    *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002); *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 808-09 (2d Cir. 1996).

[25]
    Defendants provide the full text of the web pages and audit letters partially quoted in the complaint. Such documents are considered only for the fact that the statements they contain were made, but not for their truth.

[26]
    *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 161 (2d Cir. 2000); *see San Leandro Emergency Med. Grp. Profit Sharing Plan*, 75 F.3d at 808.

*scienter* in addition to the other elements of the claim.[27]    *Scienter* is an "intent to deceive, manipulate or defraud."[28]

B.    *Rule 9(b) and the PSLRA*

As this is a securities fraud case, those aspects of the complaint that allege fraud must satisfy the heightened pleading requirements of Fed. R. Civ. P. 9(b) and the PSLRA.  To the extent that a claim is based on alleged misrepresentations, a plaintiff must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, (4) explain why the statements were fraudulent."[29] *Scienter* must be alleged "either (a) by alleging facts that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."[30]  In addition, if an allegation is based on information and belief, "the complaint shall

---

[27]

See *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp.2d 319, 329 (S.D.N.Y. 2004) (quoting *In re Initial Public Offering Sec. Litig.*, 241 F. Supp.2d 281, 385 (S.D.N.Y. 2003) (citing *In re Blech Sec. Litig*, 961 F. Supp. 569, 582 (S.D.N.Y. 1997)); *see also S.E.C. v. Zanford*, 535 U.S. 813, 824-25 (2002).

[28]

*Ganino*, 228 F.3d at 168.

[29]

*Novak v. Kasaks,* 216 F.3d 300, 306 (2d Cir. 2000) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)(in turn quoting *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993) (internal quotation marks omitted)).

[30]

*Acito v. IMCERA Grp.*, 47 F.3d 47, 52 (2d Cir. 1995); *see, e.g.*, *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001)*; Ganino*, 228 F.3d at 169-70.

state with particularity all facts on which that belief is formed."[31]

Although the PSLRA's heightened pleading standard in respect of misrepresentations arguably does not apply when plaintiffs allege a violation by virtue of a deceptive or manipulative device,[32] the complaint nonetheless must comply with Rule 9(b)'s requirement of particularity in respect of the conduct alleged and the basis for the requisite allegation of *scienter*.[33]

Finally, "[w]here multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his [or her] alleged participation in the fraud."[34]  It is not necessary, however, that plaintiffs connect a particular insider or affiliate to an allegedly deceptive corporate statement.[35]  In other contexts, in contrast, a complaint will fail where plaintiffs lump separate defendants together in vague and collective fraud allegations.[36]

C.     *Rule 8*

Not all the allegations of the complaint are averments of fraud.  These allegations are

---

[31]    15 U.S.C. § 78u-4(b)(1).  The requirement of stating "all facts" is not applied literally.  *See Novak*, 216 F.3d at 313-14.

[32]     *Cf. Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 177 (2d Cir. 2005) (holding that compliance with the PSLRA is required where the deceptive or manipulative device alleged is based on misrepresentations).

[33]    *See In re Blech Sec. Litig.*, 961 F. Supp. at 580.

[34]    *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987).

[35]    *Id.* (citing *Luce v. Edelstein*, 802 F.2d 49, 55 (2d Cir. 1986)).

[36]    *E.g.*, *Ellison v. Am. Image Motor Co.*, 36 F. Supp.2d 628, 640 (S.D.N.Y. 1999).

governed by Fed. R. Civ. P. 8(a), which requires only a short and plain statement of the claim.[37] Even under the liberal notice pleading standard of Rule 8, however, conclusory assertions are inadequate.[38]

### III. Claims under Section 10(b) of the Exchange Act and Rule 10b-5: Misrepresentations & Scienter

A. *Overview*

Defendants Grant Thornton International ("GTI"), Grant Thornton LLP ("GT-USA"), Deloitte Touche Tohmatsu ("DTT"), and Deloitte & Touch LLP and Deloitte & Touche USA LLP (collectively "Deloitte USA") principally argue that they did not audit Parmalat and were not involved in any of the alleged fraud committed by Parmalat's auditors, Deloitte Italy and GT-Italy. They assert further that they each are factually and legally separate from their Italian affiliates and therefore cannot be liable for the affiliates' alleged fraud. Their only link to the fraud, they contend, is that they have names similar to the alleged culprits and operated within the same auditing networks.

Plaintiffs respond that the links between these defendants and their Italian affiliates are far stronger that defendants admit. They argue that international accounting enterprises such as Deloitte and Grant Thornton operate as unified firms and that their alleged separateness is a fiction. Specifically, plaintiffs assert that Deloitte Italy and the other member firms conducting the Parmalat

---

[37] FED. R. CIV. P. 8(a)(2); *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination*, 507 U.S. 163, 168 (1993) (citing *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

[38] *Gregory v. Daly*, 243 F.3d 687, 692 (2d Cir. 2001); *Hallwood Realty Partners*, *L.P.*, *v. Gotham Partners L.P.*, 95 F. Supp.2d 169, 175 (S.D.N.Y. 2000).

audit did so as the agents or otherwise under the control of Deloitte USA and DTT.[39]  They assert

further that GT-Italy was controlled by and an agent of GTI and GT-USA.[40]  In turn, they contend

that GTI was controlled by GT-USA.[41]

As these arguments turn in substantial part on the characterization of the structure of

defendants' organizations, it is useful to start with an overview of those structures.

1.    Deloitte

Defendant DTT, a Swiss verein[42] headquartered in New York,[43] is a professional

services organization of member firms, sometimes referred to in promotional materials as "offices."[44]

These member firms, such as defendants Deloitte Italy and Deloitte USA, generally are organized

as limited liability entities under the laws of their respective jurisdictions.[45]

---

[39]

Cpt. ¶¶ 134, 135.

[40]

*Id.* ¶ 158.

[41]

Transcript of Oral Arg., March 25, 2005 ("Tr.") at 48-49.

[42]

A verein is a Swiss business form that DTT alleges is legally distinct from its member organizations.  *See Jeffries v. Deloitte Touche Tohmatsu Int'l*, 893 F. Supp. 455, 457 n.1 (E.D. Pa. 1995). "Verein" means association, society, club or union. CASSEL'S GERMAN DICTIONARY 662 (1978); *see also* LANGENSCHEIDT'S STANDARD DICTIONARY OF THE ENGLISH AND GERMAN LANGUAGES 1163 (6th ed. 1970).

[43]

Cpt. ¶ 131.

[44]

*Id.* ¶ 139.

[45]

*E.g. id.* ¶ 135.  Some member firms have affiliate or subsidiary firms.  For example, Deloitte Touche Tohmatsu Auditores Independentes, the Deloitte firm in Brazil, is a

Accounting and auditing standards and regulation of the accounting profession often are country specific. In addition to complying with any locally applicable rules, however, Deloitte firms follow general professional standards and auditing procedures promulgated by DTT. Member firms regularly cross check each other's work to ensure quality,[46] and they cooperate and join together in submitting bids for audit services.[47] Partners and associates of member firms participate in global practice groups and attend DTT meetings.[48]

Although various disclaimers on DTT's website indicate the legal separateness of DTT and its members, the firms market themselves under the name Deloitte, and DTT reports revenue for the firms on a combined basis.[49] According to plaintiffs, DTT advertises itself as a global network the member firms of which provide worldwide service in auditing and other professional services.[50] Member firms use the Deloitte name and logos in bidding for and delivering contracted for services.[51]

---

subsidiary of Deloitte Touche Tohmatsu USA. *Id.*

[46] *Id.* ¶¶ 144-46.

[47] *Id.* ¶ 149.

[48] *Id.* ¶ 144.

[49] *Id.* ¶¶ 131, 150.

[50] *Id.* ¶ 138.

[51] *Id.* ¶ 140.

2.     Grant Thornton

The Grant Thornton defendants have a similar structure, with GTI serving as an umbrella organization for Grant Thornton member firms around the world.   GTI is an Illinois corporation with its headquarters in London.[52]  Its member firms use the Grant Thornton name and market themselves as a global accounting organization.[53]   Like DTT, GTI reports revenue from member firms on a combined basis.[54]  Of those member firms, GT-USA is the largest, accounting for approximately one quarter of the fees generated by the global organization.[55]   GTI creates auditing policies and procedures that must be followed by the member firms and reviews each member firm every three years to ensure compliance.[56]

With this outline of Grant Thornton and Deloitte's organizational structure in mind, the Court now turns to the arguments regarding vicarious liability.

B.     *Group Pleading*

Defendants seize first on the fact that the complaint uses the terms "Deloitte" and "Grant Thornton" to refer collectively to the various entities within each organization, thus failing

---

[52]

    *Id.* ¶ 157.

[53]

    *Id.* ¶ 162 ("Founded in 1924, Grant Thornton serves public and private middle-market clients through 50 offices in the United States, and in 585 offices in 110 countries through Grant Thornton International.").

[54]

    *Id.* ¶ 161.

[55]

    *Id.*

[56]

    *Id.* ¶ 163.

to make clear which alleged actions are attributed to which entities.[57] They contend that most, if not all, of the alleged misrepresentations at issue were made by the Italian firms, Deloitte Italy and GT-Italy,[58] and that the use of the Deloitte and Grant Thornton labels does not give the other defendant Grant Thornton and Deloitte entities adequate notice of the statements that are attributed to them.

As a general matter, defendants' point is well taken, and plaintiffs' use of the firm names is ill-advised. Nevertheless, it is clear from the complaint that plaintiffs attribute the alleged misrepresentations and omissions to the Italian entities and that they sue the other Deloitte and Grant Thornton entities entirely, or, at least, primarily on vicarious liability theories. In these circumstances, the concerns of Rule 9(b) and the PSLRA are not implicated. The vicarious liability theories will stand or fall on their own merits.

C.    *Accountants' Vicarious Liability*

1.    Background

Plaintiffs contend that GTI, GT-USA, DTT, Deloitte USA and James Copeland

---

[57]

   Memorandum in Support of the Motion of Defendant Deloitte Touche Tohmatsu to Dismiss the First Amended Consolidated Class Action Complaint ("DTT Mem.") 9; Memorandum of Law in Support of Grant Thornton International's Motion to Dismiss the First Amended Consolidated Class Action Complaint ("GTI Mem.") 7-8; Grant Thornton LLP's Corrected Memorandum of Law Support of Its Motion to Dismiss the First Amended Consolidated Class Action Complaint ("GT-USA Mem.") 7.

[58]

   Deloitte Italy is not a defendant here, and GT-Italy does not move to dismiss the complaint.

   DTT argues that Parmalat effectively hid its fraud from Deloitte Italy, see DTT Mem. 4, but does not challenge plaintiffs' allegations of *scienter* on the part of the Italian auditors. *See also* Tr. at 11.

   GTI does not dispute that plaintiffs have stated a claim against GT-Italy. *See* GTI Mem. 9.

