UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re PARMALAT SECURITIES LITIGATION

This document relates to:   04 Civ. 0030

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MASTER DOCKET
04 MD 1653 (LAK)

# OPINION

Appearances:

James J. Sabella, Stuart M. Grant, John C. Kairis, Diane Zilka
GRANT & EISENHOFER P.A.

Steven J. Toll, Catherine A. Torell, Mark S. Willis,
Julie Goldsmith Reiser, Joshua S. Devore
COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.

*Attorneys for Plaintiffs*

George A. Schieren, Mark A. Kirsch, Mark Holland,
Jeff E. Butler, David Cook
CLIFFORD CHANCE US LLP
*Attorneys for the Citigroup Defendants*

Joseph B. Tompkins, Jr., A. Robert Pietrzak, Thomas McC.
Souther, Daniel A. McLaughlin, Alan C. Geolot, Mark P. Guerrera
SIDLEY AUSTIN BROWN & WOOD LLP
*Attorneys for the Bank of America Defendants*

Michael S. Feldberg, Todd S. Fishman, Kelly A. Berkell
ALLEN & OVERY LLP
*Attorneys for Defendant Credit Suisse First Boston*

Howard A. Ellins, Nancy B. Ludmerer, Antoinette G. Ellison
DAVIS POLK & WARDWELL
*Attorneys for Defendant Banca Nazionale del Lavoro S.p.A.*

# Table of Contents

I.   The Complaint and the Motions to Dismiss ................................... 1

    A.     Citigroup ....................................................... 2

        1.    Factual Allegations ........................................ 2

            a.    Securitization of Invoices ............................. 2

            b.    The Geslat / Buconero Arrangement ...................... 5

            c.    Parmalat Canada Arrangement .......................... 9

        2.    Causes of Action, Grounds for Motion to Dismiss ................. 10

    B.     Bank of America ................................................. 11

        1.    Factual Allegations ........................................ 11

            a.    The Parmalat Administracao Private Placement ............. 11

            b.    Loans Backed by Funds Raised Through Private Placements ... 14

        2.    Causes of Action, Grounds for Motions to Dismiss ................. 15

    C.    Banca Nazionale del Lavoro ....................................... 16

        1.    Factual Allegations ........................................ 16

        2.    Causes of Action, Grounds for Motion to Dismiss ................. 19

    D.    Credit Suisse First Boston ....................................... 19

        1.    Factual Allegations ........................................ 19

        2.    Cause of Action, Grounds for Motion to Dismiss ................. 21

II.   12(b)(6) Motions to Dismiss ............................................ 21

III.   Pleading a Violation of Rule 10b-5 ...................................... 22

    A.    *Scienter* ...................................................... 22

    B.    Rule 10b-5(b): Misrepresentations and Omissions ....................... 23

    C.    Rule 10b-5(a) and (c): Deceptive and Manipulative Acts and Devices ....... 24

IV.   Primary Liability Versus Liability for Aiding and Abetting ...................... 26

    A.    Rule 10b-5 Liability for Outside Financial Institutions Prior to *Central Bank* .. 27

        1.    Confusion Between Primary and Aiding and Abetting Liability ....... 29

        2.    Aiding and Abetting Liability for Lenders that Facilitate Fraud ....... 32

        3.    Most Cases Did Not Focus on the Distinction Among the Subsections of Rule 10b-5 ........................................... 34

    B.    The *Central Bank* Decision ........................................ 36

    C.    Liability for Outside Financial Institutions After *Central Bank* ............. 38

V.   Sufficiency of the Section 10(b) Claims .................................... 45

    A.    Allegations Regarding Structuring and Participating in Transactions ........ 46

        1.    Violation of Rule 10b-5(a) and (c) ............................. 46

            a.    Securitization and Factoring of Invoices ................... 47

            b.    Other Transactions that Resulted in Mischaracterization of Debt ................................................. 48

        c.     The CSFB Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>49</u>

    2.     Effect on Market for Securities or Connection with Their Purchase and Sale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>50</u>

    3.     *Scienter* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>50</u>

    4.     Causation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>53</u>

         a.     Transaction Causation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>54</u>

         b.     Loss Causation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>58</u>

    5.     Subject Matter Jurisdiction over Claims Against BNL and CSFB . . . . . <u>59</u>

  B.     Alleged Misstatements and Omissions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>62</u>

    1.     The Geslat / Buconero Press Release Allegedly "Approved" by Citigroup . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>63</u>

    2.     The Parmalat Administracao Press Release Allegedly Co-Written by BoA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>65</u>

    3.     Misrepresentations and Omissions by BoA in Connection with Loans and Private Placements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>67</u>

VI.   Section 20(a) Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>68</u>

  A.     Pleading a Violation of Section 20(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>68</u>

  B.     Sufficiency of the Allegations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>69</u>

VII.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>71</u>

LEWIS A. KAPLAN, *District Judge*.

The plaintiffs in these consolidated class actions were investors in the securities of the international dairy conglomerate Parmalat Finanziaria S.p.A. and subsidiaries and affiliates (collectively "Parmalat"). They allege that Parmalat's officers, directors, accountants, lawyers, and banks made representations and structured transactions that operated to defraud Parmalat's investors in violation of Sections 10(b)[1] and 20(a)[2] of the Securities Exchange Act of 1934 and Rule 10b-5[3] thereunder.

This opinion addresses the motions of the defendant banks to dismiss the actions as to them pursuant to Rules 12(b) and 9(b) of the Federal Rules of Civil Procedure. They require consideration of, among other issues, the contours of subsections (a) and (c) of Rule 10b-5, which prohibit "any device, scheme, or artifice to defraud" and "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person" in connection with the purchase or sale of any security.

## I. The Complaint and the Motions to Dismiss

As described in an earlier opinion,[4] the plaintiffs purport to represent classes of persons who purchased Parmalat securities from January 5, 1999 to December 18, 2003 (the "Class

---

[1]  15 U.S.C. § 78j(b).

[2]  *Id.* § 78t(a).

[3]  17 C.F.R. § 240.10b-5.

[4]  *In re Parmalat Sec. Litig*, No. 04 MD 1653 (LAK), 2005 WL 1527674 (S.D.N.Y. June 28, 2005) ("*Parmalat I*").

Period.").[5] The 368-page amended consolidated complaint details various fraudulent acts allegedly perpetrated by Parmalat and the defendants.

A.      Citigroup

        1.      Factual Allegations

        Citigroup Inc. and Citibank, N.A. ("Citibank"), and their subsidiaries and affiliates (collectively "Citigroup"), are alleged "knowingly and actively [to have] participated in the fraudulent scheme" and to have had "intimate knowledge" of Parmalat's finances through its "close relationship with its important client" and its "direct participation in the fraudulent activities."[6] The complaint describes three specific arrangements involving Citigroup.

                a.      Securitization of Invoices

        The first involved Citigroup's purchase and securitization of allegedly worthless invoices.[7]

---

[5]
     The plaintiffs are (a) Hermes Focus Asset Management Europe, Ltd. ("HFAME"), a British fund management company owned 51 percent by the BT Pension Scheme, a United Kingdom corporate pension fund, and 49 percent by Hermes Focus Asset Management, Ltd., (b) Hermes European Focus Fund I, a limited partnership of which the general partner is HFAME, (c) Hermes European Focus Fund II, a limited partnership of which the general partner is HFAME, (d) Hermes European Focus Fund III, a limited partnership of which the general partner is HFAME and the limited partner is California Public Employees Retirement System, (e) Cattolica Partecipazioni S.p.A., (f) Capital & Finance Asset Management S.A., (g) Societe Moderne des Terrassements Parisiens, (h) Solotrat S.A., (i) Laura J. Sturaitis, a United States citizen, and Arch Angelus Sturaitis, a permanent United States resident alien, as joint tenants with right of survivorship, and (j) Paolo Bianco, a United States citizen.

[6]
     First Am. Consol. Class Action Cpt. ("Cpt.") ¶¶ 784, 786-87.

[7]
     Id. ¶ 20.

Under agreements entered into in 1995, 1999, 2000, and 2001, invoices for goods sold by various Parmalat subsidiaries were purchased by defendant Eureka Securitisation plc ("Eureka"), a Citigroup affiliate, as well as by Eureka's wholly-owned Italian subsidiary, Archimede Securitization S.r.l. ("Archimede"). Archimede and Eureka then sold commercial paper secured by the invoices.[8] This securitization alone would appear to have been neither unusual nor deceptive.

The deception allegedly stemmed from Parmalat's billing system, under which many of the invoices were in effect duplicates that did not represent anything actually due. Parmalat supplied supermarkets and other retailers through a network of wholesale dealers. These dealers were invoiced for each delivery and typically paid Parmalat the full amount of the invoices. The dealers sometimes sold to retailers on their own account and sometimes distributed Parmalat's products to supermarkets on Parmalat's behalf. In the latter case, the dealer would furnish to Parmalat proof of delivery to the supermarket. Parmalat then would issue a second invoice, this one directly to the supermarket, and undertake to reimburse the dealer for the goods it distributed to the supermarket. In other words, when a dealer acted purely as Parmalat's distributor, amounts that the dealer owed Parmalat for goods distributed for Parmalat were offset by Parmalat's corresponding obligation to reimburse the dealer.[9] Like the securitization of receivables, there appears to have been nothing remarkable or deceptive about this billing system – which the complaint implies had been used for forty years[10] – standing alone.

---

[8]
    *Id.* ¶¶ 273-77, 281, 284-85, 288-89.

[9]
    *Id.* ¶¶ 808-09, 812.

[10]
    *Id.* ¶¶ 290, 806-09.

The problem was that Parmalat assigned to Archimedes and Eureka, and they then securitized, *both* the supermarket invoices, which represented receivables, *and* the corresponding dealer invoices for the same goods. The latter did not represent a real revenue stream for Parmalat because Parmalat was obligated to reimburse the dealers the same amounts that the dealers owed Parmalat.[11] In other words:

> "Citibank sold investors the supermarket invoices *and* the dealer invoices, even though . . . Parmalat was entitled to receive money from just one set of invoices. Citibank therefore double counted the invoices . . . ."[12]

The arrangement generated approximately $348 million during the Class Period.[13]

The complaint alleges that Citigroup structured the program, performed due diligence, and had detailed knowledge as early as 1995 of Parmalat's invoicing system, including the duplicate invoices.[14] Citibank installed proprietary software on Parmalat's computer network that allowed Citibank "to determine which receivables were eligible for the securitization program and to regularly audit Parmalat's sales."[15] Citibank thus "knew that the securitization program Citibank designed would create a false impression about Parmalat's cash flow from its operations, and

---

[11]

    *Id.* ¶¶ 290, 812.

[12]

    *Id.* ¶ 812.

[13]

    *Id.* ¶¶ 273, 293, 818.

[14]

    *Id.* ¶¶ 278-79, 282-83, 290, 803-12.

[15]

    *Id.* ¶ 278.

therefore mislead the market about Parmalat's real financial condition."[16] Citigroup allegedly received $35 million in fees for its role in the securitization program.[17]

The complaint alleges as well a separate aspect to the scheme. The applicable regulations governing securitization permitted only independent financial institutions, not the entities generating the receivables, to collect on them. Eureka and Archimede, however, allegedly assigned back to Parmalat the right to collect payment on the invoices. Parmalat's characterization on its balance sheets of the arrangement with Eureka and Archimede as a securitization rather than as debt therefore allegedly was misleading.[18]

b.    The Geslat / Buconero Arrangement

The complaint asserts also that Citibank structured transactions in which several of its subsidiaries made loans to Parmalat that were disguised as equity investments.[19] The alleged reason for the scheme was that Parmalat was performing poorly, but it did not want to damage its credit rating by issuing debt through the bond markets. Citibank allegedly knew that Parmalat would use the arrangement to mask its debt on its financial statements.[20]

The arrangement began in 1995, when Parmalat entered into an agreement with

---

[16]

Id. ¶¶ 813, 816.

[17]

Id. ¶ 818.

[18]

Id. ¶¶ 292, 815; see also id. ¶ 773(h).

[19]

Id. ¶¶ 24, 256.

[20]

Id. ¶¶ 791-93.

Citibank styled as a joint venture. In connection with the agreement, Parmalat set up a Swiss branch of its subsidiary, Gestione Centrale Latte S.r.l. ("Geslat"), to which Citibank contributed funds. The Swiss branch of Geslat was to make loans to other companies in the Parmalat group, with Citibank receiving a proportional share of the profits from those loans. At the same time, Parmalat gave Citibank a put option that allowed Citibank to sell its interest in Geslat back to Parmalat at a price that guaranteed that Citibank would receive a return on its investment.[21]

On December 9, 1999, Citibank altered the arrangement so that the funds would be provided by two Citibank subsidiaries, defendants Buconero LLC ("Buconero") and Vialattea LLC ("Vialattea"), both Delaware limited liability companies.[22] As the plaintiffs unflaggingly point out, "Buconero" means "black hole" in Italian.[23] Geslat guaranteed that Citibank would receive at least a certain fixed rate of return.[24] Buconero would be responsible for Geslat's losses if they exceeded a certain threshold, but Citibank could avoid that condition entirely because it had the right to dismantle the relationship with Geslat and require the repayment of its contribution if Geslat's performance or Parmalat's creditworthiness declined.[25]

---

[21]

    *Id.* ¶¶ 24, 257-59.

[22]

    *Id.* ¶¶ 173-74, 260.

[23]

    *E.g.*, *id.* ¶¶ 24, 173, 255, 266, 518.

[24]

    *Id.* ¶ 796.

    The complaint at a different point states that Geslat agreed to "endeavor" to earn at least this minimum rate. *Id.* ¶ 264. The Court accepts the allegation of a guarantee because all reasonable inferences are to be drawn in plaintiffs' favor at this stage.

[25]

    *Id.* ¶ 796.

From 1999 to 2001, Buconero and Vialattea contributed as much as $120 million to Geslat.[26] Parmalat recorded these funds as equity on its balance sheets. The funds, however, were in reality loans at favorable interest rates and therefore should have been recorded as debt.[27] The result was to understate Parmalat's liabilities by $137 million, permitting the conglomerate to conceal its troubles in South America and elsewhere.[28] Following Parmalat's collapse, Citibank publicly characterized the investments as debt and stated that "today we would only do this type of transaction if a client agreed to provide greater disclosure."[29]

A Parmalat press release dated November 21, 2003 and "approved"[30] by Citigroup made the following disclosures:[31]

> "Parmalat Finanziaria
> details of participation agreement
>
> *   *   *
>
> "On December 16, 1999, Geslat Srl, a consolidated subsidiary, acting as lead firm via its branch office in Lugano (Switzerland), entered into a participation agreement with

---

[26]

*Id.* ¶¶ 261-62, 264, 773(k).

[27]

*Id.* ¶¶ 265-66, 268, 773(k), 795-97.

[28]

*Id.* ¶¶ 266, 269, 795.

[29]

*Id.* ¶ 800.

[30]

*Id.* ¶ 267.

