UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re PARMALAT SECURITIES LITIGATION

This document relates to:     04 Civ. 0030 (LAK)

MASTER DOCKET
04 MD 1653 (LAK)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM AND ORDER**

Appearances:

>James J. Sabella
>Stuart M. Grant
>John C. Kairis
>Diane Zilka
>GRANT & EISENHOFER, P.A.
>
>Steven J. Toll
>Lisa M. Mezzetti
>Mark S. Willis
>Julie Goldsmith Reiser
>Joshua S. Devore
>COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.
>
>*Attorneys for Plaintiffs*
>
>Bruce R. Braun
>Linda T. Coberly
>Theodore Z. Polley
>WINSTON & STRAWN LLP
>*Attorneys for Defendant Grant Thornton LLP*

LEWIS A. KAPLAN, *District Judge.*

This is a purported class action on behalf of purchasers of securities of Parmalat Finanziaria, S.p.A., ("Parmalat") for damages allegedly sustained when Parmalat collapsed following discovery of a massive fraud that reportedly involved the understatement of Parmalat's debt and the

2

overstatement of its assets by billions of dollars.  The matter is before the Court on a motion by Grant Thornton LLP ("GT-US") to dismiss the third amended complaint (the "TAC") as to it.

I assume familiarity with my prior decisions in this case, including particularly those reported at 375 F. Supp. 2d 278, which dealt with motions by GT-US and other accountants to dismiss the initial complaint (the "Auditor Opinion"), and 376 F. Supp. 2d 472, which resolved similar motions by various defendant banks.  Also important for purposes of this motion is the opinion in a related case brought by the Dr. Enrico Bondi, Extraordinary Commissioner of Parmalat and related entities, which is reported at 421 F. Supp. 2d 703 ("*Bondi*").

As the nature of the litigation and the allegations of the class plaintiffs and Dr. Bondi are sufficiently described for most purposes in the previous opinions, I omit any such description here.  I discuss particulars of this pleading (which is 400 pages in length) only to the extent they are necessary to the resolution of this motion.

I

The essential background of this motion is the somewhat complex structure of Grant Thornton which, although perhaps differing in some particulars, is similar to that of the other major international accounting firms.

What is commonly known as Grant Thornton in fact consists of a number of putatively separate legal entities that use the Grant Thornton name and market themselves as a global accounting organization.  GT-US is the largest, accounting for about one-quarter of the fees generated by the global organization. Grant Thornton International ("GTI") is an Illinois corporation headquartered in London that creates auditing policies and procedures that must be followed by all member firms and reviews each member firm periodically to ensure compliance.  Grant Thornton S.p.A. ("GT-Italy") was a member firm located in Italy that audited Parmalat during part of the

3

period in which the fraud allegedly took place.[1]  All are defendants here.

GT-Italy has not challenged the sufficiency of any of the complaints.  In the Auditor Opinion, I denied GTI's motion to dismiss, but granted that of GT-US.  Following my ruling in *Bondi*, where I denied a motion by GT-US to dismiss that complaint,[2] class plaintiffs filed the TAC, in part to bring GT-US back into the case by conforming its allegations as to GT-US to Bondi's complaint.

At this point, class plaintiffs assert that the TAC asserts claims against GT-US on two theories.  First, they contend that GT-US is vicariously liable for primary violations of Section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act")[3] and Rule 10b-5 thereunder[4] allegedly committed by GT-Italy on a subagency theory, viz. that GT-Italy was an agent of GTI, which in turn was an agent of GT-US.   Second, they argue that the TAC states a claim against GT-US under Section 20(a) of the 1934 Act.[5]

II

GT-US first challenges the Rule 10b-5 claim on essentially three grounds.

First, it asserts that agency liability under Rule 10b-5, to whatever extent it exists, is limited to circumstances in which the allegedly false statement by the primary violator, here GT-Italy, was attributed to the principal, here GT-US, at the time of its public dissemination.  This, it

---

[1] Auditor Opinion, 375 F. Supp. 2d at 283, 288.

