UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re PARMALAT SECURITIES LITIGATION

MASTER DOCKET

This document relates to:     04 Civ. 0030                04 MD 1653 (LAK)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# MEMORANDUM OPINION

Appearances:


Steven J. Toll
Lisa M. Mezzetti
Mark S. Willis
Julie Goldsmith Reiser
Joshua S. Devore
COHEN, MILSTEIN, HAUSFELD & TOLL,
P.L.L.C.
Stuart M. Grant
James J. Sabella
John C. Kairis
Diane Zilka
GRANT & EISENHOFER, P.A.
*Attorneys for Class Lead Plaintiffs*

George A. Schieren
Mark A. Kirsch
Joel M. Cohen
Angelique Shingler
Mark Holland
Guy C. Quinlan
Jason A. D'Angelo
CLIFFORD CHANCE US LLP
*Attorneys for the Citigroup Movants*

Daniel F. Kolb
Sharon Katz
Frances E. Bivens
DAVIS POLK & WARDWELL
*Attorneys for Defendant Deloitte &
Touche LLP*

Michael J. Dell
Jeffrey W. Davis
KRAMER LEVIN NAFTALIS & FRANKEL
LLP
*Attorneys for Defendants Deloitte Touche
Tohmatsu and James E. Copeland*

A. Robert Pietrzak
Thomas McC. Souther
Daniel A. McLaughlin
Joseph B. Tompkins, Jr.
Alan C. Geolot
Mark P. Guerrera
SIDLEY AUSTIN LLP
*Attorneys for the Bank of America
Movants*

James L. Bernard
David A. Sifre
Quinlan D. Murphy
STROOCK & STROOCK & LAVAN LLP
*Attorneys for Defendant Grant Thornton
International*

Bruce R. Braun
Linda T. Coberly
Andrew R. DeVooght
Christopher A. Weller
WINSTON & STRAWN LLP
*Attorneys for Grant Thornton LLP*

LEWIS A. KAPLAN, *District Judge.*

This is a purported class action on behalf of purchasers of securities of the Italian company Parmalat Finanziaria, S.p.A. ("Parmalat") for damages allegedly sustained when Parmalat collapsed following discovery of a massive fraud. The Court assumes familiarity with its prior opinions[1] and sets forth only those aspects of the Third Amended Complaint (the "TAC") relevant to the instant motion.

The named plaintiffs are several entities and individuals, foreign and domestic, who purchased Parmalat securities during the course of the alleged fraud.[2] Plaintiffs seek to sue on behalf of all purchasers of Parmalat securities between January 5, 1999 and December 18, 2003.[3] Plaintiffs sue Parmalat's officers, directors, accountants, lawyers, and banks under Sections 10(b)[4] and 20(a)[5] of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5[6] thereunder.

The matter is before the Court on motions of Grant Thornton International ("GTI")

---

[1]  Particularly relevant are the opinions reported at 375 F. Supp. 2d 278 (S.D.N.Y. 2005), deciding certain auditor defendants' motions to dismiss the first amended complaint, 376 F. Supp. 2d 472 (S.D.N.Y. 2005), deciding certain bank defendants' motions to dismiss the first amended complaint, and 414 F. Supp. 2d 428 (S.D.N.Y. 2006), deciding Bank of America's motion to dismiss the second amended complaint. Plaintiffs represent that the TAC does not materially alter the allegations as to any of the moving defendants. Pls. Mem. 7. Although the TAC realleges claims previously dismissed by the Court, the Court addresses here only those claims it has not dismissed.

[2]  TAC ¶¶ 105-14.

[3]  *Id.* ¶ 1. Plaintiffs' motion for class certification is currently under submission.

[4]  15 U.S.C. § 78j(b).

[5]  *Id.* § 78t(a).

[6]  17 C.F.R. § 240.10b-5.

and Grant Thornton LLP ("GT-US") (collectively, the "Grant Thornton Movants"); Deloitte Touche

Tohmatsu ("DTT"), Deloitte & Touche LLP ("Deloitte-US") and James E. Copeland ("Copeland")

(collectively, the "Deloitte Movants")(the Grant Thornton Movants and the Deloitte Movants

collectively will be referred to as the "Auditor Movants"); Bank of America Corp., Bank of America

N.A. and Banc of America Securities Ltd. (collectively, the "BoA Movants"); and Citigroup Inc.,

Citibank, N.A., Vialattea LLC, Buconero LLC and Eureka Securitisation plc (collectively, the

"Citigroup Movants") to dismiss the claims of foreign purchasers pursuant to Federal Rule of Civil

Procedure 12(c) on the ground that the Court lacks subject matter jurisdiction over such claims, that

foreign purchasers fail to state a claim for relief, or both.


I.       *Legal Standards*

In this circuit, as in many others, the extraterritorial application of the Exchange Act

long has been characterized as implicating a court's subject matter jurisdiction.[7]  A recent Supreme

Court decision, however, raises the question whether it properly is characterized instead as going to

the existence of a claim under the federal securities laws.  In *Arbaugh v. T & H Corp.*,[8] the Supreme

Court concluded that Title VII's definition of "employer" as having fifteen or more employees was

an element of the Title VII claim rather than a limitation on subject matter jurisdiction.  The Court,

observing that "[o]n the subject-matter-jurisdiction/ingredient-of-claim-for-relief dichotomy, this

---

[7]      *See, e.g.*, *SEC v. Berger*, 322 F.3d 187, 192-95 (2d Cir. 2003); *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 984-90 (2d Cir. 1975).

[8]      546 U.S. 500, 126 S.Ct. 1235 (2006).

