UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re PARMALAT SECURITIES LITIGATION

                                       MASTER DOCKET

This document relates to:    04 Civ. 0030            04 MD 1653 (LAK)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OPINION**


Appearances:


Stuart M. Grant
James J. Sabella
John C. Kairis
Diane Zilka
GRANT & EISENHOFER P.A.

Steven J. Toll
Lisa M. Mezzetti
Mark S. Willis
Julie Goldsmith Reiser
Joshua S. Devore
COHEN, MILSTEIN, HAUSFELD & TOLL,
P.L.L.C.

Robert M. Roseman
Andrew D. Abramowitz
Daniel J. Mirarchi
Rachel E. Kopp
SPECTOR ROSEMAN & KODROFF, P.C.


*Attorneys for Class Lead Plaintiffs*

Dennis E. Glazer
Nancy B. Ludmerer
Christine A. Murtha
Antoinette G. Ellison
DAVIS POLK & WARDWELL
*Attorneys for Defendant Banca Nazionale del
Lavoro, S.p.A.*

Joseph B. Tompkins, Jr.
Alan C. Geolot
Mark P. Guerrera
A. Robert Pietrzak
Thomas McC. Souther
Daniel A. McLaughlin
SIDLEY AUSTIN LLP
*Attorneys for Defendants Bank of America
Corporation, Bank of America N.A., and Banc
of America Securities Limited*

George A. Schieren
Mark A. Kirsch
Joel M. Cohen
Guy C. Quinlan
CLIFFORD CHANCE US LLP
*Attorneys for Defendants Citigroup Inc.,
Citibank, N.A., Vialattea LLC, Buconero LLC,
and Eureka Securitization plc*

Michael S. Feldberg
Todd S. Fishman
Lanier Saperstein
Sarah Havens
ALLEN & OVERY LLP
*Attorneys for Defendants Credit Suisse, Credit Suisse International, and Credit Suisse Securities (Europe) Limited*

Daniel F. Kolb
Sharon Katz
Frances E. Bivens
Gina Caruso
Justin Goodyear
DAVIS POLK & WARDWELL
*Attorneys for Defendant Deloitte & Touche LLP*

Michael J. Dell
Jeffrey W. Davis
KRAMER LEVIN NAFTALIS & FRANKEL LLP
*Attorneys for Defendants Deloitte Touche Tohmatsu and James E. Copeland*

Melvin A. Brosterman
James L. Bernard
Quinlan D. Murphy
STROOCK & STROOCK & LAVAN LLP
*Attorneys for Defendant Grant Thornton International*

John B. Quinn
Peter E. Calamari
Loren Kieve
Gerald E. Hawxhurst
QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
*Attorneys for Defendant Parmalat S.p.A.*

LEWIS A. KAPLAN, *District Judge.*

This is a putative securities fraud class action on behalf purchasers of securities of the international dairy conglomerate, Parmalat Finanziaria S.p.A., and its subsidiaries and affiliates (collectively "Old Parmalat") during the period January 5, 1999 through December 18, 2003 (the "Class Period"). The Court has described plaintiffs' allegations in several prior opinions, familiarity with which is assumed. In broad terms, plaintiffs allege that defendants made false and misleading representations and structured transactions that operated to defraud investors in violation of Sections 10(b)[1] and 20(a)[2] of the Securities Exchange Act of 1934 and Rule 10b-5[3] thereunder. The case is before the Court on plaintiffs' motion for class certification pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3).[4]

*Background*

I.      *The Proposed Class Representatives*

The Court in May 2004 appointed (1) Hermes Focus Asset Management Europe Limited ("HFAME"), a British and Welsh fund management company owned 51 percent by the BT Pension Scheme and 49 percent by Hermes Focus Asset Management, Ltd., (2) Cattolica Partecipazioni, S.p.A. ("Cattolica"), (3) Solotrat, (4) Societe Moderne des Terrassements Parisiens

---

[1]      15 U.S.C. § 78j(b).

[2]      *Id.* § 78t(a).

[3]      17 C.F.R. § 240.10b-5.

[4]      DI 575.

("SMTP"), and (5) Capital & Finance Asset Management S.A. ("CFAM") to serve as lead plaintiffs.[5] They are joined by (1) Hermes European Focus Fund I ("HEFF I"), a limited partnership of which the general partner and manager is HFAME, (2) Hermes European Focus Fund II, a limited partnership of which the general partner and manager is HFAME ("HEFF II"), (3) Hermes European Focus Fund III, a limited partnership of which the general partner and manager is HFAME and the limited partner is California Public Employees Retirement System ("HEFF III"), (4) Laura Sturaitis, (5) Arch Sturaitis, and (6) Margery Louise Kronengold as additional named plaintiffs. HFAME, HEFF I, II, and III, and Laura and Arch Sturaitis allegedly purchased Old Parmalat ordinary shares during the proposed Class Period. The remaining lead plaintiffs and Kronengold allegedly purchased Old Parmalat bonds during that same period.[6] All plaintiffs collectively seek certification as representatives of the proposed class.

## II. The Proposed Class

Plaintiffs seek to certify a class "consisting of all those who purchased or otherwise acquired the securities of [Old] Parmalat during the period January 5, 1999 and December 18, 2003, inclusive . . . , and who were damaged thereby."[7] They propose to exclude from the class (1) the defendants, (2) any person who served during the Class Period as an officer or director of Old Parmalat or its parent, or as an officer or director of any of the other corporate defendants, (3) any

---

[5]

DI 108.

[6]

TAC ¶¶ 105-114.

