UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re PARMALAT SECURITIES LITIGATION

This document relates to:   04 Civ. 0030

MASTER DOCKET
04 MD 1653 (LAK)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

Appearances:

Steven J. Toll
Lisa M. Mezzetti
Mark S. Willis
Julie Goldsmith Reiser
Joshua S. Devore
COHEN, MILSTEIN, HAUSFELD & TOLL,
P.L.L.C.

Stuart M. Grant
James J. Sabella
John C. Kairis
Diane Zilka
GRANT & EISENHOFER, P.A.

*Attorneys for Plaintiffs*

Michael J. Dell
Scott Ruskay-Kidd
Craig L. Siegal
KRAMER LEVIN NAFTALIS & FRANKEL, LLP
*Attorneys for Defendants Deloitte Touche
Tohmatsu and James E. Copeland*

Daniel F. Kolb
Davis Polk & Wardwell, LLP
*Attorneys for Defendant Deloitte & Touche,
LLP*

2

L EWIS A. K APLAN, *District Judge.*

        Parmalat Finanziaria, S.p.A., Parmalat S.p.A. and their affiliates (collectively, "Parmalat") collapsed upon the discovery of a massive fraud that reportedly involved the understatement of Parmalat's debt by nearly $10 billion and the overstatement of its net assets by $16.4 billion.[1]  Plaintiffs, purchasers of Parmalat securities between January 5, 1999 and December 18, 2003 (the "Class Period"), seek damages against Parmalat's accountants, banks and others.  In a series of decisions, the Court granted in part and denied in part various motions to dismiss.  It certified a class consisting of domestic parties who purchased or otherwise acquired Parmalat securities during the Class Period.[2]  The matter now is before the Court on the motions of Deloitte Touche Tohmatsu ("DTT"), Deloitte & Touche LLP ("DT-US"), and James Copeland (collectively, the "Deloitte defendants") for summary judgment dismissing the complaint.

*Facts*

        The class plaintiffs represent a class of individuals who purchased ordinary Parmalat shares and bonds during the Class Period.  They sue the Deloitte defendants and others under

---

[1]    Third Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws ("Cpt.") ¶ 4.

[2]    *In re Parmalat Sec. Litig.,* No. 04 MD 1653 (LAK), 2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008).

3

Sections 10(b) and 20(a) of the Securities Exchange Act of 1934[3] (the "Exchange Act") and Rule 10b-5 thereunder.[4]

*Deloitte's Structure*

Defendant DTT, a Swiss verein[5] headquartered in New York,[6] is a professional services organization of member firms, which sometimes are referred to collectively as a "global firm."[7] These member firms, including defendants Deloitte & Touche, S.p.A. ("Deloitte Italy") and DT-US, generally are organized as limited liability entities under the laws of their respective jurisdictions.[8]

Accounting and auditing standards and regulation of the accounting profession often are country specific. In addition to complying with any locally applicable rules, however, Deloitte

---

[3]

15 U.S.C. §§ 78j(b), t(a).

[4]

17 C.F.R. § 240.10b-5 (2005).

[5]

A verein is a Swiss business form that DTT alleges is legally distinct from its member organizations. *See Jeffries v. Deloitte Touche Tohmatsu Int'l*, 893 F. Supp. 455, 457 n.1 (E.D. Pa. 1995). "Verein" means association, society, club or union. CASSEL'S GERMAN DICTIONARY 662 (1978); *see also* LANGENSCHEIDT'S STANDARD DICTIONARY OF THE ENGLISH AND GERMAN LANGUAGES 1163 (6th ed. 1970).

[6]

Copeland Dep. 13-14.

[7]

*Id.* at 55.

[8]

Def. Rule 56.1 ¶ 6.

Some member firms have affiliated or subsidiary firms. For example, Deloitte Touche Tohmatsu Auditores Independentes ("Deloitte Brazil"), the Deloitte firm in Brazil, is a subsidiary of Deloitte Touche Tohmatsu USA. *Id.*

4

firms follow general professional standards and auditing procedures promulgated by DTT. Member firms regularly cross check each other's work to ensure quality,[9] and they cooperate and join together under the direction of a single partner to provide audit services for international clients.[10] Partners and associates of member firms participate in global practice groups and attend DTT meetings.[11]

Although disclaimers on DTT's website assert the legal separateness of DTT and its members, DTT's goal, as expressed by its chief executive officer, James Copeland, was for clients to "get[] consistent seamless service across national boundaries."[12] Member firms therefore use the Deloitte name when serving international clients "in order to project the image of a cohesive international organization."[13]

*The Parmalat Scandal and Deloitte Italy*

The claims against the Deloitte defendants all rest on the premise that they are vicariously liable for the alleged fraud of Deloitte Italy, one of Parmalat's former auditors, which has not joined in the motion. The motion itself seeks dismissal only on the ground that the Deloitte defendants are not vicariously liable. It does not dispute that Deloitte Italy itself is primarily liable

---

[9]     DT 96259-268.

[10]     DTItalia 96061-66.

[11]     DTUSA 562-63.

[12]     Copeland Dep. 55.

[13]     DTItalia 96099-96100.

for the alleged fraud.  Accordingly, it suffices for present purposes to outline briefly plaintiffs'

allegations with respect to the Parmalat scandal generally and Deloitte Italy's role.

In the early 1990s, Parmalat, an Italian dairy conglomerate known for its long shelf-

life milk, pursued an aggressive growth strategy financed largely by debt.  Its expansion into South

America, however, turned out to be ill-advised, and it began to lose hundreds of millions of dollars

there.[14]  The company needed constant infusions of cash to cover these losses, service its massive

debt, and hide the personal diversion of funds by Parmalat chief executive officer Calisto Tanzi and

his family.[15]  But cash could be obtained only so long as Parmalat appeared to be a sound

investment.  To this end, insiders at Parmalat and Grant Thornton S.p.A.[16] ("GT-Italy") concocted

a scheme involving misleading transactions and off-shore entities that created the appearance of

financial health.[17]  One such transaction, for example, involved a fictitious sale of 300,000 tons of

powdered milk to Cuba for $620 million.[18]  Loans obtained on the basis of this transaction were

---

[14]

     Cpt. ¶ 240 ("By 1995, Parmalat was losing about $320 million a year in its South American operations alone.").

