UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re PARMALAT SECURITIES LITIGATION

This document relates to:   04 Civ. 0030 (LAK)
                            04 Civ. 9771 (LAK)
                            06 Civ. 2991 (LAK)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MASTER DOCKET
04 MD 1653 (LAK)

**MEMORANDUM OPINION**

Appearances:

John B. Quinn
Peter E. Calamari
R. Brian Timmons
Terry L. Wit
Adam S. Cashman
QUINN EMANUEL URQUHART OLIVER &
HEDGES, LLP

Allan B. Diamond
J. Gregory Taylor
J. Benjamin King
P. Jason Collins
DIAMOND MCCARTHY, LLP

Steven J. Toll
Lisa M. Mezzetti
Mark S. Willis
Julie Goldsmith Reiser
Joshua S. Devore
COHEN, MILSTEIN, HAUSFELD & TOLL,
P.L.L.C.

Stuart M. Grant
James J. Sabella
John C. Kairis
Diane Zilka
GRANT & EISENHOFER P.A.

*Attorneys for Plaintiffs*

James L. Bernard
David M. Cheifetz
Jamie L. Wasserstrom
STROOCK & STROOCK & LAVAN, LLP
*Attorneys for Defendant Grant Thornton
International*

Bruce R. Braun
Linda T. Coberly
WINSTON & STRAWN, LLP
*Attorneys for Defendant Grant Thornton LLP*

LEWIS A. KAPLAN, *District Judge.*

Parmalat Finanziaria, S.p.A., Parmalat S.p.A. and their affiliates (collectively, "Parmalat") collapsed upon the discovery of a massive fraud that reportedly involved the understatement of Parmalat's debt by nearly $10 billion and the overstatement of its net assets by $16.4 billion.[1]   Plaintiffs, purchasers of Parmalat securities, Dr. Enrico Bondi, the Italian-appointed representative of Parmalat's estate, and a Parmalat affiliate, seek damages against Parmalat's accountants, banks and others.   The matter now is before the Court on the motions of Grant Thornton International ("GTI") and Grant Thornton LLP ("GT US") for summary judgment dismissing the complaints.   The motion raises issues similar to those resolved in a recent opinion in involving another large accounting firm, familiarity with which is assumed.[2]

*Facts*

Plaintiffs sue under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934[3] (the "Exchange Act") and Rule 10b-5 thereunder.[4]   Their claims against GTI and GT US rest on the premise that those defendants are vicariously liable for the alleged fraud of GT Italy, one of Parmalat's former auditors, which has not joined in the motion.   The Court assumes familiarity with plaintiffs' allegations with respect to the Parmalat scandal and GT Italy's role. Accordingly, it suffices for present

---

[1]   Third Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws ("Cpt.") ¶ 4.

[2]   *In re Parmalat Secur. Litig.*, No. 04 MD 1653 (LAK), __ F.Supp.2d __, 2009 WL 179920 (S.D.N.Y. Jan. 27, 2009), *reh'g denied*, __ F.Supp.2d __ , 2009 WL 429242 (S.D.N.Y. Feb. 23, 2009).

[3]   15 U.S.C. §§ 78j(b), t(a).

[4]   17 C.F.R. § 240.10b-5 (2005).

purposes to outline briefly Grant Thornton's structure.

GTI is a non-profit corporation organized under Illinois law.[5]  It describes itself as an "international membership organization" or "umbrella" organization of member firms.[6]  These member firms, including Grant Thornton S.p.A. ("GT Italy") and GT US, are organized under the laws of their respective jurisdictions.[7]  It is the member firms that actually carry out the auditing and accounting functions.

Accounting and auditing standards and regulation of the accounting profession often are country specific.  In addition to complying with any locally applicable rules, however, Grant Thornton member firms follow professional standards and auditing procedures and use software promulgated by GTI in conducting their audits.[8]  Member firms are required to submit to regular quality assurance reviews and almost universally practice under the name "Grant Thornton."[9]  They must promote other GT member firms to their international clients and provide information about international clients to

---

[5]

Rule 56.1 St. ¶ 1. (Unless otherwise indicated, the averments in parties' Rule 56.1 Statement cited herein are undisputed.).

[6]

*Id.* ¶ 19; GTI 000065.

[7]

Rule 56.1 St. ¶ 19; GTI 0001458.

[8]

GTI 0001484 (member firm agreement); Rule 56.1 St. ¶ 214; Ex. 1088.

[9]

GTI 0001484; Ex. 1086; Rule 56.1 St. ¶ 309.

Firms that practice under the name "Grant Thornton" are required to display Grant Thorton signs "prominently" in their offices. Ex. 13100 at GTI 0018132 § 3.2.

