UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
                                   :
                                        04 Civ. 0030 (LAK)(HBP)
IN RE PARMALAT SECURITIES          :
LITIGATION                              OPINION AND
                                   :    ORDER
                                   :
----------------------------------X

          PITMAN, United States Magistrate Judge:


I.   Introduction


          Lead Plaintiffs move to unseal certain discovery

materials which certain defendants have designated as confiden-

tial pursuant to the protective order entered in this matter.[1]

For the reasons discussed below, Lead Plaintiffs' motion is

granted.

-----

[1]The Honorable Lewis A. Kaplan, United States District
Judge, ordered that discovery motions be referred to me for
resolution (Order, dated Jan. 11, 2007, Docket Item 735).
Defendants nevertheless argue that Lead Plaintiffs should have
addressed their motion to Judge Kaplan because he is more famil-
iar with the information filed under seal, the applicable law,
and the Protective Order in this case (Letter from Michael J.
Dell, Esq., Counsel for the Deloitte defendants, to the Court,
dated Oct. 17, 2008 ("Deloitte Oct. 2008 Letter"), at 1).
However, the motion pertains to discovery, and defendants have
not identified any exception in Judge Kaplan's Order of Reference
that would apply here.  Moreover, Judge Kaplan sent the parties'
submissions concerning this dispute to me, which is the clearest
indication imaginable that he wishes me to address this dispute.
Accordingly, I address the merits of Lead Plaintiff's motion.

II.  <u>Facts</u>

        The factual and procedural history of this case is set forth in several decisions by Judge Kaplan, familiarity with which is assumed.  See <u>In re Parmalat Sec. Litig.</u>, 376 F. Supp.2d 472 (S.D.N.Y. 2005) (granting in part and denying in part motion to dismiss first amended consolidated complaint); <u>In re Parmalat Sec. Litig.</u>, 570 F. Supp.2d 521 (S.D.N.Y. 2008) (granting Bank of America Corp., Bank of America, N.A., Banc of America Securities Ltd., Citigroup Inc., Citibank, N.A., Eureka Securitisation plc, and Pavia e Ansaldo's motion for summary judgment); <u>In re Parmalat Sec. Litig.</u>, 04 MD 1653 (LAK), 2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008) (certifying class of plaintiffs); <u>In re Parmalat Sec. Litig.</u>, 594 F. Supp.2d 444 (S.D.N.Y. 2009) (denying Deloitte Touche Tohmatsu, Deloitte & Touche LLP and James Copeland's motion for summary judgment); <u>In re Parmalat Sec. Litig.</u>, 598 F. Supp.2d 569 (S.D.N.Y. 2009) (denying Grant Thornton International and Grant Thornton LLP's motion for summary judgment).  I recite the facts here only insofar as they are relevant to the instant motion.

        All of the documents[2] produced by the parties during discovery are subject to a blanket protective order, which prohibits the parties from disclosing information designated

_____

        [2]I use the term "documents" to encompass both documents produced by the parties and deposition transcripts.

                                    2

confidential unless and until the Court rules that confidential treatment is inappropriate (Stipulated Protective Order, dated Aug. 3, 2005 ("Protective Order"), ¶ 9, annexed as Exhibit ("Ex.") 1 to Letter from James J. Sabella, Esq., Counsel for Lead Plaintiffs, to the Court, dated Oct. 10, 2008 ("Pls.' Oct. 2008 Letter")).  Any party may challenge another party's designation of discovery material as confidential by giving the designating party written notice of the challenge (Protective Order ¶ 9, annexed as Ex. 1 to Pls.' Oct. 2008 Letter).  If the challenging party and the designating party cannot resolve the issue through discussions, the designating party then has the burden of showing good cause for confidential treatment by a preponderance of the evidence (Protective Order ¶ 9, annexed as Ex. 1 to Pls.' Oct. 2008 Letter).

        Here, Lead Plaintiffs have moved for an order striking the confidential designation of more than 200 documents submitted by the parties in connection with their motions for summary judgment.  Lead Plaintiffs initially requested that defendants unseal approximately 1800 non-public documents which the parties cited in connection with their motions for summary judgment (Letter from James J. Sabella, Esq., Counsel for Lead Plaintiffs, to defendants' counsel, dated Sept. 19, 2008 ("Pls.' Sept. 2008 Letter"), annexed as Ex. 2 to Pls.' Oct. 2008 Letter).  Defen-dants -- Grant Thornton International ("GTI"), Grant Thornton LLP

("GT-US") (collectively, the "GT defendants"), Bank of America
Corp., Bank of America, N.A., Banc of America Securities Ltd.
(collectively, "BoA"), Citigroup Inc., Citibank, N.A., Eureka
Securitisation plc (collectively, the "Citi defendants") and
Pavia e Ansaldo ("Pavia") -- refused to consent to removing their
confidentiality designations, and Lead Plaintiffs submitted a
letter memorandum to the Court requesting a pre-motion conference
to resolve the matter (Pls.' Oct. 2008 Letter).

     Defendants submitted letter memoranda opposing Lead
Plaintiffs' request primarily on the grounds that Lead Plain-
tiffs' motive in making the request was improper and the docu-
ments were not entitled to any presumption of public access
(Deloitte Oct. 2008 Letter; Letter from James L. Bernard, Esq.,
Counsel for the GT defendants, to the Court, dated Oct. 17, 2008
("GT Oct. 2008 Letter"); Letter from Joseph B. Tompkins, Jr.,
Esq., Counsel for BoA, to the Court, dated Oct. 17, 2008 ("BoA
Oct. 2008 Letter"); Letter from Jason A. D'Angelo, Esq., Counsel
for the Citi defendants, to the Court, dated Oct. 17, 2008 ("Citi
Oct. 2008 Letter"); Letter from Christopher M. Brubaker, Esq.,
Counsel for Pavia, to the Court, dated Oct. 17, 2008).  Because
defendants made no specific factual showing concerning the
confidential nature of the documents in issue, I directed the
defendants to offer whatever evidence they chose to offer in

support of their designations by November 26, 2008 (Order, dated
Nov. 12, 2008).

The Deloitte defendants, the GT defendants, BoA and
Pavia submitted letter memoranda arguing that their confidential-
ity designations were appropriate for approximately 1200 of the
challenged documents because those documents contained various
categories of confidential information (Letter from Michael J.
Dell, Esq., Counsel for the Deloitte defendants, to the Court,
dated Nov. 26, 2008; Letter from James L. Bernard, Esq., Counsel
for the GT defendants, to the Court, dated Nov. 26, 2008 ("GT
Nov. 2008 Letter"); Letter from Alan C. Geolot, Esq., Counsel for
BoA, to the Court, dated Nov. 26, 2008 ("BoA Nov. 2008 Letter");
Letter from Christopher M. Brubaker, Esq., Counsel for Pavia, to
the Court, dated Nov. 26, 2008).  The Citi defendants chose not
to make a specific factual showing in opposition to Lead Plain-
tiffs' request (Letter from Jason A. D'Angelo, Esq., Counsel for
the Citi Defendants, to the Court, dated Nov. 26, 2008).

Lead Plaintiffs subsequently narrowed their challenge
to only 55 of the GT defendants' documents and 172 of BoA's
documents, but maintained that all of the documents designated
confidential by the Citi defendants that were submitted by the
parties in connection with the summary judgment motions should be
unsealed (Letter from James J. Sabella, Esq., Counsel for Lead
Plaintiffs, to the Court, dated Jan. 15, 2009 ("Pls.' Jan. 2009

Letter"), at 2).  Lead Plaintiffs withdrew their request to strike the Deloitte defendants' and Pavia's confidentiality designations altogether (Pls.' Jan. 2009 Letter at 2; Letter from James J. Sabella, Esq., Counsel for Lead Plaintiffs, to the Court, dated May 27, 2009).[3]  In addition, Lead Plaintiffs submitted copies of the documents in camera as well as a spreadsheet that challenged the continued protection of the remaining documents on a document-by-document basis (Spreadsheet annexed as Ex. A to Pls.' Jan. 2009 Letter; Electronic documents attached to Letter from James J. Sabella, Esq., Counsel for Lead Plaintiffs, to the Court, dated Jan. 21, 2009).

In response, both the GT defendants and BoA submitted letter memoranda as well as their own spreadsheets setting forth document-by-document replies to Lead Plaintiffs' challenges (Letter from James L. Bernard, Esq., Counsel for the GT defendants, to the Court, dated Feb. 13, 2009 ("GT Feb. 2009 Letter"); Spreadsheet annexed as Ex. A to GT Feb. 2009 Letter; Letter from Alan C. Geolot, Esq., Counsel for BoA, to the Court, dated Feb. 13, 2009 ("BoA Feb. 2009 Letter"); Spreadsheets annexed as Exs. A & B to BoA Feb. 2009 Letter).  In addition, BoA renewed its

---

[3]Although Lead Plaintiffs initially continued to challenge 40 of the Deloitte defendants' confidentiality designations, Lead Plaintiffs withdrew that challenge when Lead Plaintiffs reached a settlement with the Deloitte defendants (Letter from James J. Sabella, Esq., Counsel for Lead Plaintiffs, to the Court, dated May 27, 2009).

argument that its documents were not entitled to any presumption of public access (BoA Feb. 2009 Letter at 2-3).  However, the GT defendants failed to revisit that issue with respect to their documents (GT Feb. 2009 Letter at 2-3).

On March 16, 2009, I informed the parties that, in light of the extensive nature of their submissions regarding Lead Plaintiffs' request for a pre-motion conference, I intended to construe Lead Plaintiffs' submissions as a motion to remove the confidentiality designations from the narrowed set of documents identified in their January 15, 2009 letter and I would construe defendants' responses as oppositions to that motion (Order, dated Mar. 16, 2009).  I also directed the parties to submit additional materials, if any, addressing the merits of the dispute no later than March 23, 2009 (Order, dated Mar. 16, 2009).  The parties made no additional submissions.