("Copeland") are liable for the fraudulent acts of their respective Italian affiliates. They argue that Deloitte and its affiliates and Grant Thornton and its affiliates each operated as one firm, viz., that the affiliates acted as the agents or *alter egos* of GTI and DTT.

The Deloitte and Grant Thornton movants resist the notion that they may be sued for the alleged fraud by their Italian member firms. They argue that the fact that affiliated accounting firms share a common name such as Deloitte or Grant Thornton and practice under the same global accounting standards does not make them a single firm, liable for the acts of their separately organized members. The "'limited liability corporation is the greatest single discovery of modern times,'"[59] they contend, and they assert that a finding that a global accounting organization is one firm would imperil the capital markets and undermine professional audit standards throughout the world.[60]

The significance of the corporate form to the development of capital markets and economic progress in general cannot be denied. Nevertheless, the limited liability entity is not an unmitigated blessing. The limitation of liability that encourages capital formation in some circumstances may eliminate disincentives to fraudulent behavior.

Independent auditors serve a crucial role in the functioning of world capital markets because they are reputational intermediaries.[61] In certifying a company's financial statements, their

---

[59]

DTT Mem. 17 (quoting LARRY D. SODERQUIST ET.AL., CORPORATE LAW & PRACTICE, § 1:3.1 (2d ed. 1999).

[60]

*Id.*; Tr. at 33, 40-41.

[61]

*E.g.*, John C. Coffee, Jr., *Understanding Enron: "It's About the Gatekeepers, Stupid,"* 57 BUS. LAW. 1403, 1405 (2002); Renier H. Kraakman, *Gatekeepers: The Anatomy of Third-Party Enforcement Strategy*, 2 J. L. ECON. & ORG. 53, 53-56 (1986); Peter B. Oh,

reputations for independence and probity signal the accuracy of the information disclosed by the company, the managers of which typically are unknown to most of the investing public.

This is especially true of defendants and other global accounting firms. Certification by an entity named Deloitte & Touche, Grant Thornton, or one of the small handful of other major firms is incalculably more valuable than that of a less known firm because the auditor "is in effect pledging a reputational capital that it has built up over many years of performing similar services for numerous clients."[62] In the case of these defendants and their *confreres*, the relevant reputational capital is that associated with the worldwide organizations, at least to a predominant extent. In consequence, allowing those organizations to avoid liability for the misdeeds and omissions of their constituent parts arguably could diminish the organizations' incentives to police their constituent entities, with adverse consequence for participants in capital markets. But it is neither appropriate nor necessary to attempt at this early stage to resolve the question whether such considerations warrant disregard of the formal organizational structures of these firms. For the present, it is sufficient to consider whether plaintiffs have stated a claim against these defendants for the acts of the Italian affiliates based on the conventional theories that these firms had agency or *alter ego* relationships with them and/or each other.

---

*Gatekeeping*, 29 J. CORP. L. 735, 747-50. (2004); *see also* Revision of the Commission's Auditor Independence Requirements, Exchange Act Release No. 33-7870, 65 Fed. Reg. 43,148, 43,150 (July 12, 2000) (codified at 17 C.F.R. pts. 210, 240) ("The federal securities laws . . . make independent auditors 'gatekeepers' to the public securities markets.")

[62] Coffee, *supra* note 61, at 1405.

2.      Legal Standards

a.      Agency

An agency relationship exists under New York law[63] when there is agreement between the principal and the agent that the agent will act for the principal and the principal retains a degree of control over the agent.[64] The element of control often is deemed the essential characteristic of the principal-agent relationship.[65] "To bind a principal, 'an agent must have authority, whether apparent, actual or implied.'"[66] Actual authority arises from a principal's direct manifestations to the agent.[67] It "'may be express or implied, but in either case it exists only where the agent may reasonably infer from the words or conduct of the principal that the principal has

---

[63]

The law of the forum state governs where, as here, no party alleges that the law of a different state controls and differs from that of the forum. *See, e.g. Questrom v. Federated Dep't Stores, Inc.*, 192 F.R.D. 128, 133 n.26 (S.D.N.Y. 2000), *aff'd*, 2 Fed. Appx. 82 (2d Cir. 2001).

[64]

*Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A.*, 347 F.3d 448, 462 (2d Cir. 2003); *N.Y. Marine & Gen. Ins. Co. v. Tradeline, L.L.C.*, 266 F.3d 112, 122 (2d Cir. 2001) (quoting *Meese v. Miller*, 79 A.D.2d 237, 242, 436 N.Y.S.2d 496, 499 (4th Dep't 1981)); *see also Maurillo v. Park Slope U-Haul*, 194 A.D.2d 142, 146, 606 N.Y.S.2d 243, 246 (2d Dep't 1993).

[65]

*E.g., Meese*, 79 A.D.2d at 241, 436 N.Y.S.2d at 449; RESTATEMENT (SECOND) AGENCY § 14 cmt. a. (1958).

[66]

*Cromer Finance, Ltd. v. Berger*, No. 00 Civ. 2284 (DLC), 2002 WL 826847 *4 (S.D.N.Y. May 2, 2002) (quoting *Merrill Lynch Interfunding, Inc. v. Argenti*, 155 F.3d 113, 122 (2d Cir. 1998)).

[67]

*Dinaco, Inc. v. Time Warner, Inc.*, 346 F.3d 64, 68 (2d Cir. 2003) (applying New York law).

consented to the agent's performance of a particular act.'"[68]

Deloitte USA contends that plaintiffs' allegation of agency is intertwined with their fraud claims and that the heightened pleading requirements of Rule 9(b) therefore apply.[69] They cite *Kolbeck v. LIT America, Inc.*,[70] in which Chief Judge Mukasey held that plaintiffs were obliged to plead with particularity the existence of an implied agency relationship when the false appearance of an agency relationship was part of the alleged fraud.[71] As he explained, "plaintiffs' claim that the agency itself was a fraud, and that defendants created the appearance of an agency relationship to facilitate [defendant's] perpetration of commodities fraud" was among the circumstances constituting the fraud.[72]

Plaintiffs' claim here differs. First, they do not allege an apparent agency relationship. Second, they do not allege that the agency relationship was part of the fraud in the sense that they claim injury because they were led to believe that the Italian affiliates were movants' agents when in fact they were not. Rather, they assert that there was an actual agency relationship

---

[68]

    *Id.* (quoting *Minskoff v. Am. Express Travel Related Serv. Co.*, 98 F.3d 703, 708 (2d Cir. 1996)(in turn quoting RESTATEMENT (SECOND) AGENCY § 7 cmt. b (1958)) (emphasis omitted)); *see Riverside Research Inst. v. KMGA, Inc.*, 108 A.D.2d 365, 369, 489 N.Y.S.2d 220, 223 (1st Dep't 1985), *aff'd*, 68 N.Y.2d 689, 506 N.Y.S.2d 302 (1986).

[69]

    Memorandum of Deloitte & Touche USA LLP and Deloitte & Touche LLP in Support of Their Motion To Dismiss the First Amended Consolidated Class Action Complaint ("Deloitte USA Mem.") 20.

[70]

    923 F. Supp. 557 (S.D.N.Y. 1996), *aff'd*, 152 F.3d 918 (2d Cir. 1998) (table).

[71]

    *Id.* at 569.

[72]

    *Id.*

between Deloitte Italy and DTT and GT-Italy and GTI and that DTT and GTI therefore are vicariously liable for the torts of their agents.[73]  This allegation is not so closely intertwined with the claim of securities fraud that it is a circumstance of the fraud itself.  Accordingly, agency need not be pled with particularity in this case. The agency allegations are governed by Rule 8.

b.      *Alter Ego* Relationship

A firm may be liable for the acts of a wrongdoer if the wrongdoer is the other's *alter ego*.[74]  That is, New York will disregard the corporate form "when the corporation has been so dominated by an individual or another corporation . . . , and its separate identity so disregarded, that it primarily transacted the dominator's business rather than its own"[75] and this domination was used

---

[73]

> *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), does not eliminate corporate defendants' liability for the misrepresentations or manipulations of their agents. *See Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001). As the Third Circuit has explained, the principal is held liable on a theory of agency "not because it committed some wrongdoing outside the purview of the statute which assisted the wrongdoing prohibited by the statute, but because its *status* merits responsibility for the tortious actions of its agent." *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1431 (3d Cir. 1994) (emphasis in original); *accord Vento & Co. of New York, LLC v. Metromedia Fiber Network, Inc.*, No. 97 Civ. 7751 (JGK), 1999 WL 147732 (S.D.N.Y. Mar. 18, 1999)*; Cromer Finance, Ltd. v. Berger*, No. 00 Civ. 2284 (DLC), 2002 WL 826847 *7 (S.D.N.Y. May 2, 2002).

[74]

> A note on terminology.  The phrases "piercing the corporate veil" and "*alter ego* liability" generally are used interchangeably for purposes of New York law.  *See Wm. Passalacqua Builders, Inc v. Resnick Developers South, Inc.*, 933 F.2d 131, 138 (2d Cir. 1991) ("[T]he three-factor rule [of veil piercing] and the *alter ego* theory sued on in this case are indistinguishable, do not lead to different results, and should be treated as interchangeable.").  That is, New York will pierce the corporate veil when there is a finding that a party is the *alter ego* of the wrongdoer and used that status to injure the plaintiff.  *See infra*.

[75]

> *Wm. Passalacqua Builders, Inc.*, 933 F.2d at 138 (2d Cir. 1991) (quoting *Gartner v. Snyder*, 607 F.2d 582, 586 (2d Cir. 1979)); *see also Morris v. N.Y. State Dept. of Tax. &*

"to commit a fraud or other wrong that causes the plaintiff's loss."[76]

Whether a wrongdoer is a defendant's *alter ego* is a fact specific matter[77] that turns on such factors as the failure to adhere to corporate formalities, undercapitalization, intermingling of funds, overlap in ownership, staff and directorship, common use of office space,[78] the degree of discretion shown by the wrongdoer,[79] "whether the dealings between the entities are at arms

---

*Finance*, 82 N.Y.2d 135, 141, 603 N.Y.S.2d 807, 810-11 (1993); *Walkovsky v. Carlton*, 18 N.Y.2d 414, 417-19, 276 N.Y.S.2d 585, 587-89 (1966).

Of course, the defendants here include a number of different types of corporations and business organizations, and no defendant owns shares in another defendant. DTT contends that this failure to own shares is fatal. It argues that veil piercing is not appropriate if the defendant is not an owner of the wrongdoer whose corporate form is to be disregarded, citing a treatise that equates an owner with a shareholder. DTT Mem. 19.

The use of stock ownership is one means of corporate domination, but it is not the only one. One "who exercises sufficient control over the corporation may be deemed an 'equitable owner', notwithstanding the fact that the individual is not a shareholder of the corporation." *Freeman v. Complex Computing*, 119 F.3d 1044, 1051 (2d Cir. 1997); *see also id* (citing cases). *But see Morris*, 82 N.Y.2d at 142, 603 N.Y.S.2d at 811 (declining to decide whether a non-shareholder may be personally liable on a veil piercing theory). Consequently, the Court is unwilling to conclude at this stage that plaintiffs' theory is defeated merely because defendants do not own shares in one another.