[31]

The complaint purports to quote from the press release, the contents of which are integral to the allegations against Citigroup under Rule 10b-5(b). The Court therefore has consulted and quotes from the complete copy submitted by Citigroup. *See, e.g.*, *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 58 (2d Cir. 1998); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808-09 (2d Cir. 1996); *In re NTL, Inc. Sec. Litig.*, 347 F. Supp.2d 15, 21 (S.D.N.Y. 2004).

a third party, Buconero LLC, a Citicorp group company, acting as partner. . . .

"The partner, whose contribution amounts to a total of 117 million euros, receives a return determined each year on the basis of the company's net profit before appropriation of net profit attributable to the partner, as is common practice in relation to participation agreements.

"Geslat Srl uses the partner's contribution and the capital of the company and of the Parmalat Group to grant loans to consolidated companies in the accounts of the Parmalat Group. As of December 31, 2002 such loans amounted to 458 million euros.

"The transaction enables a leading international group to participate in and contribute to the development of the Parmalat Group's businesses through its role as a partner. In December 1999, the parties signed a five-year business plan governing the activities of the company and its Lugano branch office. Geslat Srl gave the partner, Buconero, an undertaking to comply with certain restrictions. The company thus undertook to maintain the branch office in Lugano, to use the partner's contribution and the company's capital for the purposes defined in the company's articles of association . . . [and] to not raise further funds or carry out capital increases unless provided for by specific legislation . . . . The participation agreement will automatically terminate on expiry of the business plan, unless a new business plan is agreed by the parties.

\* \* \*

"In the notes to Parmalat Finanziaria Spa's consolidated financial statements, the note to 'Shareholders' equity attributable to minority interests' specifies that minority interests in the share capital and reserves include financial contributions deriving from a participation agreement drawn up by a consolidated company, in partnership with a third-party financier acting as partner."[32]

Citibank, which regarded the Geslat transactions as a financing arrangement rather than as equity investments,[33] received annual returns from them of approximately $5 to $6 million as well as approximately $7 million in fees for structuring the transactions. Citibank derived tax

---

[32] Butler Decl. Ex. A.

[33] Cpt. ¶ 797.

benefits as well.[34]

        *c.      Parmalat Canada Arrangement*

The final set of allegations against Citigroup also involves the alleged classification of debt as equity.[35]

In 1997 and 1998, Parmalat purchased three Canadian food and dairy companies (collectively "Parmalat Canada"). Citibank helped finance the purchase with capital contributions of C\$171.9 million. The agreement between Parmalat and Citibank provided that Parmalat Canada either would be publicly listed or that Citibank could put its interest back to Parmalat for a specified amount.[36] Parmalat recorded Citibank's investments as equity on its financial statements when they should have been recorded as high-interest loans because the put option meant that Citibank bore no risk.[37] Furthermore, Parmalat's financial statements allegedly failed to disclose the put option after 1999.[38] A senior Citibank executive allegedly misrepresented the nature of Citibank's

---

[34]

    *Id.* ¶¶ 788-89.

[35]

    *Id.* ¶ 25.

[36]

    *Id.* ¶¶ 369-74, 376, 380-82.

[37]

    *Id.* ¶¶ 25, 377-79, 384-85.

[38]

    The complaint alleges that the put agreement was "secret" and "never disclosed to Parmalat's regulators, shareholders or creditors," and that Parmalat provided insufficient disclosure regarding the arrangement in its financial statements and public filings for fiscal years 1999, 2000, and 2001. *Id.* ¶¶ 379, 384-85, 820. It specifically states, however, that Parmalat's annual report for 1999 described the put agreement. *Id.* ¶¶ 378, 510. The Court therefore infers that the put option was disclosed in 1999 but not again.

involvement in Parmalat Canada in statements to the press in 1997 and 1998.[39]

The complaint asserts that "Citibank designed the financing transactions to enable Parmalat to characterize them as equity and thereby maintain the false appearance of a lower debt-to-equity ratio."[40] The bank received C$1.3 million in subscription fees and C$5.6 million in financial advisory fees as well as a net tax-free gain of C$47.82 million upon the exercise of the put option. According to the complaint, "[t]his abnormally high return can only be explained by the illegal nature of the activity."[41]

### 2. *Causes of Action, Grounds for Motion to Dismiss*

The complaint asserts causes of action against the Citigroup defendants for violation of Rules 10b-5(a) and (c) and 10b-5(b). It asserts also claims against Citigroup Inc. and Citibank under Section 20(a) for alleged primary violations of Section 10(b) and Rule 10b-5 by Citibank, Buconero, Vialattea, and Eureka.

Citigroup argues that it was not a primary violator, the allegations are deficient as to *scienter*, causation, and reliance, and the complaint fails to state a claim for controlling person liability under Section 20(a).

---

[39] *Id.* ¶¶ 374-75.

[40] *Id.* ¶ 822.

[41] *Id.* ¶ 823.

B.      Bank of America

1.      *Factual Allegations*

The complaint describes two arrangements involving defendants Bank of America Corporation ("BoA Corp."), Bank of America, N.A. ("BANA"), and Banc of America Securities Limited ("BASL"), and their subsidiaries and affiliates (collectively "BoA").[42] The plaintiffs allege that BoA "was aware of the true value of Parmalat's assets and liabilities"[43] but was "motivated to participate" in fraud because it wanted to maintain and capitalize on its lucrative relationship with Parmalat.[44]

a.      *The Parmalat Administracao Private Placement*

The first set of allegations against BoA involves loans to private investors disguised as an equity investment in a Brazilian Parmalat subsidiary that the plaintiffs call "Parmalat Empreendimentos e Administracao" ("Parmalat Administracao").

In 1999, BoA proposed and arranged what appeared to be the sale of an 18.18 percent interest in Parmalat Administracao to a group of investors led by BoA for $300 million. In reality, however, the investors purchased four-year notes issued by two special purpose Cayman Islands entities and guaranteed by Parmalat. Furthermore, as with Citibank's Parmalat Canada arrangement, the investors had the right to put their investments back to Parmalat if Parmalat Administracao did

---

[42]
     *Id.* ¶¶ 177-81.

[43]
     *Id.* ¶ 853.

[44]
     *Id.* ¶¶ 834, 837, 854.

not become publicly listed.[45] BoA and Parmalat allegedly knew that such a listing was economically impractical and therefore would not occur.[46]

BoA[47] and Parmalat co-wrote a Parmalat press release issued December 18, 1999 in which they stated in pertinent part:[48]

"New shareholders for Parmalat in Brazil

"Parmalat Administracao Ltda . . . has increased its share capital in favour of a Group of North American investors lead [*sic*] by Bank of America. The transaction, completed yesterday, will generate for Parmalat Administracao a cash inflow of USD 150 million. Then, there is an option for the transaction to be increased, up to the end of this month, by a further USD 150 million. Should this option be exercised the new shareholders will own slightly over 18% of the company's share capital.

"The total implied value attributed to Parmalat Administracao amounts to some USD 1[.]35 billion. . . .

"The objective of the transaction is to further strengthen the Group presence in Brazil . . . and also to lay the ground for the floatation of the Brazilian company within the next four years.

---

[45] *Id.* ¶¶ 396-97, 849.

[46] *Id.* ¶¶ 398, 400.

[47] Specifically, the complaint alleges that a BoA employee named Luca Sala assisted a Parmalat executive in drafting the press release. *See id.* ¶¶ 400, 849. The parties dispute whether Sala actually worked for BoA. BASL has submitted an affidavit from a BoA employee stating that Sala did not work for BASL. Buxton Aff. Whether Sala actually worked for BoA and, if he did, which BoA subsidiary employed him, is immaterial at this stage. The Court is required to accept the allegation in the complaint that Sala was an employee of BoA and that as BoA's agent, he assisted in the drafting of the press release. The affidavit submitted by BASL is excluded because the Court considers it inappropriate to convert the motion to dismiss into one for summary judgment, *see* Fed. R. Civ. P. 12(b), at this early stage.

[48] The Court quotes from the copy of the press release submitted by BoA. *See* footnote 31 above.

"Should the Brazilian company not be listed within the next four years, Parmalat Administracao's new shareholders will have the option to sell the shares acquired in the capital increase back to the Parmalat Group. In this event, the cost to Parmalat would be equal to the original price paid by the North American investors increased by a spread consistent with the most recent financial transactions undertaken by the Group on the international capital markets."[49]

This press release allegedly "made it appear as though [Parmalat] was issuing new equity for cash to finance Parmalat's expansion."[50] In its 1999 Annual Report, Parmalat included similar language,[51] which allegedly was false and "concealed the fact that instead of being an equity transaction . . . , the deal was really a $300 million private debt placement partly secured by the Brazilian stake."[52] Furthermore, the funds were assigned to a Uruguayan subsidiary rather than used for the Brazilian operations.[53]

       The complaint alleges additional, related transactions. BoA entered into an agreement with Parmalat pursuant to which BoA fronted to the Cayman Islands companies the funds needed to make interest payments on the four-year notes. When it became clear that Parmalat could not raise the money to redeem the notes, BoA assumed some of the exposure and attempted to offer another

---

[49]

    Pietrzak Decl. Ex. A.

[50]

    Cpt. ¶ 850; *accord id*. ¶¶ 399-400.

[51]

    *See id*. ¶ 401.

    By the time of the annual report, the option to acquire an additional $150 million had been exercised.

[52]

    *Id*. ¶ 402.

[53]

    *Id*. ¶ 404.

private placement to cover it.[54]

BoA and an Italian bank received as much as $38.5 million in fees and commissions for their role in the Parmalat Administracao private placement.[55]

### b.    Loans Backed by Funds Raised Through Private Placements

The complaint alleges as well that BoA extended loans to Parmalat subsidiaries and required that the loans be secured with funds raised from private placements of debt issued by Parmalat and underwritten by BoA. In essence, BoA transferred the risk of default on these loans from itself to purchasers of Parmalat's debt. The complaint includes three examples of such loans: an $80 million loan in 1998 to Parmalat subsidiaries in Venezuela, a $100 million loan to a Brazilian subsidiary in September 1998, and an $80 million loan to Parmalat Capital Finance in December 2001.[56]

With full disclosure, of course, there would have been nothing deceptive about these transactions. The complaint, however, alleges that: (a) "[n]either Bank of America nor Parmalat disclosed [that a 1998 $80 million offering] was related to the Venezuelan loan, or that the $80 million loan was done to pay off a 1997 Bank of America loan in the same amount to Parmalat Venezuela that lacked the same security for Bank of America,"[57] (b) "[i]n each instance, Bank of

---

[54]
    *Id.* ¶¶ 850-51.

[55]
    *See id.* ¶¶ 850, 852.

[56]
    *Id.* ¶¶ 839-48.

[57]
    *Id.* ¶ 846.

America publicly announced it had made a conventional loan in the stated amount to Parmalat. The reality of these transactions, however, was much different,"[58] and (c) "side letter agreements . . . that required Parmalat to pay additional interest on its loans" were not disclosed.[59]

BoA allegedly earned over $30 million in fees and interest from these transactions.[60]

### 2.  *Causes of Action, Grounds for Motions to Dismiss*

The complaint includes causes of action against the BoA defendants for violations of Rules 10b-5(a) and (c) and 10b-5(b), as well as causes of action under Section 20(a) against each of BoA Corp., BANA, and BASL for alleged primary violations of Section 10(b) and Rule 10b-5 by various BoA subsidiaries, agents, and employees.

BoA[61] argues that the Rule 10b-5(b) claims fail because BoA made no misstatements or actionable omissions, any alleged misstatements or omissions and *scienter* are not pled with the required specificity, and the allegations regarding causation are deficient. Furthermore, argues BoA, the Rule 10b-5(a) and (c) claims fail because the plaintiffs have not alleged any manipulation or deception and because the allegations regarding reliance and *scienter* are deficient. Finally, BoA

---

[58]

 *Id.* ¶¶ 846-47.

[59]

 *Id.* ¶ 848.

[60]

 *Id.*

[61]

 BoA has submitted two motions: one by BoA Corp. and BANA, and one by BASL. BASL joins in all of BoA Corp. and BANA's arguments and moves to dismiss on the additional ground of lack of personal jurisdiction. Because the Court concludes below that the complaint fails to state any claim against BoA, it does not reach the personal jurisdiction defense. The distinction between the motions therefore is immaterial.

contends that the plaintiffs fail to state claims for controlling person liability under Section 20(a).

## C. Banca Nazionale del Lavoro

### 1. Factual Allegations[62]

The core allegation against Banca Nazionale del Lavoro S.p.A. ("BNL") is that its factoring arm and 99.6 percent-owned subsidiary, Ifitalia S.p.A. ("Ifitalia"), along with other institutions, repeatedly paid Parmalat cash in exchange for assignment of invoices that both parties knew were bad.[63] Although the complaint is not completely clear, it implies that Parmalat booked

---

[62]

BNL argues that "[p]laintiffs' efforts to tie BNL to any allegedly fraudulent activity are based upon misleading assertions regarding the content of the Chiaruttini report referred to in the complaint" and asks the Court to consider sections of the report that BNL submitted. BNL Mem. 2-3 & n.1, 6-7; Ellins Decl. Ex. B.

The Chiaruttini report – a document commissioned by the public prosecutor in Milan – plays only a small role in the relevant sections of the complaint. The plaintiffs merely assert that Chiaruttini (a) highlighted one specific factoring transaction, and (b) concluded that BNL "knew of and directly participated in the scheme." Cpt. ¶¶ 304-05. (Paragraph 306 of the complaint says that a participant in the alleged scheme "provided support for Chiaruttini's conclusions" and then quotes from testimony given by the participant in an unspecified proceeding. This paragraph, however, does not quote from the report or otherwise rely on it for its assertions.) Assertion (a) is not important because it refers to only one transaction, whereas the other paragraphs allege repeated payment for assignment of stale invoices. Assertion (b) likewise is trivial because it asserts merely that BNL's knowledge stemmed from certain aspects of the fraud alleged in other paragraphs. The complaint, moreover, contains other allegations regarding *scienter*.

The Court may consider documents not incorporated by reference into a complaint on a motion to dismiss if "the complaint 'relies heavily upon [the document's] terms and effect,' which renders the document 'integral' to the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (citation omitted); *accord Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004). Unlike the press releases quoted above, *see* footnotes 31 and 48, the contents of the Chiaruttini report do not meet this standard with respect to the allegations against BNL and therefore do not affect the Court's assumption for present purposes of the truth of the allegations against BNL.

[63]

Cpt. ¶¶ 21, 295.

the cash as an asset.

This was quite misleading. In a normal factoring transaction, one party purchases, at a discount, receivables from the party that issued them and then attempts to collect the face amount of the invoices. Here, however, Parmalat had guaranteed to BNL or Ifitalia,[64] and the other banks, payment of the full face value of the invoices.[65] Moreover, Parmalat invariably made good on that guarantee, at least while the arrangement was in place.[66] The receivables thus played no economic role in the transaction; they were simply a device or excuse that permitted Parmalat to record the revenue and to conceal the liability on the guarantees. The complaint suggests, in other words, that the scheme in substance involved loans by BNL to Parmalat rather than factoring of receivables.