[2] 421 F. Supp. 2d at 718-19.

[3] 15 U.S.C. § 78j(b).

[4] 17 C.F.R. § 240.10b-5.

[5] 15 U.S.C. § 78t(a).

4

contends, is required by *Wright v. Ernst & Young LLP*[6] and its progeny.  The TAC, it says, alleges no such false statement.

Second, it contends that imposing "GTI's liabilities on GT-US would be an end-run around GTI's corporate structure"[7] and run afoul of Illinois law.[8]

Finally, GT-US argues that the theory of agency espoused here by the class plaintiffs "is novel indeed."[9]  Although it concedes that "***traditional*** agency theories may still be available for claims under Section 10(b), 'novel and expansive' theories are not."[10]  They rely for this proposition on *In re Global Crossing, Ltd. Securities Litigation* ("*Global Crossing III*").[11]

A.  The Supposed Attribution Requirement

GT-US contends that *Wright* forecloses *respondeat superior* liability here because no false statement allegedly is attributed to the firm.  *Wright*, however, does no such thing.

It is important to recognize, as an initial matter, that principals typically are liable for torts and crimes committed by their agents acting within the scope of their authority.  This long has been applied to impose *respondeat superior* liability in federal securities and criminal cases even

---

[6] 152 F.3d 169 (2d Cir. 1998).

[7] Def. Mem. 10.

[8] *Id.* (citing 805 ILL. COMP. STAT. 105/107.85, which states that "[t]he members of a [not for profit] corporation shall not be personally liable for any debt or obligation of the corporation").

[9] Def. Mem. 15.

[10] *Id.* at 16 (emphasis in original).

[11] No. 02 Civ. 0910 (GEL), 2005 WL 2990646 (S.D.N.Y. Nov. 7, 2005).

where the principal itself has committed no primary violation.[12]  The liability in such cases is vicarious – that is, it is based on the status of the defendant, not on the defendant's actions.  In other words, liability is imposed on the principal  "not because it committed some wrongdoing outside the purview of the statute which assisted the wrongdoing prohibited by the statute, but because its *status* merits responsibility for the tortious actions of its agent."[13]

*Wright*'s antecedent, the Supreme Court's decision in *Central Bank of Denver v. First Interstate Bank of Denver*,[14] dealt with a question entirely separate from vicarious liability, viz. the nature of the conduct that runs afoul of Section 10(b) and Rule 10b-5.  It held that there is no aiding and abetting liability under Section 10(b) and Rule 10b-5, essentially because aiding and abetting liability could not be reconciled with the text.[15]  *Wright* followed in its wake, holding that 10b-5 liability for an accountant's private approval of a false press release issued by its client, but not attributed to the accountant, is foreclosed by *Central Bank*, as it alleged in substance nothing more

---

[12] *New York Cent. & Hudson River R.R. Co. v. United States*, 212 U.S. 481 (1909); *see also, e.g.*, *Marbury Mgmt., Inc. v. Kohn*, 629 F.2d 705, 712-16 (2d Cir.), *cert. denied*, *Wood Walker & Co. v. Marbury Mgmt., Inc.*, 449 U.S. 1011 (1980); *Global Crossing III*, 2005 WL 2990646, at *5.  In fact, most circuits have explicitly held that *respondeat superior* applies in federal securities cases, and none currently regards the securities laws as supplanting the doctrine.  *See, e.g.*, *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001); *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1576-77 (9th Cir. 1990) (*en banc*), *cert. denied*, 499 U.S. 976 (1991); *In re Atl. Fin. Mgmt., Inc. Sec. Litig.*, 784 F.2d 29, 35 (1st Cir. 1986), *cert. denied*, *AZL Res., Inc. v. Margaret Hall Found.*, 481 U.S. 1072 (1987); *Commerford v. Olson*, 794 F.2d 1319, 1323 (8th Cir. 1986); *Henricksen v. Henricksen*, 640 F.2d 880, 887 (7th Cir.), *cert. denied*, 454 U.S. 1097 (1981); *Marbury Mgmt., Inc.*, 629 F.2d at 712-16; *Paul F. Newton & Co. v. Tex. Commerce Bank*, 630 F.2d 1111, 1118 (5th Cir. 1980); *Holloway v. Howerdd*, 536 F.2d 690, 694-95 (6th Cir. 1976).