3

Court and others have been less than meticulous,"[9] enunciated a "readily administrable bright line" rule: "[W]hen Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character."[10]

        The limits on the extraterritorial application of the Securities Exchange Act are not set forth in the text of the Act itself, but instead reflect a recognition by the courts that Congress would not have wished "the precious resources of United States courts and law enforcement agencies" to be spent on predominantly foreign transactions.[11]  *Arbaugh*'s "bright line" rule thus suggests that this limit is an element of a securities fraud claim rather than a restriction on a court's subject matter jurisdiction.[12]  The Court need not decide the issue, however.  While the appropriate characterization may affect the outcome in other cases, movants here prevail in either event.

        On a motion to dismiss, a court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in the alleging party's favor.[13]  "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient

---

[9]    126 S.Ct. at 1242.

[10]    *Id.* at 1245.

[11]    *Bersch*, 519 F.2d at 985.

[12]    *See Republic of Colombia v. Diageo N. Am. Inc.*, No. 04 Civ. 4372 (NGG), 2007 WL 1813744, at *7-8 (E.D.N.Y. June 19, 2007) (questioning whether *Arbaugh* requires that the extraterritorial application of RICO be treated as an element of the claim but declining to decide the issue); *Ayyash v. Bank Al-Madina*, No. 04 Civ. 9201(GEL), 2006 WL 587342, at *4 n.2 (S.D.N.Y. Mar. 9, 2006) (same).

[13]    *E.g.*, *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 237 (2d Cir. 2003); *Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001).

'to raise a right to relief above the speculative level.'"[14]

Upon submission by the parties of materials external to the complaint, a court may convert a motion to dismiss or for judgment on the pleadings for failure to state a claim into one for summary judgment.[15]  Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[16]  Where, as here, the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.[17]  In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment.[18]

If, where the Court considers extrinsic materials, the motions properly are characterized as motions to dismiss for lack of subject matter jurisdiction instead of summary

---

[14]

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, – F.3d –, 2007 WL 1989336, at *5 (2d Cir. July 11, 2007) (quoting *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1965 (2007)); *see also Iqbal v. Hasty*, – F. 3d –, 2007 WL 1717803, at *11 (2d Cir. June 14, 2007) (discussing *Twombly* holding and declining to limit it solely to the antitrust context).

[15]

FED. R. CIV. P. 12(b); *see also Friedl v. City of New York*, 210 F.3d 79, 83-84 (2d Cir. 2000).

Most parties submitted such materials when the motions were briefed.  After oral argument, the Court provided notice that it intended to consider such materials on the motions by BoA and Citigroup and afforded the parties an additional opportunity to present relevant materials.  Order, May 28, 2007 [04 MD 1653, docket item 1313].

[16]

*E.g.*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *White v. ABCO Eng'g Corp.*, 221 F.3d 293, 300 (2d Cir. 2000); *see also* FED. R. CIV. P. 56(c).

[17]

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Virgin At. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 273 (2d Cir. 2001).

[18]

*Celotex*, 477 U.S. at 322-23; *Raskin v. Wyatt Co.*, 125 F.3d 55, 65-66 (2d Cir. 1997).

5

judgment motions, the standard would change only in that a court may make factual findings where a material fact is disputed.[19]  As there are no material facts in dispute here, the outcome would be the same under either standard.

## II.    Successive Motions

As an initial matter, plaintiffs argue that the motions should be denied as improper successive motions under Rule 12(g) or as determined by the law of the case because all movants filed previously motions to dismiss for failure to state a claim.  Plaintiffs' arguments are without merit.  Indeed, they are further reflections of the scorched earth, take no prisoners style of litigation that both sides have pursued here to the detriment of the prompt, speedy and efficient resolution that should be the goal of all litigation.[20]

Federal Rule of Civil Procedure 12(g) states, in relevant part, that "[i]f a party makes a motion under this rule but omits therefrom any defense or objection then available to the party which this rule permits to be raised by motion, the party shall not thereafter make a motion based on the defense or objection so omitted, except a motion as provided in subdivision (h)(2) hereof on any of the grounds there stated."  Subdivision (h)(2), in turn, states that "[a] defense of failure to state a claim upon which relief can be granted . . . may be made . . . by a motion for judgment on the pleadings."  The plain language of the rule thus contemplates that successive motions to dismiss for

---

[19]

*Antares Aircraft, L.P. v. Fed. Republic of Nigeria*, 948 F.2d 90, 96 (2d Cir. 1991), *vacated on other grounds*, 505 U.S. 1215 (1992).

[20]

*See In re Parmalat Sec. Litig.*, 2007 WL 1815461, at *2-3 (S.D.N.Y. June 25, 2007).

6

failure to state a claim may be filed.  Other courts in this district have reached the same conclusion.[21]

Plaintiffs' argument that the law of the case doctrine bars consideration of the current motions also is unpersuasive.  Under the law of the case, "when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case."[22]  But as the Court has not yet ruled on whether foreign purchasers state claims against movants, the law of the case doctrine does not apply.  Moreover, the doctrine is discretionary, "and the decision whether or not to apply law-of-the-case is, in turn, informed principally by the concern that disregard of an earlier ruling not be allowed to prejudice the party seeking the benefit of the doctrine," where the term prejudice "refers to a lack of sufficiency of notice."[23]  Plaintiffs have had ample notice that the Court is considering the issue.  Hence, even if the doctrine applied, it would not bar the Court's consideration of the motions.[24]

---

[21]

    *See, e.g.*, *Dorchester Investors v. Peak Trends Trust*, No. 99 Civ. 4696 (LMM), 2002 WL 272404, at *2-3 (S.D.N.Y. Feb. 26, 2002); *Vega v. State Univ. of New York Bd. of Trustees*, No. 97 Civ. 5767 (DLC), 2000 WL 381430, at *2 (S.D.N.Y. Apr. 13, 2000).