[7]

TAC ¶ 1138.

entity in which any of the defendants have or had a controlling interest, (4) any of the defendants'

liability insurance carriers and any affiliates or subsidiaries thereof, and (5) immediate family

members, legal representatives, heirs, successors, or assigns of these excluded persons.[8]


*Discussion*

I.    *Legal Standard*

A court may certify a class only if it determines that

"(1) the class is so numerous that joinder of all members is impracticable;

"(2) there are questions of law or fact common to the class;

"(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

"(4) the representative parties will fairly and adequately protect the interests of the class"[9]

and that one of the subdivisions of Fed. R. Civ. P. 23(b) also is satisfied.  Where, as here, plaintiffs

propose to certify the class pursuant to Rule 23(b)(3), "the court [must] find[] that the questions of

law or fact common to the class members predominate over any questions affecting only individual

members, and that a class action is superior to other available methods for fairly and efficiently

adjudicating the controversy."[10]  In making that determination, the court should consider

"(A) the class members' interests in individually controlling the prosecution or

---

[8]    *Id.*

[9]    FED. R. CIV. P. 23(a)(1) - (4).

[10]    FED. R. CIV. P. 23(b)(3).

defense of separate actions;

"(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

"(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

"(D) the likely difficulties in managing a class action."[11]

The party seeking to certify a class bears the burden of establishing that the Rule 23 criteria are met.[12] Although the requirements of Rule 23 are construed liberally,[13] the Court "must receive enough evidence, by affidavits, documents, or testimony"[14] to conduct a "rigorous analysis" to determine whether plaintiffs have shown that each is satisfied.[15] The Second Circuit has defined certain standards to guide the Court's analysis. In relevant part,

"(1) a district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the

---

[11]

FED. R. CIV. P. 23(b)(3)(A) - (D).

[12]

*See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997); *Caridad v. Metro-N. Commuter R.R.*, 191 F.3d 283, 291 (2d Cir. 1999), *cert. denied sub nom. Metro-N. Commuter R.R. Co. v. Norris*, 529 U.S. 1107 (2000); *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 279 (S.D.N.Y. 2003) ("*WorldCom*").

[13]

*See, e.g.*, *Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997) (per curiam).

[14]

*In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006) ("*IPO*").

[15]

*Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982) (discussing Rule 23(a)); *IPO*, 471 F.3d at 33 & n.3 ("We see no reason to doubt that what the Supreme Court said about Rule 23(a) requirements applies with equal force to all Rule 23 requirements, including those set forth in Rule 23(b)(3).").

applicable legal standard, that the requirement is met; (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement; [and] (4) in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement[.]"[16]

## II.    Scope of the Proposed Class

The Court already has dismissed the claims of the foreign plaintiffs as against various defendants, in essence on the ground generally that the United States securities laws do not reach the alleged conduct.[17]   Plaintiffs' proposed class, however, would encompass all persons worldwide who acquired Parmalat securities during the Class Period.    While the Court already has granted preliminary certification to the proposed class for settlement purposes, the fact that claims of the foreign plaintiffs are subject to an obstacle or impediment not shared by the domestic plaintiffs warrants consideration at the outset.[18]

Assuming that the requirements of Rule 23 were satisfied, there would be no obstacle

---

[16]

*IPO*, 471 F.3d at 41; *see also In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 83 (S.D.N.Y 2007) ("*Vivendi*").

[17]

*See In re Parmalat Sec. Litig.*, 497 F. Supp.2d 526, 540 (S.D.N.Y. 2007) (dismissing foreign purchasers' claims as against the Deloitte, Grant Thornton, Citi, and Bank of America defendants on the ground that the United States securities laws did not apply to those claims); *In re Parmalat Sec. Litig.*, 376 F. Supp.2d 472, 512 (S.D.N.Y. 2005) (dismissing foreign purchasers' claims as against the Credit Suisse entities and Banca Nazionale del Lavoro S.p.A. for lack of subject matter jurisdiction); *In re Parmalat Sec. Litig.*, 376 F. Supp.2d 449, 459 (S.D.N.Y. 2005) (dismissing foreign purchasers' claims as against Maria Martellini for lack of personal jurisdiction).

[18]

As will appear, the fact that the foreign plaintiffs are subject to a defense not available against the domestic plaintiffs does not entirely foreclose a conclusion that the claims of the proposed class plaintiffs are typical of those of the proposed class as a whole.

to certifying both domestic plaintiff and foreign plaintiff classes or subclasses, each with an appropriate class representative or representatives, and perhaps even a single class. In light of the fact that the Court already has dismissed claims of foreign plaintiffs on grounds common to all such members of such a class or subclass, however, there is a substantial question whether any useful purpose would be served by certifying any class including foreign purchasers for any purpose other than settlement.

For one thing, the inclusion of foreign purchasers in any class inevitably would lead to motions to dismiss their claims. Given the previous rulings in this case, there would be a substantial likelihood that such motions would be granted, in which event inclusion of the foreign purchasers would have accomplished little if anything.

For another, the inclusion of foreign purchasers in any class would be likely to create additional difficulties. In view of the apparent weakness of their legal position, the notice presumably would have to inform them of the unlikelihood of any recovery in this case and of the risk, if any, that an adverse judgment in this case could have preclusive effect abroad unless they opted out.[19] Such a notice likely would lead substantial numbers of such class members to opt out.

A district court has broad discretion in defining the class[20] and "is not bound by the

---

[19]

The question whether an adverse judgment in a U.S. securities fraud class action would foreclose other claims that class members might have if they sued abroad doubtless would depend, at least in important respects, on the local law of whatever jurisdictions were the *fora*. The parties have favored the Court with extensive submissions on this point, the complexity of which is well illustrated by Judge Holwell's meticulous opinion in *In re Vivendi Universal, S.A.,* 242 F.R.D. 76 (S.D.N.Y. 2007). For present purposes, it suffices, however, to say that the possibility of preclusive effects abroad would have to be disclosed.