[15]

     *Id.* ¶¶ 266, 370-80.

     According to former Parmalat chief financial officer Fausto Tonna, hundreds of millions of dollars were transferred to Tanzi family companies. *Id.* ¶ 370.

[16]

     The complaint uses the name "Grant Thornton" without distinction among GT-Italy, Grant Thornton LLP, and Grant Thornton International.

[17]

     Cpt. ¶¶ 12-14.

[18]

     *Id.* ¶¶ 284.

     A Chilean subsidiary of Parmalat actually had a contract with the Cuban importer for $700,000 worth of powdered milk a month, or about 7,000-8,000 tons of milk annually. *Id.* ¶ 286.

used to service debt and obtain more loans.[19]  In short, Parmalat and its confederates were operating something akin to a Ponzi scheme.

Italian law obliged Parmalat to switch auditors in 1999.  Concerned that new auditors would discover and disclose the fraud, Parmalat and GT-Italy moved the allegedly fictitious financing transactions to Bonlat, a new company incorporated in the Caribbean that would continue to be audited by Grant Thornton.[20]  Parmalat then hired Deloitte Italy as its auditor. Deloitte offices in numerous countries audited Parmalat and its subsidiaries and affiliates as part of this worldwide engagement.[21]  Despite the company's fear that new auditors would not continue to acquiesce in the fraud, the Deloitte defendants allegedly discovered or recklessly ignored the fraud, yet certified the company's financial statements as substantially accurate.[22]

---

[19]

One of the more significant parts of this scheme used a multi-step process to create the appearance of revenue while removing debt from Parmalat's books. First, Parmalat issued a phony invoice to an offshore shell company, principally Bonlat after 1999, thus creating an account receivable for a nonexistent debt.  *Id.* ¶ 241.  At the same time it issued the invoice, Parmalat created a discounted bill, which represented the subsidiary's payment obligation to Parmalat. *Id.* ¶ 242. It then sold the discounted bill to a bank, giving the bank the right to be paid on the invoice.  The shell companies did not have any assets or revenue, however, and so Parmalat loaned the company money to pay the bank.  Next, Parmalat recorded the transfer as an investment in a subsidiary rather than as a loan. *Id.* ¶¶ 242-43. Finally, at the end of the accounting period, Parmalat assigned the credit and the liability on the invoice of the consolidated subsidiary to an unconsolidated subsidiary.  *Id.* ¶¶ 244. Parmalat then recorded the transaction as an asset because it then had a credit owed to it by an unconsolidated subsidiary.  Plaintiffs contend that this scheme allowed Parmalat to obtain massive amounts of cash in loans from banks while recording them as assets, which gave rise to Parmalat's overvaluation.  *Id.* ¶¶ 236, 244-49.

[20]

*Id.* ¶ 260-61 (quoting Tonna's account of the enterprise to Italian authorities on December 23, 2003).

[21]

*Id.* ¶137.

[22]

*E.g.*, *id.* ¶¶ 1033-34, 1041, 1108, 1137.

By late 2003, the scheme became unsustainable.  Parmalat had a liquidity crisis, and the ensuing collapse was rapid.  In early December, Parmalat could not pay certain maturing bonds.[23]  By December 11, the company's stock had lost half its value.[24]  Trading was suspended for days by Italian regulators.[25]  Parmalat's bonds rapidly lost value as well.[26]  On December 19, the company announced that a Bank of America account allegedly held by its Bonlat affiliate that supposedly contained $4.9 billion did not exist.[27]

Parmalat filed for bankruptcy in Italy on December 24 and was declared insolvent three days later.[28]  Italian authorities thereafter indicted a number of Parmalat executives and insiders as well as the company's auditor, Deloitte Italy.  Authorities also arrested many individuals connected with the fraud and seized their assets.[29]

---

[23]

*Id.* ¶¶ 827-29.

[24]

*Id.* ¶ 830.

[25]

*Id.* ¶¶ 826, 830.

[26]

*Id.* ¶ 830.

[27]

*Id.* ¶ 835.

[28]

*Id.* ¶¶ 840-41.

Parmalat's United States subsidiaries filed for bankruptcy in the Southern District of New York.  *See Grant Thornton Int'l v. Parmalat Finanziaria, S.p.A.*, 326 B.R. 46 (Bankr. S.D.N.Y. 2005).

[29]

Cpt.  ¶¶ 117-29, 138.

8

*Discussion*

The Deloitte defendants move for summary judgment dismissing plaintiffs' claims under Sections 10(b) and 20(a) of the Exchange Act. Alternatively, they assert that they are entitled to summary judgment determining that they are not jointly and severally liable pursuant to Section 21D(f)(2)(A) of the Private Securities Litigation Reform Act of 1995 ("PSLRA").[30]

*A.      Summary Judgment Standard*

Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.[31] Where, as here, the burden of proof at trial would fall on the nonmoving party,[32] it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non-movant's claim.[33] In that event, the non-moving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment.[34]

---

[30]

15 U.S.C. § 78u-4(f)(2)(A).

[31]

FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[32]

Although this is a point of debate within the Circuit, this Court holds the view that lack of culpable participation or a defendant's good faith is an affirmative defense to a Section 20(a) claim which the defendant bears the burden of proving. *See, e.g.*, *CSX Corp. v. Children's Inv. Fund Management (UK) LLP*, 562 F. Supp.2d 511, 558 & n.244 (S.D.N.Y. 2008); *In re Parmalat Sec. Litig.*, 375 F. Supp.2d 278, 307-08 & n.198 (S.D.N.Y. 2005); *In re NTL, Inc. Sec. Litig.*, 347 F. Supp.2d 15, 37 n. 127 (S.D.N.Y.2004) (collecting cases).

[33]

*Celotex*, 477 U.S. at 322-323; *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 273 (2d Cir. 2001).