4

GTI.[10]  Partners of member firms attend GTI meetings and serve on GTI committees.[11]

Although disclaimers on GTI's website assert the legal separateness of GTI and its members,[12] GTI in 2001 directed its member firms to omit "International" from its name and to use a standardized description of the organization in publications, press releases and on websites.  This description referred to GTI as "Grant Thornton" and member firms as "local firms."[13]  The change was part of a rebranding effort by GTI designed to demonstrate that member firms are part of "one confident and unified organization."[14]

*Discussion*

A.     *Summary Judgment Standard*

Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.[15]  Where, as here, the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to

---

10

   *Id.*

11

   GTI 00710000; Rule 56.1 St. ¶ 325, GTUS 009262.

12

   Rule 56.1 St. ¶ 20.

13

   Rule 56.1 St. ¶ 305; GTI 0057160.

14

   Rule 56.1 St. ¶ 303; GTI 0007907.

15

   FED. R. CIV. P. 56(c)); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

5

go to the trier of fact on an essential element of the non-movant's claim.[16]  In that event, the non-moving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment.[17]

B.      Respondeat Superior *Liability for Section 10(b) Violations by GT Italy*

        Whether GTI and GT US may be held liable for the securities violations and other actions of GT Italy turns on whether they had principal-agent relationships with GT Italy.

        An agency relationship exists under Illinois law[18] when the principal has the right to

---

[16]

*Celotex*, 477 U.S. at 322-323; *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 273 (2d Cir. 2001).

[17]

*Celotex*, 477 U.S. at 322-323; *Raskin v. Wyatt Co.*, 125 F.3d 55, 65-66 (2d Cir.1997).

[18]

Defendants' motion for summary judgment relates to three consolidated cases. The Judicial Panel on Multidistrict Litigation transferred two, *Bondi v. Grant Thornton Int'l*, No. 04 Civ. 9771 (LAK), and *Parmalat Capital Finance Ltd. v. Grant Thornton International, et al.*, No. 06 Civ. 2991 (LAK), from the Northern District of Illinois to this Court for coordinated and consolidated pretrial proceedings.  As the transferee forum, the Court applies the substantive law that would have been applied by the transferor forum. *See Menowitz v. Brown*, 991 F.2d 36 (2d Cir.1993); *In re Rezulin Products Liab. Litig.*, 210 F.R.D. 61, 69 (S.D.N.Y.2002); *In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*, 230 F.Supp.2d 392, 399 (S.D.N.Y.2002). Thus, the applicable substantive law for *Bondi* and *Parmalat Capital Finance Ltd.* is that of Illinois.

The third action, *In re Parmalat Securities Litigation*, No. 04 Civ. 0030 (LAK), was filed in the Southern District of New York. New York law, including New York conflicts principles, governs that action. *See Imbrogno v. Chamberlin*, 89 F.3d 87, 89 (2d Cir. 1996).

As this Court has noted previously in the *Bondi* action, Illinois and New York definitions of an agency relationship do not differ in any material respect. *See In re Parmalat Secur. Litig.*, 377 F.Supp.2d 390, 404 n.97 (S.D.N.Y. 2005).  Defendants' briefs rely on both Illinois and New York cases but, like the Court, note that there is no material difference in the relevant agency law. Def. Br. at 10 n.5. Plaintiffs do not suggest the contrary and rely primarily on Illinois authority.  Thus the Court will refer to Illinois authority as a matter of convenience.

control the manner and method in which the agent performs its work.[19]  "An agent's authority may be either actual or apparent, and actual authority may be either express or implied."[20]  The existence of an agency relationship may be established by direct or "circumstantial evidence, including the situation of the parties, their acts, and other relevant circumstances."[21]  The alleged agent's authority, however, may be established only by the words or conduct of the alleged principal.[22]

### 1.   Right to Control GT-Italy

"There is no rigid rule for determining whether a person is an agent."[23]  Courts consider a number of factors, "but the right to control the manner in which the work is performed is considered to be the predominant factor."[24]  The Court therefore first will consider the issue of control.

---

[19]

*Lang v. Silva*, 306 Ill. App.3d 960, 972, 240 Ill. Dec. 21, 29, 715 N.E.2d 708, 716 (App. Ct. 1999) (citing *Knapp v. Hill*, 276 Ill. App.3d 376, 380, 212 Ill. Dec. 723, 726, 657 N.E.2d 1068, 1071 (App. Ct. 1995)); *Letsos v. Century 21-New West Realty*, 285 Ill. App.3d 1056, 1064-65, 221 Ill. Dec. 310, 317-18, 675 N.E.2d 217, 224-25 (App. Ct. 1996); *see also* RESTATEMENT (SECOND) AGENCY § 14 (1958).