III.  <u>Analysis</u>

   A.  <u>Legal Principles</u>

      1.  Burden of Showing Good
          <u>Cause under Rule 26(c)</u>

"Rule 26(c) confers broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required."  <u>In re Zyprexa Injunction</u>, 474 F. Supp.2d 385, 415 (E.D.N.Y. 2007), <u>quoting</u> <u>Seattle Times Co. v.</u>

Rhinehart, 467 U.S. 20, 36 (1984).  "The touchstone of the
court's power under Rule 26(c) is the requirement of 'good
cause.'"  In re Zyprexa Injunction, supra, 474 F. Supp.2d at 415.
A blanket protective order temporarily postpones the good cause
showing until a party or intervenor challenges the continued
confidential treatment of particular documents.  The burden of
establishing good cause then lies with the party seeking to
prevent the disclosure of documents.  Gambale v. Deutsche Bank
AG, 377 F.3d 133, 139 (2d Cir. 2004); In re "Agent Orange" Prod.
Liab. Litig., 821 F.2d 139, 145 (2d Cir. 1987); 8 Charles A.
Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice
and Procedure ("Wright, Miller & Marcus") § 2035 (2d ed. 2008).

    2.   Presumption of Public Access

The "good cause" analysis is informed by the presump-
tions of public access under the common law and the First Amend-
ment.  Std. Inv. Chartered, Inc. v. Nat'l Ass'n of Sec. Dealers,
Inc. ("Std. Inv. IV"), 07 Civ. 2014 (SWK), 2007 WL 2790387 at *2
(S.D.N.Y. Sept. 26, 2007), citing United States v. Amodeo, 71
F.3d 1044, 1048 (2d Cir. 1995) ("Amodeo").

> There is a strong presumption of public access to
> "'judicial documents,' that is, such 'items filed with
> the court that are relevant to the performance of the
> judicial function and useful in the judicial process.'"
> See In re Terrorist Attacks on September 11, 2001, 454
> F. Supp.2d 220, 222 (S.D.N.Y. 2006) (quoting SEC v.
> TheStreet.com, 273 F.3d 222, 231 (2d Cir. 2001)).
> "Accordingly, a party seeking a protective order seal-

ing trial, other court hearings, or motions and accompanying exhibits filed with the court must satisfy a more demanding standard of good cause." In re Terrorist Attacks, 454 F. Supp.2d at 222-23.

Nevertheless, the Second Circuit has also noted that "an abundance of statements and documents generated in federal litigation actually have little or no bearing on the exercise of Article III judicial power. . . . Unlimited access to every item turned up in the course of litigation would be unthinkable." [Amodeo], 71 F.3d at 1048.  Courts deciding protective order motions must therefore locate documents on "a continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance." Id. at 1049.

Std. Inv. IV, supra, 2007 WL 2790387 at *3.

In addition to the common law presumption of public access . . . , courts have identified a similar, though more demanding, presumption stemming from the First Amendment.  See, e.g., Lugosch [v. Pyramid Co. of Onondaga, 435 F.3d 110, 124 (2d Cir. 2006)]; Gambale, 377 F.3d at 140 & n.4.  The First Amendment's "qualified right of access to judicial documents" is "a necessary corollary of the capacity to attend the relevant proceedings." Hartford Courant Co. v. Pellegrino, 380 F.3d 83, 93 (2d Cir. 2004).  Once a court has determined that "the more stringent First Amendment framework applies, continued sealing of the documents may be justified only with specific, on-the-record findings that sealing is necessary to preserve higher values and only if the sealing order is narrowly tailored to achieve that aim." Lugosch, 435 F.3d at 124.

Std. Inv. Chartered, Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.,

07 Civ. 2014 (SWK), 2008 WL 199537 at *4 (S.D.N.Y. Jan. 22,

2008).

As was recently re-articulated in Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110 (2d Cir. 2006), "documents submitted to a court for its consideration in a summary judgment motion are -- as a matter of law -- judicial documents to which a strong presumption of

access attaches, under both the common law and the
First Amendment." <u>Id</u>. at 121.  <u>Lugosch</u> notes that
"summary judgment is an adjudication, and '[a]n adjudi-
cation is a formal act of government, the basis of
which should, absent exceptional circumstances, be
subject to public scrutiny.'" <u>Id</u>. (quoting <u>Joy v.
North</u>, 692 F.2d 880, 893 (2d Cir. 1982), <u>cert</u>. <u>denied</u>,
460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1983)
(brackets in original)).  Thus, summary judgment docu-
ments "should not remain under seal absent the most
compelling reasons." <u>Id</u>.

<u>Allen v. City of New York</u>, 420 F. Supp.2d 295, 300-02 (S.D.N.Y.
2006).  The "motive of the party seeking access to, or disclosure
of, documents is irrelevant to the question of whether and how
strong a public right of access exists with respect to those
documents." <u>Std. Inv. IV</u>, 2007 WL 2790387 at *3; <u>accord</u> <u>Lugosch
v. Pyramid Co. of Onondaga</u>, 435 F.3d 110, 123 (2d Cir. 2006).

     3.  Exception for Specific
       <u>Showing of Competitive Harm</u>

     Notwithstanding the presumption of public access to
judicial records, courts may deny access to records that are
"sources of business information that might harm a litigant's
competitive standing." <u>Nixon v. Warner Commc'ns, Inc.</u>, 435 U.S.
589, 598 (1978).  However, the fact that business documents are
secret or that their disclosure might result in adverse publicity
does not automatically warrant a protective order.  <u>Gelb v. Am.
Tel. & Tel. Co.</u>, 813 F. Supp. 1022, 1035 (S.D.N.Y. 1993); <u>see
also</u> <u>Salomon Smith Barney, Inc. v. HBO & Co.</u>, 98 Civ. 8721 (LAK),
2001 WL 225040 at *3 (S.D.N.Y. Mar. 7, 2001) ("Implicit in the

notion of 'confidential business information' is something beyond the mere fact that the particular datum has not previously been made available to the public.").

The party opposing disclosure must make a particular and specific demonstration of fact showing that disclosure would result in an injury sufficiently serious to warrant protection; broad allegations of harm unsubstantiated by specific examples or articulated reasoning fail to satisfy the test.  See Cipollone v. Liggett Group, Inc., 785 F.2d 1108, 1121 (3d Cir. 1986); Schiller v. City of New York, 04 Civ. 7922 (KMK)(JCF), 04 Civ. 7921 (KMK)(JCF), 2007 WL 136149 at *5 (S.D.N.Y. Jan. 19, 2007), quoting In re Terrorist Attacks on Sept. 11, 2001, 454 F. Supp.2d 220, 222 (S.D.N.Y. 2006); Blum v. Schlegel, 150 F.R.D. 38, 41 (W.D.N.Y. 1993) ("The party seeking protection from disclosure has the burden of making a particular and specific demonstration of fact, as distinguished from general, conclusory statements revealing some injustice, prejudice, or consequential harm that will result if protection is denied."); see also Bridge C.A.T. Scan Assocs. v. Technicare Corp., 710 F.2d 940, 944-45 (2d Cir. 1983) (Rule 26(c) "is not a blanket authorization for the court to prohibit disclosure of information whenever it deems it advisable to do so, but is rather a grant of power to impose

conditions on discovery in order to prevent injury, harassment, or abuse of the court's processes.").[4]

      4.  Applicable Trade
         <u>Secret Definition</u>

      Although a business's information need not be a "true" trade secret in order to warrant protection from disclosure under Rule 26(c), <u>e.g.</u>, <u>Gelb v. Am. Tel. & Tel. Co.</u>, <u>supra</u>, 813 F. Supp. at 1035, trade secret law is instructive in gauging whether information constitutes sensitive business information that courts should shield from public scrutiny.  <u>See</u> <u>SEC v.</u>

---

[4]The circuit courts are split with respect to the specificity of proof necessary for good cause under Rule 26(c).  <u>See</u> <u>Topo v. Dhir</u>, 210 F.R.D. 76, 77-78 (S.D.N.Y. 2002) (describing split). Several circuits have "dispensed with the specificity requirement, only demanding that the moving party show good cause." <u>Topo v. Dhir</u>, <u>supra</u>, 210 F.R.D. at 77.  However, several other circuits and many of the district judges in this circuit have adopted the specificity requirements set forth in <u>Cipollone v. Liggett Group, Inc.</u>, <u>supra</u>, particularly in cases involving protective orders seeking to prevent harm to commercial enterprises.  <u>See</u> <u>Topo v. Dhir</u>, <u>supra</u>, 210 F.R.D. at 78 (collecting additional district court cases).  Following <u>Lugosch v. Pyramid Co. of Onondaga</u>, <u>supra</u>, the district courts that have addressed the issue have required that parties seeking to maintain documents submitted in connection with summary judgment motions under seal make a specific showing of harm.  <u>See</u> <u>Std. Inv. IV</u>, 2007 WL 2790387 at *12 (requiring showing that disclosure will result in a clearly defined, specific and serious injury); <u>Prescient Acquisition Group, Inc. v. MJ Pub. Trust</u>, 487 F. Supp.2d 374, 375 (S.D.N.Y. 2007) (requiring party seeking to maintain documents under seal to "identif[y] with particularity (<u>i.e.</u> page and line) the precise information . . . which the party maintains should be kept under seal" and "demonstrat[e] the particular need for sealing the information").  I agree that a specific showing of harm is necessary to overcome the presumption of access here.

TheStreet.com, 273 F.3d 222, 231 n.10 (2d Cir. 2001) (identifying trade secrets as example of type of information entitled to protection).  Although the parties do not address the issue of the proper source of law for the definition of the term "trade secret" in a federal action based solely on federal law claims,[5] both state and federal courts have routinely applied the six factors set forth in the Restatement (First) of Torts § 757, comment b, when determining the existence of a trade secret:

> (1) the extent to which the information is known out-side of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the business] to guard the secrecy of the information; (4) the value of the information to [the business] and [its] competitors; (5) the amount of effort or money expended by [the business] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

United States v. Int'l Bus. Machs. Corp., 67 F.R.D. 40, 46 n.9 (S.D.N.Y. 1975), citing inter alia Speedry Chem. Prods., Inc. v. Carter's Ink Co., 306 F.2d 328 (2d Cir. 1962); see also Tactica Int'l, Inc. v. Atlantic Horizon Int'l, Inc., 154 F. Supp.2d 586, 606 (S.D.N.Y. 2001); Andrew Corp. v. Rossi, 180 F.R.D. 338, 341 (N.D. Ill. 1998); Ivy Mar Co. v. C.R. Seasons Ltd., 907 F. Supp. 547, 556 (E.D.N.Y. 1995); Deford v. Schmid Prods. Co., 120 F.R.D. 648, 653 (D. Md. 1987); Waelde v. Merck, Sharp & Dohme, 94 F.R.D.