[76] *Wm. Passalacqua Builders*, 933 F.2d at 138; *accord Morris*, 82 N.Y.2d at 141-42, 603 N.Y.S.2d at 811.

[77] *Alpha Bytes Computer Corp. v. Slaton*, 307 A.D.2d 725, 726, 762 N.Y.S.2d 328, 329 (4th Dep't 2003); *First Capital Asset Mgmt., Inc. v. NA Partners, LP*, 300 A.D.2d 112, 117, 755 N.Y.S.2d 63, 67 (1st Dep't 2002); *see also MAG Portfolio Consultant GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 63 (2d Cir. 2001).

[78] *Forum Ins. Co. v. Texarkoma Transp. Co.*, 229 A.D.2d 341, 342, 451 N.Y.S.2d 786, 787-88 (1st Dep't 1996).

[79] *Wm. Passalacqua Builders*, 933 F.2d at 139.

length,"[80] and "whether the corporations are treated as independent profit centers."[81]

The proper pleading standard for a claim of *alter ego* liability has been a "knotty question" in this district.[82] Nevertheless, plaintiffs here allege that defendants used their domination of their affiliates to commit securities fraud. The fraud allegations therefore are governed by Rule 9(b) and the PSLRA.[83] The domination and control elements of the claim, however, need comply only with Rule 8.

### D.    *Deloitte Defendants*

#### 1.    Factual Allegations

Plaintiffs allege that Deloitte Italy audited Parmalat as the agent of DTT and did so pursuant to its authority and control.[84] In addition to those facts set forth already, they contend that the Deloitte organization has centralized leadership headed by a global chief executive officer and

---

[80]

    *MAG Portfolio Consultant GMBH*, 268 F.3d at 63.

[81]

    *Id.*

[82]

    *In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp.2d 385, 426 (S.D.N.Y. 2003); *United Feature Syndicate, Inc. v. Miller*, 216 F. Supp.2d 198, 222 (S.D.N.Y. 2002).

[83]

    *In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp.2d at 425-26 (S.D.N.Y.2003); *Network Enterprises, Inc. v. APBA Offshore Productions, Inc.*, No. 01 Civ. 11765 (CSH), 2002 WL 3105846 * 5 (S.D.N.Y. Sept. 12, 2002); *Gabriel Capital L.P. v. Natwest Fin., Inc.*, 122 F. Supp.2d 407, 433 (S.D.N.Y. 2000); *see also Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) (heightened pleading standard applies where liability under Sections 11 and 12(a)(2) of the Securities Act of 1933 are premised on fraud, even though fraud is not a requisite to establishing liability).

[84]

    Cpt. ¶¶ 134-35.

a global board of directors.[85] According to the complaint, there is significant overlap between the leadership of Deloitte USA and DTT.[86] Copeland was the chief executive officer and/or managing partner of DTT and Deloitte USA from 1999 to 2003, and the chief financial officer of the U.S. firm has served also as the chief financial officer of DTT for the last ten years.[87]

Plaintiffs contend that Deloitte offices throughout the world audited Parmalat as agents of DTT and that, although Deloitte & Touche S.pA. signed audit reports for Parmalat, both the Deloitte & Touche and DTT logos appeared on the reports without the abbreviation "S.p.A." in close proximity.[88] They argue also that the alleged agency relationship is evidenced by DTT's conduct in respect of the Brazilian member firm.

In 2001, Wanderley Olivetti, an auditor in Deloitte's Brazilian firm, told Adolfo Mamoli, a partner from Deloitte & Touche, S.p.A. in charge of the Parmalat audit, that he had concerns about the transfer of inter-company debt to Parmalat's Brazilian affiliate, Parmalat Participações, and in consequence would not be able to issue a clean audit opinion for the company.[89] According to plaintiffs, Parmalat Participações was a consolidated subsidiary, and any qualification of the audit opinion of its financial statements would have impacted that of Parmalat as well. Olivetti subsequently expressed additional concerns about the lack of documentation for various

---

[85]

     *Id.* ¶ 138.

[86]

     *Id.* ¶¶ 152-54.

[87]

     *Id.* ¶¶ 151-52.

[88]

     *E.g.*, Dell Aff., Ex. D, Auditor's Report 2000.

[89]

     Cpt. ¶ 1006.

transactions.

On April 5, 2002, Mamoli sent a note to Copeland in New York about the disagreements among the Italian and Brazilian auditors, explaining:

> "In connection with this multimillion-dollar worldwide engagement of which I am the Lead Client Service Partner a major issue has now emerged relating to Brazilian operations where a major contrast exists between our Firm and Local and Corporate management of Parmalat relating to certain statutory financial statements disclosure requirements on a matter of inter-company transaction and certain other minor matters.

> "I prefer not to bother you with the details on the subject; however, since the risk exists that for this problem Parmalat Headquarters could dismiss Deloitte & Touche as worldwide auditors, I would strongly appreciate your input or the input of somebody delegated by you to arbitrate the matter."[90]

There is no indication whether Copeland personally became involved. The situation was resolved by May, however, when Olivetti agreed not to issue a qualified opinion and to add only an emphasis note, which plaintiffs contend "would not require an auditor's exception or qualification and no mention of these issues appeared in [Parmalat's] consolidated financial statements."[91]

Olivetti again raised concerns in 2003 about Parmalat's transfer of intercompany debt to Parmalat Participações, allegedly through the use of fraudulent accounting entries.[92] When Olivetti threatened to withhold certification of Parmalat Participações financial statements, "the global Deloitte organization, headed in the United States by Jim Copeland, 'removed' Olivetti from

---

[90] Dell Aff., Ex. B, Letter from Mamoli to Copeland, 4/5/2002.

[91] Cpt. ¶ 1011.

[92] *Id.* ¶ 1013.

any further role in auditing Parmalat's Brazilian operations."[93]

Dr. Stefania Chiaruttini, the Italian expert appointed to investigate the fraud, uncovered other instances in which Deloitte auditors in South America raised questions with respect to Parmalat's financial statements. When these auditors brought these issues to the attention of more senior personnel, top executives, including Copeland and other Deloitte officers in the United States, "confronted the auditors who had detected the fraud and told them to keep quiet."[94]

2.      Plaintiffs Have Alleged Adequately That Deloitte Italy was the Agent of DTT

DTT asserts that plaintiffs' conclusory assertions of agency are not sufficient and that they have not alleged any specific facts that show that DTT authorized any member firms to act for it in auditing Parmalat.[95] It argues that the press releases and promotion materials quoted by plaintiffs indicate that audit services were provided by Deloitte member firms and not DTT.[96]

These purported disclaimers are not dispositive of the question of whether an agency relationship existed. First, the statement that audit services were provided by Deloitte member firms does not bear on whether the firms did so as agents of DTT. More basically, plaintiffs' allegations about how DTT operated with respect to Deloitte Italy and its member firm in Brazil are at odds with the purported disclaimer. At most, then, the disclaimers cited by DTT raise an issue of fact with

---

[93]    *Id.*

[94]    *Id.* ¶ 1033.

[95]    DTT Mem. 24.

[96]    *Id.* at 24-25.

respect to whether the member firms delivered the auditing services at issue as the agents of DTT.

DTT next asserts that at least ten other courts have declined to find "one firm" or agency liability on the basis of promotional materials of similar global accounting firms and the fact that the firms may have collaborated on some aspects of the audits there at issue.[97]  It argues that plaintiffs' allegations here are equally insufficient to state a claim on the basis of an agency relationship.

DTT's argument does not go very far where, as here, plaintiffs have made specific allegations from which an agency relationship could be inferred.  They have alleged that Mamoli sought direction and help from DTT, from which it could be inferred that DTT was in ultimate control of the audit.[98]  Plaintiffs have alleged further that DTT took actions in directing – or directing the removal of – auditors on the Parmalat audit.  Whether this was simple collaboration or an agency relationship, the Court cannot say at this point. But the Court assuredly cannot now say that no trier of fact reasonably could infer that Deloitte Italy or other member firms auditing Parmalat were agents

---

[97]

DTT Mem. 25 -26 (citing, *inter alia*, *Newby v. Enron Corp.*, 394 F.3d 296 (5th Cir. 2004); *Nuevo Mundo Holdings v. Pricewaterhouse Coopers, LLP*, No. 03 Civ. 0613 (GBD), 2004 WL 112948 (Jan. 22, 2004); *In re Worldcom, Inc. Sec. Litig.*, No. 02 Civ. 3288 (DLC), 2003 WL 21488087 (S.D.N.Y. Jun. 25, 2003); *Boston Telecommunications Grp. v. Deloitte Touche Tohmatsu*, No. C 02-05971 (JSW) (N.D. Cal. Aug 7, 2003); *Deloitte, Haskins & Sells*, 599 F. Supp. 1241, 1253 n.10 (S.D.N.Y. 1984)).

[98]

*But see Maung Ng We & Massive Atlantic Ltd. v. Merrill Lynch & Co.*, No. 99 Civ. 9687 (CSH), 2000 WL 1159835 (S.D.N.Y. Aug. 15, 2000) (finding that control could not be inferred where wrongdoers in a subsidiary merely consulted with executives in parent company and other allegations in the complaint undermined allegations that actions were authorized).

of DTT.[99]

DTT nevertheless contends that allowing the case to proceed against it on anything less than a "full showing" of agency would imperil the corporate form,[100] citing the Second Circuit's decision in *Merrill Lynch Investment Managers ("MLIM") v. Optibase, Ltd.*[101] It then argues that plaintiffs have failed to make such a full showing here.

*MLIM* does not address the requirements of pleading an agency relationship. MLIM there moved for an order staying Optibase from proceeding with arbitration against it on the grounds that it was not a signatory to the arbitration agreement. Optibase responded that arbitration could be compelled because there was an agency relationship between MLIM and the signatory, Merrill Lynch, Pierce, Fenner & Smith.[102] The district court granted MLIM's motion after an evidentiary hearing at which it considered several affidavits, declarations and a preliminary stipulation of facts

---

[99]

DTT argues also that the DTT and Deloitte & Touche logos on the audit reports produced by Deloitte Italy are irrelevant because they are the statements of agents and cannot be used to prove the existence of an agency relationship. DTT Mem. 24 n.11. They rely on *Itel Containers International Corp. v. Atlanttrafik Express Service Ltd.,* 909 F.2d 698 (2d Cir. 1990), in which the Second Circuit held that whether an express agency relationship exists "depends on the actual interaction between the putative principal and agent, not on any perception a third party may have of the relationship." *Id.* at 702. But plaintiffs do not assert that the existence of DTT's logo on the Italian audit opinions establishes the agency relationship. Rather, they claim that an agency relationship may be inferred from the presence of the logo in combination with DTT's actions in resolving of the dispute between Italian and Brazilian auditors and its general advertising strategy. As noted by Judge Cote in a similar context, "[i]t is fair to infer, in the context of pleading standards, that the representations made to third parties bore a relationship to the way Deloitte actually conducted its business." *Cromer*, 2002 WL 826847 *5.