The complaint alleges that Parmalat used old invoices for this arrangement and that each time payment on the invoices came due, Parmalat would pay BNL and the other banks the full amount for the previous set. The complaint suggests that, at the same time, Parmalat would assign to the banks, in exchange for another payment, a new set of invoices that were the same as the previous ones except that a single digit on each one had been changed to avoid detection and exclusion by BNL's computers.[67] If Parmalat's payment to the banks of the full amount on the previous set of invoices occurred at the same time as the banks' payment to Parmalat for assignment

---

[64] The allegations do not distinguish clearly between BNL and Ifitalia. *See* Cpt. ¶¶ 295-308, 865-71. The Court therefore refers collectively to both entities as BNL for purposes of describing the allegations.

[65] *Id*. ¶¶ 304, 307-08.

[66] *Id*. ¶¶ 299, 305, 866.

[67] *Id*. ¶¶ 21, 303, 305-07.

of the next set – a point on which the complaint is not entirely clear – then presumably the two payments would have been offset such that Parmalat in effect paid interest on a loan.

This arrangement began in December 1999 and was renewed every six months. It allegedly resulted in Parmalat overstating its assets and receivables and understating its debt by €103 million each year during the Class Period.[68]

BNL allegedly benefitted by receiving returns from this scheme that were "far greater than returns earned in typical factoring transactions" and from bearing Parmalat's credit risk rather than that of third parties owing payment on invoices. Furthermore, BNL was co-managing underwriter for two large bond offerings by Parmalat during the Class Period. The profits from the factoring scheme and the underwriting fees were the alleged "payoffs" for BNL's participation in the fraud.[69]

The plaintiffs allege that BNL had "intimate knowledge of the fraud" because BNL and Parmalat shared two directors, one of whom was the president of Ifitalia.[70] Furthermore, "BNL's knowledge of the fraud was also apparent in its acceptance of numerous invoices which were identical except for a change in one digit – a change made so that the invoices would be accepted by BNL's processing software which was designed to identify fraud."[71] The complaint alleges that

---

[68]

    *Id.* ¶¶ 298, 309, 870.

[69]

    *Id.* ¶¶ 308, 867, 871.

[70]

    *Id.* ¶¶ 302, 868.

[71]

    *Id.* ¶ 869; *accord id.* ¶ 302.

Ifitalia acted as BNL's agent in the scheme.[72]

        2.     *Causes of Action, Grounds for Motion to Dismiss*

The complaint asserts two causes of action against BNL, one for violation of Rule

10b-5(a) and (c) and the other under Section 20(a) for asserted violations of Section 10(b) and Rule

10b-5 by Ifitalia. BNL moves to dismiss on the grounds that the Court does not have subject matter

jurisdiction, BNL is not a primary violator, the allegations of *scienter* and causation are deficient,

and the plaintiffs fail to state a claim for controlling person responsibility under Section 20(a).

D.     *Credit Suisse First Boston*

        1.     *Factual Allegations*

The core allegation against Credit Suisse First Boston ("CSFB")[73] is that it designed

and participated in a set of transactions in late 2001 and January 2002 that CSFB knew Parmalat

would use to conceal debt on its financial statements.[74]

In particular, CSFB executed a subscription agreement with Parmalat pursuant to

which CSFB paid almost €500 million to Parmalat Participações do Brasile ("Parmalat Brasile")

for the entirety of a €500 million issue of Parmalat Brasile bonds underwritten by CSFB. The bonds

---

[72]

     *Id.* ¶ 865.

[73]

     CSFB is a wholly-owned subsidiary of Credit Suisse Group. CSFB R. 7.1 St., docket item 208. The complaint occasionally mentions affiliates of CSFB and at one point refers to Credit Suisse First Boston Corp., Cpt. ¶ 1163, an entity that, according to CSFB, no longer exists. CSFB Mem. 1 n.1. It is not necessary to distinguish among these entities at this stage of the litigation. *See In re Salomon Analyst AT&T Litig.*, 350 F. Supp.2d 455, 459 n.1 (S.D.N.Y. 2004). The Court therefore refers to all of them as CSFB.

[74]

     *See* Cpt. ¶ 406.

were convertible into equity and had an expiration date of 2008. At the same time, Parmalat and CSFB executed an agreement pursuant to which CSFB transferred back to Parmalat the right of conversion, which was priced at €248.3 million (the "Forward Sale Agreement"). Parmalat raised the funds to pay CSFB under the agreement through a separate €250 million bond issue (the "Eurobond Issue") underwritten by CSFB jointly with two other institutions. The Eurobond Issue produced €246.5 million (€250 million less costs and commissions), which was deposited in a CSFB checking account.[75]

Parmalat then recorded both (a) the "right" it had purchased from CSFB to convert the Parmalat Brasile bonds, and (b) the proceeds of the Parmalat Brasile bond issue as assets each worth approximately €250 million.[76] This accounting treatment was improper. The net result of these transactions, according to the complaint, was that Parmalat obtained €500 million in financing – €250 million each from the Parmalat Brasile bonds and the Eurobond Issue – and "manufactured €248 million in assets . . . and concealed €248 million of debt."[77]

The complaint alleges that CSFB received millions of dollars in commissions and fees from these transactions. Furthermore, fifty percent of the risk from underwriting the Parmalat Brasile bond issue was transferred back to Parmalat under the Forward Sale Agreement. CSFB transferred the remaining risk to the market by selling the Parmalat Brasile bonds or by executing credit default

---

[75] *Id.* ¶¶ 406-13, 415.

[76] *Id.* ¶ 415.

[77] *Id.* ¶¶ 416, 859, 863.

The allegations regarding Parmalat's accounting treatment for these transactions are murky. The Court has attempted to infer a coherent account.

swap agreements.[78] The complaint alleges as well that as a reward for designing and participating in the scheme, CSFB received lucrative underwriting roles for at least three debt offerings during the Class Period.[79]

### 2. Cause of Action, Grounds for Motion to Dismiss

The complaint includes one cause of action against CSFB for violation of Rule 10b-5(a) and (c). CSFB moves to dismiss on the grounds that the plaintiffs have failed to allege that it is a primary violator, the complaint does not adequately allege *scienter*, and the Court lacks subject matter jurisdiction over the allegations against it.

### II. 12(b)(6) Motions to Dismiss

In deciding a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded factual allegations in the complaint and draws all reasonable inferences in the plaintiffs' favor.[80] Dismissal is inappropriate "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."[81]

---

[78]     *Id.* ¶¶ 417-18.

[79]     *Id.* ¶ 863.

[80]     *E.g.*, *Flores v. Southern Peru Copper Corp.*, 343 F.3d 140, 143 (2d Cir. 2003); *Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001).

[81]     *Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) (internal quotation marks omitted)).

### III.  Pleading a Violation of Rule 10b-5

Section 10(b) makes it unlawful "for any person, directly or indirectly . . . [t]o use or employ, in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."[82] Rule 10b-5 in turn provides:

> "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> "(a)      To employ any device, scheme, or artifice to defraud,
>
> "(b)      To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> "(c)      To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> "in connection with the purchase or sale of any security."[83]

### A.      Scienter

Most claims under Rule 10b-5 allege misrepresentations or omissions in violation of Rule 10b-5(b). The elements of such claims are different from those based on alleged violations of subsections (a) and (c). Both types of claims, however, are subject to pleading requirements regarding *scienter*. Under the Private Securities Litigation Reform Act ("PSLRA"), the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the

---

[82]      15 U.S.C. § 78j(b).

[83]      17 CF.R. § 240.10b-5.

required state of mind."[84] The required state of mind is "an intent to deceive, manipulate, or defraud."[85] A plaintiff may establish this intent "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."[86]

### B.      Rule 10b-5(b): Misrepresentations and Omissions

To state a claim based on a misrepresentation or omission in violation of Rule 10b-5(b), plaintiffs must allege that a defendant "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury."[87]

The allegations in support of such a claim must meet the requirements of Rule 9(b) and the PSLRA. Rule 9(b) requires that the circumstances constituting fraud be stated with particularity, which means that the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were

---

[84]     15 U.S.C. § 78u-4(b)(2).

[85]     *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 168 (2d Cir. 2000) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976) (internal quotation marks omitted)); *accord Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001).

[86]     *Kalnit*, 264 F.3d at 138 (quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.1995) (internal quotation marks omitted)); *accord Rombach v. Chang*, 355 F.3d 164, 176 (2d Cir. 2004).

[87]     *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (quoting *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 106 (2d Cir.1998) (internal quotation marks omitted)), *pet'n for cert. filed*, 73 U.S.L.W. 3632 (Apr. 11, 2005) (No. 04-1371); *accord Ganino*, 228 F.3d at 161.

made, and (4) explain why the statements were fraudulent."[88] The PSLRA is to similar effect, providing that for each allegation of a misrepresentation or misleading omission:

> "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."[89]

## C.     *Rule 10b-5(a) and (c): Deceptive and Manipulative Acts and Devices*

To state a claim based on conduct that violates Rule 10b-5(a) and (c), the plaintiff must allege that a defendant (1) committed a deceptive or manipulative act, (2) with *scienter*, that (3) the act affected the market for securities or was otherwise in connection with their purchase or sale, and that (4) defendants' actions caused the plaintiffs' injuries.[90] Certain of these elements will be elaborated on below.

BoA and Citigroup suggest that subsections (a) and (c) apply only to the narrow category of acts understood as "manipulative" in a technical sense.[91] This interpretation is refuted

---

[88]

*Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994) (internal quotation marks and citation omitted)); *accord In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 69-70 (2d Cir. 2001).

[89]

15 U.S.C. § 78u-4(b)(1).

[90]

*See Parmalat I*, 2005 WL 1527674, at *2; *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp.2d 319, 329 (S.D.N.Y. 2004) (quoting *In re Initial Public Offering Sec. Litig.*, 241 F. Supp.2d 281, 385 (S.D.N.Y. 2003) (citing *In re Blech Sec. Litig.*, 961 F. Supp. 569, 582 (S.D.N.Y. 1997))); *In re Sterling Foster & Co. Sec. Litig.*, 222 F. Supp.2d 289, 303-04 (E.D.N.Y. 2002); *Connolly v. Havens*, 763 F. Supp. 6, 10 (S.D.N.Y. 1991); *see also SEC v. Zandford*, 535 U.S. 813, 821-25 (2002); *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996); *Royal American Managers, Inc. v. IRC Holding Corp.*, 885 F.2d 1011, 1015 (2d Cir. 1989).

[91]

BoA Mem. 22-23; BoA Reply Mem. 3-4; Citigroup Mem. 13-14.

by the language of the rule as well as the case law, which make it clear that subsections (a) and (c) apply to at least some deceptive acts as much as to certain technical forms of market manipulation.[92] Indeed, the broad purpose of Section 10(b) is to "prevent practices that impair the function of stock markets in enabling people to buy and sell securities at prices that reflect undistorted (though not necessarily accurate) estimates of the underlying economic value of the securities traded."[93]

The PSLRA's pleading requirements regarding misleading statements and omissions do not apply to claims that allege no misrepresentation or omission but instead are based on alleged violations of Rule 10b-5(a) and (c). These claims, however, sound in fraud and therefore come within Rule 9(b), the policies of which are "to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit."[94]

A plaintiff alleging market manipulation in violation of Rule 10b-5(a) and (c) must specify "what manipulative acts were performed, which defendants performed them, when the

---

92 *See, e.g.*, *Global Crossing*, 322 F. Supp.2d at 336-37 ("[S]ubsections (a) and (c) encompass much more than illegal trading activity: they encompass the use of '*any* device, scheme or artifice,' or '*any* act, practice, or course of business' used to perpetrate a fraud on investors . . . . [C]ourts including this country's highest court have held that a cause of action lies for claims that involve allegations of manipulative schemes used in connection with securities markets."); *see also* section IV.C below.

93 *Id*. at 337 (quoting *Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857, 861 (7th Cir. 1995) (Posner, C.J.)).

94 *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) (quoting *O'Brien v. Nat'l Property Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991) (internal quotation marks omitted)).

manipulative acts were performed and what effect the scheme had on the securities at issue."[95] The plaintiffs here do not allege classic market manipulation, but they do seek to hold the defendant banks liable for deceptive conduct without a specific misrepresentation or omission. The Court therefore concludes that the appropriate level of particularity for the 10b-5(a) and (c) claims asserted here is that the plaintiffs must specify what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and what effect the scheme had on investors in the securities at issue.

### IV. Primary Liability Versus Liability for Aiding and Abetting

Many of the banks' arguments are based on the Supreme Court's holding in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,[96] that there is no private civil liability for aiding and abetting a violation of Section 10(b) and Rule 10b-5. The banks argue that they merely structured or participated in transactions that Parmalat misdescribed, that they did not make any misrepresentations, and that they therefore at worst were aiders and abettors of Parmalat's fraud and thus not subject to private civil liability. The plaintiffs counter that the banks are liable as primary violators, not aiders and abettors.

As an initial matter, it is essential to remember something that the law and commentary following *Central Bank* sometimes overlooks, and that is the definition of aiding and

---

[95]

> *Global Crossing*, 322 F. Supp.2d at 329 (quoting *In re Blech Sec. Litig.*, 961 F. Supp. 569, 580 (S.D.N.Y. 1997)); *accord In re Natural Gas Commodity Litig.*, 358 F. Supp.2d 336, 343 (S.D.N.Y. 2005); *Endovasc Ltd. v. J.P. Turner & Co.*, No. 02 Civ. 7313 (LAP), 2004 WL 634171, at *5 (S.D.N.Y. 2004); *SEC v. U.S. Envtl., Inc.*, 82 F. Supp.2d 237, 240 (S.D.N.Y. 2000).

[96]

> 511 U.S. 164 (1994).

abetting. Prior to *Central Bank*, liability for aiding and abetting, following the criminal practice, required proof of three elements. In the Second Circuit's formulation, they were: "(1) a securities law violation by a primary wrongdoer, (2) knowledge of the violation by the person sought to be charged, and (3) . . . that the person sought to be charged substantially assisted in the primary wrongdoing."[97] Thus, an aider and abettor is nothing more nor less than someone who deliberately facilitates another's primary violation. *Central Bank* foreclosed liability for aiding and abetting the Rule 10b-5 violations of others, but the decision did not change the scope of Rule 10b-5 or what constitutes a primary violation of it.

The basic question here thus is not whether the banks' actions made them aiders and abettors – even if they were, it would be immaterial – but rather whether the banks are subject to private civil liability as primary violators of Rule 10b-5. In order to answer that question, the Court finds it helpful to review *Central Bank* and the law before and since regarding the extent of Rule 10b-5 civil liability for financial institutions that take part in deceptive activity.

A.      *Rule 10b-5 Liability for Outside Financial Institutions Prior to* Central Bank

Section 10(b) was enacted as part of an effort "'to insure honest securities markets and thereby promote investor confidence' after the market crash of 1929. More generally, Congress

---

[97]

*Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir. 1983); *accord Ross v. Bolton*, 904 F.2d 819, 824 (2d Cir. 1990); *IIT v. Cornfeld*, 619 F.2d 909, 922 (2d Cir.1980); *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47-48 (2d Cir. 1978).