[13] *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1431 (3d Cir. 1994) (emphasis in original).

[14] 511 U.S. 164 (1994).

[15] *Id.* at 176-77.

6

than aiding and abetting.[16]

The issue in *Central Bank* and *Wright* thus was the nature of the *conduct* that subjects one to Section 10(b) and Rule 10b-5 liability. Neither involved the entirely distinct question whether a principal, in consequence of its status, may be held liable on the basis of *respondeat superior* for a 10b-5 violation committed by its agent. I, however, decided precisely that question – adversely to GT-US's position – in the Auditor Opinion.[17]

The fact that *Central Bank* and *Wright* left *respondeat superior* liability untouched is confirmed by *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*.[18] Certain defendants there contended that they could not be held liable under Rule 10b-5 in light of *Central Bank* and *Wright* because the allegedly false report had been delivered by another. But the Court of Appeals rejected that argument, writing that those defendants:

> "contend that under *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), and *Wright v. Ernst & Young, LLP*, 152 F.3d 169 (2d Cir. 1998), they are not liable for the acts of DeRoziere. These cases are inapposite. In *Central Bank* the Supreme Court held that a party may not bring a cause of action against one actor under § 10(b) for aiding and abetting the violation by another actor because § 10(b) does not prohibit aiding and abetting. *See* 511 U.S. at 191. *Wright* simply applied that holding. *See* 152 F.3d at 175.
>
> "The distinction between the case at bar and those cited is that in *Central Bank* and *Wright* there was no allegation that the defendants were agents of the alleged defrauder, acting for the defrauder. Rather, the *Central Bank* and *Wright* plaintiffs only alleged that the defendants knew of the purported fraud through transactions with the defrauders, but failed to expose the deception."[19]

Indeed, as Judge Koeltl cogently has suggested, a contrary view would preclude holding corporations

---

[16] 152 F.3d at 173-75.

[17] 375 F. Supp. 2d at 291 n.73.

[18] 250 F.3d 87.

[19] *Id*. at 100.

and other business entities liable for securities frauds committed by their employees.[20]

In sum, GT-US's reliance on *Wright* is fundamentally misplaced because it confuses the conduct necessary to violate 10b-5 with the quite separate matter of whether a principal may be held liable for the 10b-5 violation of its agent on the basis of the principal's status.[21]  That issue already has been settled, at least for this litigation, contrary to GT-US's position.  I see no reason to depart from that holding.

B.      *GTI's Corporate Structure and Illinois Law*

GTI is an Illinois not-for-profit corporation of which GT-US is a member.  Act 105, section 107.85 of chapter 805 of the Illinois statutes provides that "[t]he members of [such] a corporation shall not be personally liable for any debt or obligation of the corporation."  GT-US therefore argues that it cannot be held liable for the violations of GT-Italy on plaintiffs' subagency theory, in the absence of a piercing of the corporate veil of GTI, because this statute excludes such liability.

Once again, GT-US's argument confuses the issue.  The statute it relies upon states the conventional rule that members or shareholders of a corporation, simply by virtue of that status, are not personally liable for the debts of their entities.  But *respondeat superior* liability for criminal and tortious behavior rests on the entirely different concept that a principal bears legal responsibility for the actions of its agent that are committed in the course of the agency.  Such liability thus turns on the principal's status as principal.  Where the principal is also a corporate member or shareholder,

---

[20] *Vento & Co. of New York v. Metromedia Fiber Network, Inc.*, No. 97 Civ. 7751 (JGK), 1999 WL 147732, at *13 (S.D.N.Y. Mar. 18, 1999).