    The result does not change if the motion properly is characterized as one contesting subject matter jurisdiction because subject matter jurisdiction "can never be forfeited or waived." *Arbaugh*, 126 S.Ct. at 1244.

[22]

    *United States v. Uccio*, 940 F.2d 753, 758 (2d Cir. 1991).

[23]

    *Id.*

[24]

    *See id.* at 758-59.

### III.    Discussion

A.    *The Extraterritorial Application of the Securities Laws*

As noted above, the federal securities laws are silent with respect to their extraterritorial application.  In *Bersch v. Drexel Firestone, Inc.*,[25] however, Judge Friendly noted that "[w]hen . . . a court is confronted with transactions that on any view are predominantly foreign, it must seek to determine whether Congress would have wished the precious resources of United States courts and law enforcement agencies to be devoted to them rather than leave the problem to foreign countries."[26]  The test in this Circuit for whether Congress would so wish is "(1) whether the wrongful conduct occurred in the United States, and (2) whether the wrongful conduct had a substantial effect in the United States or upon United States citizens."[27]

Conduct in the United States will support application of the securities laws only when "substantial acts in furtherance of the fraud were committed within the United States."[28]  U.S. acts or culpable failures to act must have been "more than 'merely preparatory'" and must have "'directly caused' the claimed losses."[29]  In contrast, "where the United States activities are merely preparatory or take the form of culpable nonfeasance and are relatively small in comparison to those abroad,"

---

[25]

519 F.2d 974.

[26]

*Id.* at 985.

[27]

*SEC v. Berger*, 322 F.3d 187, 192 (2d Cir. 2003); *see also In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 510 (S.D.N.Y. 2005).

[28]

*Psimenos v. E.F. Hutton & Co.*, 722 F.2d 1041, 1045 (2d Cir. 1983).

[29]

*SEC v. Berger*, 322 F.3d at 193 (quoting *Itoba Ltd. v. Lep Group PLC*, 54 F.3d 118, 122 (2d Cir. 1995)); *see also Alfadda v. Fenn*, 935 F.2d 475, 478 (2d Cir. 1991).

8

the securities laws do not apply.[30]  "Inherent in the conduct test is the principle that Congress does not want 'the United States to be used as a base for manufacturing fraudulent security devices for export, even when these are peddled only to foreigners.'"[31]  All parties here agree that the conduct of each defendant is analyzed separately.[32]

Initially, plaintiffs did not contend that the second test – the effects test – applies to the claims of foreign purchasers.  At oral argument, however, lead plaintiffs' counsel urged the Court to apply a "blended" test weighing both conduct and overall effects, citing *Itoba Ltd. v. Lep Group PLC*.[33]  Plaintiffs argue, in essence, that since the fraud harmed U.S. purchasers,[34] this effect should factor into the Court's consideration of whether the U.S. conduct of the moving defendants is sufficient to support application of the securities laws.

Plaintiffs' argument is unpersuasive.  The plaintiff in *Itoba* was a foreign entity, but the alleged injury flowed to its parent company and its shareholders, half of whom resided in the United States.[35]  Thus, if neither the effects test nor the conduct test alone had been satisfied, the

---

[30]

　　*Bersch*, 519 F.2d at 987.

[31]

　　*Itoba*, 54 F.3d at 122 (quoting *Psimenos*, 722 F.2d at 1045).

[32]

　　*See* Pls. Mem. 15.

[33]

　　54 F.3d 118.  Plaintiffs made the argument also in their supplemental brief.  Pls. Supp. Mem. 2 n.2.

[34]

　　The TAC alleges that Parmalat sold nearly $1.5 billion in securities to United States investors.  TAC ¶ 62.

[35]

　　*Itoba*, 54 F.3d at 124.

9

injury suffered in the U.S. would not have been redressed.  This case is very different.  Plaintiffs here seek to certify a class of purchasers of Parmalat securities.  Some purchasers were domestic; others foreign.  Movants seek to dismiss only the claims of the latter.  The claimed injuries to American purchasers will be litigated, and the question of whether the securities laws reach the claims of foreign purchasers need not consider the U.S. effect.[36]  Thus, the effects test has no bearing on the present motions.

### B.    The Auditor Movants

It is unnecessary to convert the motions of the Auditor Movants to ones for summary judgment, as plaintiffs have not stated a legally sufficient claim.  The Court begins by setting forth the allegations of the complaint, drawing every reasonable inference favorable to plaintiffs.

### 1.    Allegations

The TAC alleges that Parmalat's auditors during the relevant period, Grant Thornton S.p.A. ("GT-Italy") and Deloitte & Touche, S.p.A. ("Deloitte-Italy"), participated in and are liable for Parmalat's fraud.  GT-Italy and Deloitte-Italy allegedly, for example, certified Parmalat's financial statements despite knowing that such statements contained material misrepresentations.[37]  The TAC does not allege, however, that any fraudulent acts or omissions by GT-Italy or Deloitte-

---

[36]
     *See In re Alstom S.A. Sec. Litig.*, 406 F. Supp. 2d 346, 370 (S.D.N.Y. 2005) (rejecting the same argument where "[t]he Court has jurisdiction over the claims of domestic shareholders and may adjudicate their rights").

[37]
     *E.g.*, TAC ¶¶ 1033-34.

10

Italy took place in the United States.