[20]

*See Boucher v. Syracuse Univ.*, 164 F.3d 113, 118 (2d Cir. 1999); *see, e.g.*, FED. R. CIV. P. 23(c)(4) (discretion to certify particular issues), 23(c)(5) (discretion to certify subclasses).

class definition proposed in the complaint."[21]  Given the strong likelihood that the inclusion of

foreign plaintiffs in any non-settlement class would accomplish little good and create practical

difficulties, the Court exercises its discretion to modify the proposed class to include only domestic

parties who purchased or otherwise acquired Old Parmalat securities during the Class Period.  In the

unlikely event that any of the named foreign purchaser plaintiffs sees any point in persisting with

respect to a non-settlement class or subclass including foreign purchasers, they may renew this

motion to that extent.

    Focusing on the claims of domestic plaintiffs, the only  named plaintiffs who are

members of the proposed class as modified are Arch and Laura Sturaitis.[22]  As only class members

---

[21]

 *Robidoux v. Celani*, 987 F.2d 931, 937 (2d Cir. 1993); *Lundquist v. Sec. Pac. Auto. Fin. Servs. Corp.*, 993 F.2d 11, 14 (2d Cir.), *cert. denied* 510 U.S. 959 (1993) (citing *Robidoux*).

[22]

 Most of the proposed class representatives clearly were citizens of foreign countries who purchased Parmalat securities while outside of the United States and thus were subject to the Court's previous rulings discussed in *supra* note 19.  *See* TAC ¶ 105 (discussing HFAME's citizenship); Mezzetti Decl. Ex. A (S. Howaldt Dep. at 15) (discussing the citizenship of HEFF I, II, and III); Feldberg Decl. Ex. 18 (J. Setti Dep. at 340-44) (discussing citizenship of Solotrat and SMTP); *id.* Ex. 20 (B. Azzollini Dep. at 11-12) (discussing Cattolica's citizenship); *id.* Ex. 21 (M. Vandenkerchove Dep. at 37-38) (discussing CFAM's citizenship).  Only Kronengold does not fit neatly into the foreign citizen/foreign purchase category.  Rather, although she (1) was a citizen of Italy and had resided there since approximately 1973, (2) owned property only in Italy, (3) voted in Italian elections, (4) paid taxes in Italy, and (5) purchased Parmalat securities while in Italy and through an Italian bank, she was also a U.S. citizen who held a U.S. passport and voted via absentee ballot in federal elections. *See* Bernard Decl. Ex. G (M. Kronengold Dep. at 22-35, 38-39, 58-59).  In the last analysis, however, it is clear that the Court's prior rulings applied with equal force to Kronengold, as her minimal American ties were insufficient to provide her the protection of the federal securities laws.  *Accord Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 992 (2d Cir. 1975) ("Congress surely did not mean the securities laws to protect the many thousands of Americans residing in foreign countries against securities frauds by foreigners acting there . . . ."); *Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118, 128 n.12 (2d Cir. 1998) ("U.S. residence of individual investors – not American nationality – must be the focus of the effects test."), *cert. denied* 525 U.S. 1139 (1999).

have standing to bring claims on behalf of a class,[23] they are the only relevant proposed class representatives. The Sturaitises, moreover, during the Class Period bought only Parmalat ordinary shares, as opposed to debt. Accordingly, they lack standing to bring claims on behalf of those class members who purchased Parmalat debt notwithstanding the allegations that the same general course of conduct allegedly engaged in by defendants caused injury to all putative class members.[24] The Court therefore further modifies the class to include only domestic investors who purchased or otherwise acquired Parmalat ordinary shares during the Class Period.

## III.    Rule 23(a)

### A.    Numerosity

Rule 23(a)(1)'s numerosity requirement "does not mandate that joinder of all parties be impossible—only that the difficulty or inconvenience of joining all members of the class make use of the class action appropriate."[25] Although plaintiffs need not provide a precise calculation of the size of the class, and courts are permitted to draw reasonable inferences from the available

---

[23]

> *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997); *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 99 (2d Cir. 2007); *In re Initial Pub. Offering Sec. Litig.*, 21 MC 92(SAS), 2008 WL 2050781, at *2 (S.D.N.Y. May 13, 2008) ("It is hornbook law that the class representative must be a member of the class.").

[24]

> *See In re Salomon Analyst Level 3 Litig.*, 350 F. Supp.2d 477, 497 (S.D.N.Y. 2004).

[25]

> *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 244-45 (2d Cir. 2007) ("*Central States*"); *see Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993).

evidence,[26] numerosity is presumed where the class consists of at least 40 members.[27]

Plaintiffs contend that the numerosity requirement is satisfied here because there were "hundreds of entities holding Parmalat securities" in the United States.[28]  Defendants concede that "[o]ver 100 U.S. resident [Qualified Institutional Buyers ("QIBs")] . . . purchased during the Class Period and held in December 2003 approximately 58 million shares of Parmalat common stock" but challenge numerosity on the ground that the number of shares purchased by "U.S. retail investors, or U.S. resident investors other than QIBs, in all likelihood was negligible."[29]  This argument, however, is unpersuasive.

As an initial matter, defendants' characterization of the number of domestic retail investors and the extent of their holdings as being in all likelihood negligible reveals nothing about the actual number of domestic retail investors.  Indeed, defendants' evidence indicates that the number of domestic retail investors in Parmalat common stock, although small, exceeds the presumptive threshold for a finding of numerosity[30] and is consistent with plaintiffs' assertion that

---

[26]

*See In re Initial Pub. Offering Sec. Litig.*, 243 F.R.D. 79, 84 (S.D.N.Y. 2007).

[27]

*Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir.), *cert. denied sub nom. N. Rockland Cent. Sch. Dist. v. Consol. Rail Corp.*, 515 U.S. 1122 (1995); *Vivendi*, 242 F.R.D. at 83.

[28]

Hakala Decl. ¶¶ 13; *see also id.* ¶ 59.

[29]

Comment Decl. ¶¶ 12, 17.