[34]

*Celotex*, 477 U.S. at 322-323; *Raskin v. Wyatt Co.*, 125 F.3d 55, 65-66 (2d Cir.1997).

B.    *Vicarious Liability After* Stoneridge

    The Deloitte defendants first challenge plaintiffs' claim that DTT is vicariously liable on a *respondeat superior* theory for federal securities law violations of its alleged agent, Deloitte Italy.  This claim, they argue, cannot survive the Supreme Court's decision in *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*,[35] which, in their view, foreclosed common law theories of secondary liability for Exchange Act claims.  Section 20(a) of the Exchange Act, the Deloitte defendants argue, now is the exclusive basis for vicarious liability for Exchange Act violations.[36]

    In *Stoneridge*, the Supreme Court held that "[r]eliance by the plaintiff upon the defendant's deceptive acts is an essential element of the Section 10(b) private cause of action."[37] The Court stated that "[t]he conduct of a secondary actor must satisfy each of the elements or preconditions for liability" and concluded that Section 10(b) "does not incorporate common-law fraud into federal law."[38]

---

[35]

    128 S. Ct. 761 (2008).  The Deloitte defendants argue also that the Court must grant summary judgment dismissing plaintiffs' *alter ego* claim.  Plaintiffs do not appear to pursue such a claim, as they do not address it in their response brief. Previously, the Court declined to consider plaintiffs' *alter ego* claim after concluding plaintiffs had pleaded adequately an agency relationship. *See In re Parmalat Sec. Litig.*, 375 F. Supp.2d 278, 296 (S.D.N.Y. 2005).

[36]

    Def. Br. at 6-7.

[37]

    128 S. Ct. at 769.

[38]

    *Id.* at 769, 771.

Were it considered in a vacuum, aspects of the *Stoneridge* Court's reasoning would seem to apply also to common law agency principles.[39]  Nevertheless, *Stoneridge* did not deal with the question presented here, viz. whether a principal is liable vicariously for an Exchange Act violation committed by its agent acting within the agent's scope of employment.  There are substantial reasons why its holding should not be extended, at least by a district court.

At the most basic level, the common law principle of *respondeat superior* – i.e., that a principal is liable for the acts of its agent within the scope of the agent's authority – is centuries old.[40]  The Second Circuit – and nearly every other circuit to have considered the question – expressly has permitted the application of the common law principle of *respondeat superior* to hold principals liable for Section 10(b) violations by their agents.[41]  While there doubtless are

---

[39]

See, e.g., *id.* at 771 ("'Congress, in enacting the securities laws, did not intend to provide a broad federal remedy for all fraud.'") (quoting *Marine Bank v. Weaver*, 455 U.S. 551, 556 (1982)).

[40]

See, e.g., *The Hector,* 24 How. (62 U.S.) 110, 123 (1860); *Philadelphia & Reading R. Co. v. Derby,* 14 How. (55 U.S.) 468, 479 (1852); JOSEPH STORY, COMMENTARIES ON THE LAWS OF AGENCY § 452, at 465-66,(1839); I WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 417-20 (1765).

[41]

See *Marbury Mgmt., Inc. v. Kohn*, 629 F.2d 705, 716 (2d Cir. 1980); *Secs & Exch. Comm'n v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 812-13 (2d Cir. 1975); *see also Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1576-78 (9th Cir. 1990) (en banc); *Commerford v. Olson*, 794 F.2d 1319, 1322-23 (8th Cir. 1986); *In re Atlantic Fin. Mgmt.*,784 F.2d 29, 32-35 (1st Cir. 1986); *Paul F. Newton & Co. v. Texas Commerce Bank*, 630 F.2d 1111, 1118-19 (5th Cir. 1980); *Holloway v. Howerdd*, 536 F.2d 690, 694-95 (6th Cir. 1976); *Carras v. Burns*, 516 F.2d 251, 259 (4th Cir. 1975); *Fey v. Walston & Co., Inc.*, 493 F.2d 1036, 1051-52 (7th Cir. 1974); *Kerbs v. Fall River Indus., Inc.*, 502 F.2d 731, 740-41 (10th Cir. 1974); *but see Sharp v. Coopers & Lybrand*, 649 F.2d 175, 180-84 (3d Cir. 1981) (holding that, in general, common law agency principles should not establish secondary liability under Section 10(b), but that certain exceptions to this general rule exist in light of the "public trust" certain firms, including accounting firms, hold "and the duty to supervise arising therefrom"), *overruled on other grounds by In re Data Access Sys. Sec. Litig.*, 843 F.2d 1537 (3d Cir. 1988) (en banc).

11

circumstances in which a Supreme Court decision so undermines the viability of established circuit precedent as to justify a district court in concluding that it need not follow previously binding circuit law, this Court is not persuaded that this is such an instance.

The typical defendant in a Section 10b-5 or other Exchange Act case is a corporation. Corporations and other legal entities, as we frequently instruct juries, are not living, breathing human beings and therefore can act only through their agents. In consequence, acceptance of the Deloitte defendants' argument would confine liability for securities law violations committed by corporate officers and employees to the individual malefactors and limit recovery against the corporations that employed them and, frequently, benefitted from the securities violations. This in turn would undermine the ability of defrauded investors to obtain meaningful compensation, as  individual corporate employees who are personally culpable in the usual case seldom are capable of paying judgments of the requisite magnitude.[42]  It could undermine as well government efforts to enforce the securities laws against corporations and other business entities.

If the Supreme Court in *Stoneridge* intended any such transformation of this long-settled principle of American law, it presumably would have made its intention clear. It did nothing of the sort. Accordingly, this Court declines to do so here.

---

[42]
The Eleventh and District of Columbia Circuits have not spoken on this precise issue.

Of course, corporate officers and employees often will have claims for indemnification against their employers. The practical utility of this fact, however, is at least somewhat limited because claims for indemnification often do not arise until payment is made against the judgment. *See*, *e.g.*, RESTATEMENT (FIRST) OF RESTITUTION § 77 (1937).