[20]

*Amigo's Inn, Inc. v. License Appeal Comm. of City of Chicago*, 354 Ill. App.3d 959, 965, 290 Ill. Dec. 825, 831, 822 N.E.2d 107, 113 (App. Ct. 2004); *see Gilbert v. Sycamore Mun. Hosp.*, 156 Ill.2d 511, 523-24, 190 Ill. Dec. 758, 765, 622 N.E.2d 788, 795 (1993); *FDL Foods, Inc. v. Kokesch Trucking, Inc.*, 233 Ill. App.3d 245, 255, 174 Ill. Dec. 474, 481, 599 N.E.2d 20, 27 (App. Ct. 1992).

[21]

*Prodromos v. Everen Secs., Inc.*, 341 Ill. App.3d 718, 724-25, 275 Ill. Dec. 671, 676, 793 N.E.2d 151, 156 (App. Ct. 2003) (citing *Tomaso v. Plum Grove Bank*, 130 Ill. App.3d 18, 23, 85 Ill. Dec. 220, 225, 473 N.E.2d 588, 593 (App. Ct. 1985)).

[22]

*First Am. Title Ins. Co. v. TCF Bank, F.A.*, 286 Ill. App.3d 268, 274, 222 Ill. Dec. 39, 44, 676 N.E.2d 1003, 1008 (App. Ct. 1997); *Tierney v. Community Memorial General Hosp.*, 268 Ill. App.3d 1050, 1062, 206 Ill. Dec. 279, 293, 645 N.E.2d 284, 293 (App. Ct. 1994).

[23]

*Lang*, 306 Ill. App.3d at 972, 240 Ill. Dec. at 29, 715 N.E.2d at 716-17.

[24]

*Id.*

*a.*      GTI

Plaintiffs point to numerous facts indicating that GTI exercised control over "the manner and method"[25] by which its member firms, including GT Italy, performed their work.[26] GTI executed an agreement with each of its member firms in which the member firm agreed to conduct itself "in a manner consistent with GTI policies, procedures, guidelines, specifications and directions issued by GTI . . . including . . . the GTI Policies and Procedures Manual and any GTI communications on technical and professional matters."[27] GTI's audit manual, in turn, provided nearly 200 pages of detailed auditing procedures and methods, known as the Horizon Audit Approach, "to be followed by all partners and staff."[28] GTI required member firms to use its Explorer auditing software.[29]

Evidence of GTI's control extends beyond the manner in which member firms audited their clients. GTI required member firms to adopt its quality control standards and code of ethics.[30] While it did not require member firms to adopt a specific risk management policy, it demanded that member firms either implement a policy that met specifications set out in GTI's quality assurance

---

[25]

In re Parmalat Secur. Litig., 377 F.Supp.2d at 402.

[26]

Pl. Br. at 13-22.

[27]

Rule 56.1 St. ¶ 214; Ex. 1968 at GTI 0018062; *see also* GTI 0001484 (GTI Policies and Procedures Manual) (requiring member firms to, *inter alia*, execute member firm agreement, name use agreement, and adopt GTI mission statement and strategic framework).

[28]

GTI 0000500; *see generally* GTI 0000498-692.

[29]

Rule 56.1 St. ¶ 216.

[30]

GTI 0041396.

manual or adopt GTI's risk management policy.[31]

Plaintiffs point also to evidence that GTI controlled the manner in which member firms branded and marketed themselves to clients. GTI required member firms to "adopt the Grant Thornton style" on their stationery and business cards in order to maintain a "[c]onsistent look and feel" among member firms.[32]  GTI could require member firms to submit their forms and publications to GTI to ensure compliance with GTI's guidelines.[33]  Member firms' web sites had to conform to GTI guidelines as well.[34]  GTI even mandated where in their offices member firms hung signs carrying the Grant Thornton name.[35]

GTI established detailed guidelines about how member firms should refer to GTI and themselves.  After observing that the use of the phrase "Grant Thornton International" caused prospective clients to question the structure and organization of the firm, GTI instructed member firms to refer only to "Grant Thornton," not "Grant Thornton International," in promotional materials and to use a new "Grant Thornton" logo.[36]  It circulated a memorandum providing examples of permissible language to describe both GTI and member firms. These referred to GTI as an "international organisation" and directed prospective clients to "contact [their] local Grant Thornton office for

---

[31]

GTI 0001213.

[32]

Rule 56.1 St. ¶ 261; GTI 0011088.

[33]

*Id.* ¶ 264.

[34]

*Id.* ¶ 265.

[35]

*Id.* ¶ 268; Ex 13100, at GTI 001813132.

[36]

GTI 0007852-55; GTI 0007854.