_____

[5]Lead Plaintiffs' third amended complaint alleged only violations of Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (Third Amended Complaint, Docket Item 516, at viii-ix, 354-400).

27, 28-29 (E.D. Mich. 1981); Monaco v. Miracle Adhesives Corp.,
Civ.A. 76-2373, 1979 WL 200011 at *1 (E.D. Pa. Aug. 21, 1979);
Ashland Mgmt. Inc. v. Janien, 82 N.Y.2d 395, 407, 624 N.E.2d
1007, 1013, 604 N.Y.S.2d 912, 918 (1993); 1-1 Milgrim on Trade
Secrets § 1.01 n.3 (Lexis 2009) (collecting cases for nearly
every state).

The six factors assist the courts in determining
whether information is "sufficiently valuable and secret to
afford an actual or potential economic advantage over others."
Wiener v. Lazard Freres & Co., 241 A.D.2d 114, 123-24, 672
N.Y.S.2d 8, 15 (1st Dep't 1998), quoting Restatement (Third) of
Unfair Competition § 39 (1995); accord Trump's Castle Assocs. v.
Tallone, 645 A.2d 1207, 1208 (N.J. Super. Ct. App. Div. 1994);
see Restatement (First) of Torts § 757, cmt. b ("A trade secret
may consist of any formula, pattern, device or compilation of
information which is used in one's business, and which gives him
an opportunity to obtain an advantage over competitors who do not
know or use it.").  In order to be sufficiently valuable and
secret, the information must not be "commonly known to the trade
in which the putative trade secret owner is engaged."  1-1
Milgrim on Trade Secrets § 1.07; accord Kewanee Oil Co. v. Bicron
Corp., 416 U.S. 470, 475 (1974) (The information in question
"must be secret, and must not be of public knowledge or of a
general knowledge in the trade or business."); Speedry Chem.

14

Prods., Inc. v. Carter's Ink Co., supra, 306 F.2d at 331 (The
information must not be "of general knowledge in an industry.");
quoting Restatement (First) of Torts § 757, cmt. b; see also
Sit-Up Ltd. v. IAC/InterActiveCorp., 05 Civ. 9292 (DLC), 2008 WL
463884 at *12 (S.D.N.Y. Feb. 20, 2008); Pella Windows & Doors v.
Buscarnera, 07 CV 82 (SLT)(JMA), 2007 WL 2089298 at *10 (E.D.N.Y.
July 18, 2007); Johnson Controls, Inc. v. A.P.T. Critical Sys.,
Inc., 323 F. Supp.2d 525, 537 (S.D.N.Y. 2004).

     B.  Lead Plaintiffs'
        Allegedly Improper Motive

      As a threshold matter, defendants argue that Lead
Plaintiffs should not be permitted to unseal documents for the
purpose of using them in pending lawsuits in Italy, in circumven-
tion of Italian procedural rules that would not otherwise permit
discovery of the documents (Deloitte Oct. 2008 Letter at 2-5; see
also BoA Oct. 2008 Letter at 2-3).  Even if Lead Plaintiffs were
interested in using non-public information obtained in this
action in an Italian lawsuit, they would not likely be able to do
so without modification of the existing Protective Order, which
survives this action, and which provides that "[a]ll information,
whether designated confidential or not, that is produced or
exchanged in the course of this action (other than information
that is publicly available) shall be used by the party or parties
to whom the information is produced solely for the purpose of

this action" (Protective Order ¶¶ 1, 26, annexed as Ex. 1 to Pls.' Oct. 10 Letter) (emphasis added).  Thus, striking the confidentiality designation will not, by itself, permit the Lead Plaintiffs' to use the documents in other litigations.

Furthermore, even if Lead Plaintiffs could make such use of the documents produced in this action, defendants fail to cite persuasive authority for their assertion that the use of discovery materials in a foreign jurisdiction with less permissive discovery rules is an improper motive or otherwise constitutes good cause to keep such discovery under seal.  Defendants cite to footnote 17 in Oppenheimer Funds, Inc. v. Sanders, 437 U.S. 340, 353 (1978), in which the Supreme Court cautioned that it would be improper to allow a party to obtain discovery "when the purpose of [the] discovery request is to gather information for use in proceedings other than the pending suit" (Deloitte Oct. 2008 Letter at 5 n.7).  However, defendants do not claim that Lead Plaintiffs instituted this action for the purpose of obtaining documents for use in other actions, nor do they deny that Lead Plaintiffs requested discovery in this action for use in their prosecution of this action.  As a result, Oppenheimer's cautionary language is not applicable.  See Dove v. Atl. Capital Corp., 963 F.2d 15, 18-19 (2d Cir. 1992) (District Court did not abuse its discretion by denying plaintiff's motion to seal documents that might be used by defendant in related, foreign

litigation with less permissive discovery rules because discovery in question was relevant to defendant's good faith defense of domestic federal action); Cipollone v. Liggett Group, Inc., 113 F.R.D. 86, 91 (D.N.J. 1986) ("So long as the initial litigation has not itself been instituted in bad faith for the purpose of obtaining documents for other actions, and so long as the interests of those represented in the initial litigation are being fully and ethically prosecuted, the Federal Rules do not foreclose the collaborative use of discovery.").[6]

Defendants have therefore failed to sustain their burden of proving that Lead Plaintiffs' supposedly improper motives constitute good cause for continued blanket confidential treatment for the challenged documents.

---

[6]Defendants also cite to Well-Made Toy Manufacturing Corp. v. Lotus Onda Industrial Co., 00 Civ. 9605 (DFE), 2002 WL 72930 at *4 (S.D.N.Y. Jan. 17, 2002), in which the court granted a Hong Kong defendant's motion for summary judgment, and denied plaintiff's request that the defendant produce documents for the apparent purpose of "learn[ing] about other U.S. companies it could sue" for direct infringement of its copyright (Deloitte Oct. 2008 Letter at 5 n.7). Here, defendants have already produced the documents in question, so there is no issue concerning the merits of permitting new discovery for use in other actions.

C.   The Applicability of
     the Presumption of Access

BoA alone challenges the applicability of the common
law presumption of access to its documents.[7]  BoA argues that its
documents are not "judicial" or, even if they are "judicial,"
their negligible relevance to the summary judgment motion consid-
erably weakens the weight of the presumption of public access
(BoA Oct. 2008 Letter at 1-2; see also BoA Feb. 2009 Letter at
2).  BoA notes that the parties initially submitted proposed Rule

_____

   [7]The GT defendants initially raised a similar challenge;
however they failed to revisit the issue after Lead Plaintiffs
substantially revised their document disclosure request.  In
their October 17, 2008 letter to the Court, the GT defendants
stated that "many" of the 515 documents which Lead Plaintiffs
initially sought to unseal "were neither cited nor relevant to
any of the limited issues briefed for summary judgment," and that
the Court should therefore "reject Lead Plaintiffs' claim that
all of the documents on their list should be unsealed because
they are 'judicial documents'" (GT Oct. 2008 Letter at 2).  Lead
Plaintiffs subsequently reduced the number of the GT defendants'
documents that they sought to unseal from 515 to 55 (Pls.' Jan.
2009 Letter at 2).  The GT defendants chose not revisit the issue
of whether the 55 remaining documents were relevant to the
"issues briefed for summary judgment" in their reply to Lead
Plaintiffs' revised request (GT Feb. 2009 Letter).  It is clear,
from my in camera review, that many of the documents in question
are relevant to the primary issue on which Judge Kaplan enter-
tained the GT defendants' arguments for summary judgment, namely,
the existence of principal-agent relationships among GT-US, GTI,
and GT Italy.  See In re Parmalat Sec. Litig., supra, 598 F.
Supp.2d at 572-81.  Because the GT defendants have not even
attempted to argue that any particular documents, though cited in
the parties' Rule 56.1 submissions, were nevertheless immaterial
to any issue that Judge Kaplan could have adjudicated at the
time, I find that all of the GT defendants' documents currently
in issue are entitled to the "highest" presumption of public
access normally accorded to summary judgment submissions.
Lugosch v. Pyramid Co. of Onondaga, supra, 435 F.3d at 123.

56.1 Statements to Judge Kaplan without docketing them (BoA Feb. 2009 Letter at 2), and that Judge Kaplan subsequently limited the grounds on which BoA was permitted to move for summary judgment (Transcript of Hearing before Judge Kaplan, dated Jan. 29, 2008 ("Tr."), at 24). However, Judge Kaplan explicitly ruled that the parties were to base their motions on the Rule 56.1 Statements already submitted and directed them not to submit new or narrowed Rule 56.1 Statements (Tr. at 9-10, 18). In addition, the parties' proposed Rule 56.1 Statements were relevant and useful to Judge Kaplan's management of the case, particularly his ability to narrow the issues to be "attack[ed] . . . in a staged fashion" through dispositive motions (Tr. at 18). Otherwise, Judge Kaplan would not have requested the proposed Statements (See Tr. at 14 ("I have been remiss in not expressing my appreciation for the massive amount of effort that went into .  . the 56.1 statements particularly, and I am really quite sincere in that.")). Thus, the documents cited in the parties' 56.1 Statements are "'items filed with the court that [we]re relevant to the performance of the judicial function and useful in the judicial process.'" SEC v. TheStreet.com, supra, 273 F.3d at 231. They therefore meet the definition of "judicial" documents. "Lugosch definitively reinforced [Amodeo]'s ruling that documents submitted in connection with a motion for summary judgment are judicial documents for presumption-of-access purposes, . . . a principle that

19

district courts have faithfully applied." Std. Inv. IV, supra,
2007 WL 2790387 at *5, citing Prescient Acquisition Group, Inc.
v. MJ Pub. Trust, supra, 487 F. Supp.2d at 374, and Allen v. City
of New York, supra, 420 F. Supp.2d at 302.