[100]

DTT Mem. 23.

[101]

337 F.3d 125 (2d Cir. 2003).

[102]

*Id.* at 130.

about the relationship between MLIM and the signatory.[103]  The Second Circuit upheld this

conclusion on appeal, finding that Optibase had "failed to adduce facts that would support" the

finding of an agency relationship.[104] In doing so, it rejected Optibase's reliance on a Third Circuit

case[105] involving the same parties that purported to apply "agency logic" to hold that arbitration

could be compelled.[106]

*MLIM* is inapposite.  To be sure, plaintiffs must prove agency to hold DTT liable for

the acts of Deloitte Italy and the other member firms that conducted the Parmalat audit.[107]  But the

issue here is not whether plaintiffs have proved the existence of an agency relationship, merely

whether they should have the chance to do so.  In any case, *MLIM* did not involve anything

comparable to the allegations relating to DTT's actions with respect to the problems created by

Deloitte's Brazilian affiliate.[108]

The Court has considered DTT's remaining arguments and finds them without merit.

---

[103]

*Merrill Lynch Investment Managers v. Optibase, Ltd.,* No. 02 Civ. 4282 (LTS) 2002 WL 31015555 (S.D.N.Y. Sept. 2, 2002).

[104]

337 F.3d at 131.

[105]

*Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 7  F.3d 1110 (3d Cir. 1993).

[106]

*MLIM*, 337 F.3d at 131.

[107]

*See* Cpt. ¶ 135.

[108]

The hearing in *MLIM* produced the following facts: (1) MLIM and Merrill Lynch, Pierce, Fenner & Smith, Inc. ("MLPF&S") both had the same parent corporation, (2) executives from the parent served as officers of MLIM, (3) MLPF&S brokers offered their clients products that were advised by MLIM, (4) MLPF&S marketed the services of the entire Merrill Lynch family of products, and (5) Merrill Lynch companies presented to the public the image of a single, integrated firm.  337 F.3d at 130.

Plaintiffs have adequately pleaded an agency relationship and therefore the Court declines to consider their alternative claim that DTT may be liable as the *alter ego* of its member firms.

### 3. Deloitte USA

#### a. Plaintiffs Have Not Alleged Sufficiently an *Alter Ego* Relationship

Plaintiffs seek to hold Deloitte USA liable on the theory that (1) Deloitte Italy violated the securities laws as the agent of DTT, and (2) DTT is the *alter ego* of Deloitte USA. As discussed, plaintiffs adequately have pleaded the first part of that theory.[109] In respect of the second step, their contention appears to rest on the group's marketing materials and the fact that Deloitte USA's top executives serve also as the top executives of DTT.

Plaintiffs contend that these facts are sufficient to overcome a motion to dismiss, relying on *Franklin High Income Trust v. APP Global Ltd.*[110] The Appellate Division there affirmed the denial of Arthur Andersen LLP's motion to dismiss, explaining that dismissal was not appropriate "merely because the accounting defendants dispute plaintiffs' allegations respecting the assertedly close and controlling relationship between them and the Arthur Andersen entity that was purportedly immediately responsible for the complained-of audits and financial statements."[111]

Their reliance on *Franklin High Income Trust* is misplaced. Plaintiffs there did not

---

[109] 
Plaintiffs' Memorandum of Law In Opposition to Defendants' Motions to Dismiss the First Amended Consolidated Class Action Complaint ("Pl. Mem.") 71 (citing allegations in the complaint).

[110] 
7 A.D.3d 400, 776 N.Y.S.2d 473 (1st Dep't 2004).

[111] 
*Id.* at 401, 776 N.Y.S.2d at 473.

base their claim on vicarious liability, but asserted that Arthur Andersen, LLP, Arthur Andersen Singapore and Andersen Worldwide SC had audited APP Global Ltd. and therefore were liable for certifying the company's allegedly fraudulent financial statements from 1997 to 2000.[112]   By contrast, plaintiffs here do not assert that Deloitte USA signed the audit reports or made the misrepresentations and omissions at issue.

Here, defendants' marketing materials indicate a close relationship among the parties and the existence of overlapping executives cuts in favor of a finding of domination.[113]   However, the complaint does not indicate that there was an intermingling of funds or a failure to adhere to corporate formalities.  Indeed, the marketing materials state that each firm is separately incorporated. Without pleading any facts that would tend to show that Deloitte USA used the close relationship to dominate DTT, an *alter ego* relationship cannot be inferred from the close relationship and overlap in executives.[114]   Significantly, plaintiffs must do more than allege that Deloitte USA had the opportunity to dominate DTT.   They must allege that it in fact dominated DTT and used it in a

---

[112]

Complaint ¶¶ 1,17, *Franklin High Income Trust*, 7 A.D.3d 400, 776 N.Y.S.2d 473 (1st Dep't 2004) (Ind. No. 02/602567); 7 A.D.3d at 400, 776 N.Y.S.2d at 473 ("Plaintiffs' allegations that defendant . . . [AWSC], a Swiss cooperative domiciled in Geneva, Switzerland, prepared financial statements that were to be used to solicit the interest of New York investors . . . are adequate to sustain the action as against" AWSC.).

[113]

*Wm. Passalacqua Builders, Inc.*, 933 F.2d at 139 (citing that factor among others).

[114]

*See, e.g., Pebble Cove Homeowner's Assoc. Inc. v. Fidelity New York FSB*, 153 A.D.2d 843, 843, 545 N.Y.S.2d 362, 363 (2d Dep't 1989) (interlocking directors and officers, in and of themselves, are insufficient to allege *alter ego* liability); *Musman v. Modern Deb, Inc.*, 50 A.D.2d 761, 762, 377 N.Y.S.2d 17, 20 (1st Dep't 1975) (same); *accord American Protein Co.*, 844 F.2d at 59 (overlapping boards of directors not sufficient to establish *alter ego* relationship); *In re Rymsbran Continental Corp.*, 177 B.R. 163, 171 (E.D.N.Y. 1995) (same).

relevant manner.[115]  To hold otherwise would create an *alter ego* relationship between almost every parent and subsidiary.

### b.    Liability on the Basis of Deloitte USA's Actions

Although plaintiffs have failed to allege that Deloitte USA is liable vicariously for the alleged misdeeds of Deloitte Italy, they contend that its own actions violated Section 10(b) of the Exchange Act.

 Plaintiffs assert that Deloitte USA was involved in the fraud by providing audit services to Parmalat USA Corp. as well as non-audit services such as "'comfort letters' in connection with certain Parmalat U.S. acquisitions.'"[116] Specifically, they contend that Mike Power, an auditor in Deloitte USA's New Jersey office, raised concerns with the Italian auditors about Parmalat's overvaluation of goodwill in connection with its fiscal year 2002 financial statements.  An auditor at Deloitte Italy passed these concerns along to audit partner Adolfo Mamoli, as well as to Parmalat director and chief accounting officer Luciano Del Soldato.[117] Neither Deloitte USA nor Deloitte Italy followed up, however, and plaintiffs charge that they would have discovered that the "recorded value of goodwill [was] not supported by any corroboration" had they done so.[118]

---

[115]

*See DeJesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65, 70 (2d Cir. 1996); *Williams v. McAllister Bros., Inc.*, 534 F.2d 19, 21 (2d Cir. 1976).

[116]

Cpt. ¶ 86.

[117]

*Id.* ¶ 1000.

[118]

*Id.* (quoting the Chiaruttini report).

Exchange Act Section 10(b) and Rule 10b-5 do not encompass claims of aiding and abetting.[119] They prohibit only "the making of a material misstatement (or omission) or the commission of a manipulative act."[120] The Second Circuit has opted for a bright line approach to determining primary liability, concluding that "[a]llegations of 'assisting,' 'participating in,' 'complicity in' and similar synonyms . . . all fall within the prohibitive bar of *Central Bank*."[121]

Plaintiffs have not alleged here that Deloitte USA itself made any misrepresentations in respect of Parmalat's overvaluation of its goodwill. Moreover, even assuming *arguendo* that the overvaluation of goodwill could be considered a deceptive or manipulative act, plaintiffs do not contend that Deloitte USA created, contrived or even participated in this alleged scheme to overvalue Parmalat's goodwill.[122] Indeed, the complaint asserts that an auditor from Deloitte USA complained about it. Plaintiffs therefore have failed to state a claim against Deloitte USA as a primary violator

---

[119]

    *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994); *Wright v. Ernst & Young, LLP*, 152 F.3d 169, 175 (2d Cir. 1998).

[120]

    *Central Bank*, 511 U.S. at 177.

[121]

    *Shapiro v. Cantor*, 123 F.3d 717, 720 (2d Cir. 1997); *see also Wright v. Ernst & Young*, 152 F.3d 169 (2d Cir. 1998) (concluding that an individual must make a public misrepresentation to incur primary liability under 10b-5(b)); *Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*, 135 F.3d 837 (2d Cir. 1998) (no liability for conspiracy under Section 10(b)).

[122]

    *See SEC v. First Jersey Securities, Inc.* 101 F.3d 1450 (2d Cir. 1996), *cert. denied,* 522 U.S. 812 (1997) (finding primary liability where defendant directed employees to make false and misleading statements to the public); *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 336-37 (S.D.N.Y. 2004) (primary liability for deceptive acts where auditors "masterminded" company's misleading accounting practices); *In re Blech Securities Litig.*, No. 94 Civ. 7696 (RWS), 2002 WL 31356498 *4 (S.D.N.Y. Oct. 17, 2002) (primary liability for manipulation where defendant "directed" or "contrived" allegedly fraudulent trades).

of Section 10(b) of the Exchange Act.

### 4. James Copeland

#### a. *Alter Ego* and Agency

Plaintiffs allege that Copeland was the chief executive officer of both DTT and Deloitte USA during the Class Period and that he or someone else at DTT may have taken action against a troublesome Brazilian auditor. However, they do not aver facts suggesting that Copeland dominated either company or misused the corporate form and that failure is fatal. Thus, plaintiffs' claim that Copeland was an *alter ego* of DTT lacks any factual or legal basis.

Plaintiffs claim also that Copeland had an agency relationship with the Italian auditors. The theory is that (1) he was a partner of Deloitte USA, (2) Deloitte USA is the *alter ego* of DTT, and (3) the Italian auditors were agents of DTT. But this theory suffers from a number of infirmities, not the least of which is that plaintiffs have failed to allege that Deloitte USA is the *alter ego* of DTT.