Other circuits adopted similar theories. *See, e.g.*, Alan R. Bromberg & Lewis D. Lowenfels, *Aiding and Abetting Securities Fraud: A Critical Examination*, 52 ALB. L. REV. 637, 662 (1988); Sally Totten Gilmore & William H. McBride, *Liability of Financial Institutions for Aiding and Abetting Violations of Securities Laws*, 42 WASH & LEE L. REV. 811, 819 & n.52 (1985).

sought 'to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry.'"[98] In Judge Friendly's words: "[t]he purpose of § 10(b) and Rule 10b-5 is to protect persons who are deceived in securities transactions–to make sure that buyers of securities get what they think they are getting . . . ."[99]

    As is well-known, the implied private right of action under Rule 10b-5 was recognized in the lower courts as early as 1946[100] and acknowledged by the Supreme Court in 1971.[101] Private civil liability for aiding and abetting a violation of Rule 10b-5 was recognized in the 1960s[102] and eventually became a common feature of Section 10(b) private damages actions.[103]

---

[98]

*SEC v. Zandford*, 535 U.S. 813, 819 (2002) (quoting *United States v. O'Hagan*, 521 U.S. 642, 658 (1997) and *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151 (1972)) (citations and some internal quotation marks omitted).

[99]

*Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 943 (2d Cir. 1984).

[100]

*See Kardon v. Nat'l Gypsum Co.*, 69 F. Supp. 512, 513-14 (E.D. Pa. 1946).

[101]

*See Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 13 n.9 (1971).

[102]

*See Brennan v. Midwestern United Life Ins. Co.*, 259 F. Supp. 673, 680-81 (N.D. Ind. 1966), *aff'd*, 417 F.2d 147, 154 (7th Cir. 1969); *Pettit v. American Stock Exchange*, 217 F. Supp. 21, 28 (S.D.N.Y. 1963) (financial institutions accused of aiding and abetting a conspiracy directed at the fraudulent issue of stock by permitting exchange specialists to maintain dummy accounts and assisting the sale and delivery of unregistered stock).

[103]

*See, e.g.*, Bromberg & Lowenfels, *supra*, at 771 & n.813; Daniel R. Fischel, *Secondary Liability Under Section 10(b) of the Securities Act of 1934*, 69 CAL. L. REV. 80, 81-82 (1981).

*1.      Confusion Between Primary and Aiding and Abetting Liability*

Courts, however, did not always distinguish clearly between primary violations of Section 10(b) and aiding and abetting by lawyers, accountants, and bankers of such violations.[104] In *Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,[105] for example, a trustee in bankruptcy of a broker-dealer alleged that the firm had misappropriated its customers' funds and used them to speculate in large stock transactions for the firm's own account with defendant Merrill Lynch. Merrill Lynch was or should have been aware of the misconduct, but nonetheless enabled it.[106] It was charged both as an aider and abettor and as a primary violator of Rule 10b-5. The Seventh Circuit denied summary judgment on both counts, observing in relation to the charge of a primary violation:

> "It is well settled that parties may be liable for violations of the [1934] Act and Rule 10b-5 as long as they engage in fraudulent activity 'in connection with' the sale or purchase of securities or in a fraudulent 'course of business.' . . . [The complaint] sufficiently alleges that defendant benefitted by a course of business which operated as a fraud upon the bankrupt's customers to entitle those customers . . . to recover . . . ."[107]

---

104      *See* Bromberg & Lowenfels, *supra*, at 640 ("The dividing line between primary violation and aiding-abetting violation, however, is indistinct and, in the minds of some courts, virtually nonexistent. It is common for the same person to be sued both as a primary violator and as an aider-abettor. It is not uncommon for a person to be held liable in both capacities." (footnotes omitted)); Gilmore & McBride, *supra*, at 819-20 ("The first element, the underlying violation, caused much confusion in the early aiding and abetting cases. The courts often failed to distinguish primary from secondary violations and also failed to distinguish among the various forms of secondary liability." (footnotes omitted)); Fischel, *supra*, at 103 ("Frequently the line between primary and secondary liability is blurred . . . .").

105      410 F.2d 135 (7th Cir. 1969).

106      *Id*. at 136-37, 141.

107      *Id*. at 144.

Thus, conduct by a financial institution that appears to have amounted only to aiding and abetting was regarded as sufficient for primary liability.

Other courts have sustained aiding and abetting claims against financial institutions in circumstances in which the institutions appear to have been primary violators and the courts in essence understood them as such. For example, in *Rolf v. Blyth, Eastman Dillon & Co.*,[108] the Second Circuit agreed that a broker trusted by the plaintiff could be liable for aiding and abetting the broker's colleague, an aggressive money manager, in the latter's management of the plaintiff's discretionary brokerage account. The district court had found the management to be "fraudulent in nature."[109] The facts and the Circuit's language, however, suggest that the broker just as easily could have been liable as a primary violator. According to the Second Circuit, the district court had found that the trusted broker had a "practice of continually voicing his confidence in [the money manager] and in [the money manager's] investment decisions." This practice, the district court found, "constituted a fraud upon [the plaintiff], who sincerely believed that [the broker] had some basis for his statements."[110] Moreover, the Second Circuit repeatedly observed that the broker "*participated in and* lent assistance to the fraud upon [the plaintiff]."[111] The phrase "participated in . . . the fraud," like the court's recounting of the broker's specific misrepresentations, suggests the commission of

---

[108]

570 F.2d 38 (2d Cir. 1978).

[109]

*Id*. at 43.

[110]

*Id*.

[111]

*Id*. at 44 (emphasis added); *accord id*. at 41, 43, 49 & n.21.

a primary violation in addition to the facilitation of the manager's violations.[112]

    A comparable case is *Carroll v. First National Bank of Lincolnwood*,[113] in which the plaintiff securities dealers alleged that the defendant bank was a "main participant" in a scheme to defraud the plaintiffs. The scheme entailed inducing the plaintiffs to finance the purchase of large amounts of securities for which the participants in the scheme deliberately delayed payment in order to profit from manipulated prices. The complaint alleged that the defendant bank held settlement drafts without payment for as long as possible and that the bank, when questioned about non-payment, stalled and gave false and misleading assurances that payment would be forthcoming. Furthermore, the bank arranged for persons other than the plaintiffs' designated customers to purchase those customers' securities in order to conceal from the plaintiffs the participants' inability to make good on their purchase orders.[114] The bank was charged as an aider and abettor. The allegations, however, suggest primary violations, and the Seventh Circuit's analysis appear to have considered only liability as a primary violator.[115]

    This lack of precision in dealing with primary violations as compared with aiding and

---

[112]
    Indeed, the dissenting judge appears to have assumed that "participation" in a fraud means something other than simply aiding and abetting it: "the majority errs in concluding that [the broker's] conduct, principally his assurances regarding [the manager's] competency as investment counsel . . . establishes recklessness equivalent to an intentional and deliberate participation in *or* aiding and abetting of such 'fraud.'" *Id*. at 51 (emphasis added).

[113]
    413 F.2d 353 (7th Cir. 1969).

[114]
    *Id*. at 355-56.

[115]
    *See id*. at 356-58.

abetting liability of course is understandable. Prior to *Central Bank*, both theories were available, and rigorous distinction between them seldom if ever mattered.

### 2. Aiding and Abetting Liability for Lenders that Facilitate Fraud

In the pre-*Central Bank* era, a number of cases examined allegations similar to the present ones in that banks or other entities were said to have financed transactions that the banks knew would result in fraud. *H.L. Federman & Co. v. Greenberg*,[116] for example, was a derivative suit by a shareholder of a utility company against, among others, Tokyo Boeki, a corporation that financed a complicated set of transactions pursuant to which (1) a director of the utility effectively purchased its subsidiary, United Steel and Strip Corp. ("United"), and (2) the utility relinquished an option to acquire a different corporation. The plaintiff challenged the proxy statement in which the utility asked the shareholders to approve certain of the transactions, alleging, among other things, that the statement misleadingly described Tokyo Boeki as a commercial lender and the financing arrangement as a loan, when in fact Tokyo Boeki was a subsidiary of another steel company that supplied United, and it had purchased an option to acquire United's stock. The plaintiff alleged that Tokyo Boeki was aware of the contents of the proxy statement as well as the nature and effect of the transactions. The court sustained the Rule 10b-5 aiding and abetting claim against Tokyo Boeki.[117]

A similar fact pattern was at issue in *Tucker v. Janota*,[118] which denied a summary

---

[116]

405 F. Supp. 1332 (S.D.N.Y. 1975).

[117]

*Id.* at 1333-35, 1337-38.

[118]

Fed. Sec. L. Rep. (CCH) ¶ 96,701, 1978 WL 1128 (N.D. Ill. 1978).

judgment motion by banks that were alleged to have aided and abetted securities law violations by extending unsecured loans to physicians as part of a standing arrangement with a firm that sold tax shelters. The banks allegedly knew that the firm was violating the securities statutes and that the physicians would use their loans to invest with the firm.[119]

Other decisions upheld aiding and abetting claims where banks were alleged to have propped up issuers, knowing that they would defraud less favorably situated creditors. In *Monsen v. Consolidated Dressed Beef Co.*,[120] the Third Circuit sustained a jury verdict holding a bank liable for aiding and abetting a fraud committed by the defendant beef company on the holders of its unregistered notes, who for the most part were the company's employees and their family, and friends of the family that owned the company. The bank lent the company money and became a secured creditor. The note holders' debt was subordinated to that of the bank, as the bank had demanded. At the bank's instigation, the company continued borrowing from its employees, even though, as the bank knew, they were ignorant of their junior status. When the company collapsed, the bank seized control of its assets, liquidated them, and applied all of the proceeds to the company's debt to the bank.[121]

A similar case is *Metge v. Baehler*,[122] in which the Eighth Circuit denied summary judgment dismissing an aiding and abetting claim against a bank that was alleged to have propped

---

[119]

1997 WL 1128, at *1, *8.

[120]

579 F.2d 793 (3d Cir. 1978).

[121]

*Id.* at 795-98, 802.

[122]

762 F.2d 621 (8th Cir. 1985).

up a troubled real estate company with knowledge that the continued financing was disadvantaging holders of the company's unsecured promissory notes.[123]

These decisions all sustained aiding and abetting liability, but in none of these cases did the banks commit deceptive acts. The financiers allegedly knew that their counterparties would defraud others, and they assisted or even encouraged their counterparties in connection with those frauds, but there was nothing inherently dishonest about their acts. The deception stemmed entirely from the actions of the borrowers.

### 3. Most Cases Did Not Focus on the Distinction Among the Subsections of Rule 10b-5

It is important to bear in mind that the vast majority of Rule 10b-5 cases has targeted false or misleading statements – in other words, conduct prohibited by subsection (b) of the Rule. In the pre-*Central Bank* era, subsections (a) and (c), if they were referred to at all, usually were used to target certain forms of manipulative trading activity.[124] The cases did not focus on the reach of

---

[123]

    *Id.* at 623, 625-30.

[124]

    *E.g.*, *Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir. 1983) ("Churning, in and of itself, may be a deceptive and manipulative device under section 10(b)"); *Newburger, Loeb & Co. v. Gross*, 563 F.2d 1057, 1069 (2d Cir. 1977) (same); *Schoenbaum v. Firstbrook*, 405 F.2d 215, 219-20 (2d Cir. 1968) (en banc) (controlling shareholder alleged to have used influence over corporation and insider information to acquire additional shares of the corporation at grossly inadequate prices; court held that "[i]f it is established that the transaction took place as alleged it constituted a violation of Rule 10b-5, subdivision (3) because [the controlling shareholder] engaged in an 'act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.'"); *see also Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977) ("'Manipulation' is 'virtually a term of art when used in connection with securities markets.' . . . The term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976))); *Carroll v. First Nat'l Bank of Lincolnwood*, 413 F.2d 353 (7th Cir. 1969).

"deceptive device or contrivance" (the Section 10(b) language) or, for that matter, the Rule 10b-5

language of "employ[ing] any device, scheme, or artifice to defraud" or "engag[ing] in any act,

practice, or course of business which operates or would operate as a fraud or deceit upon any

person."

Presumably one reason for this is that the essence of fraud or deceit, at least at

common law, is a misrepresentation that induces detrimental reliance.[125] This theory of recovery is

familiar, and it therefore was not controversial to base private damages actions for Rule 10b-5

violations on this pattern. Moreover, any deceptive device or practice, other than one involving

manipulative trading activity, logically requires that somebody misrepresent or omit something at

some point, even though the device could entail more than the misrepresentation. As it was widely

agreed that Rule 10b-5 prohibited misrepresentations and omissions, and aiding and abetting liability

also was uncontroversial, the path of least resistance for a plaintiff suing based on a deceptive

arrangement with multiple actors was to allege that one actor had misrepresented or omitted a

material fact and that the other actors had aided and abetted that fraud.

In other words, for decades the distinction between the conduct covered by

subsections (a) and (c) on the one hand, and subsection (b) on the other was largely insignificant. A

corollary is that courts for the most part found it unnecessary to consider the extent to which the

phrase "manipulative or deceptive device or contrivance" in Section 10(b) applied to conduct other

than misrepresentations, omissions, and market manipulation. It no longer is possible, however, to

---

[125] *See, e.g.*, RESTATEMENT (SECOND) OF TORTS § 525.

ignore these issues.[126]

## B.    The Central Bank Decision

The relevant claim in *Central Bank* was that Central Bank of Denver, N.A. ("Central Bank"), which served as indenture trustee for a pair of municipal bond issues, had aided and abetted violations of Section 10(b) by the developer and the underwriter of the bond issues. The bonds were issued in 1986 and 1988 to finance improvements at a residential and commercial development. They were secured by liens on land that applicable covenants required to be worth at all times at least 160 percent of the outstanding principal and interest. The developer was required to furnish to the indenture trustee an annual report evidencing that the collateral met the 160 percent threshold.

In early 1988, the senior underwriter for the 1986 bond issue warned Central Bank that local real estate values were declining, that the developer's 1988 appraisal did not reflect the actual situation, and that it was possible that the 160 percent condition was being violated. Central Bank's in-house appraiser reviewed the developer's appraisal, found that it was overly optimistic, and suggested retaining an outside appraiser to conduct an independent review of it. After an exchange of letters with the developer, however, Central Bank agreed to delay independent review until after the closing of the 1988 bond issue. The municipal building authority defaulted before the independent review was finished.[127]

---

[126]

*See, e.g.*, Peter M. Saparoff & Breton Leone-Quick, *The Future of Secondary Actor Liability Under Section 10(b)*, 29th Annual Advanced ALI-ABA Course of Study (May 13-14, 2004), available on Westlaw as SJ084 ALI-ABA 723 ("The battle over secondary actor liability, first addressed in *Central Bank*, has shaped and will continue to shape the extent of primary liability under Section 10(b).").