[21] GT-US relies on *In re Global Crossing, Ltd. Sec. Litig.*, No. 02 Civ. 0910 (GEL), 2005 WL 1907005, at *10 n.8 (S.D.N.Y. Aug. 8, 2005), and *Gabriel Capital, L.P. v. Natwest Finance, Inc.*, 122 F. Supp. 2d 407, 430-31 (S.D.N.Y. 2000), both of which adopted the position they advocate, at least to some extent.  They are not persuasive for the reasons set forth in the text.

vicarious liability on the basis of the status of member or shareholder is foreclosed by the statute. But the statute does not address the question whether a member or shareholder, in circumstances in which the member or shareholder is a principal and the wrongdoer its agent, is vicariously liable on the basis of its status as a principal.

C.   *The Supposed Novelty of Plaintiff's Theory*

The sole basis for GT-US's attempt to attach significance for 10b-5 purposes to a perceived distinction between "traditional" and "novel" theories of agency is *Global Crossing III*.[22] To whatever extent the case actually supports such a distinction, which is debatable, it has no application here.

In *Global Crossing III*, the Court dealt with securities fraud claims against the Canadian Imperial Bank of Commerce ("CIBC") and CIBC World Markets Corp. ("World Markets"), large shareholders in Global Crossing, that arose in connection with the massive accounting irregularities at Global Crossing. Insofar as is relevant here, the plaintiffs' theory was that CIBC and World Markets were liable on the theory of *respondeat superior* for false and misleading statements signed by Global Crossing directors who were World Markets employees chosen by CIBC to sit on the Global Crossing board of directors. In dismissing this claim, Judge Lynch made essentially two points.

First, directors have fiduciary duties to act on behalf of the companies on the boards of which they serve, not on behalf of the entities that appointed them.[23] Although he did not say it in so many words, the logical conclusion from that proposition is that the CIBC-World Markets designees were not acting within the scope of their authority as agents of CIBC and World Markets when they signed the false and misleading statements in their capacities as directors of Global

---

[22] 2005 WL 2990646.

[23] *Id.* at *5.


9

Crossing. He went on to note that plaintiffs had "point[ed] to no case where a corporation has been held liable on a theory of respondeat suuperior for the actions of its employees in their capacities as independent directors sitting on the board of a different corporation" and that extension of *respondeat superior* liability to cover such cases would go considerably beyond previous practice in the securities area.[24]

Second, Judge Lynch pointed out that the existence of control person liability under Section 20(a) of the 1934 Act, with its "good faith" defense, "counsels against novel and expansive applications of respondeat superior in this context."[25]

GT-US has fastened on the second of these points. But its reliance is misplaced.

As an initial matter, the holding that conventional principles of *respondeat superior* were insufficient to make CIBC and World Markets responsible for the actions of their designees on the Global Crossing board in their capacities as Global Crossing directors was quite sufficient to dispose of the motion. The observations about the need for caution in expanding *respondeat superior* in the securities law context appear to have been *dicta*. Moreover, there is reason to conclude that they are inconsistent with the law of this Circuit. In *Marbury Management, Inc. v. Kohn*,[26] the defendants sought to defeat claims made on *respondeat superior* theories by arguing that the existence of control person liability under Section 20(a) of the 1934 Act was inconsistent with permitting vicarious liability except under that statute. But the Second Circuit rejected that contention, stating that:

> "there is no warrant for believing that Section 20(a) was intended to narrow the remedies of the customers of brokerage houses or to create a novel defense in cases otherwise governed by traditional agency principles. On the contrary Section 28(a),

---

[24] *Id*. at *6.

[25] *Id*.

[26] 629 F.2d 705.

15 U.S.C. § 78bb, specifically enacts that the rights and remedies provided by the '34 Act shall be in addition to any and all rights and remedies that may exist at law or in equity."[27]

In consequence, there is strong reason to conclude that *respondeat superior* liability exists in appropriate securities fraud cases without regard to whether the facts or the doctrine is characterized best as traditional or novel. But there ultimately is no need to decide that issue.