The TAC alleges that the Grant Thornton and Deloitte Movants are vicariously liable for the allegedly fraudulent conduct of, respectively, GT-Italy and Deloitte-Italy.[38]  The Court previously found that plaintiffs have alleged sufficiently that GT-Italy was the agent or *alter ego* of GTI and GT-US and that Deloitte-Italy was the agent or *alter ego* of DTT.[39]  These movants thus would be vicariously liable for any Section 10(b) violations committed by their respective agents. The Court previously held also that plaintiffs allege legally sufficient claims against all of the Auditor Movants for liability under Section 20(a) of the Exchange Act, which provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter . . . shall also be liable jointly and severally with and to the same extent as such controlled person . . . ."[40]  Of particular significance for present purposes, the Court held that the culpable participation of the controlling person was not a necessary element of a Section 20(a) claim.[41]

In sum, the TAC sues the Auditor Movants exclusively for the acts and omissions of others, based on their status as principals and controlling persons.[42]

---

[38]

     This vicarious liability arises from the structure of international auditing entities, which has been explained at length in prior opinions.  *See In re Parmalat*, 375 F. Supp. 2d at 287-88.

[39]

     *Id.* at 294-96, 300-01; *In re Parmalat Sec. Litig.*, 474 F. Supp. 2d 547, 550-54 (S.D.N.Y. 2007).

[40]

     15 U.S.C. § 78t(a).

[41]

     375 F. Supp. 2d at 308-10.

[42]

     This Court repeatedly has held that culpable participation need not be alleged to state a claim under and is not an element of Section 20(a) liability and that *First Jersey* is not to the contrary.  *E.g.*, *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 307-10 (S.D.N.Y.

    2.    *Analysis*

        Plaintiffs argue that "all acts or failures to act by [the Auditor Movants] occurred in the United States" and that the conduct test therefore is satisfied.[43]  The Auditor Movants reply that any U.S. conduct in which they engaged is not alleged to have been directly related to the fraud and thus cannot support extraterritorial application of the securities laws.[44]

        Plaintiffs' argument misses the mark.  The conduct test looks not at *any* conduct, but at *culpable* conduct in furtherance of the fraud.  Plaintiffs seek to hold the Auditor Movants liable solely on the basis of their status as principals or controlling persons – a status which, in itself, is not alleged to have been part of the fraud.  In fact, plaintiffs made this very point in a prior motion in seeking to persuade the Court to apply Rule 8's pleading standard to their allegations of agency.  The

---

2005).  The Court notes that the Second Circuit recently listed culpable participation as an element of liability under Section 20(a), citing *SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996).  *ATSI Commc'ns, Inc.*, 2007 WL 1989336, at *15.  The statement in *ATSI*, however, was *dictum*, as indeed was the statement in *First Jersey* to which it referred.  While the Court gives careful attention even to *dicta* of the Court of Appeals, it respectfully declines to follow these, which appear to be at odds with the language of Section 20(a) of the Exchange Act.

Plaintiffs submit certain evidence, uncovered during discovery, that they claim shows direct wrongdoing on the part of certain Auditor Movants – a claim the Auditor Movants contest.  The Court expresses no opinion as to whether the evidence in fact shows such wrongdoing, as plaintiffs' sole remaining claims are for vicarious and control person liability.  Whether plaintiffs wish to seek leave to amend their pleadings for the fourth time is a separate question.

[43]      Pls. Mem. 2.

[44]      The Auditor Movants contend also that the securities laws would not apply to claims of foreign purchasers against GT-Italy and Deloitte-Italy as plaintiffs allege no U.S. conduct by these entities.  Where the primary violation is not actionable, the Auditor Movants argue, claims for derivative liability also must fail.  Plaintiffs respond that vicarious and control person liability claims can stand absent an actionable primary claim, citing cases where the primary claim was barred by statute of limitations or defective service of process.  As the Court dismisses the claims in any event, it need not decide this argument.

12

Court agreed, concluding that plaintiffs' "allegation [of agency relationship] is not so closely intertwined with the claim of securities fraud that it is a circumstance of the fraud itself."[45]  Thus, the Auditor Movants' U.S.-based actions simply formed the relationships of agency and control. These relationships were not parts of the fraud and did not directly cause plaintiffs' alleged injuries.[46]

Further, plaintiffs tacitly acknowledge that none of the alleged primary violators' conduct took place in the United States.  As the only culpable conduct for which plaintiffs seek to hold the Auditor Movants liable occurred outside of the United States, the securities laws do not apply to claims of foreign purchasers.

C.     The BoA and Citigroup Movants

BoA, Citigroup, and plaintiffs all submitted extrinsic materials in connection with the banks' motions.  Having provided the requisite notice to the parties,[47] the Court converts BoA's and Citigroup's motions to dismiss into motions for summary judgment dismissing the claims of foreign purchasers.

---

45

375 F. Supp. 2d at 291.

46

Plaintiffs' argument that extraterritorial application is warranted because of the Auditor Movants' culpable failures to act in failing to prevent the fraud of their agents is unpersuasive.  The securities laws do not apply to "failure[s] to prevent fraudulent acts where the bulk of the activity was performed in foreign countries." *Fidenas AG v. Compagnie Internationale Pour L'Informatique CII Honeywell Bull S.A.*, 606 F.2d 5, 10 (2d Cir. 1979) (quoting *IIT v. Vencap, Ltd.*, 519 F.2d 1001, 1018 (2d Cir. 1975)).

47

Order, May 28, 2007 [04 MD 1653, docket item 1313].

1.      *The BoA Movants*

a.      *The Parmalat Administração investment*

i.      *Claim for relief*

The TAC alleges two fraudulent arrangements involving the BoA Movants.  The first is an arrangement for equity investment in a Brazilian Parmalat subsidiary, Parmalat Administração.[48]  BoA was the private placement agent for the investment and also an investor. Under the terms of the transaction, designed by BoA employees based in Italy, investors purchased four-year notes from two Cayman Islands special purpose entities, which used the proceeds to invest in Parmalat Administração.  A return on the Parmalat Administração investment was assured by a put agreement guaranteed ultimately by Parmalat.