[30]

*See* Comment Decl. Ex. D (indicating the percentage of the overall volume of Parmalat equity traded in the U.S. during the Class Period); Gompers Decl. ¶ 53 (describing the types of investors who would have participated in the U.S. grey market).

there were "hundreds of . . . US retail investors" over the Class Period.[31]

Moreover, even assuming *arguendo* that "negligible" meant that the number of domestic retail investors was not sufficient to satisfy Rule 23(a)(1), defendants concede that the number of domestic institutional investors in the putative class is sufficient to satisfy the numerosity requirement. Defendants, however, contend that the Court should not consider those entities because they have the ability to bring their own actions. But that point is not persuasive. Although it is possible that some institutional investors might be capable of bringing individual actions to remedy their alleged injuries, those parties who choose not to do so "should not be deprived the opportunity to pursue this [class] action simply because some [other] litigants . . . [might pursue] parallel actions."[32] Furthermore, to the extent this point is relevant, it more appropriately is considered with respect to the superiority requirement of Rule 23(b)(3).

The pertinent factors regarding the numerosity analysis all favor plaintiffs. Accordingly, the Court finds that plaintiffs have satisfied the numerosity requirement.

---

[31] *See* Hakala Decl. ¶ 59.

[32] *WorldCom*, 219 F.R.D. 267, 306 (S.D.N.Y. 2003).

B.      *Commonality*

Rule 23(a)(2) mandates that the claims of the class share common questions of law or fact.[33]  This requirement "has been applied permissively in securities fraud litigation" and generally is satisfied "where putative class members have been injured by similar material misrepresentations and omissions."[34]  "The critical inquiry is whether the common questions are at the core of the cause of action alleged."[35]

Plaintiffs contend that at least six questions of law or fact are common to all members of the class, including (1) "[w]hether the federal securities laws were violated by the defendants' acts as alleged," (2) "[w]hether defendants engaged in a scheme and fraudulent course of conduct in violation of Rule 10b-5," (3) "[w]hether statements made by the defendants to the investing public during the Class Period misrepresented material facts about the business, operations and financial statements of Parmalat in violation of Rule 10b-5," (4) "[w]hether the defendants acted willfully or with recklessness in connection with the scheme and the misrepresentations alleged," (5) "[w]hether the conduct engaged in by the defendants caused Plaintiffs' losses," and (6) "[w]hether the members of the Class have sustained damages."[36]  These questions, and the factual bases upon which they rest,

---

[33]

       *Central States*, 504 F.3d 229, 245 (2d Cir. 2007); *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997) (per curiam).

[34]

       *Fogarazzo v. Lehman Bros., Inc.*, 232 F.R.D. 176, 179-80 (S.D.N.Y. 2005); *see also Vivendi*, 242 F.R.D. 76, 84 (S.D.N.Y. 2007) (citing *In re Nortel Networks Corp. Sec. Litig.*, No. 01 Civ. 1855(RMB), 2003 WL 22077464, at *3 (S.D.N.Y. Sept. 8, 2003)).

[35]

       *Fogarazzo*, 232 F.R.D. at 180 (quotation marks and citation omitted).

[36]

       TAC ¶ 1142.

clearly are common to all class members, a point defendants do not dispute.  Accordingly, the Court

finds that plaintiffs have satisfied the commonality requirement.

C.    *Typicality*

To satisfy the typicality requirement, plaintiffs must demonstrate that "the claims or

defenses of the representative parties are typical of the claims or defenses of the class."[37]  This

requirement "is satisfied when each class member's claim arises from the same course of events, and

each class member makes similar legal arguments to prove the defendant's liability."[38]  Although

"'it is settled that the mere existence of individualized factual questions with respect to the class

representative's claim will not bar class certification, class certification is inappropriate where a

putative class representative is subject to unique defenses which threaten to become the focus of the

litigation.'"[39] The unique defense rule, however, "'is not rigidly applied in this Circuit.'"[40]  Indeed,

it is "intended to protect plaintiff class—not to shield defendants from a potentially meritorious

---

[37]

     FED. R. CIV. P. 23(a)(3).

[38]

     *Central States*, 504 F.3d at 245 (quoting *Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001); *see also Vivendi*, 242 F.R.D. 76, 85 (S.D.N.Y. 2007) ("Typicality requires that the claims of the named plaintiffs arise from the same practice or course of conduct that gives rise to the claims of the proposed class members.") (internal quotation marks and citation omitted).

[39]

     *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59-60 (2d Cir. 2000) (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990)); *In re NTL, Inc. Sec. Litig.*, No. 02 Civ. 3013 (LAK)(AJP), 2006 WL 330113, at * 7 (S.D.N.Y. Feb. 14, 2006); *Fogarazzo*, 232 F.R.D. at 180.

[40]

     *In re NTL, Inc. Sec. Litig.*, 2006 WL 330113, at *7 (quoting *Koppel v. 4987 Corp.*, 191 F.R.D. 360, 365 (S.D.N.Y. 2000)).

suit"[41] and "has generally been applied only where a full defense is available against an individual plaintiff's action."[42]  Moreover, "it is beyond reasonable dispute that a representative may satisfy the typicality requirement even though that party may later be barred from recovery by a defense particular to him that would not impact other class members."[43]

Plaintiffs argue, and defendants concede, that the Sturaitis's claims arise from the same alleged course of fraud and deceptive conduct as the claims of the rest of the proposed class. Indeed, it is undisputed that each claim raised in this putative class action is based on a core set of activities allegedly engaged in by Old Parmalat, its officers and directors, and the auditors, financial institutions, and lawyers of which Old Parmalat was a client.