C.     DTT

    1.     Respondeat Superior *Liability for Section 10(b) Violations by Deloitte Italy*

        Whether DTT may be held liable for the securities violations and other actions of Deloitte Italy turns on whether DTT had a principal-agent relationship with that member firm.

        An agency relationship exists under New York law[43] when there is an agreement between the principal and the agent that the agent will act for the principal, and the principal retains a degree of control over the agent.[44] The element of control often is deemed the essential characteristic of the principal-agent relationship.[45] "When the existence of an agency relationship is uncertain, the courts often look to control as a critical indicator."[46]

        To bind a principal, "an agent must have authority, whether apparent, actual or implied."[47] Actual authority arises from a principal's direct manifestations to the agent.[48] It "'may

---

[43] The law of the forum state governs where, as here, no party alleges that the law of a different state controls and differs from that of the forum. *See, e.g., Questrom v. Federated Dep't Stores, Inc.*, 192 F.R.D. 128, 133 n.26 (S.D.N.Y. 2000), *aff'd*, 2 Fed. Appx. 81 (2d Cir. 2001).

[44] *Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A.*, 347 F.3d 448, 462 (2d Cir. 2003); *N.Y. Marine & Gen. Ins. Co. v. Tradeline, LLC*, 266 F.3d 112, 122 (2d Cir. 2001) (quoting *Meese v. Miller*, 79 A.D.2d 237, 242, 436 N.Y.S.2d 496, 499 (4th Dep't 1981)); *see also Maurillo v. Park Slope U-Haul*, 194 A.D.2d 142, 146, 606 N.Y.S.2d 243, 246 (2d Dep't 1993).

[45] *See, e.g., Meese*, 79 A.D.2d at 241; Restatement (Second) Agency § 14 cmt. a. (1958).

[46] *Maritime Ventures Int'l, Inc. v. Carribean Trading & Fidelity*, 689 F. Supp. 1340, 1353 (S.D.N.Y. 1988).

[47] *Merrill Lynch Interfunding, Inc. v. Argenti*, 155 F.3d 113, 122 (2d Cir. 1998) (applying New York law); *see also In re Parmalat Sec. Litig.*, 375 F. Supp.2d at 290.

[48] *Dinaco, Inc. v. Time Warner, Inc.*, 346 F.3d 64, 68 (2d Cir. 2003) (applying New York law).

be express or implied, but in either case it exists only where the agent may reasonably infer from the words or conduct of the principal that the principal has consented to the agent's performance of a particular act.'" [49]

The Deloitte defendants contend that plaintiffs have failed to raise a genuine issue of material fact as to whether DTT and Deloitte Italy had a principal-agent relationship.  Plaintiffs, however, point to numerous facts that could be taken as indicating that DTT structured and conducted itself in a manner that permitted it to exercise control over its member firms, including Deloitte Italy.

To begin with, DTT exercised substantial control over the manner in which the member firms conducted their professional activities.  Each member firm agreed in DTT's governing document, the Articles of the Verein, to "support and adhere to the purposes and policies of the Verein" and to "be bound by the requirements contained in resolutions and protocols . . . including . . . those regarding professional standards and methodologies." [50]  DTT set the policies that governed member firms, including Deloitte Italy, which dictated the specific methodologies to be applied in conducting audits and the particular software and documentation procedures to be used. [51]  It  required member firms to sign license agreements pursuant to which they agreed to

---

[49]

    *Id.* (quoting *Minskoff v. Am. Express Travel Related Serv. Co.*, 98 F.3d 703, 708 (2d Cir. 1996) (in turn quoting RESTATEMENT (SECOND) AGENCY § 7 cmt. b (1958)) (emphasis omitted)); *see Riverside Research Inst. v. KMGA, Inc.*, 108 A.D.2d 365, 370, 489 N.Y.S.2d 220, 223 (1st Dep't 1985), *aff'd*, 68 N.Y.2d 689 (1986).

[50]

    DTT 017426-27-32 § 6.2(a).

[51]

    Ex. 1004, at 1 ("All services provided by the Member Firms are governed by these policies unless their applicability is explicitly limited by the Executive Committee of Deloitte Touche Tohmatsu.") (Deloitte Professional Practice Manual); *id.* (requiring the use of the

comply with DTT's "quality standards, specifications, directions, and procedures"[52] and required

a review of each member firm's compliance every three years.[53]

DTT had control over the acceptance and rejection of engagements by member firms

and required use of the company name.[54]  DTT's rules prohibited member firms from suing each

other[55] and required that one member firm accept client work referred from another member firm.[56]

DTT could arrange, with the approval of the transferring firm, for the transfer of employees from

one member firm to another.[57]

DTT played also a substantial role in the legal and risk management affairs of

member firms.[58]  Member firms, with the exception of DT-US,  generally did not have in-house

legal counsel, but relied instead on DTT's legal staff.[59]  DTT instructed auditors to refer press

---

Audit Approach Manual by Member Firms for "all audit engagements covering fiscal
periods beginning on or after December 31, 1995"); *see also* DTItalia 000097749-98709 (the
Audit Approach Manual).

[52]

DT 17385 § 5.1.

[53]

Ex. 1004 at 204. DTT chooses which firms and which specific audit engagements will be
reviewed. Willemain Dep. 29-30.

[54]

Pl. Rule 56.1 ¶¶ 25-28; DT 442660-62.

[55]

Murray Dep. 94.

[56]

Ex. 1644 at 2.

[57]

Murray Dep. 258-60.

[58]

Pl. Br. at 14-15.

[59]

Murray Dep. 23-26.

inquiries to DTT and, where lawsuits naming a member firm were threatened or filed, DTT lawyers reviewed the work papers of that member firm.[60] In addition, DTT required member firms to purchase specified levels of insurance coverage.[61]

The Deloitte defendants contend that the manner in which DTT is structured does not demonstrate control.[62] Some courts have adopted that view.[63] But plaintiffs do not rely upon DTT's structure alone.

DTT's Professional Practice Manual states that "differences of opinion between Member Firms . . . should be resolved" by referring such matters "to the Chairman and Chief

---

[60]

Pena Dep. 23-24.