9

details."[37]   GTI instructed member firms not to use a list of terms including "member firm," "correspondent firm," and "network," in part because they "dr[e]w attention to the structure" of the firm.[38]

Additionally, plaintiffs presented evidence that GTI controlled member firms' actions through its periodic reviews and disciplinary measures.  Each member firm was expected to submit to a comprehensive review of its operations, policies, and procedures every three years.[39] As part of the review process, a representative from GTI or another member firm examined the member firm's audit work.[40]

GTI possessed "a range of different possible actions" to discipline a member firm.[41] Sanctions included the demotion of a member firm to correspondent status, hiring of new partners for the member firm, termination of existing personnel, and expulsion of the member firm.[42]  In practice, it in fact imposed at least some of these sanctions on member firms.  Following an adverse review, GTI reclassified the El Salvador member firm as a correspondent firm, which included loss of the right to

---

[37]

GTI 0007855.

[38]

GTI 0007858.

[39]

Rule 56.1 St. ¶ 225; Barber Dep. 17; GTUS 164940.

[40]

Barber Dep. 17.

[41]

McDonnell Dep. 88.

[42]

Exs. 13112, 13113.

10

use the Grant Thornton name, and required that it hire new partners.[43] After an Indonesian member firm feuded publically with a second Indonesian member firm, GTI sanctioned the offending firm by imposing nine non-negotiable requirements, including the resignation of one of the member firm's directors.[44] Additionally, in the wake of the Parmalat collapse, GTI threatened GT Italy with expulsion unless managing partner Lorenzo Penca resigned from that position immediately whereupon GT Italy suspended Penca and a second partner and Parmalat auditor.[45]

GTI contends that it nevertheless is entitled to summary judgment because there is no evidence that, if credited, would permit a finding that GTI controlled the specific GT Italy audit work that allegedly gave rise to plaintiffs' alleged injuries.  But GTI overstates its case.

For centuries, the principal has been liable for the torts, including the intentional torts, of its agent as long as the agent acted within the scope of its employment – and regardless of whether

---

[43]

Ex. 13112; Kleckner Dep. 414-15.

The fact that GT Mexico personnel conducted the El Salvador firm review and drew up a list of sanctions is not to the contrary. GT Mexico did so at the direction and with the approval of GTI. *See* Ex. 13112; Kleckner Dep. 421; *see also* Barber Dep. 17 (noting that both GTI representatives and member firms conduct periodic performance reviews pursuant to GTI's policies).

[44]

Ex. 13113.

Defendants contend that GTI's sanctioning of the Indonesian firm fails to demonstrate GTI's control of a member firm because GTI mediated the dispute only after one of the feuding Indonesian member firms requested GTI's assistance. Def. Reply Br. at 9-10. Defendants are mistaken.  GTI resolved the dispute by imposing non-negotiable conditions on one firm – conditions that demonstrated control over the firm's operations. The reason GTI became involved in the dispute resolution is irrelevant.  *See In re Parmalat Secur. Litig.*, 2009 WL 179920 at **5-6 (international accounting organization's power to arbitrate disputes among member firms demonstrates control).

[45]

Rule 56.1 St. ¶ 258; McDonnell Dep. 73.

the principal directed or caused the agent to engage in the tortious activity.  Justice Story's early treatise

on agency put the matter aptly years ago:

> "It is a general doctrine of law, that, although the principal is not ordinarily liable . . . in a criminal suit, for the acts or misdeeds of his agent . . . yet he is held liable to third persons in a civil suit for frauds, deceits, concealments, misrepresentations, torts, negligences, and other malfeasances or misfeasances and omissions of duty of his agent in the course of his employment, although the principal did not authorize, or justify, or participate in, or, indeed, know of such misconduct . . . ."[46]

Or, as the Restatement now puts it:

> "(1) An employer is subject to vicarious liability for a tort committed by its employee acting within the scope of employment.
>
> "(2) An employee acts within the scope of employment when performing work assigned by the employer or engaging in a course of conduct subject to the employer's control. An employee's act is not within the scope of employment when it occurs within an independent course of conduct not intended by the employee to serve any purpose of the employer.
>
> "(3) For purposes of this section, (a) an employee is an agent whose principal controls or has the right to control the manner and means of the agent's performance of work, and (b) the fact that work is performed gratuitously does not relieve a principal of liability."[47]

As GTI does not question that GT Italy, assuming *arguendo* that it was an agent, acted within the scope

of its agency, the only material question as to vicarious liability here is whether the evidence is

sufficient to permit a rational jury to conclude by a preponderance of the evidence that GTI controlled

---

[46]

JOSEPH STORY, COMMENTARIES ON THE LAWS OF AGENCY § 452, at 465 (1839).