Furthermore, the documents in issue were "used by
parties moving for, or opposing, summary judgment," Lugosch v.
Pyramid Co. of Onondaga, supra, 435 F.3d at 123, and, thus, are
subject to a strong presumption of public access.  The fact that
Judge Kaplan ultimately narrowed the issues for decision on
summary judgment does not render the documents immaterial to
Judge Kaplan's decisionmaking process.  Judge Kaplan denied BoA's
request to limit its motion for summary judgment to the narrow
legal issue on which Judge Kaplan eventually granted BoA summary
judgment (Tr. at 19, 22).  There were other substantive issues
which BoA's motion and Lead Plaintiffs' response addressed, but
BoA has not shown that any documents were immaterial to the
parties' good faith arguments, including those that Judge Kaplan
did not reach, see In re Parmalat Sec. Litig., supra, 570 F.
Supp.2d at 526 ("As plaintiffs have failed to establish the
reliance element of their Section 10(b) claims against BoA, Citi,
and Pavia, the Court need not address defendants' additional
grounds for summary judgment.").  Based on BoA's failure to show
lack of materiality, and the GT defendants' failure to address
the issue in any substantive manner, I find that the parties'

entire Rule 56.1 Statements were material to the adjudication of their summary judgment motions, and entitled to a strong presumption of public access.

D.   The Citi Defendants' Documents

The Citi defendants chose not to make a specific factual showing in opposition to Lead Plaintiffs' request to strike the confidentiality designations from their documents (Letter from Jason A. D'Angelo, Esq., Counsel for the Citi Defendants, to the Court, dated Nov. 26, 2008).  As a result, Lead Plaintiffs maintained their original request that "all of the Citi[ defendants'] materials submitted on the summary judgment motions should be unsealed" (Pls.' Jan. 2009 Letter at 2). The Citi defendants noted that some of their documents were subject to an additional protective order in an action pending in the Superior Court of New Jersey (Citi Oct. 2008 Letter at 1). However, it is not for this Court to oversee compliance with another court's order.  Accordingly, I direct that the confidentiality designations be stricken from those documents identified in Lead Plaintiffs' September 19, 2008 Letter which the Citi defendants designated as confidential.  As used in the remainder of this Opinion and Order, references to "defendants" do not include the Citi defendants.

21

E.   <u>Defendants' Showings of Good Cause</u>

1.   <u>Overview</u>

In support of their argument to maintain the documents under seal, defendants first submit testimony from their employees asserting that the information in their documents was developed at substantial cost, was never disclosed to third parties except pursuant to an agreement to keep the information confidential, and would cause significant economic harm to defendants if the documents were disclosed to competitors.  For the most part, the testimony offered does not discuss the contents of specific documents.  Second, defendants submit letter memoranda in which they cite caselaw purportedly showing that there is good cause to protect their documents under Rule 26.  Third, defendants submit spreadsheets prepared by counsel that briefly discuss each document and allude to reasons why particular documents should remain under seal.

With scattered exceptions, defendants (1) make only vague and conclusory showings of the economic value of the information contained in any particular document and (2) make minimal or nonexistent showings of the potential harm that disclosure of particular information would cause.  Furthermore, the documents at issue often do not reveal the information that defendants claim they contain.  As a result, defendants have

failed to sustain their burden of showing good cause to keep the documents under seal.

### 2.   The Grant Thornton Defendants

#### a.   Introduction

The GT defendants specify five amorphous categories of supposedly proprietary information which they seek to protect from disclosure:  "operations and policy information," "strategic information," "financial information," "audit materials" and "meeting minutes of governing boards" (GT Nov. 2008 Letter at 2). The GT defendants have submitted separate statements from GT-US and GTI witnesses, which attempt to show good cause to maintain the two entities' documents under seal.  The GT defendants have also submitted a spreadsheet that discusses why certain documents are "proprietary" (the "GT Spreadsheet") (GT Spreadsheet, annexed as Ex. A to GT Feb. 2009 Letter).  Each of the entries on the GT spreadsheet includes some version of the following statement: "Accordingly, as GT-US's [or GTI's] submissions make clear, this document, the public disclosure of which would disadvantage GT-US [or GTI], is entitled to continued confidentiality protection" (GT Spreadsheet, annexed as Ex. A to GT Feb. 2009 Letter, at 8). In support of this statement, the GT defendants cite to portions of their letter memoranda and witness statements.  However, neither the GT defendants' letter memoranda nor their witness

23

statements demonstrates that the disclosure of any of the 55 documents at issue would reveal information that is not commonly known in the trade and that would cause a specific and significant harm to GT-US or GTI.

        b.   Operations and
           <u>Policy Information</u>

The GT defendants first seek to protect their "operations and policy information" (GT Nov. 2008 Letter at 5-6).  The GT defendants' witness statements explain, in broad terms, that GT-US and GTI policies and procedures are valuable to those entities (Declaration of Russell G. Wieman, National Managing Partner of Audit and Advisory Services of GT-US, dated Nov. 25, 2008 ("Wieman Decl."), ¶ 4, annexed as undesignated exhibit to GT Nov. 2008 Letter; Declaration of J.W. Mike Starr, Chief Operating Officer of GTI, dated November 25, 2008 ("Starr Decl."), ¶ 6, annexed as undesignated exhibit to GT Nov. 2008 Letter).  GT-US's witness gives the examples of GT-US "internal risk management and quality control policies" as examples of valuable policies, and he cites the GT-US audit manual as an example of a document containing valuable procedures (Wieman Decl. ¶¶ 6, 11, annexed as undesignated exhibit to GT Nov. 2008 Letter).

The GT defendants do not claim that the documents in issue contain the actual text of particular policies or procedures.  Rather, the GT defendants seek to protect unspecified

operations and policy "information" that is neither a policy nor a procedure.  However, the cases the GT defendants cite do not support protection for so broad a class of documents,[8] and defendants' witnesses do not address the value or secrecy of "operational and policy information" (GT Nov. 2008 Letter at 5).

Moreover, my in camera review of both GTI's and GT-US's documents has not revealed that they expressly or impliedly refer to any of the sorts of policies or procedures described by the GT defendants' witnesses.  GT-US's documents reveal specific aspects of GT-US's work that related to Parmalat.  For example, the documents reveal discounted rates at which GT-US billed its services related to Parmalat matters, discussions among GT-US employees concerning whether to continue the GT firms' relationship with Parmalat, discussions of why Parmalat terminated its relationship with GT-US and other GT firms, and GT-US employees' concerns regarding GT-Italy's management structure and style.

---

[8] See C.A. Muer Corp. v. Big River Fish Co., Civ.A. 97-5402, Civ.A. 97-6073, Civ.A. 97-7154, 1998 WL 488007 at *1, *4 (E.D. Pa. Aug. 10, 1998) (granting plaintiff's motion for blanket protective order, without document-by-document showing of good cause, with respect to disclosure to defendant competitor of, among other things, future business and expansion plans, media and advertising schedules and sales forecasts); Duracell Inc. v. SW Consultants, Inc., 126 F.R.D. 576, 578-79 (N.D. Ga. 1989) (granting motion for protective order denying plaintiff's discovery requests for defendant's marketing strategy, battery sales (present and projected), customer lists, and other information about defendants' marketing approaches, because "[i]f Duracell were able to identify Power Plus's present and future customers and the markets they are trying to enter, it could place Power Plus's future in the battery industry in jeopardy.").

The GT-US documents discuss specific GT-US employee opinions, decisions and actions, but do not suggest whether these actions were consistent with or relied on GT-US policies or procedures.

Similarly, most of GTI's documents in the "operations and policy information" category discuss GTI employees' concerns with GT-Italy without discussing the content of any particular policies or procedures. For example, there are several reports describing the results of GTI "reviews" of GT-Italy in October 1998 and December 1999 and a "follow-up" in December 2001. These reports discuss the ways in which GT-Italy needed improvement in its management, training, risk management and quality control procedures. In addition, some of the deposition testimony that Lead Plaintiffs wish to unseal discusses the possibility of a member firm being removed from the GTI network, as GT-Italy eventually was. However, at no point did the documents in issue reveal the content of any policies or procedures concerning the actions of GTI, GT-US or GT-Italy; they did not discuss the content of GTI's specific policies concerning the behavior of member firms and the grounds for their removal from the GTI network. As a result, the GT defendants have failed to meet their burden of showing good cause to protect the documents challenged by Lead Plaintiffs on the theory that they contain "operations and policy information."

26

c.   Strategic and
     Financial Information

The GT defendants also seek to protect information that they refer to as "strategic" or "financial."  The "strategic" category generally contains documents from 2001 that discuss whether and how GTI and its member firms might attempt to market themselves in a manner that would create the appearance of a global firm, rather than a network of firms.  The "strategic" category also contains several documents that do not appear to fit in the category; for example, testimony concerning a meeting in which an officer of GTI directed GT-Italy to make certain changes as a condition of remaining in the GTI network.  The "financial" category contains documents from 1998 and 1999 that discuss the discounts that various GT firms granted to Parmalat.

GT-US, but not GTI,[9] has shown that most of its information in the "strategic" category is secret.  GT-US requires all of its personnel to protect the confidentiality of its marketing strategies both during and after the conclusion of their employment with GT-US (Declaration of Russell G. Wieman, dated Feb. 11, 2009 ("Wieman 2009 Decl."), ¶ 1, annexed as undesignated exhibit

---

[9]GTI's witness did not discuss the secrecy and value of information concerning its marketing and branding strategy, so it has not shown good cause to protect its documents on that topic. Further, there are no GTI documents containing financial information that remain in issue, so it is not necessary to address GTI's showing concerning such documents.

to GT Feb. 2009 Letter).  GT-US has also shown that it requires its clients and its affiliate firms in the GT network to ensure that any strategic information that GT-US discloses to them remains confidential (Wieman 2009 Decl. ¶ 1, annexed as undesignated exhibit to GT Feb. 2009 Letter).