#### b. Individual Liability

Plaintiffs next claim that Copeland is liable under Section 10(b) and subsections (a) and (c) of Rule 10b-5 on the basis of his alleged actions to ensure that Deloitte auditors issued clean audit opinions for Parmalat and its subsidiaries. They contend that Copeland and the Deloitte defendants knew about Parmalat's fraudulent scheme and certified its financial statements notwithstanding the serious concerns they should have had about doing so. In particular, Copeland,

or other DTT executives working under him, are alleged to have silenced auditors who raised concerns about Parmalat's financial statements.[123]

Plaintiffs contend that these allegations go beyond mere participation to actual perpetration of the fraud. They argue that their allegations are similar to those in *In re Global Crossing Securities Litigation*,[124] in which the court held that plaintiffs stated a claim under Rule 10b-5(a) and (c) against auditor Arthur Andersen, in part because certain auditors' "concerns had been 'quash[ed].'"[125]

At least for present purposes, *Global Crossing* does not help the plaintiffs. The court there found that the fact that auditors' concerns had been quashed was significant for purposes of establishing *scienter*. But even assuming that this would be sufficient to allege *scienter* on the part of Copeland, the first issue is whether they have alleged that he was a primary violator. This is where the complaint and that in *Global Crossing* part company. In *Global Crossing*, plaintiffs claimed that Andersen had, *inter alia*,

"masterminded the misleading accounting for IRUs [indefeasible right of use] and the subsequent sham swap transactions used to circumvent GAAP and inflate the Companies' revenues, that it actively participated in structuring each swap, that it was intimately involved in all of [Global Crossing]'s and [Asia Global Crossing]'s accounting functions, and that it directly participated in the creation of the misleading 'pro forma' numbers that concealed these practices from investors."[126]

---

[123]

Cpt. ¶¶ 1010-13, 1033.

[124]

322 F. Supp.2d 319 (S.D.N.Y. 2004).

[125]

*Id.* at 347.

[126]

*Id.* at 336.

The court concluded that given "Andersen's allegedly central role in these schemes, as their chief architect and executor," there could be "no doubt as to its potential liability as a primary violator under section 10(b)."[127]

Here, plaintiffs have not alleged that Copeland was the mastermind or architect of any fraud, but only that he assisted by encouraging others not to disclose the alleged fraud. Indeed, they contend that Parmalat and its Grant Thornton auditors created and managed most of the alleged schemes to create false revenue, which Deloitte Italy then concealed.[128] Plaintiffs' allegations therefore do not state a claim for primary liability under Section 10(b) against Copeland.[129]

E. *Grant Thornton Defendants*

1. Factual Allegations

Plaintiffs contend that GT-Italy was controlled by GTI and GT-USA and that it was their agent, acting on their authority and for their benefit.[130] In turn, they assert that GTI was

---

[127]

*Id.*

[128]

*Compare, e.g.*, Cpt. ¶ 957 (Tonna "stated that Grant Thornton created these shell entities, and then created Bonlat as a 'cover' in an attempt to conceal Grant Thornton's participation in the fraud."), *with* ¶ 960 (Deloitte actually 'examined the working papers from Grant Thornton regarding the auditing of Bonlat, and . . . Deloitte & Touche discovered immediately how this company was being used by [Parmalat].'") (quoting the Chiaruttini Report).

[129]

The Court does not read Count V to assert a claim against Copeland for violation of Rule 10b-5(b). Such claim would fail for the same reasons as does Count IV.

[130]

Cpt. ¶ 158.

controlled by GT-USA.[131]  In addition to those facts already set forth, plaintiffs contend that two incidents show that the Grant Thornton member firms operated as agents and/or *alter egos* of GTI in their work for Parmalat.

First, they allege that Grant Thornton member firms cooperated in setting up Camfield Pte. Ltd. ("Camfield"), a Singapore-based holding company that was used in the fictitious sale of powdered milk to Cuba.  Camfield operated out of the offices of Foo Kan Tan Grant Thornton, the Singapore member firm of GTI,[132] and an employee of an affiliate of Foo Kan Tan Grant Thornton served as Camfield's company secretary.[133]

Second, they point to GTI's actions in disciplining GT-Italy and some of its individual partners for their alleged participation in the Parmalat fraud. On December 31, 2003, GTI announced that Lorenzo Penca and Maurizio Bianchi, partners of GT-Italy "have both been suspended with immediate effect from all responsibilities for an indefinite period" after their arrest by Italian authorities in relation to the Parmalat scandal.[134]  It stated further that it was "continuing, with the involvement of legal counsel, its investigation into the Parmalat matter and its review of Grant Thornton S.p.A."[135]  Subsequently, on January 8, 2004, GTI announced that it had expelled Grant

---

[131]     Tr. at 48-49.

[132]     Cpt. ¶¶ 240-41, 243.

[133]     *Id.* ¶ 243.

[134]     *Id.* ¶ 167.

[135]     *Id.*

Thornton, S.p.A. from the organization. It explained that "Grant Thornton S.p.A. can no longer operate as part of the international network" and that "[n]o further work will be performed by independent Grant Thornton International member firms on behalf of Grant Thornton S.p.A."[136]

### 2. GTI

#### a. Plaintiffs Have Alleged Adequately that GT-Italy was an Agent of GTI

GTI contends that plaintiffs have not alleged any facts that could serve as the basis of an agency relationship. It points to many of the same cases cited by DTT,[137] relying specifically upon two cases from this district, *Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP*,[138] and *In re Worldcom, Inc. Securities Litigation*[139] to argue that allegations that promotional materials referred to the firm as global and that the firms used a common name are not sufficient to justify a finding of agency.[140]

In *Worldcom*, the court dismissed plaintiffs' securities claim against Andersen Worldwide SC ("AWSC"), the umbrella organization for the former Arthur Andersen firms, finding the allegation that it was an "'umbrella organization for its member firms worldwide'" insufficient

---

[136]

        *Id.* ¶ 168 (alteration in original).

[137]

        *See supra* note 97.

[138]

        No. 03 Civ. 0613 (GBD), 2004 WL 112948 (S.D.N.Y. Jan. 22, 2004).

[139]

        No. 02 Civ. 3288 (DLC), 2003 WL 21488087 (S.D.N.Y. June 25, 2003).

[140]

        GTI Mem. 16.

to plead agency.[141]  Similarly, in *Nuevo Mundo Holdings*, the court held that statements by an agent proclaiming the existence of an agency relationship, coupled with allegations that "there is overall training and supervision of all affiliates and peer review meetings held to assure compliance with the accepted professional standards and ethical requirements of what each affiliate is doing," were insufficient to allege an agency relationship between Arthur Andersen LLP and the Peruvian member firm of AWSC, and Pricewaterhouse Coopers, LLP and the Peruvian member firm of Pricewaterhouse Coopers International Ltd.[142]

Plaintiffs' allegations differ from those in *Worldcom* and *Nuevo Mundo Holdings*. The complaint here not only quotes GTI's press releases, but contends that GTI exercised control over GT-Italy in a manner typical of a principal-agent relationship.  It alleges further that GTI investigated and disciplined the Italian member firm and ultimately expelled it from the group.[143] GTI's ability to discipline individual partners of GT-Italy suggests that it had the power to direct the policies and practices of that firm – a defining characteristic of agency.

GTI responds that even if plaintiffs' allegations are not conclusory, they are undermined by the fact that its website and the January 8, 2004 press release stated that each member firm "is a separate independent national firm," that no firm is "responsible for the services or

---

[141] *In re Worldcom*, 2003 WL 21488087 *10 (quoting the complaint).

[142] *Nuevo Mundo*, 2004 WL 112948 *4 -*6.

[143] Cpt. ¶¶ 167-68.

activities of any other," and that GTI does not deliver services in its own name.[144] It cites *In re Lernout & Hauspie Securities Litigation,*[145] in which the court observed that the web page that plaintiffs relied upon to argue that KPMG International should be liable vicariously for the acts of KPMG UK, belied their claim, as it indicated the legal separateness of each firm.[146] In consequence, it declined to find that plaintiffs' sole allegation that "KPMG Int'l markets itself and all of its member firms as a single entity" sufficient to state a claim against it.[147]

GTI's reliance on the *Lernout & Hauspie* decision is misplaced, as the complaint here differs. First, plaintiffs do not claim that the agency relationship was based on apparent authority, viz., that GTI's advertisements are the basis for vicarious liability because of the appearance to a third party. Consequently, the fact that its press release stated that each firm is a separate legal entity does not necessarily undermine plaintiffs' claim that an actual agency relationship existed.

Second, the plaintiffs in *Lernout & Hauspie* relied only on allegations that defendants

---

144

        Grant Thornton International's Reply Memorandum of Law in Further Support of its Motion to Dismiss 8.

        GTI appends to its memorandum in support of its motion what it purports to be the full text of the press release cited by plaintiffs but does not attach them to any declaration or affidavit that identifies them as the true and correct copies of what they are supposed to be.

145

        230 F. Supp.2d 152 (D. Mass. 2002).

146

        *Id.* at 170.

147

        *Id.*

marketed themselves as a unified firm.[148]  Not so the complaint here, which alleges specific instances in which GTI acted in a manner consistent with an agency relationship. As noted in the Court's discussion of DTT's argument in this respect, the arguable inconsistency between GTI's alleged actions and its public statements is sufficient to overcome a motion to dismiss.

Plaintiffs sufficiently have alleged an agency relationship between GTI and GT-Italy. The Court consequently does not consider plaintiffs' alternative theories of vicarious and individual liability.

3.     GT-USA

a.     Agency and *Alter Ego*

Plaintiffs next claim that GTI was the *alter ego* of GT-USA and/or that GTI acted as its agent.[149]  They base these claims on their allegations that GT-USA is the largest of the Grant Thornton member firms, earned twenty-five percent of the global organization's revenue, and had access to the books and papers of other Grant Thornton firms. In other words, plaintiffs assert that GT-USA was the proverbial thousand pound gorilla, able to use its size to get what it wanted.

Assuming that GT-USA was large enough to have practical control over GTI – and

---

148

> *In re Lernout & Hauspie Sec. Litig.*, 230 F. Supp.2d at 170 ("The sole basis on which Plaintiffs rest their claim is the allegation that 'KPMG Int'l markets itself and all of its member firms as a single entity.'").

149

> *Id.* ¶ 1151; Tr. at 48-49.  The complaint alleges also that GT-USA was controlled by and was an agent of GTI.  *See* Cpt. ¶¶ 157-58. At oral argument, plaintiffs' counsel conceded that their allegation that GT-USA was controlled by GTI was a mistake and represented that they stand on their contention that GTI is the *alter ego* or agent of GT-USA. Tr. at 48-49.

the complaint does not indicate the relative size of GT-USA – standing alone, such an allegation is not sufficient to establish an *alter ego* relationship for the reasons discussed in respect of plaintiffs' claim of an *alter ego* relationship between DTT and Deloitte USA.[150]

Nor are there allegations from which an agency relationship could be inferred. Plaintiffs therefore have failed to state a claim against GT-USA on the basis that GTI was its agent or *alter ego*.[151]

F.      *Conclusion*

To sum up, plaintiffs' allegations with respect to GT-USA, Deloitte USA and Copeland are insufficient to state a claim against them on the theory that Deloitte Italy and GT-Italy were their agents or *alter egos*. As plaintiffs do not allege that these defendants committed any deceptive acts or made any material misrepresentations or omissions, primary liability cannot attach under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. On the other hand, plaintiffs have alleged sufficiently that an agency relationship existed between GTI and GT-Italy and DTT and its member firms that conducted the Parmalat audit. As principals, they would be responsible for the actions of their agents and the knowledge and, consequently *scienter,* of their agents is imputed to them. Plaintiffs therefore have alleged that GTI and DTT made materially false statements or

---

[150]

   *See supra* part III.D.3.a.