[127]

511 U.S. at 167-68.

The Tenth Circuit overturned the district court's grant of summary judgment to Central Bank, reasoning that a trier of fact could find that Central Bank was reckless – recklessness being sufficient in the Tenth Circuit's view to support liability for aiding and abetting a Section 10(b) violation – based on its knowledge of the inaccuracy of the 1988 appraisal, and that it substantially assisted primary violations of Section 10(b) by delaying the independent review.[128] Both sides assumed the viability of an aiding and abetting theory of liability. Central Bank petitioned for certiorari on the questions whether it could be liable for aiding and abetting (1) absent a breach of the indenture agreement or other duty, and (2) based only on a showing of recklessness.[129] The Supreme Court granted certiorari on the second question and, on its own initiative, directed the parties to brief and argue the question "[w]hether there is an implied private right of action for aiding and abetting violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5."[130]

The Court held that there is no such right of action. The decision was based almost exclusively on the language of Section 10(b), which does not reach those who aid and abet a violation of the section by another.[131] The Court observed: "With respect . . . to . . . the scope of conduct prohibited by § 10(b), the text of the statute controls our decision. . . . We have refused to

---

[128]

Id. at 168-69.

[129]

Id. at 194 (Stevens, J., dissenting).

[130]

Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 508 U.S. 959 (1993) (grant of certiorari); see also 511 U.S. at 194-95.

[131]

The Court supported its holding with dicta concluding that the 1934 Congress did not intend an aiding and abetting cause of action. See 511 U.S. at 178-85.

allow 10b-5 challenges to conduct not prohibited by the text of the statute."[132]

As discussed above, however, the decision did not affect the contours of a primary violation of Section 10(b). The plaintiffs in *Central Bank* conceded that the indenture trustee "did not commit a manipulative or deceptive act within the meaning of § 10(b),"[133] but there is nothing in the decision to suggest that Central Bank would have escaped liability if it had been found to have committed such an act. On the contrary, the Court not only reaffirmed that the text of Section 10(b) delimits the universe of such acts, it pointed out as well that:

> "[t]he absence of § 10(b) aiding and abetting liability does not mean that secondary actors in the securities markets are always free from liability under the securities Acts. Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b-5, assuming *all* of the requirements for primary liability under Rule 10b-5 are met."[134]

## C.    *Liability for Outside Financial Institutions After* Central Bank

The Second Circuit has applied *Central Bank* to establish a "bright line" test for determining whether a defendant is liable for an alleged misstatement or omission:

> "'[A] defendant must actually make a false or misleading statement in order to be held liable under Section 10(b). Anything short of such conduct is merely aiding and abetting, and no matter how substantial that aid may be, it is not enough to trigger liability under Section 10(b).' . . . [A] secondary actor cannot incur primary liability under the Act for a statement not attributed to that actor at the time of its dissemination. . . . [T]he misrepresentation must be attributed to that specific actor

---

[132]

    *Id*. at 173.

[133]

    *Id*. at 191.

[134]

    *Id*.

at the time of public dissemination . . . ."[135]

This attribution rule defines the contours of liability for violations of Rule 10b-5(b).

Far less clear is the precise reach of subsections (a) and (c) of the rule.[136] Only two Second Circuit cases after *Central Bank* touch on this issue.

In the first, *SEC v. First Jersey Securities, Inc.*,[137] a discount broker-dealer ("First Jersey") used fraudulent practices to induce customers to buy certain securities at excessive prices. In particular, the firm's salespersons each were instructed to promote only one security at a time, and to do so emphatically. The sales force did not know of, let alone disclose, any risks or other negative factors associated with the securities. The promoted securities typically were underwritten by First Jersey and traded only in the over-the-counter market. First Jersey sold the securities in units that consisted of several shares of common stock, among other items.[138]

The firm later would urge its customers to sell the securities back to the firm at a slight profit to the customers. First Jersey then would split the repurchased units into their component parts and sell the components individually to different customers at significantly higher total prices than the firm had paid the first customer. The firm did not inform the selling customers

---

[135]

     *Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998) (quoting *Shapiro v. Cantor*, 123 F.3d 717, 720 (2d Cir.1997) (internal quotation marks omitted)).

[136]

     *See, e.g.*, *In re Lernout & Hauspie Sec. Litig.*, 236 F. Supp.2d 161, 170-71 (D. Mass. 2003) ("while it is well-established that § 10(b) and Rule 10b-5 cover fraudulent schemes, no matter how novel, the Supreme Court has never addressed the extent to which § 10(b) and Rule 10b-5 proscribe participation in such schemes.").

[137]

     *See SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450 (2d Cir. 1996).

[138]

     *Id*. at 1456-57.

that it was going to split the units and resell their components at much higher prices, nor did it inform the buyers of the components that those components previously had sold for a much lower price. The sales force – and therefore the clientele – was kept in the dark about virtually every aspect of this scheme.[139]

In these circumstances, there were up to three types of fraud at issue – fraud on the initial customers when they bought, fraud on the same people when they sold the units back to First Jersey, and fraud on the purchasers of the components of the units – but all are most readily understood as frauds based on misstatements or omissions. Both the Second Circuit and the district court so understood the case. On appeal, the defendants did not challenge the district court's findings that they had "failed to make disclosures of facts that would have been important to their customers; that their nondisclosures were intended to, and did, defraud their customers; and that these intentional frauds were designed to facilitate the markups that they charged."[140] The Second Circuit then held that the nondisclosures about the market for the securities was relevant to the question of whether the markups were excessive.[141]

With the benefit of hindsight, the facts of *First Jersey Securities* might be understood as an example of a scheme in violation of subsections (a) and (c) of Rule 10b-5. In 1996, however, those subsections were not as salient as they are now, and nowhere in the decision did the Second Circuit specify which subsections were at issue.

---

[139]

*Id.* at 1457-58.

[140]

*Id.* at 1467.

[141]

*Id.* at 1467-68.

*First Jersey Securities* then addressed whether Robert E. Brennan, First Jersey's sole owner and chief executive,[142] was liable under Section 10(b). The Circuit concluded that he was because he had planned, overseen, and orchestrated the entire program and therefore "had knowledge of First Jersey's frauds and participated in the fraudulent scheme."[143]

The Second Circuit's opinion concerning Brennan creates some uncertainty in the context of this case. The discussion follows directly the Circuit's statement that "primary liability may be imposed 'not only on persons who made fraudulent misrepresentations but also on those who had knowledge of the fraud and assisted in its participation.'"[144] But the case cited for that proposition was decided before *Central Bank* and did not distinguish between primary and aiding and abetting liability. Indeed, the elements set forth in the earlier opinion and quoted in *First Jersey Securities* – knowledge coupled with assistance – practically define aiding and abetting, not a primary violation. Moreover, *First Jersey Securities* was decided before the Second Circuit adopted the bright line test for misstatements and omissions, which ruled out the possibility that a defendant could be liable merely for "participating" in the misstatements or omissions of others without attribution to that defendant. Thus, while *First Jersey Securities* seems to say that participation in a Rule 10b-5(b) violation, even by one to whom the misrepresentations or omissions are not attributed, may ground primary liability, its reliance for that proposition on a pre-*Central Bank* decision that may have rested on aiding and abetting leaves the matter somewhat unclear.

---

[142]

*Id*. at 1458.

[143]

*Id*. at 1471-72.

[144]

*Id*. at 1471 (quoting *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 517 (2d Cir. 1994)).

*First Jersey Securities* was followed by *SEC v. U.S. Environmental, Inc.*,[145] which held that a stock trader could be primarily liable under Section 10(b) for executing trades that he knew were part of a program to manipulate the price of the stock even though he did not share the overall purpose of that program.[146] The Circuit concluded, with reference to *First Jersey Securities*, that the stock trader "'participated in the fraudulent scheme'"[147] because the trader "himself 'commi[tted] a manipulative act' . . . by effecting the very buy and sell orders that manipulated USE's stock upward."[148]

The Second Circuit thus appears to have indicated that a "participant" in a fraud can be liable, but this formulation is subject to uncertainty. For one thing, the bright line test means that the "participant" formulation no longer applies in the very context – actionable misstatements and omissions in violation of Rule 10b-5(b) – in which it first was used. Nor is it clear what would make someone a "participant" in a Rule 10b-5(a) or (c) scheme. *First Jersey Securities* and *U.S. Environmental* thus send an unclear message with respect to the allegations against the bank defendants relating to their structuring of and participation in certain transactions.

In determining whether subsections (a) and (c) of Rule 10b-5 reach those allegations, the Court bears in mind that the language of Section 10(b) and subsections (a) and (c) is quite broad and that the Supreme Court has emphasized repeatedly that Section 10(b) "should be 'construed not

---

[145]    155 F.3d 107 (2d Cir. 1998).

[146]    *Id.* at 109, 112.

[147]    *Id.* at 112 (quoting *First Jersey Securities*, 101 F.3d at 1471).

[148]    *Id.* at 112 (quoting *Central Bank*, 511 U.S. at 177).

technically and restrictively, but flexibly to effectuate its remedial purposes.'"[149] The Court nevertheless returns, as the Supreme Court repeatedly has instructed, to the text of Section 10(b).[150]

The Supreme Court has given instruction on the meaning of the relevant terms in Section 10(b). The key phrase for present purposes is "directly or indirectly . . . [t]o use or employ . . . any . . . deceptive device or contrivance." "Device," according to the Supreme Court, should be understood to mean "that which is devised, or formed by design; a contrivance; an invention; project; scheme; often, a scheme to deceive; a stratagem; an artifice." Contrivance, the Court noted, means "a thing contrived or used in contriving; a scheme, plan, or artifice."[151] The same dictionary used by the Supreme Court defines "deceptive" as "[t]ending to deceive; having power to mislead."[152]

So far as this Court is aware, only one other court has attempted to resolve the

---

[149]

*SEC v. Zandford*, 535 U.S. 813, 819 (2002) (quoting *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151 (1972) (internal quotation marks omitted)); *accord Pinter v. Dahl*, 486 U.S. 622, 653 (1988); *Herman & MacLean v. Huddleston*, 459 U.S. 375, 386-87 (1983); *Santa Fe Indus.*, 430 U.S. at 475-76; *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 12 (1971); *SEC Capital Gains Res. Bureau, Inc.*, 375 U.S. 180, 195 (1963).

[150]

*See Central Bank*, 511 U.S. at 173-74; *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 472-74 (1977); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 197 (1976) ("In addressing [the elements of a cause of action under Section 10(b) and Rule 10b-5], we turn first to the language of § 10(b), for '[t]he starting point in every case involving construction of a statute is the language itself.'" (quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756 (1975) (Powell, J., concurring))).

[151]

*Ernst & Ernst*, 425 U.S. at 199 n.20 (quoting WEBSTER'S NEW INTERNATIONAL DICTIONARY 580, 713 (2d ed. 1934)).

[152]

WEBSTER'S NEW INTERNATIONAL DICTIONARY 679 (2d ed. 1934).

viability of allegations similar to those here by rigorous analysis of the text of Section 10(b).[153] *In re Lernout & Hauspie Securities Litigation*[154] addressed allegations that an issuer's business partners had created shell companies, knowing that the issuer intended to enter into bogus licensing agreements with them and thus to inflate its bottom line.[155] The defendants argued that the investors were misled only by the issuer's misrepresentations relating to the sham entities and not by their creation. According to the defendants, the business partners therefore at most were aiders and abettors. The plaintiffs countered that the business partners had participated directly in a scheme intended to mislead investors and that the formation of the shell entities could not be separated from the misrepresentations based on them. After analyzing the text of Section 10(b), the court concluded:

> "the better reading of § 10(b) and Rule 10b-5 is that they impose primary liability on any person who substantially participates in a manipulative or deceptive scheme by directly or indirectly employing a manipulative or deceptive device (like the creation or financing of a sham entity) intended to mislead investors, even if a material misstatement by another person creates the nexus between the scheme and the securities market."[156]

In other words, the sham companies were deceptive devices because they created an appearance of

---

[153] Other decisions in recent years have examined whether banks and other business partners could be primarily liable under Section 10(b) where they structured or financed transactions that were the basis of misrepresentations on the issuer's financial statements. *See In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp.2d 804, 914-16 (S.D. Tex. 2004); *In re Homestore.com, Inc. Sec. Litig.*, 252 F. Supp.2d 1018, 1037-42 (C.D. Cal. 2003); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp.2d 549, 692-704 (S.D. Tex. 2002). None of these decisions, however, discussed in any depth the text of Section 10(b).

[154] 236 F. Supp.2d 161 (D. Mass. 2003); *see also Quaak v. Dexia, S.A.*, 357 F. Supp.2d 330, 341-42 (D. Mass. 2005).

[155] 236 F. Supp.2d at 166-69.

[156] *Id*. at 173; *accord Quaak*, 357 F. Supp.2d at 341.

substance where substance was lacking.

This Court largely agrees, but it takes issue with the *Lernout & Hauspie* court on one point. The term "substantially participated" does not appear in the text of Section 10(b) or Rule 10b-5, and it invites dispute over whether a particular defendant's role was or was not substantial. The text asks only whether a defendant directly or indirectly used or employed a manipulative or deceptive device or contrivance.[157] The Court adheres to that language.

One final point. This analysis is not a back door into liability for those who help others make a false statement or omission in violation of subsection (b) of Rule 10b-5. The Second Circuit has made clear that to "make" a statement for purposes of Rule 10b-5(b) requires that the statement be attributed to its maker at the time it is made.[158] That is a different matter from whether a defendant's challenged conduct in relation to a fraudulent scheme constitutes the use of a deceptive device or contrivance.

### V. Sufficiency of the Section 10(b) Claims

The acts for which the plaintiffs seek to hold the defendant financial institutions liable fall into two major groups: (1) structuring and participating in transactions that were hidden or mischaracterized on Parmalat's financial statements, allegedly in violation of Rule 10b-5(a) and (c),

---

[157] These words of course will have to be applied in each case, and there will be disputes over whether they apply to particular fact patterns. At a certain point, however, attempts to translate an inquiry about the reach of a statute into a judge-made test become counter-productive. What disputes there are should focus on the language of the statute and rule in question.

[158] Some commentators have criticized this rule. *E.g.*, Robert A. Prentice, *Locating that "Indistinct" and "Virtually Nonexistent" Line Between Primary and Secondary Liability Under Section 10(b)*, 75 N.C. L. Rev. 691, 727-32 (1997).

and (2) making certain statements or omissions in connection with the foregoing, allegedly in violation of Rule 10b-5(b).[159] The Court considers whether the complaint sufficiently alleges the elements of the relevant causes of action.

## A.     Allegations Regarding Structuring and Participating in Transactions

### 1.     Violation of Rule 10b-5(a) and (c)

As discussed above, the major question here is whether the banks directly or indirectly used or employed any device or contrivance with the capacity or tendency to deceive. The

---

[159] The complaint contains vague allegations that Parmalat made a number of statements "with the active participation" of the bank defendants. *See* Cpt. ¶¶ 468, 516, 625, 690, 751. These assertions are entirely conclusory, at least with respect to the banks, and therefore fail to meet the requirements of Rule 9(b) and the PSLRA for purposes of the claims against the banks. They run afoul also of *Central Bank* and the bright line test announced in *Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998). Also foreclosed by *Central Bank* is any liability based on the allegation that the bank defendants "knew" that "the financial statements of Parmalat and the consolidated financial statements of the Parmalat Group had not been prepared in accordance with applicable rules and regulations or financial and accounting principles," Cpt. ¶ 573.