Plaintiffs' theory here is simplicity itself. In their view, GT-Italy violated the securities laws to their detriment within the scope of its employment as an agent of GTI and a subagent of GT-US. Assuming they can prove that, there would be nothing at all novel about subjecting both GTI and GT-US to vicarious liability. The Restatement states with pristine clarity that "[t]he rules applicable to the liability of a principal for the acts of agents, are applicable to his liability for subservants and other subagents insofar as their conduct has relation to the principal's affairs."[28] Cases to the same effect are legion.[29] In consequence, even if GT-US were right in positing that "[a]lthough ***traditional*** agency theories may still be available for claims under Section 10(b), 'novel and expansive theories' are not,"[30] the lack of novelty of the legal principles relied upon by plaintiffs would doom their argument.[31]

---

[27] *Id.* at 716.

[28] RESTATEMENT (SECOND) OF AGENCY § 255 (1958).

[29] *E.g.*, *Blanchette v. Cataldo*, 734 F.2d 869, 875 (1st Cir. 1984); *Reed v. Michael Realty & Assocs.*, No. 92 C 6751, 1994 WL 559225, at *8 (N.D. Ill. Oct. 7, 1994); *Merritt v. Woodridge Court Condos. Assoc.*, No. 87 C 4073, 1988 WL 53166, at *6 (N.D. Ill. May 16, 1988).

[30] Def. Mem. 16 (emphasis in original).

[31] GT-US's contention that the TAC fails sufficiently to allege the subagency relationship (Def. Mem. 4-6, 18-21), assuming the argument actually is addressed to that point as well as to its contention that the TAC fails sufficiently to allege facts that would justify piercing the GTI corporate veil, is without merit. The relevant allegations are practically a verbatim

11

III

GT-US's final argument is that the Section 20(a) claim is insufficient because the TAC fails to allege control by GT-US over the transactions in question.[32] This argument too, in my view, is without merit.

Section 20(a) of the 1934 Act provides:

"Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."[33]

The statute thus requires control only of a person liable under the chapter, not of the transaction constituting the violation. Requiring a plaintiff to plead and prove not only that the defendant controlled the person liable under the chapter, but also that the defendant had exercised control over the transaction constituting the violation, would be in serious tension and probably inconsistent with the language of the statute. It would be inconsistent also with my oft-stated view that a plaintiff relying on Section 20(a) is not obliged to allege or prove a controlling person's culpable participation in the violation.[34] And to whatever extent GT-US may be making a somewhat different point, viz., that the allegations of the complaint do not adequately allege that it had the ability to control the

---

copy of those I upheld in *Bondi*, 421 F. Supp. 2d at 719. *Compare Bondi v. Grant Thornton Int'l*, No. 04 Civ. 9771, First Am. Cpt. (docket item 121) ¶¶ 138-55, *with* TAC ¶¶ 176-92.

[32] Def. Mem. 22-24.

[33] 15 U.S.C. § 78t(a).

[34] *E.g.*, Auditor Opinion, 375 F. Supp. 2d at 307-10.

I recognize, of course, that there is a split of authority on this point. *See Lapin v. Goldman Sachs Group, Inc.*, No. 04 Civ. 2236 (KMK), 2006 WL 2850226, at *18-19 (S.D.N.Y. Sept. 29, 2006) (discussing split in S.D.N.Y.).

transactions at issue, I disagree.

### *Conclusion*

For the foregoing reasons, the motion of Grant Thornton LLP to dismiss the third amended complaint [04 MD 1653 docket item 638, 04 Civ. 0030 docket item 551] is denied in all respects. For the sake of good order, I note that I exclude all materials other than the TAC that were submitted on the motion and decline to convert it into a motion for summary judgment.

SO ORDERED.

Dated:      February 21, 2007

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)