In a prior opinion, the Court held that, while plaintiffs allege no actionable misrepresentations by BoA with respect to this transaction, plaintiffs sufficiently allege a violation of Rule 10b-5(a) and (c) on the theory that the structure of the transaction itself was deceptive:

> "The [structure of the arrangement] created the appearance that BoA believed that [Parmalat Administração] was worth . . . $1.6 billion and was willing to invest its own money based on that valuation, when in fact BoA knew that [Parmalat Administração] was worth far less and was willing to invest only because the put guaranteed that BoA would be repaid at a premium."[49]

---

[48]

The particulars of this arrangement have been described at great length in previous opinions, *see, e.g.*, 477 F. Supp. 2d 602, 605-06 (S.D.N.Y. 2007), and only details relevant to the present motions are repeated here.

[49]

414 F. Supp. 2d 428, 434-35.  The TAC asserts also claims against BoA for control person liability under Section 20(a) of the Exchange Act.  As the Court finds that the securities laws do not apply to plaintiffs' primary liability claims against BoA Movants, plaintiffs' control person claims also fail for the reasons stated with respect to the Auditor Movants.

>        ii.      Evidence of United States conduct

It is undisputed that BoA actively and successfully solicited U.S. investors and participated in several U.S. "road shows" to that end.  Much of plaintiffs' evidence of U.S. conduct, however, demonstrates only the involvement of U.S.-based BoA officials in the private placements, either in soliciting such investments or in obtaining a favorable rating for the investment from an independent rating organization.[50]

Plaintiffs submit evidence of additional U.S.-based actions that they argue supports extraterritorial application of the securities laws:

- U.S.-based BoA personnel performed a 1998 analysis of Parmalat's Brazilian operations.[51]  Although plaintiffs assert also that this analysis was ignored, there is no evidence as to what BoA actually did with it.

- In January 1998, Luca Sala, a Milan-based BoA employee, met with other BoA personnel in San Francisco to discuss the then-potential transaction.[52] The documents provided by plaintiffs, a letter explaining the meeting and an attached meeting memo, however, make clear that the meeting was quite preliminary.  Indeed, Mr. Sala states that "we cannot estimate [the value of Parmalat's Brazilian subsidiary] as we are still waiting for the relevant

---

[50]     See, e.g., Sabella Supp. Decl., Exs. 51, 53-56, 76-78.

[51]     Sabella Decl., Exs. 60, 62.

[52]     Sabella Supp. Decl., Ex. 49.

15

information."[53]

- Also in January 1998 and before the deal was consummated, Mr. Sala advised a U.S.-based BoA official to call Parmalat's CEO to express BoA's interest in the transaction.[54]  There is no evidence, however, that the call ever took place.

- BoA's New York office provided short-term financing to a Cayman Islands-based Parmalat subsidiary for its purchase of notes.[55]

- Plaintiffs submit evidence that legal work on the transaction was performed in the U.S. and that legal opinions were issued by U.S.-based lawyers.[56] There is no evidence, however, that any BoA employees participated in this work.[57]

---

[53]

*Id.*, Ex. 49 at BOFA-1870187.

[54]

*Id.*, Ex. 50.

[55]

*Id.*, Exs. 60-62.

[56]

*Id.*, Ex. 79.

[57]

Some of plaintiffs' additional claims are not supported by the undisputed evidence. Plaintiffs assert that U.S.-based BoA officers had to approve BoA's participation in the transaction.  The documentation they cite, however, refers to a different transaction, *see* Sabella Decl., Ex. 59, and plaintiffs' counsel admitted at oral argument that "the trail sort of runs a little bit cold . . . [a]nd I'm not sure who approved it at the end."  Tr. 31.

Plaintiffs assert also that BoA relied on a valuation of Parmalat's Brazilian operations produced by an arm of DT-US.  Assuming *arguendo* that such evidence would be relevant, the uncontested evidence shows that this valuation was in fact prepared by a Brazil-based Deloitte entity.  BoA Reply, Exs. A & B.

iii.    *Analysis*

Plaintiffs' primary argument is that BoA's marketing of this investment in the U.S. provides the requisite U.S. conduct to support application of the securities laws.  Although they concede that the marketing itself was not fraudulent or deceptive, they urge that the allegedly deceptive transaction could not have been executed absent this U.S. marketing.  The Bank argues that non-deceptive conduct constituting a "but for" cause of the deceptive transaction is not sufficient under *Bersch*.

At oral argument, plaintiffs relied primarily on *Psimenos v. E.F. Hutton & Co.*[58] Psimenos, a Greek citizen and resident, opened an investment account with Hutton's Athens office, relying on representations made by an Athens-based Hutton employee.  He gave Hutton discretionary authority to trade in his account and directed the employee to seek conservative investments.  Despite this direction, Hutton agents invested Psimenos' account speculatively and he incurred heavy losses.  Similar results ensued after Psimenos, unhappy with the losses, transferred his account first to Hutton's Paris office and then back to the Athens office under a new manager.  Psimenos claimed, *inter alia*, that Hutton "churned" his account solely to generate commissions.  The primary U.S. conduct was that the trades often were executed in the U.S.[59]

The Second Circuit, despite the fact that the trades themselves were not fraudulent, held that they were sufficient to support application of the Commodities Exchange Act because

---

[58]      722 F.2d 1041.

[59]      The court noted that Psimenos allegedly relied on a pamphlet created by Hutton's New York office in opening his account.  The significance of this U.S. conduct in the court's overall analysis is unclear, as it noted that such conduct alone would not support application of the securities laws.  *Id.* at 1046.