Defendants, however, contend that Arch Sturaitis is subject to unique defenses that threaten to become the focus of the action, viz. that he (1) did not rely on any public statements made by any of the defendants about Parmalat, nor did he perform any research regarding the price of Parmalat stock, before making his investments, (2) did not conduct due diligence as did the sophisticated institutional investors comprising the majority of the proposed class, and (3) purchased 2,800 of his 3,000 shares on December 15, 2003, one week after Parmalat suffered its liquidity crisis on December 8, and thus will be subject to a unique defense regarding loss causation.[44]  They assert

---

[41]

    *Trief v. Dun & Bradstreet Corp.*, 144 F.R.D. 193, 200 (S.D.N.Y. 1992).

[42]

    *In re NTL, Inc. Sec. Litig.*, 2006 WL at *7 (internal quotation marks and citation omitted).

[43]

    *Trief*, 144 F.R.D. at 200-01.

[44]

    Credit Suisse Mem. at 13-14; New Parmalat Mem. at 18-19; Grant Thornton International Mem. at 15-16, 25-26.

further that Laura Sturaitis will not be able to prove reliance because she vested all decision-making authority regarding the family's investment in Parmalat in her husband.

The fact that Arch Sturaitis did not rely on any public statements regarding Parmalat is not dispositive of the typicality requirement "[b]ecause a person is ineligible to represent a class of securities purchasers only if he 'clearly did not rely upon either the allegedly misleading financials *or* on the integrity of the market price or information.'"[45]  Sturaitis, however, testified that he was aware of the price each time he purchased Parmalat stock[46] and, at least with respect to his purchase on December 15, 2003, "assumed [the stock price] was a good value" because he had "general confidence in the market to be able to give [him] the feeling that this is . . . the price that this company should be at this time."[47]  It is clear also from Sturaitis's testimony that although he relied on his "gut feeling" and general knowledge about Parmalat's products in focusing his interest on Parmalat, the integrity of the stock price played a role in his actual investment decisions.[48]

Defendants' second contention, viz. that Arch Sturaitis' claim is atypical of those of institutional investors – the latter presumably performed extensive due diligence prior to investing – is conclusory assertion.  It fails to identify (1) what, if any, unique defenses would apply to

---

[45]
    *In re Gaming Lottery Sec. Litig.*, 58 F. Supp. 2d 62, 72 (S.D.N.Y. 1999) (quoting *In re AM Int'l., Inc. Sec. Litig.*, 108 F.R.D. 190, 195 (S.D.N.Y. 1985)) (emphasis in original); *see also In re Salomon Analyst Metromedia Litig.*, 236 F.R.D. 208, 213 (S.D.N.Y. 2006).

[46]
    *See* Feldberg Decl. Ex. 13 (A. Sturaitis Dep. at 142:14-18, 161:25-162:3, 169:12-19).

[47]
    *Id.* at 169:12-170:11.

[48]
    *See id.* at 182:6-14 ("The price that I was quoted didn't strike me was [*sic*] a surprising number.  And so it seemed that maybe this would be a comfortable price to, you know, to increase my holdings.").

Sturaitis and (2) how they would threaten to become the focus of the litigation. It therefore is insufficient to defeat a finding of typicality.

Defendants' challenge to Sturaitis's typicality with respect to the issue of loss causation similarly is without merit. As an initial matter, it is common ground that Sturaitis purchased 200 shares of Parmalat stock prior to any disclosure of Parmalat's financial problems. Moreover, although defendants contend that Sturaitis's December 15 purchase occurred "after the materialization of the concealed risk" on December 8,[49] the Third Amended Complaint ("TAC") sufficiently alleges that the true extent of the alleged Parmalat fraud was not disclosed until December 19, 2003, when Parmalat issued a press release regarding the fact that a $4.9 billion bank account did not exist.[50] Furthermore, the issue of loss causation will be applicable to all members of the proposed class, not just Sturaitis or others who purchased Parmalat shares after December 8, 2003. In consequence, loss causation as it applies solely to Sturaitis does not threaten to become the focus of the litigation to the prejudice of other class members.

Plaintiffs therefore have demonstrated that Arch Sturaitis's claims are typical of the class he seeks to represent. Accordingly, the Court finds that Rule 23(a)(3) has been satisfied with respect to him. Laura Sturaitis, however, is atypical of the class because she did not make any investments in Parmalat. She was simply a joint tenant with her husband in an account that held

---

[49]

Credit Suisse Mem. at 14.

[50]

TAC ¶ 835; *see also In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 307 (S.D.N.Y. 2005) (describing events in December 2003 as alleged in the complaint); *accord In re NTL, Inc. Sec. Litig.*, No. 02 Civ. 3013(LAK)(AJP), 2006 WL 330113, at * 9 (S.D.N.Y. Feb. 14, 2006) ("[A] plaintiff may do one of two things to sufficiently allege loss causation. . . . [It] may identify particular disclosing event[s] that reveal the false information, and tie dissipation of artificial price inflation to those events.") (internal quotation marks and citation omitted).

Parmalat securities.[51]  Arch Sturaitis made all investment decisions regarding Parmalat, and he did so without consulting with her in any material respect.[52]  Laura Sturaitis therefore would be unable to establish reliance.  Accordingly, plaintiffs have not demonstrated that her claims are typical of the claims of the proposed class.

### D.     Adequacy

Plaintiffs must show also that "the representative parties will fairly and adequately protect the interests of the class."[53]  This requires in part that plaintiffs demonstrate that the proposed class representatives have no "interests [that] are antagonistic to the interest of the other members of the class."[54]  Further, a class representative will be deemed inadequate if it "'ha[s] so little knowledge of and involvement in the class action that [it] would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys.'"[55]  Defendants

---

[51]

TAC ¶ 113.

[52]

See Feldberg Decl. Ex. 13 (A. Sturaitis Dep. at 112:7-113:5); Mezzetti Decl. Ex. H (L. Sturaitis Dep. at 86:6-17).

[53]

FED. R. CIV. P. 23(a)(4).