[61]

Holt Dep. 174-75; Ex. 1803 at 7.

[62]

Def. Br. at 15-21.

[63]

*In re Asia Pulp & Paper*, 293 F. Supp.2d 391, 393, 396 (S.D.N.Y. 2003) (allegations of cost and profit sharing, partner overlap, global setting of professional standards, and maintenance of a global infrastructure and administration insufficient to demonstrate "control" under Section 20(a) for purposes of motion to dismiss when no allegation that global umbrella entity controlled or influenced particular audits by individual member firms); *Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP*, No. 03 Civ.0613 (GBD), 2004 WL 112948, at **3-6 (S.D.N.Y. Jan. 22, 2004) (global umbrella entity that requires member firms to adhere to certain procedures and conducts reviews to ensure that member firms follow those procedures insufficient find principal/agent relationship between global entity and member firm when there were no allegations that the global entity participated in decisions about how member firms completed audit reports or that the global entity was aware of or contributed to a decision to alter the audit reports); *Howard v. Klynveld Peat Marwick Goerdeler*, 977 F. Supp. 654, 661-62 (S.D.N.Y. 1997) (umbrella entity that set standards for member accounting firms and provided general assistance does not have a principal agent relationship with member firm); *but see Banco Espirito Santo Int'l v. BDO Int'l*, 979 So. 2d 1030, 1033-34 (Fla. Dist. Ct. App. 2008) (holding that evidence demonstrating, *inter alia*, that global entity could require member firms to provide services to clients, comply with global operating directives and restrictions, and submit to review of member firm's compliance presented a triable issue of material fact as to agency).

Executive for resolution."[64]   Moreover, there is evidence that DTT exercised that authority in the specific context of the Parmalat engagement.

In 2002, Deloitte Brazil and Deloitte Italy had a difference of opinion about how to treat certain related party transactions in which Parmalat Brazil had engaged.   Wanderley Olivetti of Deloitte Brazil concluded that the audit report should include an emphasis paragraph describing the transaction.   Deloitte Italy disagreed and requested that DTT "arbitrate the matter."[65]   James Copeland, the chief executive officer of DTT, appointed Richard Murray to do so.   Murray described his assignment as one that "invoked the CEO's responsibility to resolve differences in accordance with the dispute resolution provisions of . . . the practice manual."[66]

Murray held a conference call during which the "principal business . . . was [his] declaration of [his] conclusion" about the appropriate disclosure.   He characterized the call as "an announcement of [his] recommendation jointly to the two firms and an acceptance by each firm that they would abide by the decision."[67]   He concluded that "[n]on-disclosure [of the transaction] . . . [wa]s unacceptable."[68]

The Deloitte defendants argue that DTT neither controlled nor had authority to

---

[64]

Ex. 1004 § 1510 at 43-44.

[65]

Ex. 1005 DTT282597.

 "Arbitration" is a "binding" method of dispute resolution. BLACK'S LAW DICTIONARY (8th ed. 2004).

[66]

Murray Dep. 43.

[67]

*Id.* at 141.

[68]

Ex. 1012 at 1.

17

control Deloitte Brazil's decisions about the audit report. They emphasize Murrary's characterization of his role as arriving at a "voluntary," "consensus" solution following consultation with Deloitte Italy and Deloitte Brazil.[69]  They point also to the testimony of Alcides Hellmeister, the managing partner of Deloitte Brazil, who stated that "DTT had no authority to tell Deloitte Brazil how to conduct its audits of the financial statements of Parmalat Brazil, and it did not do so."[70]

The testimony upon which the Deloitte defendants rely would support a conclusion at trial that DTT did not control the outcome of the Deloitte Brazil – Deloitte Italy dispute[71] and even, perhaps, a conclusion that DTT lacked the authority to dictate the outcomes of disputes among member firms generally.  But the standard on a motion for summary judgment is different. Here the Court is obliged to view the evidence in the light most favorable to the plaintiffs.  And by that standard, the argument falls short.

The Deloitte defendants' position ignores the DTT Practice Manual, which confers authority to resolve disputes on DTT's chief executive officer, and Deloitte Italy's request that the matter be "arbitrate[d]," a word that means, or is at least susceptible of interpretation as referring

---

[69]

Murrary Dep. 139 ("I achieved a consensus agreement on a voluntary basis resolving a high intensity dispute by Monday morning.").

[70]

Hellmeister Aff. at ¶ 8.

[71]

The fact that a member firm seeks guidance from or confers with DTT does not necessarily indicate that it is subject to DTT's control.  *See Maung NE We & Massive Atlantic Ltd. v. Merrill Lynch & Co., Inc.*, No. 99 CIV. 9687 (CSH), 2000 WL 1159835, at *7 (S.D.N.Y. Aug. 15, 2000) ("It is one thing to 'consult' with, or obtain 'recommendations' or approval from a parent corporation.  It is quite another for the parent's approval to be required before the subsidiary can act.").

to, a binding determination by a third party. Against the background of these documents, the characterizations of the authority and roles of Messrs. Copeland and Murray reasonably could be viewed as self-serving and unpersuasive attempts to put a helpful face on otherwise unhelpful facts. Were a jury so to conclude, it would be justified in concluding also that DTT actually did dictate the resolution of the Deloitte Brazil dispute with Deloitte Italy.  Evidence that a global entity controlled or influenced a particular audit report of a member firm, taken together with plaintiffs' structural evidence,[72] is sufficient to permit the conclusion, under even the most stringent standard, that the global entity controlled the member firm.[73]

The Deloitte defendants argue also that *Rodonich v. House Wreckers Union Local 95*[74] stands for the proposition that Deloitte member firms were not DTT agents even if DTT did decide an issue relating to the Parmalat audit.  But the argument is not convincing.

In *Rodonich*, the Second Circuit affirmed a grant of summary judgment for an international union, concluding that it could not be held liable as a principal for Local 95's imposition of discipline on a member.[75] In *Rodonich*, however, the local had the power to impose

---

[72]

    *See United States v. Corr*, 543 F.2d 1042, 1050 (2d Cir. 1976) (noting that "control" for control person liability is a factual question that depends on the totality of the circumstances).