[47]

RESTATEMENT (THIRD) OF AGENCY § 7.07 (2006).  *Accord, e.g., Cement-Lock v. Gas Technology Inst.,* 523 F.Supp.2d 827, 860 (N.D. Ill. 2007) (Illinois law) (corporation liable for intentional torts of agent committed within the scope of agent's authority); *Shapo v. O'Shaughnessy,* 246 F.Supp.2d 935, 969 (N.D. Ill. 2002) (same); *Mitchell v. Norman James Const. Co.,* 291 Ill. App.3d 927, 932-33, 684 N.E.2d 872, 878 (1997) ("It is well-settled that under the doctrine of *respondeat superior*, an employer may be liable for the negligent, wilful, malicious, or even criminal acts of its employees when such acts are committed in the course of employment and in furtherance of the business of the employer.")

*or* had the right to control GT Italy's work on the Parmalat audit.

GT Italy contracted in its member firm agreement to conduct itself "in a manner consistent with GTI policies, procedures, guidelines, specifications and directions issued by GTI . . . and any GTI communications on technical and professional matters."[48]  GTI required member firms to follow its Horizon audit methodology and use its proprietary Explorer software.[49]  These tools prescribed the "manner and method" by which member firms conducted audits.  They went beyond mere "guidelines" or "professional standards," dictating step-by-step instructions for auditors.  For example, one chapter of the GTI Audit Manual set forth the "procedures that *must* be performed in all audits to enable the audit team to understand and document" the client's accounting system and internal controls.[50]  Another chapter described when and how various "analytical procedures" should be used during an audit.[51]  Thus, the evidence here plainly would justify a finding that GTI controlled or, at least, had the right to control the manner in which GT Italy conducted its allegedly fraudulent audits.

The fact that GT Italy and individual auditors may have exercised some independent judgment in conducting audits[52] or could  tailor some of the instructions contained in the audit manual

---

[48]

    GTUS 006336.

[49]

    Rule 56.1 St. ¶ 56.

[50]

    Ex. 1085 at GTI 0000576 (emphasis added).

[51]

    *Id.* at GTI 0000588.

    GT Italy began using GTI's audit methodology and software on Parmalat audits in 2002 at the latest. Barbaria Dep. 20, 32.  Thus, GT Italy relied on GTI's audit methodology during part of the time GT Italy audited Parmalat S.p.A. and Bonlat, two of the most important companies in the Parmalat group. Rule 56.1 St. ¶ 343.

[52]

    Rule 56.1 St. ¶ 57.

to fit the legal rules of a particular country[53] would not require a contrary conclusion.  The fact that a professional employee or agent exercises independent judgment in the course of his or her employment does not preclude holding the principal liable.[54]  Moreover, GT Italy's tailoring of the audit methodology was limited. GT Italy partner Massimo Barbaria testified that "adapting" GTI audit to the "Italian situation" meant translating it into Italian and using only those procedures applicable to a specific client.  He explained that the methodology and the software as provided by GTI were "particularly suitable for . . . big companies or listed companies[] such as Parmalat."[55]

GTI argues further that any control it exerted through its audit methodology requirements and software would not have prevented GT Italy's deliberate fraud.[56]  But that is quite beside the point in view of the fact that principals are liable for the torts of their agents committed within the scope of their agencies.

GTI contends also it did not control GT Italy because two GT Italy partners who worked on the Parmalat audit did not even know there was an entity called GTI and, in any event, there were

---

[53]

*Id.* ¶ 125.

[54]

*See Sloan v. Metro. Health Council of Ind.*, 516 N.E.2d 1104, 1109 (Ind. App. 1987) ("[W]e find no logical basis for denying liability under proper circumstances on the ground that the professional must exercise a professional judgment that the principal may not properly control.") (cited with approval by *Petrovich v. Share Health Plan of Ill., Inc.*, 188 Ill.2d 17, 44, 719 N.E.2d 756, 771 (1999)).

[55]

Barbaria Dep. 98-99.

[56]

Def. Br. at 23.

no GTI personnel on GT Italy's audit team.[57]  GTI's first argument is less than compelling.[58]  But even

if GTI were correct, it would not change the result.  Even clear evidence that two GT Italy partners on

the Parmalat account did not know of GTI would be insufficient to refute plaintiffs' evidence that GTI

controlled GT Italy.  Furthermore, GTI's argument that GTI personnel did not perform the daily "tasks

essential to serving GT Italy's clients"[59] misses the point.  A principal may be held liable vicariously

for acts committed by its agents in the course of the principal's business even if the principal did not

itself participate in those acts.[60]

Finally, GTI argues that its request that GT Italy suspend two auditors and GTI's

subsequent termination of GT Italy's member firm agreement do not demonstrate control as a matter

---

[57]

Def. Br. at 21.