GT-US has not, however, explained why the seven-year-old information concerning its marketing strategy has any continued value to the firm today or why the information might otherwise cause GT-US harm if it was disclosed.  GT-US argues that its strategic decisionmaking "is the means by which . . . GT-US evaluate[s] prior work, identif[ies] goals for the future, and develop[s] plans for many aspects of [its] business," and that, if disclosed, its competitors would have what amounted to a "playbook documenting how . . . GT-US . . . evaluated and addressed some of [its] most important decisions and why [it] . . . deemed a particular course of action to be most advantageous" (GT Nov. 2009 Letter at 7).  However, strategic decisionmaking is necessarily fact-specific.  GT-US has not shown how any aspect of GT-US's decisionmaking concerning its marketing strategy in 2001 would be helpful to anyone attempting to understand GT-US's current marketing strategy, or any of its other strategic decisionmaking, for that matter.

Similarly, GT-US argues that "'a competitor could determine the strength or relative vulnerability of [GT-US's]

28

financial condition' . . . [,] gain insight into the financial
processes of [GT-US]" and "target certain member firms and
attempt to lure them away from the GTI network by offering them
more competitive fees" if it gained access to GT-US's financial
information (GT Nov. 2009 Letter at 9).  However, GT-US has
failed to offer any factual evidence to support either the
secrecy or the value of its financial information; its witness
simply did not discuss this information in his testimony (<u>see
generally</u> Wieman Decl., annexed as undesignated exhibit to GT
Nov. 2008 Letter; Wieman 2009 Decl., annexed as undesignated
exhibit to GT Feb. 2009 Letter).  Thus, the GT defendants have
not shown good cause to protect the documents challenged by Lead
Plaintiffs on the ground that they contain "strategic informa-
tion" or "financial information."

> d.  <u>Audit Materials</u>

GT-US[10] also argues that its so-called audit materials
"as well as other documents and communications that reflect the
substance of those materials" should be protected from disclosure
(Wieman Decl. ¶ 8, annexed as undesignated exhibit to GT Nov.
2008 Letter).  GT-US's witness defined "auditing materials" as

---

[10]Lead Plaintiffs have, for the present, withdrawn their
challenge to the confidentiality of all GTI documents that GTI
previously designated as "audit materials."  Thus, it is not
necessary to address GTI's arguments concerning those documents.

"audit manuals, software and other auditing tools that its partners and staff employ to provide audit services to the firm's public and private clients" (Wieman Decl. ¶ 6, annexed as undesignated exhibit to GT Nov. 2008 Letter).

Based on my in camera review, most of the documents in issue make no mention of GT-US's "manuals, software and other auditing tools."  The vast majority of the documents in the category relate to specific company actions or decisions, and there is no way to discern from the documents whether these actions or decisions reveal GT-US's overall business manuals, software or tools or whether they "reflect" the application of those manuals and tools.  For example, the documents discuss in general terms the procedures to be performed by GT firms as part of Parmalat's disclosure of financial information prior to an initial public offering, and they describe the financial materials that the GT firms required from Parmalat.  They also describe the pace and completeness of Parmalat's production of such materials to the GT firms and the potential adjustments that Parmalat might have to make to its Italian financial statements in order to meet United States GAAP standards.  In addition, the documents include a draft engagement letter and memorandum of understanding between GT-US and Parmalat, as well as some of GT-US's fee invoices.  Although this information relates to services performed by various GT firms for Parmalat, it is not clear that

the information reveals any of GT-US's "tools."  As a result, GT-US's witness testimony concerning the secrecy and value of its "auditing materials" does not apply to the majority of documents that GT-US has labeled as such.

With respect to any of the "audit materials" that might arguably reveal something about GT-US's auditing approach, GT-US has shown that the documents are secret because they are kept confidential within the firm, and only disclosed to others with the understanding that they too will keep the documents confidential (Wieman 2009 Decl. ¶ 1, annexed as undesignated exhibit to GT Feb. 2009 Letter).

However, GT-US's showings of the value of the documents and resulting potential harm to the firm from the documents' disclosure are conclusory and unilluminating (Wieman Decl. ¶¶ 7, 10, annexed as undesignated exhibit to GT Nov. 2008 Letter).  GT-US's witness states that "GT-US has expended [and continues to expend] substantial financial and personnel resources . . . developing and refining its audit materials so as to be able to provide industry-leading services to its clients . . . [and] to hone proven techniques and cultivate new ones to effectively respond to legal and regulatory developments, client needs and industry trends" (Wieman Decl. ¶ 7, annexed as undesignated exhibit to GT Nov. 2008 Letter).  However, GT-US's witness does not explain which of GT-US's auditing tools disclosed by the

documents in issue provide valuable, as opposed to generic, information.  GT-US also does not specify which of its documents, if any, reveal "proven techniques" or the key to its "industry leading" services.  Surely some auditing techniques are standard in the industry and already well-known among GT-US's competitors, but GT-US makes no showing concerning whether any of these techniques allegedly disclosed by the documents are not otherwise commonly known in the trade.  Because GT-US fails to offer specific evidence showing that any of its "audit materials" contain information that confers on GT-US a particular advantage not already commonly known to the industry, GT-US's witness's conclusory testimony to the contrary rings hollow.[11]

Furthermore, because the GT defendants have failed to make a specific factual showing of the harm that would result from the disclosure of certain information in each document, their citation to cases that involved sufficient showings of potential harm cannot fill the gap.

---

[11]The GT defendants offered more specific explanations of the harms that would result from the disclosure of particular audit manuals, member firm agreements and board meeting minutes (GT Nov. 2008 Letter at 5, 6, 8).  However, Lead Plaintiffs no longer seek the disclosure of such materials.

32

            e.  Meeting Minutes
                of Governing Boards

        Finally, the GT defendants seek to protect the meeting

minutes from GTI's governing and advisory boards (GT Nov. 2008

Letter at 9-10).  GTI's witness claims that "[m]inutes and notes

from [committee] meetings are only circulated internally to those

individuals who are appointed or elected to serve" on the commit-

tee in question, and that "[t]his information gives an in-depth

look into the internal governance and the strategic decision

making process within GTI and member firms" (Starr Decl. ¶¶ 27-

28, annexed as undesignated exhibit to GT Nov. 2008 Letter).

However, the two documents in this category remaining in issue --

Deposition Exhibits[12] ("DX") 1374 and 1383 -- are email chains

from 2003 and 1999, respectively, not minutes or notes from

meetings.  The GT defendants have not made any showing that these

particular documents were kept secret in the same manner and to

the same degree as meeting notes and minutes.

        Moreover, the GT defendants have not shown that these

particular documents reveal valuable information about any board

or committee's decisionmaking process, or that the information

would be harmful if disclosed.  DX 1374 discusses whether the

_____

        [12]The parties apparently used a master numbering system for
all deposition exhibits, regardless of the deposition at which
they were introduced (see List of Documents and Testimony Cited
in Summary Judgment Briefs, annexed as part of Ex. 2 to Pls.'
Oct. 2008 Letter).

audit policy committee should revisit one of its "recommenda-
tions" concerning whether GTI's member firms should disclose to
their clients GTI's actual structure, i.e., a network of inde-
pendent national firms, rather than a single global firm.
Although the last email in the chain was sent only to members of
the GTI Board of Governors, it does not reveal any deliberations
of the Board or the audit committee themselves concerning that
issue.  Similarly, DX 1383 is an email that counsel represents to
be from one member of GTI's audit policy committee to the other
members of the committee concerning whether to permit the disclo-
sure of elements of GTI's audit software to university students.
It reveals one committee member's opinion concerning the proposal
and refers to the "development of a policy concerning release of
Explorer outside of GTI that we discussed at our last meeting."
It does not reveal the "internal governance and the strategic
decisionmaking process" of the committee.  Although both docu-
ments certainly discuss policies or recommendations that GTI's
governing bodies have made, they do not reveal anything about
these bodies' decisionmaking processes other than the fact that
they made decisions concerning the issues described above.
Because GTI has not explained what other valuable aspect of its
Board or committee decisionmaking processes these documents
reveal, it has not shown good cause to keep these documents under
seal.

3.   <u>BoA</u>

        BoA claims that its documents contain one or more of
the following categories of information that it alleges are
valuable and kept confidential:  (1) BoA's "process for conduct-
ing credit review and analysis" [68 documents], (2) "financial
and strategic business information of [BoA's] clients" [3 docu-
ments], (3) information regarding "methods used to structure and
market transactions to clients" [30 documents], (4) information
"detail[ing] confidential communications with potential or actual
investors in a transaction" [16 documents], (5) descriptions of
BoA's "pricing strategy and fee arrangements" [6 documents], and
(6) "transaction documents" [36 documents], (BoA Nov. 2008 Letter
at 2).  BoA has also categorized 23 documents not mentioned in
its letter memoranda as "miscellaneous."

            a.   Credit Review
                 <u>and Analysis Process</u>

        BoA first claims that its process of analyzing and
reviewing credit, as revealed by the documents in issue, is
entitled to protection.  This category includes documents dis-
cussing Parmalat's and its subsidiaries' financial condition and
creditworthiness in the context of BoA's deciding whether to lend
additional money to those entities, and BoA's planning and
execution of the sale of those entities' debt to third party

35

investors.  In support of its position, BoA offers the testimony
of its Senior Risk Manager, Douglas Keyston, that "credit review
and financial analysis of the Bank's customers are the core
functions of the Bank" (Declaration of Douglas Keyston, Senior
Risk Manager at BoA's Global Corporate & Investment Bank, dated
Nov. 25, 2008 ("Keyston Decl."), ¶ 6.a, annexed as Ex. B to BoA
Nov. 2008 Letter) and that, "[a]lthough the Bank continues to
refine its credit and financial analysis processes, the core of
these processes [remains] relevant today as the current credit
policies, processes, and procedures relate to those that were in
effect in the 1990s" (Keyston Decl. ¶ 6.d, annexed as Ex. B to
BoA Nov. 2008 Letter).  Keyston also claims that BoA has devel-
oped these processes by "expend[ing] significant time and money"
(Keyston Decl. ¶ 6.a, annexed as Ex. B to BoA Nov. 2008 Letter),
that it "prohibit[s] employees from disseminating such informa-
tion externally" and that it "instructs its employees not to
share client information with employees within the Bank who do
not need to know it" (Keyston Decl. ¶ 6.c, annexed as Ex. B to
BoA Nov. 2008 Letter).