[151]

   Plaintiffs do not contend that GT-USA could be liable on the basis of its own actions and they do not allege any such actions here.

omitted a material fact in connection with the purchase and sale of securities with *scienter*.[152]

Having pled the first three elements of a claim under 10(b) – that defendants made material misrepresentations or omissions with *scienter* in connection with the purchase or sale of securities – the next issue is whether plaintiffs adequately allege causation.

### IV. Claims under Section 10(b) of the Exchange Act and Rule 10b-5: Causation

To plead causation sufficiently under Section 10(b) "a plaintiff must allege both transaction causation, *i.e.* that *but for* the fraudulent statement or omission, the plaintiff would not have entered into the transaction; and loss causation, *i.e.*, that the subject of the fraudulent statement or omission was the cause of the actual loss suffered."[153] DTT and GTI contend that the complaint is deficient in pleading both forms of causation.

### A. Transaction Causation

"[T]ransaction causation refers to the causal link between the defendant's misconduct and the plaintiff's decision to buy or sell securities. It is established simply by showing that, but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the

---

[152] *Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784, 497 N.Y.S.2d 898, 899 (1985); *Marine Midland Bank v. John E. Russo Produce Co.*, 50 N.Y.2d 31, 43, 427 N.Y.S.2d 961, 968 (1980).

[153] *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001); *see also Emergent Capital Inv. Mgmt, LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 196-97 (2d Cir. 2003) ("The causation element has two aspects, both of which must be alleged and proven: transaction causation and loss causation").

detrimental securities transaction."[154]  Here, plaintiffs contend that defendants' fraud artificially inflated the price of Parmalat securities and that they would not have bought Parmalat stock or bonds had they known of its true financial condition.[155]  While, they do not claim to have relied on particular misstatements or omissions, they argue that the complaint adequately alleges transaction causation for two reasons.  They are correct.

First, reliance for purposes of transaction causation may be presumed where, as here, defendants are alleged to have made material omissions.[156]  Insofar as the complaint turns on alleged omissions, this principle alone suffices to plead transaction causation.

Second, the fraud-on-the-market doctrine provides a rebuttable presumption that plaintiffs relied on defendants' misrepresentation or omissions pursuant to the theory that a company's securities prices in an open and efficient market are determined by all available information.[157] Consequently, "[m]isleading statements . . . defraud purchasers of stock even if the purchasers do not directly rely on the misstatements."[158]  Although generally discussed in terms of

---

154

*Emergent Capital Inv. Mgmt.*, 343 F.3d at 197.

155

Cpt. ¶ 1063.

156

*See Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 539 (2d Cir. 1999) ("Reliance can be presumed in some cases of omission or non-disclosure, but only where the defendant has misrepresented or omitted a material fact[.]") (internal quotation marks and citations omitted); *accord Simon De Bartolo Grp., L.P. v. Richard E. Jacobs Grp., Inc.*, 186 F.3d 157, 173 (2d Cir. 1999).

157

*Hevesi v. Citigroup, Inc.*, 366 F.3d 70, 77 (2d Cir. 2004).

158

*Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988) (quoting *Peil v. Speiser*, 806 F.2d 1154, 1160-61 (3d Cir. 1986)); *see also id.* at 247 ("Because most publicly available

misrepresentations, the reasoning applies equally to instances of alleged market manipulation or other schemes to defraud.[159]

To obtain the benefit of this presumption, plaintiffs first must allege that the relevant market was open and developed or, in other words, efficient. An open market is "one in which anyone, or at least a large number of persons, can buy or sell."[160] A developed market is "one which has a relatively high level or activity and frequency, and for which trading information (e.g. price and volume) is widely available."[161] Whether a market is open and developed often is a question of fact.[162]

---

information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action.")

[159]

*See* 4 ALAN R. BROMBERG & LEWIS D. LOWENFELS, BROMBERG & LOWENFELS ON SECURITIES & COMMODITIES FRAUD § 7:469 (2d ed. 2003) (noting that the Supreme Court's decision in *Basic* made no distinction between the clauses of Rule 10b-5).

[160]

*Id.* § 7:484.

[161]

*Id. But see Cromer Finance Ltd. v. Berger*, 205 F.R.D. 113, 130 (S.D.N.Y. 2001) (noting that the issue is not whether the market "be 'opened' and 'developed' *per se*, but that those features are typical of markets where share price 'reflects all publicly available information and, hence, any material misrepresentations.'") (quoting *Basic*, 485 U.S. at 246)).

[162]

*In re Laser Arms Corp. Securities Litig.*, 794 F. Supp. 475, 490 (S.D.N.Y. 1989), *aff'd*, 969 F.2d 15 (2d Cir. 1992).

Courts considering the issue have looked to several factors, including:

"(1) a large weekly trading volume; (2) the existence of a significant number of analyst reports; (3) the existence of market makers and arbitrageurs in the security; (4) the eligibility of the company to file an S-3 registration statement; and (5) a history of immediate movement of the stock price caused by unexpected corporate events or financial releases." *In re Public Offering Securities Litig.*, 227 F.R.D. 65, 207 n. 323 (S.D.N.Y. 2004) (citing *Cammer v. Bloom*, 711 F. Supp. 1264, 1276 (D.N.J. 1989)); *id.* (citing cases).

Plaintiffs allege that there was an efficient worldwide market for Parmalat securities.[163] They claim that Parmalat securities traded actively on several markets, including the Luxembourg, Milan and Uruguayan stock exchanges.[164] Parmalat common stock was traded in the over-the-counter market in the United States, but plaintiffs do not indicate the volume of such trades.[165] There was also an active market in American Depository Receipts, each of which represented a proportional interest in twenty shares of Parmalat common stock.[166] Parmalat made regular reports to the Italian securities regulators,[167] information about the company was available

---

[163]

Cpt. ¶¶ 57, 1064.

[164]

*Id.* ¶ 8.

[165]

*Id.* ¶ 59.

[166]

*Id.*

An American Depository Receipt ("ADR")

"is a receipt that is issued by a depositary bank that represents a specified amount of a foreign security that has been deposited with a foreign branch or agent of the depositary, known as the custodian. . . . ADRs are tradeable in the same manner as any other registered American security, may be listed on any of the major exchanges in the United States or traded over the counter, and are subject to the Securities Act and the Exchange Act." *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 367 (3d Cir. 2002) (internal citations omitted).

[167]

Cpt. ¶ 1064.

widely,[168] and securities analysts followed and reported on Parmalat.[169]

Defendants respond that the allegations "cover many different types of securities, including new issues . . . , issues denominated in numerous currencies . . . , and private placements"[170] and that the fraud-on-the-market theory therefore is inapplicable.[171]

Although plaintiffs have pleaded that some of the misrepresentations occurred in connection with private placements,[172] that does not undermine their claims against GTI, DTT and their Italian affiliates based on publicly traded securities. These defendants are alleged to have made misstatements in annual and semi-annual audit reports. In this context, the reliance presumed by the doctrine of the fraud-on-the-market is especially appropriate, as it is difficult to imagine that the markets would not have moved on the basis of reports by Parmalat's independent auditors.[173]

---

[168]

E.g. id. ¶ 450 (Report on Parmalat's pre-tax profit and planned acquisition of a rival in Bloomberg News); ¶ 454 (Report on Parmalat on Dow Jones Newswire); ¶¶ 443-752 (citing news reports about Parmalat and offering memoranda, press releases and financial reports from Parmalat); ¶ 1064 (noting 5,330 major articles on Parmalat during the Class Period).

[169]

Id. ¶¶ 403, 733, 1064.

[170]

DTT Mem. 15. GTI incorporates DTT's arguments in respect of causation.

[171]

They argue also that plaintiffs cannot rely on the fraud-on-the-market theory as they did not make any misrepresentations. As plaintiffs have alleged adequately that their agents made the statements at issue, however, GTI and DTT may be subject to liability for those statements.

[172]

See, e.g., Cpt. ¶¶ 608-09.

[173]

See Basic, 485 U.S. at 246 (noting that the presumption of reliability is based on common sense and probability); Cromer Finance, Ltd., 130 F.R.D. at 131 (finding presumption of reliance where it would was hard to imagine that an investor would buy a stock without relying on the auditor's opinion of the net asset value per share).

Moreover, defendants do not explain why the fact that securities were denominated in several currencies would undermine plaintiffs' reliance on the fraud-on-the-market theory. Plaintiffs have alleged sufficient facts to invoke the presumption of reliance at this stage with respect of these defendants. They therefore have pleaded transaction causation sufficiently.[174] Whether they later will succeed in proving the applicability of the fraud-on-the-market theory must abide that event.

B.      *Loss Causation*

Loss causation is the requirement that a plaintiff allege that the "defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss."[175] "To plead loss causation, the complaint must allege facts that support an inference that [the defendant's] misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent

---

In *United States v. Arthur Young & Co.*, 464 U.S. 805 (1984), the Supreme Court explained the importance of an auditor's opinion to the financial markets:

"The inclusion in an audited financial statement of anything less than an unqualified opinion could send signals to stockholders, creditors, potential investors, and others that the independent auditor has been unable to give the corporation an unqualified bill of financial health. Such a public auditor's opinion could well have serious consequences for the corporation and its shareholders." *Id.* at 819 n.14.

[174]

*E.g.*, *In re Laser Arms Corp. Sec. Litig.*, 794 F. Supp. 475, 490 (S.D.N.Y. 1989) (allegations that shares traded in the over the counter market sufficient to raise an issue of fact as to efficiency of market), *aff'd,* 969 F.2d 15 (2d Cir. 1992); *Cf. Reingold v. Deloitte Haskins & Sells*, 599 F. Supp. 1241, 1264 (S.D.N.Y. 1984) (whether ADRs traded in an efficient market question of fact that cannot be resolved on motion to dismiss).

[175]

*Dura Pharmaceuticals, Inc. v. Broudo*, 125 S.Ct. 1627, 1633 (2005); *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 175 (2d Cir. 2005).

the fraud."[176]  In short, "the damages suffered by plaintiff must be a foreseeable consequence of any misrepresentation or material omission."[177]

DTT and GTI assert the plaintiffs have failed to plead loss causation because they do not allege that any misrepresentation by them was the proximate cause of the decline in value of the price of Parmalat securities or that a corrective disclosure about their prior misrepresentations caused the company's collapse.[178]  They contend that their role in the alleged fraud came to light only after the price of Parmalat stock plummeted and, in consequence, that plaintiffs have not pleaded loss causation.