In addition, the complaint alleges that Citibank accounts in the name of Parmalat's law firm were used to receive large amounts misappropriated from Parmalat, that Citibank knew or was reckless in not knowing that the accounts were being used for money-laundering and other improper activities, and that Citibank failed to fulfill its obligation to prevent or report the activity. *Id.* ¶¶ 824-28. These allegations are incongruously tacked on to the end of the allegations regarding Citibank's *scienter* with respect to the Parmalat Canada arrangement. Even if these allegations made out the necessary connection with the purchase or sale of securities – a point of which the Court is not at all certain – they would run afoul of *Central Bank*. Nor are these allegations even remotely relevant to Citibank's *scienter* regarding the Parmalat Canada arrangement.

Similarly, the allegation that "Citigroup, Bank of America and other financial institutions provided extensive banking services to Parmalat that furthered and concealed the fraudulent and manipulative accounting practices of Parmalat, by channeling hundreds of millions of dollars through United States bank accounts, and siphoning off hundreds of millions of dollars from Parmalat through various U.S. bank accounts," *id.* ¶ 82, runs afoul of both Rule 9(b) and *Central Bank*.

alleged transactions fall into three groups.

<p style="text-align: center;">*a.*     *Securitization and Factoring of Invoices*</p>

The complaint alleges that Citigroup securitized, and BNL factored, invoices that, for various reasons, were worthless.[160] Each thought itself secure from the obvious credit "risk," Citigroup because it sold the receivables or assigned back to Parmalat the right to collect payment (the complaint is not entirely clear on this point), and BNL because it relied on Parmalat's guarantee. Parmalat's security holders, however, allegedly were not so fortunate. They were victimized by Parmalat's misleading financial statements.

The Court concludes that the arrangements involving the regular factoring and securitization of worthless invoices were deceptive devices or contrivances for purposes of Section 10(b). These were inventions, projects, or schemes with the tendency to deceive because they created the appearance of a conventional factoring or securitization operation when, in fact, the reality was quite different. BNL knew when it paid Parmalat for the invoices that they were worth nothing and were in fact a trick to disguise its loan to Parmalat. The same is true of Citigroup's purchase of

---

[160]     There is another way to understand the allegations against Citigroup. They could be read to suggest that the distributor invoices were not worthless at all, but rather, like the supermarket invoices, represented valid receivables, and that the fraud here arose from Parmalat's failure to disclose in its financial statements that the proceeds of the securitization of the distributor invoices needed to be offset against Parmalat's obligations to those distributors. That is, it is possible that Parmalat never sold bad invoices to Citigroup but simply misrepresented the effect of the securitization transactions on its financial health. On this view, the relevant allegations likely would fail to state a claim against Citigroup for reasons set forth in the following section, namely that Citibank would not have committed a deceptive act but rather merely facilitated Parmalat's misstatements. At this stage, however, the Court is obliged to draw from the complaint all reasonable inferences in the plaintiffs' favor and therefore assumes for present purposes that Citigroup securitized worthless invoices.

certain invoices. If the allegations of the complaint are accepted, the banks used these devices. In the language of Rule 10b-5(c), the banks engaged in acts, practices, or courses of business that would operate as a fraud or deceit upon others. In these circumstances, it cannot be said that the banks' conduct fell outside of Rule 10b-5 or Section 10(b).[161]

The defendants' argument that they were at most aiders and abettors of a program pursuant to which Parmalat made misrepresentations on its financial statements misses the mark. The transactions in which the defendants engaged were by nature deceptive. They depended on a fiction, namely that the invoices had value. It is impossible to separate the deceptive nature of the transactions from the deception actually practiced upon Parmalat's investors. Neither the statute nor the rule requires such a distinction.

b.      *Other Transactions that Resulted in Mischaracterization of Debt*

A number of the allegations against the banks concern transactions in which they made loans allegedly disguised as equity investments or assets. These principally include the allegations against BoA involving the private placement of Parmalat Administracao's securities and those against Citigroup involving Buconero and Geslat, as well as Parmalat Canada.

In each of these cases, what remains when the bluster is stripped away are financings and investments. These transactions were not shams. Nor did they depend on any fictions. There is no suggestion that Citigroup did not own the equity stakes in the relevant Parmalat entities that it purported to buy. The same is true of the investments made by the purchasers of the Parmalat

---

[161]      *Cf. In re Lernout & Hauspie Sec. Litig.*, 236 F. Supp.2d 161, 174-76 (D. Mass. 2003); *Quaak v. Dexia, S.A.*, 357 F. Supp.2d 330, 341-42 (D. Mass. 2005).

Administracao debt privately placed by BoA. The put options established floors on Citigroup's and the private investors' potential losses, but there is no suggestion that the transactions were something other than what they appeared to be. These arrangements therefore were not inventions, projects, or schemes with the tendency to deceive. Any deceptiveness resulted from the manner in which Parmalat or its auditors described the transactions on Parmalat's balance sheets and elsewhere. In entering into these transactions, the banks therefore did not use or employ a deceptive device or contrivance. At worst, the banks designed and entered into the transactions knowing or even intending that Parmalat or its auditors would misrepresent the nature of the arrangements. That is, they substantially assisted fraud with culpable knowledge – in other words, they aided and abetted it. Under *Central Bank*, of course, that is not a basis for private civil liability.[162] The complaint therefore will be dismissed insofar as it seeks to hold the defendant banks liable for participating in these transactions.

### c. The CSFB Transactions

The allegations against CSFB present a close question. It is not entirely clear from the complaint whether the purported transfer or relinquishment of the conversion right for half the value of the bond issue was part of a deceptive device or contrivance. On the one hand, CSFB's relinquishment of the conversion right presumably had some value to Parmalat. On the other hand, if the allegations are given the interpretation most generous to the plaintiffs, the parties grossly

---

[162] The plaintiffs' memorandum characterizes Buconero as a "sham entity" or "fraudulent SPE," Pl. Mem. 9, 45, but a bank's use of special purpose corporate entities in connection with financing and other investment arrangements is neither unusual nor deceptive in and of itself.

overstated that value and did so for the purpose of inflating Parmalat's assets on its financial statements. The conversion right thus may well have played a role similar to that of the invoices in the BNL arrangement. The Court is obligated so to assume at this stage, where reasonable inferences are to be drawn in the plaintiffs' favor. Nor can there be any dispute that if this was a deceptive device or contrivance, then CSFB used it or engaged in a course of business that would operate as a fraud or deceit.

2.      *Effect on Market for Securities or Connection with Their Purchase and Sale*

BNL, but not Citigroup or CSFB, argues that its alleged acts were not connected with the purchase or sale of securities.[163] It is mistaken. A plaintiff makes out a sufficient nexus with the purchase or sale of securities when the defendants' deceptive conduct affects a market for securities.[164] The alleged factoring and securitization schemes would have created the appearance of revenue or assets where there was none and thus distorted the prices of Parmalat's securities.[165]

3.      Scienter

Citigroup, BNL, and CSFB argue that the complaint fails to plead *scienter* adequately. The Court disagrees. The plaintiffs have set forth with particularity facts that constitute strong

---

[163]

BNL Mem. 14 n.12.

[164]

*E.g.*, *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp.2d 319, 329 (S.D.N.Y. 2004) (quoting *In re Initial Public Offering Sec. Litig.*, 241 F. Supp.2d 281, 385 (S.D.N.Y. 2003) (citing *In re Blech Sec. Litig.*, 961 F. Supp. 569, 582 (S.D.N.Y. 1997))).

[165]

*Cf. Global Crossing*, 322 F. Supp.2d at 335-37; *In re Enron Corp., Derivative & ERISA Sec. Litig.*, 235 F. Supp.2d 549 (S.D. Tex. 2002); *In re Worldcom, Inc. Sec. Litig.*, 294 F. Supp.2d 392 (S.D.N.Y. 2003).

circumstantial evidence of conscious misbehavior or recklessness.

The complaint asserts that Citigroup was intimately familiar with Parmalat's billing system and structured the invoice securitization program. These assertions are supported by detailed allegations regarding due diligence that Citigroup performed regarding Parmalat's billing system, as well as an allegation that Citigroup installed proprietary software on Parmalat's computers. The plaintiffs therefore have pled facts that would evidence Citigroup's consciousness of, or recklessness regarding, the alleged worthlessness of some of the invoices securitized by Eureka and Archimedes.

Citigroup's argument that these allegations "establish[] only that Citigroup understood Parmalat's Italian distribution system, not that it knew it was being misused,"[166] is unpersuasive. The argument assumes that only direct, and not circumstantial, evidence can be used to establish *scienter*. That of course is not the case, and Citigroup's familiarity with Parmalat's billing system is strong circumstantial evidence, at least in this context, from which one could infer that Citigroup knew that the system was being misused.[167]

A similar analysis applies to the allegations against BNL. BNL and Ifitalia's very participation in the factoring arrangement, which depended on the recycling of stale invoices, if proven, would constitute strong circumstantial evidence that BNL or Ifitalia understood exactly what

---

[166] Citigroup Mem. 17.

[167] Citigroup argues as well that the complaint "fails to explain why Citigroup would have knowingly purchased phony receivables from Parmalat." *Id*. at 18. On the contrary, the complaint is quite clear on this point. Citigroup allegedly earned $35 million in fees or commissions for its role in the securitization program. Cpt. ¶ 818. Whether this is sufficient to support an inference of motive is a question the Court need not reach in light of its conclusion that the complaint adequately pleads facts giving rise to an inference of conscious misbehavior or recklessness.

they were receiving in exchange for their loans to Parmalat. Likewise, the practice of altering a single digit on the invoices to avoid detection by BNL's computers would constitute strong circumstantial evidence of conscious misbehavior.

BNL's principal argument regarding *scienter* is that simply because BNL was Ifitalia's parent does not mean that BNL knew about the falsity of the invoices handled by its subsidiary, Ifitalia.[168] This argument, however, ignores the language of the complaint, which alleges that BNL, and not just Ifitalia, was a party to and involved in many of the deceptive transactions related to the factoring scheme.[169] The Court of course is required to accept these allegations at face

---

[168]

BNL argues as well, in defending against the Section 20(a) claim, that the allegations of Ifitalia's *scienter* are insufficient. These arguments barely merit attention. First, BNL argues that "[t]he alleged knowledge of 'stale' invoices by Ifitalia . . . comes from testimony given by Claudio Pessina, an indicted Parmalat executive who was allegedly involved in the destruction of evidence." BNL Mem. 23. The Court is baffled that experienced attorneys would argue on a motion to dismiss that the Court should ignore an allegation in a complaint simply because it is attributed to a source that the defendants believe is not credible.

BNL next argues that "Pessina's statements are not sufficient to show that Ifitalia had intent to 'defraud, manipulate, or deceive' investors in Parmalat securities. They certainly do not support a 'strong inference' that Ifitalia knew of Parmalat's intent to misstate revenues." *Id*. The Court is not at all sure of BNL's unstated premise that liability under Section 10(b) requires an intent to further the overall scheme (or knowledge of it), as opposed to just consciousness of one's own misconduct. Indeed, BNL's position would appear to be foreclosed by *U.S. Environmental, Inc.*, 155 F.3d at 111-12. It is unnecessary to reach this question, however, because BNL's interpretation of the complaint is unpersuasive even on its own terms. If the allegations are true, Ifitalia had to have known that Parmalat's revenue was being distorted.

[169]

For example:

"[Parmalat dealers] always paid the entire amount due directly to *BNL* at the expiration date . . . .

"*BNL* also had knowledge of this scheme due to the crude way Parmalat altered the invoices to make them acceptable to *BNL*'s software . . . .

value.

CSFB likewise is said to have structured the transactions, participated in them as Parmalat's counterparty, and underwritten the relevant bond issues, all so that Parmalat could overstate its assets and understate its debt. These allegations, if proven, are more than sufficient to give rise to an inference of conscious misbehavior, let alone recklessness.

### 4. Causation

"It is long settled that a securities-fraud plaintiff 'must prove both transaction and loss causation.'"[170] Transaction causation has been described as "akin to reliance."[171] At the pleading stage, it requires "only an allegation that 'but for'" the alleged misconduct, "'the plaintiff would not have entered into the detrimental securities transaction.'" Loss causation is the "'causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff.'"[172] The bank

---

"When payment on a set of invoices became due, Contal provided *BNL* with a new list of stale invoices to receive additional cash. The list of stale invoices was exactly the same as the prior lists provided to *BNL*, except that at *BNL*'s request and instruction, Parmalat changed a single digit on each invoice's number . . . .

"Chiaruttini highlighted in her report one such transaction . . . [in which] Parmalat assigned to its subsidiary Contal non-existent credits . . . and Contal executed a factoring agreement with *BNL* to receive cash advance on such credits. The terms of the agreement provided that Contal was obligated to make payment directly to *BNL* in the event of default." Cpt. ¶¶ 299, 302-04 (emphases added).

[170]

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (quoting *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir. 1994)), *pet'n for cert. filed*, 73 U.S.L.W. 3632 (Apr. 11, 2005) (No. 04-1371).

[171]

*Lentell*, 396 F.3d at 172.

[172]

*Id.* (quoting *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003)); *accord Dura Pharms., Inc. v. Broudo*, 125 S. Ct. 1627, 1629, 1631 (2005).

defendants argue that the complaint does not adequately allege causation.

### a.    Transaction Causation

The plaintiffs contend that they would not have purchased Parmalat's stock or bonds, or at least not done so at the same prices, had they known its true financial condition.[173] The plaintiffs do not claim to have relied on particular actions of the defendants. Instead they argue that the defendants committed a fraud on the market.

The fraud-on-the-market doctrine permits a rebuttable presumption of reliance if a company's securities traded in an efficient market. The theory is that, in an open and developed market, the price of the security is determined by all available information.[174] "Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements."[175] According to the plaintiffs, the relevant schemes created the appearance of revenue or assets for Parmalat where there was none and therefore may be presumed to have affected

---

[173]

    The complaint asserts:

> "As a result of the fraudulent activities of the Bank Defendants . . . , the price of Parmalat securities were artificially inflated during at least the Class Period.

> "In ignorance of Parmalat's true financial condition, Plaintiffs, relying upon the integrity of the market price for Parmalat's securities, purchased or otherwise acquired Parmalat securities at artificially inflated prices during the Class Period.

> "But for the fraud, none of the securities that were brought to market could have been sold at any price and those securities that were traded in the market would not have been purchased at these artificially inflated prices." Cpt. ¶¶ 1168-70.

[174]

    *Basic Inc. v. Levinson*, 485 U.S. 224, 241-47 (1988); *accord, e.g.*, *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 77 (2d Cir. 2004).

[175]

    *Basic*, 485 U.S. at 241-42 (internal quotation marks and citation omitted).

the prices of Parmalat's securities if the market for them was efficient.

Whether a market is efficient often is a question of fact.[176] As the Court's earlier opinion noted, the plaintiffs sufficiently allege that the markets for Parmalat's securities were efficient.[177] Citigroup, but not BNL, argues that the plaintiffs may not rely on the fraud-on-the-market doctrine because the complaint fails to specify the markets for Parmalat's various securities, the market makers, the weekly trading volume, and empirical evidence that the price of Parmalat securities moved in response to announcements and events. Citigroup, however, cites no authority for its implicit premise that the plaintiffs are required to plead with exquisite specificity all of the information that ultimately will bear on the factual determination of whether the markets for the relevant securities were efficient.[178] "[T]he question on a motion to dismiss is not whether plaintiff

---

[176]

See *In re Laser Arms Corp. Sec. Litig.*, 794 F. Supp. 475, 490 (S.D.N.Y. 1989), *aff'd*, 969 F.2d 15, 16 (2d Cir. 1992).