"[t]he trades Hutton executed on American markets constituted the final act in Hutton's alleged fraud on Psimenos, without which Hutton's employees could not have generated commissions for themselves. Coming as they did as the culminating acts of the fraudulent scheme, such trading could hardly be called 'preparatory activity' not subject to review under the anti-fraud provisions of the CEA."[60]

*Psimenos*, however, does not get plaintiffs where they want to go. The fraud alleged in *Psimenos* was the mismanagement of Psimenos' account, and the losses occurred when bad investments were made. Thus, while the trades themselves were not fraudulent, they were, as the Circuit noted, the "final act" in the fraud – absent the consummated trades, the fraudulent management of the account was incomplete.

Here, the theory is that BoA "created the appearance that BoA believed that [Parmalat Administração] was worth . . . $1.6 billion and was willing to invest its own money based on that valuation, when in fact BoA knew that [Parmalat Administração] was worth far less and was willing to invest only because the put guaranteed that BoA would be repaid at a premium."[61] Thus, the alleged fraud was complete when BoA designed and invested in the transaction. The marketing to U.S. investors, unlike the trades in *Psimenos*, neither completed the fraud nor directly caused plaintiffs' alleged losses. Hence, solicitation of U.S. investors does not support application of the securities laws.

The other evidence of U.S. conduct submitted by plaintiffs plainly is insufficient.

---

[60]       *Id.* at 1044.

[61]       414 F. Supp. 2d at 434-45.

18

BoA's U.S. conduct, at most, was ancillary or preparatory to the fraud.  It did not rise to the level of "substantial acts in furtherance of the fraud."  The alleged fraudulent scheme – involving Parmalat's Brazilian operations, various Cayman Islands entities, and BoA employees based in Italy – was overwhelmingly a foreign transaction.

### b.    *The Parmalat Venezuela loan restructuring*

#### i.    *Claim for relief*

The second arrangement by which the TAC alleges that BoA participated in Parmalat's fraud involved a loan BoA made to a Venezuelan Parmalat subsidiary, Parmalat Venezuela.  As part of the original loan, which the Court determined was not deceptive,[62] Parmalat took out an insurance policy to protect against the risk of political upheaval in South America.  In 2001, plaintiffs allege, BoA restructured the loan to provide that these insurance payments be paid to a third party entity, Graubndner Kantonalbank ("GBK"), instead of the original insurer.  Plaintiffs allege that GBK had no obligation to provide any coverage and that the funds it received ultimately were funneled back to Parmalat's corrupt insiders.  In a prior opinion, the Court concluded that:

> "If, indeed, the insurance policy was changed in 2001 to provide for payments to GBK despite the fact that GBK performed no services, that transaction arguably was deceptive because it was capable of misleading investors into believing that the payments were legitimate when, in fact, they were not.  To that extent, then, this transaction may have been a deceptive or manipulative device within the meaning of Rule 10b-5(a) and (c)."[63]

---

[62]   *See* 414 F. Supp. 2d at 436.

[63]   *Id.* at 437

ii.     *Evidence of United States conduct*

The only U.S. conduct alleged with respect to this transaction is that the insurance premiums paid to GBK were transferred via U.S. bank accounts.[64]

iii.    *Analysis*

The use of a U.S. bank to transfer funds to GBK was insufficient to support extraterritorial application of the securities laws.  Like the Parmalat Administração transaction, the alleged fraud here was the structure of the transaction itself.  That payments were made via a U.S. bank is entirely peripheral to the alleged fraud.  If such U.S. conduct were sufficient to support extraterritorial application of the securities laws, it would nearly eliminate the conduct test altogether.  The cases cited by plaintiffs do not indicate otherwise.[65]

---

[64]
    Sabella Supp. Decl., Exs. 74-75.

    Plaintiffs submit also evidence that security for the original loan was raised through U.S. private placements, that payments for these notes were made to a U.S. bank, and that U.S.-based BoA personnel contacted U.S. investors to discuss political risk insurance. Pls. Mem. 27; Pls. Supp. Mem. 16-17.  This evidence, however, all pertains to the loan prior to the 2001 restructuring.  As noted above, the Court found that the underlying loan was not deceptive and the U.S. conduct submitted played no apparent role in the allegedly fraudulent transaction.  Plaintiffs' argument that U.S. conduct relating to the original loan was "essential in allowing the later fraud to occur," Pls. Supp. Mem. at 17 n.75, is unpersuasive.  It is at best preparatory conduct and thus insufficient to support extraterritorial application.

[65]
    In *Leonard v. Garantia Banking Ltd.*, No. 98 Civ. 4848 (LMM), 1999 WL 944802 (S.D.N.Y. Oct. 19, 1999), a foreign plaintiff sued a foreign bank and its foreign employee for fraud and mismanagement of his investment account.  The U.S. conduct was (1) plaintiff transferred his money into the bank's New York-based accounts using U.S. money-transfer systems, and (2) some of the investments made with plaintiff's funds were made by trading on the New York Stock Exchange.  The court found that the latter conduct, involving "a significant portion of the total transactions in the account," was sufficient to support application of the securities laws. *Id.* at *5.  The former conduct only entered the

2.      *The Citigroup Movants*

a.      *Claim for relief*

Plaintiffs sue the Citigroup Movants for their participation in the securitization of worthless or duplicate receivables. The mechanics were as follows. Parmalat sold food products to distributors, who in turn sold them to supermarkets. Parmalat then issued duplicate invoices – one to the distributor and the other to the supermarket – for the same goods and booked both invoices as receivables. Pursuant to an agreement between Parmalat and Citigroup, Archimede Securitization S.r.l. ("Archimede"), an Italian Citigroup subsidiary, purchased receivables, including the duplicate receivables, from Parmalat's Italian operations.