[54]

Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 60 (2d Cir. 2000); Vivendi, 242 F.R.D. 76, 85 (S.D.N.Y. 2007).  The Court no longer needs to analyze under Rule 23(a)(4) whether proposed class counsel are adequate.  See In re NTL, Inc. Sec. Litig., 2006 WL at * 11.  In any event, although the adequacy of class counsel is not challenged here, the Court finds that class counsel are qualified, experienced, and capable of conducting this litigation.

[55]

Baffa, 222 F.3d at 61 (quoting Maywalt v. Parker & Parsley Petroleum Co., 67 F.3d 1072, 1077-78 (2d Cir. 1995)); cf. In re Monster Worldwide, Inc. Sec. Litig., ___ F.R.D. ___, No. 07 Civ. 2237(JSR), 2008 WL 2721806, at *3 (S.D.N.Y. July 14, 2008) (describing the threshold showing of knowledge or involvement necessary to satisfy the adequacy inquiry

challenge Arch Sturaitis's adequacy on two grounds.[56]

Defendants contend first that Sturaitis has demonstrated neither a willingness to lead nor an ability to manage the litigation. To support this assertion, defendants point to his deposition, in which he described his role as a named plaintiff, in contrast to a lead plaintiff, as lacking supervisory authority to direct the process of the litigation.[57] But although defendants are correct that Sturaitis did not see his role at the time of his deposition as one requiring him to supervise the class action, it is clear that Sturaitis was participating actively in the litigation. He was able to summarize the allegations of the complaint, list many of the defendants, generalize the scope of the proposed class, and recite the Class Period.[58] Further, Sturaitis testified that he had dedicated time to reading various submissions and communicated with counsel with some frequency. Indeed, when asked how much time he was willing to devote to the action over the year following his deposition, Sturaitis responded, "As long as necessary."[59] In consequence, Sturaitis's involvement in this action is sufficient to ensure that he will protect and advance the interests of absent class members.[60] The

---

as "modest").

[56]

Credit Suisse Mem. at 14-15; Grant Thornton International Mem. at 31; New Parmalat Mem. at 18-19.

[57]

See Feldberg Decl. Ex. 13 (A. Sturaitis Dep. at 266:20-268:11).

[58]

Bernard Decl. Ex. N (A. Sturaitis Dep. at 229:23-237:19).

[59]

Id. at 269:22-24; Mezzetti Decl. Ex. G (A. Sturaitis Dep. at 269:22-24).

[60]

In light of the Court's determination that Sturaitis lacks standing to represent the debt holders in the putative class, the Court need not address defendants' second adequacy challenge.

Court therefore finds that plaintiffs have satisfied Rule 23(a)(4).

IV.    *Rule 23(b)*

Plaintiffs here seek to certify the class pursuant to Fed. R. Civ. P. 23(b)(3).  The Court therefore must consider whether common questions of law or fact predominate and whether a class action mechanism would be a superior means by which to adjudicate this dispute.

A.    *Predominance*

The Court may certify the proposed class under Rule 23(b)(3) only if plaintiffs demonstrate that "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to individualized proof."[61]  This inquiry, which focuses "on the legal or factual questions that qualify each class member's case as a genuine controversy . . . [,] tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."[62]

Plaintiffs here allege that defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder.  To succeed on the 10b-5 claims, plaintiffs must prove (1) a material misrepresentation or omission by defendants, (2) *scienter,* (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4)

---

[61]

*In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir. 2001), *cert. denied* 536 U.S. 917 (2002) (citation and internal quotation marks omitted).

[62]

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

transaction causation, (5) economic loss, and (6) loss causation.[63]  The Section 20(a) claims require

proof of (1) a primary violation of the federal securities laws and (2) control by the defendant over

the primary violator.[64]

It is common ground, save for the issue of transaction causation, that the domestic

plaintiffs' claims are predicated upon a common nucleus of facts and a common course of conduct

such that each element necessary to prove defendants' allegedly fraudulent conduct is common to

all class members.  Defendants, however, contend that individual questions of reliance preclude

plaintiffs from satisfying the predominance criterion.  Plaintiffs respond that (1) common questions

predominate notwithstanding any need to prove reliance on an individual basis and in any event (2)

they will not have to prove reliance on an individual basis because it can be presumed.

Plaintiffs' first contention has some modest appeal.  In *McLaughlin v. American

Tobacco Co.*,[65] the Second Circuit declined to hold that a class never may be certified where

individual questions of reliance exist.[66]  Nevertheless, it overturned a class certification order in a

RICO class action because the issue of reliance was "too individualized to admit of common

---

[63]

See Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc., 128 S. Ct. 761, 768 (2008); *In re Parmalat Sec. Litig.*, 375 F. Supp.2d 278, 302-03 (S.D.N.Y. 2005).

[64]

*See, e.g.*, *In re Parmalat Sec. Litig.*, 376 F. Supp.2d 472, 515 (S.D.N.Y. 2005).

[65]

522 F.3d 215 (2d Cir. 2008).

[66]

*Id.* at 224 (discussing *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 (5th Cir. 1996)).  That the decision of the particular reliance question presented in *McLaughlin* may have been called into question by *Bridge v. Phoenix Bond & Indem. Co.*, 128 S. Ct. 2131 (2008), has no impact on the relevance of the general discussion of reliance in securities fraud class actions.

proof."[67]

While the boundaries of *McLaughlin* – i.e., the circumstances in which issues of reliance will not preclude class certification – remain to be determined, there is no need to seek them in this case. As this Court has discussed in a prior decision in this matter, reliance may be presumed where (1) defendants are alleged to have made material omissions or (2) the fraud-on-the-market doctrine applies.[68] Plaintiffs seek to avail themselves of both presumptions. Defendants, however, contend that (1) the *Affiliated Ute* presumption does not apply because this is a case involving affirmative misrepresentations, not one "involving primarily a failure to disclose,"[69] and (2) plaintiffs cannot avail themselves of the fraud-on-the-market doctrine because they have failed to demonstrate market efficiency.