[73]

    *See, e.g.*, *In re Asia Pulp & Paper*, 293 F. Supp.2d at 396 (dismissing complaint alleging vicarious liability of global accounting firm where complaint alleged only "'one-firm'" or "unified company theory" of agency and noting the significant absence of allegations that the global entity "was able to control or in any way influence the particular audits conducted or opinions offered by its individual firm members").

[74]

    817 F.2d 967, 974-75 (2d Cir. 1987).

[75]

    *Id.* at 970.

discipline pursuant to the union's constitution.  The international had only the authority to conduct an appellate review of that decision.  The local could not and did not act at the international's direction at any stage of its own decision making process.[76]  Here, in contrast, there is evidence that would permit the conclusion that DTT had the power to impose its will on a member firm's professional judgment and that it exercised that power to dictate to Deloitte Brazil an outcome favorable to Deloitte Italy.

In all the circumstances, the totality of the evidence – including evidence concerning the structure and internal relationships of Deloitte generally, DTT's authority over the professional practices of the member firms, and DTT's exercise of that authority in connection with the Parmalat engagement – raises a genuine issue of material fact as to whether Deloitte Italy was an agent of DTT with respect to the Parmalat engagement.  Accordingly, DTT is not entitled to summary judgment dismissing the claims against it to the extent they rest on the theory that DTT is liable on the basis of *respondeat superior* for any Section 10(b) liability that Deloitte Italy may have to plaintiffs.

2.    *Section 20(a) Liability*

The DTT next contends that it is entitled to summary judgment dismissing plaintiffs' Exchange Act Section 20(a) claim.

Section 20(a) provides that:

"[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter . . . shall also be liable jointly and severally with and to the same extent as such controlled person to any person whom such controlled person

---

[76]    *Id.* at 974-75.

is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."[77] DTT argues that it is entitled to summary judgment because there is no evidence that would justify a conclusion that it controlled the alleged primary violator, Deloitte Italy.  It contends in any event that the record indisputably establishes that it acted in good faith and did not induce the act or acts constituting the alleged violations.[78]

### a.    Control

Control of a primary violator under Section 20(a) may be demonstrated by "showing that the defendant 'possessed the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'"[79]  "[O]nly the ability to direct the actions of the controlled person, and not the active exercise thereof" is required to establish control.[80]  DTT argues that control for Section 20(a) purposes must extend to the transaction in question, whether or not it was exercised.[81]  As this Court already has ruled in this case, however, the plain language of Section 20(a), requires control only

---

[77]    15 U.S.C. § 78t(a).

[78]    The Deloitte defendants do not dispute for purposes of this motion that there was a primary violation by the controlled person. *See SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996) (listing elements of § 20(a) claim).

[79]    *First Jersey*, 101 F.3d at 1472-73 (quoting 17 C.F.R. § 240.12b-2 and adopting this standard for a Section 20(a) claim).

[80]    *See Dietrich v. Bauer*, 126 F. Supp.2d 759, 764-65 (S.D.N.Y. 2001); *see also In re Flaff Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp.2d 429, 458 (S.D.N.Y. 2005) (citing *Dietrich* for same proposition).

[81]    Def. Br. at 24-25.

of a person or entity liable under the chapter, not of the transaction constituting the violation.[82]

Requiring a plaintiff to prove not only that the defendant controlled the person or entity, but also

that the defendant exercised control over the transaction constituting the violation, would be in

serious tension and probably inconsistent with the language of the statute. It would be inconsistent

also with this Court's oft-stated view that a plaintiff relying on Section 20(a) is not obliged to allege

or prove a controlling person's culpable participation in the violation[83] and with this Court's prior

ruling in this case.[84]

Even if the Court adopted the view put forth by defendants, it would not reach a

different result.  As discussed above, plaintiffs have presented sufficient evidence that DTT had the

ability to influence the preparation of member firms' audit reports generally and the Parmalat audit

report prepared by Deloitte Brazil specifically. Thus, whether or not DTT's control must extend to

the transaction in question need not affect the analysis of this issue.  The Court concludes that

plaintiffs have shown that there is a genuine issue of material fact as to whether DTT was a

controlling person.[85]

---

[82]

      *In re Parmalat Sec. Litig.*, 474 F. Supp.2d 547, 554 (S.D.N.Y. 2007); *see also* 15 U.S.C. § 78j(t)(a) ("Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person . . . .").

[83]

      *See, e.g.*, *In re Parmalat Sec. Litig.*, 375 F. Supp.2d 278, 307-10 (S.D.N.Y. 2005).  The Court recognizes, of course, that there is a split of authority on this point. *See, e.g.*, *In re Alstom SA Sec. Litig.*, 406 F. Supp.2d 433, 487 (S.D.N.Y. 2005); *Cromer Finance Ltd. v. Berger*, 137 F. Supp.2d 452, 484 (S.D.N.Y. 2001).

[84]

      *In re Parmalat Sec. Litig.*, 474 F. Supp.2d 547, 554 (S.D.N.Y. 2007).

[85]

      *See In re Parmalat Sec. Litig.*, 375 F. Supp.2d at 310 (equating the two standards).

     *b.     Good Faith*

Good faith is an affirmative defense. "It is not enough on a motion for summary judgment to demonstrate that plaintiffs fall short of producing evidence of culpable conduct; rather, the defendant[s] must put forth [their] own evidence of this defense sufficient to direct a conclusion of law that [they are] entitled to the defense."[86]

The Deloitte defendants first argue that they have shown affirmatively that DTT acted in good faith. They point to the fact that there is no evidence that DTT had reason to know of or recklessly disregarded any fraud by Deloitte Italy in connection with the Parmalat audits.[87] Plaintiffs do not dispute this. But this alone is insufficient to demonstrate good faith, as it does not exclude the possibility that DTT was, for example, wilfully blind to a violation.[88]

The Deloitte defendants next point to evidence indicating that DTT had an appropriate compliance review system in place. A court may consider such structures in deciding whether an entity's acts or omissions were in good faith.[89] However, the existence of a compliance review system alone is not sufficient to establish a good faith defense on a motion for summary judgment. In *SEC v. Lum's, Inc.*, for example, the district court found the issue of Lehman Brothers' good faith "close," despite testimony by several witnesses about the company's

---

[86]

     *In re Boesky*, Nos. 732, M21-45-MP, 1995 WL 456368, at *1 (S.D.N.Y. Aug. 1, 1995); *see also First Jersey*, 101 F.3d at 1473 ("Once the plaintiff makes out a prima facie case of § 20(a) liability, the burden shifts to the defendant to show that he acted in good faith.").