[58]

The GT Italy partners' testimony was ambiguous at best. For example, at one point during Massimo Barbaria's deposition he stated, "was there any Grant Thornton International? I know there was Grant Thornton US, Grant Thornton Spain . . . but Grant Thornton International?" However, in response to the question "Are you familiar with Grant Thornton International?" he testified, "Yes, let's call it a big hat of the Grant Thornton."  *Compare* Barbaria Dep. 101-02 *with* 17.

Nor did Francesco Bertolli's testimony unambiguously support GTI's argument.  When asked if he was "aware whether Grant Thornton International existed in a - - in a corporate structure sense[,]" he said when he used the term "Grant Thornton International," he "mean[t] a network made up of all Grant Thornton entities in the world . . . ." Bertolli Dep. at 57-58. But in response to a question about who selected people to conduct the member firm review of GT Italy, he responded, "It was not up to [GT Italy] to select those people, they were sent by Grant Thornton International." *Id.* at 56.

[59]

Def. Br. at 21.

[60]

*E.g.*, *Woods v. Cole*,181 Ill.2d 512, 518, 693 N.E.2d 333, 336 (1998) ("Under the doctrine of *respondeat superior*, a principal may be held liable for the tortious actions of an agent which cause a plaintiff's injury, even if the principal does not himself engage in any conduct in relation to the plaintiff."); *see also supra* notes 46-47.

of law.[61]  While this may be true,[62] plaintiffs are not required at this juncture to demonstrate control as a matter of law.  They must demonstrate only that there is a genuine issue of material fact that GTI controlled GT Italy.  This they have done.

> b.    *GT US*

GT US seeks summary judgment on a somewhat different ground.  Its position is that GT US controlled neither GTI nor GT Italy and therefore is entitled to dismissal even if GT Italy was GTI's agent.  Plaintiffs contend that GT US controlled GTI, and thus indirectly controlled GT Italy, making GT Italy its subagent.

According to traditional agency principles, an agent may appoint subagents to perform the tasks or functions the agent has agreed to perform for the principal.[63]  As the Restatement describes it, "[t]he relationships between a subagent and the appointing agent and between the subagent and the appointing agent's principal are relationships of agency."[64]  In view of the fact that a jury would be entitled to conclude that GTI controlled GT Italy, the fundamental question presented by GT US's

---

[61]

Def. Br. at 24-26.

[62]

Defendants contend that GTI "recommend[ed]" the suspension of two of its auditors. Def. Br. at 24.  Plaintiffs counter that GTI forced the employees' suspension by threatening to terminate GT Italy's member firm status if the firm did not suspend them. Viewed in the light most favorable to the plaintiffs, the evidence supports the conclusion that GTI caused the suspension of the GT Italy auditors. As the right to discharge a person and terminate a relationship is an indicator of control, *Petrovich*, 719 N.E.2d at 772-73, the evidence thus tends to indicate that GTI controlled GT Italy even if it does not compel that conclusion as a matter of law.

[63]

*Petersen v. U.S. Reduction Co.*, 267 Ill. App.3d 775, 784, 641 N.E.2d 845 (App. Ct. 1994).

[64]

RESTATEMENT (THIRD) OF AGENCY § 3.15(1) (2006); *see also AYH Holdings, Inc. v. Avreco, Inc.*, 357 Ill.App.3d 17, 33-34, 826 N.E.2d 1111, 1126 (App. Ct. 2005).

motion is whether plaintiffs have put forth sufficient evidence to justify a finding that GT US controlled GTI.

The evidence suggests that GTI is disproportionately dependent upon and influenced by a single member firm: GT-US. First, GT US had the power to veto significant decisions related to GTI governance and structure. It held two seats on the at least twelve member GTI board of directors.[65] The two GT US directors held veto power over GTI's addition of new member or correspondent firms, amendment of GTI's bylaws, articles of incorporation, member firm agreements and name use agreements.[66] Additionally, GT US could veto a decision to change the number of members on the GTI board and to elect or remove GTI's managing director or officers.[67]

Second, GT US provided GTI with funding, office space and employees. During the relevant period, GTI depended on annual contributions from member firms for funding, and GT US was the largest contributor.[68]

Third, GTI had no offices or employees of its own.[69] GTI operated out of GT US's Chicago offices and GT UK's London offices and relied on personnel largely from GT US and GT

---

[65]    Rule 56.1 St. ¶ 9; GTUS 006388.

[66]    Ex. 1968; Ex. 13096.

[67]    Ex. 13096.