          Keyston's statements show that the information in this
category is valuable to BoA because BoA could not perform its
core function of lending money without having processes for
assessing the creditworthiness of its borrowers.  Keyston's
statements also show that BoA keeps the information confidential.

However, BoA has not addressed the issue of whether the aspects
of its credit review and analysis process revealed by the docu-
ments in issue are common in the banking industry.  BoA argues
that "BoA, like other banks, considers the process by which its
credit review is conducted, as well as the individual credit and
financial analyses of its customers" to be confidential (BoA Nov.
2008 Letter at 4).  However, the fact that BoA's documents
addressing the financial health of its customers are not gener-
ally disclosed to the public does not necessarily mean that the
aspects of its credit analysis that they reveal are uncommon in
the banking industry.  The vast majority of the documents discuss
issues that would intuitively be relevant to any bank's or
private investor's assessment of a large company's creditworthi-
ness:  the company's past payment history, its past and projected
future financial performance, its revenues, its margins, its
degree of liquidity, its degree of indebtedness, its likely
future available cash flow, its likely ability to meet its
liabilities, its business objectives and strategies, its
strengths and weaknesses as compared to its competitors, the
attractiveness and riskiness of its industry as a whole, and the
reputation and reliability of its management.

        Furthermore, unlike the documents in the cases cited by
BoA, the documents in issue here do not reveal how BoA combines
these commonplace credit review factors into a single credit

review score, or how it might apply the factors in another
company's case.  See Smith v. Equifax Info. Servs., Inc., 3:04 CV
01660 CFD TP, 2005 WL 2660381 (D. Conn. Oct. 18, 2005) (protect-
ing manuals concerning protocols and procedures for processing
consumer credit score disputes and assuming that methods for
calculating credit scores were confidential); In re Powell,
97-10274, 97-1085, 1998 WL 800110 at *1-*2 (Bankr. D. Vt. Oct.
19, 1998) (protecting Commercial Banking Policy Manual setting
out specific criteria for loans, pricing information, and credit
limits, because "competitor, using the pricing and loan informa-
tion supplied in this manual, could easily contrast its own
policies to that of potential customers of [the] Bank"); Bank of
New York v. Meridien BIAO Bank Tanzania Ltd., 171 F.R.D. 135,
140-41, 143-44 (S.D.N.Y. 1997) (protecting bank's Credit Policy
Manual, Authorized Signature Book, Audit Review and Monitoring of
Operational Risks Manual, Internal Auditing Manual; and Opera-
tions Manual).  The one potential exception is DX 9042, which is
a memorandum from one BoA employee to three others discussing
numerous concerns with the approval of BoA's loan to Parmalat and
related private debt placement; this document discusses, among
other things, BoA's apparently anomalous internal credit rating
of Parmalat, the lack of a pre-screening process, the ability of
Parmalat to exert pressure on BoA, and the fact that the transac-
tion did not meet standard financial benchmarks.  Although the

memorandum goes into some detail concerning the apparent failure
of BoA to comply with its own credit approval standards, the
memorandum is vague concerning the actual content of BoA's loan
approval process, the role that BoA's credit rating plays in that
process, the other transactions that would require compliance
with BoA's loan approval standards, or other information that
would reveal how BoA's loan approval process would work in other
cases.  Therefore, I am not convinced that the documents in this
category, including DX 9042, are sufficiently secret and valuable
to afford BoA an economic advantage that its competitors lack.

        With respect to potential harm, BoA argues that "knowl-
edge of the Bank's credit policies and how the policies are
executed with regard to particular customers" could furnish third
parties a "potential avenue for fraud" and allow them to "obtain
capital which they otherwise could not obtain" (Keyston Decl.
¶ 6.f, annexed as Ex. B to BoA Nov. 2008 Letter).  The documents
in issue tend to reveal BoA's determinations concerning whether
and how to extend credit to Parmalat entities and sell that debt
to third parties, not an overarching credit policy or formula
that would be applicable in the case of other customers.  Thus,
it is not clear how the information could allow any third party
to dupe BoA into extending it greater credit.  Moreover, given
the outcome of its credit transactions with Parmalat and the all-

but-total failure of BoA's credit policies,[13] it would be irra-
tional for BoA to be using the same credit policies today that it
was using at the time it extended credit to Parmalat.  On the
other hand, if BoA has indeed kept the same credit review pro-
cesses in place notwithstanding the empirical evidence of their
ineffectiveness, it seems disingenuous for BoA to complain of the
likelihood of harm from the processes' disclosure due to their
known, but unremedied, susceptibility to fraud.  A competitor has
no reason to copy credit practices that result in uncollectible
loans and billion-dollar losses.  In either case, I am not
persuaded that the disclosure of the documents discussing
Parmalat's creditworthiness could be harmful to BoA now, or that
the risk of harm outweighs the public's interest in access to the
documents underlying Judge Kaplan's adjudication.

            b.  Financial and
                Strategic Business
                Information of Clients

        BoA also argues that release of its credit review and
analysis information "could inflict commercial harm on the Bank"
because "customers may not take lightly the fact that confiden-
tial information about a former Bank client's creditworthiness
was disclosed to the public" (Keyston Decl. ¶ 6.e, annexed as Ex.

--------

[13]I take judicial notice of the fact that BoA has accepted
more than $45 billion in federal "bailout" funds as a result of,
among other things, its deficient credit policies.

40

B to BoA Nov. 2008 Letter).  This argument merges with BoA's
argument concerning the theoretically broader category of "finan-
cial and strategic business information of clients," because the
only client's information remaining in issue in that category is
a Parmalat subsidiary's information.   With respect to that
category of documents, BoA argues that

> [r]evelation of the Bank's customers' confidential
> information may significantly harm the Bank's commer-
> cial reputation.  If customers do not trust the Bank's
> ability to maintain the confidentiality of their non-
> public commercial and financial information, customers
> may be unwilling to provide the Bank with sensitive
> information that would be part of any proper and com-
> plete analysis of financing needs and capabilities.
> Alternatively, customers may opt to bank elsewhere.

(Keyston Decl. ¶ 13.b, annexed as Ex. B to BoA Nov. 2008 Letter).
BoA's argument that its customers will retaliate against BoA for
disclosing Parmalat's information in connection with a federal
litigation is pure speculation.  Needless to say, Parmalat has
not intervened to object to the disclosure of its information,
and I am puzzled as to why BoA believes that other customers
would be concerned about BoA's being ordered to disclose informa-
tion concerning its dealings with a customer that engaged in a
massive fraud.  It is difficult to understand why honest business
persons would be concerned about disclosure of the details of a
fraudulent enterprise.

Absent a more rigorous and convincing showing of
potential harm to BoA, the obvious public interest in such

scrutiny outweighs any interest that BoA may have in maintaining its customers' information private.

c.  Transaction Documents

BoA also seeks protection for information regarding "methods used to structure and market transactions to clients," information "detail[ing] confidential communications with potential or actual investors in a transaction," descriptions of BoA's "pricing strategy and fee arrangements," and "transaction documents."  Having viewed the documents in these categories in camera, it is clear that, in actuality, they can all be categorized as documents that reveal BoA's activities surrounding its extending credit to Parmalat and BoA's acting as a private placement agent for Parmalat's debt on several occasions between 1997 and 2001.  These documents span most of that time period and include BoA's internal discussions concerning how to structure the transactions to make them less risky and more lucrative, the profit the transactions would generate for BoA, BoA's documents that marketed the transactions to potential investors and, finally, the documents memorializing the transactions themselves. BoA refers to these four categories of documents as structuring methods, pricing strategies, communications with potential investors and marketing methods and transaction documents,

respectively.  I shall refer to all four categories of documents collectively as the "transaction documents."

BoA argues that the transaction documents reveal "innovative" methods for methods for structuring, marketing and executing transactions (Keyston Decl. ¶ 7.a, annexed as Ex. B to BoA Nov. 2008 Letter), and that these documents are "akin to recipes or blueprints for manufacturers" (Keyston Decl. ¶ 12.b, annexed as Ex. B to BoA Nov. 2008 Letter), which "could clearly enable [competitors] to copy these transactions for their own use" (Keyston Decl. ¶ 7.c, annexed as Ex. B to BoA Nov. 2008 Letter).  BoA also fears that, if it were to disclose its fee information for the transactions, competitors would "adjust and alter their sales plans and adjust their pricing policies, which m[ight] harm" BoA, and it might "reveal favorable or exclusive terms not available to other Bank customers," which "could result in serious damage to the Bank's negotiating position with other clients" (Keyston Decl. ¶ 9.a, annexed as Ex. B to BoA Nov. 2008 Letter).  BoA's witness further attests that BoA does not reveal the terms of private placement transactions or the fees charged for them to anyone other than the customer whose debt is being sold, and that it has instituted internal policies and procedures prohibiting the dissemination of documents used to market such private placements (Keyston Decl. ¶¶ 7.b, 8.b, 9.a, annexed as Ex. B to BoA Nov. 2008 Letter).

43

I accept BoA's representation that the documents at
issue in these categories are not disclosed to the general
public.  BoA has not made any representation concerning whether
it disclosed the documents in issue to customers and prospective
investors with the agreement that they be maintained in confi-
dence.  Such customers and potential investors would presumably
risk losing the opportunity to participate in the transaction if
they contemporaneously divulged information about the transaction
to others.  However, their incentive to keep the information
confidential is presumably less strong now, more than seven years
after the transactions were completed.  As a result, BoA has made
a weak showing of the secrecy of the information in issue.