An allegation that a corrective disclosure caused the plaintiff's loss may be sufficient to satisfy the loss causation requirement.[179]  It is not, however, necessary.  In *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*,[180] the Second Circuit held that an allegation that the defendant's misrepresentation concealed the subject that caused the loss was sufficient because the loss was foreseeable.  Plaintiffs there alleged that the defendants' misrepresentations about the past business problems of Mallick, the company's principal, led them to regard Mallick as capable of managing

---

[176]

> *Lentell*, 396 F.3d at 175.

[177]

> *Emergent Capital Investment Mgmt*, 343 F.3d at 197.

[178]

> DTT Mem. 15.

[179]

> *See Lentell*, 396 F.3d at 175 &  n.4.

[180]

>  250 F.3d 87 (2d Cir. 2001).

the complex debt loads of the venture.[181]  They alleged further that Mallick ultimately was unable to do so and that the venture consequently suffered a liquidity crisis which left its stock worthless.[182]  The Second Circuit held that this was a sufficient allegation of loss causation because it was foreseeable that "Mallick's concealed lack of skill would cause the company's eventual liquidity problems."[183]

This reasoning was reaffirmed and expanded upon in *Lentell v. Merrill Lynch & Co.*[184]  The court there concluded that plaintiffs had failed to plead loss causation because they did "not allege that the subject of those false recommendations (that investors should buy or accumulate 24/7 Media and Interliant stock), or any corrective disclosure regarding the falsity of those recommendations, is the cause of the *decline* in stock value that plaintiffs claim as their loss."[185]  The use of the word "or" indicates that a corrective disclosure is not necessary where, as here, plaintiffs allege that the subject of the misrepresentations and omissions caused their loss.

The complaint here avers that defendants, through their agents, Deloitte Italy and GT-Italy, misrepresented that the financial statements of Parmalat and its subsidiaries were accurate and

---

[181]

    *Id.* at 96.

[182]

    *Id.* at 94.

[183]

    *Id.* at 98.

[184]

    396 F.3d 161 (2d Cir. 2005); *see also Emergent Capital Inv. Mgmt.*, 343 F.3d at 198 (explaining that the allegation of loss causation was adequate in *Suez Equity Investors* because plaintiffs "specifically asserted a causal connection between the concealed information – *i.e.*, the executive's history – and the ultimate failure of the venture").

[185]

    396 F.3d at 175 (emphasis in original).

complete[186] when, in fact, they significantly understated the company's debt and overstated its

revenue and net assets.[187]   Plaintiffs cite a number of particular misrepresentations, but one will

suffice to illustrate that their allegations of loss causation are adequate.

On April 11, 2002, Deloitte Italy issued two audit reports, both signed by Adolfo

Mamoli, on Parmalat's financial statements.[188]   The reports certified that the financial statements

fairly presented the financial position of Parmalat and the Parmalat group as of December 31, 2001.

Plaintiffs contend that these statements in fact overstated its consolidated shareholder equity by more

than €8 billion and overstated a consolidated of EBITDA[189] of approximately €948 million by at

least €538 million.[190]

Among the risks concealed by these reports was that Parmalat had massive

---

[186]

       *E.g.* Cpt. ¶ 465 (Audit report certifying Parmalat's financial statements for financial year ended 1998 signed by GT-Italy dated May 13, 1999), ¶ 486 (Audit report dated October 15, 1999 signed by GT-Italy certifying Parmalat's financial statements for the last six months) ¶ 514 (Two reports dated May 10, 2000 signed by Mamoli of Deloitte Italy and reporting on the 1999 financial data on Parmalat and the Parmalat group), ¶ 570 (Report dated April 13, 2001 certifying Parmalat's year 2000 consolidated financial statements signed by Mamoli of Deloitte Italy), ¶ 594 (Deloitte Italy's Auditors' Review Report of Parmalat's interim financial information for the period ending June 30, 2001), ¶ 620 (Deloitte Italy's Auditor's Review Report for financial statements as of December 31, 2001); ¶ 646 (Deloitte Italy's Auditor's Review Report on Parmalat's interim financial information for the period ending June 30, 2002 signed by Mamoli) ¶ 684 (Two reports dated April 14, 2003 and signed by Deloitte Italy partner Guiseppe Rovelli certifying the accuracy of Parmalat's 2002 financial statements).

[187]

       *E.g.*, *id.* ¶¶ 469-472, 772-73.

[188]

       *Id.* ¶ 620.

[189]

       "EBITDA" stands for earnings before interest, taxes, depreciation and amortization.

[190]

       Cpt. ¶ 626.

undisclosed debt and was unable to service it. Defendants reasonably could have foreseen that Parmalat's inability to service its debt would lead to a financial collapse. The concealed risk materialized when Parmalat suffered a liquidity crisis on December 8, 2003 and was unable to pay bonds as they came due.[191] Italian regulators suspended trading in Parmalat securities in Italy. The next day, Parmalat announced that it would have to delay repayment on maturing bonds.[192] The prices of Parmalat stock dropped sharply on the Luxembourg exchange.[193] When trading in Parmalat stock resumed in Italy on December 11, 2003, Parmalat shares lost almost one-half of their value.[194] The value of its bonds dropped rapidly and Standard & Poor's dropped its rating to double C, at the low end of investment grade.[195] That the true extent the fraud was not revealed to the public until February – after Parmalat shares were worthless and after the close of the Class Period – is immaterial where, as here, the risk allegedly concealed by defendants materialized during that time and arguably caused the decline in shareholder and bondholder value.

### V.   Section 20(a): Control Person Liability

Plaintiffs claim that Copeland, DTT, Deloitte & Touche LLP, GTI, and GT-USA are

---

[191]

     *Id.* ¶ 754-57.

[192]

     *Id.* ¶ 757.

[193]

     *Id.* ¶ 759.

[194]

     *Id.*

[195]

     *Id.*

liable as controlling persons under Section 20(a) of the Exchange Act, which provides that

> "Every person who, directly or indirectly, controls any person liable under any provision of this chapter . . . shall also be liable jointly and severally with and to the same extent as such controlled person to any person whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."[196]

The elements of a claim under Section 20(a) include both a primary violation and control over the primary violator. Defendants contend that plaintiffs must allege also culpable participation by the control person.

A.      *Pleading Culpable Participation Is Not Required*

The Second Circuit has not addressed the question whether a plaintiff must allege culpable participation in order to state a legally sufficient claim under Section 20(a).[197] As this Court recently noted, whether culpable participation must be pleaded as well as proven "is an interesting question on which courts, both within and outside this circuit are deeply divided."[198]

---

[196]

15 U.S.C. § 78t(a).

[197]

The Second Circuit cases that substantively address Section 20(a) all relate to the required elements to establish a prima facie case. These are: (1) primary violation, (2) defendant's control over primary violator, and (3) culpable participation by controlling person in the primary violation. *E.g., Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir. 1998); *First Jersey Sec., Inc.,* 101 F.3d at 1472.

[198]

*In re NTL, Inc. Securities Litig.,* 347 F. Supp.2d 15, 37 (S.D.N.Y. 2004) (comparing *Harrison v. Dean Witter Reynolds, Inc.,* 974 F.2d 873, 881 (7th Cir. 1992); *Metge v. Baehler,* 762 F.2d 621, 631 (8th Cir. 1985), *cert. denied sub nom, Metge v. Bankers Trust Co.,* 474 U.S. 1057 (1986); *Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1575 n.24 (9th Cir. 1990); *Brown v. Enstar Group, Inc.,* 84 F.3d 393, 396 (11th Cir. 1996); *In re IPO.,* 241 F. Supp.2d at 392-97; *In re Interpublic Sec. Litig.,* 2003 WL 21250682, at *15; *In re WorldCom, Inc. Sec. Litig.,* No. 02 Civ. 3288 (DLC), 2003 WL 21219049, at *18-20

This question is one of statutory interpretation. The starting point therefore must be the plain language of the text.[199]

In this case, the statutory language is clear upon its face. An individual who controls another is liable for the primary violation of the controlled person *unless* the controlling person acted in good faith and did not induce the cause of action. The interpretation most consistent with the text is that the defendant bears the burden of establishing good faith and lack of inducement, not that the plaintiff must allege the opposite in its pleadings.[200] It accords also with the purpose of Section 20(a) which, as the Second Circuit observed, was enacted "to expand, rather than restrict, the scope of liability."[201]

Nor are the Second Circuit cases inconsistent with the conclusion that plaintiff is not required to allege culpable participation. In one line of cases, beginning with *Marbury Management,*

---

(S.D.N.Y. May 19, 2003); *Neubauer v. Eva-Health USA, Inc.,* 158 F.R.D. 281, 284 (S.D.N.Y. 1994); *with Rochez Bros. v. Rhoades,* 527 F.2d 880, 890-91 (3d Cir. 1975); *Carpenter v. Harris, Upham & Co.,* 594 F.2d 388, 394 (4th Cir. 1979); *In re Globalstar Sec. Litig.,* No. 01 Civ. 1748 (SHS), 2003 WL 22953163, at *12 (S.D.N.Y. Dec. 15, 2003); *In re Oxford Health Plans, Inc.* 187 F.R.D. 133,142 (S.D.N.Y. 1999); *In re Livent, Inc. Sec. Litig.,* 78 F. Supp.2d 194, 222 (S.D.N.Y. 1999)).

[199]

*In re Renshaw,* 222 F.3d 82, 88 (2d Cir. 2000).

[200]

*See* Bradford R. Turner, Brown v. Enstar Group, Inc.: *The Eleventh Circuit Opens the Door for Expansive Controlling Person Liability Under the 1933 and 1934 Securities Acts,* 32 GA. L. REV. 323, 346-47 (1997) ("The illogical result created by the [requirement that the plaintiff prove culpable participation] is that once a plaintiff has proven culpable participation, a defendant cannot conceivably prove good faith or lack of inducement.").

[201]

*SEC v. Management Dynamics, Inc.,* 515 F.2d 801, 812 (2d Cir. 1975); 9 LOUIS LOSS & JOEL SELIGMAN, SECURITIES REGULATION 4458 (3d ed. 2004).

*Inc. v. Kohn*,[202] the Court laid out the burden shifting aspect of Section 20(a) when it held that once

plaintiff had established control, the burden of proving good faith shifted to the defendant.[203] While

*Lanza v. Drexel & Co.*,[204] *SEC v. First Jersey Securities, Inc.*[205] and their progeny are relied upon by

those district courts in this Circuit that have required the pleading of culpable participation, these

cases are consistent with the burden shifting element of *Marbury Management*.[206]

In *Lanza*, the Second Circuit stated that "[t]he intent of Congress in adding [Section

20(a)] . . . was obviously to impose liability only on those directors . . . who are in some meaningful

sense culpable participants in the fraud perpetrated by controlling persons."[207]  This statement has

no bearing on the question of pleading culpable participation.  It merely reiterates that an individual

must culpably have participated in the fraud in order ultimately to be held liable, a requirement that

would be satisfied by the failure of a control person to establish the statutory good faith defense.