[177]

See *Parmalat I*, 2005 WL 1527674, at *15-16; *see also* Cpt. ¶ 1064.

[178]

Citigroup relies primarily on *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989), but in that case the court converted a motion to dismiss into one for summary judgment and examined a substantial affidavit bearing on the pertinent factors. Moreover, the court considered whether to hold an evidentiary hearing to inquire into the efficiency of the relevant market. It declined to do so, but it clearly believed that this determination must be based on evidence rather than the pleadings alone. *See id.* at 1287-93. Citigroup cites also (a) *Freeman v. Laventhal & Horwath*, 915 F.2d 193, 198-99 (6th Cir. 1990), a summary judgment decision, (b) *Mott v. R.G. Dickinson & Co.*, No. 92-1450-PFK, 1993 WL 342839, at *2 (D. Kan. Aug. 13, 1993), which followed a holding from *Freeman* that the primary market for a new issue of municipal bonds is inefficient as a matter of law, and (c) *Unger v. Amedisys Inc.*, 401 F.3d 316 (5th Cir. 2005), which reviewed a class certification decision that was based on a factual record. *See* Citigroup Mem. 22-24; Citigroup Reply Mem. 8-9.

has proved an efficient market, but whether he has pleaded one."[179] The Court concludes that the fraud-on-the-market doctrine is applicable at this stage.

That, however, is not the end of the inquiry. The fraud-on-the-market doctrine permits a presumption that the plaintiffs relied on the misstatements of Parmalat in connection with the relevant schemes involving the banks. The bank defendants, however, made no representations in connection with those schemes, at least none relevant here. The plaintiffs therefore cannot be said to have relied on the banks.

Although it often is said that reliance is an element of a private cause of action under Rule 10b-5, that formulation typically arises in the context of Rule 10b-5 actions based on misstatements and omissions – in other words, conduct in violation of Rule 10b-5(b) rather than (a) and (c). The reliance requirement in that context has a very specific function: in the Supreme Court's words, to "provide[] the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury"[180] or, in the formulation of the Second Circuit, "to certify that the conduct of the defendant actually caused the plaintiff's injury."[181] At the same time, as the Supreme Court has explained, "[t]here is . . . more than one way to demonstrate the causal connection" for purposes of

---

179

*Hayes v. Gross*, 982 F.2d 104, 107 (3d Cir. 1992); *accord Chu v. Sabratek Corp.*, 100 F. Supp.2d 815, 826 (N.D. Ill. 2000); *see also In re USA Talks.com, Inc. Sec. Litig.*, No. 99-CV-0162-L (JA), 2000 WL 1887516, at *6 (S.D. Cal. Sept. 14, 2000) ("A showing of whether the *Cammer* elements are met requires a factual exploration which is premature at the motion to dismiss stage.").

180

*Basic*, 485 U.S. at 243.

181

*List v. Fashion Park, Inc.*, 340 F.2d 457, 462 (2d Cir. 1965) (citing RESTATEMENT OF TORTS § 546 (1938); WILLIAM L. PROSSER, HANDBOOK OF THE LAW OF TORTS 550 (2d ed. 1955); 1 FOWLER V. HARPER AND FLEMING JAMES, JR., THE LAW OF TORTS 583-84 (1956)).

the Rule 10b-5 cause of action,[182] a cause of action that does not precisely track the common law tort of fraud.[183] Moreover, "the plaintiff is not required to prove that the defendant's act was the sole and exclusive cause of his injury; he need only show that it was substantial, i.e., a significant contributing cause."[184]

In this case, the complaint alleges that the banks' actions in connection with the relevant transactions actually and foreseeably caused losses in the securities markets. The banks made no relevant misrepresentations to those markets, but they knew that the very purpose of certain of their transactions was to allow Parmalat to make such misrepresentations. In these circumstances, both the banks and Parmalat are alleged causes of the losses in question. So long as both committed acts in violation of statute and rule, both may be liable.

This analysis is not an end run around *Central Bank*. If a defendant has committed no act within the scope of Section 10(b) and Rule 10b-5 – as in fact was the case in *Central Bank* – then liability will not arise on the theory that that defendant assisted another in violating the statute and rule. But where, as alleged here, a financial institution enters into deceptive transactions as part of a scheme in violation of Rule 10b-5(a) and (c) that causes foreseeable losses in the securities markets, that institution is subject to private liability under Section 10(b) and Rule 10b-5.

---

[182]

*Basic*, 485 U.S. at 243.

[183]

*See id*. (agreeing that the reliance requirement applicable to common law fraud may be modified in the Rule 10b-5 context); *Dura Pharms.*, 125 S. Ct. at 1631 ("The courts have implied from [Section 10(b) and Rule 10b-5] a private damages action, which resembles, but is not identical to, common-law tort actions for deceit and misrepresentation.").

[184]

*Wilson v. Comtech Telecomms. Corp.*, 648 F.2d 88, 92 (2d Cir. 1981) (internal quotation marks and citation omitted).

### b. *Loss Causation*

The Second Circuit recently explained in the context of fraud actions based on misstatements and omissions: "To plead loss causation, the complaint must allege facts that support an inference that [the defendant's] misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud."[185] In short, "the damages suffered by plaintiff must be a foreseeable consequence of any misrepresentation or material omission."[186] As the Court noted in its earlier opinion, loss causation does not, as the defendants would have it, require a corrective disclosure followed by a decline in price.[187]

The loss causation requirement applies as well where the claims are based on deceptive or manipulative conduct in violation of Rule 10b-5(a) and (c).[188] By analogy, the loss causation requirement will be satisfied if such conduct had the effect of concealing the circumstances that bore on the ultimate loss. The schemes involving worthless invoices and the CSFB transactions created the appearance of assets or revenue where there was none and therefore concealed, among other things, the risks that Parmalat would be unable to service its debt and consequently suffer financial collapse. As the earlier opinion explained, that risk materialized when Parmalat suffered

---

[185] *Lentell*, 396 F.3d at 175.

[186] *Emergent Capital Inv. Mgmt.*, 343 F.3d at 197 (quoting *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 186 (2d Cir. 2001)).

[187] *Parmalat I*, 2005 WL 1527674, at *16-17.

[188] *See* 15 U.S.C. § 78u-4(b)(4); *see also Dura Pharms.*, 125 S. Ct. at 1631.

a liquidity crisis in December 2003.[189]

5.      *Subject Matter Jurisdiction over Claims Against BNL and CSFB*

The complaint does not allege that any part of the transactions involving BNL and and CSFB occurred in the United States.[190] It is essentially undisputed that these were foreign transactions.

In assessing whether federal subject-matter jurisdiction extends to claims based on transnational securities frauds, courts examine "(1) whether the wrongful conduct occurred in the United States, and (2) whether the wrongful conduct had a substantial effect in the United States or upon United States citizens."[191]

---

[189]

*See Parmalat I*, 2005 WL 1527674, at *17.

[190]

*See* Cpt. ¶¶ 52-95, 184-85, 295-309, 406-18, 860-71.

BNL contends that all of BNL and Ifitalia's actions occurred in Italy, BNL Mem. 7, a point not disputed by the plaintiffs but not supported by the complaint, which is silent as to where the relevant events occurred.

[191]

*SEC v. Berger*, 322 F.3d 187, 192 (2d Cir. 2003); *accord Itoba Ltd. v. Lep Group PLC*, 54 F.3d 118, 121-22 (2d Cir. 1995); *OSRecovery, Inc. v. One Groupe Int'l, Inc.*, 354 F. Supp.2d 357, 366 (S.D.N.Y. 2005).

The plaintiffs argue that these factors should be evaluated with respect to the "fraud as a whole," rather than with respect to the activities of an individual defendant challenging subject-matter jurisdiction. Pl. Mem. 123. The short answer to this contention is that even if the plaintiffs' "fraud as a whole" theory is correct – the Court assumes this without deciding it – there was no "fraud as a whole," at least none that included BNL and CSFB. The allegations against BNL and CSFB describe discreet transactions unrelated to those that the other banks are alleged to have engaged in.

The plaintiffs cite only two cases for their "fraud as a whole" theory. In one, the defendants were alleged to have conspired to make false or misleading statements regarding sales projections in a single prospectus or to have aided and abetted that violation. *CL-Alexanders Laing & Cruickshank v. Goldfeld*, 709 F. Supp. 472, 473-75, 478 (S.D.N.Y. 1989). In the

Jurisdiction based on conduct within the United States exists only when "substantial acts in furtherance of the fraud were committed within the United States."[192] The complaint does not allege that BNL, CSFB, or Parmalat committed any substantial acts in the United States in furtherance of the schemes involving BNL and CSFB, a point implicitly conceded by the plaintiffs' memorandum.[193] Any jurisdiction over the claims against BNL and CSFB therefore must be based upon effects in the United States of those banks' alleged wrongful conduct. A corollary is that there is no subject matter jurisdiction over claims against BNL and CSFB brought by foreigners who purchased Parmalat securities outside the United States.[194]

---

other, *Cromer Finance Ltd. v. Berger*, No. 00 Civ. 2284 DLC, 2003 WL 21436164 (S.D.N.Y. June 23, 2003), the allegations concerned a single program to falsify a fund's monthly account statements and related reports in order to hide losses resulting from risky trading strategies. *See id.* at *1, 3, 5; *Cromer Finance Ltd. v. Berger*, 137 F. Supp.2d 452, 463-66 (S.D.N.Y. 2001).

[192]

*Psimenos v. E.F. Hutton & Co.*, 722 F.2d 1041, 1045 (2d Cir. 1983) (citing *ITT v. Vencap, Ltd.*, 519 F.2d 1001, 1018 (2d Cir. 1975)); *accord Berger*, 322 F.3d at 193.

[193]

The complaint contains a solitary allegation that one of Parmalat's attorneys created a Delaware corporation "to replace Contal in [the BNL factoring] scheme," Cpt. ¶ 301. It is not clear, however, what acts were performed in connection with the Delaware entity, where they were performed, and how the Delaware entity could have been created to replace Contal if it also controlled Contal at material times. *See id.* ¶ 300. This allegation therefore does not satisfy the requirement of a "substantial" act.

[194]

*See Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 993 (2d Cir. 1975) ("the anti-fraud provisions of the federal securities laws . . . [d]o not apply to losses from sales of securities to foreigners outside the United States unless acts (or culpable failures to act) within the United States directly caused such losses."); *see also In re Bayer AG Sec. Litig.*, No. 03 Civ. 1546 WHP, 2004 WL 2190357, at *17 (S.D.N.Y. Sept. 30, 2004) (plaintiffs and court agreed on absence of effects-based jurisdiction over claims by foreign purchasers of securities mainly listed on foreign exchanges).

*Dicta* in some cases contemplate that there might be jurisdiction over claims by foreigners resident outside the United States who purchased securities in U.S. markets where the markets were affected by conduct by defendants that occurred outside the U.S. *See Europe*

Jurisdiction over securities fraud claims is appropriate "whenever a predominantly foreign transaction has substantial effects within the United States."[195] In *Bersch v. Drexel Firestone, Inc.*,[196] Judge Friendly held that this condition was satisfied where it was alleged that twenty-two U.S. residents, who purchased only one percent of the shares offered in a foreign corporation's distribution of stock, potentially were defrauded by misstatements in prospectuses intended for non-U.S. investors.[197] Judge Newman followed this holding in *Consolidated Gold Fields PLC v. Minorco, S.A.*[198] In that case, tender offer documents containing allegedly false and misleading statements about the target had been sent by the potential acquirer, a Luxembourg corporation, to the British nominees of shareholders and depository banks resident in the United States. The nominees were required to forward the documents to the beneficial owners in the United States, which held approximately 2.5 percent of the target corporation's shares.[199] The Circuit concluded that federal jurisdiction existed because the "'effect' (the transmittal of the documents by the

---

*and Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118, 128 (2d Cir. 1998); *Bersch*, 519 F.2d at 993 ("Other fact situations, such as losses to foreigners from sales to them within the United States, are not before us."); *Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1334 (2d Cir. 1972).

None of the plaintiffs here, however, were non-U.S. residents that purchased on U.S. exchanges, and therefore this issue is immaterial.

[195]

*Consolidated Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 261-62 (2d Cir. 1989).

[196]

519 F.2d 974 (2d Cir. 1975).

[197]

*See id.* at 980, 991.

[198]

871 F.2d 252.

[199]

*Id.* at 255-56, 261-62.

nominees) was clearly a direct and foreseeable result of the conduct outside the territory of the United States."[200]

The same rationale supports the conclusion that jurisdiction over the claims against BNL and CSFB exists here insofar as they are brought by purchasers of Parmalat securities resident in the United States. The plaintiffs have alleged that the transactions involving BNL and CSFB resulted in the creation of fictitious assets or revenues and that Parmalat disseminated false information about its financial condition, knowing that investors in the United States would receive and rely upon that information.[201] This effect is at least as substantial as that found sufficient in *Bersch* and *Consolidated Gold Fields*. These allegations therefore suffice at the pleading stage to establish jurisdiction over the U.S. purchasers' claims against BNL and CSFB.

\* \* \*

For the foregoing reasons, the motions to dismiss will be denied insofar as the complaint seeks to hold Citigroup and BNL liable for participating in transactions involving allegedly worthless invoices, and CSFB liable for participating in the scheme set forth in the complaint, except that the complaint will be dismissed to the extent that it asserts claims against BNL and CSFB on behalf of purchasers not resident in the United States.

B.     *Alleged Misstatements and Omissions*

The complaint seeks to hold the defendant financial institutions liable for three sets of alleged misstatements or omissions in violation of Rule 10b-5(b): (1) the November 21, 2003

---

[200]

       *Id.* at 262.

[201]

       Cpt. ¶¶ 57-62.

press release allegedly approved by Citigroup regarding the Geslat and Buconero arrangement, (2) the December 18, 1999 press release allegedly co-written by BoA regarding the Parmalat Administracao private placement, and (3) a series of statements and omissions by BoA relating to BoA loans backed by funds raised from private placements of Parmalat debt.[202]

### 1.    The Geslat / Buconero Press Release Allegedly "Approved" by Citigroup

The allegations regarding the press release allegedly approved by Citigroup fail for at least two independent reasons.

First and most importantly, these assertions run afoul of the bright line rule requiring attribution to the defendant at the time the statement was made.[203] Here, the press release was

---

[202]

The complaint alleges as well that Citigroup executives made misleading statements to the press in 1997 and 1998 regarding the Parmalat Canada arrangement. Cpt. ¶¶ 374-75. These statements, however, were made before the Class Period, and the limitations period for an action based on them has expired. *See* 28 U.S.C. § 1658.