In a previous opinion, the Court concluded that "the arrangements involving the regular factoring and securitization of worthless invoices were deceptive devices or contrivances for purposes of Section 10(b). . . . [Another bank] knew when it paid Parmalat for the invoices that they were worth nothing and were in fact a trick to disguise its loan to Parmalat. The same is true of Citigroup's purchase of certain invoices. If the allegations of the complaint are accepted, the banks used these devices" in violation of Rule 10b-5(a) and (c).[66] Thus, Citigroup's alleged participation in the fraud involved its purchase of allegedly worthless receivables.[67]

---

analysis as, if necessary, a "tipping of the scales" in support of such application, but the court expressly noted that it "would not by [itself] be sufficient to support" extraterritorial application. *Id.* at *6. Similarly, in *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, No. 75 Civ. 0540 (CES), 1980 WL 1146 (S.D.N.Y. Dec. 18, 1980), there was significant U.S. conduct beyond the fact that the sale of allegedly overvalued assets was processed by U.S. banks.

[66]
    376 F. Supp. 2d at 504.

[67]
    As the Court dismisses foreign purchasers' direct liability claims against Citigroup, plaintiffs' control person liability claims also fail. *See supra* note 48.

21

### b.    Evidence of United States conduct

While it is undisputed that the alleged duplication of receivables and Archimede's purchase of those receivables took place solely in Italy, plaintiffs submit evidence that certain Citigroup conduct relating to this program took place in the U.S.  This U.S. conduct falls into three general categories.

First, it is uncontested that the Italian receivables were purchased by Citigroup primarily with funds that originated in the U.S.  Archimede, the Italian subsidiary, purchased the receivables from Parmalat.[68]  A United Kingdom Citigroup subsidiary, Eureka Securitisation plc. ("Eureka U.K."), purchased the receivables from Archimede.[69]  Eureka U.K.'s portfolio, of which Parmalat receivables constituted about ten percent,[70] was financed in large part by funds raised in the U.S. through the issuance of commercial paper by a U.S. subsidiary, Eureka Securitization, Inc. ("Eureka U.S.").[71]  The transfer of funds from Eureka U.S. to Eureka U.K. was managed in part by Citigroup's New York office.[72]  There is no evidence, however, of any fraudulent activity with respect to the money raised by Eureka U.S., and no investors in Eureka U.S. or Eureka U.K. ever lost money

---

[68]    Sabella Supp. Decl., Ex. 6 at 61.

[69]    *Id.*, Ex. 9, at 09.

[70]    D'Angelo Decl., Ex. 5 ¶ 5.

[71]    *Id.*, Ex. 11, at 10390; *see also id.*, Ex. 12.  Money raised by Eureka U.S. accounted for 89 to 95 percent of Eureka U.K.'s financing.  Sabella Supp. Decl., Exs. 13-15.

[72]    *Id.*, Ex. 17, at 6811; *see also id.*, Ex. 5, at 56.

22

due to the Parmalat program.[73]

The second area of U.S. conduct is that in 2000, Citigroup, having purchased Parmalat's Italian receivables since 1995,[74] began purchasing receivables from Parmalat's U.S. and Canadian facilities as well.[75]  The parties dispute whether the purchase of Italian, U.S., and Canadian receivables constituted a single securitization program or three separate programs.  Assuming *arguendo* that they were part of one program, there is no evidence that there was any fraud in the U.S. component.  Nor is there evidence that the U.S. component was necessary for the allegedly fraudulent Italian program to exist – indeed, the Italian program functioned for five years before the U.S. program began.

The final category of U.S. conduct alleged is that Citigroup's New York office played some role in the administration and review of the Italian securitization program.  Citigroup concedes that a New York employee conducted one audit of Parmalat's Italian facilities and that New York employees twice signed credit approval documents for the program, but notes that there is no evidence that any acted with knowledge of the fraud.[76]  It contends also, and the Court agrees, that the clear majority of management, administration, and review of the Italian Parmalat program was handled by Citigroup's European offices.

The evidence shows that Citigroup's New York office performed some administrative

---

[73]

      *See* D'Angelo Decl., Ex. 5, ¶¶ 8, 14.

[74]

      *Id.*, Ex. 5 ¶ 9 & Ex. B.

[75]

      *Id.*, Ex. 5 ¶ 12 & Ex. E.

[76]

      Citigp. Supp. Mem. 13.

duties with respect to the Italian program.[77]   A 2002 email delegated the role of overseeing a "contingency plan" for certain clients, including Parmalat, to an employee who may have been U.S.-based at the time.[78]   A New York-based attorney at Sherman & Sterling participated on BoA's behalf in 1995 conversations with Zini, Parmalat's counsel, regarding the securitization program, but the details of the securitization program pursuant to those conversations did not include any fraud or duplication.[79]   Certain policies relating or applicable to Eureka U.K. were or may have been drafted in the U.S.,[80] but there is no evidence that they played any role in the fraud.  Citigroup employees worked with U.S. credit agencies to get a certain credit rating for the Parmalat program.[81]   Finally, offer letters for the Parmalat program were collected by the New York office.  Although plaintiffs submit evidence that certain customers did not submit the offer letters,[82] there is no evidence of Parmalat's role or of any connection to the fraud.  Nor do plaintiffs submit any evidence that U.S.-

---

[77]
Certain evidence plaintiffs submit does not support their argument.  For example, a document submitted by plaintiffs stating that Eureka U.K. facilities had to pass a review by Citigroup's New York office prior to approval was written after the close of the class period and does not prove Citigroup's policies during the relevant time period.  *See* Sabella Supp. Decl., Ex. 26.

[78]
*Id.*, Exs. 34, 7 at 8-9 (employee was "back and forth" between London and New York offices at the time).

[79]
*Id.*, Ex. 42, at 7296.

[80]
*See* Pls. Supp. Mem. 10-11; Citigp. Supp. Mem. 15-16.