As an initial matter, defendants overstate the limitations of the applicability of the *Affiliated Ute* presumption.[70] While it is not available where the omissions served only to "exacerbate[] the misleading nature of the affirmative statements,"[71] it does apply where the alleged

---

[67]

    *Id.* at 225.

[68]

    *In re Parmalat Sec. Litig.*, 375 F. Supp 2d 278, 303 (S.D.N.Y. 2005).

[69]

    *Affiliated Ute Citizens*, 406 U.S. at 153.

[70]

    *See, e.g.*, New Parmalat Mem. at 24 (characterizing the presumption as applying "*only* in cases in which *no* positive statements exist.") (emphasis in original).

[71]

    *Starr ex rel. Estate of Sampson v. Georgeson S'holder, Inc.*, 412 F.3d 103, 109 n.5 (2d Cir. 2005); *see, e.g.*, *In re Salomon Analyst Metromedia Litig.*, 236 F.R.D. 208, 218-19 (S.D.N.Y. 2006); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, No. 05 Civ. 1898(SAS), 2006 WL 2161887, at *9 (S.D.N.Y. August 1, 2006).

omissions played an independent, or at least interdependent, role in the alleged fraud.[72]  That is the case here.  The allegedly fraudulent conduct spans a large set of misstatements *and* omissions.  For example, plaintiffs allege throughout the TAC that defendants engaged in a course of conduct that included failure to disclose material facts that made the reporting of certain information and transactions, although perhaps not deceptive in themselves, otherwise misleading.  It is appropriate in those circumstances for plaintiffs to avail themselves of the *Affiliated Ute* presumption.

The availability of the *Affiliated Ute* presumption permits generalized proof of reliance with respect to the omission claims, but perhaps not with respect to those claims that rest predominantly on alleged misrepresentations.  Indeed, plaintiff's acknowledge as much.  But they seek to plug that gap with the fraud-on-the market presumption of reliance.

The fraud-on-the-market doctrine "creates a rebuttable presumption that (1) misrepresentations by an issuer affect the price of securities traded in the open market, and (2) investors rely on the market price of securities as an accurate measure of their intrinsic value."[73]  But "[t]o obtain the benefit of this presumption, plaintiffs first must allege that the relevant market was open and developed or, in other words, efficient."[74]

---

[72]

See, e.g., *Fogarazzo v. Lehman Bros., Inc.*, 232 F.R.D. 176, 186-87 & nn.85, 87 (S.D.N.Y. 2005); *WorldCom*, 219 F.R.D. 267, 298 (S.D.N.Y. 2003) ("While the omissions and misrepresentations are alleged to be interdependent in their significance and effect, it remains true that the description of the relationship at issue here was omitted from the analyst reports, that the description of WorldCom's financial condition was not a description of the relationship, and that reliance on material omissions is presumed.").

[73]

*IPO*, 471 F.3d 24, 42 (2d Cir. 2006) (citing *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 77 (2d Cir. 2004).

[74]

*In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 303 (S.D.N.Y. 2005).

In analyzing market efficiency, courts frequently rely on five factors, including

"(1) a large weekly trading volume; (2) the existence of a significant number of analyst reports; (3) the existence of market makers and arbitrageurs in the security; (4) the eligibility of the company to file an S-3 registration statement; and (5) a history of immediate movement of the stock price caused by unexpected corporate events or financial releases."[75]

Plaintiffs have demonstrated that each of these factors weighs in their favor.[76]

Plaintiffs' expert, Dr. Hakala, opined that the average daily trading volume of Parmalat common stock during the proposed Class Period was 3.45 million shares, with greater than 350 million shares held by non-Parmalat affiliates throughout that time.[77]  Moreover, Parmalat common stock was traded on several exchanges around the world, and the company was the subject of "[h]undreds of analyst reports by many different analyst firms."[78]  Further, Parmalat filed shelf registration statements in Italy.[79]  But plaintiffs' strongest support for market efficiency is provided by Dr. Hakala's equity event study, which demonstrated the effects that certain informational events had on the price of Parmalat's stock over the Class Period.[80]  He concluded that "the events one might suspect as being important proved to be extremely significant. . . .  Furthermore, the reactions

---

[75]
Id. at 303-04 n.162 (quotation marks and citation omitted).

[76]
See, e.g., Hakala Decl. ¶ 7.

[77]
Id. ¶ 16(a).  The average market value of those shares was always in excess of 500 million euros.

[78]
Id. ¶ 16(b).

[79]
Id. ¶ 16(d).

[80]
See id. ¶¶ 18-25; id. Ex B-1; see also Pls. Reply Mem. at 58 (showing graphical results).

to new material news tended to be swift and fully absorbed within one full day of trading in the absence of additional news and commentary."[81]  In other words, the price of Parmalat common stock over time showed sensitivity and quick reaction to information as it became publicly available.  This is a hallmark of market efficiency.[82]

Not surprisingly, defendants disagree with Dr. Hakala's analysis and conclusions.[83] Their principal contention is that trades in Parmalat stock transacted in the United States occurred in the over-the-counter ("OTC") market, which was not an efficient market for Parmalat securities. In particular, Dr. Gompers argued that the volume of trades in this market was extremely low[84] and that "prices . . . [in the OTC market] diverged significantly from previous and subsequent prices in Milan,"[85] where Parmalat securities predominately traded ,  when OTC trades occurred when the Milan exchange was closed.  Furthermore, he stated that there were no published quotes for the OTC trades, no market makers that posted binding quotes for Parmalat equity, and only one analyst report authored in the United States.[86]  Finally, he criticized Dr. Hakala's event study on the grounds that

---

[81]

Hakala Decl. ¶ 25.