[87]

     Def. Br. at 26-27.

[88]

     *See, e.g.*, *Compudyne Corp. v. Shane*, 453 F. Supp.2d 807, 830 (S.D.N.Y. 2006); *Dietrich*, 126 F. Supp.2d at 765.

[89]

     *See SEC v. Lum's, Inc.*, 365 F. Supp. 1046, 1064-65 (S.D.N.Y. 1973).

23

compliance department and the procedures it took to ensure that employees were kept apprised of how to comply with securities laws.[90]  Here, the Deloitte defendants' evidence relates only to DTT's procedures and policies, but not to how those procedures and policies actually were implemented during the period in question.[91]  The lack of such evidence alone precludes this Court from ruling as a matter of law that defendants acted in good faith.

Third, the Deloitte defendants argue that the evidence demonstrates that DTT's actions and recommendations plainly were made in good faith when issues involving Parmalat audits were brought to its attention.[92]  By way of illustration, they point to the incident involving a difference of opinion between Deloitte Brazil and Deloitte Italy about the appropriate treatment of a Parmalat Brazil transaction.[93]  They contend that their actions with respect to this incident demonstrate their good faith because DTT ultimately recommended disclosure of the transaction.[94]

---

[90]

Id.

[91]

See Def. Br. at 27; see also First Jersey, 101 F.3d at 1473 (to establish good faith under Section 20(a), "the controlling person must prove that he . . . 'maintained and enforced a reasonable and proper system of supervision and internal controls'") (quoting Marbury Mgmt. Inc. v. Kohn, 629 F.2d 705, 716 (2d Cir. 1980)) (emphasis added).

[92]

Def. Br. at 27-28.

[93]

The Deloitte defendants discuss also an incident involving Deloitte Italy's concerns that DT-US's decision to perform an appraisal for a company seeking to purchase Parmalat assets would impair Deloitte Italy's independence. DT-US requested that DTT speak with Deloitte Italy to see if the two member firms could reach an understanding.  The Deloitte defendants contend that this incident demonstrates DTT's good faith as DTT repeatedly emphasized that, in the end, it was Deloitte Italy's decision whether DT-US's work would impair the Italian firm's independence. See ex. 1437; ex 1252, at 1; Mamoli Dep. 110. This evidence may support a contention that DTT did not control Deloitte Italy, but does little to support the contention that DTT acted in good faith.

[94]

Def. Br. at 27-29.

24

To plaintiffs, the same incident demonstrates DTT's willful blindness, as they argue the incident raised warning signs that DTT intentionally ignored.[95]

The Deloitte defendants agree with plaintiffs that the Deloitte Brazil - Deloitte Italy dispute raised red flags, but argue that DTT responded to these warning signs appropriately.[96] Jorge Pena of DTT testified that DTT wanted to know whether the non-disclosure of the transaction involved in the dispute was limited to Parmalat Brazil or whether, instead, other Parmalat subsidiaries had not disclosed similar transactions.  He had heard, for instance, that Parmalat Argentina had been involved in such a transaction.[97]  After looking into the matter, however, Pena learned that the transaction involving Parmalat Argentina had been disclosed properly.[98] This indicated to Pena that the dispute over the treatment of the transaction was a "Brazilian issue," not the result of, say, the policy or influence of the parent Parmalat corporation.[99]  To DTT, that rendered the issues raised by the dispute "far less important."[100]

Certainly, the facts that DTT (a) resolved the dispute between Deloitte Italy and Deloitte Brazil by deciding that some form of disclosure was necessary and (b) examined how a similar transaction involving Parmalat Argentina had been treated would tend to support a

---

[95]

Pl. Br. at 22.

[96]

Def. Br. at 27-29.

[97]

Pena Dep. 210-11.

[98]

*Id*. at 211.

[99]

*Id*.

[100]

*Id*.

conclusion that DTT was not willfully blind to Deloitte Italy's alleged violations.  It is insufficient, however, to compel a conclusion of law that DTT acted in good faith.

The willful blindness standard is satisfied where a control person "'knew or should have known that [the] primary violator . . . was engaged in fraudulent conduct, but . . . did not take steps to prevent the primary violation.'"[101] Here, the Deloitte defendants ask the Court to conclude as a matter of law that DTT's limited investigation was sufficient.  The Court declines to do so.  While a jury might so find, a jury would be entitled to conclude also that the issue raised by the disclosure dispute merited more than merely looking to see how one similar transaction had been reported.  Indeed, Pena himself testified that DTT originally had been concerned that the pressure not to disclose the transaction had come from Parmalat itself, not the Brazilian subsidiary.  But there is no evidence that DTT ever questioned Deloitte Italy about whether it was receiving client pressure to resist disclosure nor conducted any other investigation.

In all the circumstances, the Court concludes that DTT has failed to demonstrate that it is entitled to the good faith defense as a matter of law.

D.     *DT-US*

    1.     *Control Person*

The Deloitte defendants next contend that DT-US is entitled to summary judgment because it did not control DTT.  Plaintiffs, however, respond with at least three meritorious arguments.