[68]    Rule 56.1 St. ¶ 330. As this Court has previously noted, the provision of a significant portion of one entity's operating costs is a factor that may indicate control. *See In re Parmalat Secur. Litig.*, 2009 WL 179920, at *9.

[69]    Rule 56.1 St. ¶¶ 317-18.

UK.[70] For example, GTI's chief executive always has been either a partner or former partner of GT US or GT UK.  Robert Kleckner, a former GT US partner, served GTI as managing director from 1991 to 2001.[71]  David McDonnell, a GT UK partner, replaced Kleckner as GTI's chief executive officer in 2001.[72]  GT US personnel provided all financial and accounting functions for GTI at the expense of GT US, and a GT US partner acted as GTI's secretary treasurer.[73]  During at least part of the time period relevant here, GTI's director of audit and quality control and the chair of GTI's information technology committee were GT US partners.[74]  Additionally, GT US's general counsel provided legal advice to GTI.[75]

Finally, there is evidence that GT US controlled significant GTI decisions through its role in the Executive Partners Group ("EP Group").[76]  This informal advisory group consisted of the

---

[70]

*Id.* ¶ 317; Ex. 13111.

GTI operated also out of GTI managing director Robert Kleckner's Florida home. *Id.*

[71]

Rule 56.1 St. ¶ 22.

During Kleckner's tenure, GTI's chief executive officer was given the title of managing director. *See* GTI 0071011.

[72]

Rule 56.1 St. ¶ 22.

[73]

*Id.* ¶ 560; GTI 0068243; McDonnell Dep. 298-99.

[74]

Rule 56.1 St. ¶¶ 562-65.

[75]

GTUS 163637-38; Barber Dep. 165-66, 281.

[76]

Pl. Br. at 26-29.

chief executive officers of GTI, GT US, GT UK, and the two Canadian member firms.[77] However, according to GTI managing director Robert Kleckner, the GT US and GT UK representatives played a larger role than their Canadian counterparts.[78] Kleckner testified that the approval of the EP Group was "important" because it "had control over the resources."[79] For this reason he discussed "general strategic issues[,] . . . governance changes" and "initiatives requiring resources with" this group before presenting such initiatives to GTI's board.[80] Kleckner believed that "significant change worldwide can only take place through the joint leadership of" GT US and GT UK.[81]

There is evidence of at least one instance in which the EP Group actually exerted control over GTI's decision making.  Before a GTI board meeting, Kleckner floated a proposal he intended to share with the GTI board to the EP Group.  When the EP Group rejected the proposal, Kleckner summarily removed it from the GTI board's agenda. Kleckner explained, "why clutter the agenda . . . with something I know is going to be a dead issue."[82]

GT US counters these indicia of GT US's power to control the actions of GTI essentially by taking many in isolation and contending that each, considered alone, would not compel a finding of control.  It argues, for example, that the veto power of the GT US representatives on the

---

[77]

Kleckner Dep. 636.

[78]

*Id.* at 636-37.

[79]

*Id.*at 631.

[80]

Rule 56.1 St. ¶ 312; Kleckner Dep. 485.

[81]

Kleckner Dep. 485-86.

[82]

*Id.* at  655.

19

GTI board did not carry with it formal authority to require GTI to act affirmatively as GT US directed, that the fact that senior officers of GTI simultaneously served in senior positions at GT US did not make their actions while wearing their GTI hats the actions of GT US, and that the influence of the GT US members of the EP Group was limited by the participation in that group of executive partners of other member firms.  But these arguments once again miss central points.

The beauty of the Bayeaux tapestry or the genius of a Bach concerto cannot be appreciated by looking only at individual stitches on the fabric or by listening only to the B flats.  Just so here.  The question whether GT US controlled GTI cannot or, at least, need not be resolved by looking at each individual piece of evidence.

In the last analysis, the question before the Court is whether the evidence as a whole is sufficient to permit – not compel – a rational jury to conclude that GT US controlled GTI.  Considering all of the evidence as a whole, the Court holds that it is.  That is not to say that the points advanced by GT US lack force.  It is to say only that it is beyond the Court's proper function to resolve the conflicting inferences and conclusions that may be drawn from evidence that, in the Court's view, quite plainly cuts in different directions.

2.    *Consent to Agency Relationship*

Defendants argue that GTI and GT US denied GT Italy the ability to act as their agent, relying upon provisions of the member firm and name use agreements.[83]  Section 12.3 of the member firm agreement, for example, provided that a member firm "may not act for or bind any other member

---

[83]    Def. Br. at 11-12.

firm or GTI, for any purpose whatsoever."[84]

The short answer to this contention is that disclaimers contained in the agreements between and among GT US, GTI and GT Italy, whatever their effect on the rights of those parties *inter se,* are not conclusive of the question as against non-parties. They at best are some evidence favorable to GTI and GT US.[85] And they are insufficient to require summary judgment of dismissal in light of the other evidence favorable to the plaintiffs.