As to the value and potential harmfulness of the
information, BoA's showing, like the GT defendants' showing,
fails to address the specific information in the specific series
of transactions in issue, and it fails to explain why the spe-
cific types of transactions in issue would potentially be copied
by any competitor today.  Methods of structuring and marketing
transactions, like the GT defendants' strategic decisionmaking,
are necessarily fact-specific.  The components of complex finan-
cial transactions, unlike recipe ingredients, cannot be readily
copied because they are not suitable for all types of companies.
Furthermore, even recipes are not protectible as trade secrets if
they are commonly known in the industry.  BoA has failed to

44

explain what particular information about the particular transac-
tion structures and marketing techniques used here are not
already public, are not already commonly known in the industry,
and yet are valuable to competitors now.  Furthermore, in the
cases most closely on point cited by BoA, the courts protected
companies' specific plans and strategies for marketing and
selling their specific products from being disclosed to competi-
tors.  See, e.g., Sullivan Mktg., Inc. v. Valassis Commc'ns,
Inc., supra, 1994 WL 177795 at *1-*2 (protecting pricing and
marketing strategies of maker of advertising booklets for inser-
tion in newspapers); Encyclopedia Brown Prods., Ltd. v. Home Box
Office, Inc., supra, 26 F. Supp.2d at 614 (protecting programming
strategy and surveys of customer viewing habits).[14]  BoA has not

_____

[14]BoA also cites to several cases in which the courts did
not analyze their reasons for protecting particular information,
e.g., Brookdale Univ. Hosp. & Med. Center, Inc. v. Health Ins.
Plan of Greater N.Y., 07-CV-1471 (RRM)(LB), 2008 WL 4541014 at *2
(E.D.N.Y. Oct. 7, 2008) (court's protected unspecified "propri-
etary or sensitive business information," under confidentiality
order that defined the term to include financial data, marketing
and advertising data and plans, strategic or long-range plans,
internal cost data, performance data, customer or vendor data,
contracts and agreements with third parties, or technological
data)); Wal-Mart Stores v. Gen. Power Prods., LLC, 1:06 CV 143,
2006 U.S. Dist. LEXIS 31315 at *2 (W.D. Ark. May 15, 2006) (court
order preventing disclosure of "any Information which [either
party] deems private and/or confidential including, without
limit to:  . . . sales strategy); Kohler v. Albright, 3:03-CV-0609,
2003 WL 22697213 at *1 (N.D. Ind. Nov. 12, 2003) (stating in
passing that sales strategy may be confidential, but case in-
volved motion to dismiss for lack of subject matter jurisdic-
tion), or in which the parties agreed that the information was
confidential, Vesta Corset Co., v. Carmen Founds., Inc., 97 Civ.
(continued...)

made a similar specific showing of the economic value of their information or a specific showing of potential economic harm that resembles the harm in those cases.

With respect to fee information, BoA's showing fails for essentially the same reason. It has not come forward with specific facts showing that disclosure of the specific fees that it charged to Parmalat for this series of transactions would tend to be damaging now, seven to fourteen years after the fact. Whether pricing information is a trade secret is extremely fact-specific. Lehman v. Dow Jones & Co., Inc., 783 F.2d 285, 297-98 & n.16 (2d Cir. 1986). Economic circumstances may change. Potential parties to a transaction may change. BoA's statements that competitors might "adjust" their sales and pricing, and that various clients might be irate at the "favorable or exclusive terms" in the transactions, might have been compelling if they had been coupled with citations to specific information contained in the documents that would cause such reactions if it were disclosed today.

BoA again cites to Encyclopedia Brown Productions, Ltd. v. Home Box Office, Inc., supra, 26 F. Supp.2d at 608-09, which found, among other things, that the rates, including discounts, actually paid by individual cable operators to HBO ought to be

_____

(...continued)
5139 (WHP), 1999 WL 13257 at *2, *4 (S.D.N.Y. Jan. 13, 1999). I
therefore do not find these cases helpful to my analysis.

protected from public disclosure because of the cable operators'
testimony that "public access to such information would give [the
cable operators'] competitors a bargaining advantage in negotiat-
ing with HBO and, in addition, would impede the cable operator
defendants' ability effectively to bargain with suppliers of
cable programming other than HBO."  Encyclopedia Brown Prods.,
Ltd. v. Home Box Office, Inc., supra, 26 F. Supp.2d at 609.  The
court also protected the rates that HBO charged to operators
because testimony showed that disclosure "would hinder HBO's
ability to obtain favorable rates from cable operators and other
service providers" and "would expose HBO's cost and profit
structure and, thereby, threaten HBO's competitive position."
Encyclopedia Brown Prods., Ltd. v. Home Box Office, Inc., supra,
26 F. Supp.2d at 609.  Thus, Encyclopedia Brown Productions
included a more detailed and fact-specific showing of the current
value of the pricing information in issue than the showing made
by BoA.  BoA's bare statements concerning what competitors
"might" do, without additional fact-specific testimony tying the
statements to specific information in the documents in issue, are
not sufficient to constitute good cause to maintain the confiden-
tiality of its fee information.

47

d.  "Miscellaneous" Documents

Finally, BoA seeks to protect 23 documents which it has categorized only as "miscellaneous."  Of these documents, only nine are truly in issue.[15]  Of these nine documents, BoA objects to seven[16] of the documents because they are documents or testimony in which the author of the document or the witness quotes from or discusses a confidential document that Lead Plaintiffs have not sought to unseal.  BoA makes no other factual showing that the documents independently reveal secret or valuable information or otherwise should remain under seal.  However, the fact that the documents refer to or are based on unchallenged confidential documents is not, without more, sufficient to prevent disclosure.  BoA must still meet its burden of showing

_____

[15]Five of the 23 miscellaneous documents are completely in Italian, and BoA has not provided an English translation of the documents.  In addition, BoA has not responded to Lead Plaintiffs' challenge with an explanation for why nine of the 23 documents should remain under seal:  BoA failed to include the documents in its spreadsheet, though Lead Plaintiffs did challenge their continued confidential treatment (Compare Lead Plaintiffs' Spreadsheet, annexed as Ex. A to Pls.' Jan. 2009 Letter, at 35-38, with BoA List of Documents by Confidential Category, annexed as Ex. B to BoA Feb. 2009 Letter, at 16-18).  As a result, BoA has not shown good cause, or any cause, to keep any of these 14 documents under seal.

[16]The seven documents in question are:  McCormick Dep. 1456:1-1457:19 & 5943:13-5949:13, Caldwell Dep. 212:12-213:25, Dharan 30(b)(6) Dep. 1862:1-17, 1941:3-10 & 1950:7-1951:2, and DX 20195.

good cause to maintain the documents under seal.  BoA has not done so with respect to any of the seven documents.

The remaining two documents both fall into the "transaction documents" category already discussed:  the Davis Deposition at 584:7 through 587:14 discusses earlier and later versions of one of the BoA's Brazilian Parmalat transactions, and DX 9131 contains the minutes of a 1998 board meeting of a Parmalat entity approving several different agreements amounting to a complex transaction of the same type discussed above.  Because BoA has not provided any additional substantive showing of the secrecy or value of these documents, it has not shown good cause to keep them under seal for the same reasons stated in Part III.E.3.c, above, discussing BoA's "transaction documents."

4.  <u>Summary</u>

In sum, the GT defendants and BoA have not made the specific showing of good cause necessary to rebut Lead Plaintiffs' challenge to the confidentiality of any of the documents specified in Lead Plaintiffs' January 15, 2009 Letter. They have failed to show that the disclosure of any of the particular documents in issue would reveal business information that is sufficiently valuable and secret that it could cause competitive harm to them now.

49

IV.  Conclusion

Accordingly, for all the foregoing reasons, Lead Plaintiffs' motion is granted.  Defendants' designations of confidentiality are stricken with respect to all documents listed on the schedules annexed hereto.  The Citi defendants' designations of confidentiality are also stricken with respect to all documents produced by them and submitted by the parties in connection with the parties' summary judgment motions.

Dated:  New York, New York
        June 1, 2009

                              SO ORDERED

                              HENRY PITMAN
                              United States Magistrate Judge


Copies transmitted to:

James J. Sabella, Esq.
Grant & Eisenhofer
Chase Manhattan Centre
1201 North Market Street
Wilmington, Delaware  19801

James L. Bernard, Esq.
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York  100381

Christopher M. Brubaker, Esq.
Kittredge Donley Elson
  Fullem & Embick
Suite 200

400 Market Street
Philadelphia, Pennsylvania  19106

Michael J. Dell, Esq.
Kramer Levin Naftalis & Frankel, LLP
1177 Avenue of the Americas
New York, New York 10036

Alan C. Geolot, Esq.
Sidley Austin LLP
1501 K Street, N.W.
Washington, D.C.  20005

George A. Schieren, Esq.
Clifford Chance US, LLP
31 West 52nd Street
New York, New York  10019

## GT Defendants' Documents

| Document Type | Document Number |
|---|---|
| Deposition Exhibit | 1225 |
| Deposition Exhibit | 1556 |
| Deposition Exhibit | 1217 |
| Deposition Exhibit | 1215 |
| Deposition Exhibit | 1032 |
| Deposition Exhibit | 1029 |
| Deposition Exhibit | 1028 |
| Deposition Exhibit | 1219 |
| Deposition Exhibit | 1374 |
| Deposition Exhibit | 1072 |
| Deposition Exhibit | 1200 |
| Deposition Exhibit | 1081 |
| Deposition Exhibit | 1082 |
| Deposition Exhibit | 1083 |
| Deposition Exhibit | 1097 |
| Deposition Exhibit | 1086 |
| Deposition Exhibit | 1383 |
| Deposition Exhibit | 1731 |
| Document | GT-UK000945 |
| Document | GT-UK000091-93 |