---

[202]

629 F.2d 705 (2d Cir. 1980).

[203]

*Id.* at 716 ("where . . . the erring salesman completes the transaction through the employing brokerage house and the brokerage house receives a commission on the transactions, the burden of proving good faith is shifted to the brokerage house."); *see also In re Citisource, Inc. Sec. Litig.,* 694 F. Supp. 1069, 1076 (S.D.N.Y.1988) ("the burden is on the defendant to show that he is not culpable, rather than on the plaintiff to show that the defendant is culpable").

[204]

479 F.2d 1277 (2d Cir. 1973).

[205]

101 F.2d 1450 (2d Cir. 1996).

[206]

Moreover, it is telling that neither *First Jersey* nor any of the following Second Circuit cases has overruled those cases that have omitted culpable participation as a pleading requirement. Instead, *First Jersey* specifically relied on *Marbury Management* throughout the Court's discussion of Section 20(a) liability.

[207]

*Lanza,* 479 F.2d at 1299.

In *First Jersey*, the Second Circuit went a step further and said that culpable participation is an element in proving a *prima facie* case of control person liability, which of course seems to support defendants' argument.[208] Having given with one hand, however, the *First Jersey* panel took away with the other. It then restated the burden shifting approach of *Marbury Management*, explaining "[o]nce the plaintiff makes out a *prima facie* case of § 20(a) liability, the burden shifts to the defendant to show that he acted in good faith, and that he did not . . . induce the act or acts constituting the violation."[209] As another court has stated in reference to this passage, the Second Circuit there "essentially rendered the culpable participation requirement meaningless."[210] Another way to put the same point would be to say that the broad language to the effect that culpable participation is an element of a Section 20(a) plaintiff's *prima facie* case was a loosely stated *dictum*.

Since *First Jersey,* the Second Circuit has addressed Section 20(a) liability, albeit briefly, in four cases.[211] At no point has the Second Circuit applied *First Jersey* to conclude that culpable participation must be pleaded to state a legally sufficient Section 20(a) claim. Nor has it overruled *Marbury Management*.[212] *Suez Equity Investors* is the only decision that substantively

---

[208]

    *First Jersey Sec. Inc.,* 101 F.3d at 1472-73.

[209]

    *Id.* at 1473 (internal quotations and citations omitted).

[210]

    *In re Initial Public Offering Sec. Litig.,* 241 F. Supp.2d at 395.

[211]

    *See Boguslavsky,* 159 F.3d at 720; *Suez Equity Investors,* 250 F.3d at 101; *In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 77-78 (2d Cir. 2001); *Ganino v. Citizens Utility Co.,* 228 F.3d 154, 170-71 (2d Cir. 2000).

[212]

    Three of these cases did not substantively address Section 20(a). In both *Ganino* and *In re Scholastic Corporation Securities Litigation*, the Second Circuit reinstated the Section 20(a) claim after finding adequate pleading of a primary violation and without addressing

addressed the pleading requirements, and it supports the view that alleging culpable participation is not required. The Second Circuit there held that plaintiffs had alleged control person liability adequately without any discussion of culpable participation.[213]

In sum, if the Second Circuit had held that a Section 20(a) claim is insufficient absent an allegation of culpable participation, this Court of course would follow it. But it has not. With the plain language of the statute unambiguous, this Court holds that plaintiffs state a legally sufficient claim under this statute if they plead (1) a primary violation by a controlled person and (2) control of the primary violator by the defendant.

B.    *Control*

Defendants do not dispute that plaintiffs have alleged primary violations by GT-Italy and Deloitte Italy. They contend, however, that plaintiffs do not sufficiently allege control.[214] "Control over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through

_____

the pleading requirements. *Ganino,* 228 F.3d at 170-71; *In re Scholastic Corp. Sec. Litig.,* 252 F.3d at 77-78. In *Boguslavsky*, the issue was whether the plaintiff's claim of control person liability was barred by collateral estoppel. While the Court reiterated the *First Jersey* elements of a prima facie case, it did not extend this discussion to the context of pleadings. *Boguslavsky,* 159 F.3d at 720-21.

[213]

*Suez Equity Investors,* 250 F.3d at 101 ("[w]hile somewhat broad, [the allegation that defendant was an officer of the bank and had primary responsibility for the actions of the other corporate defendants] is sufficient to plead controlling person liability.").

[214]

DTT Mem. 20; GTI Mem. 17.

the ownership of voting securities, by contract, or otherwise.'"[215] The remaining question therefore is whether the facts alleged by plaintiffs would permit a conclusion of control by this standard.

1.    *GTI, DTT, & James Copeland*

As noted, plaintiffs have pleaded adequately that DTT and GTI were principals that controlled their respective agents, Deloitte Italy and GT-Italy. They therefore state a sufficient control person claim in respect of those two defendants.[216] Although a defendant ultimately may not be held liable as both a primary violator and a controlling person,[217] such alternative theories of liability are permissible here.[218]

Plaintiffs allege that Copeland was the chief executive officer of DTT and his alleged role in resolving disputes in respect of the Parmalat auditors. It could be inferred from these facts that he had actual control over the primary violators.[219] Plaintiffs therefore have stated a claim under

---

[215]

*First Jersey Sec. Inc.,* 101 F.3d at 1472-73 (quoting 17 C.F.R. § 240.12b-2 and adopting this standard for a Section 20(a) claim).

[216]

*E.g. id.* at 1472 (upholding control person liability for principal of broker-dealer).

[217]

*See In re Scholastic Corp. Securities Litig.*, 252 F.3d 63, 77 (2d Cir. 2001); *In re Globalstar Securities Litig.*, No. 01 Civ. 1748 (SHS), 2002 WL 22953163 * 13 (Dec. 15, 2003) (citing *Suez Equity Investors*, 250 F.3d at 101)).

[218]

FED. R. CIV. P. 8(e)(2).

[219]

*See Dietrich v. Bauer*, 76 F. Supp.2d 312, 335 (S.D.N.Y. 1999) (control may be inferred from positions as owner and president of company); *Food & Allied Service Trades Dep't, AFL-CIO v. Millfeld Trading,* 841 F. Supp. 1386, 1391 (S.D.N.Y. 1994) (status as treasurer and chief financial officer suggest control over financial reporting); *cf. Suez Equity Investors,* 250 F.3d at 101 (an allegation that defendant was an officer of the bank and had

Section 20(a) against Copeland.

2.     *Deloitte & Touche LLP and GT-USA*

Plaintiffs assert that Deloitte & Touche LLP[220] and GT-USA controlled DTT and GTI respectively.  Specifically, they contend that Deloitte & Touche LLP and DTT had overlapping chief executive and financial officers, the top executives of Deloitte & Touche LLP traditionally ran both organizations, and Deloitte & Touche LLP's relative size among member firms gave it practical control of DTT.[221]   They claim that GT-USA controlled GTI by virtue of its size within the organization,[222] the unified structure of the of the international accounting organization and the contractual relationships among member firms.[223]  Both GT-USA and Deloitte & Touche LLP are alleged also to have had access to all the books and papers of the member firms, presumably including those in Italy.

Plaintiffs' allegations that the top executives of Deloitte & Touche LLP held the top two positions at DTT and that at least one of those executives was involved in the Parmalat audit are

---

[220]     primary responsibility for the actions of the other corporate defendants is sufficient to plead controlling person liability.).

[221]     Plaintiffs only bring this claim against Deloitte & Touche LLP, the auditing arm of Deloitte & Touche USA LLP.

[222]     Cpt. ¶¶ 136, 151-53, 1132.

[223]     GT-USA earned twenty-five percent of the fees generated by the global organization. *Id.* ¶ 161.

*Id.* ¶ 1151.

sufficient to give rise to an inference of control. Plaintiffs' claim in respect of GT-USA, however, falls short. The only non-conclusory allegations of control are that of relative size and GT-USA's access to member firms' books and records. Although relative size may indicate control,[224] it is not sufficient where, as here, plaintiffs do not allege that this size gave it voting control or even considerable influence.[225] Moreover, the right to access another firm's books and records, without more, does not suggest any concomitant right to control that firm in respect to the transaction in question.[226] Plaintiffs consequently have not stated a claim against GT-USA under Section 20(a).

## VI. Rule 8

Defendants move also to dismiss the complaint under Rules 8(a)(2) and (e)(1), asserting that, at 368 pages and 1,249 paragraphs, it is too long and confusing.

The Court is in substantial sympathy with defendants. The requirement of pleading fraud with particularity does not justify a complaint longer than some of the greatest works of

---

[224]

    *Cf. Effenbein v. Gulf & Western Indus. Inc.*, 590 F.2d 445, 451 (2d Cir. 1978) ("It is true that, as a practical matter, ownership of [twenty-seven percent] of a corporation's stock may, in many circumstances, be equated with control over that corporation.").

[225]

    *E.g.*, *Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp.2d 429, 458-59 (S.D.N.Y. 2005) (ownership of thirty percent of a company's shares and power to appoint three members to the board not sufficient to allege control).

[226]

    Plaintiffs rely on *Teachers' Retirement System v. A.C.L.N. Ltd.*, No. 01 Civ. 11814 (MP) 2003 WL 21058090 (S.D.N.Y. May 15, 2003), to argue that allegations that an international organization that ensures quality control and has stringent conditions of membership raises an inference of control sufficient to survive a motion to dismiss. *Id.* at *12. But this case is not relevant to the question of whether GT-USA may be said to have controlled GTI.

literature.  A complaint of this length, indeed, is an undue imposition on all who are obliged to read it.  Nevertheless, a dismissal under Rule 8 "is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised."[227]  Although plaintiffs' submission is lengthy, it does not "overwhelm the defendants' ability to understand or to mount a defense."[228]  It will not be dismissed under Rule 8.

---

[227]  *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988)

[228]  *Wynder v. McMahon*, 360 F.3d 73, 80 (2d Cir. 2004).

*VII.  Conclusion*

For the foregoing reasons, the auditor defendants' motions to dismiss are disposed of as follows:

1.  The motions of Deloitte Touche Tohmatsu [docket item 226] and Grant Thornton International [docket item 211] to dismiss are denied.

2.  The motion of Deloitte & Touche USA LLP and Deloitte & Touche LLP to dismiss [docket item 293], to the extent that counts IV and V assert claims against them under Section 10(b) of the Exchange Act and Rule 10b-5, is granted and is denied in all other respects.

3.  Grant Thornton LLP's motion to dismiss as to it [docket item 217] is granted.

4.  James E. Copeland's motion to dismiss [docket item 224], to the extent that count IV asserts a claim against him under Section 10(b) of the Exchange Act and Rule 10b-5, is granted and is denied in all other respects.

As it is not clear that plaintiffs could not allege facts that would render sufficient the claims that this Court has found wanting, plaintiffs are granted leave to amend the complaint on of before August 8, 2005 in a final effort to do so.  Should they amend, they shall serve and provide the Court with a red- or black-lined copy of the new pleading.  They are reminded in regard to any amendment that brevity is the soul of wit.

SO ORDERED.

Dated: June 28, 2005

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)