There is also an allegation that Citigroup's Smith Barney unit issued a research report on November 12, 2003 in which it changed its rating for Parmalat from "Hold" to "Buy." Cpt. ¶ 733. The plaintiffs do not press this allegation as a basis of liability, and in any case the complaint does not indicate that there was anything false or misleading about this report.

[203]

*See* section IV.C above.

The plaintiffs' attempt to avoid the bright line attribution rule do not avail. They cite *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 75-76 (2d Cir. 2001), *see* Pl. Mem. 86-87, but the relevant discussion in that case – which does not cite *Central Bank*, *Wright v. Ernst & Young LLP*, 152 F.3d 169 (2d Cir. 1998), or *Shapiro v. Cantor*, 123 F.3d 717 (2d Cir.1997) – addressed only whether the complaint properly attributed relevant misrepresentations to a particular defendant. *In re Scholastic Corp.* did not question, let alone purport to set aside, the attribution rule set forth in *Wright* and *Shapiro*.

The plaintiffs rely also on *In re Global Crossing, Ltd. Sec. Litig*, 322 F. Supp.2d 319, 332-34 (S.D.N.Y. 2004). That decision formulated a new version of the *Wright* rule:

"[A] plaintiff may state a claim for a primary liability under section 10(b) for a false statement (or omission), even where the statement is not publicly attributed

Parmalat's. It was not attributed to Citigroup at the time of its dissemination or otherwise. It therefore cannot serve as a basis for Section 10(b) liability.

Second, the complaint fails to specify why the press release is false or misleading. Plaintiffs dispute this point, insisting in their memorandum of law that the complaint "allege[s] that this release described Citigroup's role as a 'partner' when in fact it was a lender."[204] But the relevant sections of the complaint do not say this. The inference depends on reading between the lines of the complaint, which Rule 9(b) and the PSLRA are supposed to foreclose. The explanation in the plaintiffs' memorandum may not cure defects in the complaint.[205]

---

to the defendant, where the defendant's participation is substantial enough that s/he may be deemed to have *made* the statement, and where investors are sufficiently aware of defendant's participation that they may be found to have *relied* on it as if the statement had been attributed to the defendant." *Id.* at 333.

Even if this variation on *Wright* were correct, it would not help the plaintiffs. They have pled no facts to suggest that investors would have attributed the press release to Citigroup, let alone facts like those at issue in *Global Crossing*, in which the court observed:

"[I]t is undisputed, as a matter of public record, that Andersen's audit reports were included in all of GC's registration statements and annual reports from 1998 to 2000, and that they were widely available to shareholders during the class period. Andersen's role as GC's auditor was thus well known to investors, who could easily have relied on the accounting firm's involvement in making any public financial reports, even where a particular statement was not publicly attributed to it. Moreover, Andersen's aggressive marketing of the novel accounting strategies promoted in the White Paper, which allegedly 'became a "must-read" in the telecom industry,' raises an inference that sophisticated investors would have known of Andersen's role in creating the reporting practices behind GC's false statements. These allegations are sufficient to raise a reasonable inference not only that Andersen was one of the 'makers' of the statements, but also that investors viewed it as such." *Id.* at 334.

[204] Pl. Mem. 86 n.51.

[205] *E.g.*, *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp.2d 371, 432 (S.D.N.Y. 2001) ("The complaint cannot, of course, be amended by the briefs in opposition to a motion to dismiss"); *Lazaro v. Good Samaritan Hosp.*, 54 F. Supp.2d 180, 184 (S.D.N.Y. 1999).

Even if the complaint somehow could be read to reflect the explanation in the memorandum, it still would not be clear why the press release was misleading. There is nothing in the complaint, at least nothing that meets the relevant pleading standards, to suggest that Citigroup, through Buconero, did not make equity investments in Geslat.[206] Rather, the complaint hints that investors were deceived because additional terms governing the Citigroup / Parmalat relationship – terms that would have revealed that Parmalat ultimately was liable to repay Citigroup's contributions and that the investments therefore should have been recorded as liabilities rather than equity on Parmalat's financial statements – were not disclosed. Because these circumstances are not spelled out in the complaint, it runs afoul of Rule 9(b) and the PSLRA.

### 2. The Parmalat Administracao Press Release Allegedly Co-Written by BoA

The allegations regarding the December 18, 1999 press release allegedly co-written by BoA also fail.

Most importantly, the press release was issued by Parmalat and not attributed to BoA.[207]

Second, the complaint insufficiently pleads BoA's *scienter*. The press release is said to have been misleading because it did not disclose that the Brazilian company would never be

---

[206] Indeed, the complaint alleges that a 1999 internal Citibank memorandum stated that "[f]rom Citigroup's point of view, the [Buconero / Geslat arrangement] creates an investment . . . [that] qualifies as equity from a U.S. tax perspective . . . ." Cpt. ¶ 799.

[207] *Global Crossing* does not avail here, either. Even if that case states the correct rule, the complaint fails to allege facts suggesting that investors would attribute the press release to BoA. *See* footnote 203 above.

listed.[208] The basis for this information-and-belief allegation is the testimony of a Parmalat official that:

> "[s]urely from the year 2002, but probably earlier, the management of the Brazilian group and myself were aware of the substantial economic-financial impossibility to be listed, especially in light of the values indicated in the equity transaction organized by the Bank of America and financed through [private placements]."[209]

Even assuming that this testimony could support an inference that Parmalat knew at the time the press release was prepared that the Brazilian entity never could be listed, the complaint fails to support an inference that BoA knew that and intended to mislead the public.

The complaint insufficiently alleges motive. The circumstances suggest that BoA, far from wanting to mislead the public, would have had an interest in bringing about the listing of the Brazilian entity. Its gain presumably would have been greater if its and its fellow investors' stake in the Brazilian entity had been sold publicly rather than treated as a four-year loan. "Where plaintiff's

---

[208]  The complaint alleges as well that Sala, the alleged BoA employee, "told [a Parmalat employee] how to describe the transaction without revealing that Parmalat would have to repurchase the 18.18% stake at a very substantial premium in the event the Brazilian entity did not obtain a public listing . . . ." Cpt. ¶ 400. The press release, however, specifically states that:

> "[s]hould the Brazilian company not be listed within the next four years, Parmalat Administracao's new shareholders will have the option to sell the shares acquired in the capital increase back to the Parmalat Group. In this event, the cost to Parmalat would be equal to the original price paid by the North American investors increased by a spread consistent with the most recent financial transactions undertaken by the Group on the international capital markets." Pietrzak Decl. Ex. A.

Assuming the complaint properly characterizes the contingent repurchase, the complaint fails to explain why "a spread consistent with the most recent financial transactions" is a misleading description of "a very substantial premium."

[209]  Cpt. ¶ 398.

view of the facts defies economic reason," the Second Circuit has explained, the complaint "does not yield a reasonable inference of fraudulent intent."[210]

Nor are there are any facts here to suggest conscious misbehavior or recklessness.

3.    *Misrepresentations and Omissions by BoA in Connection with Loans and Private Placements*

The complaint fails to state a claim based on BoA's alleged misrepresentations and omissions connected with the private placements used to back BoA's loans to Parmalat. The allegation that BoA and Parmalat failed to disclose that an $80 million offering in 1998 was related to the Venezuelan loan is time-barred. The allegation that "[i]n each instance, Bank of America publicly announced it had made a conventional loan in the stated amount to Parmalat" when "[t]he reality of these transactions . . . was much different"[211] fails to specify where and when BoA made these announcements. As for the allegation that BoA omitted to disclose in connection with its loans "side letter agreements . . . that required Parmalat to pay additional interest on its loans,"[212] the complaint fails to allege or show that BoA owed a duty to disclose that would have made an omission actionable.[213]

---

[210]

*Kalnit v. Eichler*, 264 F.3d 131, 140-41 (2d Cir. 2001) (quotation marks and citations omitted).

[211]

Cpt. ¶ 847.

[212]

*Id*. ¶ 848.

[213]

*See Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 189 (2d Cir. 1998) ("In the case of an omission, the duty to disclose generally 'arises when one party has information that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.'" (quoting *Chiarella v. United States*, 445 U.S. 222, 228 (1980)

* * *

For the foregoing reasons, the complaint will be dismissed insofar as it seeks to hold the defendants liable for any misrepresentations in, or omissions from, the two press releases, and for the alleged misrepresentations and omissions relating to the BoA loans.

## VI.  Section 20(a) Claims

A.  *Pleading a Violation of Section 20(a)*

Section 20(a) of the Exchange Act provides that:

"[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."[214]

It is undisputed that a complaint asserting a claim under Section 20(a) must allege a primary violation of the securities laws and control by the defendant over the primary violator. The defendants argue, and the plaintiffs dispute, that the complaint must allege as well culpable participation by the controlling person. For reasons stated in an earlier opinion in this matter,[215] the Court agrees with the plaintiffs.

---

[214]

(internal quotation marks omitted))); *accord Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 179 (2d Cir. 2001); *OSRecovery, Inc. v. One Groupe Int'l, Inc.*, 354 F. Supp.2d 357, 370-71 (S.D.N.Y. 2005).

15 U.S.C. § 78t(a).

[215]

*Parmalat I*, 2005 WL 1527674, at *18-19; *see also Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 2005 WL 1560506, at *13 (S.D.N.Y. July 5, 2005); *Neubauer v. Eva-Health USA, Inc.*, 158 F.R.D. 281, 284 (S.D.N.Y. 1994).

*B.    Sufficiency of the Allegations*

In light of the discussion above, the Court need consider only whether the complaint states claims for controlling person liability against BNL and Citigroup Inc. and Citibank.

For the reasons discussed above, the complaint adequately alleges primary violations committed by Ifitalia and the relevant Citigroup entities. The only remaining issue is the sufficiency of the allegations as to control of Ifitalia by BNL and control of the relevant Citigroup entities by Citigroup Inc. and Citibank. BNL, but not Citigroup, disputes the sufficiency of those allegations.

The complaint alleges that Ifitalia is "BNL's factoring arm," BNL "owns 99.6% of Ifitalia," Ifitalia "acted as agent of, with authority from, and for the benefit of its parent, BNL," and BNL "conducted and directed [the relevant] transactions through Ifitalia."[216] The allegations regarding the Citigroup defendants' control over the relevant Citigroup entities are at least as detailed.[217]

_____

[216]

Cpt. ¶¶ 295, 297.

[217]

The substantive allegations are:

"Defendant Buconero LLC ("Buconero") . . . was formed by Citigroup, Inc. and Citibank . . . . Citigroup, Inc. owns Buconero. Buconero's operations are overseen by Citibank Overseas Investment Corp. . . . . Buconero was formed by Citigroup, Inc. and Citibank for the sole purpose of manipulating Parmalat's financial statements . . . . [Buconero's] involvement in transactions with Parmalat entities was on the authority of, at the direction of, and for the benefit of Citigroup, Inc. and Citibank.

"Defendant Vialattea LLC ("Vialattea") . . . was formed by Citigroup, Inc. and Citibank . . . . Citigroup, Inc. owns Vialattea. Vialattea is a wholly-owned subsidiary of Citibank Overseas Investment Corp. and is the direct parent of Buconero. Vialattea does not have offices or staff separate from Citibank. Vialattea was formed by Citigroup, Inc. and Citibank for the sole purpose of manipulating Parmalat's financial statements . . . . Vialattea's involvement in transactions with

BNL and the plaintiffs agree on the applicable standard: plaintiffs must allege that "the defendant possessed 'the power to direct or cause the direction of the management and policies of [the allegedly controlled] person, whether through the ownership of voting securities, by contract, or otherwise.'"[218] The allegations of control here are not extremely detailed, but they do not need to be at this stage, where they are governed by Rule 8.[219] For purposes of pleading a Section 20(a) claim, these allegations are sufficient.[220]

---

Parmalat entities was on the authority of, at the direction of, and for the benefit of Citigroup, Inc. and Citibank.

"Defendant Eureka Securitization Plc ("Eureka") . . . [has] its principal place of business in England. Citigroup, Inc. owns Eureka. Eureka shares offices with Citibank's London Branch and is managed by Citibank as part of its global securitization business. . . . Eureka was formed by Citigroup, Inc. and Citibank for the sole purpose of manipulating Parmalat's financial statements . . . . Eureka's involvement in transactions with Parmalat entities was on the authority of, at the direction of, and for the benefit of Citigroup, Inc. and Citibank." Cpt. ¶¶ 173-75.

By contrast, the complaint contains only conclusory assertions in support of the allegation that Citigroup Inc. controls Citibank. *See id.* ¶¶ 171-72, 1187-88. This omission is not particularly troubling, however. Citigroup's Rule 7.1 statement states what is practically common knowledge in the financial world, which is that Citibank is a wholly-owned subsidiary of Citicorp, which is a wholly-owned subsidiary of Citigroup Inc. *See* Citigroup R. 7.1 St., docket item 223.

[218]

*SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1473 (2d Cir. 1996) (quoting 17 C.F.R. § 240.12b-2).

[219]

*See, e.g., In re Philip Servs. Corp. Sec. Litig.*, No. 98 Civ. 835 (MBM), 2004 WL 1152501, at *19 (S.D.N.Y. May 24, 2004); *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp.2d 392, 415-16 (S.D.N.Y. 2003) (for purposes of pleading the control element of a § 20(a) claim, "[a] short, plain statement that gives the defendant fair notice of the claim that the defendant was a control person and the ground on which it rests its assertion that a defendant was a control person is all that is required."); *Neubauer*, 158 F.R.D. at 284-85.

[220]

*Cf. Parmalat I*, 2005 WL 1527674, at *19-20.

BNL argues, relying on *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288 (DLC), 2004 WL 1097786, at *3 (S.D.N.Y. May 18, 2004), that a bare allegation of a parent/subsidiary

*VII. Conclusion*

The motions of the defendant financial institutions to dismiss the complaint are disposed of as follows:

1. Citigroup's motion [04 MD 1653, docket item 28] is denied insofar as Counts XII, XIV, and XV of the complaint seek to hold Citigroup liable for participating in transactions involving allegedly worthless invoices, and otherwise granted.

2. BoA's motions [04 MD 1653, docket items 14 & 16] are granted.

3. BNL's motion [04 MD 1653, docket item 51] is granted to the extent that the complaint asserts claims on behalf of purchasers of Parmalat securities not resident in the United States and otherwise denied.

4. CSFB's motion [04 MD 1653, docket item 15] is granted to the extent that the complaint asserts claims on behalf of purchasers of Parmalat securities not resident in the United States and otherwise denied.

The plaintiffs are granted leave to amend the complaint on or before August 8, 2005 to cure the deficiencies noted in this opinion. Should they amend, they shall serve and provide the Court with a red- or black-lined copy of the new pleading.

SO ORDERED.

Dated: July 13, 2005

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

relationship is insufficient to establish control for purposes of pleading a Section 20(a) claim. Even if that is so – a point on which the Court expresses no view – the plaintiffs in this case have alleged more than the bare fact of a parent / subsidiary relationship, including BNL's ownership of nearly 100 percent of Ifitalia's equity, Ifitalia's identity as BNL's factoring arm, and Ifitalia's status as BNL's agent for purposes of the transactions at issue here. The allegations regarding the Citigroup defendants' control over the relevant entities are at least as detailed.