[81]
*See* Pls. Supp. Mem. 11; Citigp. Supp. Mem. 16.

[82]
Sabella Supp. Decl., Ex. 46, at 125.

based Citigroup employees knew of the fraud.[83]

The undisputed evidence shows that Citigroup's Italian and London offices were primarily responsible for the management and administration of the Italian receivables program. Citigroup submits three emails from 1994 discussing in detail the negotiations for the Italian securitization program. Only London- and Milan-based Citigroup employees participated in these emails.[84] In 1994, 1996, and 1998, Citigroup conducted reviews of Parmalat S.p.A. based on visits by London- and Milan-based Citigroup employees.[85] Citigroup submits also uncontested deposition testimony by various European-based Citigroup employees testifying to their substantial roles in managing the Italian securitization program.[86]

        *c.*    *Analysis*

As an initial matter, plaintiffs submit no evidence that Citigroup's U.S. personnel had any knowledge of the allegedly fraudulent scheme. Their argument, in essence, is that the fraudulent scheme depended on U.S. conduct. Citigroup argues that any fraud was complete at the moment Archimede purchased the receivables and that the U.S. conduct referred to by plaintiffs therefore is immaterial. In the alternative, it argues that the U.S. conduct was too peripheral to support

---

[83]

    Plaintiffs submit a single email from November 2003 by a retired Citigroup employee who states, "I remember some portfolio review a couple years ago when . . . someone in NY asked where there could be nasty surprises in Europe, a la Enron. My answer was Parmalat." *Id.*, Ex. 35. There is no indication that this remark was made in connection to the Italian receivables program.

[84]

    D'Angelo Decl., Exs. 15-17.

[85]

    *Id.*, Exs. 26-28.

[86]

    *Id.*, Ex. 21 at 14, 19-22, 150-51; Ex. 23 at 10-14; Ex. 24 at 105.

extraterritorial application of the securities laws.

Unlike the transactions involving the other movants discussed above, plaintiffs here submit evidence of regular U.S. conduct in a variety of areas related to the allegedly fraudulent securities program. But none of the U.S. conduct was essential to the completion of the fraud. For example, although the U.S. commercial paper market was an overwhelming source of Eureka U.K.'s funds, it was not, as plaintiffs urge, "absolutely necessary to maintain the securitization program."[87] As noted above, the Italian securitization program existed for five years before Citigroup began to purchase American receivables also, so the latter cannot have been necessary for the former to function. Finally, Citigroup's New York offices handled certain administrative functions and the occasional review or approval of the Italian program. In light of the evidence that the European offices conducted the lion's share of these duties, however, it is unlikely that the conduct of the New York office was necessary for the fraud to occur.

Indeed, all of the U.S. conduct was clearly peripheral to the fraud itself – the purchase of duplicate receivables, which occurred in Italy. Assuming *arguendo* that the fraud extended to Eureka U.K.'s purchase of the receivables, this action took place in England. Extraterritorial application of the securities laws cannot apply where, as here, "the essential core of the alleged fraud took place [abroad]. Any activities in the United States were clearly secondary and ancillary."[88]

---

[87]    Pls. Supp. Mem. 4. A Citigroup employee explained that "the commercial paper market in Europe is tiny. In America, it's a massive, trillions of dollars. . . . [Y]ou can borrow more cheaply through the US commercial paper market, therefore give your customer a better price than his local bank can." Sabella Supp. Decl., Ex. 16, at 223-24. Thus, American funds were preferable, but there is no evidence that they were necessary.

[88]    *Fidenas AG v. Compagnie Internationale Pour L'Informatique CII Honeywell Bull S.A.*, 606 F.2d 5, 8 (2d Cir. 1979) (quoting district court with approval); *see also N. S. Fin. Corp. v. Al-Turki*, 100 F.3d 1046, 1053 (2d Cir. 1996) ("At most, [defendants] obtained information from New York that facilitated the fraud in France. None of the conduct in

26

*V.     Conclusion*

For the foregoing reasons, the motions of the Deloitte, Grant Thornton, Bank of America and Citigroup Movants to dismiss the claims of foreign purchasers [04 MD 1653, docket items 764, 768, 788, 792; 04 Civ. 0030, docket items 601, 604, 625, 766] are granted.[89]

SO ORDERED.

Dated:        July 24, 2007

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

New York can be construed as a material component of the fraud."); *Euro Trade & Forfaiting, Inc. v. Vowell*, No. 00 Civ. 8431 (LAP), 2002 WL 500672, at *7-8 (S.D.N.Y. Mar. 29, 2002) (defendants' manipulation of the U.S. stock market was insufficient to support extraterritorial application of the securities laws where the fraud alleged was the pledge of inflated stock as security for a loan and all conduct relating to the loan occurred outside the U.S.); *Philan Ins. v. Hall & Co.*, 748 F. Supp. 190, (S.D.N.Y. 1990) (no extraterritorial application of RICO where the U.S. actions "were not the actions that directly caused [plaintiffs'] loss, but rather were merely preparatory . . . , and there is no allegation that the moving defendants knowingly participated in [the fraudulent] actions in the United States").

[89]       This decision applies to citizens of foreign countries who purchased Parmalat securities while outside of the United States.  It is unclear whether the conduct test discussed above applies also to U.S. citizens who purchased Parmalat securities while abroad, or foreigners who purchased while in the U.S.  *See Bersch*, 519 F.2d at 992-93 ("While merely preparatory activities in the United States are not enough to trigger application of the securities laws for injury to foreigners located abroad, they are sufficient when the injury is to Americans so resident. . . .  Other fact situations, such as losses to foreigners from sales to them within the United States, are not before us."); *see also Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118, 128 n.12 (2d Cir. 1998).  As the parties have not made submissions on this issue, the Court leaves it for another day.

27