[82]

*See Cammer v. Bloom*, 711 F. Supp. 1264, 1287 (D.N.J. 1989) ("[S]howing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price . . . is the essence of an efficient market and the foundation for the fraud on the market theory.").

[83]

*See* Gompers Decl. ¶¶ 47-65; Comment Decl. ¶¶ 12-27.

[84]

Gompers Decl. ¶¶ 48-49.

[85]

*Id.* ¶ 46.

[86]

*Id.* ¶ 61, 65.

"he fail[ed] to establish that the days associated with statistically significant price changes are the days with news that one would expect to cause changes in the prices of Parmalat securities in an efficient market. Nor does the existence of a significant correlation between Parmalat securities and market or industry indices prove that Parmalat securities traded in efficient markets."[87]

Overall, Dr. Gompers concluded that the OTC market "did not always react to important information" and that this was "consistent with [its] lack of liquidity."[88]

Dr. Gompers did no event study to show how Dr. Hakala's analysis would have differed had the claimed flaws in his work been corrected. Nor did he address the question whether the markets in which U.S. institutional investors traded Parmalat securities were efficient. Indeed, Dr. Gompers did not opine on the efficiency of the Italian market for Parmalat[89] even though all parties agreed that U.S. retail investors, notwithstanding certain cost barriers, could have accessed foreign markets through brokers in order to trade Parmalat ordinary shares.[90] By contrast, Dr. Hakala's analysis addressed the efficiency of both the exchanged-based and OTC markets. Moreover, assuming *arguendo* that Dr. Gompers were correct in asserting that the OTC market was not efficient, that would serve only to rebut the presumption of reliance as to those U.S. investors who had traded Parmalat securities in the OTC market rather than on a foreign exchange. It does not impact the availability of the presumption in the first instance.

---

[87]

Gompers Rebuttal Decl. ¶ 6.

[88]

Gompers Decl. ¶ 64.

[89]

*Id.* ¶ 54 (conceding that he "conducted no independent study of the Milan market for Parmalat equity and [was] not offering an opinion on whether the Milan market was, in fact, efficient.").

[90]

Hakala Decl. ¶ 59; Comment Decl. ¶ 18.

In the last analysis, the Court finds plaintiffs' evidence and conclusions regarding market efficiency sufficiently persuasive that they may avail themselves of the fraud-on-the-market presumption of reliance, at least for present purposes.[91]   In consequence, the Court finds that plaintiffs have demonstrated that common issues of law or fact predominate over any issues subject to individualized proof.

### B.    *Superiority*

The second prong of the Rule 23(b)(3) analysis requires the Court to determine whether plaintiffs have shown that the class action "is superior to other available methods for fairly and efficiently adjudicating the controversy."[92]   In conducting this analysis, the Court is guided by a non-exhaustive list of factors, including the interests of class members in controlling their own actions individually, the extent and nature of any litigation already commenced, the desirability of concentrating the litigation before this Court, and any difficulties likely to arise in managing the class.[93]

As an initial matter, many of defendants' protestations with respect to the superiority of the class action have been addressed by the Court's modification of the proposed class definition. The fact that bond purchasers have brought at least four actions is irrelevant in light of the exclusion of bond purchasers from the class.   In any event, those cases name as defendants only Bank of

---

[91]    The Court therefore need not address plaintiffs' contention that reliance may be presumed as a consequence of the "fraud created the market" doctrine.

[92]    FED. R. CIV. P. 23(b)(3).

[93]    *Id.* 23(b)(3)(A)-(D).

America entities, all of whom have been dismissed from this case.[94]  Moreover, the proposed class no longer includes foreign purchasers, thereby addressing defendants' concerns over the potential lack of *res judicata* effect any judgment might have in other countries.

Once the modification of the class definition is taken into account, the Court has no reservations regarding the superiority of a class action.  It is not aware that any other equity holders are interested in prosecuting their individual claims outside of this action, nor of any litigation that has been commenced to that end. The Court further finds that judicial economy would best be served by concentrating all claims in this forum, as this Court has gained extensive knowledge of the subject matter of this action over the last four years.  Finally, there is no serious dispute that this class, comprised of domestic purchasers described as numbering at most in the "hundreds," would present few if any manageability concerns.[95]  Accordingly, the Court finds that plaintiffs have shown that a class action is the superior method of adjudication with respect to the class members' claims.

V.    *The Class Period*

Plaintiffs proposed that the Class Period encompass the period of time between and including January 5, 1999 and December 18, 2003, on the basis that the former date is the earliest possible time permitted by the applicable statute of repose and the latter date marks the day immediately preceding the disclosure of the news regarding the non-existence of the $4.9 billion

---

[94]

See In re Parmalat Sec. Litig., ____ F. Supp. 2d ____, No. 04 MD 1653(LAK), 2008 WL 3275643 (S.D.N.Y. Aug. 7, 2008).

[95]

Accord In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 140 (2d Cir. 2001) (noting that denial of class certification on manageability grounds is "disfavored").

bank account. Certain defendants contend that the Class Period should commence later and end earlier. With respect to ending earlier, those defendants argue that the financial crisis facing Parmalat materialized on December 8, 2003, when it became evident that the company was suffering a liquidity crisis. Defendants, however, have presented no persuasive evidence that December 8, 2003 is an appropriate date at which to terminate the Class Period. Nor is the argument for an earlier commencement date persuasive. Accordingly, the Court declines to modify the Class Period.

*Conclusion*

For the foregoing reasons, plaintiffs' motion [04 MD 1653, docket item 679; 04 Civ. 0030, docket item 575] is granted to the extent indicated above and denied in all other respects. This ruling is without prejudice to (1) the pending application to approve a settlement with New Parmalat on behalf of a broader class and (2) a renewed motion to expand the class to include foreign purchasers, as indicated above.

SO ORDERED.

Dated:          August 20, 2008

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)