First, plaintiffs contend DT-US controls DTT through the many DT-US partners that

---

[101]     *Dietrich*, 126 F. Supp.2d at 765 (quoting *First Jersey*, 101 F.3d at 1472).

occupy key DTT positions.[102]  They point to the fact that the chief executive officer of DTT always

has been a DT-US partner.[103]  Indeed, James Copeland, DTT's chief executive officer during the

period relevant here, was simultaneously DT-US's chief executive officer.[104]  Additionally, DTT's

chief financial officer was also the chief financial officer of DT-US, and DTT's head of legal and

regulatory affairs and DTT's director of independence were former and current DT-US partners,

respectively.[105]

      This argument alone is not dispositive.  As this Court already has stated in this case,

"[i]t is a 'well-established principle [of corporate law] that directors and officers holding positions

with a parent and its subsidiary can and do "change hats" to represent the two corporations

separately, despite their common ownership.'"[106] But it certainly is relevant that several DT-US

partners, including many who held key leadership positions at DT-US, simultaneously held officer

positions at DTT.

      Second, plaintiffs contend that DTT and its member firms depend on DT-US for

financing.  It is uncontroverted that member firms provide DTT's main source of funding and that

DT-US contributes a significant portion of those funds, for example $80 million out of a $218

---

[102]

      Pl. Br. at 32-33.

[103]

      Bernikow Dep. 41-42.

[104]

      Bernikow Dep. 39.

[105]

      Copeland Dep. 40-41; Murray Dep. 20-21, 31, 34-35; Pena Dep. 118-19.

[106]

      *In re Parmalat*, 501 F. Supp.2d 560, 588 (S.D.N.Y. 2007) (second alteration in original)
(quoting *United States v. Bestfoods*, 524 U.S. 51, 69-70 (1998)).

million budget in 2001.[107]  Additionally, DT-US provided loans to DTT and guaranteed DTT's bank

financing.[108]  While the provision of funds alone is insufficient to support a finding that one entity

controlled another, the contribution of a significant portion of one entity's operating costs is a factor

that may indicate control.[109]

        Plaintiffs point also to what they assert was a specific instance of DT-US's control

of DTT.  When DTT deliberated whether to separate its consulting function from its audit function,

DT-US partners voted for the proposal before other member firms voiced their agreement.[110]  The

DTT board of directors then conditionally approved the transaction.[111]  Following the vote,

however, DT-US changed its mind and concluded that separating Deloitte Consulting from DTT

was too risky.  Apparently without soliciting the opinions of other member firms, DTT management

agreed with DT-US to withdraw the plan from the board's consideration.[112]  From this, a jury

reasonably could infer that DT-US at least influenced and possibly controlled DTT's decision.

        In sum, it is uncontroverted that several DT-US partners held key leadership

---

[107]

      Def. Rule 56.1 Statement ¶ 79.

[108]

      Copeland Dep. 35-36; Willemain Dep. 88-89.

[109]

      *See, e.g.*, *Mecca v. Gibralter Corp.*, 746 F. Supp. 338, 342 (S.D.N.Y. 1990) (evidence
sufficient to support jury finding of control where individual defendant depended on
defendant corporation's financing and corporation retained threat of bringing criminal
charges against individual defendant); *Bulger v. Royal Doulton*, PLC, No. 05 Civ. 7709,
2006 WL 3771016, at *5 (S.D.N.Y. Dec. 16, 2005).

[110]

      *See* Pl. Br. at 37; ex. 1814, at 1-2.

[111]

      Ex. 1814, at 1.

[112]

      DTT 2000094.

positions at DTT, including the position of chief executive officer, and that DT-US, through loans and outright contributions provided a large portion of DTT's funding. There is evidence also of at least one instance in which DT-US may have influenced DTT's decision making. Considering the totality of the circumstances, the Court concludes that plaintiffs have shown there is a genuine issue of material fact as to whether DT-US controlled DTT.

2.      *Good Faith*

The Deloitte defendants assert only that DT-US did not know of any fraud relating to Parmalat Finanziaria.[113] As discussed above, this assertion is insufficient to "'direct a conclusion of law that [DT-US] is entitled to the defense."[114] The Court thus concludes that DT-US is not entitled to summary judgment on the control person issue.

E.      *Copeland*

1.      *Control Person*

As Copeland was the chief executive officer of DT-US and DTT, plaintiffs have met their burden to demonstrate a genuine issue of fact as to whether Copeland was a control person of both entities.[115]

---

[113]

Def. Br. at 36.

[114]

*In re Boesky*, 1995 WL 456368, at *1; *see also First Jersey*, 101 F.3d at 1473 ("Once the plaintiff makes out a prima facie case of §20(a) liability, the burden shifts to the defendant to show that he acted in good faith."); *In re WorldCom*, 2005 WL 638268, at *15.

[115]

*See In re Initial Public Offering Sec. Litig.*, 241 F. Supp.2d at 352 n. 26; *Dietrich*, 126 F. Supp.2d at 765-66, 768.

2.    *Good Faith*

The Deloitte defendants presented no evidence of Copeland's good faith in addition to that already discussed.  Thus, for the reasons discussed above, the Court concludes that Copeland has failed to establish an affirmative defense of good faith.

F.    *Joint and Several Liability*

In the alternative, the Deloitte defendants contend that they are entitled to summary judgment determining that they are not jointly and severally liable for any fraudulent conduct pursuant to Section 21D(f)(2)(A) of the PSLRA, which limits joint and several liability to defendants who commit knowing rather than merely reckless violations of the securities laws.[116]

According to the Senate Report, this amendment was intended to protect deep-pocket defendants who "bear very little responsibility" for an alleged securities violation from being sued and potentially held liable for 100 percent of the damages.[117]  The legislative history indicates no intent to alter traditional principles of vicarious liability under which liability is attributed to one party based on the actions of another party regardless of the first party's mental state.  The Court thus concludes that the Deloitte defendants are not entitled to summary judgment on this claim.

---

[116]    15 U.S.C. § 78u-4(f).

[117]    *See* S. Rep. No. 104-98, at p. 29, 104th Cong., 1st Sess. 1995, *reprinted in* 1995 U.S.C.C.A.N. 679.

30

*Conclusion*

For the foregoing reasons, the Deloitte defendants' motion for summary judgment [04 Civ. 0030 docket item 984; 04 MD 1653 docket item 1586] is denied.


SO ORDERED.

Dated:            January 27, 2009

_____
                        Lewis A. Kaplan
                  United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)