Defendants argue also that an agency relationship cannot be created without the consent of both parties and that such consent is lacking here. Defendants' initial premise is correct as far as it goes.[86] But the conclusion does not follow. Consent may be inferred from actions, not merely the words, of the putative principal and agent.[87] The evidence is sufficient to infer such consent here. By way of example only, GT's and GT US's actions (1) encouraging member firms to practice under the Grant Thornton name, (2) promulgating and enforcing policies and procedures governing most aspects of member firms' operation, and (3) working to achieve a certain level of quality in member firms'

---

[84]

GTUS 006345.

[85]

*In re Parmalat Secur. Litig.*, 377 F.Supp.2d 390, 404 (S.D.N.Y. 2005) (applying Illinois law and noting that written disclaimers of agency merely raise an issue of fact with respect to existence of agency relationship); *Schlunk v. Volkswagenwerk Aktiengesellschaft*, 145 Ill. App.3d 594, 602, 105 Ill. Dec. 39, 44, 503 N.E.2d 1045, 1050 (App. Ct. 1986) (same); *see also First Am. Title Ins. Co.*, 286 Ill. App.3d at 274 (alleged agent's authority may be established by words or conduct of alleged principal).

[86]

*See, e.g.*, *Stone v. Stone*, 407 Ill. 66, 80, 94 N.E.2d 855, 862 (1950); *People ex rel. Harris v. Parrish Oil Production, Inc.*, 249 Ill. App.3d 664, 670, 622 N.E.2d 810, 816 (App. Ct. 1993).

[87]

*Lilly v. Cook County*, 60 Ill. App.3d 573, 580, 377 N.E.2d 136, 142 (App. Ct. 1978) ("The relationship of agency does not depend on an express appointment and acceptance, but it may be implied from the facts and circumstances of a particular case."); *see also Stefani v. Baird & Warner, Inc.*, 157 Ill. App.3d 167, 171, 510 N.E.2d 65, 68 (App. Ct. 1987); *Milwaukee Mut. Ins. Co. v. Wessels*, 114 Ill. App.3d 746, 749, 449 N.E.2d 897, 901 (App. Ct. 1983).

work arguably demonstrated their consent to allow GT Italy to act on their behalf. Likewise, GT Italy's submission to defendants' regulation would permit a reasonable jury to infer that GT Italy consented to act as defendants' agent.

*C.*      Alter Ego

As an alternative to their agency argument, plaintiffs contend that GTI was GT US's *alter ego* which GT US used to conduct its own business.[88] As plaintiffs have demonstrated a genuine issue of material fact as to whether GT US controlled GTI, the Court does not reach plaintiffs' *alter ego* argument.

*D.*      *Section 20(a) Liability*

Defendants contend they are entitled to summary judgment dismissing plaintiffs' Exchange Act Section 20(a) claim. They argue that control of a primary violator under Section 20(a) must extend to the transaction in question – GT Italy's audits of Parmalat – whether or not such control was exercised.[89] However, this Court recently ruled that the plain language of Section 20(a) requires only control of a person or entity liable under the chapter, not participation in or direction of the transaction constituting the violation.[90] As discussed above, plaintiffs have presented sufficient evidence that GTI and GT US had the ability to control the manner and method of the preparation of member firms' audit reports. The Court thus concludes there is a genuine issue of material fact as to whether GTI and GT US were controlling persons.

---

[88]        Pl. Br. at 31-37.

[89]        Def. Br. at 37-39.

[90]        *In re Parmalat Secur. Litig.*, 2009 WL 179920, at *7.

E.       *Vicarious Liability After* Stoneridge

Defendants argue also that plaintiffs' claim that GTI and GT US are vicariously liable for the alleged federal securities law violations of their agent, GT Italy, cannot survive the Supreme Court's decision in *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*[91] The Court recently concluded that *Stoneridge* does not foreclose an Exchange Act claim based on the vicarious liability of a principal for a violation committed by its agent acting within that agent's scope of employment.[92] Accordingly, plaintiffs' claims based on theories of vicarious liability survive.

*Conclusion*

For the foregoing reasons, defendants' motion for summary judgment dismissing the complaints [04 Civ. 0030 docket item 983; 04 MD 1653 docket item 1585; 04 Civ. 9771 docket item 613; 06 Civ. 2991 docket item 183] is denied.

SO ORDERED.

Dated:        February 25, 2009

Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

_____

[91]       128 S. Ct. 761 (2008).

[92]       *In re Parmalat Secur. Litig.*, 2009 WL 179920, at **3-4).