## GT Defendants' Documents

| Document | GT-UK000937-939 |
|---|---|
| Document | PP00444628-444644 |
| Document | PP00444667 |
| Document | GT-UK00006-119 |
| Document | GT-UK000118-119 |
| Document | GT-UK000900-902 |
| Document | GTUK000898-1014 |
| Document | GT-UK00060 |
| Document | GT-UK 000033-34 |
| Document | GTI-0057153-57160 |
| Document | GTI-0041396-41398 |
| Testimony | Akerblom 8/10/2006 130:19-131:9 |
| Testimony | Akerblom 8/10/2006 143:23-144:15 |
| Testimony | Akerblom 8/10/2006 179:5-181:3 |
| Testimony | Akerblom 8/10/2006 234:14-21 |
| Testimony | Akerblom 8/10/2006 234:3-235:7 |
| Testimony | Akerblom 8/10/2006 234:4-21 |
| Testimony | Akerblom 8/10/2006 255:2-20 |
| Testimony | Barber 9/27/2006 176:5-16 |
| Testimony | Barber 9/27/2006 217:9-15 |
| Testimony | Esposito 10/6/2006 104:17-105:4 |
| Testimony | Esposito 10/6/2006 255:10-258:6 |
| Testimony | Esposito 10/6/2006 256:9-260:2 |
| Testimony | Esposito 10/6/2006 259:14-260:4 |
| Testimony | Esposito 10/6/2006 292:15-293:3 |
| Testimony | Esposito 10/6/2006 295:22-298:2 |

**GT Defendants' Documents**

| Testimony | Esposito 10/6/2006 299:22-301:10 |
|-----------|----------------------------------|
| Testimony | Esposito 10/6/2006 307:21 – 310:4 |
| Testimony | Esposito 10/6/2006 309:5-13 |
| Testimony | Hartley, M. 03/02/2007 109:8-25 |
| Testimony | Hartley, M. 03/02/2007 183:22-184:6 |
| Testimony | Hartley, M. 03/02/2007 190:18-23 |
| Testimony | Kleckner 11/3/2006 51:25-58:4 |
| Testimony | Kleckner 11/3/2006 95:6-97:9 |
| Testimony | McDonnell (GTI 30(B)(6)) 2/15/2007 79:21-25 |

**Bank of America Documents**

| Document Type | Document Number |
|---|---|
| Deposition Exhibit | 106 |
| Deposition Exhibit | 136 |
| Deposition Exhibit | 154 |
| Deposition Exhibit | 189 |
| Deposition Exhibit | 190 |
| Deposition Exhibit | 213 |
| Deposition Exhibit | 251 |
| Deposition Exhibit | 252 |
| Deposition Exhibit | 347 |
| Deposition Exhibit | 349 |
| Deposition Exhibit | 356 |
| Deposition Exhibit | 438 |
| Deposition Exhibit | 441 |
| Deposition Exhibit | 442 |
| Deposition Exhibit | 457 |
| Deposition Exhibit | 496 |
| Deposition Exhibit | 557 |
| Deposition Exhibit | 558 |
| Deposition Exhibit | 559 |

**Bank of America Documents**

| | |
|---|---|
| Deposition Exhibit | 565 |
| Deposition Exhibit | 566 |
| Deposition Exhibit | 568 |
| Deposition Exhibit | 569 |
| Deposition Exhibit | 570 |
| Deposition Exhibit | 576 |
| Deposition Exhibit | 577 |
| Deposition Exhibit | 580 |
| Deposition Exhibit | 581 |
| Deposition Exhibit | 582 |
| Deposition Exhibit | 583 |
| Deposition Exhibit | 585 |
| Deposition Exhibit | 586 |
| Deposition Exhibit | 587 |
| Deposition Exhibit | 590 |
| Deposition Exhibit | 591 |
| Deposition Exhibit | 592 |
| Deposition Exhibit | 593 |
| Deposition Exhibit | 595 |
| Deposition Exhibit | 596 |
| Deposition Exhibit | 597 |

**Bank of America Documents**

| | |
|---|---|
| Deposition Exhibit | 598 |
| Deposition Exhibit | 599 |
| Deposition Exhibit | 600 |
| Deposition Exhibit | 601 |
| Deposition Exhibit | 602 |
| Deposition Exhibit | 603 |
| Deposition Exhibit | 610 |
| Deposition Exhibit | 611 |
| Deposition Exhibit | 616 |
| Deposition Exhibit | 618 |
| Deposition Exhibit | 628 |
| Deposition Exhibit | 634 |
| Deposition Exhibit | 636 |
| Deposition Exhibit | 637 |
| Deposition Exhibit | 638 |
| Deposition Exhibit | 639 |
| Deposition Exhibit | 641 |
| Deposition Exhibit | 660 |
| Deposition Exhibit | 661 |
| Deposition Exhibit | 663 |
| Deposition Exhibit | 688 |

**Bank of America Documents**

| | |
|---|---|
| Deposition Exhibit | 710 |
| Deposition Exhibit | 801 |
| Deposition Exhibit | 804 |
| Deposition Exhibit | 805 |
| Deposition Exhibit | 806 |
| Deposition Exhibit | 1355 |
| Deposition Exhibit | 4145 |
| Deposition Exhibit | 4188 |
| Deposition Exhibit | 4189 |
| Deposition Exhibit | 4315 |
| Deposition Exhibit | 4321 |
| Deposition Exhibit | 4398 |
| Deposition Exhibit | 4404 |
| Deposition Exhibit | 4408 |
| Deposition Exhibit | 4410 |
| Deposition Exhibit | 4411 |
| Deposition Exhibit | 4412 |
| Deposition Exhibit | 4413 |
| Deposition Exhibit | 4416 |
| Deposition Exhibit | 4421 |
| Deposition Exhibit | 4426 |

## Bank of America Documents

| | |
|---|---|
| Deposition Exhibit | 4428 |
| Deposition Exhibit | 4429 |
| Deposition Exhibit | 4432 |
| Deposition Exhibit | 4435 |
| Deposition Exhibit | 4437 |
| Deposition Exhibit | 4439 |
| Deposition Exhibit | 4440 |
| Deposition Exhibit | 4443 |
| Deposition Exhibit | 4445 |
| Deposition Exhibit | 4452 |
| Deposition Exhibit | 4453 |
| Deposition Exhibit | 4455 |
| Deposition Exhibit | 4459 |
| Deposition Exhibit | 4497 |
| Deposition Exhibit | 9042 |
| Deposition Exhibit | 9131 |
| Deposition Exhibit | 9191 |
| Deposition Exhibit | 9202 |
| Deposition Exhibit | 9204 |
| Deposition Exhibit | 9206 |
| Deposition Exhibit | 9209 |

**Bank of America Documents**

| | |
|---|---|
| Deposition Exhibit | 10013 |
| Deposition Exhibit | 10019 |
| Deposition Exhibit | 10050 |
| Deposition Exhibit | 20195 |
| Document | BOFA-0011444 |
| Document | BOFA-0536674-536764 |
| Document | BOFA-0769903-769990 |
| Document | BOFA-1965630-1965739 |
| Document | BOFA-1972567-197572 |
| Document | BOFA-2002617-2002619 |
| Document | BOFA-2009942-2010052 |
| Document | BOFA-2022498 |
| Document | BOFA-2027760-2027761 |
| Document | BOFA-2057484-2057485 |
| Document | BOFA-2059459-2059539 |
| Document | BOFA-2072304-2072306 |
| Document | BOFA-2072348-2072349 |
| Document | BOFA-2238238-2238239 |
| Document | BOFA-2258079-2258093 |
| Document | BOFA-2453908-2453913 |
| Document | BOFA-2454072-2454154 |

**Bank of America Documents**

| | |
|---|---|
| Document | BOFA-2475355-58 (Ex. 4496) |
| Document | P01173220-1173317 |
| Document | P02260820-02260828 |
| Document | P02785846-2785848 |
| Document | P03420823 |
| Document | P03860997 |
| Document | P03861215-3861222 |
| Document | P04572208-4572219 |
| Document | P04898179-4898190 |
| Testimony | Bondi<br>97:6-12 |
| Testimony | Bouhadiba 183:23-186:23 |
| Testimony | Bouhadiba 222:14-223:11 |
| Testimony | Bouhadiba 50:12-23 |
| Testimony | Bouhadiba 51:18-23 |
| Testimony | Caldwell 212:12-213:25 |
| Testimony | Chalk 253:1-255:23 |
| Testimony | Chalk 272:4-6 |
| Testimony | Chalk 279:3-18 |
| Testimony | Chalk 324:15-19 |
| Testimony | Chalk 325:3-11 |

**Bank of America Documents**

| | |
|---|---|
| Testimony | Davis 584:7 - 587:14 |
| Testimony | Dharan 30(b)(6) 1862:1-17 |
| Testimony | Dharan 30(b)(6) 1941:3-10 |
| Testimony | Dharan 30(b)(6) 1950:7-1951:2 |
| Testimony | Dharan 30(b)(6) 1806:2-17 |
| Testimony | Dharan 30(b)(6) 1923:25-1924:22 |
| Testimony | Dharan 30(b)(6) 2599:5-2608:17 |
| Testimony | Dharan 30(b)(6) 2608:18-2610:12 |
| Testimony | Dharan 30(b)(6) 2611:2-2615:10 |
| Testimony | Dharan 30(b)(6) 2621:13-2622:12 |
| Testimony | Donzelli 73:12-23 |
| Testimony | Lau 1005:11-15 |
| Testimony | Lau 1028:15-1030:18 |

8

**Bank of America Documents**

| | |
|---|---|
| Testimony | Lau 1029:15-23 |
| Testimony | Lau 434:24-436:2 |
| Testimony | Lau 701:2-21 |
| Testimony | Lau 758:5-759:17 |
| Testimony | Lau 957:18-959:10 |
| Testimony | Lau 974:14-25 |
| Testimony | Lau 974:7-13 |
| Testimony | MacRae 156:3-15 |
| Testimony | MacRae 335:9-13 |
| Testimony | McCormick 1449:3-25 |
| Testimony | McCormick 1456:1-1457-19 |
| Testimony | McCormick 4201:11-25 |
| Testimony | McCormick 4202:1-20 |
| Testimony | McCormick 4347:6-12 |
| Testimony | McCormick 5943:13-5949:13 |